## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FELD ENTERTAINMENT, INC.,**<br>**8607 Westwood Center Drive**<br>**Vienna, VA 22182** )<br>)<br>)<br>) | |
|     **Plaintiff,** )<br>) | |
|         v. )<br>) | |
| **AMERICAN SOCIETY FOR THE**<br>**PREVENTION OF CRUELTY TO**<br>**ANIMALS,**<br>**424 East 92nd Street**<br>**New York, NY 10128-6804,** )<br>)<br>)<br>)<br>)<br>) | **Civil Action No. _____**<br><br>**DEMAND FOR A JURY TRIAL** |
| **ANIMAL WELFARE INSTITUTE,**<br>**1007 Queen Street**<br>**Alexandria, VA 22314,** )<br>)<br>)<br>) | |
| **THE FUND FOR ANIMALS,**<br>**200 West 57th Street**<br>**New York, NY 10019,** )<br>)<br>)<br>) | |
| **TOM RIDER,**<br>**600 East Holland St.**<br>**Washington, IL 61571,** )<br>)<br>)<br>) | |
| **ANIMAL PROTECTION INSTITUTE,**<br>**1122 S Street**<br>**Sacramento, CA 95814,** )<br>)<br>)<br>) | |
| **WILDLIFE ADVOCACY PROJECT,**<br>**1601 Connecticut Avenue, NW, Suite 700**<br>**Washington, DC 20009-1035,** )<br>)<br>)<br>) | |
|     **Defendants.** )<br>) | |

## COMPLAINT OF FELD ENTERTAINMENT, INC.

## I.    JURISDICTION AND VENUE

    1.    This Complaint is brought pursuant to the provisions of the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* This Court has subject

matter jurisdiction over the claims for relief arising under RICO pursuant to 18 U.S.C. § 1964(c).

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965.

2.     Feld Entertainment, Inc. ("FEI") previously sought to assert the causes of action
alleged in this Complaint as counterclaims in the ongoing case, *American Society for the
Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus, et al.*, Civil
Action No. 03-2006 (EGS) (D.D.C.), previously filed as Civil Action No. 00-1641 (hereinafter
the "ESA Action").  FEI's Motion for Leave to Amend its Answers to Assert Additional Defense
and RICO Counterclaim (Docket No. 121) was denied on August 23, 2007 (Docket No. 176).  In
view of that action, FEI now brings its claims as an independent, unrelated lawsuit.

## II.     NATURE OF THE ACTION

3.     This is a civil action brought by FEI pursuant to RICO against the American
Society for the Prevention of Cruelty to Animals ("ASPCA"), Animal Welfare Institute
("AWI"), The Fund For Animals ("FFA"), Animal Protection Institute ("API"), Tom Rider
("Rider") and the Wildlife Advocacy Project ("WAP").

4.     From on or about 2001, continuing through the filing of this Complaint, ASPCA,
AWI, FFA, API, Rider and WAP, and others known and unknown, including agents and
employees of defendants, collectively have constituted an associated-in-fact enterprise (the
"Enterprise") within the meaning of 18 U.S.C. § 1961(4).  ASPCA, AWI, FFA, API, Rider and
WAP, together with others known and unknown, each participated in the operation and
management of the Enterprise.

5.     From on or about 2001, continuing through the filing of this Complaint, ASPCA,
AWI, FFA, API, Rider and WAP conducted or participated, directly or indirectly, in the conduct
of the Enterprise's affairs through a pattern of racketeering activity in violation of § 1962(c).

6.      From on or about 2001, continuing through the filing of this Complaint, ASPCA, AWI, FFA, API, Rider and WAP conspired to conduct the affairs of the Enterprise through a pattern of racketeering activity in violation of §1962(d).

7.      Together and acting in concert with others as hereinafter described, ASPCA, AWI, FFA, API, Rider and WAP have perpetrated and continue to perpetrate a scheme to permanently ban Asian elephants in circuses and to defraud FEI of money and property, with the ultimate objective of banning Asian elephants in all forms of entertainment and captivity.  To carry out this scheme, ASPCA, FFA, API, Rider and WAP conspired to conduct and conducted the Enterprise through a pattern of, among other things, bribery and illegal gratuity payments (in violation of both state and federal law), obstruction of justice, mail fraud, and wire fraud.

8.      At various times during the past six years, ASPCA, AWI, FFA and API, facilitated by WAP and the law firm Meyer, Glitzenstein & Crystal ("MGC"), have been providing funding to Rider for his participation as a plaintiff and as a key fact witness in the ESA Action, as well as a witness testifying on behalf of legislative proposals advanced or supported by certain of the defendants before the United States Congress and various state legislatures concerning captive Asian elephants in the United States.

9.      ASPCA, AWI, FFA, API and Rider are plaintiffs in the ESA Action, and FEI is a defendant.  Rider is essential to ASPCA, AWI, FFA and API's pursuit of the ESA Action against FEI because, without him, ASPCA, AWI, FFA and API would not have standing to bring that lawsuit.  Rider's alleged injuries are the sole reason that the ESA Action continues and form the sole basis upon which ASPCA, AWI, FFA and API can obtain the relief that they request in the ESA Action.

10.     Since at least 2001, Rider has received and accepted, and Rider presently continues to receive and accept: (1) payments directly from ASPCA, AWI, FFA and API and (2) payments from ASPCA, AWI, FFA and API that are funneled through MGC and/or WAP. These payments are Rider's principal, if not sole, source of income.  Rider has not held an identifiable job since May 2001.  Rider does not collect unemployment compensation, food stamps or Aid for Families with Dependent Children.  From May 2001 through and including the present date, virtually all of his living expenses have been, and continue to be, defrayed by ASPCA, AWI, FFA and API either directly or through MGC and/or WAP.

11.     Rider has received funding regularly from one or more of ASPCA, AWI, FFA and API and/or MGC and WAP since May 2001.  Since the funding began, the source of funding to Rider has changed:  ASPCA, AWI, FFA and API have funded, and continue to fund, Rider for varying periods of time.  How Rider has received, and continues to receive, the funding also has changed:  at times ASPCA, AWI, FFA and API have paid Rider directly and at other times ASPCA, AWI, FFA and API's payments have been funneled through MGC or WAP.  But, at least one thing has remained constant:  Rider's livelihood is derived from his services to ASPCA, AWI, FFA and API as a paid plaintiff and key fact witness in the ESA Action and as a legislative witness.

12.     The payments to Rider, as described herein, have totaled more than $100,000.00.  In addition to the cash, Rider has received and accepted non-cash compensation, such as hotel rooms, cell phone use, a video camera, zoom camera equipment and a lap top computer that were paid for by one or all of ASPCA, AWI, FFA, API and WAP.

13.     These payments and benefits to Rider constitute bribery of a witness in violation of 18 U.S.C. § 202(b)(3) and illegal gratuity payments in violation of 18 U.S.C. § 202(c)(2).  The

payments and benefits also violate the bribery laws of Connecticut and Nebraska. These violations of federal and state law are independent predicate acts under 18 U.S.C. § 1961.

14.    Further, Rider's receipt and acceptance of the payments and benefits described above violate the federal bribery statute, 18 U.S.C. § 202(b)(4), and the federal anti-gratuity statute, 18 U.S.C. § 202(c)(3). Rider's receipt and acceptance of the payments and benefits also violate the bribery laws of Connecticut and Nebraska. These violations of federal and state law are independent predicate acts under 18 U.S.C. § 1961.

15.    The payments have been and continue to be sent to and from the following persons: (1) from ASPCA, AWI, FFA and API directly to Rider; (2) from ASPCA, AWI, FFA and API to MGC and/or WAP (that are then funneled to Rider); and (3) from WAP to Rider. The payments are sent and continue to be sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property. Each mailing or wiring of a payment is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

16.    Since receiving and accepting these payments and benefits, Rider's testimony has changed to become more favorable to ASPCA, AWI, FFA and API's position in the ESA Action. Rider's answers to interrogatories and deposition testimony in the ESA Action are inconsistent with and contradict prior statements that Rider made about the same subjects under oath and penalty of perjury. Rider's false testimony under oath amounts to obstruction of justice in violation of 18 U.S.C. § 1503(a), a predicate act under 18 U.S.C. § 1961.

17.    ASPCA, AWI, FFA, API and WAP, together with the encouragement and advice of MGC, devised a scheme to hide the fact that Rider was on their payroll and to create the false

image of Rider as a purported volunteer championing Asian elephant welfare. The payments to Rider have been, and continue to be, euphemistically and falsely labeled as "grants" in order to avoid federal and state income tax consequences for Rider. From 2002 to 2005, WAP sent Rider Forms 1099 that characterized its payments to Rider as "non-employee compensation." However, since at least 2000, Rider has failed to file any personal income tax returns with the United States Internal Revenue Service ("IRS") or appropriate state taxing authorities. Rider has failed to declare as income any of the substantial payments he has received from ASPCA, AWI, FFA, API or WAP.

18.     After discovery began in the ESA Action, ASPCA, AWI, FFA, API, Rider and WAP attempted to cover-up the payment scheme. Since FEI filed its Motion to Compel Documents Subpoenaed from the Wildlife Advocacy Project ("Motion to Compel Documents Subpoenaed from WAP") on September 7, 2006, MGC and/or WAP have attempted to hide the fact that, in reality, WAP is the alter ego of MGC. In addition, after FEI filed its Motion to Compel Documents Subpoenaed from WAP, API changed the characterization of its "grants" to WAP from "grants" in "support of the Ringling Brothers and Barnum & Bailey Case" to "grants" in "support of the Ringling Brothers and Barnum & Bailey PR efforts."

19.     Further, through false answers to deposition questions and false responses to interrogatories in the ESA Action, AWI has attempted to deflect attention from its involvement in and knowledge of the Rider funding scheme. Rider also has submitted a false interrogatory answer in the ESA Action that was designed to conceal the payments he received and still receives. These false statements amount to obstructions of justice in violation of 18 U.S.C. § 1503(a), a predicate act under 18 U.S.C. § 1961.

20.     The payment scheme, which was devised and carried out with the encouragement and advice of MGC, first became known to FEI in June 2004 when one or more of the defendants submitted their discovery responses in the ESA Action.

## III.    THE PARTIES

### A.     PLAINTIFF

21.     Plaintiff Feld Entertainment, Inc. ("FEI") is a corporation organized under the laws of Delaware, with its principal place of business located in Vienna, Virginia.  FEI produces live circus shows under the trade name "Ringling Bros. and Barnum & Bailey."

### B.     DEFENDANTS

22.     Defendant American Society for the Prevention of Cruelty to Animals ("ASPCA") is a non-profit membership organization which professes to be dedicated to eliminating the abuse, neglect, and exploitation of all animals, including animals used in entertainment.  According to its Form 990 for the 2005 calendar year, ASPCA's total revenue was $78,544,143.00 and at year end, its net assets or fund balances were $93,395,691.00.

23.     Defendant Animal Welfare Institute ("AWI") is a non-profit membership organization which professes to be dedicated to eliminating pain and fear inflicted by people on animals, including animals used for entertainment purposes.  According to its Form 990 for the tax year beginning July 1, 2004 and ending on June 30, 2005, AWI's total revenue was $9,312,363.00 and at year end, its net assets or fund balances were $12,730,212.00.

24.     Defendant The Fund for Animals ("FFA") is a non-profit membership organization which professes to be dedicated to eliminating the abuse, neglect, and exploitation of animals, including those used for entertainment purposes.  FFA and the Humane Society of the United States ("HSUS") merged effective January 1, 2005.  After the merger, both groups

operated their advocacy programs under the banner of the HSUS.  According to its Form 990 for the calendar year 2005, HSUS's total revenue was $124,891,122.00 and at year end, its net assets or fund balances were $200,058,734.00.

25.     Defendant Tom Rider ("Rider") worked for FEI from June 1997 until November 1999 in the position of "barn man."  Under the supervision of others, Rider cleaned up after certain FEI elephants and gave them food and water.

26.     Defendant Animal Protection Institute ("API") is a non-profit membership organization which professes to be dedicated to eliminating the abuse, neglect, and exploitation of animals, including animals used in entertainment.  According to its Form 990 for the 2005 calendar year, API's total revenue was $3,529,201.00 and at year end, its net assets or fund balances were $4,673,863.00.

27.     Defendant Wildlife Advocacy Project ("WAP") is an organization claiming to be a non-profit advocacy group.  WAP was founded by Katherine Meyer ("Meyer") and Eric Glitzenstein ("Glitzenstein") of MGC.  WAP is the lobbying and advocacy extension of MGC. WAP is the alter ego of Meyer, Glitzenstein, and MGC, together and separately.  Glitzenstein serves or has served as the President of WAP.  Meyer serves or has served as the Secretary of WAP.  Glitzenstein and Meyer serve or have served as two of WAP's Directors.  Glitzenstein and Meyer are active in daily management and supervision of WAP.  MGC and WAP share the same address and facsimile numbers.  Name plates for both MGC and WAP hang on the same office door to Suite 700, 1601 Connecticut Avenue, N.W., Washington, D.C. 20009.  The WAP and MGC websites are linked.  Most, if not all, of WAP's advocacy projects are related to cases litigated by MGC.

## IV.   FACTUAL BACKGROUND AND COMMON ALLEGATIONS

## A.   BACKGROUND INFORMATION REGARDING THE ESA ACTION

28.     The original complaint in the ESA Action was numbered as Civil Action No. 00-1641 and was filed on July 11, 2000, on behalf of, among others, ASPCA, AWI, FFA and Rider. These same parties filed a Second Amended Complaint on March 13, 2001 which was dismissed by the Court on June 29, 2001 on the ground that plaintiffs therein lacked standing to sue.  On February 4, 2003, the U.S. Court of Appeals for the District of Columbia Circuit reversed this dismissal, ruling that, assuming the truth of the allegations in the Second Amended Complaint, Rider had standing to sue.  The standing of ASPCA, AWI and FFA, independent of Rider's claims, was not addressed.

29.     ASPCA, AWI, FFA and Rider filed another ESA complaint against FEI in this Court on September 26, 2003 which was numbered Civil Action. No. 03-2006.  On November 25, 2003, the original action, Civil Action No. 00-1641, was dismissed without prejudice to the prosecution of an identical case, Civil Action No. 03-2006.  Since that time, the ESA Action has proceeded as a single civil action under No. 03-2006.  On February 23, 2006, API was added as a plaintiff to the ESA Action pursuant to plaintiffs' Supplemental Complaint.

30.     Plaintiffs in the ESA Action claim that FEI's treatment of its Asian elephants violates the "taking" prohibitions of section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B) and the Fish and Wildlife Service's ("FWS") regulations implementing the ESA, 50 C.F.R. § 17.21.  Plaintiffs in the ESA Action seek an order: (1) enjoining FEI from, *inter alia*, violating the ESA and the FWS's implementing regulations; (2) directing FEI to forfeit possession of its elephants; (3) awarding plaintiffs their reasonable attorney's fees and costs for this action pursuant to the ESA's fee-shifting provision for citizen suits, 16 U.S.C. § 1540(g)(4); and (4) granting plaintiffs any other relief that this Court deems just and proper.

**B.      THE PAYMENTS TO TOM RIDER**

31.     ASPCA, AWI, FFA and API are paying Rider for his participation as a plaintiff and as a key fact witness in the ESA Action.  MGC encouraged and advised ASPCA, AWI, FFA and API to make these payments to Rider, some of which occurred through MGC and through WAP.

32.     At all times since the original complaint in the ESA Action was filed, Rider has received funding from one or several of the plaintiffs named in the ESA Action.  At the time that the original complaint was filed on July 11, 2000, Rider was employed as a "security guard" by one of the plaintiffs named in the original complaint.  Rider remained in this position as a "security guard" until May 2001 – shortly after this former plaintiff voluntarily withdrew with prejudice from the ESA Action in January 2001.  This former plaintiff told Rider that, after its voluntary withdrawal from the ESA Action, Rider could not remain on its "payroll" as a "security guard" and continue to speak out against FEI.  At this point, in May 2001, the funding of Rider transitioned to the remaining named plaintiffs.

33.     At all times since May 2001, Rider has received steady and continuous funding by and/or through ASPCA, AWI, FFA, API, WAP and MGC.

34.     These payments to Rider constitute bribery of a witness in violation of 18 U.S.C. § 202(b)(3) and illegal gratuity payments in violation of 18 U.S.C. § 202(c)(2), which are independent predicate acts under 18 U.S.C. § 1961.

35.     Rider's receipt and acceptance of the payments also violate the federal bribery statute, 18 U.S.C. § 202(b)(4), and federal anti-gratuity statute, 18 U.S.C. § 202(c)(3).  These violations are independent predicate acts under 18 U.S.C. § 1961.

36.     The mechanics of these payments to Rider and Rider's receipt and acceptance of these payments are detailed below.

37.     Rider quit his job with FEI in November 1999. His employment with FEI was the last job that Rider had for which he has reported any income to, or filed an income tax return with, the IRS or any state or local taxing authority or agency. After holding one or more interim positions of employment after his job with FEI, Rider began to receive payments from one or more of ASPCA, AWI or FFA in or about May 2001.

38.     In or about May 2001, representatives of ASPCA, AWI, and FFA met to discuss the mechanism for funding Rider. During these discussions, ASPCA, AWI, and FFA jointly agreed to pay Rider $3,000.00 for two months of what Rider claimed were "expenses." In reality, this payment was Rider's livelihood as he had no other job or source of income. This scheme of funding Rider's livelihood continued for the next six years through and including the present date.

39.     From and after May 2001, through approximately the end of 2002, ASPCA paid Rider at least $47,400.00. In 2003, ASPCA determined that it could no longer provide financial assistance to Rider due to budgetary restraints. At that point, AWI and FFA assumed the task of paying Rider. In order to facilitate these funding efforts, MGC encouraged and advised ASPCA, FFA and AWI to donate funds and to solicit donations for the Rider funding through WAP in furtherance of the unlawful payment scheme and conspiracy.

40.     From and after 2003 through approximately April 2005, AWI and FFA paid Rider at least $17,000.00.

41.     API joined the ESA Action in February 2006 and became another source of money for Rider.  From April 2005 to January 2007, API made nearly $10,000.00 in payments to WAP, some or all of which ultimately was funneled to Rider.

## WAP'S PAYMENTS TO RIDER

42.     From March 2001 to September 2005 alone, WAP made at least 193 expenditures on behalf of Rider.  To date, WAP has received at least twelve payments from ASPCA, AWI, FFA and API that were intended to go to Rider.

*WAP's Cash Payments to Rider*

43.     According to the Forms 1099 that WAP issued to Rider, WAP's cash payments to Rider from 2002 through 2005 alone total $72,649.34.  WAP paid Rider $7,777.34 in 2002; $7,336.00 in 2003; $23,940.00 in 2004; and $33,600.00 in 2005.  All of this money was denominated "non-employee compensation" by WAP.  Rider declared none of this money as income on any tax return with the federal or any state government.  Although the precise amount remains to be determined in discovery, the amount of money that Rider received in 2006 from WAP equaled or exceeded the amount that he received from WAP in 2005.

*WAP's 2002 Expenditures and ASPCA's $6,000 "Grant"*

44.     From January 15, 2002 until March 12, 2002, WAP paid Rider at least nine times. The payments were made approximately once a week and ranged from $441.00 to $1,639.34. WAP listed the payments on its books in an account labeled "media" and under the heading "elephants."

45.     At least some of WAP's payments to Rider from January 15, 2002 to March 12, 2002, were made using a $6,000.00 payment WAP received from ASPCA.

46.     On December 21, 2001, less than one month before WAP began making these payments to Rider, ASPCA made a $6,000.00 "grant" to WAP.  ASPCA's cover letter stated that

the check was "in payment of the 2002 first quarter grant money for the Tom Ryder [sic] project" to "assist in Tom's work on the Ringling Brothers' circus tour and litigation." WAP recorded this payment on its books as a "Grant from ASPCA to WAP for Tom Rider."

47.     WAP's first series of payments to Rider ended on March 12, 2002. At that point, ASPCA assumed the role of paying Rider directly and stopped paying Rider through MGC and/or WAP. ASPCA then paid Rider directly through wire transfers via Western Union.

48.     In addition to taking over the payments to Rider directly, ASPCA paid MGC $526.16 on or about April 4, 2002 as "reimbursement for money given to Tom Rider exceeding the $6,000.00 grant to the Wildlife Advocacy Project for the 1st quarter 2002."

*WAP's Expenditures from 2003 until Present and "Grants" from ASPCA, AWI, FFA and API*

49.     ASPCA paid Rider directly from March 2002 to July 2003. During this time, WAP did not make any payments to Rider.

50.     In July 2003, after ASPCA determined that it could not provide Rider with funding beyond May 2003, WAP resumed its payments to Rider. These payments followed discussions with, and with the knowledge and approval of, FFA, AWI and MGC as well as ASPCA and WAP.

51.     On July 16, 2003 WAP began making systematic payments to Rider.

52.     Although there may have been other "donors" (whose identification WAP has refused to divulge), a significant amount of the money that WAP has paid to Rider since July 2003 has come from AWI, FFA and API. From February 19, 2004 to April 4, 2005, AWI made "grants" and/or "donations" totaling at least $10,500.00 to WAP. Four of AWI's payments were specifically earmarked for Rider. From March 17, 2005 to June 15, 2005, FFA, under the name

HSUS, "donated" $5500.00 to WAP.  Most recently, newly added plaintiff API made "grants" totaling at least $9,951.30 to WAP from April 20, 2005 to January 3, 2007.

53.     These 2004-2007 "grants" and/or "donations" from AWI, FFA, and API to WAP were used, and continue to be used, to fund WAP's disbursements to Rider.

*WAP's Payment of Rider's Expenses*

54.     In addition to the cash payments to Rider described above, WAP has funded other of Rider's expenses by paying them directly or providing them in kind.

55.     From January 8, 2004 and continuing through at least May 3, 2004, WAP paid for Rider's cell phone service from Virgin Mobile.  Payments from WAP to Virgin Mobile with the designation "For Tom Rider usage" total $658.00.  WAP's own accounting records reflect the following payments to Virgin Mobile for Rider's cell phone usage:

| DATE | NAME | MEMO | ACCOUNT | CLASS | AMOUNT |
|------|------|------|---------|-------|--------|
| 1/8/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $83.00 |
| 1/20/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $25.00 |
| 1/22/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $75.00 |
| 2/4/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $50.00 |
| 2/13/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $50.00 |
| 2/23/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $50.00 |
| 3/5/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $75.00 |
| 3/17/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $50.00 |
| 3/29/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $50.00 |
| 4/8/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $75.00 |
| 5/3/2004 | Virgin Mobile | For Tom Rider usage | Cellular phone | Elephants | $75.00 |

56.     WAP continued to make payments to Virgin Mobile from May 3, 2004 through March 14, 2005. After May 3, 2004, the "memo" for the payments to Virgin Mobile changed to read only "cell phone minutes." Beginning in December 2004, WAP began making payments for "cell phone minutes" to Cingular. These payments continued until at least September 13, 2005. All of the "cell phone minutes" payments to Virgin Mobile and Cingular were for Rider's cell phone usage.

57.     On at least one occasion, WAP, through Glitzenstein, directly paid Rider's expenses using WAP's VISA credit card. Glitzenstein used his WAP VISA credit card to pay for Rider's hotel room at the Lincoln Inn in Lincoln, Nebraska from March 17 to March 23,

2005. Rider stayed at the Lincoln Inn while he testified before the Nebraska legislature regarding a bill concerning Asian elephants. WAP paid $421.60 for Rider's hotel room.

### ASPCA, AWI, FFA, AND API'S 'GRANTS" AND/OR "DONATIONS" TO WAP AND WAP'S "GRANTS" TO RIDER THROUGH THE MAILS AND WIRES FURTHER A SCHEME TO DEFRAUD FEI OF MONEY AND PROPERTY

*The Scheme to Defraud FEI of Money and Property*

58.     From on or about May 2001 and continuing to this day, ASPCA, AWI, FFA and API sent "grants" directly to Rider and "grants" and/or "donations" to MGC and/or WAP that were intended as payments to Rider through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property. Each mailing or wiring of a payment by ASPCA, AWI, FFA and API to Rider or to MGC and/or WAP is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961. ASPCA, AWI, FFA and API's payments are described in the paragraphs below.

59.     WAP has used the "grants" and/or "donations" from ASPCA, AWI, FFA and API to send payments to Rider through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property. Each mailing or wiring of a payment by WAP to Rider is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

60.     WAP's "grants" to Rider, which have been and are being funded by ASPCA, AWI, FFA and API, are in reality payments to fund a "plaintiff" who has no actual injury in fact so that ASPCA, AWI, FFA and API can bring the ESA Action. Alone, ASPCA, AWI, FFA and API do not have standing to bring the ESA Action. But, with Rider as a paid plaintiff and key

fact witness -- with a contrived injury in fact -- the ESA Action has continued for more than six years. These payments to Rider by ASPCA, AWI, FFA and API, which have been funneled through MGC and/or WAP, are illegal under the federal bribery statute, 18 U.S.C. § 202(b), and the federal anti-gratuity statute, 18 U.S.C. 202(c), and are impermissible under District of Columbia Rules of Professional Conduct 1.8(d) and 3.4(b)

61.     ASPCA, AWI, FFA, API, Rider and WAP, with the encouragement and advice of MGC, carried out the illegal and ethically improper payment scheme with the intent to defraud FEI of money and property by forcing it to defend a complaint that would otherwise not exist -- the ESA Action -- at great expense for more than six years.

62.     Acting in concert, ASPCA, AWI, FFA, API, Rider and WAP, with the encouragement and advice of MGC, devised a scheme to hide the fact that Rider was on their payroll and to create the false image of Rider as a purported volunteer championing Asian elephant welfare. ASPCA, AWI, FFA, API, Rider and WAP, with the encouragement and advice of MGC, have falsely characterized the payments as "grants" for "media expenses" in order to hide the illegal and ethically improper payment scheme and to avoid federal and state income tax consequences for Rider.

63.     Since at least 2000, Rider has failed to file any personal income tax returns with the IRS or appropriate state taxing authorities. Rider has failed to declare as income any of the substantial payments he has received from ASPCA, AWI, FFA, API, and WAP. If Rider did declare the illegal and ethically improper payments as income, he would have been required to pay federal and state incomes taxes on the payments. In turn, ASPCA, AWI, FFA and API would have had to pay Rider even more money to further their scheme to deprive FEI of money and property.

64.    Over time, the defendants have changed the characterization of the payments to cover-up the improper payment scheme, because the payments are just that – payments and not "grants" for "media expenses." WAP's own accounting records categorize the payments to Rider as a "media expense." WAP's letters to Rider, that accompany the payments, categorize the payments as "grants" for Rider's "media and public education efforts." The Forms 1099 that WAP issued to Rider show that WAP paid Rider "non-employee compensation" of $7,777.34 in 2002 and $7,336.00 in 2003. But, WAP did not list "Media" as one of its Line 16 "Other Expenses" in its Form 990-EZ's for those years. It was not until 2004 that WAP disclosed a $23,940.00 Line 16 "Other Expense" for "Media" on its Form 990-EZ. Conveniently, according to the Form 1099 that WAP issued to Rider for the year 2004, $23,940.00 is the exact amount of money that WAP paid Rider in "non-employee compensation." In addition, after FEI filed its Motion to Compel Documents Subpoenaed from WAP in September 2006, API changed how it characterized its payments to WAP. API's April 2005 and July 2006 payments to WAP were termed as "grants" in "support of the Ringling Brothers and Barnum & Bailey **Case**." (Emphasis added). After FEI filed its Motion to Compel Documents Subpoenaed from WAP, API dropped the reference to the ESA Action and re-characterized its January 2007 payment to WAP as a "grant" in "support of the Ringling Brothers and Barnum and Bailey **PR efforts**." (Emphasis added).

65.    In reality, Rider lives in a Volkswagen van and the "grants"/"donations"/"non-employee compensation" for "media"/"public education"/"PR efforts"/"Ringling Brothers and Barnum & Bailey Case" provided by ASPCA, AWI, FFA, API, MGC and WAP fund anything and everything it takes Rider to live in that van. The money actually supports Rider's livelihood in that, among other things, Rider has used his "media" "grants" to buy clothes, gasoline, cat

food, cat toys, "Alien v. Predator" the movie, tabloids, magazines, film, birch beer, Krispy Kreme donuts, smoked clams, candles, the New York Post, cooked shrimp, videos, and DVDs. Not one of Rider's receipts that have been produced by WAP is for "media expenses" such as photocopies, mailings, or taxi cabs as Rider contends.

66.     WAP also sent Rider a check to pay for the van itself. On April 12, 2005, Meyer, a partner at MGC and counsel for plaintiffs in the ESA Action, sent Rider a purported "grant" in the amount of $5,500.00 to allow him to purchase a used van. Meyer is a member of WAP's Board of Directors, and is or has been an officer of WAP, serving as its Secretary. WAP funded the purchase of the van to enable Rider to shadow one or more FEI circus units and, among other things, gather information for use in the ESA Action and as a witness before legislative bodies. The van was also provided so that Rider could travel to the various legislative bodies before whom he has appeared and offered testimony against FEI concerning Asian elephants in support of proposed bans on said elephants.

67.     WAP's cash payments also maintain Rider's van. Rider uses the cash payments that he receives from WAP to maintain the van's registration in his own name. Rider pays his automobile insurance premiums on the van with the cash payments that he receives from WAP. Rider has also used WAP funding to pay for thousands of dollars in improvements to the van.

68.     FEI has suffered and continues to suffer significant damages resulting from the substantial costs it has incurred in responding to the ESA Action -- which has been ongoing for the past six years and continues to this day because of the illegal, ethically improper, and fraudulent "grants" to Rider.

69.     As is described in the paragraphs below, WAP has used, and continues to use, the United States mails, private or commercial interstate carriers, and interstate wires to send the

illegal, ethically improper, and fraudulent "grants" to Rider in furtherance of its scheme to defraud FEI of money and property.

70.    When WAP sent, and continues to send, the "grants" to Rider through the United States mails, private or commercial interstate carriers, and/or interstate wires, WAP intentionally devised or participated in a scheme reasonably calculated to deceive FEI with the purpose of either obtaining from or depriving FEI of money and/or property.

71.    FEI is the direct victim of WAP's use of the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of its scheme to defraud it of money and/or property.

*Use of the Mails and Wires to Send the Payments to Rider*

72.    WAP's cash payments to Rider are usually delivered via Federal Express.   On some occasions, Rider has been paid in the form of a Western Union money gram.

73.    The packages that Rider receives from WAP contain: (1) a cover letter from WAP and (2) a check from WAP.   The cover letters contain materially false and/or misleading statements.   The cover letters falsely characterize the illegal and improper payments as "grants" used to fund a "media" campaign: "Enclosed is a further **grant** to continue with your invaluable **media and public education efforts** with regard to Ringling Brothers' **mistreatment of elephants** in the circus." (emphases added).   The payments are just that – payments and not "grants."   The "grants" pay for everything and anything it takes to live in a Volkswagen van, the van itself, and maintenance of the van.   The payments actually fund Rider's continued participation in the ESA Action as a paid plaintiff and key fact witness, and not his "media and public education efforts."   Further, Rider's alleged eye-witness accounts of Ringling Brothers' mistreatment of elephants are fraudulent too.   As is described below in paragraphs 127-133,

Rider's testimony has changed to become more favorable to ASPCA, AWI, FFA and API's position in this lawsuit while he has received the illegal, ethically improper, and fraudulent "grants."

74.     The cover letters from WAP are usually signed by Glitzenstein.   Glitzenstein signed the complaint that was filed on September 26, 2003 in the ESA Action.   The docket sheet for the ESA Action currently lists Glitzenstein as counsel for plaintiffs in the ESA Action. Glitzenstein is a partner at MGC and also is or has been the President of WAP.

75.     WAP's own accounting records show that from January 15, 2002 until September 26, 2005, WAP sent Rider the following payments through the United States mails, private or commercial interstate carriers, and interstate wires in furtherance of a scheme to defraud FEI of money and property.   Each mailing or wiring of a payment is a violation of either the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961:

| **DATE** | **NAME** | **MEMO** | **ACCOUNT** | **CLASS** | **AMOUNT** |
|---|---|---|---|---|---|
| 1/15/2002 | Western Union | wire transfer to Miami, FL . . . ($49.00 = wire fee) he only gets $500.00 | MEDIA | Elephants | $549.00 |
| 1/25/2002 | Western Union | wire transfer to Atlanta, Georgia . . . ($49.00 = wire fee) he only gets $500.00 | MEDIA | Elephants | $549.00 |
| 1/29/2002 | Tom Rider | Bus pass – 2 months – Feb - April 2002 | MEDIA | Elephants | $600.00 |
| 2/7/2002 | Western Union | wire transfer to LA, CA for hotel . . . ($41.00 wire fee) he only gets $400.00 | MEDIA | Elephants | $441.00 |
| 2/12/2002 | Western Union | wire transfer to Atlanta, GA | MEDIA | Elephants | $549.00 |
| 2/18/2002 | Western Union | wire transfer to Atlanta, GA for hotel & video camera | MEDIA | Elephants | $1,081.00 |
| 2/25/2002 | Western Union | wire Transfer to Atlanta, GA for hotel | MEDIA | Elephants | $549.00 |
| 2/28/2002 | Western Union | wire Transfer to Tom in NY | MEDIA | Elephants | $767.00 |
| 3/12/2002 | Western Union | wire transfer to Atlanta, GA for hotel | MEDIA | Elephants | $549.00 |
| 7/16/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $1,000.00 |
| 7/23/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 8/13/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $200.00 |
| 8/22/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 9/4/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $250.00 |
| 9/22/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 10/2/2003 | Tom Rider | Media expenses – 10/2/03 | MEDIA | Elephants | $500.00 |
| 10/14/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 10/30/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 11/13/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |

| **DATE** | **NAME** | **MEMO** | **ACCOUNT** | **CLASS** | **AMOUNT** |
|---|---|---|---|---|---|
| 11/19/2003 | Tom Rider | Media expenses – last payment from $5k Grant | MEDIA | Elephants | $50.00 |
| 11/26/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $200.00 |
| 12/9/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $140.00 |
| 12/10/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/16/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/23/2003 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/2/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/12/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/20/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/27/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 2/2/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 2/11/2004 | Tom Rider | Media expenses in GA | MEDIA | Elephants | $500.00 |
| 2/18/2004 | Tom Rider | Media expenses in Cincinnati | MEDIA | Elephants | $500.00 |
| 3/1/2004 | Tom Rider | Media expenses in Charlotte | MEDIA | Elephants | $500.00 |
| 3/9/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 3/17/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 3/29/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 4/5/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 4/12/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 4/20/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 4/27/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 5/6/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 6/2/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $800.00 |

| DATE | NAME | MEMO | ACCOUNT | CLASS | AMOUNT |
|--------|----------|----------------|---------|-----------|----------|
| 6/9/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 6/14/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 6/22/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 6/29/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 6/30/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 7/6/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 7/20/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 7/22/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $300.00 |
| 7/26/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $100.00 |
| 8/2/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $800.00 |
| 8/9/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 8/16/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 8/23/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 8/30/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $600.00 |
| 9/3/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $300.00 |
| 9/14/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 9/21/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 9/28/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $300.00 |
| 10/5/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $90.00 |
| 10/6/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 10/13/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 10/18/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $350.00 |
| 11/2/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $700.00 |

| DATE | NAME | MEMO | ACCOUNT | CLASS | AMOUNT |
|---|---|---|---|---|---|
| 11/8/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $400.00 |
| 11/11/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $400.00 |
| 11/15/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $200.00 |
| 11/19/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $200.00 |
| 11/24/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/1/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/7/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $300.00 |
| 12/10/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $100.00 |
| 12/14/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/17/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/20/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 12/27/2004 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/3/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/11/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $700.00 |
| 1/18/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 1/24/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 2/1/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $400.00 |
| 3/9/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 3/14/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 3/22/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $400.00 |
| 3/29/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $200.00 |
| 4/4/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |
| 4/11/2005 | Tom Rider | Media expenses | MEDIA | Elephants | $500.00 |

31383077

| DATE | NAME | MEMO | ACCOUNT | CLASS | AMOUNT |
|---|---|---|---|---|---|
| 4/12/2005 | Tom Rider | Media | MEDIA | Elephants | $5,500.00 |
| 4/19/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 4/28/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 5/4/2005 | Tom Rider | Media | MEDIA | Elephants | $600.00 |
| 5/9/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 5/13/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 5/19/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 5/31/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 6/6/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 6/13/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 6/20/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 6/23/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 6/29/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 7/5/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 7/11/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 7/14/2005 | Tom Rider | Media | MEDIA | Elephants | $300.00 |
| 7/18/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 7/25/2005 | Tom Rider | Media | MEDIA | Elephants | $700.00 |
| 7/29/2005 | Tom Rider | Media | MEDIA | Elephants | $300.00 |
| 8/2/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 8/8/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 8/15/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |
| 8/22/2005 | Tom Rider | Media | MEDIA | Elephants | $500.00 |

| **DATE** | **NAME** | **MEMO** | **ACCOUNT** | **CLASS** | **AMOUNT** |
|----------|----------|----------|-------------|-----------|------------|
| 8/29/2005 | Tom Rider | Media in San Francisco | MEDIA | Elephants | $500.00 |
| 9/6/2005 | Tom Rider | Media in Everett, Washington | MEDIA | Elephants | $500.00 |
| 9/12/2005 | Tom Rider | Media in Sacramento, CA | MEDIA | Elephants | $500.00 |
| 9/19/2005 | Tom Rider | Media in Sacramento, CA | MEDIA | Elephants | $500.00 |
| 9/26/2005 | Tom Rider | Media in Salt Lake City, UT | MEDIA | Elephants | $500.00 |

## ASPCA'S PAYMENTS TO RIDER

### *ASPCA'S Participation in the Illegal, Ethically Improper, and Fraudulent Payment Scheme*

76.     From May 2001 to May 2003, ASPCA paid Rider purportedly to gather information about how FEI treated its Asian elephants.  These activities were in furtherance of Rider's role as a plaintiff in the ESA Action and as a judicial and legislative witness.

77.     ASPCA's cash payments to Rider from May 2001 to May 2003 totaled at least $47,400.00.  ASPCA sometimes made these payments directly to Rider.  At other times ASPCA funneled these payments to Rider through MGC or WAP.  ASPCA paid Rider either directly or through MGC and/or WAP $7,400.00 in 2001; $18,000.00 in 2002; and $22,000.00 from January through May 2003.  ASPCA did not produce any Forms 1099 for these Rider payments in discovery in the ESA Action, nor has Rider, even though they were requested by FEI.  Upon information and belief, such 1099's were never prepared by ASPCA.

### *ASPCA's Direct Cash Payments to Rider*

78.     For some period of time, yet to be determined in discovery, ASPCA directly paid Rider "grants" of $250.00 per week.  Rider also directly received two lump sum payments from ASPCA:  one $5,000.00 "grant" and one $1,000.00 "grant."

79.     During 2003, ASPCA directly: (1) advanced Rider money to pay for bus tickets, (2) reimbursed him for his "daily living expenses," and (3) paid for his hotel rooms and other expenses using one or more credit cards issued to ASPCA.

*ASPCA's Payments to Rider through MGC*

80.     In 2001, some of ASPCA's funding to Rider went through MGC.  ASPCA paid MGC $9,000.00.  The $9,000.00 payment was for both legal fees to MGC and for payments to Rider through WAP.  Of the $9,000.00, $1,600.00 was designated for legal fees to MGC for its work on the ESA Action and the remaining $7,400.00 was earmarked as a payment to WAP that was intended for Rider.

81.     In May 2001, ASPCA had discussions with AWI and FFA regarding Rider's financial situation after he quit a "security" job with another animal rights organization that was a party to the original complaint but voluntarily withdrew from the ESA Action.  Per these discussions, ASPCA made a $1,000.00 payment to Rider through MGC.  MGC wired the money directly to Rider through Western Union.  MGC made the wires with its own accounts and resources and then invoiced ASPCA for the amounts.

82.     In 2002, ASPCA's payments to Rider were included in ASPCA's regular payments to its attorneys in the ESA Action, MGC.  On or after April 4, 2002, ASPCA sent a check to MGC for $526.16 as "reimbursement for money given to Tom Rider exceeding the $6,000.00 grant to the Wildlife Advocacy Project for 1st quarter 2002."

83.     In 2003, ASPCA made most of its Rider payments directly to Rider.  However, ASPCA did make at least one payment for Rider's expenses that was funneled through MGC in 2003.  On or after May 23, 2003, ASPCA sent MGC a check for $445.00 payable to MGC, which was for "Tom Rider testimony at MA legislative hrg. on anti-circus bill."  This payment

was in connection with Rider's testimony as a witness before a committee of the Massachusetts Legislature. Although the money was funneled through MGC, Rider knew that ASPCA was the source. ASPCA used MGC because MGC had a mechanism in place to wire money to Rider.

*ASPCA Payments to Rider through WAP*

84.    In addition to MGC, ASPCA also used WAP as a conduit of payments to Rider. On December 21, 2001, ASPCA sent WAP a check for $6,000.00, which was earmarked as "grant money for the Tom Ryder [sic] project," to "assist in Tom's work on the Ringling Brothers' circus tour and litigation." This $6,000.00 payment represented only the first installment of a $24,000.00 total sum that ASPCA intended to pay Rider. This $6,000.00 payment from ASPCA was later supplemented by a $526.16 payment from ASPCA to MGC.

*Other Compensation Provided to Rider*

85.    ASPCA also provided Rider non-cash compensation. ASPCA provided Rider with a laptop computer. ASPCA provided Rider with a zoom camera valued at $400.00 to surveil FEI's circus units. For some period of time, yet to be determined in discovery, ASPCA paid for all of Rider's cell phone expenses.

*ASPCA'S Use of the Mails and Wires to Further the Scheme to Defraud FEI of Money and Property*

86.    ASPCA's direct "grants" to Rider were payments that were sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property. Each mailing or wiring of a payment by ASPCA to Rider is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

87.     ASPCA's "grants" and/or "donations" to MGC and/or WAP were intended as payments to Rider and sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property. Each mailing or wiring of a payment by ASPCA to MGC and/or WAP is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

88.     When ASPCA sent the "grants" and/or "donations" through the United States mails, private or commercial interstate carriers, and/or interstate wires, ASPCA intentionally devised or participated in a scheme reasonably calculated to deceive FEI with the purpose of either obtaining from or depriving FEI of money and/or property.

89.     FEI is the direct victim of ASPCA's use of the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of its scheme to defraud it of money and/or property.

## AWI'S PAYMENTS TO RIDER

*AWI'S Participation in the Illegal, Ethically Improper, and Fraudulent Payment Scheme*

90.     In May 2001, after discussions with ASPCA and FFA, AWI agreed to pay Rider $1,000.00 shortly after Rider quit his "security job" with another animal rights organization that filed the initial complaint in the ESA Action.

91.     In May 2003, when it became apparent that ASPCA could not continue funding Rider, ASPCA, AWI, FFA and MGC had discussions regarding continued funding for Rider. AWI and FFA agreed to assume Rider's funding.

92.     Although the amount has yet to be determined in discovery, AWI paid Rider thousands of dollars between 2001 and 2005. Rider has admitted to receiving "grants" directly

from AWI. According to AWI's Form 990 for the calendar or tax year beginning July 1, 2004 and ending on June 30, 2005, AWI made a $1,208.00 cash "grant" directly to Rider.

93.     Rider has also received funds from AWI that were funneled through WAP.   For the period from November 6, 2000 through July 13, 2005, AWI made "grants" and/or "donations" to WAP totaling at least $10,500.00 -- that were intended for Rider. WAP's own accounting records reflect the following "grants" and/or "donations" from AWI to WAP that were intended for Rider:

| DATE | NAME | MEMO | ACCOUNT | CLASS | AMOUNT |
|------|------|------|---------|-------|--------|
| 2/19/2004 | Deposit | Grant from AWI for Elephant Education – **Tom Rider** | ELEPHANTS -- Media | Elephants | $2,500.00 |
| 10/6/2004 | Deposit | Donation from AWI – Cathy Liss | Elephants -- Media | Elephants | $1,500.00 |
| 11/24/2004 | Deposit | AWI donation to **T. Rider** | Elephants -- Media | Elephants | $1,500.00 |
| 3/9/2005 | Deposit | AWI | Elephants -- Media | Elephants | $1,500.00 |
| 4/4/2005 | Deposit | AWI donation for **Tom Rider** | Elephants -- Media | Elephants | $3,500.00 |

(Emphases added).

94.     In sum, AWI's cash payments to Rider total at least $13,208.00.  AWI did not produce any Forms 1099 for its Rider payments in discovery in the ESA Action, nor has Rider, even though they were requested by FEI.  Upon information and belief, such 1099's were never prepared by AWI.

*AWI'S Use of the Mail and Wires to Further the Scheme to Defraud FEI of Money and Property*

95.     AWI's direct "grants" to Rider were payments that were sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a

scheme to defraud FEI of money and property.  Each mailing or wiring of a payment by AWI to Rider is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

96.  AWI's "grants" and/or "donations" to WAP were intended as payments to Rider and sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property.  Each mailing or wiring of a payment by AWI to WAP is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

97.  When AWI sent the "grants" and/or "donations" through the United States mails, private or commercial interstate carriers, and/or interstate wires, AWI intentionally devised or participated in a scheme reasonably calculated to deceive FEI with the purpose of either obtaining from or depriving FEI of money and/or property.

98.  FEI is the direct victim of AWI's use of the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of its scheme to defraud it of money and/or property.

## FFA'S PAYMENTS TO RIDER

### *FFA'S Participation in the Illegal, Ethically Improper, and Fraudulent Payment Scheme*

99.  In May 2001, FFA joined ASPCA and AWI in agreeing to make a $1,000.00 payment to Rider.  FFA's agreement to pay Rider $1,000.00 came after discussions with ASPCA and AWI after Rider quit his "security" job with another animal rights organization.

100.  In May 2003, when it became apparent that ASPCA could not continue funding Rider, ASPCA, AWI, FFA and MGC had discussions regarding continued funding for Rider. AWI and FFA agreed to assume Rider's funding.

101.    Rider has received other direct cash payments from FFA.  In July 2004, FFA directly paid Rider $1,000.00.  This $1,000.00 direct cash payment was "to assist with [Rider's] travel expenses" to participate in a press conference in Denver, Colorado that was held in connection with a proposal to ban circus animal acts within the city limits of Denver.  FFA also paid to repair Rider's old Volkswagen van so that Rider could travel to the Denver press conference.  Although FFA did receive a receipt for the repairs to Rider's van, FFA did not receive a receipt for the remainder of Rider's expenses associated with the press conference.  Rider appeared at the press conference with Mike Markarian, FFA's Rule 30(b)(6) witness in the ESA Action.

102.    FFA and HSUS merged effective January 1, 2005.  After the merger, WAP received "donations" from HSUS totaling $5,500.00 that were intended to be paid to Rider.  WAP's own accounting records reflect the following "donations" from HSUS to WAP that were intended for Rider:

| DATE | NAME | MEMO | ACCOUNT | CLASS | AMOUNT |
|------|------|------|---------|-------|--------|
| 3/17/2005 | Deposit | Contribution from HSUS to Elephant media campa... | Elephants -- Media | Elephants | $500.00 |
| 4/18/2005 | Deposit | Donation from HSUS | Elephants -- Media | Elephants | $2,000.00 |
| 6/15/2005 | Deposit | Donation from HSUS for media in Elephants | Elephants -- Media | Elephants | $3,000.00 |

*Other Compensation Provided to Rider*

103.    Before WAP bought him his current Volkswagen van, Rider drove an older Volkswagen van.  On at least one occasion, FFA paid to have the older vehicle repaired.  The repairs enabled Rider to attend the press conference in Denver, Colorado that was held in

connection with a proposal to ban circus animal acts within the city limits of Denver that was referenced above in paragraph 101.

104.    FFA's and HSUS's cash payments to Rider total at least $7,500.00.  FFA did not produce any Forms 1099 for any of FFA's or HSUS's Rider payments in discovery in the ESA Action, nor has Rider, even though they were requested by FEI.  Upon information and belief, such 1099's were never prepared by FFA or HSUS.

*FFA'S Use of the Mail and Wires to Further the Scheme to Defraud FEI of Money and Property*

105.    FFA's direct "grants" to Rider were payments that were sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property.  Each mailing or wiring of a payment by FFA to Rider is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

106.    FFA's "grants" and/or "donations" to WAP were intended as payments to Rider and sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property.  Each mailing or wiring of a payment by FFA to WAP is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

107.    When FFA sent the "grants" and/or "donations" through the United States mails, private or commercial interstate carriers, and/or interstate wires, FFA intentionally devised or participated in a scheme reasonably calculated to deceive FEI with the purpose of either obtaining from or depriving FEI of money and/or property.

108.    FEI is the direct victim of FFA's use of the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud it of money and/or property.

## API'S PAYMENTS TO RIDER

*API'S Participation in the Illegal, Ethically Improper, and Fraudulent Payment Scheme*

109.    API became a plaintiff in the ESA Action on February 23, 2006.   Upon information and belief, API was added so that it could provide additional funding to Rider and so that plaintiffs could attempt to recoup some or all of such funding through the ESA Action against FEI.

110.    API has made "grants" totaling at least $9,951.30 to WAP that are related to the ESA Action.  Upon information and belief, some or all of this money has been paid to Rider.  All three payments were accompanied by a letter signed by Nicole G. Paquette, General Counsel for API.  The following chart summarizes the three letters accompanying API's payments to WAP.

| DATE OF LETTER | RE: | TEXT OF LETTER | CHECK AMOUNT |
|---|---|---|---|
| April 21, 2006 | Grant | Please find enclosed a **grant** for **$3,000.00** towards support of the **Ringling Brothers and Barnum & Bailey <u>Case</u>.** | $3,000.00 |
| July 20, 2006 | Grant | Please find enclosed a **grant** for **$3,951.30** towards support of the **Ringling Brothers and Barnum & Bailey <u>Case</u>.** | $3,951.30 |
| January 3, 2007 | Grant | Please find enclosed a **grant** for **$3,000.00** towards support of the **Ringling Brothers and Barnum & Bailey <u>PR efforts</u>.** | $3,000.00 |

111.    In an effort to cover-up the illegal, ethically improper, and fraudulent funding scheme, API changed the text of its letters to WAP to reflect that its "grants" were really supporting WAP's "Ringling Brothers and Barnum & Bailey **<u>PR efforts</u>**" and not the "Ringling Brothers and Barnum & Bailey **<u>Case</u>**." (Emphases added). Coincidentally, this change came after FEI filed its Motion to Compel Documents Subpoenaed from WAP in September 2006.

112.    In addition to the API's payments to WAP that are intended for Rider, Rider has received money directly from API earmarked as "grants."

113.    Upon information and belief, API's cash payments to Rider total at least $10,001.30. API has not produced any Forms 1099 for its Rider payments in discovery in the ESA Action, nor has Rider, even though they were requested by FEI. Upon information and belief, such 1099's were never prepared by API.

*API'S Use of the Mail and Wires to Further the Scheme to Defraud FEI of Money and Property*

114.   API's direct "grants" to Rider were payments that were sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property.  Each mailing or wiring of a payment by API to Rider is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

115.   API's "grants" and/or "donations" to WAP were intended as payments to Rider and sent through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property. Each mailing or wiring of a payment by API to WAP is a violation of the federal mail fraud statute, 18 U.S.C. § 1341, or the federal wire fraud statute, 18 U.S.C. § 1343, and is an independent predicate act under 18 U.S.C. § 1961.

116.   When API sent the "grants" and/or "donations" through the United States mails, private or commercial interstate carriers, and/or interstate wires, API intentionally devised or participated in a scheme reasonably calculated to deceive FEI with the purpose of either obtaining from or depriving FEI of money and/or property.

117.   FEI is the direct victim of API's use of the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of its scheme to defraud it of money and/or property.

## MGC'S INVOLVEMENT IN THE PAYMENTS TO RIDER

118.   Numerous payments from ASPCA, AWI, FFA and API to Rider have been funneled through MGC, as described herein.  At least one of these payments was commingled with a payment for MGC's legal fees.

119.    MGC has made at least one payment to Rider, and then was reimbursed for the

payment from WAP.  On February 14, 2002, WAP wrote a check to MGC for $1,639.34, which

WAP's own accounting records stated was to "[r]eimburse for money **paid** to Tom Rider."  This

money had been paid by MGC to Rider but was supposed to have been paid to Rider by WAP.

120.    MGC encouraged and advised ASPCA, AWI, FFA and API to "donate" funds to

be provided to Rider through its alter ego WAP.  On November 5, 2003, Meyer sent an email to

ASPCA, FFA and AWI from her MGC email account.  Meyer attached to the email a copy of a

fund-raising letter from WAP that she sent on behalf of Rider.  In relevant part, Meyer stated:

> I have also attached a copy of a fund-raising letter **I sent from the Wildlife
> Advocacy Project on Tom's behalf** to the woman who gave him his last grant
> (which is running out) – so that you can see what Tom has been doing over the
> last few months on his own for this cause . . . .
>
> All in all, I am personally very very impressed with his [Rider's] efforts, his
> persistence, his ability to get some media coverage on this issue, **and his total
> commitment to the lawsuit**.  I would very much like to keep him out there – so if
> you guys have any ideas about how we can raise more funds for this please let me
> know.  **The funds can be contributed to our Wildlife Advocacy Project which
> is a C-3 organization – so they are tax deductible**.  He only needs about $5,000
> to keep him going for about 6 months.

(Emphases added).

121.    Upon information and belief, ASPCA, AWI, FFA, API, WAP and/or MGC have

made or agreed to make payments similar to the Rider payments described herein, to other

witnesses.  Such payments were made or agreed to be made to influence the respective witness'

testimony or to procure that witness' assistance in obtaining information for use against FEI in

the ESA Action or with respect to proceedings before various legislative and/or administrative

bodies.

## THE FUND-RAISER HELD IN FURTHERANCE OF THE SCHEME TO DEFRAUD FEI OF MONEY AND PROPERTY

122.   In July 2005, ASPCA, AWI and FFA, operating under the name HSUS, jointly hosted a fund-raiser to solicit funds to provide an additional source of funding for Rider.  The defendants who were involved in the fund-raiser referenced the ESA Action in the fund-raising solicitation materials.  One or more attorneys from MGC participated directly in this solicitation of funds.  The solicitation materials contain materially false and/or misleading statements about Tom Rider, the ESA Action, and FEI.  The invitation to the fund-raiser states the following:

> In an innovative case and the first of its kind in the country, the American Society for the Prevention of Cruelty to Animals (ASPCA), Animal Welfare Institute (AWI) and Fund for Animals (which has recently joined forces with the Humane Society of the United States) have sued Ringling Bros. and Barnum & Bailey under the Endangered Species Act for its mistreatment of Asian Elephants.
>
> **The three non-profit organizations are joined by former Ringling Bros. employee Tom Rider who left the circus to speak about the elephant abuse he witnessed on a daily basis.**
>
> . . .
>
> **Unfortunately, the non-profit organizations are up against Feld Entertainment-the parent company of Ringling Bros. and one of the richest corporations in the world.  Therefore, we desperately need your help to raise money so we can successfully wage this battle on behalf of the elephants.**
>
> Benefit hosted by
> the American Society for the Prevention of Cruelty to Animals,
> Animal Welfare Institute,
> and Humane Society of the United States

(Emphases added).

123.   The invitation is false and/or misleading in the following five ways.  First, the invitation's various claims that FEI mistreats its Asian elephants are untrue.  Second, the invitation fails to state that after quitting his job with FEI, Rider went to work for another circus in Europe.  Rider did not "le[ave] the circus to speak out about elephant abuse" but rather left

FEI to work for another circus. Rider only began to speak out about elephant abuse when he was paid to do so. Third, the invitation claims that Rider "witnessed [elephant abuse] on a daily basis." The invitation fails to state that Rider's alleged accounts of elephant abuse have changed to become more favorable to ASPCA, AWI, FFA and API's position in the ESA Action and that his current allegations are inconsistent with and contradict prior statements that Rider previously made about the same subjects under oath and penalty of perjury. Fourth, the invitation misleadingly states that the non-profit organizations are not capable of proceeding "against Feld Entertainment -- one of the richest corporations in the world" when, at the end of 2005 (the year that the fundraiser was held), the combined net assets or fund balances of the participating defendants -- ASPCA, AWI and FFA/HSUS -- was $306,184,637.00. (At the time the fund-raiser was held, in July 2005, API had not yet been added as a plaintiff to the ESA Action. At the end of 2005, API's net assets or fund balances was $ 4,673,863.00. In total, at the end of 2005, the combined net assets or fund balances of ASPCA, AWI, FFA/HSUS, and API was $310,858,500.00.) The invitation misleadingly implies that the animal rights non-profits versus FEI is akin to David versus Goliath, when in fact the assets or fund balances of those non-profits is hundreds of millions of dollars. Fifth, the invitation misleadingly implies that any funds raised would help ASPCA, AWI and FFA/HSUS "wage" their legal "battle" against FEI, when in fact, the funds were going to support Rider. According to ASPCA, the fund-raiser was held "so [that ASPCA, AWI and FFA/HSUS could] continue to support Tom Rider in his outreach to the public and the media."

124.   AWI sent the invitation to the July 2005 fundraiser on behalf of ASPCA, FFA/HSUS, and itself through the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud FEI of money and property, in

violation of the federal mail fraud statute, 18 U.S.C. § 1341, and/or the federal wire fraud statute, 18 U.S.C. § 1343.  This mailing is an independent predicate act under 18 U.S.C. § 1961.

125.    When AWI sent the fundraiser invitation through the United States mails, private or commercial interstate carriers, and/or interstate wires, AWI, together with ASPCA and FFA/HSUS, intentionally devised or participated in a scheme reasonably calculated to deceive FEI with the purpose of either obtaining from or depriving FEI of money and/or property.

126.    FEI is the direct victim of AWI's use of the United States mails, private or commercial interstate carriers, and/or interstate wires in furtherance of a scheme to defraud it of money and/or property.  The fund-raiser's sole targets were FEI and its Asian elephants; the fund-raiser did not purport to raise money for any other purpose.

## C.    TOM RIDER'S EVOLVING STORY

127.    Rider, the only individual plaintiff in the ESA Action, has given at least six statements under oath and penalty of perjury regarding his observations while he was employed by FEI:  (1) Statement under Oath in Galt, California (March 25, 2000); (2) Statement to a Congressional Committee (June 13, 2000); (3) Affidavit submitted to the United States Department of Agriculture ("USDA") (July 20, 2000); (4) Answer to Defendants' First Set of Interrogatories (June 3, 2004); (5) Deposition of Tom E. Rider (October 12, 2006); and (6) Supplemental Responses to Defendants' First Set of Interrogatories (January 30, 2007).

128.    ASPCA, AWI, FFA and API have embraced Rider's affidavit to the USDA by incorporating it into their answers to interrogatories in the ESA Action which were submitted under penalty of perjury.

129.    While Rider has been receiving payments from ASPCA, AWI, FFA and API, facilitated by MGC and WAP, his statements have changed to become more favorable to ASPCA, AWI, FFA and API's position in the ESA Action.

130.    Rider's June 2004 Answer to Defendant's First Interrogatory No. 11 in the ESA Action contains new assertions of fact that were not raised in his previous three statements made under oath and penalty of perjury ((1) Statement under Oath in Galt, California (March 25, 2000); (2) Statement to a Congressional Committee (June 13, 2000); and (3) Affidavit submitted to USDA (July 20, 2000)).  Rider's Answer to Interrogatory No. 11 recites his "recollections" of FEI's alleged abuses against elephants in specific locations and on specific dates that were not mentioned at all in his previous three statements under oath, even though such "recollections" would have been responsive and even though the earlier statements were closer in time to the events that Rider claimed he witnessed.  In total, there are sixty-seven newly "recalled" instances of alleged elephant abuse.

131.    In each of the sixty-seven newly remembered instances where Rider for the very first time alleges that he witnessed abuse of FEI's elephants, Rider does so only in very general terms.  Conveniently, Rider's observations parallel the "taking" alleged in the ESA Action complaint.  In other instances, Rider's testimony regarding elephant "abuse" at specific times and locations has changed to fit ASPCA, AWI, FFA and API's "taking" allegations.

132.    When Rider answered Interrogatory No. 11 falsely and submitted a false affidavit to the USDA, which was incorporated by reference into ASPCA, AWI, FFA and API's Answers to Interrogatory No. 2, he acted with the specific intent to impede the administration of justice.

133.   Rider's false answers to interrogatories and false affidavit to the USDA amounted to obstruction of justice in violation of 18 U.S.C. § 1503(a), a predicate act under 18 U.S.C. § 1961.

## D.   ATTEMPTS TO COVER-UP THE PAYMENTS TO RIDER

134.   AWI and Rider have attempted to cover-up the illegal, ethically improper and fraudulent payment scheme -- a scheme that was hatched before API became a plaintiff in the ESA Actionand which API later joined.   API also has attempted to cover-up its knowledge of WAP's payments to Rider and its own substantial payments to Rider through WAP, which are detailed above.

135.   Since FEI filed its Motion to Compel Documents Subpoenaed from WAP on September 7, 2006, MGC and/or WAP have attempted to hide the fact that, in reality, WAP is the alter ego of MGC.   In FEI's Memorandum in Support of its Motion to Compel Documents Subpoenaed from WAP, FEI referenced the "Who We Are" page of WAP's website in support of its argument that WAP is MGC's alter ego.   This page stated that Glitzenstein serves as the President of WAP while Meyer serves as the Secretary of WAP, and that together, Glitzenstein and Meyer serve as two of WAP's three Directors.   Further, the "Who We Are" page stated that "Mr. Glitzenstein and Ms. Meyer are extremely active in daily management and supervision of the Wildlife Advocacy Project."   Less than one month later, as of the date that FEI submitted its Reply in Support of its Motion to Compel, on October 3, 2006, the entire WAP website was no longer functional.   However, as of the date that FEI submitted its Notice of Supplemental Points and Authorities in Support of its Motion to Compel, on November 1, 2006, WAP's website was again functional, with the exception of its "Who We Are" page.   In or about January or February 2007, the "Who We Are" page returned to WAP's website, this time deleting reference to

Glitzenstein and Meyer's positions as officers of WAP and their active involvement in WAP's operations.

136.    In addition, after FEI filed its Motion to Compel Documents Subpoenaed from WAP, API changed the characterization of its payments to WAP from "grants" in "support of the Ringling Brothers and Barnum & Bailey **Case**" to "grants" in "support of the Ringling Brothers and Barnum & Bailey **PR efforts**." (emphases added).

137.    Further, through false answers to deposition questions and false responses to interrogatories in the ESA Action, AWI has attempted to deflect attention from its involvement in and knowledge of the Rider funding scheme. Rider also has submitted a false interrogatory answer in the ESA Action that was designed to conceal the payments he received and still receives. Upon information and belief, AWI and Rider's cover-up of the funding to Rider has amounted to at least three acts of obstruction of justice in violation of 18 U.S.C. § 1503(a).

## AWI SUBMITTED FALSE ANSWERS TO INTERROGATORIES REGARDING AT LEAST ONE PAYMENT TO WAP

138.    AWI submitted its Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs American Society for the Prevention of Cruelty to Animals, Animal Welfare Institute, and Fund for Animals ("AWI's Responses and Objections") in the ESA Action on June 9, 2004. Meyer, a partner in MGC and a founding member and director of MGC's alter ego WAP, signed AWI's Responses and Objections.

139.    At the time AWI submitted its Responses and Objections in June 2004, ASPCA, AWI and FFA had all made payments or agreed to make payments either directly to Rider or to MGC and/or WAP that were funneled to Rider. ASPCA, AWI and FFA had already agreed to pay Rider $1,000.00 each – for a total of $3,000.00 – in May 2001, after Rider quit his "security job" with another animal rights organization that was previously a plaintiff in the ESA Action.

WAP had already paid Rider $15,114.34 from 2002-2003 and was on track to pay Rider $23,940.00 in 2004, according to the Forms 1099 that WAP issued to Rider. ASPCA had already made a $6,000.00 "grant" to WAP in 2001 and supplemented that "grant" with a $526.16 check to MGC. Further, ASPCA had already been paying Rider directly for over one year – from March 2002 to May 2003. WAP had already written a check to MGC in February 2002, that WAP's own accounting records stated was to "[r]eimburse for money **paid** to Tom Rider." (emphasis added). Most importantly, at the time that AWI submitted its Responses and Objections in June 2004, AWI had already made a $2,500.00 "grant" to WAP in February 2004, which WAP's own accounting records labeled as: "Grant from AWI for Elephant Education – Tom Rider."

140. FEI's Interrogatory No. 21 states: "Identify each resource you have expended from 1997 to the present in 'advocating better treatment for animals held in captivity, including animals used for entertainment purposes' as alleged in the complaint, including the amount and purpose of each expenditure." AWI's Response to Interrogatory No. 21 failed to disclose the $2,500.00 payment that AWI made to WAP on February 13, 2004 – less than four months before, that was intended for Rider, even though such a disclosure would have been responsive.

141. FEI's Interrogatory No. 22 states: "Identify each expenditure from 1997 to the present of 'financial and other resources' made while 'pursuing alternative sources of information about defendants' actions and treatment of elephants' as alleged in the complaint." AWI's Response to Interrogatory No. 22 failed to disclose the $2,500.00 payment that AWI made to WAP on February 13, 2004 – less than four months before, that was intended for Rider, even though such a disclosure would have been responsive.

142.    AWI's failure to disclose this substantial payment to WAP – intended for Rider – was part of AWI's effort to cover-up the illegal, ethically improper and fraudulent payment scheme (a scheme that was hatched before API became a plaintiff in the ESA Action and which API later joined), its knowledge of WAP's payments to Rider, and its own substantial payments to Rider through WAP.

143.    AWI acted with the specific intent to impede the due administration of justice in the ESA Action.

144.    AWI's false interrogatory response amounted to an obstruction of justice in violation of 18 U.S.C. § 1503(a).

## AWI TESTIFIED FALSELY REGARDING PAYMENTS TO RIDER IN ITS DEPOSITION

145.    On May 18, 2005, AWI testified under oath and penalty of perjury, through its Rule 30(b)(6) witness, Cathy Liss, President of AWI, that it was "not aware" that AWI was sharing Rider's expenses with other organizations and that it did not know whether other animal welfare organizations were providing reimbursements to Rider.

146.    At the time that AWI so testified, ASPCA, AWI, and FFA had all made payments or agreed to make payments either directly to Rider or to MGC and/or WAP that were funneled to Rider.  ASPCA, AWI and FFA had agreed to pay Rider $1,000.00 each – for a total of $3,000.00 – in May 2001, after Rider quit his "security job" with another animal rights organization that was previously a plaintiff in the ESA Action.  WAP had already paid Rider $39,053.34 from 2002-2004 and was on track to pay Rider $33,600.00 during 2005, according to the Forms 1099 that WAP issued to Rider.  ASPCA had already made a $6,000.00 "grant" to WAP in 2001 and supplemented that "grant" with a $526.16 check to MGC.  Further, ASPCA had already been paying Rider directly for over one year – from March 2002 to May 2003.

WAP had already written a check to MGC in February 2002, that WAP's own accounting records stated was to "[r]eimburse for money **paid** to Tom Rider." (emphasis added). FFA, through HSUS, had already made a $500.00 "grant" to WAP in March 2005 and a $2,000.00 "grant" to WAP in April 2005. Most importantly, at the time that AWI testified in May 2005, AWI had already paid $10,500.00 in "grants" to WAP, some of which were specifically earmarked for Rider. Additionally, AWI made a $1,208.00 cash "grant" directly to Rider some time during the calendar or tax year beginning July 1, 2004 and ending on June 30, 2005.

147.    AWI's testimony under oath and penalty of perjury through its Rule 30(b)(6) witness, Cathy Liss, President of AWI, that it was "not aware" that AWI was sharing Rider's expenses with other organizations and that it did not know whether other animal welfare organizations were providing reimbursements to Rider, is false in two respects. First, there is evidence predating AWI's deposition that AWI had discussions with ASPCA, FFA, and MGC regarding the continued funding of Rider. Therefore, Liss, President of AWI and AWI's Rule 30(b)(6) witness, certainly knew or should have known that ASPCA and FFA were paying Rider's travel expenses and that AWI was sharing Rider's expenses with ASPCA and FFA. Second, there is evidence predating AWI's deposition that Liss personally knew that WAP was distributing funds to Rider. Therefore, Liss knew that "other animal welfare organizations," namely WAP, provided "similar reimbursements" to Rider.

148.    AWI's testimony contradicts Lisa Weisberg's (ASPCA's Senior Vice President of Government Affairs and Public Policy and ASPCA's Rule 30(b)(6) witness in the ESA Action) May 7, 2001 email to Larry Hawk (ASPCA's former President and CEO), which confirmed in writing that ASPCA, AWI, and FFA were all in communication regarding sources of funding for Rider after Rider quit his "security job" with another animal rights organization. Liss, as

President of AWI and AWI's Rule 30(b)(6) witness, knew or clearly should have known that ASPCA and FFA were paying Rider's travel expenses and that AWI was sharing Rider's payments with ASPCA and FFA.

149.    AWI's testimony contradicts ASPCA's July 19, 2005 sworn testimony through Weisberg, its Rule 30(b)(6) witness.  ASPCA testified that after it determined that it could not provide funding to Rider beyond May 2003 due to budgetary restraints, ASPCA had communications with AWI and FFA regarding funding for Rider. Liss, as President of AWI and AWI's Rule 30(b)(6) witness, knew or clearly should have known that ASPCA and FFA were paying Rider's travel expenses and that AWI was sharing Rider's expenses with ASPCA and FFA.

150.    AWI's testimony directly contradicts the November 5, 2003 email that Meyer sent from her MGC email account to ASPCA, FFA, and AWI as described above.  Liss and Meyer had at least one discussion regarding Meyer's November 5, 2003 email and, on December 11, 2003, Meyer proposed to Liss that AWI make a payment to WAP to fund the activities against FEI.  On February 13, 2004, Liss sent a letter to Meyer stating that AWI was providing WAP with a $2500.00 payment in accordance with Meyer's December 11, 2003 request.  Thus, when Liss testified under oath and penalty of perjury at AWI's May 18, 2005 deposition in the ESA Action as AWI's Rule 30(b)(6) witness, Liss had personal knowledge that other "animal welfare organizations" were providing funding to Rider for his travel and living expenses.  She not only knew about it, she participated in it directly.  AWI's sworn statement that "I don't know," therefore was false.

151.    AWI testified falsely under oath and penalty of perjury in a deposition in the ESA Action in an effort to cover-up the illegal, ethically improper and fraudulent payment scheme (a

scheme that was hatched before API became a plaintiff in the ESA Action and which API later joined), its knowledge of WAP's payments to Rider, and its own substantial payments to Rider through WAP.

152.   AWI acted with the specific intent to impede the due administration of justice in the ESA Action.

153.   AWI's false testimony under oath and penalty of perjury amounted to an obstruction of justice in violation of 18 U.S.C. § 1503(a).

## RIDER SUBMITTED FALSE INTERROGATORY ANSWERS CONCERNING PAYMENTS HE RECEIVED FROM ASPCA, AWI, FFA AND WAP

154.   Rider submitted his Responses and Objections to Defendants' First Set of Interrogatories ("Rider's Responses and Objections") in the ESA Action on June 3, 2004. Meyer, a partner in MGC and a founding member and director of MGC's alter ego WAP, signed Rider's Responses and Objections.

155.   At the time that Rider submitted his Responses and Objections in June 2004, ASPCA, AWI and FFA had all made payments or agreed to make payments either directly to Rider or to MGC and/or WAP that were funneled to Rider.  ASPCA, AWI and FFA had already agreed to pay Rider $1,000.00 each – for a total of $3,000.00 – in May 2001, after Rider quit his "security job" with another animal rights organization that was previously a plaintiff in the ESA Action.  WAP had already paid Rider $15,114.34 from 2002-2003 and was on track to pay Rider $23,940 in 2004, according to the Forms 1099 that WAP issued to Rider.  ASPCA had already made a $6,000 "grant" to WAP in 2001 and supplemented that "grant" with a $526.16 check to MGC.  Further, ASPCA had already been paying Rider directly for over one year – from March 2002 to May 2003.  WAP had already written a check to MGC in February 2002, that WAP's

own accounting records stated was to "[r]eimburse for money **paid** to Tom Rider." (emphasis added). AWI had already made a $2500.00 "grant" to WAP in February 2004.

156. FEI's First Interrogatory No. 24 in the ESA Action called for Rider to "[i]dentify all income, funds, compensation, or other money or items . . . received from any animal advocacy organization." Rider objected to this interrogatory but also provided the following answer: "I have not received any such compensation." Rider signed and verified this answer upon his oath before a notary public on June 3, 2004. Meyer, a partner in MGC and counsel for plaintiffs in the ESA Action, signed the responses that contained this answer.

157. Rider's answer to Interrogatory No. 24 in the ESA Action was false. Rider had received tens of thousands of dollars in payments from ASPCA, AWI, FFA, MGC and/or WAP as of June 3, 2004 when he swore to the truth of this answer. In addition the substantial payments that Rider had received from WAP up to and including June 3, 2004, had been reported by WAP to the IRS as "non-employee compensation" on Forms 1099 that Rider admits he received.

158. Meyer and/or MGC knowingly permitted Rider to submit this false interrogatory answer to FEI in the ESA Action. Meyer and/or MGC had personal knowledge of the substantial payments that had been made up to and including June 3, 2004 by ASPCA, AWI, FFA MGC and/or WAP to Rider. Moreover, WAP is alter ego of Meyer and/or MGC, and Meyer and/or MGC knew that the substantial payments that Rider had received from WAP up to and including June 3, 2004, had been reported by WAP to the IRS as "non-employee compensation" on Forms 1099 that Rider admits that he received.

159.    Rider's false answer to Interrogatory No. 24 in the ESA Action, as enabled by Meyer and/or MGC, was part of Rider and MGC's effort to cover-up the illegal, ethically improper and fraudulent payment scheme.

160.    Rider acted with the specific intent to impede the due administration of justice in the ESA Action.

161.    Rider's false interrogatory response amounted to an obstruction of justice in violation of 18 U.S.C. § 1503(a).

E.    **FEDERAL AND STATE LEGISLATIVE EFFORTS**

162.    To accomplish their scheme to ban Asian elephants in circuses and to defraud FEI of money and property, with the ultimate objective of banning Asian elephants in all forms of entertainment and captivity, the defendants have supported legislation pending in Congress and in a number of states.

163.    In 1999, a bill was introduced in Congress that would have outlawed elephants in live performances.

164.    Similar bills have been introduced in the legislatures of California, Connecticut, Florida, Maryland, New York, Rhode Island and Washington.  In addition, a number of cities and municipalities have introduced measures to prohibit or to create obstacles to the exhibition of elephants traveling in circuses.

165.    Rider has testified before the United States Congress and the legislatures of at least three states, Connecticut, Massachusetts and Nebraska, in support of these legislative efforts. ASPCA, AWI, FFA and/or API, through MGC and WAP, paid Rider in connection with his testimony at these hearings.  Further, at the time that he testified at these hearings, Rider knew that the payments were coming from ASPCA, AWI, FFA and/or API.  Rider's legislative

testimony has evolved to fit ASPCA, AWI, FFA and API's legislative and litigation agenda against FEI.

166.    ASPCA, AWI, FFA, API and WAP's payments and benefits to Rider are bribery of a witness in violation of the state bribery laws of Connecticut (Conn. Gen. Stat. § 53a-149(a)) and Nebraska (Neb. Rev. Stat. Ann. § 28-918(1)(a)).  Further, when Rider received and accepted ASPCA, AWI, FFA, API and WAP's payments and benefits, Rider violated the state bribery laws of Connecticut (Conn. Gen. Stat. § 53a-150(a)) and Nebraska (Neb. Rev. Stat. Ann. § 28-918(3)).

167.    As a legislative witness in receipt of payments from ASPCA, AWI, FFA and/or API, through MGC and WAP, Rider has given varying, conflicting and ultimately false descriptions of the same elephant incidents fashioned to fit the circumstances in which Rider happens to be speaking.  For example, in his sworn statement to Congress on June 13, 2000, Rider misrepresented an incident in Tupelo, Mississippi, in order to create the false impression that Asian elephants in a circus are dangerous to support a proposed ban on elephants in entertainment endorsed by defendants.  Barely a month later in his sworn affidavit to the USDA, Rider gave a completely different account of the same Tupelo incident in order to support the claim by MGC to USDA that FEI allegedly mistreats elephants in the circus.  Similarly, to support one agenda, Rider, in his sworn statement to Congress on June 13, 2000, falsely characterized the FEI elephant "Karen," as a "killer elephant" that he could never touch, but in sworn testimony on March 4, 2005, before a committee of the Connecticut Legislature described the same animal as a gentle elephant that he could actually hug.

168.    In addition to these federal and state legislative efforts, ASPCA, FFA, AWI and MGC have brought other litigation and compiled a report concerning FEI's Asian elephants.

## V.   DAMAGES SUFFERED BY FEI

169.   FEI has sustained damages which are ongoing and yet to be completely identified and quantified, that are the direct and proximate result of wrongful actions of defendants and others known and unknown to FEI, acting in concert, and which are described herein. Such damages are ongoing, and include, but are not limited to significant damages, direct, indirect, collateral, consequential, and incidental, to FEI's business and operations resulting from the substantial costs incurred by FEI to defend the ESA Action that has continued only due to the racketeering activity of ASPCA, AWI, FFA, API, Rider and WAP which has been ongoing since at least May 2001.

170.   FEI has retained the law firm of Fulbright & Jaworski L.L.P., and previously Covington & Burling L.L.P., to represent it in this matter, and FEI is obligated to pay said attorneys a reasonable fee for their services and the costs necessitated by the ESA Action.

## COUNT I

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

## CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY

## (18 U.S.C. §§ 1962(c) and 1964(c))

## (Against ASPCA, FFA, AWI, API, Rider and WAP)

171.   FEI realleges and incorporates by reference each and every allegation in paragraphs 1-170 above as if set forth fully herein.

### *The Enterprise*

172.   From on or about 2001, continuing through the filing of this Complaint, ASPCA, AWI, FFA, API, Rider and WAP were "persons" within the meaning of 18 U.S.C. § 1961(3).

173.   From on or about 2001, continuing through the filing of this Complaint, ASPCA, AWI, FFA, API, Rider and WAP, and others known and unknown, including agents and employees of the defendants, formed an associated-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4).

174.   From on or about 2001, continuing through the filing of this Complaint, the Enterprise formed by these parties engaged in, and the activities of which affected, interstate and foreign commerce.

175.   Defendants formed the Enterprise to execute and attempt to execute a scheme to ban Asian Elephants from circuses and to defraud FEI of money and property, with the ultimate objective of banning Asian elephants in all forms of entertainment and captivity.

176.   From on or about 2001, continuing through the filing of this Complaint, ASPCA, AWI, FFA, API, Rider and WAP, and each of them individually, together with others known and unknown to FEI, acting in concert, were each employed or were employed by and associated with the Enterprise and have in the past, continuously and currently continue to, in an ongoing manner, knowingly and intentionally conduct the activities of the Enterprise, directly or indirectly, through a continued pattern of racketeering activity consisting of numerous acts of racketeering in the District of Columbia and elsewhere.  Their actions include multiple, related acts in violation of the following provisions of the United States Code:  Bribery; 18 U.S.C. § 201(b); Illegal Gratuity Payments, 18 U.S.C. § 201(c); Obstruction of Justice, 18 U.S.C. § 1503(a); Mail Fraud, 18 U.S.C. § 1341; Wire Fraud, 18 U.S.C. § 1343.  Further, ASPCA, AWI, FFA, API, Rider and WAP conducted the affairs of the Enterprise through, among other things, multiple related acts in violation of the bribery laws of Connecticut and Nebraska.  These violations of the United States Code were in furtherance of the Enterprise's ongoing scheme to

ban Asian Elephants from circuses and to defraud FEI of money and property, with the ultimate objective of banning Asian elephants in all forms of entertainment and captivity.

177.    From on or about 2001, the Enterprise has existed separate and apart from defendants' racketeering acts and their conspiracy to commit such acts.  The Enterprise has an ascertainable structure and purpose beyond the scope and commission of defendants' predicate acts.

*The Pattern of Racketeering Activity*

178.    The Enterprise as described herein is at all relevant times a continuing enterprise because it continues to execute a scheme to ban the use of Asian elephants in circuses and defraud FEI of money and property, with the ultimate objective of banning Asian elephants in all forms of entertainment and captivity, by bringing the ESA Action against FEI that is substantiated by Rider's testimony, which is (and has been) influenced by unlawful payments orchestrated by ASPCA, AWI, FFA, FFA, API, Rider and WAP, and facilitating Rider's obstruction of justice in the ESA Action.  In furtherance of the scheme to defraud FEI of money and property, these payments to Rider, and other solicitation materials, have been sent through the mails and wires in violation of the federal mail and wire fraud statutes.  Further, AWI and Rider have committed three or more obstructions of justice in this matter in an effort to cover-up the racketeering activity.  The conduct of the Enterprise has continued from its inception through the date of this Complaint and threatens to continue into the future, by virtue of the continued payments to Rider and to WAP, which are as recent as January 3, 2007, and the ESA Action which centers on Rider's testimony.

179.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity.

Such activity consists of multiple acts of racketeering by each defendant herein, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission of a prior act of racketeering activity. These racketeering activities include multiple repeated acts of:

a.     Bribery (18 U.S.C. § 201(b)(3)): On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, directly or indirectly, corruptly gave, offered, or promised anything of value to any person, or offered or promised such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation as a witness upon a trial, hearing or other proceeding, with respect to the individuals identified above in the ESA Action, in violation of 18 U.S.C. § 201(b)(3) and 18 U.S.C. § 2, as described in paragraphs 3-133 of this Complaint;

b.     Bribery (18 U.S.C. § 201(b)(4)): On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, directly or indirectly, corruptly demanded, sought, received, accepted, or agreed to accept anything of value personally or for any other person or entity in return for being influenced in testimony under oath or affirmation as a witness upon a trial, hearing or other proceeding, with respect to the individuals identified above in the ESA Action, in violation of 18 U.S.C. § 201(b)(4) and 18 U.S.C. § 2, as described in paragraphs 3-133 of this Complaint;

c.      Illegal Witness Payments (18 U.S.C. § 201(c)(2)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, directly or indirectly, gave, offered, or promised anything of value to any person, for or because of the testimony under oath or affirmation as a witness upon a trial, hearing or other proceeding, with respect to the individuals identified above involved with the ESA Action, in violation of 18 U.S.C. § 201(c)(2) and 18 U.S.C. § 2, as described in paragraphs 3-133 of this Complaint;

d.      Illegal Witness Payments (18 U.S.C. § 201(c)(3)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, directly or indirectly, demanded, sought, received, accepted, or agreed to receive or accept anything of value personally for or because of the testimony under oath or affirmation as a witness upon a trial, hearing or other proceeding, with respect to the individuals identified above involved with the ESA Action, in violation of 18 U.S.C. § 201(c)(3) and 18 U.S.C. § 2, as described in paragraphs 3-133 of this Complaint;

e.      Obstruction of Justice (18 U.S.C. § 1503(a)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, corruptly influenced, obstructed, or impeded, or endeavored to influence, obstruct, or impede the due administration of justice, in violation of 18 U.S.C. § 1503(a) and 18 U.S.C. § 2, as described in paragraphs 127-161 of this Complaint.

f.      Mail Fraud (18 U.S.C. § 1341):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their

behalf, aided and abetted by each other, and the remaining defendants, used the United States mails and/or private or commercial interstate carriers in furtherance of a scheme to defraud FEI of money and property in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2, as described in paragraphs 3-133 of this Complaint.

       g.    <u>Wire Fraud</u> (18 U.S.C. § 1343):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, used interstate wires in furtherance of a scheme to defraud FEI of money and property, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as described in paragraphs 3-133 of this Complaint.

       h.    <u>Bribery</u> (Conn. Gen. Stat. § 53a-149(a)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, offered, conferred, or agreed to confer upon a witness any benefit to influence the testimony or conduct of such witness, in, or relation to, any official proceeding, in violation of Conn. Gen. Stat. § 53a-149(a), as described in paragraphs 3-133, 162-167 of this Complaint.

       i.    <u>Bribery</u> (Conn. Gen. Stat. § 53a-150(a)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, solicited, accepted, or agreed to accept any benefit from another person upon an agreement or understanding that such benefit will influence his testimony or conduct in, or relation to, any official proceeding, in violation of Conn. Gen. Stat. § 53a-150(a), as described in paragraphs 3-133, 162-167 of this Complaint.

     j.     <u>Bribery</u> (Neb. Rev. Stat. Ann. § 28-918(1)(a)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, offered, conferred, or agreed to confer any benefit upon a witness or person he believes is about to be called as a witness in any official proceeding with intent to influence him to testify falsely or unlawfully withhold any testimony, in violation of Neb. Rev. Stat. Ann. § 28-918(1)(a), as described in paragraphs 3-133, 162-167 of this Complaint.

     k.     <u>Bribery</u> (Neb. Rev. Stat. Ann. § 28-918(3)):  On or about the dates indicated in the paragraphs incorporated below, the defendants and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining defendants, accepted or agreed to accept any benefit from any other person for the purpose of being influenced to testify falsely or unlawfully withhold any testimony in any official proceeding, in violation of Neb. Rev. Stat. Ann. § 28-918(3) as described in paragraphs 3-133, 162-167 of this Complaint.

180.    The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, ASPCA, AWI, FFA, Rider, API and WAP.

181.    Each defendant had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf.  Each defendant also attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but active perpetrators.

182.    FEI has been injured in its business or property as a direct and proximate result of the defendants' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

183.    As a result of the violations of 18 U.S.C. § 1962(c) by the defendants, FEI has suffered substantial damages in an amount to be proved at trial.

184.    Pursuant to 18 U.S.C. § 1964(c), FEI is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys fees, incurred by reason of defendants' violations of 18 U.S.C. § 1962(c).

## COUNT TWO

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

**CONSPIRACY TO CONDUCT THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF § 1962(c)**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against ASPCA, FFA, AWI, API, Rider and WAP)**

185.    FEI realleges and incorporates by reference each and every allegation in paragraphs 1-184 above as if fully set forth herein.

186.    From on or about 2001, and continuing through the time of filing in this Complaint, ASPCA, AWI, FFA, API, Rider and WAP, and others unknown and unknown, being persons employed by and associated with the Enterprise, did unlawfully, knowingly and intentionally conspire, combine, confederate and agree together to conduct of the affairs of the Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

187.    Each defendant agreed that at least two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the Enterprise.

188.    It was part of the conspiracy that the defendants and their co-conspirators would commit numerous acts of racketeering activity in the conduct of the affairs of the Enterprise,

including but not limited to, the acts of racketeering set forth below.  The pattern of racketeering

activity, as defined by 18 U.S.C. §§ 1961(1) and (5) includes multiple repeated acts of:

      a.      Bribery, 18 U.S.C. § 201(b)(3), as described in paragraphs 3-133 of this

Complaint;

      b.      Bribery, 18 U.S.C. § 201(b)(4), as described in paragraphs 3-133 of this

Complaint;

      c.      Illegal Witness Payments, 18 U.S.C. § 201(c)(2), as described in

paragraphs 3-133 of this Complaint;

      d.      Illegal Witness Payments, 18 U.S.C. § 201(c)(3), as described in

paragraphs 3-133 of this Complaint;

      e.      Obstruction of Justice, 18 U.S.C. § 1503(a), as described in paragraphs

127-161 of this Complaint.

      f.      Mail Fraud, 18 U.S.C. § 1341, as described in paragraphs 3-133 of this

Complaint.

      g.      Wire Fraud, 18 U.S.C. § 1343, as described in paragraphs 3-133 of this

Complaint.

      h.      Bribery, Conn. Gen. Stat. § 53a-149(a), as described in paragraphs 3-133,

162-167 of this Complaint.

      i.      Bribery, Conn. Gen. Stat. § 53a-150(a), as described in paragraphs 3-133.

162-167 of this Complaint.

      j.      Bribery, Neb. Rev. Stat. Ann. § 28-918(1)(a), as described in paragraphs

3-133, 162-167 of this Complaint.

k.      <u>Bribery</u>, Neb. Rev. Stat. Ann. § 28-918(3), as described in paragraphs 3-133, 162-167 of this Complaint.

189.    In furtherance of this unlawful conspiracy, and to effect its objectives, defendants committed numerous overt acts, including but not limited to those set forth in paragraphs 3-188 above.

190.    FEI has been injured in its business or property by reasons of the defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

191.    As a result of the conspiracies between and among all of the defendants to violate 18 U.S.C. § 1962(c), FEI has suffered substantial damages, in an amount to be proved at trial.

192.    Pursuant to 18 U.S.C. § 1964(c), FEI is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorney's fees, by reason of defendants' violations of 18 U.S.C. § 1962(d).

**COUNT III**

**VIRGINIA CONSPIRACY ACT**

**CONSPIRACY TO HARM A BUSINESS**

**(Va. Code Ann. § 18.2-499(a), § 18.2-500)**

**(Against ASPCA, FFA, AWI, API, Rider and WAP)**

193.    Defendants combined associated, agreed, mutually undertook, or concerted together, as described in paragraphs 1-192 of this Complaint.

194.    Defendants' concerted action was undertaken to injure FEI intentionally, purposefully, and without lawful justification, as described in paragraphs 3-192 of this Complaint.

195.    Defendants undertook their concerted action intentionally and purposefully to injure FEI's business.  ASPCA, FFA, AWI, API, Rider and WAP intended that their actions in creating and carrying out the illegal, ethically improper and fraudulent payment scheme, which enabled them to bring the baseless ESA Action, would cause FEI to spend a significant amount of money in defending the ESA Action, as described in paragraphs 3-192 of this Complaint.

196.    Defendants conspired to accomplish an unlawful purpose and/or to accomplish a purpose, not in itself criminal or unlawful, by criminal or unlawful means.  Defendants have perpetrated and continue to perpetrate a scheme to permanently ban Asian elephants in circuses and to defraud FEI of money and property, with the ultimate objective of banning Asian elephants in all forms of entertainment and captivity.  To carry out this scheme, Defendants have each violated the following provisions of the United States Code:  (1) Bribery; 18 U.S.C. § 201(b); (2) Illegal Gratuity Payments, 18 U.S.C. § 201(c); (3) Obstruction of Justice, 18 U.S.C. § 1503(a); (4) Mail Fraud, 18 U.S.C. § 1341; and (5) Wire Fraud, 18 U.S.C. § 1343.  Further, the defendants' actions include multiple related acts in violation of the bribery laws of Connecticut and Nebraska.

197.    Defendants' concerted action caused FEI injury, in its business or property as a direct and proximate result of defendants' violations of federal and state law, including injury by reason of the predicate acts constituting the pattern of racketeering activity.  As a result of the violations of Va. Code Ann. § 18.2-499 by defendants, FEI has suffered substantial damages in an amount to be proved at trial and is entitled to relief under Va. Code Ann. § 18.2-500.

### PRAYER FOR RELIEF

WHEREFORE, FEI prays for judgment against all defendants jointly and severally, as follows:

A.     Judgment in an amount equal to three times the damage caused to FEI by defendants' racketeering activity, pursuant to 18 U.S.C. § 1964(c) and conspiracy to harm FEI's business, pursuant to Va. Code Ann. § 18.2-500(a).

B.     Preliminary and permanent injunctions enjoining defendants from any further racketeering activity and from harming FEI's business, pursuant to Va. Code Ann. § 18.2-500(b);

C.     Appropriate attorney's fees, pursuant to 18 U.S.C. § 1964 and Va. Code Ann. § 18.2-500(a)-(b);

D.     Trial by jury, pursuant to Fed. R. Civ. P. 38;

E.     For any other relief the Court deems just and proper.

Respectfully Submitted,

John M. Simpson (D.C. Bar #256412)
Joseph T. Small, Jr. (D.C. Bar #926519)
Lisa Zeiler Joiner (D.C. Bar #465210)
Michelle C. Pardo (D.C. Bar #456004)
George A. Gasper (D.C. Bar #488988)

FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-0200
Facsimile: (202) 662-4643

ATTORNEYS FOR DEFENDANT
FELD ENTERTAINMENT, INC.

Dated this 28th day of August, 2007.

31383077