UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.  :
           :
    Plaintiff,    :
           :
  v.        :   Case No. 07- 1532 (EGS)
           :
AMERICAN SOCIETY FOR THE :
PREVENTION OF CRUELTY  :
ANIMALS, et al.    :
           :
    Defendants.  :
           :

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY ALL PROCEEDINGS

Defendants successfully delayed plaintiff Feld Entertainment, Inc.'s ("FEI's") discovery of their RICO violation for years by euphemistically packaging their illicit payment scheme; refusing to produce documents that the Court has now ruled they had no right to withhold; falsifying sworn answers to interrogatories and deposition questions, and spoliating evidence. All of this misconduct is documented, can be proven and, astoundingly, continues to unfold. Defendants now ask the Court to "temporarily" stay the RICO Action until the conclusion of the ESA Action.[1]  While they call it a "stay," what defendants are really seeking is an order excusing them from having to defend their illegal conduct.  Nowhere in defendants' motion do they make a legitimate case for a stay based upon the considerations that normally justify such relief, namely, duplicative litigation of the same issues in two different cases.  Indeed, just weeks

---

[1]   The plaintiff in this case (the "RICO Action") is Feld Entertainment, Inc. ("FEI") and the defendants are the American Society for the Prevention of Cruelty to Animals ("ASPCA"), the Fund for Animals ("FFA"), the Animal Welfare Institute ("AWI"), Tom Rider ("Rider"), the Animal Protection Institute ("API") and the Wildlife Advocacy Project ("WAP").  ASPCA, FFA, AWI, Rider and API have sued FEI under the citizen-suit provision of the Endangered Species Act ("ESA") and that case (the "ESA Action") is currently pending before this Court (Civ. Act. No. 03-2006).  FEI previously sought leave to amend its answers to assert its RICO claim as a counterclaim in the ESA Action, which the Court denied in its Memorandum Opinion (Civ. Act. No. 03-2006, Docket No. 175, 8/23/07) ("Mem. Op.").  FEI then filed its RICO claim as a separate action and the RICO Action was assigned to this Court.

before filing the instant motion, they convinced this very Court that the two matters were so different that a counterclaim in the ESA Action was rejected. Now they claim the two cases are inseparable. Moreover, they cite no case in which a court has stayed a RICO action in circumstances like this. Instead, defendants implore the Court to use its discretion to cover their tracks. That is not how our system of justice works. Defendants are not above the law no matter how moral they believe their cause to be.

Claims that defendants have violated RICO have been made against them pursuant to the pleading requirements of the Federal Rules of Civil Procedure. Those rules are well suited to a determination of whether these claims should proceed. If they fail to pass muster under Rule 12, then that will be the end of them. On the other hand, if the claims are deemed to be valid (which they are), then there is absolutely no reason, and defendants offer none, why those claims should not proceed to the ultimate day of reckoning at trial. Like any other litigant with a viable cause of action, FEI is entitled to its day in court. A "stay" of those claims, simply because defendants would prefer that the Court look the other way when it comes to their own conduct – which is essentially all that this motion amounts to – would be a miscarriage of justice.

The centerpiece of defendants' motion is the invented argument that, somehow, the resolution of the ESA Action will have an effect on the RICO Action. As shown below, it will have no effect whatsoever. No matter what the outcome of the ESA Action, the fact remains that defendants violated the RICO statute and will have to account for their behavior. Contrary to defendants' belief, the ends do not justify the means here. The Court already has held that the RICO Action will require discovery and trial evidence that is wholly separate and distinct from the discovery and trial evidence necessary to resolve the "narrow" issues in the ESA Action. Mem. Op. at 5-6. This is precisely why the RICO claims were not added to the ESA Action and

why they now stand as a separate and independent lawsuit. Defendants vigorously argued for that separation and, now that they have it, should not be allowed to completely reverse their position and claim that there is some kind of critical connection between the two cases that would justify shutting down the RICO Action.

Defendants' insinuation that the RICO Action is some kind of delay tactic also is false. FEI has absolutely no reason to fear any proceeding in which the treatment of its Asian elephants is an issue. The constant chorus of "abuse" – gratuitously included in virtually every filing that defendants make – is untrue and highly offensive to the employees of FEI who have dedicated their lives to the welfare of these animals. Having elephants in captivity is perfectly lawful in this country regardless of whether defendants agree with or approve of it, which they clearly do not. From their perspective, any husbandry tool used on captive elephants – be it the guide, tether or otherwise – should be banned so that elephants cannot be exhibited in captivity, which is the misguided but true outcome they seek in the ESA Action. Yet the law prohibits neither these husbandry practices, nor the exhibition of elephants, and FEI will continue to willingly defend rather than cave in to the meritless claim that it is "taking" its lawfully-owned and exhibited Asian elephants.

The extreme relief that defendants seek here is unwarranted. They ask the Court to permit them to avoid the Federal Rules with which all litigants, including FEI, must comply. The proper procedure here is to permit defendants to proceed with their defense, not to deprive the plaintiff, FEI, of its case.

## ARGUMENT

Trial courts have broad discretion to enter a stay of an action before it when there are pending "independent proceedings which bear upon the case." <u>Hisler v. Gallaudet Univ.</u>, 344 F.

Supp. 2d 29, 35 (D.D.C. 2004) (quoting <u>Leyva v. Certified Grocers of Cal., Ltd.</u>, 593 F.2d 857, 863-64 (9th Cir. 1979)).  However, "[t]he proponent of a stay bears the burden of establishing its need."  <u>Clinton v. Jones</u>, 520 U.S. 681, 708 (1997); <u>see also</u> <u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 255 & 256 (1936) ("the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which [the movant] prays will work damage to some one else") ("the burden of making out the justice and wisdom of a departure from the beaten track lay heavily on the petitioners").  Indeed, the burden on the party moving for a stay is substantial.  "The party requesting such a stay must make out a clear case of hardship or inequity in order to prevail . . . *[T]he right to proceed in court should not be denied except under the most extreme circumstances*."  <u>GFL Advantage Fund, Ltd. v. Colkitt</u>, 216 F.R.D. 189, 193 (D.D.C. 2003) (internal citations and quotation omitted) (emphasis added); <u>see also</u> <u>Gordon v. Fed. Deposit Ins. Corp.</u>, 427 F.2d 578, 580 (D.C. Cir. 1970) ("The overall interest of the courts that justice be done may very well require that the compensation and remedy due a civil plaintiff should not be delayed (and possibly denied).  The court, in its sound discretion, must assess and balance the nature and substantiality of the injustices claimed on either side.").

Defendants have alleged no such "extreme circumstances" to warrant the stay that they request.  Indeed, no basis asserted by defendants even comes close to satisfying their heavy legal burden for obtaining a stay.  Contrary to defendants' self-serving mischaracterizations of FEI's RICO claim, the RICO Action is ripe, and litigation of the ESA Action will in no way clarify, narrow or moot litigation of it.  Moreover, allowing the RICO Action to proceed will not result in any prejudice to defendants of the type necessary to obtain a stay.  By definition, being named as a defendant in a lawsuit is inconvenient.  If that universal truth were the standard for obtaining

a stay, then FEI could get one in the ESA Action. Such an approach is obviously not the law generally, and it is contrary to the Court's rulings in the ESA Action. When FEI sought to stay discovery for the purpose of containing discovery costs while its motion for summary judgment was pending, this Court refused to grant the request. See Order (Civ. Act. No. 03-2006, Docket No. 94, 9/26/06). Staying the RICO Action would only further prejudice FEI by indefinitely postponing its right to pursue a claim, the existence of which was hidden from it for years by defendants' continued false statements under oath and spoliation of evidence. Defendants' transparent attempts to gain sympathy and special treatment from the Court merely because they are non-profit organizations is likewise not supported by the law. Nor is defendants' unfounded argument that they have a First Amendment right to commit illegal activity under the guise of their political agenda. The Constitution of the United States affords no such protection. FEI, on the other hand, has a right to redress from the RICO activity that was leveled at it in a bad faith effort to exterminate its business. Depriving FEI of the opportunity to seek such redress would be a denial of its due process.

## I.   LITIGATION OF THE ESA ACTION WILL HAVE NO BEARING UPON THE RICO ACTION

Defendants claim that a stay is warranted because the resolution of the ESA Action will somehow clarify or limit the issues to be litigated in the RICO Action. Defs. Mot. at 16-22. Defendants' argument, however, is premised upon their self-serving mischaracterization and over-simplification of FEI's RICO claim. Nothing that happens in the future of the ESA Action has anything to do with FEI's ability to bring or succeed on the merits of the RICO Action. Rider's decision to join and remain in the ESA Action already has occurred – as have defendants' schemes to pay him and cover-up those payments. Rider's standing is the "but for" cause of the ESA Action, and any future determinations as to the standing of the organizations

(or any requested new plaintiffs) will not moot the injury that FEI already has suffered. In other words, the harm FEI already has incurred over the past seven years cannot be undone.

Further, the Court's determination as to Rider's credibility as a witness in the ESA Action will not be a mini-trial on the RICO conduct because defendants convinced this Court to reject FEI's counterclaim in that suit. Rider's testimony will not clarify or moot whether the payments to, and received by him, violate the federal bribery and illegal gratuity statutes, and the Court will not take up the questions of law and fact associated with those allegations in the ESA Action. Moreover, defendants' contention that one case will bear upon litigation of the other is directly contrary to the Court's August 23, 2007 Memorandum Opinion, which unequivocally held that the ESA and RICO Actions involve different legal issues and will require different evidence. Mem. Op. at 5 ("The focus of the only claim in the [ESA Action] is whether or not [FEI's] treatment of its elephants constitutes a taking within the meaning of Section 9 of the ESA. Any limited information about payments to or the behavior of Tom Rider that [FEI] is entitled to in order to challenge [the] credibility of one plaintiff in [the ESA Action] is far different from the vast amount of information [FEI] would be seeking . . . to prove an alleged RICO scheme."). Litigation of the ESA Action will not clarify, narrow or moot any legal or factual issues to be litigated in the RICO Action and the cases cited by defendant are inapposite.[2]

---

[2]      Cf. Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 807 F.2d 16, 20 (1st Cir. 1986) (staying litigation where pending arbitration may have preclusive, evidentiary, or issue-narrowing effect); S.A. Minercao Da Trindad-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 196 (2d Cir. 1984) (staying litigation pending arbitration where arbitrable claims dominated case and non-arbitrable claims were of "uncertain" validity); IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Americas, 402 F. Supp. 2d 289, 293 (D.D.C. 2005) (arbitration may affect "scope" of case or resolve issues raised in their entirety); Abbey v. Modern African One, LLC, 305 B.R. 594, 609 (D.D.C. 2004) (staying plaintiffs' claims where "at least some of [those] claims will in all probability be determined by [an ongoing] adversary proceeding"); Cohen v. Carreon, 94 F. Supp. 2d 1112, 1120 (D. Or. 2000) (staying litigation pending ruling in state court where claims in both cases substantially similar); Cullen v. Paine Webber Group, Inc., 689 F. Supp. 269, 283 (S.D.N.Y. 1988) (staying claim pending resolution of arbitration proceeding where scope of arbitral issues uncertain); Terra Nova Ins. Co. Ltd. v. Distefano, 663 F. Supp. 809, 813 (D. R.I. 1987) (staying claim filed in federal court where "viability" of that claim was "contingent upon the outcome of parallel state court proceedings"); Shaw v. Williams, 676 F. Supp. 168, 171 (N.D. Ill. 1987) (staying claim filed in federal court where plaintiff filed state court action two years prior and the court found a substantial likelihood

Having already persuaded the Court that the RICO claims are unrelated to the ESA Action, defendant cannot be heard today to claim that the RICO Action is inseparable from the ESA Action such that the drastic measure of a stay is appropriate.

### A.    The Standing Of The Organizations And Potential New Plaintiffs Is Irrelevant To The RICO Action

According to defendants, even if Rider's standing is successfully challenged in the ESA Action, either the organizations or the request for new individual plaintiffs[3] will generate standing to bring the ESA Action, no longer making Rider the "but for" cause of the ESA Action and therefore eliminating any harm to FEI by having been made to litigate claims led by Rider. Defs. Mot. at 19-20. This argument fails. The bribery, illegal gratuities, obstruction, mail fraud and wire fraud do not disappear even if Rider disappears. Those acts already have been consummated during the period in which the ESA Action has proceeded on Rider's standing alone. Any future determination as to the standing of any other party will not eliminate the injury that FEI already has incurred. It would serve at most as a limitation on the damages that FEI is entitled to recover.

While defendants would like to re-write the history of the ESA Action on standing, the record is clear: by virtue of this Court's June 2001 opinion, Performing Animal Welfare Society v. Ringling Bros., No. 00-1641 (D.D.C. June 29, 2001), and the decision of the Court of Appeals, ASPCA v. Ringling Bros., 317 F.3d 334 (D.C. Cir. 2003), there is no doubt that Rider is the "but

---

that state court litigation would dispose of federal case); Spencer v. Agency-Rent-a-Car, Inc., No. 81-2097, 1981 WL 1707 (D. Mass. Nov. 17, 1981) (staying RICO claim while litigation of the plaintiff's securities fraud claim, which was predicated on the same conduct, proceeded).

[3]    The request to replace the individual plaintiffs in the ESA Action remains undecided. Granting the request would be an egregious outcome given the scope of the defendants' conspiracy. FEI has set forth in detail the latest evidence produced by defendants pursuant to the Court's Order in the ESA Action, which further supports FEI's allegations that defendants conspired to, and did indeed engage in, activity that violates the RICO statute. Notice of Supp. Points of Authority in Opp. to Pls. Mot. For Leave to File a Supp. Compl. (Civ. Act. No. 03-2006, Docket No. 199, 10/4/07).

for" cause of the ESA Action because without him there would be no ESA Action.[4]  Further litigation of the ESA Action will not change these holdings.  They are the law of the case in the ESA Action.

The organizations' argument that they have alleged their own standing in the ESA Action, see Def. Mot. at 20 n.6, and can now prove those allegations, see Defs. Mot. at 19-20 ("the Court may . . . determine that the other plaintiffs in the ESA Action have standing irrespective of Tom Rider"), is a red herring.  The standing of the organizations already has been litigated and is not subject to further consideration by the Court.  Defendants do not identify any reason why that decision should be reconsidered.[5]  Cf. Spirit of the Sage Council v. Kempthorne, No. 98-1873, 2007 U.S. Dist. LEXIS 63684, at *17-18 (D.D.C. Aug. 30, 2007) (Sullivan, J.) (prior ruling of the Court that plaintiffs had standing would be followed as the law of the case because there were no changed circumstances and "the parties should not have to battle for the same judicial decision again without good reason.").  But even if the Court were to reverse itself and now find that the organizations have standing independent of Rider, that would not change the fact that the ESA Action has been pursued for the past seven years on the basis of Rider's

---

[4]    This Court held that the organizations have neither an aesthetic injury nor an informational injury.  On appeal, the D.C. Circuit opined only as to Rider's standing; therefore, this Court's holding that the organizations do not have standing remains the law of this case and is not subject to further litigation.  ASPCA v. Ringling Bros., 317 F.3d 334, 338 (D.C. Cir. 2003).

[5]    Moreover, a public statement by their own counsel makes clear that the defendant organizations (and their counsel) knew that their ability to bring the ESA Action depended entirely on Rider's standing at the time the complaint was filed in 2000 and that their present arguments regarding their own standing are efforts at back-pedaling.  Lead counsel for plaintiffs in the ESA Action, Katherine Meyer, explained at a 2006 symposium that it was Rider's standing – as an individual with an alleged aesthetic injury, as opposed to an organizational plaintiff with an alleged informational injury – that was essential for standing to bring the ESA Action:

> In the Ringling Bros. case, *our main argument was that Tom Rider* had been a barn man for the elephants and had seen the mistreatment of the Asian elephants . . . When [Laidlaw] was issued, *we saw an opening for Rider to have standing*. . . . *So we used [Laidlaw] . . . and came up with the novel argument that Rider was suffering Article III injury* because he had to avoid going back to see his "girls," as he calls them, whom he loved so much.

13 Animal L. 61, 74-75 (2006) (emphases added).

fabricated "injury in fact" as implemented and facilitated by defendants' racketeering activity. Those actions already have occurred and will not vanish by virtue of some decision on the organizations' standing yet to be made by the Court. That is, for at least the past seven years, the RICO "bell" has been ringing in connection with the ESA Action, and that bell is not going to be "unrung" by any future decision in that case.

For the same reasons, defendants' effort to add three new individual plaintiffs to the ESA Action is beside the point. Whether these parties come in or not (which should be prohibited), and whether they have standing in their own right (which they do not), has absolutely no effect on the RICO violations that have already occurred and the damages that FEI has already suffered as a result. What the effort to add the new ESA Action plaintiffs does confirm, however, is defendants' recognition that it is only a matter of time before Rider is eliminated as a plaintiff once the full extent of the illegal scheme to pay him is made known. It also undercuts the organizations' claim that they do not need Rider because they have standing in their own right. If that is the case, then there would be no need to add more plaintiffs. Defendants have essentially already admitted this. See Reply in Support of Pls. Mot. for Leave to File a Supp. Compl. (Civ. Act. No. 03-2006, Docket No. 187, 9/11/07) at 4 ("[B]ecause Ms. Hundley has alleged that she suffers precisely this kind of injury, her standing is indistinguishable from what the Court of Appeals has already ruled is sufficient to satisfy the requirements of Article III.").

In short, defendants' contrived standing arguments do not justify a stay of the RICO Action. Taking defendants' position on its face still gets them nowhere: Even if the organizational defendants' standing was subject to further litigation and the Court found that the organizations do have a cognizable "informational" injury, and even if other individuals were added as plaintiffs to the ESA Action who actually have some kind of aesthetic injury and are

not participants in racketeering activity, such events would only serve to limit FEI's injury and damages, not eliminate them. While waiting for resolution of the ESA Action would suit defendants, it is not a basis for a stay.

**B.    Rider's Credibility As A Witness Is Irrelevant To The RICO Action**

Contrary to defendants' assertions, Rider's witness testimony in the ESA Action will not serve to clarify, let alone be dispositive of, whether the (now undisputed) payments to and received by Rider are bribes or illegal gratuities. Defendants incorrectly argue that the Court should permit the RICO Action to proceed only if it "doubts the credibility of Mr. Rider's testimony" after first hearing it in the ESA Action. Defs. Mot. at 16-17 ("if the Court concludes that Mr. Rider's testimony is credible (and indeed, is corroborated by the other testimony and evidence), then that will raise serious questions as to whether FEI has sufficiently pled a claim under RICO."). This argument is seriously flawed, legally and logically.

The RICO Action will go to trial unless defendants either get it dismissed under Fed. R. Civ. P. 12 or obtain summary judgment under Fed. R. Civ. P. 56. It is elementary that a disposition under Rule 12 is to be made solely within the four corners of the pleadings. Therefore, regardless of how credible or incredible Rider's testimony in the ESA Action is, it would not be properly considered by the Court pursuant to a motion under Rule 12, either to dismiss for failure to state a cause of action (12(b)(6)) or for judgment on the pleadings (12(c)). See Saddler v. D'Ambrosio, 759 F. Supp. 4, 8 (D.D.C. 1990) ("Much of the resolution of the contradiction in the versions of events . . . will be based on the evaluation of the credibility of witnesses, something not available to the Court in the posture of a motion to dismiss, or a motion for summary judgment."). Indeed, for purposes of a Rule 12 motion in the RICO Action, the Court would be required to assume the truth of the allegations in the Complaint, namely that

Rider's account of the alleged elephant abuse he claims he witnessed is false and has been tailored, in exchange for money, to fit the defendants' "taking" claims and other agenda items. Compl. ¶¶ 127-133. Thus, defendants' assertion (Defs. Mot. at 17 & 18) that "[i]f the Court concludes that Mr. Rider's testimony is credible . . . then that will raise serious questions as to whether FEI has sufficiently pled a claim under RICO" simply reflects defendants' profound misunderstanding of Rule 12 procedures. Whether the RICO claim has been sufficiently pled will turn solely on the allegations in FEI's Complaint.

Nor would Rider's credibility or lack thereof in the ESA Action be a basis for summary judgment in the RICO case. Credibility is inherently factual, and it is also elementary that when a case boils down to the credibility of a witness, summary judgment is improper. Czekalski v. Peters, 475 F.3d 360, 363 & 368 (D.C. Cir. 2007) (on summary judgment, the court "must view the evidence in the light most favorable to the nonmoving party . . . , draw all reasonable inferences in her favor, and *eschew making credibility determinations or weighing the evidence*") ("This is a dispute we cannot resolve without evaluating witness credibility and weighing the evidence, neither of which is appropriate at the summary judgment stage.") (citations omitted) (emphasis added). Tellingly, defendants cite no case in which a court has determined that a witness is credible as a matter of law in one case based upon the testimony of that witness in another case. Moreover, on a motion for summary judgment by defendants in the RICO Action, the inferences and facts will have to be taken in favor of the non-movant (i.e., FEI). See Czekalski, 475 F.3d at 363. As previewed in the Complaint – the allegations of which are based on evidence actually produced in the ESA Action – there would be more than an ample basis for the proposition that issues of fact exist as to whether Rider, and the other defendants, are truthful.

Thus, there is no legally permissible way that the Court's assessment of Rider's credibility in the ESA Action would be any basis for a determination of the merits of the RICO claims. By their motion for stay, defendants are asking the Court to wait for something to happen in the ESA Action that the Court cannot properly consider in any event in the RICO Action with respect to whether or not the RICO claims should proceed.

Furthermore, "credibility" is not the legal standard for (or even an element of) violation of the federal bribery statute or the federal illegal gratuity statute. See 18 U.S.C. § 201(b)(3)-(4) ("directly or indirectly, *corruptly* gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, *with intent to influence the testimony*") ("directly or indirectly, *corruptly* demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity *in return for being influenced in testimony*") & 18 U.S.C. § 201(c)(2)-(3) ("directly or indirectly, gives, offers, or promises anything of value to any person, *for or because of the testimony*") ("directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally *for or because of the testimony*") (emphases added). The credibility assessment that the Court will make in the ESA Action will simply be whether or not Rider's account of what he claims he witnessed is believable. That does not involve any legal determination as to the intent and purpose of the payments (i.e., whether the payments were made with a "corrupt" intent and were made with an "intent to influence") when the Court hears Rider's testimony in the ESA Action.

Further, even truthful testimony that is purchased violates the federal illegal gratuity statute, making the credibility (and corroboration) of Rider's testimony in the ESA Action irrelevant for purposes of the RICO Action. See 18 U.S.C. § 201(c)(2)-(3) ("for or because of

the testimony under oath").  It makes no difference, therefore, if Rider's accounts regarding elephant abuse are true or false in the context of this statute – a point that defendants conspicuously overlook.  As the Court previously ruled in the ESA Action, those legal and factual issues are independent of the issues raised in the ESA Action.  See Mem. Op. at 5 ("The focus of the only claim in [the ESA Action] is whether or [FEI's] treatment of its elephants constitutes a taking within the meaning of Section 9 of the ESA.").  The purpose and intent of the payments, and ultimately whether they were bribes and/or gratuities for testimony, are questions of fact that can only be decided by a jury in the RICO Action.

Moreover, after trial on the ESA Action, the Court will not be in a better position to make any "assessment" as to whether Rider was bribed because it will have had heard only a small portion of the RICO evidence, further undermining any argument in support of a stay.  The Court held that the RICO Action will require substantially more evidence than is relevant to the ESA Action and denied FEI's request for full discovery on the RICO conduct.  See Mem. Op. at 5 & 6 ("Any limited information about payments to or the behavior of Tom Rider that defendant is entitled to in order to challenge [the] credibility of one plaintiff in this case is far different from the vast amount of information [FEI] would be seeking . . . . to prove an alleged RICO scheme.") ("The far-reaching nature of defendant's RICO claim would likely require substantial additional evidence . . . beyond the evidence already produced on the payments to Tom Rider, as defendant's alleged scheme is not limited simply to these payments.").  To properly make any "assessment" as to the viability and merit of the RICO Action, specifically the bribery allegations, the Court must have the entire record of the extensive RICO conduct before it.  As the Court has opined, this will require substantial additional discovery that will not take place

when the "very limited discovery" that remains to be completed in the ESA Action is taken.  See Mem. Op. at 4.

Rider's testimony in the ESA Action (assuming he even ultimately testifies in that case), and any determination the Court makes as to his credibility therein, is entirely irrelevant to the legal and factual issues that go to whether the payments he received from the other defendants are bribes or illegal gratuity payments.  Because the trial of the ESA Action will have no bearing upon whether Rider was bribed, a stay is inappropriate on this basis.

**C.**    **The Court Has Held That The RICO Action And The ESA Action Involve Distinct Legal Issues And Evidence That Do Not Support The Granting of A Stay**

Defendants' argument that the ESA Action will bear upon litigation of the RICO Action is directly contrary to the Court's Memorandum Opinion and the Court should deny defendants' motion on the basis of its Opinion alone.[6]  The Court unequivocally held that litigation of the ESA Action will determine whether FEI violated section 9 of the ESA and that issue alone.  See Mem. Op. at 5 & 8 ("[t]he focus of the only claim [] is whether or not [FEI's] treatment of its elephants constitutes a taking within the meaning of Section 9 of the ESA") (the ESA Action involves "litigation on a very narrow issue – whether or not [FEI's] treatment of its elephants constitutes a taking").  Further, the Court opined that the ESA Action and the RICO Action involve different legal issues and will require different evidence.  See Mem. Op. at 6 (FEI's RICO claim involves "an elaborate scheme, including cover-ups" that "would likely require substantial additional evidence – including at minimum, numerous additional documents and

---

[6]    Not only is defendants' argument contrary to the Court's Opinion, it is also contrary to their own prior position on this issue.  In opposition to FEI's efforts to add its RICO claim as a counterclaim in the ESA Action, defendants strenuously argued that the two were in no way related.  Predictably, since the opposite conclusion now suits defendants' position, they now argue that the two actions are intimately related.  Judicial estoppel, however, prevents defendants from doing just that.  See Zedner v. U.S., 126 S. Ct. 1976, 1987 (2006) ("judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.") (citations omitted).

depositions – beyond the evidence already produced on payments to Tom Rider, as defendant's alleged scheme is not limited to these payments."). And, as argued previously, while the Court may evaluate the payment evidence to determine whether to credit Rider's testimony, the Court's determination as to whether Rider is telling the truth about elephant abuse has *no* relevance as to whether Rider was bribed or received illegal gratuities for that testimony (or whether the RICO Action could survive a motion to dismiss or for summary judgment on those issues). In denying FEI's motion for leave to amend, the Court expressly rejected FEI's argument that the RICO conduct had become part and parcel of the ESA Action and that the claims should be litigated at the same time.

Thus, the Court has held that, for a variety of reasons, the RICO issues must be litigated separately from the "narrow" "taking" issue. See Mem. Op. at 4-8. This determination is incompatible with defendants' insistence that the two cases are so closely connected that the RICO case must be stayed pending the outcome of the ESA Action. If such a connection existed, however, then the RICO claims should have been added as a counterclaim to the ESA Action. The Court ruled otherwise, and that determination, standing alone, shows that a stay of the RICO case would be unwarranted.

## II. PROCEEDING WITH THE RICO ACTION WILL PRESENT NO RECOGNIZED PREJUDICE TO DEFENDANTS, LET ALONE A "CLEAR CASE OF HARDSHIP OR INEQUITY" AS IS REQUIRED BY CONTROLLING PRECEDENT

Defendants cannot demonstrate "prejudice," let alone a "clear case of hardship or inequity," which is required by a long line of Supreme Court cases prescribing the standards for obtaining a stay of litigation. Clinton v. Jones, 520 U.S. 681, 708 (1997) ("[t]he proponent of a stay bears the burden of establishing its need"); Landis v. N. Am. Co., 299 U.S. 248, 255 (1936)

("the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward"). Their inability to do so is reason enough to deny their motion for a stay.

Defendants incorrectly contend that the "same considerations" that led the Court to deny FEI's motion for leave to amend "counsel heavily in favor of staying" the RICO Action. Defs. Mot. at 14. In fact, it is exactly the opposite: The Court's prior ruling addressed *whether* the *RICO* claim *should delay* litigation of the *ESA* Action while the present inquiry is *whether* litigation of the *ESA* Action *should delay* litigation of the *RICO* Action. Since there will be no RICO counterclaim in the ESA Action, it is clear the proceeding with the RICO claims in a totally separate lawsuit can have no delaying or any other effect on the ESA action. Such a delay was the primary basis that defendants would have suffered if the "taking" and RICO claims were adjudicated in one lawsuit. That defendants would be inconvenienced by defending one lawsuit while pursuing another does not establish "prejudice" let alone "hardship." See Baisden v. Bourne, No. 06-517, 2006 U.S. Dist. LEXIS 88114, at *11 (D. Neb. Dec. 5, 2006) ("The interest of the plaintiffs to proceed with one case at a time does not justify the burden of delay a stay may cause the defendants."). Perhaps defendants should have considered that they could be called to account for hiring a plaintiff to procure standing *before* proceeding with such a scheme as the consequences for doing so are not unforeseeable.

Defendants argue that "the prejudice and dilatory motive that the Court deemed sufficient bases to deny FEI's motion to add the RICO claim into the ESA Action are also grounds for staying the Second RICO Suit." Defs. Mot. at 15. This is wrong. The considerations identified are only relevant when determining whether a counterclaim should be added to an ongoing case. Now that the RICO claims are the subject of an independent lawsuit, as defendants insisted that they be, the only operative "timing" issue is whether FEI filed its RICO claim within the four

year statute of limitations (which it has).[7]  Whether a proposed counterclaim comes too late in the course of an ongoing case has nothing to do with whether a newly filed lawsuit is barred by limitations, and defendants' effort to conflate the two concepts should be rejected.

Defendants' "prejudice" argument is equally unfounded.  In its opinion, the Court's reference to "prejudice" involved the organizations and Rider having to litigate the ESA "taking" claim at the very same trial as the RICO claim, and that adding the RICO claim may have delayed that trial. Mem. Op. at 4-7.  Now that it has been filed as a separate lawsuit, litigation of the RICO Action will in no way delay trial of the ESA Action and, as such, it will work no prejudice on defendants.  Moreover, given that the Court has established firm deadlines for the close of discovery and for the submission of pre-trial schedules in the ESA Action, it is difficult to imagine how the newly-filed RICO lawsuit could advance at any pace that would interrupt or divert time or resources from the ESA Action – and, in any event, defendants make no argument to the contrary.

Litigants are often required to simultaneously prosecute and defend multiple lawsuits at the same time.  That defendants will have to devote attention to the RICO Action at the same time as the ESA Action is no reason to stay the former.  Defendants are in this position because, as FEI maintains, they engaged in a pattern of illegal racketeering activity.  The Federal Rules provide the framework for determining whether FEI's RICO claims should go forward, namely, Fed. R. Civ. P. 12 & 56.  If the claims fail under those rules, then that will be the end of it. However, if they pass muster under those rules, then they clearly should proceed to trial.  In neither event is there any basis for staying consideration of the claims.

---

[7]      Indeed, the Court found that the earliest that FEI could have had notice of a potential RICO cause of action was September 2005, which is well within the four-year statute of limitations.  See Mem. Op. at 7.

Tellingly, plaintiffs cite no authority for their position that a lawsuit brought against one party should be stayed while an unrelated lawsuit brought by that party is pursued. Defendants are not immune from defending a lawsuit against them merely because they have filed their own. Indeed, defendants' novel approach would allow any litigant faced with multiple litigation to stay subsequent, unrelated litigation on the basis that it preferred to not spend its time or resources on multiple actions (particularly if it is defendant). FEI certainly has never received such a "free pass" from the judiciary even though the animal rights activists have filed simultaneous, separate lawsuits against it. It had to litigate both simultaneously, as defendants should also be required to do. The reality of what is happening here is that defendants are asking the court to protect them from having to be defendants. They have no reservations whatsoever about filing lawsuits while other matters are pending so long as they get to be the plaintiffs. There is no legal basis for affording them such special protections, and indeed, to do so would be an abuse of discretion.

For this reason, federal courts have expressly rejected the very same argument: "[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of <u>Landis</u>." <u>Lockyer v. Mirant Corp.</u>, 398 F.3d 1098, 1112 (9th Cir. 2005); <u>see also</u> <u>Sierra Club v. City of Honolulu</u>, No. 04-00463, 2007 U.S. Dist. LEXIS 67595, at *11-12 (D. Haw. Sept. 11, 2007) (emphasis added) (***no hardship where defendant had to "expend limited resources to . . . defend [civil] lawsuit when [defendant was] pursuing global settlement negotiations involving hundreds of millions of dollars of [the] same issues with" the government***); <u>Am. Honda Motor Fin. Co. v. Coast Dist. Sys.</u>, No. 06-04752, 2007 U.S. Dist. LEXIS 19981, at *5 (N.D. Ca. Feb. 26, 2007) (no hardship where defendant subject to "inconvenience because of duplicative discovery requests" in two ongoing proceedings).

Like <u>Sierra Club</u>, the allegedly inconvenient timing of the RICO Action and defendants' supposed "limited resources," are not proper bases for a stay.  <u>See</u> Defs. Mot. at 2-3 & 15 ("[P]ermitting the Second RICO Suit to proceed at this time will seriously prejudice the ASPCA Plaintiffs' ability to pursue the ESA Action . . . by diverting their attention and limited resources from that case to this one.") ("[I]t is evident that the upcoming few months are the <u>worst possible time</u> for the ASPCA Plaintiffs and their counsel to be distracted by the Second RICO Suit. . . . [T]he ASPCA Plaintiffs and their counsel will be devoting substantial attention to the ESA Action in the coming few months.").  FEI and its counsel will also be busy with both actions, so the complaint itself is hollow.

Moreover, the claim of "limited resources" is not supported by any evidence, and although defendants like to baldly assert this, they have yet to prove it.  The Complaint here shows, based on defendants' own IRS Form 990 filings that defendants are (or in the case of FFA are closely associated with) organizations that have millions of (in some cases hundreds of millions) of dollars in assets.  Compl. ¶¶ 22-27, 123 (total net assets of ESA Action organizational plaintiffs is over $310 million).  The "David vs. Goliath" image that defendants would like to create is disingenuous and tiresome.

Defendants' argument that the RICO Action will distract their counsel during the ESA Action similarly is not a basis to warrant a stay.  Despite the fact that Meyer, Glitzenstein & Crystal ("MGC") attorneys have been involved in the RICO activity, and likely will be witnesses in the RICO Action, defendants have voluntarily chosen to retain the same law firm to represent them in the RICO Action.  That MGC may have "limited resources" (another unsupported assertion) and may be unable to litigate both cases at the same time is no reason to delay FEI's day in court.  Defendants were free to retain entirely different counsel but apparently chose not

to do so. Indeed, it is difficult to understand why counsel would undertake a defense of the RICO Action knowing that they would be material witnesses in the litigation.[8] Defendants (and their counsel) knew of the deadlines approaching in the ESA Action at the time the RICO Action was filed. Defendants cannot shield themselves from their illegal and unethical conduct and delay FEI's day in court by retaining counsel that allegedly are "too busy" or has inadequate resources to properly represent them.

That MGC's representation of defendants creates a potential conflict of interest also is irrelevant to a stay of the RICO Action. The Court recognized that adding the RICO claim to the ESA Action could have created the need for the change of counsel in that case and consequently could have delayed the litigation. See Mem. Op. at 6 ("Allowing a counterclaim to go forward that alleges plaintiffs' counsel's involvement in improper payments would likely involve depositions of plaintiffs' counsel and create a need for new counsel to pursue the 'taking' claim where no need currently exists."). However, defendants cannot now argue the same with respect to the RICO Action: They voluntarily retained the same law firm with full knowledge of that conflict. While it is one thing for a lawyer to become a material witness in a case after a counterclaim has been filed, it is an entirely different matter for a lawyer to take on a case (and for a client to retain that lawyer) knowing at the outset that she will be a material witness in that matter. Defendants' counsel's claimed inability to litigate both cases is the direct result of defendants' own failure or unwillingness to seek independent legal advice and to retain counsel with a conflict. The self-created circumstances by defendants cannot be used to delay or deny FEI's right to prosecute its own claims.

---

[8]    In fact, the representation may violate District of Columbia Rule of Professional Conduct 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness").

III.   **ALLOWING DEFENDANTS TO FURTHER DELAY A CLAIM, THE EXISTENCE OF WHICH THEY HID FOR MORE THAN SIX YEARS THROUGH FALSE TESTIMONY UNDER OATH AND SPOLIATION OF EVIDENCE, WOULD SIGNIFICANTLY PREJUDICE FEI'S RIGHT TO ITS DAY IN COURT**

Defendants' request for a stay, while not only unsupported by any caselaw, will result in significant prejudice to FEI, which cannot be ignored. As defendant's illegal activity continues – and more evidence of it has emerged since the filing of the RICO complaint – it is exceedingly necessary for FEI to have its day in court to redress these wrongs. Defendants have hidden the basis of FEI's RICO claim for years. As set forth below, since 2001, they have repeatedly lied under oath about the payments to Rider, they have withheld documents requested by FEI, and they have destroyed numerous others. Now, after having concealed this conduct for years, defendants ask the Court to indefinitely stay these proceedings to wait for the trial of another case that has no bearing upon the claims in this case. FEI, like any plaintiff, is entitled to have its claims heard and defendants should not be permitted to further stall litigation of the RICO Action now that their misconduct has been discovered – notwithstanding their best efforts to cover it up. See GFL Advantage Fund, Ltd. v. Colkitt, 216 F.R.D. 189, 193 (D.D.C. 2003) (internal citations and quotation omitted) (emphasis added) (*"[T]he right to proceed in court should not be denied except under the most extreme circumstances."*).

For example, after falsely and repeatedly representing that they have been "forthcoming" with their discovery responses and that they already had disclosed the existence of all payments made to Rider, defendants last month produced approximately 1,000 pages of documents and numerous revised interrogatory responses that provide, for the first time, information not previously known to FEI *and the existence of which, defendants had denied on multiple occasions*. Defendants and their counsel now claim that this information was just "overlooked," and that counsel's repeated assurances to FEI and the Court that all documents already had been

produced were merely "overstatements," and they apologize for that.  See Pls. Resp. to Def. Notice of Supp. Points and Authorities in Opp. to Pls. Mot. for Leave to File a Supp. Compl. (Civ. Act. No. 03-2006, Docket No. 201, 10/5/07), at 3-4.  Regardless of what defendants' latest excuse is (and significantly, several have now been proffered), the fact is that this material, including legal bills and a 1099 issued by counsel to Rider, was withheld by defendants for years until the Court ordered them to produce it.  Astoundingly, only after being compelled by Court order, defendants produced documents and information that contradict their earlier statements to this Court that they had been "forthcoming" and informed FEI of all funds paid to Rider.[9] Defendants, for example, recently informed FEI for the first time that approximately $10,000 *was paid to Rider by his counsel* and billed to the organizations.  See Ex. 1, Rider's Latest Response to Inter. No. 24; Ex. 2, 1099 From Law Firm.  This single revelation contradicted numerous sworn interrogatory responses and sworn deposition answers provided by defendants while represented by counsel who knew, or clearly should have know, them to be false.[10]  The

---

[9]    See Pls. Opp. to FEI's Mot. to Compel Discovery From the Organizational Plaintiffs (Civ. Act. No. 03-2006, Docket No. 156, 6/26/07) at 4-5 ("Thus, *defendants already have … the actual amounts of funding that the groups have donated for Mr. Rider*'s media and educational campaign. … Accordingly, *there is no information remaining to compel on this matter that would not simply duplicate information already provided*, without trampling on plaintiffs' First Amendment rights."); id. at 14 ("*[T]he groups and WAP have already provided defendants with documents demonstrating the amounts of such funding for each group.*"); id. at 21 (*Plaintiffs have provided "defendants with information demonstrating the amount and source of funding Mr. Rider."*); id. at 27 ("As plaintiffs have repeatedly stated, *they have not withheld, and have never intended to withhold, any documents or information concerning the amounts of funding that the groups are providing either to Mr. Rider or to WAP* … Indeed, *defendants now have a complete accounting of all of the funds the groups have provided for Mr. Rider's media work*, both directly and by way of donations to WAP, and all of defendants' complaints about missing information on this issue relate to defendants' desire to force plaintiffs to provide the same information in multiple formats – i.e., in written, documentary, and oral form at depositions. However, *wasting the Court's and the parties' time in an attempt to compel plaintiffs to provide information that defendants already have is vexatious and harassing to say the least, and the Court should not tolerate this conduct.*"); id. at 29 ("*[D]efendants had already obtained … an accounting of all of the funding that the organizational plaintiffs had provided to Mr. Rider or to WAP.*").  The recently compelled production demonstrates that *all* of these statements were false.

[10]    See Ex. 3, FFA Depo. at 157-59 (testifying that it only paid Rider on one occasion and omitting any reference to these payments); Ex. 4, AWI Depo. at 142 (omitting any reference to these payments and testifying that it was not aware that it was sharing Rider's expenses with other organizations even though the bills from its law firm identified the payments to Rider as "shared expense"); Ex. 5, ASPCA Depo. at 226-27 (testifying under oath that its payments to Rider were not through its counsel in 2003 notwithstanding that it now conceded such payments were

documents related to these payments also flatly contradict statements to FEI about this topic. Notwithstanding defendants' proclamation that they "have no 'non-privileged portions of the invoices from [our] firm that reflect monies filtered through it for payments to Mr. Rider,'" **_plaintiffs recently produced ten such invoices after being compelled by the Court to do so_**. Compare Ex. 9, Meyer letter to Gasper at 5 (12/15/06) (quoting Gasper letter to Meyer (11/22/06)) with Ex. 10, Legal Bills From Law Firm Reflecting Payments to Rider.

Not only have defendants provided false testimony and false interrogatory responses to hide their misconduct (and, thus, hide the existence of FEI's RICO claim), defendants took extraordinary steps to either make the payments to Rider appear legitimate or, at the very least, difficult to trace back to them. In one instance, for example, defendant AWI sought to provide Rider with $500. Yet, instead of wiring the money to Rider itself, however, AWI issued a $600 check to one of its employees who then cashed the check, personally wired $500 to Rider, personally paid the wire transfer fee, and placed the remainder in AWI's petty cash fund. Ex. 7, AWI's Latest Response to Inter. No. 21. Defendant WAP, moreover, resorted to identifying payments to Rider as expenses for "Media" in specific cities. While WAP often chose cities that corresponded to the upcoming schedule of FEI's circus, it appears that Rider has neither produced receipts nor alleged in his interrogatory responses to have been in those cities at those times. Compare Ex. 11, WAP Ledger (reflecting payments totaling $3,500 for "Media" work in Canton, Toledo, Omaha and Chicago in September/October 2006 and another $2,000 for "Media" work in Everett, Salt Lake City, Pittsburgh, and Chicago in September/October 2005) with Ex. 12, Rider's Second Response to Inter. Nos. 4-5 (reflecting no such "media" work in

---

made); all of which omitted any reference to such payments); Ex. 6, FFA's Latest Response to Inter. No. 21 (acknowledging inconsistency between current interrogatory response and deposition testimony); Ex. 7 AWI's Latest Response to Inter. No. 21 (same); Ex. 8, Four Sworn Interrogatory Responses to Nos. 21-22 (omitting any discussion of such payments).

those times) and Ex. 13, Schedule of FEI's Circus (performing in or near those cities at the time of WAP's payments).  Indeed, WAP paid Rider $1,000 for "Media in Washington, DC" when he was in DC for his deposition in the ESA Action, not for any "media" work.  Compare Ex. 11, WAP Ledger with Ex. 14, Rider Depo. at 1-2 and Ex. 12, Rider's Second Response to Inter. Nos. 4-5 (sworn response identifying no "media" work in DC at that time).  WAP's efforts are nothing more than an attempt to throw FEI off of its trail and to further hide evidence that supports FEI's RICO claim.

Defendants' misconduct does not stop with mere false testimony and fancy bookkeeping. Defendants, for example, further hid the existence of FEI's RICO Action by destroying documents relevant to the payment scheme.  Ex. 15, Rider Decl ¶¶ 3, 5; Ex. 16, ASPCA Decl. ¶ 2(c).  Importantly, defendants' spoliation is not limited to past conduct.  Rider, himself, has now admitted under oath that he may not be keeping all documents related to the payment scheme because he "lives in a van" and allegedly has a difficult time keeping track of papers.  Ex. 15, Rider Decl. ¶ 5.  Living in a van is no excuse for Rider to get rid of relevant evidence or for his counsel to continue to permit him to do it unabated.  This Court had little sympathy for FEI's difficulties involved with recordkeeping that occurs while traveling.  It should not now grant a pass to Rider.  Again, it is no excuse for Rider to argue that he cannot keep documents because it is "too hard."  In light of defendants' admitted track record related to spoliation, the Court should not give them any more time in which they have the opportunity to continue destroying evidence. FEI has an urgent need to take discovery related to its claims before defendants have any further chance to destroy it.

Although defendants label their request for a stay as "temporary," there is nothing temporary about it.  Defendants are asking the Court to freeze the case indefinitely even though

they already have spent several years concealing it through their own misconduct, false testimony, spoliation, and other nefarious deeds. Such behavior is not puffing by FEI – it has been demonstrated through evidence – and it is of such an egregious nature the Court simply cannot ignore it. Granting defendants' request for an indefinite stay cannot be supported by the law. See Landis, 299 U.S. at 254-55 ("[A] court may abuse its discretion if its grants 'a stay of indefinite duration in the absence of a pressing need."). Defendants seek a stay of FEI's claim pending final disposition of the ESA Action, even though no trial date has been set in the ESA Action and, after such a trial, there almost assuredly will be continued litigation relating to the ESA's fee-shifting provision and an appeal of the Court's ultimate finding. The final resolution of the ESA Action is not merely several weeks away. Cf. F.S. v. District of Columbia, No. 06-923, 2007 U.S. Dist. LEXIS 27520, at *17 (D.D.C. April 13, 2007) (Sullivan, J.) ("a stay lasting a matter of weeks" would result in no prejudice). FEI's claims against defendants, based upon hard evidence, are neither *de minimus* nor inconsequential. See United States v. Milberg Weiss Bershad & Shulman L.L.P., Crim No. 05-587 (C.D. Cal. 2006) (alleging criminal conspiracy to, *inter alia*, pay plaintiffs to bring class action and share-holder derivative lawsuits and to serve as witnesses in those actions). The conduct that is at issue here is totally unacceptable, amounting to a fraud upon this very Court and the D.C. Circuit. It cannot be ignored, legitimized, or indefinitely delayed as defendants seek. That result should not be permitted.

## IV.    THERE IS NO FIRST AMENDMENT RIGHT TO PERPETRATE A FRAUD ON THE COURT THROUGH BRIBERY AND PERJURY

Defendants' constitutional avoidance argument is entirely without merit. The D.C. Circuit has made clear that litigation premised on bribes and false statements receive no constitutional protection: The Noerr-Pennington doctrine does not protect illegal activity when a "party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the

litigation of its legitimacy." Whelan v. Abell, 48 F.3d 1247, 1250-51 (D.C. Cir. 1995) (quoting Liberty Lake Investments, Inc., v. Magnuson, 12 F.3d 155, 159 (9th Cir. 1993)). Whelan observed that: "However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods. 'Misrepresentations condoned in the political arena, are not immunized in the adjudicatory process." Whelan, 48 F.3d at 155 (quoting California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 513 (1972)). Moreover, with respect to allegations of bribery, Whelan specifically stated that "[a]ttempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of Noerr." Whelan, 48 F.3d at 1255 (quoting Federal Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n., 663 F.2d 253, 263 (D.C. Cir. 1981)).

The RICO Action alleges that through, *inter alia*, bribery, illegal gratuity payments and perjury amounting to obstruction of justice defendants have perpetrated a fraud on this Court and FEI, Compl. ¶¶ 3-168; this is precisely the type of conduct that Whelan held is beyond Noerr-Pennington's protection. In any event, this issue should be briefed on a Rule 12 motion to dismiss and is not a proper basis to stay the RICO Action. The resolution of the ESA Action will have no bearing upon defendants' Noerr-Pennington defense to the RICO Action.[11]

---

[11]     The ESA Action also falls within the "sham" exception to Noerr-Pennington. Among other things, purchasing the services of a plaintiff and then committing perjury and obstruction of justice to cover the payment tracks are sufficient to characterize the ESA Action as an "objectively baseless" lawsuit. Opdyke Investment Co. v. City of Detroit, 883 F.2d 125, 1273 (6th Cir. 1989) (the "sham" exception to Noerr-Pennington immunity applies where, as here, abuse of process arises from "perjury, or bribery, or any other such reprehensible practice"); accord Baltimore Scrap v. The David J. Joseph Co., 237 F.3d 394 (4th Cir. 2001). Defendants' citation to Sosa v. DIRECTV, Inc., 438 F.3d 923 (9th Cir. 2006) is inapposite. In that case, the plaintiffs "declined to invoke the sham exception" to Noerr-Pennington immunity and the only issue before the court was whether RICO "proscribes the sending of pre-litigation demand letters asserting legal claims that may be weak but do not rise to the level of shams." Id. at 940 & 939. Sosa does not govern this Court's analysis of the RICO Action which is predicated on

## CONCLUSION

To stay an entire case in this Circuit requires extreme circumstances. Defendants present no such circumstances, because there are none here. That defendants have the audacity to claim a stay is now necessary because this case is indistinguishable from the ESA Action, when just weeks ago they convinced the Court to disallow the RICO counterclaim because the two matters are entirely different, comes as no surprise given the rest of their conduct to date. What has occurred here with the payments to Rider to cure the organizational plaintiffs' standing, so that suit can be brought under a statute that could permit defendants' counsel to recover its fees at its conclusion is ***utterly outrageous***. Defendants elected to play an exceedingly dangerous game by proceeding with this scheme and apparently thought they would never be caught. Moreover, once they were caught and FEI began asking for the evidence, they then lied to both FEI and this Court to conceal its existence. To date, FEI does not believe that it has received what it was owed pursuant to the Court's August 23, 2007 Order because of continued gamesmanship by defendants. The time for defendants to answer for what they have done has come. They are not entitled to any court protection, nor should they be rewarded, for their actions, regardless of whether it comes in the form of a stay or otherwise.

---

conduct associated with "sham" and fraud litigation. Further, unlike the plaintiffs in <u>Sosa</u>, FEI has clearly stated claims for relief on each and every predicate act alleged in the RICO Action.

For all of the reasons stated above, the Court should deny defendants' stay motion.

Respectfully submitted,

John M. Simpson (D.C. Bar #256412)
Joseph T. Small, Jr. (D.C. Bar #926519)
Lisa Zeiler Joiner (D.C. Bar #465210)
Michelle C. Pardo (D.C. Bar #456004)
George A. Gasper (D.C. Bar #488988)

FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
Counsel for Plaintiff Feld Entertainment, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FELD ENTERTAINMENT, INC.** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No. 07- 1532 (EGS)** |
| | : | |
| **AMERICAN SOCIETY FOR THE** | : | |
| **PREVENTION OF CRUELTY** | : | |
| **ANIMALS, <u>et</u> al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY ALL PROCEEDINGS

# EXHIBIT INDEX

| Number | Description |
|---|---|
| 1. | Rider's Latest Response to Interrogatory No. 24 |
| 2. | 1099 From Law Firm |
| 3. | FFA Deposition Excerpt |
| 4. | AWI Deposition Excerpt |
| 5. | ASPCA Deposition Excerpt |
| 6. | FFA's Latest Response to Interrogatory No. 21 |
| 7. | AWI's Latest Response to Interrogatory No. 21 |
| 8. | Four Sworn Responses to Interrogatory Nos. 21-22 |
| 9. | Meyer letter to Gasper (12/15/06) |
| 10. | Legal Bills From Law Firm Reflecting Payments to Rider |
| 11. | WAP Ledger |
| 12. | Rider's Second Response to Interrogatory Nos. 4-5 |
| 13. | Schedule of FEI's Circus |

14.          Rider Deposition Excerpt

15.          Rider Declaration

16.          ASPCA Declaration

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.   :
             :
     **Plaintiff,**    :
             :
  **v.**          :   **Case No. 07- 1532 (EGS)**
             :
**AMERICAN SOCIETY FOR THE** :
**PREVENTION OF CRUELTY**  :
**ANIMALS, et al.**     :
             :
    **Defendants.**   :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RINGLING BROS. AND BARNUM & BAILEY CIRCUS, et al., <br><br> Defendants. | )<br>)<br>)<br>)<br>)  Civ. No. 03-2006 (EGS)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF TOM RIDER'S 2d SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

These are Plaintiff Tom Rider's 2d Supplemental Responses to Defendant's First Set of

Interrogatories, which are being provided pursuant to the Court's August 23, 2007 Discovery

Order (Docket No. 178). All of the definitions and objections contained in Mr. Rider's earlier

Interrogatory Responses apply here as well. Notwithstanding any of those general and specific

objections, Mr. Rider is providing all of the information required by the Court's Order.

**Interrogatory No. 2:**

Describe each and every job or volunteer position you have held since you completed high school
(or, if you never completed high school, since your last year of schooling) that you did not
describe in response to the previous interrogatory.

**Supplemental Response to Interrogatory No. 2:**

Although I do not consider the media, legislative, and public education advocacy that I

have done for any other organization to be a "job," I nevertheless state that I also performed the

contend that all of defendant's elephants at the Center for Elephant Conservation are similarly chained.

I further rely on the following video footage produced by defendant: FELD-VID 001, 002, 006, 007; FEI 0010, 0013, 0016, 0017, 0018, 0019, 0020, 0025, 0026, 0436, 0437, 10350, 10351, 10352, 10354, 10355, 10357, 10358, 10359, 10360, 10361, 10362, 10364, 10365, 10366, 10367, 10368, 10369, 10383, 38227, 38228, 38229, 40957, 40958, 40960, 40965, 40966, 40968, 40970, 40971, 40974, 40975, 40982, 40983, 40984, 40985, 40986, 40987, 40989, 40990. Additional information responsive to this Interrogatory is contained in footage that plaintiffs have reviewed and requested from defendant, but that has not yet been produced by defendant. Once plaintiffs obtain that footage, I will supplement this response accordingly.

**Interrogatory No. 24:**

Identify all income, funds, compensation, other money or items, including, without limitation, food, clothing, shelter, or transportation, you have ever received from any animal advocate or animal advocacy organization. If the money or items were given to you as compensation for services rendered, describe the service rendered and the amount of compensation.

**Supplemental Response to Interrogatory No. 24**

In March 2000, PAWS paid for an airline ticket for me to come to Galt, California so that I could be deposed by PAWS' attorney.

From March through December 2000, and January - February, 2001, I received approximately $50 a week from PAWS to pay for my living expenses while I did media, legislative, and public advocacy for PAWS concerning the mistreatment of Asian elephants by the Ringling Brothers Circus. During this time PAWS also paid my motel bill at an inexpensive motel near Galt, California, and it paid for some airline tickets for me to go to Las Vegas,

-13-

Nevada to do media work; to attend a press conference in Phoenix Arizona; and to testify before the United States Congress in June 2000 regarding a bill to ban elephants in circuses, and to speak to officials at the United States Department of Agriculture about this matter. A copy of the 1099 from PAWS for 2000 is being produced, along with copies of documents showing some of the airline travel and the hotel bill for my stay in Washington, D.C. in June 2000. I did not receive a 1099 from PAWS for 2001.

In February 2001, I went to live on PAWS' sanctuary, "ARK 2000." I lived in a used motor home that PAWS provided to me, and PAWS continued to give me additional funds to pay for my living expenses – it was a little more than $50 a week to account for the additional expense of gas for the motor home and a gas generator that I used for electricity, but I do not remember exactly how much it was. I continued to do media and legislative advocacy for PAWS as described above, and I also watered some of the plants at the sanctuary, fed the wild turkeys, and performed some security for PAWS by watching the gate.

Since May 2001, I have received grant money from other animal advocacy groups to do media and legislative advocacy and public education concerning the way elephants in circuses are treated. That funding has been used for my living expenses while I travel across the country to do this advocacy, first by Greyhound bus (I usually slept on the bus, but occasionally stayed in an inexpensive motel room), and then (and continuing to today) in a used van which I usually park in a camping ground or parking lot and sleep in (but sometimes stay in a motel room). Those expenses have included Greyhound bus tickets, hotel bills, camping registration fees, food, clothing, gas money, gas for a generator, and the other necessities of every day living – while I travel back and forth across the country and visit numerous cities each year to talk to reporters,

-14-

editors, producers, legislative bodies, grass roots groups, and individuals about what really goes

on behind the scenes at the circus and the systematic daily abuse that the elephants must endure.

The amount of grant money I have received from the Wildlife Advocacy Project ("WAP") for

this advocacy is identified in the 1099s from that group which I am producing (Bates Labels: TR

457-461).

   To the best of my recollection, over the last six and a half years I have received the

following additional amounts of funding and other items for this advocacy from the following

animal advocacy groups:

ASPCA:      approximately $6,000; the ASPCA also paid for my cell phone for part of the year
            in 2002 and in 2003, and sometimes paid for hotel rooms for me; it also gave me a
            used lap top computer to use.

AWI:        approximately $1,600; in addition, AWI paid for car repairs for my van in
            January, 2007

FFA:        approximately $1,000

API:        approximately $50.00; in addition API paid for a round-trip plane ticket so that I
            could go to Omaha, Nebraska in January 2006 to testify in support of legislation,
            and I believe that it also paid for my hotel room for 2 days while I was there.

   In addition, during 2001 - 2003, I received approximately $ 9,000 from the law firm

Meyer & Glitzenstein that was reimbursed by the organizational plaintiffs for my expenses in

connection with my media, legislative, and public education advocacy.  I am producing the 1099

form that I received from Meyer & Glitzenstein that reflects part of  this information (TR 00456);

the plaintiff organizations are producing other documents concerning this information (F 04493-

04516; AWI 09932-09939, 10054-10063); and the ASPCA documents that pertain to this

information will be identified when the ASPCA submits its responsive documents.

From all other animal advocacy groups over the last seven years, other than the plaintiff groups, or WAP, I have received:

> approximately $25,350; plus one of those groups also paid for a round-trip train ticket for me to go from Los Angeles to Chicago in March 2006 so that I could speak to the City Council in support of legislation that would ban the use of bull hooks on elephants, and it also paid my hotel bill for 2 days while I was there; and another group paid for a plane ticket for me in July 2001 so that I could speak to the City Council of South Hampton, New York about proposed legislation concerning circuses.

None of these groups are parties to this lawsuit, attorneys for any of the parties, or employees or officers of any of the plaintiff organizations or WAP. See Order (Docket No. 178) at 3.

In July 2003, my attorney Katherine Meyer personally provided me approximately $ 600 to pay for a round-trip plane ticket from San Francisco to Washington, Illinois, so that I could attend my sister's funeral.

In addition, over the last seven years, I received approximately $ 7,690 from nine different individuals who could probably be described as "animal advocates." None of those individuals are parties to this lawsuit, attorneys for any of the parties, or employees or officers of any of the plaintiff organizations or WAP. See Order (Docket No. 178) at 3.

-16-

Pursuant to 26 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
is true and correct to the best of my knowledge.

_____
Tom  E. Rider

_____9/24/2007_____
Date

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FELD ENTERTAINMENT, INC.** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 07- 1532 (EGS)** |
| | : | |
| **AMERICAN SOCIETY FOR THE** | : | |
| **PREVENTION OF CRUELTY** | : | |
| **ANIMALS, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 2

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city, state, and ZIP code | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| MEYER & GLITZENSTEIN<br><br>1601 CONNECTICUT AVE NW STE 700<br>WASHINGTON, DC   20009 | $ | **2001** | |
| | 2 Royalties | Form 1099-MISC | |
| | $ | | |

| | 3 Other income | 4 Federal income tax withheld | Copy A |
|---|---|---|---|
| PAYER'S Federal identification number<br>52-1807436 | $ | $ | For |
| | 5 Fishing boat proceeds | 6 Medical and health care payments | Internal Revenue Service Center |
| RECIPIENT'S identification number | $ | $ | File with Form 1096. |

| RECIPIENT'S name<br>JON KIDER<br>600 EAST HOLLAND, APT D | 7 Nonemployee compensation<br><br>8781.00 | 8 Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the 2001 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
|---|---|---|---|
| Street address (including apt. no.)<br>WASHINGTON, IL   61571 | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ► ☐ | 10 Crop insurance proceeds<br>$ | |
| City, state, and ZIP code | 11 ///// | 12 ///// | |
| Account number (optional) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ |
| 15 | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**    Cat. No. 14425J    Department of the Treasury - Internal Revenue Service

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC. :
         :
    Plaintiff, :
         :
  v.      :  Case No. 07- 1532 (EGS)
         :
AMERICAN SOCIETY FOR THE :
PREVENTION OF CRUELTY :
ANIMALS, et al.    :
         :
    Defendants. :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 3

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3                 Case No. 03-2006 (EGS)

 4

 5

 6     - - - - - - - - - - - - - - - - - - -  X

 7   AMERICAN SOCIETY FOR THE PREVENTION OF         )

 8   CRUELTY TO ANIMALS, et al.,                    )

 9               Plaintiffs,                         )

10        v.                                         )

11   RINGLING BROS. AND BARNUM & BAILEY             )

12   CIRCUS, et al.,                                )

13               Defendants.                         )

14     - - - - - - - - - - - - - - - - - -  X

15                     Washington, D.C.

16                     June 22, 2005

17                                            ORIGINAL

18

19        Deposition of MICHAEL MARKARIAN, a witness

20   herein, called for examination by counsel for

21   defendant, taken at the offices of COVINGTON &

22   BURLING, 1201 Pennsylvania Avenue, Suite 1100, on the

23   22nd day of June, 2005, at 9:41 a.m. before Mary Ann

24   Payonk, RPR, RMR, RDR, Certified Realtime Reporter and

25   Notary Public.
```

Page 2

```
 1    APPEARANCES:

 2    ON BEHALF OF PLAINTIFF:

 3         KATHERINE MEYER, ESQUIRE

 4         MEYER GLITZENSTEIN & CRYSTAL

 5         1601 Connecticut Avenue., N.W.

 6         Washington, DC 20009

 7         (202) 588-5206

 8

 9    ON BEHALF OF DEFENDANT:

10         JOSHUA D. WOLSON, ESQ.

11         COVINGTON & BURLING

12         1201 Pennsylvania Avenue

13         Suite 1100

14         Washington, DC 20004

15         (202) 662-6000

16

17    ALSO PRESENT:

18         Ellen Hebert, videographer

19

20

21

22

23

24

25
```

Michael Markarian                                        June 22, 2005
                    Washington, D.C.

1              I know he has attended legislative

2    hearings in -- in some states and -- and press

3    conferences in some states to -- to discuss the

4    treatment of animals in circuses, and we have worked

5    with him on some of those issues.

6         Q    What do you mean when you say you've

7    worked with him in connection with those legislative

8    hearings and press conferences?

9         A    I -- for example, staff member of the Fund

10   for Animals was at a -- a -- a press conference and

11   rally in Harrisburg, Pennsylvania dealing with the

12   treatment of animals in circuses.  Mr. Rider was also

13   present there.

14        Q    Was that a protest in Harrisburg?

15        A    I don't particularly know if it was a

16   protest.  I was not personally present.  I believe it

17   was a -- a press conference and a rally to -- to

18   educate the public about the issue of circuses and the

19   treatment of animals in circuses.

20        Q    Okay.  Has the fund ever -- has the fund

21   ever paid Mr. Rider any money?

22        A    Yes.

23        Q    On how many occasions?

24        A    I believe there was one occasion.  Last

25   July of 2004 we gave Mr. Rider $1,000 to assist with

1111 14th Street, NW Suite 400                    Washington, DC 20005

Page 158

1    his travel expenses to participate in the Denver press

2    conference, which I mentioned earlier.

3        Q    When you say you gave him $1,000, did you

4    pay for him to -- to attend that press -- let me

5    rephrase that.

6            Did you -- is the $1,000 reflective of

7    expenses you incurred to purchase and make travel

8    arrangements for him, such as air fare, or did you

9    actually hand over the $1,000 to make his own

10   arrangements?

11           MS. MEYER:  Objection to the form.

12   BY MR. WOLSON:

13       Q    You can answer.

14       A    We gave the $1,000 directly to Mr. Rider.

15   He made his own travel arrangements.

16       Q    Did he submit any receipts for those --

17   that thousand dollars?

18       A    I believe that we did receive one receipt

19   from him.

20       Q    Was that receipt for $1,000?

21       A    I don't -- I don't recall how -- the exact

22   amount.

23       Q    Do you know what the receipt was for?

24       A    My recollection is that he -- he -- that

25   it was a receipt for some repairs to his vehicle which

Michael Markarian
Washington, D.C.
June 22, 2005

Page 159

1    allowed him to drive to -- to Denver.

2         Q     So you never got a receipt from him for a

3    hotel room?

4         A     No, not to my knowledge.

5         Q     Other than paying money, has the fund ever

6    given Mr. Rider any other sort of compensation, like

7    food or lodging or transport?

8         A     Not that I'm aware of.

9         Q     Go back to the interrogatory responses and

10   look at interrogatory number 8 on page 25.  I'm sorry,

11   interrogatory 16.  Interrogatory 16 asks for every

12   communication that you have had with any current or

13   former employee of defendant since 1996.  See that?

14        A     Yes.

15        Q     Okay.  On page 26 is the start of a

16   paragraph that lasts for about a page detailing some

17   communications that Mr. Schubert has had with

18   Mr. Rider.  Do you see that?

19        A     Yes, I do.

20        Q     Okay.  The first one of these occurred

21   in -- what it says here was June or July of 1999 or

22   2000.  Do you see that?

23        A     Yes.

24        Q     Who was Mr. Schubert working for at that

25   time?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FELD ENTERTAINMENT, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 07- 1532 (EGS) |
| | : | |
| AMERICAN SOCIETY FOR THE | : | |
| PREVENTION OF CRUELTY | : | |
| ANIMALS, et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 4

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3       - - - - - - - - - - - - - - - X

 4    AMERICAN SOCIETY FOR THE          :

 5    PREVENTION OF CRUELTY TO          :

 6    ANIMALS, et al.,                  :

 7              Plaintiffs,             :    Case No. 03-2006(EGS)

 8         v.                           :

 9    RINGLING BROS. AND BARNUM &       :

10    BAILEY CIRCUS, et al.,            :

11              Defendants.             :

12       - - - - - - - - - - - - - - - X

13                          Washington, D.C.

14                          Wednesday, May 18, 2005

15              Videotape Deposition of CATHY LISS, a

16    30(b)(6) witness herein, called for examination by

17    counsel for Defendants in the above-entitled matter,

18    pursuant to notice, the witness being duly sworn by

19    SUSAN L. CIMINELLI, a Notary Public in and for the

20    District of Columbia, taken at the offices of

21    Covington & Burling, 1201 Pennsylvania Avenue, N.W.,

22    Washington, D.C., at 9:38 a.m., Wednesday, May 18,

23    2005, and the proceedings being taken down by

24    Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and

25    transcribed under her direction.
```

Cathy Liss 30(b)(6)

Washington, DC

May 18, 2005

---

Page 2

1  APPEARANCES:
2
3    On behalf of the Defendants:
4      JOSHUA D. WOLSON, ESQ.
5      Covington & Burling
6      1201 Pennsylvania Avenue, N.W.
7      Washington, D.C. 20004
8      (202) 662-5232
9
10   On behalf of the Plaintiffs:
11     KIMBERLY OCKENE, ESQ.
12     Meyer & Glitzenstein
13     1601 Connecticut Avenue, N.W.
14     Suite 700
15     Washington, D.C. 20009-1056
16     (202) 588-5206
17
18
19   ALSO PRESENT:
20     ELLEN HEBERT, Videographer
21     MIKE SONGER
22
23
24
25

---

Page 4

1              E X H I B I T S
2  AWI EXHIBIT NO.              PAGE NO.
3    6  Plaintiff Animal Welfare Institute's    56
4       responses and objections to defendants'
5       first set of interrogatories
6    7  String of emails from February 2004    84
7    8  Comments AWI submitted to USDA      102
8    9  Letter dated April 18th, 1991 from    117
9       Sullivan
10  10  News release titled Children of San Diego  127
11      Speak Out Against the Use of Elephants
12      in Circuses
13  11  Memo dated July 29th, 1998 from Jones   128
14  12  Document Bates numbered AWI 01618     173
15      through 1623
16  13  Letter from Ockene to Wolson         186
17  14  Complaint dated September 26th, 2003   198
18
19
20
21
22
23
24
25

---

Page 3

# C O N T E N T S

2  WITNESS        EXAMINATION BY COUNSEL FOR
3  CATHY LISS       PLAINTIFFS   DEFENDANTS
4  By Mr. Wolson                       6
5  By Ms. Ockene          211
6
7    Afternoon Session - Page 122
8
9       E X H I B I T S
10  AWI EXHIBIT NO.              PAGE NO.
11   1  Deposition notice of Animal Welfare    8
12      Institute
13   2  Printout from Animal Welfare         41
14      Institute's website
15   3  Printout from Animal Welfare         42
16      Institute's website
17   4  AWI's annual report for year        45
18      July 1, 2002 to June 30, 2003
19   5  Plaintiffs American Society for the    50
20      Prevention of Cruelty to Animals'
21      Fund for Animals and Animal Welfare
22      Institute's responses and objections
23      to defendants' first set of document
24      Production requests
25

---

Page 5

1
2        THE VIDEOGRAPHER: This is the video
3  deposition of Cathy Liss, taken by counsel for the
4  Defendant in the matter of the American Society for
5  the Prevention of Cruelty to Animals, et al. vs.
6  Ringling Bros. and Barnum & Bailey Circus, et al. in
7  the United States District Court for the District of
8  Columbia, civil action 03-2006(EGS), held in the
9  office of Covington & Burling at 1201 Pennsylvania
10  Avenue, Northwest, Washington, D.C., on this date,
11  Wednesday, May 18th, 2005 at the time indicated on
12  the video screen, 9:38:18 a.m.
13        My name is Ellen Hebert and I'm the legal
14  video specialist. The court reporter is Sue
15  Ciminelli. We are employed by Alderson Reporting.
16  Counsel will now introduce themselves and the parties
17  they represent after which the court reporter will
18  administer the oath to the witness.
19        MR. WOLSON: Josh Wolson from Covington &
20  Burling on behalf of the Defendant, and with me is
21  Mike Songer.
22        MS. OCKENE: Kimberly Ockene from Meyer,
23  Glitzenstein & Crystal on behalf of the plaintiffs.
24  Whereupon,
25              CATHY LISS,

---

2 (Pages 2 to 5)

Cathy Liss 30(b)(6)

Washington, DC

May 18, 2005

**Page 138**

1    Q.   Who was there from the ASPCA?
2    A.   Lisa Weissberg.
3    Q.   Who was there from Fund for Animals?
4    A.   Mike Markarian.
5    Q.   Anyone else? Not from the Fund in
6 particular, but was there anyone else in general
7 there?
8    A.   Our counsel.
9    Q.   Ms. Meyer?
10    A.   Yes.
11    Q.   Anyone else?
12    A.   I don't recall who else was present.
13    Q.   How long did that meeting last?
14    A.   Couple hours at most.
15    Q.   Are there any other occasions on which you
16 met Mr. Rider?
17    A.   No.
18    Q.   Does Mr. Rider ever work for AWI?
19    A.   No.
20    Q.   Has Animal Welfare Institute ever paid
21 Mr. Rider any money?
22    A.   Yes.
23    Q.   How much did they pay him?
24    A.   Couple thousand dollars.
25    Q.   When was that?

**Page 139**

1    A.   Over the course of five years. Roughly
2 from 2000 forward.
3    Q.   Are you still making payments to him?
4    A.   No.
5    Q.   When was the last time you made a payment
6 to him?
7    MS. OCKENE: Objection to the
8 characterization that there were payments on some
9 schedule.
10    MR. WOLSON: I don't think I made that
11 characterization.
12    MS. OCKENE: I'm still objecting to the
13 form.
14    THE WITNESS: We have no plans to give him
15 additional moneys at this time.
16    BY MR. WOLSON:
17    Q.   Well, my question was when was the last
18 time you made a payment to him?
19    A.   At some point in 2005. I don't recall the
20 date specifically.
21    Q.   So within the last four an a half months?
22    A.   Yes.
23    Q.   What were you paying him for?
24    A.   For public education.
25    Q.   What do you mean by public education?

**Page 140**

1    A.   For him to do -- to speak at events.
2    Q.   What events has he spoken at on behalf of
3 AWI?
4    A.   He has never spoken on behalf of AWI.
5    Q.   What events has AWI paid him to speak at?
6    A.   We haven't paid him -- we paid his
7 transportation costs so that he could go to Atlanta,
8 for example, to speak.
9    Q.   Okay. Tell me all the events for which
10 you paid his transportation costs so he could go
11 speak.
12    A.   I couldn't tell you. It's not very many.
13    Q.   What do you mean by not very many? How
14 many are we talking about?
15    A.   Given that the -- it's $2,000 for a hotel
16 and transportation, it doesn't go very far. Maybe
17 three.
18    Q.   How did you decide when to, when to pay
19 for Mr. Rider's -- let me rephrase that. Has it been
20 at your request that Mr. Rider has gone to speak at
21 these events?
22    A.   Yes.
23    Q.   And why have you decided to ask Mr. Rider
24 to speak at these particular events?
25    A.   They were in conjunction with appearances

**Page 141**

1 of the circus and we thought it was important to
2 educate the public about what he observed.
3    Q.   And when you say the circus, do you mean
4 specifically Ringling Bros.?
5    A.   Yes.
6    Q.   So you paid Mr. Rider's expense -- travel
7 expenses to go speak about Ringling Bros. in cities
8 where Ringling Bros. was performing?
9    A.   That's correct. We contributed towards.
10 Yes.
11    Q.   Was it always at your initiative that you
12 contributed towards it?
13    A.   No.
14    Q.   Whose initiative was it?
15    A.   It might have been his, too.
16    Q.   He approached you to ask you to
17 contribute?
18    A.   Yes.
19    Q.   Has he ever asked for anything more than
20 his travel expenses?
21    A.   No.
22    Q.   Is all the money that you paid him for
23 travel expenses?
24    A.   Yes.
25    Q.   On the times that you've reimbursed him,

36 (Pages 138 to 141)

## Page 142

are you, has it been only the Animal Welfare
Institute that was paying for his travel expenses?
    A.  To my knowledge. Yes.
    Q.  You're not aware that you were sharing his
expenses with some other organization?
    A.  That's correct.
    Q.  The first time that you paid Mr. Rider to
do this, or reimbursed him to do this, was it after
you filed this lawsuit?
    A.  Yes.
    Q.  Have you ever provided him with any
nonmonetary compensation?
    A.  No.
    Q.  Does he make his own travel arrangements
or do you make them for him?
    A.  He does them.
    MS. OCKENE: Speak up a little bit.
    THE WITNESS: Pardon? Oh, sorry.
    BY MR. WOLSON:
    Q.  Do you know if any other animal welfare
organizations have provided similar reimbursements to
Mr. Rider?
    A.  I don't know.
    Q.  You never discussed it with him?
    A.  I imagine -- I don't know.

## Page 143

    Q.  And the occasions that he has spoken where
you've reimbursed him, the small number of occasions,
have you discussed with him beforehand what he will
say?
    A.  No.
    Q.  Have you discussed his travel plans with
him at all?
    A.  To a limited extent.
    Q.  What is the extent of your discussion?
    A.  Just confirming dates that he would be
there and that would be it.
    Q.  Does he submit you receipts before you
reimburse him?
    A.  No. And these aren't reimbursements. We
paid him before he went.
    Q.  You prepay his travel expenses?
    A.  Yes.
    Q.  Do you pay him or do you pay the -- do you
prepay for instance the airline ticket?
    A.  No. Well, he doesn't typically travel by
air. This is --
    Q.  Just as an example more than a specific,
but I mean, do you pay the hotel directly or do you
pay him?
    A.  We pay him.

## Page 144

    Q.  Well, that -- okay. Aside from confirming
sort of logistical arrangements for him, have you had
any other discussions about these speeches he is
going to give or these appearances he is going to
make?
    A.  No. I mean, for one we prepared with our
staff a press release, so that we did talk with him
about it.
    Q.  A press release on behalf of the Animal
Welfare Institute?
    A.  Yes.
    Q.  Not on his behalf?
    A.  On behalf of all the plaintiffs.
    Q.  When was that?
    A.  I believe that was a payment that was this
year in Atlanta.
    Q.  I guess I asked you about meetings with
Mr. Rider and we talked about two, one in probably
2000 or 2001 and one more recently. Have there been
other, other than the times that you've talked to him
about sort of his logistical arrangements for travel,
have there been other conversations or communications
with him?
    A.  Only as plaintiffs.
    MS. OCKENE: Don't answer to the extent

## Page 145

that any of these conversations reveal
attorney-client privilege material.
    BY MR. WOLSON:
    Q.  What's been the means of communication?
    A.  Phone.
    Q.  Conference calls? Is that a yes? You
have to speak up.
    A.  I'm sorry. There I go.
    Q.  Okay. Have there been emails?
    A.  No.
    Q.  When you met with Mr. Rider for the first
time, did he say whether he was employed?
    MS. OCKENE: Again, to the extent there
was an attorney present or this involves
attorney-client privilege material, don't reveal --
    MR. WOLSON: No, wait a minute. Whether
or not he said he was employed has nothing to do with
whether or not there was legal advice given, or a
request for legal advice.
    MS. OCKENE: If there was an attorney
present in the context of this --
    MR. WOLSON: No, that is not the standard
for attorney-client privilege, the presence of an
attorney.
    MS. OCKENE: I'm instructing her not to

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FELD ENTERTAINMENT, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 07- 1532 (EGS) |
| | : | |
| AMERICAN SOCIETY FOR THE | : | |
| PREVENTION OF CRUELTY | : | |
| ANIMALS, <u>et</u> al. | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 5

Lisa Weisberg

Washington, DC

July 19, 2005

1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - X

4    AMERICAN SOCIETY FOR THE      :

5    PREVENTION OF CRUELTY TO      :

6    ANIMALS, et al.,              :

7               Plaintiffs,        :

8         V.                       :  Case No. 03-2006 (EGS)

9    RINGLING BROS. AND BARNUM &  :

10   BAILEY CIRCUS, et al.,        :

11              Defendants.        :

12      - - - - - - - - - - - - - X

13                        Washington, D.C.

14                        Tuesday, July 19, 2005

15              Videotaped deposition of LISA WEISBERG, a

16   witness herein, called for examination by counsel for

17   Defendants in the above-entitled matter, pursuant to

18   notice, the witness being duly sworn by MARY GRACE

19   CASTLEBERRY, a Notary Public in and for the District

20   of Columbia, taken at the offices of Covington &

21   Burling, 1201 Pennsylvania Avenue, N.W., Washington,

22   D.C., at 9:40 a.m., Tuesday, July 19, 2005, and the

23   proceedings being taken down by Stenotype by MARY

24   GRACE CASTLEBERRY, RPR, and transcribed under her

25   direction.

Lisa Weisberg                                                   July 19, 2005

Washington, DC

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 |  |
| 3 | On behalf of the Plaintiffs: |
| 4 | KIMBERLY OCKENE, ESQ. |
| 5 | Meyer Glitzenstein & Crystal |
| 6 | 1601 Connecticut Avenue, N.W. |
| 7 | Washington, D.C. 20009 |
| 8 | (202) 588-5206 |
| 9 |  |
| 10 | On behalf of the Defendants: |
| 11 | MAURA A. DALTON, ESQ. |
| 12 | Covington & Burling |
| 13 | 1201 Pennsylvania Avenue, N.W. |
| 14 | Washington, D.C. 20004 |
| 15 | (202) 662-5263 |
| 16 |  |
| 17 | ALSO PRESENT: |
| 18 | ELLEN HEBERT, Videographer |

**Page 4**

E X H I B I T S

| ASPCA EXHIBIT NO. | PAGE NO. |
|---|---|
| 9 - May 7, 2001 email to Larry Hawk from Lisa Weisberg | 49 |
| 10 - Lobbying Expenditures by Electing Public Charities form | 64 |
| 11 - B-Laws of the ASPCA | 105 |
| 12 - May 20, 2004 letter from to Lisa Weisberg from Gisele Gomez | 113 |
| 13 - Cruelty Complaint | 114 |
| 14 - Cruelty Complaint | 117 |
| 15 - Cruelty Complaint | 121 |
| 16 - Cruelty Complaint | 125 |
| 17 - Activity Card | 129 |
| 18 - Activity Card | 134 |
| 19 - April 2001 letter from Lisa Weisberg to Fellow Action Team Member | 143 |
| 20 - June 16, 2000 letter to John Harwood from Lisa Weisberg | 148 |
| 21 - January 29, 2002 email to Larry Hawk | 156 |
| 22 - ASPCA Board of Directors Meeting minutes | 175 |
| 23 - Agenda for 2005 Benefit for the Asian Elephants | 204 |

**Page 3**

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| LISA WEISBERG | DEFENDANTS |
| By Ms. Dalton | 7 |
|  | PLAINTIFFS |
| By Ms. Ockene | 228 |

Afternoon Session - Page 139

E X H I B I T S

| ASPCA EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Notice of Deposition of Plaintiff American Society for the Prevention of Cruelty to Animals | 9 |
| 2 - Lobbying Report | 20 |
| 3 - Plaintiff American Society for Prevention of Cruelty to Animals' Responses and Objections to Defendants' First Set of Interrogatories | 24 |
| 4 - ASPCA request for check | 36 |
| 5 - ASPCA request for check | 39 |
| 6 - ASPCA request for check | 40 |
| 7 - ASPCA request for check | 43 |
| 8 - ASPCA request for check | 48 |

**Page 5**

E X H I B I T S

| ASPCA EXHIBIT NO. | PAGE NO. |
|---|---|
| 24 - Complaint for Declaratory and Injunctive Relief | 213 |
| 25 - Broadcast transcript | 218 |

2 (Pages 2 to 5)

Lisa Weisberg                                                        July 19, 2005

Washington, DC

---

Page 222

1    MS. OCKENE: There is a mutual
2  understanding in this case. There is no written
3  agreement.
4        BY MS. DALTON:
5    Q.  So generally speaking, what are your legal
6  duties? Sorry. Generally speaking, on your
7  day-to-day basis at the ASPCA, what part of those
8  duties involve providing legal advice?
9    A.  Well, both with what the existing laws are
10  to protect animals, where legislation is needed,
11  certainly my review of the complaint in this case and
12  my recommendation that we become a co-plaintiff.
13      Again, specifically to New York law and
14  whether a specific situation that our humane law
15  enforcement officers may be investigating, and
16  whether the incidents surrounding that or the
17  circumstances surrounding that incident violate the
18  anticruelty statute.
19    Q.  And your work in providing that advice is
20  separate to the ASPCA's legal department, is that
21  correct?
22    A.  Yes.
23    Q.  Who from the ASPCA is planning on
24  attending the July 21st fund-raiser that we've
25  discussed?

---

Page 223

1    A.  As far as I know, I don't believe any
2  employee of the ASPCA. I don't know if any ASPCA
3  members are planning on attending.
4    Q.  You referred to the vice president of
5  development?
6    A.  Correct.
7    Q.  And I'm sorry, I can't recall his name.
8    A.  It's a woman, Jo Sullivan.
9    Q.  So she's not planning on attending?
10    A.  I don't know. I don't believe so. I
11  believe that there was some discussion about her and
12  Ed Sayres attending, but something came up that
13  requires I know Mr. Sayres to be in New York and
14  unable to attend. But I can't speak to Jo Sullivan.
15    Q.  And your discussions with Jo Sullivan
16  regarding the invitation and the content of the
17  discussion at the fund-raising event did not include
18  who this additional former Ringling Bros. --
19    A.  No, it was more just organizing the event
20  and getting the invites out to our high donors.
21    Q.  Now, I'm going to apologize in advance
22  because I'm going to ask you to just recap with me --
23  and I know we've covered it in various parts of the
24  deposition, but I just want to make sure I understand
25  and have a full picture of it -- the various funds

---

Page 224

1  and the years that you provided funding to Tom Rider
2  and whether or not you provided that funding directly
3  or whether or not you've provided it through the
4  Wildlife Advocacy Project or at Meyer & Glitzenstein.
5  So I just kind of want to recap really briefly.
6    A.  Okay.
7    Q.  So if I remember correctly, you said that
8  the first year that any of this funding was provided
9  was in 2001, correct?
10    A.  Correct.
11    Q.  So prior to 2001, the ASPCA did not
12  provide any funding to Mr. Rider?
13    A.  Correct.
14    Q.  And in 2001, the funding was provided
15  through Meyer & Glitzenstein in the amount of
16  approximately $7,400?
17    A.  Correct.
18    Q.  And was there any other direct funding
19  that year?
20    A.  As far as I remember, no.
21    Q.  And then in 2002, you said that you didn't
22  fund anything through the Wildlife Advocacy Project
23  but there were other payments to Mr. Rider that were
24  included in your regular payments to your attorneys,
25  Meyer & Glitzenstein?

---

Page 225

1    A.  Correct.
2    Q.  And then in 2003, you said that those
3  payments continued from January 3rd through May --
4  I'm sorry, January '03 to May '03, and those were
5  direct payments or indirect payments in 2003?
6      MS. OCKENE: I'm just going to object to
7  the use of the term payments. It's a
8  mischaracterization. You can answer.
9      THE WITNESS: Both. There were instances
10  where I would pay for his lodging on my corporate
11  credit card as well as reimbursing Tom Rider for the
12  expenses, living expenses he incurred or was going to
13  incur as advances.
14      BY MS. DALTON:
15    Q.  So in 2003, it both would be indirect and
16  direct payments?
17    A.  Correct.
18    Q.  And then in 2002, you also had both
19  indirect and direct?
20    A.  I believe they were indirect.
21    Q.  All the ones in 2003?
22    A.  No.
23    Q.  I'm sorry, 2002?
24    A.  Right.
25    Q.  So I'm just going to summarize one last

Alderson Reporting Company
800-FOR-DEPO

1111 14th Street, NW Suite 400                         Washington, DC  20005

Lisa Weisberg
July 19, 2005
Washington, DC

---

Page 226

1  time to make sure we have it.
2      A.  Okay.
3      Q.  So 2001, you have payments that go to the
4  ASPCA -- to your attorneys Meyer & Glitzenstein and
5  then they provide funding through the Wildlife
6  Advocacy Project?
7      A.  Right.
8      Q.  And there were no other reimbursements or
9  any sorts of payments that you provided?
10     A.  As far as I remember.
11     Q.  And in 2002, there were indirect payments
12 that went to Meyer & Glitzenstein but, to the best of
13 your knowledge, the Wildlife Advocacy Project was not
14 involved?
15     A.  Correct.
16     Q.  And there were no other direct
17 reimbursements?
18     A.  Not that I remember.
19     Q.  And in 2003, there were both indirect
20 payments through Meyer & Glitzenstein and other --
21     A.  No, not through Meyer & Glitzenstein.
22     Q.  So in 2003, there was just --
23     A.  It was either direct reimbursement to Tom
24 Rider or I would put the charges on my corporate
25 credit card.  But having nothing to do with Meyer &

---

Page 227

1  Glitzenstein.
2      Q.  Since 2003, there have been no additional
3  funds?
4      A.  Correct.
5      Q.  And since 2003, has Mr. Rider asked you
6  for any money?
7      A.  No.
8      Q.  And when we were discussing captive
9  breeding, you had mentioned that captive breeding
10 efforts at zoos were helpful because they aided in
11 the diversity of the gene pool, correct?
12     A.  Correct.
13     Q.  And is it your position that breeding at
14 CEC does not add to the diversity of the gene pool of
15 Asian elephants?
16     A.  I don't recall saying that.
17     Q.  I know you didn't.  That's why I'm asking
18 you.
19     A.  I don't know because I don't know how they
20 run their breeding program.
21     MS. DALTON:  That's all I have.
22     MS. OCKENE:  I have some redirect.  It's
23 going to take me a second to get organized.
24     MS. DALTON:  Can we go off the record?
25     THE VIDEOGRAPHER:  Going off the record.

---

Page 228

1  The time is 16:01:28.
2      (Recess.)
3      THE VIDEOGRAPHER:  We're back on the
4  record.  The time is 16:04:47.
5      EXAMINATION BY COUNSEL FOR PLAINTIFFS
6      BY MS. OCKENE:
7      Q.  I just have a few questions.
8      A.  Okay.
9      Q.  First, taking a look at Exhibit 3, it's
10 the interrogatory responses.
11     A.  Okay.
12     Q.  And this is under interrogatory number 22
13 and this is in reference to --
14     A.  What page is that?
15     Q.  33.  The grant for $7,400 that you
16 referred to earlier.
17     A.  Right.
18     Q.  And a moment ago.
19     MS. DALTON:  I'm sorry, you said on page
20 33?
21     MS. OCKENE:  Yes, the grant to the
22 Wildlife Advocacy Project that we've discussed
23 several times.
24     BY MS. OCKENE:
25     Q.  You indicated that you thought that money

---

Page 229

1  went through Meyer & Glitzenstein.  Is that something
2  you're certain of or could that money have also just
3  gone to the Wildlife Advocacy Project?
4      MS. DALTON:  Object.
5      THE WITNESS:  I believe that it went
6  directly to the Wildlife Advocacy Project.
7      BY MS. OCKENE:
8      Q.  And turning to -- actually, I have another
9  question on that.  And you earlier stated that the
10 funds that were provided to the Wildlife Advocacy
11 Project were used to support Tom Rider's travel
12 expenses, his media outreach efforts, his public
13 education efforts?
14     A.  Correct.
15     Q.  Are you aware whether the money that went
16 to the Wildlife Advocacy Project might have been used
17 for other things other than simply for Tom Rider's
18 efforts?
19     A.  I assumed it was for Tom Rider's efforts.
20     Q.  Do you know if it could also have been
21 used to support Ms. Darcy Kemitz' position, for
22 example?
23     A.  It may have been.  It may have gone
24 towards whatever salary she got working on behalf of
25 the Project.

---

Alderson Reporting Company
800-FOR-DEPO

1111 14th Street, NW Suite 400
Washington, DC 20005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.      :
                                     :
          **Plaintiff,**       :
                                     :
   **v.**                              :     **Case No. 07- 1532 (EGS)**
                                     :
**AMERICAN SOCIETY FOR THE**   :
**PREVENTION OF CRUELTY**      :
**ANIMALS, <u>et</u> al.**             :
                                     :
          **Defendants.**   :
_____:

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY ALL PROCEEDINGS

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al., ) ) ) ) ) Plaintiffs, ) ) v. ) ) RINGLING BROS. AND BARNUM & BAILEY CIRCUS, et al., ) ) ) Defendants. ) | Civ. No. 03-2006 (EGS/JMF) |

**PLAINTIFF THE FUND FOR ANIMALS' SUPPLEMENTAL RESPONSES AND
OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES TO
PLAINTIFFS AMERICAN SOCIETY FOR THE PREVENTION OF
CRUELTY TO ANIMALS,
ANIMAL WELFARE INSTITUTE, AND FUND FOR ANIMALS**

Pursuant to Federal Rule of Civil Procedure 33 and the August 23, 2007 Order of the

Court, plaintiff The Fund for Animals ("The Fund") hereby offers the following supplemental or

amended responses to Defendant's First Set of Interrogatories to Plaintiffs American Society for

the Prevention of Cruelty to Animals, Animal Welfare Institute, and Fund for Animals. The

Fund hereby incorporates by reference the definitions and the general and specific objections that

it made in its original and January 31, 2007 responses to Defendant's First Set of Interrogatories

to Plaintiffs American Society for the Prevention of Cruelty to Animals, Animal Welfare

Institute, and Fund for Animals.

10383, 38227, 38228, 38229, 40957, 40958, 40960, 40965, 40966, 40968, 40969, 40970, 40971,

40972, 40974, 40975, 40982, 40983, 40984, 40985, 40986, 40987, 40989, 40990. Additional

information responsive to his Interrogatory is contained in footage that plaintiffs have reviewed

and requested from defendant, but that has not yet been produced by defendant. Once plaintiffs

obtain that footage, they will supplement this Response accordingly.

**Interrogatory No. 19:** Describe each communication you have had since 1996 with any other
animal advocates or animal advocacy organizations about the presentation of elephants in
circuses or about the treatment of elephants at any circus, including Ringling Bros. and Barnum
& Bailey Circus.

**Supplemental Response to Interrogatory No. 19:**

The Fund supplements and amends its original response to this Interrogatory by providing

the following supplemental information. The remaining portions of the original response remain

unaltered.

The Fund has continued to have conversations with the other plaintiffs and their lawyers

about legal strategies in this case, the evidence that plaintiffs may rely on, and the status of the

litigation, all of which are protected by the attorney-client and attorney work product privileges.

**Interrogatory No. 21:** Identify each resource you have expended from 1997 to the present in
"advocating better treatment for animals held in captivity, including animals used for
entertainment purposes" as alleged in the complaint, including the amount and purpose of each
expenditure.

**Supplemental Response to Interrogatory No. 21:**

In accordance with the Court's August 23, 2007 Order, The Fund supplements and

amends its prior responses to this Interrogatory by providing the following information

concerning funding for media and public education efforts with respect to the treatment of

elephants in the circus. The Fund did not originally view this information as responsive to this

Interrogatory because the Fund believed the Interrogatory's reference to "resource you have expended from 1997 to the present in 'advocating better treatment for animals held in captivity, including animals used for entertainment purposes'" referred only to funds expended by the Fund's own staff to advocate for elephants, as opposed to grants to other activists or non-profits. The Fund makes donations to a number of individuals and non-profits each year, and does not consider advocacy undertaken by grantees to be Fund advocacy. The Fund is nonetheless providing the information in compliance with the Court's Order, and because defendant has stated that it views this information as responsive to this Interrogatory. The remaining portions of The Fund's prior responses to this Interrogatory remain unaltered.

The Fund has provided funds to Mr. Rider on the following two occasions: July 21, 2004, in the amount of $500.00, and July 22, 2004, also in the amount of $500.00. These funds are reflected in documents being produced by The Fund, F 4483-4486. As reflected in the documents and described in Mr. Michael Markarian's deposition, these funds were to cover the cost of repairing Mr. Rider's van, so that he could drive from California to Denver, Colorado for a press conference concerning proposed legislation regarding elephants in circuses.

The Fund has also made contributions to the Wildlife Advocacy Project for that organization's advocacy and public education work on the issue of the treatment of elephants held in captivity. Although The Fund makes these contributions with the understanding that WAP may use the money however it chooses in conjunction with its advocacy and public education work concerning elephants in captivity, The Fund is aware that the contributions have been used by WAP to support Mr. Rider's important public education and media efforts

concerning the treatment of elephants in the circus. The following documents reflecting these contributions are hereby incorporated by reference: F 4487-4492.

On several occasions in 2001, 2002 and 2003, The Fund also provided some funds indirectly to Mr. Rider through reimbursements to the law firm Meyer & Glitzenstein. Those funds were transferred to Mr. Rider by Meyer & Glitzenstein, and billed to The Fund as a cost for media work.[1]

The amount of funds that The Fund contributed to Mr. Rider's public education work in this fashion – including the fees for the wire transfers – amounts to approximately $4,433.00, and is reflected in Meyer & Glitzenstein invoices being produced by The Fund, see F 4493-4516. Some of these invoices are addressed to the American Society for the Prevention of Cruelty to Animals, because, at the time, the Meyer & Glitzenstein billing system created one detailed bill for all three plaintiff organizations addressed to the ASPCA (as the lead plaintiff), and each individual group received a cover sheet specifying the amount that group was being billed, as well as any specific expenses charged only to that group. The phrase "Shared Expense" in an invoice, see, e.g., F 4499, means that the expense was shared equally among the groups. The phrase "special expense" in an invoice, see, e.g., F 4493, means that the specified expenses were billed only to the client to whom the invoice is addressed. Similarly, due to a change in the

---

[1] Mr. Markarian was asked at his June 2005 deposition whether "the fund ever paid Mr. Rider any money." Transcript of June 22, 2005 Deposition of Michael Markarian at 157. Mr. Markarian identified the $1000 in direct payments made to Rider mentioned above, see Transcript of June 22, 2005 Deposition of Michael Markarian at 157-159, but did not identify these other funds at that time because they were itemized as reimbursements for expenses paid within a legal invoice, rather than direct payments from the Fund to Mr. Rider, and thus Mr. Markarian did not focus on them in response to the question at the deposition.

13

invoicing system, the phrase "Additional Charges from Primary Client" in the April 11, 2003

invoice, F 4511, means that that particular item was shared among the clients. In that same

invoice, F 4511, the phrase "Additional Charges" means that only The Fund was charged for that

item.

**Interrogatory No. 22:** Identify each expenditure from 1997 to the present of "financial and

other resources" made while "pursuing alternative sources of information about defendants'

actions and treatment of elephants" as alleged in the complaint.

**Supplemental Response to Interrogatory No. 22:**

Subject to and without waiving their previous objections to this Interrogatory, The Fund

states that, to date, it has spent approximately $12,870.70 on legal fees and costs pursuing

information from the United States Department of Agriculture concerning defendant's actions

and treatment of elephants.

Objections respectfully submitted by,

Kimberly D. Ockene
(D.C. Bar No. 461191)
Katherine A. Meyer
(D.C. Bar No. 244301)
Tanya M. Sanerib
(D.C. Bar No. 473506)
Howard M. Crystal
(D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

Dated: September 24, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RINGLING BROS. AND BARNUM & BAILEY CIRCUS, et al., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civ. No. 03-2006 (EGS/JMF) |

## VERIFICATION

I, MICHAEL MARKARIAN, declare as follows:

    1.    I am employed as the President of the Fund for Animals ("The Fund"). The Fund is a plaintiff in this case.

    2.    I have read the foregoing supplemental objections and responses to defendant's Interrogatories and know the contents thereof. Upon information and belief, said Objections and Responses are true and correct.

    Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge.

                                                         Michael Markarian

Dated: September 24, 2007

-1-

State of Maryland
County of Montgomery

Subscribed and sworn to before me this 24th day of September 2007.

Susan D. Adams
Notary Public

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.       :
                                  :
          **Plaintiff,**        :
                                  :
     v.                         :     Case No. 07- 1532 (EGS)
                                  :
AMERICAN SOCIETY FOR THE     :
PREVENTION OF CRUELTY         :
ANIMALS, <u>et</u> al.                  :
                                  :
          **Defendants.**    :
_____:

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY ALL PROCEEDINGS</u>

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, <u>et al.</u>,<br><br>Plaintiffs,<br><br>v.<br><br>RINGLING BROS. AND BARNUM & BAILEY CIRCUS, <u>et al.</u>,<br><br>Defendants. | Civ. No. 03-2006 (EGS/JMF) |

**PLAINTIFF ANIMAL WELFARE INSTITUTE'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, <u>ANIMAL WELFARE INSTITUTE, AND FUND FOR ANIMALS</u>**

Pursuant to Federal Rule of Civil Procedure 33 and the August 23, 2007 Order of the Court, plaintiff Animal Welfare Institute ("AWI") hereby offers the following supplemental or amended responses to Defendant's First Set of Interrogatories to Plaintiffs American Society for the Prevention of Cruelty to Animals, Animal Welfare Institute, and Fund for Animals. AWI hereby incorporates by reference the definitions and the general and specific objections that it made in its original and January 31, 2007 responses to Defendant's First Set of Interrogatories to Plaintiffs American Society for the Prevention of Cruelty to Animals, Animal Welfare Institute, and Fund for Animals.

circuses or about the treatment of elephants at any circus, including Ringling Bros. and Barnum & Bailey Circus.

## Supplemental Response to Interrogatory No. 19:

AWI supplements and amends its original response to this Interrogatory by providing the following supplemental information. The remaining portions of the original response remain unaltered.

AWI has continued to have conversations with the other plaintiffs and their lawyers about legal strategies in this case, the evidence that plaintiffs may rely on, and the status of the litigation, all of which are protected by the attorney-client and attorney work product privileges.

**Interrogatory No. 21:** Identify each resource you have expended from 1997 to the present in "advocating better treatment for animals held in captivity, including animals used for entertainment purposes" as alleged in the complaint, including the amount and purpose of each expenditure.

## Supplemental Response to Interrogatory No. 21:

In accordance with the Court's August 23, 2007 Order, AWI supplements and amends its prior responses to this Interrogatory by providing the following information concerning both direct and indirect funding for Tom Rider's media and public education campaign concerning the treatment of elephants in circuses. AWI states that although it did not originally view this information as responsive to this Interrogatory, it is providing the information in compliance with the Court's Order, and because defendant has stated that it views this information as responsive to this Interrogatory. The remaining portions of AWI's prior responses to this Interrogatory remain unaltered.

Since 2000, AWI has provided funds directly to Mr. Rider, or has paid directly for Mr. Rider's expenses, on several occasions. On each such occasion the funds were to cover Mr.

Rider's travel and living expenses so that he could continue his important public education and media work concerning the treatment of elephants in the Ringling Bros. Circus. In 2000-2001, AWI provided a total of $1,102 to Mr. Rider for this purpose. This grant is reflected in the document AWI 09948, at 09968. In 2005 AWI twice provided Mr. Rider with funds by wire transfer so that he could travel and continue his public education work – once on February 14, 2005, in the amount of $600, and the other on February 22, 2005 in the amount of $500. These transfers are reflected in the document AWI 9941 (the amounts show $655 and $553 respectively because of the additional wire transfer fees).

In 2006 AWI also provided Mr. Rider with direct funds twice so that he could continue touring the country doing public education work. On March 21, 2006 AWI gave Mr. Rider $250 in the form of a check, reflected in AWI 9945, and on March 30, 2006 AWI gave Mr. Rider $500 via wire transfer. The wire transfer is reflected in AWI 9946. AWI 9946 is a check made out to AWI employee Jill Umphlet for $600. Ms. Umphlett cashed the check and wired $500 to Mr. Rider, and there was a $36 wire transfer fee. The remaining $64 was placed in AWI's petty cash funds. On December 8, 2006, AWI paid for the repair of Mr. Rider's van in the amount of $1,657.58. This payment is reflected in AWI's credit card statement, at AWI 9943-9944 (payment to "Ricks German Performance Atascadero CA").

Since 2004 AWI has also made contributions to the Wildlife Advocacy Project for that organization's advocacy and public education work on the issue of the treatment of elephants held in captivity. It is AWI's understanding that these funds are used to support Mr. Rider's important public education and media efforts concerning the treatment of elephants in the circus.

12

The following documents reflecting these contributions are hereby incorporated by reference: AWI 6058, 6495-6506, 9927-9930.

On several occasions in 2001, 2002 and 2003, AWI also provided some funds indirectly for Mr. Rider's public education and media efforts through reimbursements to the law firm Meyer & Glitzenstein. Those funds were transferred to Mr. Rider by Meyer & Glitzenstein, and were billed to AWI as a cost for media work.[1]

The amount of funds that AWI contributed to Mr. Rider's public education work in this fashion – including the fees for the wire transfers – amounts to approximately $2,032.00, and is reflected in Meyer & Glitzenstein invoices being produced by AWI, see AWI 9932-9939, and 10048-10057. Some of these invoices are addressed to the American Society for the Prevention of Cruelty to Animals, because, at the time, the Meyer & Glitzenstein billing system created one detailed bill for all three plaintiff organizations addressed to the ASPCA (as the lead plaintiff), and each individual group received a cover sheet specifying the amount that group was being billed, as well as any specific expenses charged only to that group. When an invoice indicates that there was a "shared expense," see, e.g., AWI 9939, this means that the expense was shared equally among the groups, unless the invoice indicates that the expense was divided in some other specified manner, see, e.g., AWI 9934. When an invoice indicates that there was a "special expense," see, e.g., AWI 9939, this means that the specified expenses were billed only to the client to whom the invoice is addressed. Similarly, due to a change in the invoicing system, the

---

[1]At her May 2005 deposition, Ms. Liss was asked: "Has Animal Welfare Institute ever paid Mr. Rider any money?" Transcript of May 18, 2005 Deposition of Cathy Liss at 138. Ms. Liss did not identify these specific funds at the time because she did not think of them as direct payments by the organization to Mr. Rider.

phrase "Additional Charges from Primary Client" in the April 11, 2003 invoice, AWI 9932, means that that particular item was shared among the clients.

**Interrogatory No. 22:**  Identify each expenditure from 1997 to the present of "financial and other resources" made while "pursuing alternative sources of information about defendants' actions and treatment of elephants" as alleged in the complaint.

**Supplemental Response to Interrogatory No. 22:**

AWI states that, to date, it has spent approximately $12,870.70 on legal fees and costs pursuing information from the United States Department of Agriculture concerning defendant's actions and treatment of elephants.

Objections respectfully submitted by,

Kimberly D. Ockene
(D.C. Bar No. 461191)
Katherine A. Meyer
(D.C. Bar No. 244301)
Tanya M. Sanerib
(D.C. Bar No. 473506)
Howard M. Crystal
(D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206

Dated: September 24, 2007

14

## VERIFICATION

CITY OF     *VA*     )
                    )
                    )
STATE OF   *Alexandria*   )


TRACY SILVERMAN, being duly sworn, says:

I am employed as General Counsel for the Animal Welfare Institute ("AWI"). AWI is a plaintiff in this case. I have read the foregoing supplemental objections and responses to Defendants' First Set of Interrogatories to Plaintiffs American Society for the Prevention of Cruelty to Animals, Fund for Animals, and Animal Welfare Institute and know the contents thereof. Upon information and belief, said objections and responses are true and correct.

_____
Tracy Silverman

Sworn to before me this

_24_ day of September, 2007


_____
Notary Public

My Commission Expires:

_6/30/2010    ID#295077_

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.          :
                                  :
            Plaintiff,            :
                                  :
      v.                          :      Case No. 07- 1532 (EGS)
                                  :
AMERICAN SOCIETY FOR THE          :
PREVENTION OF CRUELTY             :
ANIMALS, et al.                   :
                                  :
            Defendants.           :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al., ) ) ) ) | |
| Plaintiffs, ) | Civ. No. 00-01641 (EGS) |
| ) | |
| v. ) | |
| ) | |
| RINGLING BROS. AND BARNUM & BAILEY CIRCUT, et al., ) ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF ANIMAL WELFARE INSTITUTE'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, ANIMAL WELFARE INSTITUTE, AND FUND FOR ANIMALS**

Pursuant to Federal Rule of Civil Procedure 33 and the agreement of the parties, plaintiff Animal Welfare Institute ("AWI") hereby offers the following objections and responses to Defendants' First Set of Interrogatories to AWI.

## DEFINITIONS

1.      As used herein, "irrelevant" means not relevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence.

## GENERAL OBJECTIONS

1.      AWI's general objections, as set forth herein, are to be considered continuing objections and responses to the specific Interrogatories that follow, even if not referred to in the objection and response to a specific Interrogatory.  AWI's objections

and without waiving this or the general objections to these Interrogatories, AWI states

that Cathy Liss, President of AWI, had a brief phone conversation in 2002 with Ted

Friend, a researcher based in Texas, in which he said that Ringling treats its animals

(elephants and big cats) okay. He did not go into detail, but indicated that he felt animal

protection groups were unfounded in their complaints. Other than that, AWI has not had

any communications with any person who has expressed support for or otherwise said

positive things about defendants' treatment of their elephants.

**Interrogatory No. 21:**

Identify each resource you have expended from 1997 to the present in "advocating better
treatment for animals held in captivity, including animals used for entertainment
purposes" as alleged in the complaint, including the amount and purpose of each
expenditure.

**Objection and Response to Interrogatory No. 21:**

AWI objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome, and oppressive. Subject to and without waiving this or the general

objections, AWI estimates that approximately half of its program activities are related to

improving conditions for captive animals, with an average annual total expenditure of

approximately $437,000 from 1997 to the present. Since 1997 AWI has spent on average

approximately $28,000/year producing educational materials "advocating better treatment

of animals held in captivity," including $14,666 to publish Comfortable Quarters for

Laboratory Animals, and $12,754 to publish Environmental Enrichment for Caged

Rhesus Macaques. AWI spends about $25,000/year speaking and/or attending and

distributing educational material on improving the treatment of animals in captivity at

symposia, and approximately $25,000/year conducting research and writing to encourage

better treatment of captive animals. AWI has produced databases on enriching the lives

28

of captive animals for use by the general public, and maintains an on-line forum on

enriching the lives of captive animals. The cost for updating the databases and

maintaining the forum is approximately $40,000/year. AWI provides guidance directly

to individuals who have animals in captivity about ways to improve the conditions for

their animals and spend approximately $32,000/year on this activity. Many of the

documents produced by AWI in response to defendants' document requests also

demonstrate resources AWI expends in advocating for the better treatment of animals in

captivity.

**Interrogatory No. 22:**

Identify each expenditure from 1997 to the present of "financial and other resources"
made while "pursuing alternative sources of information about defendants' actions and
treatment of elephants" as alleged in the complaint.

**Objection and Response to Interrogatory No. 22:**

AWI objects to this Interrogatory on the grounds that it is overly broad and

unduly burdensome. Subject to and without waiving these objections, AWI states that in

2000 it spent approximately 3% of the time and benefits of the Executive Director, Cathy

Liss and President, Christine Stevens (full-time volunteer), as well as .5% of the overhead

for its office gathering information from individuals and other organizations about

Ringling Brothers' treatment of its Asian elephants, culminating in AWI's decision to

become a co-plaintiff in this action; a total resource expenditure of approximately $6,650.

AWI states that it spent approximately $4,000 between 2001 and 2003 pursuing a

Freedom of Information Act case against the United States Department of Agriculture for

documents related to defendants' treatment of their elephants. AWI also spent

approximately $14,000 between 2002 and 2003 in reviewing the documents received in

response to the Freedom of Information Act law suit, and compiling a report based on those documents concerning the United States Department of Agriculture's failure to enforce the Animal Welfare Act against defendants. In addition, annually AWI expends miscellaneous staff resources searching the news, the internet, and other sources for information related to defendants' treatment of their elephants.

**Interrogatory No. 23:**

Describe the subject and substance of the testimony that would be given by each person identified in the initial disclosures.

**Objection and Response to Interrogatory No. 23:**

AWI objects to this Interrogatory on the ground that the plaintiffs have already provided this basic information with their initial disclosures, and to provide further details at this point would reveal the work product of their attorneys. Subject to and without waiving the foregoing or general objections to these Interrogatories, AWI states that the subject and substance of the testimony that Tom Rider will provide is described in Mr. Rider's answers to the Interrogatories directed to him.

Objections respectfully submitted by,

Katherine A. Meyer
(D.C. Bar No. 244301)
Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

June 9, 2004

30

## VERIFICATION

CITY OF ALEXANDRIA             )
                               )
                               )
STATE OF VIRGINIA              )


        CATHY LISS, being duly sworn, says:

        I am employed as the President of the Animal Welfare Institute.  Animal Welfare
Institute is a plaintiff in this case.  I have read the foregoing objections and responses to
Defendants' First Set of Interrogatories to Plaintiff Animal Welfare Institute and know
the contents thereof.  Upon information and belief, said Objections and Responses are
true and correct.

                                        _____
                                        Cathy Liss


Sworn to before me this
____ day of June, 2004


_____
                                Notary Public


My Commission Expires:   Sept 30, 2006

_____

31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— )<br>AMERICAN SOCIETY FOR THE )<br>PREVENTION OF CRUELTY TO )<br>ANIMALS, et al., )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>RINGLING BROS. AND BARNUM )<br>& BAILEY CIRCUS, et al., )<br> )<br>Defendants. )<br>————————————————) | Civ. No. 03-2006 (EGS) |

**PLAINTIFF ANIMAL WELFARE INSTITUTE'S SUPPLEMENTAL RESPONSES
AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 33 and the agreement of the parties, plaintiff

Animal Welfare Institute ("AWI") hereby provides the following supplemental responses and

objections to Defendants' First Set of Interrogatories.

**DEFINITION**

1.    As used herein, "irrelevant" means not relevant to the subject matter of this action

and not reasonably calculated to lead to the discovery of admissible evidence.

**OBJECTIONS**

1.    AWI hereby incorporates by reference both the general and specific objections

that it made to Defendants' First Set of Interrogatories, as well as its objections to defendants'

definitions of "describe" and "identify."

Advocacy Project concerning Tom Rider's media and public education work for the Wildlife

Advocacy Project.

In addition, Ms. Silverman attended some of the trial in People for the Ethical Treatment

of Animals, Inc. v. Kenneth Feld, et al., No. 2004-220181 (Cir. Ct. Fairfax County, Va.), during

2006, and at that time had conversations about that case with Jeff Kerr and Debbie Leahy of

People for the Ethical Treatment of Animals, and she also had a conversation during that time

period with Florence Lambert of the Elephant Alliance, concerning the testimony Ms. Lambert

provided at that trial.

Ms. Silverman also talked to Nicole Paquette of the Animal Protection Institute about

legislation pending in Nebraska, and she also talked to Ms. Paquette in conjunction with a pres

conference she attended in Sacramento, California in September 2005 concerning Ringling

Bros.' mistreatment of captive elephants.

**Interrogatory No. 20:**  Describe each communication in which any person, other than
defendants or their employees, has expressed support for or otherwise said positive things about
defendants' treatment of their elephants.

**Supplemental Response to Interrogatory No. 20:**

AWI has nothing to add to its original answer to this Interrogatory

**Interrogatory No. 21:**  Identify each resource you have expended from 1997 to the
present in "advocating better treatment for animals held in captivity, including animals used for
entertainment purposes" as alleged in the complaint, including the amount and purpose of each
expenditure.

**Supplemental Response to Interrogatory No. 21:**

Subject to and without waiving its previous objections to this Interrogatory, AWI states

that since June 2004 it has spent an average of approximately $440,000 annually on program

-15-

activities related to improving conditions for captive animals; an average of approximately

$49,800 a year producing educational materials advocating better treatment of animals held in

captivity; approximately $22,380 a year speaking at and/or attending and distributing educational

materials on improving the treatment of animals in captivity at symposia and approximately

$23,000 a year conducting research and writing to encourage better treatment of animals;

approximately $38,900 a year updating databases and maintaining an on-line forum on enriching

the lives of captive animals; and approximately $38,850 a year providing guidance directly to

individuals who have animals in captivity about ways to improve the conditions for their animals.

AWI has made contributions to the Wildlife Advocacy Project for advocacy work for

public education on the issue of the treatment of elephants held in captivity. Documents

reflecting these contributions have been produced by AWI and are hereby incorporated by

reference, AWI 06494-06506.

AWI also spent approximately $768.73 in September 2005 in connection with Tracy

Silverman attending a press conference in Sacramento California concerning Ringling Bros.'

mistreatment of elephants.

**Interrogatory No. 22**: Identify each expenditure from 1997 to the present of "financial
and other resources" made while "pursuing alternative sources of information about defendants'
actions and treatment of elephants" as alleged in the complaint.

**Supplemental Response to Interrogatory No. 22:**

Subject to and without waiving their previous objections to this Interrogatory, AWI states

that is has spent approximately $12,102.10 on legal fees and costs pursuing information from the

United States Department of Agriculture concerning defendants' actions and treatment of

elephants.

**Interrogatory No. 23**:  Describe the subject and substance of the testimony that would be given by each person identified in the initial disclosures.

**Supplemental Response to Interrogatory No. 23**:

Subject to and without waiving its previous objections to this Interrogatory, AWI additionally states that the subject and substance of the testimony that Tom Rider will provide is further described in Mr. Rider's deposition testimony that was given on October 12, 2006, which AWI hereby incorporates by reference.  In addition, the substance and subject of the testimony of Miyun Park was provided by deposition on January 5, 2005; the substance and subject of the testimony of Betsy Swart was provided by deposition on March 18, 2005; and the substance and subject of the testimony of Angela D. Martin was provided by deposition on March 9, 2005, all of which AWI hereby incorporates by reference.


Objections respectfully submitted by,


Katherine A. Meyer
(D.C. Bar No. 244301)
Tanya M. Sanerib
(D.C. Bar No. 473506)
Howard M. Crystal
(D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206


Dated:  January 31, 2007

-17-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, <u>et al.</u>, ) ) ) ) | |
| Plaintiffs, ) ) | Civ. No. 00-01641 (EGS) |
| v. ) ) | |
| RINGLING BROS. AND BARNUM & BAILEY CIRCUT, <u>et al.</u>, ) ) ) | |
| Defendants. ) ) | |

**PLAINTIFF THE FUND FOR ANIMALS' RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS
AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS,
ANIMAL WELFARE INSTITUTE, AND FUND FOR ANIMALS**

Pursuant to Federal Rule of Civil Procedure 33 and the agreement of the parties,

plaintiff The Fund for Animals ("The Fund") hereby offers the following objections and

responses to Defendants' First Set of Interrogatories to The Fund.

<u>**DEFINITIONS**</u>

1.      As used herein, "irrelevant" means not relevant to the subject matter of

this action and not reasonably calculated to lead to the discovery of admissible evidence.

<u>**GENERAL OBJECTIONS**</u>

1.      The Fund's general objections, as set forth herein, are to be considered

continuing objections and responses to the specific Interrogatories that follow, even if not

referred to in the objection and response to a specific Interrogatory.  The Fund's

cannot recall each such communication. Some information regarding such communications may be found in the documents provided by The Fund in response to defendants' document requests.

In addition, Michael Markarian has had numerous conversations with the other organizational plaintiffs and their attorneys in this case concerning the litigation, most of which are protected by the attorney-client privilege.

**Interrogatory No. 20:**

Describe each communication in which any person, other than defendants or their employees, has expressed support for or otherwise said positive things about defendants' treatment of their elephants.

**Objection and Response to Interrogatory No. 20:**

The Fund objects to this Interrogatory on the ground that it is vague and ambiguous. In particular, The Fund does not know what is meant by the term "positive things." Subject to and without waiving this objection or the general objections to these Interrogatories, The Fund states that it is not aware of any such communications.

**Interrogatory No. 21:**

Identify each resource you have expended from 1997 to the present in "advocating better treatment for animals held in captivity, including animals used for entertainment purposes" as alleged in the complaint, including the amount and purpose of each expenditure.

**Objection and Response to Interrogatory No. 21:**

The Fund objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and highly oppressive. The term "each resource" is also vague and ambiguous. Subject to and without waiving this or the general objections to the interrogatories, The Fund provides the following information concerning resources expended advocating better treatment for animals in captivity:

31

The following funds were expended on printing, postage, and mail services for direct mailings to members of The Fund for Animals and potential supporters on topics such as circuses, canned hunts, and animals raised in captivity for their fur:

- 1997: $393,209
- 1998: $204,570
- 1999: $441,213
- 2000: $425,068
- 2001: $764,572
- 2002: $1,269,770
- 2003: $1,096,580

The following funds were expended on printed literature for educational purposes, including fact sheets, brochures, and materials for teachers and children regarding circuses, canned hunts, and other issues related to captive animals:

- 1997: $54,160
- 1998: $170,932
- 1999: $65,525
- 2000: $125,711
- 2001: $132,112
- 2002: $128,712
- 2003: $173,828

The following funds were expended on paid print and broadcast advertising to educate consumers on the issue of animals raised in captivity for fur production:

- 2001: $150,410
- 2002: $631,061
- 2003: $606,525

The following funds were expended on media distribution services to educate the public on issues such as circuses, private ownership of exotic wildlife, captive animals raised for fur, and canned hunts:

U.S. Newswire:
- 2003: $12,425
- 2004: $1,975

P.R. Newswire:
- 2000: $17,680
- 2001: $23,690
- 2002: $28,270
- 2003: $26,805
- 2004: $17,820

The following funds were expended to produce Public Service Announcements distributed to television stations nationwide on the issues of "canned hunts" of captive wildlife and the private ownership of exotic wildlife:

- 2001: Canned Hunts, $40,000
- 2003: Exotic Animals, $44,200

The following funds were expended on web site and online communications to educate people about animal cruelty issues such as circuses, canned hunts, exotic pets, and animals raised for their fur:

- 2001: $22,660
- 2002: $72,622.48
- 2003: $106,433.58
- 2004: $52,933.34

The Fund made a donation to the Captive Wild Animal Protection Coalition of $2,000 in 2003.

Extensive staff time and other resources have also been expended annually on various items relating to advocating for animals in captivity, including:

- 2002-2003 - running the National Humane Essay Contest on the topic of circuses with animal acts.
- 2003-2004 – running the National Humane Essay Contest on the topic of exotic animals as "pets."
- Writing reports, fact sheets, and press releases every year.
- Setting up canned hunt filing system.
- Setting up and updating canned hunt database.
- Sending letters to state wildlife agencies requesting canned hunting info.
- Writing letters opposing rodeos.
- Researching canned hunt laws and regulations.
- Writing letters to zoos about surplus animal policy.
- Attending Chronic Wasting Disease conference in Colorado where game farms were discussed.
- Testifying on Pennsylvania canned hunt regulations.
- Lobbying on Pennsylvania canned hunt bill.
- Attending Federal canned hunt bill committee mark-up.
- Protesting circus at Montgomery County Fair, Maryland, in 2002 and 2003.
- Employing a full-time lobbyist in California working on exotic animal bills and attending meetings of the California Fish and Game Commission and the Advisory Committee on Humane Care and Treatment of Wild Animals. Lobbyist has worked on the following state bills: (1997) SB 196, AB 716; (1998) AB 1635, AB 409, AB 716; (2000) SB 1462, SB 2149; (2001) F&G regs on deer farms;

(2002) AB 2574, AB 2847, SB 1210, SB 1306, SB 1851, F&G regs on exotics in captivity and deer farms; (2003) SB 732, AB 885, AB 395.

- Employing a full-time lobbyist in New York working on exotic animal bills, including bills to ban the trophy shooting of captive exotic mammals and to ban the private ownership of exotic wildlife. Lobbyist has worked on the following bills: (2003) S2735a and A4609a; (2004) A2684b, S905b, S6446a, A10188a.

The Fund's Director of Government and International Affairs has also expended time engaging in the following activities related to advocacy on behalf of animals in captivity:

2001:

1/11: Participated in conference call regarding circus lawsuits.
2/6: Attended monthly lobbyist meeting.
2/23: Attended Species Survival Network Strategy Meeting.
3/5: In Annapolis for meetings with state legislators regarding MD General Assembly bill to prohibit elephants in circuses in MD.
3/9: same as 3/5
3/12: same as 3/5
3/16: Testified on MD General Assembly bill to prohibit elephants in circuses in MD.
3/19: Participated in conference call regarding upcoming press conference on circus lawsuit.
3/22: Attended press conference on circus lawsuit at Nat'l Press Club.
4/26 through 4/28: Meetings with Dr. Willie Smits of Gibbon Foundation, Indonesia, and legislative staff on Capitol Hill. Also with staff of USFWS.
4/28 through 5/2: Attended conference in Boston on Great Apes.
6/5: Met with AZA staff re roadside zoos.
6/14 through 7/6: Uganda/Rwanda/UK trip: Meetings with heads of wildlife agencies, local NGOs, park rangers, ecotourism operations, UK-based animal protection organizations regarding various wildlife issues, including wildlife trade and animals in captivity. Field site visits in Uganda and Rwanda with national park staff and wildlife biologists regarding protected areas management, viability of endangered wildlife populations, and impacts of trade. Strategy sessions with Government Ministers regarding bilateral cooperation between Uganda and Rwanda on CITES positions, migratory routes of certain species, poaching, and illegal trade.
8/24: Attended Species Survival Network Strategy Meeting.
8/30: Met with Dr. Marc Ancrenaz of Kinabatangan Orangutan Conservation Project.
9/25: Several appointments on Capitol Hill with staff re CITES issues, including trade for captivity. Also attended reception at Indonesian Embassy.
10/3: Attended House Resources Committee hearing.
10/19: Attended Species Survival Network Strategy Meeting, met with Director of Conservation International re coordinated projects in Africa.
11/29 through 12/4: Attended Species Survival Network Annual Summit in Costa Rica.
12/13: Several meetings on Capitol Hill re canned hunt bill.

34

12/14: Species Survival Network Strategy Meeting.

2002:

1/30: Meeting with Senator Jeffords.
1/31: meeting with American Zoo and Aquarium Association.
2/14: Meeting with USFWS.
2/15: Species Survival Network Strategy Meeting.
2/20 through 2/24: Meetings in Chicago with U.S. based ecotourism companies, including their charitable foundations.
2/28 through 3/1: Trinational Conference on Wildlife Law Enforcement.
3/1: Meeting with Kevin Adams at USFWS.
4/6 through 4/13: CITES Animals Committee Meeting in Costa Rica.
4/17: USFWS Public Meeting on proposals for CITES CoP 12.
4/18: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA).
4/25  Humane Awards dinner and ceremony.
4/26: Species Survival Network Meeting.
4/26 through 5/15: Tanzania and Netherlands trip.  Lectured at Mweka College of African Wildlife Management, met with Tanzanian based animal protection NGOs, toured Trophy hunting concession with local Maasai tribal leaders, met with Tanzanian Minister of Tourism and Environment, accompanied Tanzanian National Parks staff on several wildlife recovery missions, attended strategy meetings at Greenpeace Amsterdam.
5/21: Strategy meeting with other lobbyists re CEAPA.
5/22: Meetings on Capitol Hill re CEAPA.
6/14 through 6/18: Black Beauty Ranch, Texas.
6/21: Species Survival Network Meeting.
6/28 through 7/3: Various speeches given at Animal Rights 2002 Conference.
7/11: Strategy Meeting at HSUS re CITES elephant proposals.
7/18: Meetings with Congressional candidates re animal issues at the federal level.
8/20: Briefing at USFWS re proposals and resolutions for CITES CoP 12.
8/23  Species Survival Network Strategy Meeting.
9/5: Meetings on Capitol Hill re CEAPA.
9/17: CITES oversight hearing in House Resources Committee.
9/20  Species Survival Network Meeting.
10/3: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA).
10/18: Species Survival Network Meeting.
10/19: Meeting with WV state delegates re animal legislation in Charleston.
10/22: Species Survival Network Press Conference.
10/31 through 11/17: Attended CITES CoP 12 in Santiago Chile as non-governmental observer and lobbied for pro-animal initiatives.
12/3: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA).
12/13: Meeting with AZA re roadside zoos and CEAPA.

2003:

1/14: Conference call re CEAPA.
3/6: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA).
3/11: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA) various times during March 2003: Worked on article for Animal Free Press re elephants, including captive elephants.
3/10: Met with WV state legislators re various animal related legislation.
3/19-3/20: Smithsonian Conference, "Elephants and Ethics".
3/24: Conference call with USFWS.
4/3: Meeting with IFAW contract lobbyist.
4/7: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA).
4/15: Meetings on Capitol Hill re Captive Exotic Animal Protection Act (CEAPA).
4/20 through 4/27: CITES Standing Committee, Geneva Switzerland.
5/5: Conference call with members of Pan African Sanctuary Alliance.
5/23: Conference call with members of Pan African Sanctuary Alliance.
5/25 through 6/16:  Rwanda/Uganda/Kenya trip: Field work in various national parks, meetings with President Kagame's staff re restoration of migratory corridors, wildlife trade issues, and expansion of ecotourism, meetings with Uganda Wildlife Authority director and staff re wildlife export policies and protected areas management, meetings with President Kibaki's staff re Kenya's comprehensive wildlife policy strategy and elephant relocation plans.  Spoke at Pan African Sanctuary Alliance annual meeting, Kenya Wildlife Service briefing and East African Wildlife Society dinner.
6/27 through 7/2: Gave various speeches at Animal Rights 2003 conference.
8/15 through 8/22: CITES Animals Committee Meeting, Geneva Switzerland.
9/12  Meeting with Dr. Sammy El Falaly, Director of CITES Management Authority for Egypt, in Cairo re wildlife trade and policies on confiscated animals, also Egyptian animal protection laws and live animal auctions.
9/24  Lectured at Shepherd College on wildlife related legislation and international wildlife law.
9/26: conference call on USFWS draft regs and proposed rule on ESA changes.
10/2: conference call on USFWS draft regs and proposed rule on ESA changes.
10/16 through10/19  White Oak Plantation Wildlife facility, Jacksonville FL.
10/22: conference call on USFWS draft regs and proposed rule on ESA changes.
10/24  Speech at Women in Government Relations conference in D.C.
11/2: Speech at Animal Welfare Society Annual Dinner, Shepherdstown WV.
11/6:  Meeting with Uganda President Yoweri Museveni in Washington DC.
11/9:  Speech at Student Lobby Day training session, American University, Washington DC.
11/21: conference calls on USFWS draft regs and proposed rule on ESA changes.
12/3: speech at WV Democratic Association Annual Dinner.
12/18: Meeting with HSUS Investigations staff.

2004:

Various dates through January and February: conference calls on USFWS draft regs
and proposed rule on ESA changes.
3/14 through 3/19: CITES Standing Committee Meeting, Geneva Switzerland.
3/23: Meeting w/ WV State Delegate John Doyle and State Senators John Unger and
Herb Snyder re animal related legislation.
4/16 through 4/23: Animal Transport Association Conference in Vienna Austria.

1997:

Numerous meetings, conference calls and Hill visits re CITES proposals dealing with
transport of circus animals, captive breeding, etc.
June 1997: CITES Conference of the Parties 10 in Harare, Zimbabwe.

1998:

Countless meetings, Hill visits, and embassy visits re capture of wild elephant calves
in Botswana and subsequent abuse of calves, and selling to various zoos. Ensuing
Legal case in South Africa – worked extensively with South African NGOs lining up
expert testimony, research and background information. Briefed CITES parties on
developments in the case against the wildlife dealer, Riccardo Ghiazza

September: Speeches at Performing Animal Welfare Society Annual Meeting In
Sacramento, CA.


In addition to the above-listed human resource and monetary resource expenditures,

the documents produced by The Fund in response to defendants' document requests also

demonstrate numerous resources The Fund has expended in advocating for the better

treatment of animals in captivity, and The Fund refers defendants to those documents.

**Interrogatory No. 22:**

Identify each expenditure from 1997 to the present of "financial and other resources"
made while "pursuing alternative sources of information about defendants' actions and
treatment of elephants" as alleged in the complaint.

**Objection and Response to Interrogatory No. 22:**

The Fund objects to this Interrogatory on the grounds that it is overly broad, and

unduly burdensome. Subject to and without waiving these or the general objections, The

37

Fund states that its Director of Government and International Affairs spent approximately 10% of her time in 2000 gathering information on Ringling Bros. (approximately $3,000), culminating in a decision to be a co-plaintiff in this law suit. The Fund also spent approximately $4,000 between 2001 and 2003 pursuing a Freedom of Information Act case against the United States Department of Agriculture for documents related to defendants' treatment of their elephants. The Fund also spent approximately $14,000 between 2002 and 2004 for reviewing the documents received in response to the Freedom of Information Act law suit, and compiling and disseminating a report based on those documents concerning the United States Department of Agriculture's failure to enforce the Animal Welfare Act against defendants. In addition, The Fund annually expends miscellaneous staff resources searching the news, the internet, and other sources for information related to defendants' treatment of their elephants.

**Interrogatory No. 23:**

Describe the subject and substance of the testimony that would be given by
each person identified in the initial disclosures.

**Objection and Response to Interrogatory No. 23:**

The Fund objects to this Interrogatory on the ground that the plaintiffs have already provided this basic information with their initial disclosures, and to provide further details at this point would reveal the work product of their attorneys. Subject to and without waiving the foregoing or general objections to these Interrogatories, the Fund states that the subject and substance of the testimony that Tom Rider will provide is described in Mr. Rider's answers to the Interrogatories directed to him.

Objections submitted by,

Katherine A. Meyer
(D.C. Bar No. 244301)
Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

June 9, 2004

## VERIFICATION

CITY OF SILVER SPRING     )
                                        )
                                        )
STATE OF MARYLAND       )

MICHAEL MARKARIAN, being duly sworn, says:

I am employed as the President of The Fund for Animals.  The Fund for Animals is a plaintiff in this case.  I have read the foregoing objections and responses to Defendants' First Set of Interrogatories to Plaintiff The Fund for Animals and know the contents thereof.  Upon information and belief, said Objections and Responses are true and correct.

_____
Michael Markarian

Sworn to before me this
4 day of June, 2004

_____
Notary Public

My Commission Expires:

OPHER S. BENDAVID
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expire: [illegible] 24 2005

6/4/04

41

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RINGLING BROS. AND BARNUM & BAILEY CIRCUS, et al., <br><br> Defendants. | Civ. No. 03-2006 (EGS) |

## PLAINTIFF THE FUND FOR ANIMALS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33 and the agreement of the parties, plaintiff The Fund for Animals ("The Fund") hereby provides the following supplemental responses to Defendants' First Set of Interrogatories.

### DEFINITION

1.    As used herein, "irrelevant" means not relevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence.

### OBJECTIONS

1.    The Fund hereby incorporates by reference both the general and specific objections that it made to Defendants' First Set of Interrogatories, as well as the Fund's objections to defendants' definitions of "describe" and "identify."

"animal advocacy organizations" other than plaintiffs, any such communications by the Fund are reflected in supplemental documents that it has provided to defendants.

**Interrogatory No. 20:** Describe each communication in which any person, other than defendants or their employees, has expressed support for or otherwise said positive things about defendants' treatment of their elephants.

**Objection and Response to Interrogatory No. 20:**

The Fund has nothing to add to its original answer to this Interrogatory

**Interrogatory No. 21:** Identify each resource you have expended from 1997 to the present in "advocating better treatment for animals held in captivity, including animals used for entertainment purposes" as alleged in the complaint, including the amount and purpose of each expenditure.

**Objection and Response to Interrogatory No. 21:**

Subject to and without waiving its previous objections to this Interrogatory, The Fund states that since its most recent response to this Interrogatory, the Fund has expended approximately $88,378.68 advocating better treatment for animals held in captivity, including animals used for entertainment purposes, through its website and other online communications, which are included in supplemental documents that The Fund is providing to defendants. This amount was expended on consulting and hosting fees incurred in creating and maintaining the Fund's website.

**Interrogatory No. 22:** Identify each expenditure from 1997 to the present of "financial and other resources" made while "pursuing alternative sources of information about defendants' actions and treatment of elephants" as alleged in the complaint.

**Supplemental Response to Interrogatory No. 22:**

Subject to and without waiving its previous objections to this Interrogatory, the Fund states that since its original response to this Interrogatory The Fund has spent approximately

16

$12,000 pursuing information from the United States Department of Agriculture concerning defendants' actions and treatment of elephants.

**Interrogatory No. 23:** Describe the subject and substance of the testimony that would be given by each person identified in the initial disclosures.

**Supplemental Response to Interrogatory No. 23:**

Subject to and without waiving its previous objections, The Fund additionally states that the subject and substance of the testimony that Tom Rider will provide is further described in Mr. Rider's deposition testimony that was given on October 12, 2006, which The Fund hereby incorporates by reference. In addition, the substance and subject of the testimony of Miyun Park was provided by deposition on January 5, 2005; the substance and subject of the testimony of Betsy Swart was provided by deposition on March 18, 2005; and the substance and subject of the testimony of Angela D. Martin was provided by deposition on March 9, 2005, all of which The Fund hereby incorporates by reference.

Objections respectfully submitted by,

Katherine A. Meyer
(D.C. Bar No. 244301)
Tanya M. Sanerib
(D.C. Bar No. 473506)
Howard M. Crystal
(D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

Dated: January 31, 2007

17

## **VERIFICATION**

I, MICHAEL MARKARIAN, declare as follows:

I am employed as the President of The Fund for Animals. The Fund for Animals is a plaintiff in this case. I have read the foregoing objections and responses to Defendants' Interrogatories to Plaintiff The Fund for Animals and know the contents thereof. Upon information and belief, said Objections and Responses are true and correct.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

1/31/07

Michael Markarian

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.  :
         :
    Plaintiff,   :
         :
   v.      :  Case No. 07- 1532 (EGS)
         :
AMERICAN SOCIETY FOR THE :
PREVENTION OF CRUELTY  :
ANIMALS, et al.    :
         :
    Defendants.  :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 9

# Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

December 15, 2006

**<u>Sent by E-Mail and First Class Mail</u>**

George A. Gasper
Fulbright & Jaworski
801 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2623

Re:     <u>ASPCA v. Ringling Bros.</u>, Civ. No. 03-2006

Dear Mr. Gasper:

This letter responds to the meet and confer letter that you sent me on November 22, 2006 ("11/22 Let."). Your principal concern appears to be that the plaintiffs are "deficient" in several respects regarding their June 9, 2004 discovery responses to defendants' initial March 30, 2004 discovery requests. In addition, you complain about certain answers that were provided by plaintiffs' 30(b)(6) witnesses at their depositions that occurred May 18, 2005 (Cathy Liss); June 22, 2005 (Michael Markarian), and July 19, 2005 (Lisa Weisberg). Finally, you also ask that plaintiffs update their document production, since the last update you received was in August of this year. <u>See</u> 11/22 Let. at 10.

I have not been able to get back to you on these matters until now because your letter was sent the day before Thanksgiving, Ms. Ockene is out on maternity leave, and, since Thanksgiving, I have had two out-of-town arguments and several briefs due in various forums. As your co-counsel knows, I am also dealing with a very serious illness in my immediate family. Nevertheless, I am getting back to you as soon as feasible and within the time-frame requested in your November 22 letter.



recycled paper

A.    **General Response**

As to your principal concern – i.e., the "deficiencies" in plaintiffs' June, 2004 responses to defendants' initial discovery requests, I am sure it will come as no surprise to you that we are extremely perplexed by the fact that defendants have waited more than two and a half years to complain about any of these responses, and then have demanded that we provide complete responses to your more than 12 page, single-spaced letter about these matters within such a short period of time. Indeed, you sent your letter to us on November 22, the day before the Thanksgiving holiday, and have requested a complete response to all of your concerns by today – thus, giving the plaintiffs fifteen business days to respond. This is simply not enough time to answer all of your numerous questions concerning the alleged "deficiencies" in plaintiffs' June 2004 discovery responses, when defendants have had two and a half years to lodge those complaints. Indeed, even if we count from the day your law firm entered its appearance in this case, March 10, 2006, you have had nine months to lodge your complaints, and have failed to do so until now.

The extreme delay in notifying us of these alleged deficiencies is particularly egregious in light of the fact that when plaintiffs notified defendants of the deficiencies in defendants' discovery responses in October 2004 – only four months after those discovery responses were received – defendants complained mightily about this delay. See, e.g., Letter from Josh Wolson (November 8, 2004) ("there is no reason to have allowed this process to sit in limbo for four months . . . [t]he long delay makes it more difficult for us and our client to re-canvass the files that are no longer fresh in our clients' minds"); see also Memorandum In Opposition To Plaintiffs' Motion To Compel (February 15, 2005) at 1 ("until October 19 [2004], when plaintiffs first sent a letter about defendants' responses, defendants had no reason to believe that plaintiffs deemed any of their discovery responses inadequate"). Needless to say, a more than two and a half year delay in identifying alleged deficiencies is far more troubling, and also much more problematic, than the four month delay about which defendants vociferously complained.

I would also add that defendants not only waited to notify us of these alleged deficiencies until more than two and a half years after plaintiffs provided defendants with their discovery responses, but you also appear to have waited to send your letter until Ms. Ockene, who as your own letter demonstrates has been principally responsible for handling these particular discovery matters, was out of our office on maternity leave – a fact that is well known by defendants' lawyers. Indeed, while your letter raises many questions concerning particular representations made by Ms. Ockene either in letters or during depositions, it is obviously extremely difficult for us to respond immediately to these matters while she is on leave.

Therefore, as an initial matter, although we certainly will try our best to respond to all of your concerns promptly, and to produce all additional discovery that is not privileged that you contend should have been provided with the June 2004 discovery responses, as well as to answer the questions you have about particular testimony that was provided during depositions of our clients during the summer of 2005, we need more time to do so. Indeed, although we have begun

the process of discussing these matters with our clients, this requires multiple discussions with several high-level officials from each group, which will require considerably more time than you have suggested, and, with the holidays upon us, cannot possibly be completed until some time after the New Year. Mr. Rider is currently traveling throughout the country which makes it difficult for us to meet with him as well.

Providing a thorough response to your November 22 letter will also require us to have discussions with Ms. Ockene and will also require Ms. Ockene to review correspondence and deposition transcripts to which you refer throughout your November 22 letter – all of which will require her to take time off from her maternity leave which is otherwise not currently scheduled to end until some time in February.

In addition, you make reference in your letter to the fact that you are "continuing" to review plaintiffs' June 2004 discovery responses and deposition testimony, and that if you "discover additional deficiencies," you will "promptly" notify us. See 11/22 Let. at 1. However, if we are going to make our clients take time out from their extremely busy schedules to address concerns you have about their June 2004 discovery responses or their 2005 deposition testimony, we prefer to do so with all of your questions in hand, rather than on a piecemeal basis. Therefore, either provide us with a complete list of all of the alleged "deficiencies" you have found in our clients' June 2004 discovery responses and deposition testimony now, or we will assume that we need not address any such additional matters once we provide complete responses to your November 22 letter.

We suggest that, unless we receive a complete list of such alleged deficiencies by the end of this month, December 31, 2006, we may assume that this matter is closed, barring any new revelations that bear on these matters. If you have a different date on which you can give us a complete list of all the deficiencies in the plaintiffs' 2004 discovery responses or 2005 depositions that we can use to calculate a time-table for providing you a complete response to your concerns, please let us know as soon as possible.

Assuming that by December 31, 2006 you are able to identify all of the alleged deficiencies that you contend exist with respect to plaintiffs' June 2004 responses to defendants' initial discovery requests, and plaintiffs' 2005 deposition testimony, we will endeavor to provide you as soon as possible with all of the information addressed in your November 22 letter, as supplemented by any additional "deficiencies" you identify by December 31. If you tell us soon that there are no such additional "deficiencies" to which we need to respond, we will make our best effort to complete the process of discussions with our clients and Ms. Ockene within the next few weeks, and provide you a more complete response to all of the matters addressed in your November 22 letter by January 15, 2007. Under the circumstances – and particularly defendants' two and a half year delay in notifying us of any of the alleged "deficiencies" in plaintiffs' June 9, 2004 discovery responses and 2005 deposition testimony – this is extremely reasonable on our part. Indeed, we note that when plaintiffs notified defendants on October 19, 2004 of the deficiencies in defendants' June 2004 discovery responses – only four months after

-3-

those discovery responses were provided – we gave the defendants until January 11, 2005 to provide responses to those concerns before proceeding with a motion to compel.  <u>See</u> Letter to Eugene Gulland (October 19, 2004); Letter to Joshua Wolson (December 22, 2004).

If you decide to complete your notification concerning the alleged deficiencies in plaintiffs' June 2004 discovery responses and 2005 deposition testimony by December 31, we will do our best to get you a complete response to all of these matters by January 31, 2007.  Therefore, please let us know as soon as possible whether you intend to supplement your November 22 letter with additional items.

As to your request that plaintiffs "please update" their June 2004 discovery requests, <u>see</u> 11/22 Let. at 10, we agree that both parties should comply with their duty to supplement their discovery responses.  To date, neither plaintiffs nor defendants have provided any supplemental responses to Interrogatories.  In addition, plaintiffs have provided supplemental responses with respect to most if not all of defendants' document production requests on March 21, 2005, July 11, 2006, and August 11, 2006.  Accordingly, we propose that the parties mutually agree to a date on which they will produce all supplemental discovery, including both Interrogatory responses and Document requests, that has not yet been produced with respect to all of the discovery requests that were served by the parties in March 2004.  We would propose that this date also be January 31, 2007, but are open to alternative suggestions that may be more convenient and/or realistic for defendants.

To summarize, we are agreeing to provide you, by January 15, 2007, complete answers to all of your questions concerning the alleged deficiencies in plaintiffs' June 2004 discovery responses and 2005 deposition testimony, if you advise us that you have no additional concerns, and to provide you with all outstanding supplemental discovery by January 31, 2007, if defendants will agree to reciprocate by providing us with all of their outstanding supplemental discovery by that date.  However, if you do have additional concerns about plaintiffs' June 2004 responses to defendants' initial discovery, or with respect to plaintiffs' deposition testimony – as you appear to suggest may be the case – we have requested that you supplement your November 22 letter by December 31, 2006 with such concerns, and, if you do so, we will provide a complete response to <u>all</u> such concerns by January 31, 2007.

B.    <u>**Specific Responses**</u>

There are certain matters raised in your November 22 letter that we can respond to now.

1.    <u>**Discovery Sought From The Organizational Plaintiffs**</u>

First, in response to your question in footnote 2 of your letter regarding Ms. Ockene's representation in her February 13, 2006 letter concerning objections, it is our understanding that any document for which any objection was raised was listed on plaintiffs' privilege log.  Thus, unlike defendants' practice – which came to light during our dispute over defendants' failure to

produce the elephants' medical records – plaintiffs did not intentionally hide the existence of any documents that were covered by defendants' document production requests. Rather, plaintiffs searched for all requested records, and either produced them, listed them on their privilege log, or specifically requested a confidentiality agreement for information that is confidential.[1]

Second, you have raised several concerns about conversations that the plaintiffs may have had with each other that did not concern litigation strategy, including but not limited to conversations about funding of Mr. Rider's public education efforts, and documents that may have been generated on such matters. You have also asked whether any of the plaintiffs had any such conversations with employees or officials of the Wildlife Advocacy Project, and whether any documents concerning such communications exist. As part of our effort to provide you with a complete response to all of your concerns, we will definitely ask our clients about all such matters. As to the plaintiffs' obligation to further supplement their discovery responses about these matters, plaintiffs will do so on whatever date the parties agree to for mutual supplementation, and will also update their privilege log as necessary. We do not anticipate asserting a privilege for any conversations or documents that did not concern litigation strategy, but until we are able to ascertain precisely what conversations and documents may exist, we cannot give you a guarantee on this at this time.

Third, you question why, in response to Defendants' Interrogatories No. 21 and 22, none of the plaintiff organizations identified financial and other resources provided for Mr. Rider's public education efforts. See 11/22 Let. at 6-7. The simple answer appears to be that these Interrogatories specifically refer to the plaintiffs' standing allegations in the Complaint that they filed in this case. We do not believe that any of the plaintiffs were relying on any funding of Mr. Rider's public education efforts in support of their standing allegations. Nor do we know whether any of the plaintiffs had made any contributions to Mr. Rider's public education efforts at the time the Complaint was filed. However, we will definitely look into this matter and see if there is any additional information that should have been provided with the June 9, 2004 discovery responses. As to plaintiffs' duty to supplement their responses to these questions, we will do so on whatever date the parties agree to for mutual supplementation.

Fourth, plaintiffs have no "non-privileged portions of the invoices from [our] firm that reflect monies filtered through it for payments to Mr. Rider." 11/22 Let. at 7.

Fifth, we will discuss with Ms. Weisberg whether she can ascertain "what other issues the money was directed to" when the ASPCA stopped funding Mr. Rider's public education efforts in 2003, see 11/22 Let. at 7, and if she can figure this out at this late date, we will either provide

---

[1] You note that Ms. Weisberg lodged an objection in response to Document Request No. 3 to producing documents on the basis of work product, but that no such document is listed on the privilege log. See 11/22 Let. at 4. It is my understanding that there are no such documents and that Ms. Weisberg did not mean to imply that there are any. However, we will check with her to make sure.

you the information without a confidentiality agreement or request that you agree to one, as you suggest on page 8 of your letter.

Sixth, as to whether there are additional records concerning inspections of circuses by the ASPCA dating back to January 1, 1996, that have not been produced, 11/22 Let. at 8, we already responded to this inquiry. See Letter from Ms. Ockene (July 11, 2006). The ASPCA has not been able to locate any other documents that are responsive to this discovery request. As to the inspections for which there are no documents, we will discuss this with the ASPCA and provide you with such descriptions.

Seventh, as to your question in footnote 3 on page 8 of your letter, as promised, we have made further inquiries about the answer to Interrogatory No. 20, and the answer is that our client is not aware of any other such communications.

Eighth, we can confirm that, on June 9, 2004, the organizational plaintiffs produced all documents requested of them in defendants' March 30, 2004 discovery requests, except for those listed on plaintiffs' privilege log, and if plaintiffs requested a confidentiality agreement with respect to any such records. In addition, plaintiffs have supplemented those discovery requests with additional records on March 21, 2005, July 11, 2006, and August 11, 2006, and intend to provide further supplemental responses on the date upon which the parties mutually agree for such supplementation.

Ninth, as to your inquiry regarding whether AWI's discovery responses included responses from the Society of Animal Protective Legislation (SAPL), see 11/22 Let. at 10, the answer is yes, they did. AWI, including SAPL, will provide any supplemental discovery by the date the parties mutually agree upon for such supplementation. As to your related question concerning whether the ASPCA has produced discovery responses from its Humane Law Enforcement Division, see 11/22 Let. at 10, the answer is also yes. All such additional records that had not already been produced were provided to you by letter from Ms. Ockene dated July 11, 2006. The ASPCA, including its Humane Law Enforcement Division, will provide any supplemental discovery by the date the parties mutually agree upon for such supplementation.

Tenth, your observation that some of plaintiffs' supplemental productions have included documents generated prior to 2003, see 11/22 Let. at 10, simply demonstrates that plaintiffs are continuing to be as thorough as possible in providing defendants with all requested discovery. Indeed, we note that defendants' own supplemental productions produced on July 21, 2006 and August 3, 2006, contain documents dated 1995, 1998, 1999, 2002, and 2004.[2]

---

[2]See FEI 21945-46; FEI 15282; FEI 22036; FEI 15274; FEI 11392; FEI 15300; FEI 18859-63; FEI 21310-11; FEI 29446.

-6-

2.    <u>**Discovery Sought From Tom Rider**</u>

First, Mr. Rider's response to Document Request Nos. 3 and 4 was intended to be inclusive. <u>See</u> 11/22 Let. at 10.

Second, we disagree with you that Mr. Rider has "possession, custody, or control" of copies of documents that are maintained by the other plaintiff organizations or The Wildlife Advocacy Project, and you have provided no citations for this novel proposition. <u>See</u> 11/22 Let. at 11. <u>See, also</u> <u>Alexander v. FBI</u>, 194 F.R.D. 299 (D.D.C. 2000) (a party has "control" over a document if the party has "the legal right to obtain the document[] on demand"). Please let us know your authority for your assertion that Mr. Rider has the legal right to obtain documents from any of the organizational plaintiffs or The Wildlife Advocacy Project. The bottom line is that Mr. Rider produced every document he had in his possession, custody, or control in response to defendants' March 30, 2004 discovery requests, unless he claimed a privilege for the document or specifically requested a confidentiality agreement for it. He, like the other plaintiffs, acknowledges his obligation to <u>supplement</u> his discovery responses, and he will definitely do so by the date that is agreed upon by the parties.

Third, you omit a very salient point from your discussion concerning Mr. Rider's responses to Document Request Nos. 20 and 21, and Interrogatory No. 24 on page 11 of your letter, which is that Mr. Rider agreed to provide answers to <u>all</u> of this discovery subject to a confidentiality agreement. <u>See</u> Mr. Rider's Interrogatory Responses at 19; Mr. Rider's Document Request Responses at 13-14. Indeed, Mr. Rider made absolutely clear two and a half years ago that he was "willing to provide" all of this information. <u>Id.</u> Now that defendants have obtained much of this information from other sources, including the organizational plaintiffs and The Wildlife Advocacy Project, and, as you note, Mr. Rider himself willingly provided some of this information to defendants during his October 12, 2006 deposition, we will check with Mr. Rider to ascertain whether he is willing to provide a complete response to this discovery without a confidentiality agreement. In addition, Mr. Rider recognizes his obligation to supplement his responses on these matters and intends to do so by the date upon which the parties agree for such supplementation.[3]

Fourth, as to Mr. Rider's responses to Document Request Nos. 22 and 23, and Interrogatory No. 4, it is incorrect to suggest that Mr. Rider objected to providing answers to all of this discovery "based on an alleged attorney-client privilege." <u>See</u> 11/22 Let. at 12. On the contrary, in response to Interrogatory No. 4, Mr. Rider provided a detailed list of individuals and groups he has spoken with, and he also produced documents reflecting this information. <u>See</u> Interrogatory Responses at 8-10. It is true that Mr. Rider asserted a privilege "with respect to

---

[3]Your semantic disagreement with Mr. Rider about what constitutes "compensation," <u>see</u> 11/22 Let. at 11, is irrelevant in light of the fact that your Interrogatory No. 24 also asked him to identify all "money or items, without limitation," etc. that he has received, which he has consistently agreed to do. <u>See</u> Mr. Rider's Interrogatory Response at 19.

conversations he has had with the co-plaintiffs, that one or more of his attorneys participated in, and with respect to conversations he has had with Lisa Weisberg who is an attorney with the ASPCA." As to whether any such conversations involved matters that did not concern litigation strategy – which appears to be your main concern – we will ask Mr. Rider, and, if so, make every effort to provide such information to defendants, unless Mr. Rider has some other legitimate basis for objecting to the disclosure of such information.

We will also attempt to ascertain whether Mr. Rider is able to describe more of the conversations that may be responsive to Interrogatory No. 4, and if so, provide that information to you. We will also ascertain from Mr. Rider whether he wishes to continue to assert a privilege based on his right to association with respect to his answer to this particular Interrogatory, and if so, we will provide you with the basis for any asserted harm that would flow from the information that was sought by this Interrogatory. See 11/22 Let. at 12. As to communications Mr. Rider has had with the Wildlife Advocacy Project, id., we will also provide this information to you when we provide our complete response to your November 22 letter.

As to documents, on June 9, 2004, Mr. Rider produced to defendants all documents requested by Document Request Nos. 22 and 23. He acknowledges that he has a duty to supplement his response to this discovery and we will ensure that he does so by the date agreed upon by the parties.

Fifth, we can confirm that on June 9, 2004, Mr. Rider produced all documents requested in defendants' March 30, 2004 discovery requests, except for those for which he asserted a privilege (which would be listed on plaintiffs' privilege log) or for which he specifically requested a confidentiality agreement. As we have stated throughout this letter, Mr. Rider acknowledges his obligation to supplement his discovery responses and he will do so by the date that is agreed upon by the parties.

## C.    Conclusion

We have tried to answer as many of the questions raised in your November 22 letter as possible on such short notice, and in view of my schedule, the fact that Ms. Ockene is on leave, and the amount of time that has passed since plaintiffs provided defendants with their discovery responses. As explained, we will provide answers to all of your other questions by January 15 if you inform us that you have no other concerns about the plaintiffs' June 9, 2004 discovery responses or their 2005 depositions. However, if you do have additional concerns, we have asked you to provide them to us by December 31, 2006, so that we can address all such concerns at one time, rather than on a piecemeal basis. In that event, we have stated that we will provide answers to all of such concerns by January 31, 2007.

Therefore, please let us know if you will be providing us with an additional list of alleged discovery "deficiencies" so that we will know which schedule should apply. If by December 31, 2006, you have not notified us of any other alleged "deficiencies" in the plaintiffs' June 9, 2004

-8-

discovery responses or 2005 depositions, we will assume that your November 22 letter includes the entire list.

In addition, we have suggested that the parties mutually agree on a date of January 31, 2007 to exchange all supplemental discovery, which would also include providing supplemental responses to the parties' March 30, 2004 Interrogatories. Please let us know if you can agree to that date, or whether you would like to suggest an alternative date that is more convenient or practical for defendants. If you believe a personal meeting would help sort out any of these matters or assist in arriving at a mutually convenient schedule for reaching a final resolution on these issues, please let us know.

Sincerely,

Katherine A. Meyer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.     :
                               :
         Plaintiff,      :
                               :
     v.                   :     Case No. 07- 1532 (EGS)
                               :
AMERICAN SOCIETY FOR THE   :
PREVENTION OF CRUELTY     :
ANIMALS, et al.            :
                               :
         Defendants.    :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 10

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC 20009
(202) 588-5206

American Society for the Prevention
of Cruelty to Animals
Attn: Lisa Weisberg
424 E.92nd Street
New York, NY 10128

June 14, 2001

Invoice # 3776
In reference to: Ringling Brothers Elephants

Redacted - Non-Responsive

**Additional charges:**

Shared Expense

Redacted - Non-Responsive

A 01203

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC 20009
(202) 588-5206

American Society for the Prevention
of Cruelty to Animals
Attn:  Lisa Weisberg
424 E.92nd Street
New York, NY 10128

July 16, 2001

Invoice # 3810
In reference to: Ringling Brothers Elephants



Redacted - Non-Responsive

**Additional charges:**

Shared Expense

Redacted - Non-Responsive

A 01205

American Society for the Prevention
July 16, 2001

Redacted - Non-Responsive

- Finance charge, and bank fees from $500.00 Western Union wire transfer to    184.82
  Tom Rider on 5/3/01.

Redacted - Non-Responsive

A 01206

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC 20009
(202) 588-5206

American Society for the Prevention
of Cruelty to Animals
Attn: Lisa Weisberg
424 E.92nd Street
New York, NY 10128

July 20, 2001

Invoice # 3819
In reference to: Ringling Brothers Elephants



Redacted - Non-Responsive

**Additional charges:**

Shared Expense

Redacted - Non-Responsive

- Tom Rider travel expenses $1,100.00.          600.00
  ($600.00 to be shared between ASPCA, AWI, and The Fund. Remaining
  $500.00 to be paid by The Fund).

A 01207

American Society for the Prevention
July 20, 2001

Page    2

Redacted - Non-Responsive

American Society for the Prevention
September 6, 2001                                                    Page     2

Redacted - Non-Responsive

**Additional charges:**

Shared Expense

Redacted - Non-Responsive

- Finance charges for 3 wire transfers to Tom Rider                    38.81

Redacted - Non-Responsive

- Wire transfer fee from $500.00 wire to Tom Rider on 7/20/01.  The Fund    53.00
  for Animals to pay $500.00
- Finance charges for 5 wire transfers to Tom Rider - VISA-AUGUST2001    39.85

Redacted - Non-Responsive

American Society for the Prevention
September 27, 2001

Page    2

**Additional charges:**

Amount

Shared Expense



Redacted - Non-Responsive

- Wire transfer fee for $500.00 wire to Tom Rider on 8/16/01 — 53.00
- Fee for wire transfer on 8/30/01 - to be divided by all 3 groups — 53.00

Redacted - Non-Responsive

Special Expense

- Wire transfer to Tom Rider to be paid by ASPCA — 500.00
- Wire transfer to Tom Rider on 8/16/01 to be paid by ASPCA — 500.00
- Wire $500.00 to Tom Rider on 8/30/01.  ASPCA to pay this wire transfer — 500.00

Redacted - Non-Responsive

A 01210

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC 20009
(202) 588-5206

American Society for the Prevention
of Cruelty to Animals
Attn: Lisa Weisberg
424 E.92nd Street
New York, NY 10128

November 30, 2001

Invoice # 4031
In reference to: Ringling Brothers Elephants Appeal

**Additional charges:**

|  | Amount |
|---|---|
| Shared Expense | |
| - Wire transfer cash advance fees | 50.61 |
| Redacted - Non-Responsive | |
| - Wired on 10/4/01 to Tom Rider for reimbursement of lost bus pass ($350.00 + 45.00 fee = $395.00) | 395.00 |
| - Wire transfer to Tom in Boston. Total $500.00 w/$53.00 fee | 553.00 |
| - Wire transfer to Tom Rider in Massachusetts (500.00 + $53.00 fee) | 553.00 |
| - Bus pass for Tom Rider - wired to Chicago, IL (fee = $63.00) | 663.00 |

Redacted - Non-Responsive

American Society for the Prevention
November 30, 2001

Page    2

Invoice #  4032
In reference to: Ringling Brothers Elephants



Redacted - Non-Responsive

**Additional charges:**

Shared Expense

Redacted - Non-Responsive

   - Wire transfer on 9/4/01.  To be divided by all 3 groups.      663.00
   - Finance charges for wire transfers      57.59

Redacted - Non-Responsive

   - Fee for $500.00 wire transfer on 9/27/01 = $53.00      53.00

Redacted - Non-Responsive

American Society for the Prevention
November 30, 2001

Page        3

Amount

Special Expense

   - Wire transfer on 9/13/01 to Tom Rider - ASPCA to pay       500.00



Redacted - Non-Responsive

A 01213

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC 20009
(202) 588-5206

American Society for the Prevention
of Cruelty to Animals
Attn: Lisa Weisberg
424 E.92nd Street
New York, NY 10128

January 3, 2002

Invoice # 4070
In reference to: Ringling Brothers Elephants Appeal



**Additional charges:**

Shared Expense

- $500.00 (w/fee $553.00) Wire transfer to Tom Rider on 11/5/01          553.00

- Wire transfer to Tom Rider in Redwood City, CA. $500.00 + $49.00          549.00
  transaction fee.

A 01214

American Society for the Prevention
January 3, 2002

Page    2

Amount

Special Expense



- $500.00 to Tom Rider (no wire transfer - wrote a check while he was in our
  office).  ASPCA to pay for 1 week and Advocates-Elephants to pay 1 week
  = $250.00

250.00

American Society for the Prevention
April 11, 2003

Page    2

Invoice # 5085
In reference to:Ringling Brothers Elephants



Redacted - Non-Responsive

**Additional charges:**

Redacted - Non-Responsive

3/21/2003  Media for Tom Rider                                          300.00

Redacted - Non-Responsive

You are responsible for 33.3334% of expense charges:                $102.08

Redacted - Non-Responsive

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC  20009
(202) 588-5206

American Society for the Prevention
of Cruelty to Animals
Attn:  Lisa Weisberg
424 E.92nd Street
New York, NY 10128

May 15, 2003

Invoice # 5136
In reference to:General

**Additional charges:**

| | Amount |
|---|---|
| 4/30/2003  Transportation for Tom Rider to Boston, MA from CA ($400.00 plus wire fee of $45.00 = $445.00) | 445.00 |



Redacted - Non-Responsive

A 01219

# Meyer & Glitzenstein

1601 Connecticut Ave., N.W.
Suite 700
Washington, DC  20009
(202) 588-5206


American Society for the Prevention
of Cruelty to Animals
Attn:  Lisa Weisberg
424 E.92nd Street
New York, NY 10128

November 20, 2003

Invoice # 5601
In reference to:General

**Additional charges:**

| | Amount |
|---|---|
| 11/19/2003  Media expenses for Tom Rider in Ringling Brothers case. | 500.00 |



Redacted - Non-Responsive

A 01220

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.          :
                                  :
              Plaintiff,          :
                                  :
        v.                        :        Case No. 07- 1532 (EGS)
                                  :
AMERICAN SOCIETY FOR THE          :
PREVENTION OF CRUELTY             :
ANIMALS, et al.                   :
                                  :
              Defendants.         :
_____   :

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 11

2:11 PM
09/17/07
Cash Basis

The Wildlife Advocacy Project
Transaction Detail By Account
All Transactions

| Type | Date | Num | Name | Memo | Class | Split | Paid Amount |
|------|------|-----|------|------|-------|-------|-------------|
| Check | 3/20/2001 | 1158 | Rachelle Detweiler | RB circus info | Elephants | CASH - WILD... | 120.42 |
| Check | 3/23/2001 | DEBIT | Raku An Asian | Dinner w/Carol Buckley - re: Elephants | Elephants | CASH - WILD... | 38.07 |
| Check | 3/26/2001 | DEBIT | Wall Street Deli | Lunch w/Carol Buckley re:Elephants | Elephants | CASH - WILD... | 10.15 |
| Check | 5/16/2001 | DEBIT | Typhoon Restaurant | Lunch w/Tom Rider and Leslie | Elephants | CASH - WILD... | 34.00 |
| Check | 9/13/2001 | DEBIT | UPS | UPS to Tom Rider | Elephants | CASH - WILD... | 24.00 |
| Check | 11/21/2001 | DEBIT | Teleflora Com | Flowers to Lisa | Elephants | CASH - WILD... | 46.33 |
| Check | 11/23/2001 | DEBIT | Frontier Pies | Thanksgiving Dinner for Tom Rider | Elephants | CASH - WILD... | 30.00 |
| Check | 12/14/2001 | 1274 | Platinum Plus | To reimburse a wire transfer charged on Meyer & Glitzenstein credit card | Elephants | CASH - WILD... | 0.00 |
| Check | 12/18/2001 | 1274 | A&K News | copy of Elephants transcript | Elephants | CASH - WILD... | 30.00 |
| Check | 1/15/2002 | DEBIT | Western Union | wire transfer to Miami, FL - #8971132304 ($49.00 = wire fee) he only gets $500.00 | Elephants | CASH - WILD... | 549.00 |
| Check | 1/25/2002 | DEBIT | Western Union | wire transfer to Atlanta, Gerogia - #8972873074 ($49.00 = wire fee) he only gets $500.00 | Elephants | CASH - WILD... | 549.00 |
| Check | 1/29/2002 | 1289 | Tom Rider | Bus pass - 2 months + Feb - April 2002 | Elephants | CASH - WILD... | 548.00 |
| Check | 1/29/2002 | 1290 | Tom Rider | biweekly expense (he was in the office - so I did not need to wire) | Elephants | CASH - WILD... | 600.00 |
| Check | 2/7/2002 | DBIT | Western Union | wire transfer to LA, CA  for hotel - #8971200530 ($41.00 = wire fee) he only gets $400.00 | Elephants | CASH - WILD... | 500.00 |
| Check | 2/14/2002 | DEBIT | Western Union | wire transfer to LA, CA | Elephants | CASH - WILD... | 441.00 |
| Check | 2/16/2002 | 1302 | Meyer & Glitzenstein | Reimburse M&G for 11/30, 12/5,12/14,12/28 $ paid by M&G but should have come out of Wildlife Adv... | Elephants | CASH - WILD... | 549.00 |
| Check | 2/25/2002 | DEBIT | Western Union | wire transfer to Atlanta, GA for hotel & video camera | Elephants | CASH - WILD... | 1,639.34 |
| Check | 2/28/2002 | DEBIT | Western Union | wire transfer to Atlanta, GA for hotel | Elephants | CASH - WILD... | 1,081.00 |
| Check | 3/12/2002 | DEBIT | Western Union | wire transfer to Tom in NY | Elephants | CASH - WILD... | 549.00 |
| Check | 1/23/2003 | debit | Western Union | wire transfer to Atlanta, GA for hotel | Elephants | CASH - WILD... | 767.00 |
| Check | 7/16/2003 | 1415 | First Union | media work in RB case | Elephants | CASH - WILD... | 549.00 |
| Check | 7/22/2003 | 1416 | Tom Rider | expenses - bus pass, etc. | Elephants | CASH - WILD... | 496.00 |
| Check | 7/23/2003 | 1417 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/13/2003 | 1418 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 0.00 |
| Check | 8/22/2003 | 1424 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 9/4/2003 | 1425 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 200.00 |
| Check | 9/22/2003 | 1428 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 10/14/2003 | 1431 | Tom Rider | Media expenses - 10/2/03 | Elephants | CASH - WILD... | 250.00 |
| Check | 10/14/2003 | 1433 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 10/30/2003 | 1437 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 11/13/2003 | 1438 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 11/19/2003 | 1443 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 11/29/2003 | 1444 | Tom Rider | Media expenses - last payment from $5k Grant | Elephants | CASH - WILD... | 50.00 |
| Check | 12/9/2003 | 1445 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 200.00 |
| Check | 12/10/2003 | 1447 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 140.00 |
| Check | 12/18/2003 | 1449 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 12/23/2003 | 1455 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 1/2/2004 | 1456 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 1/8/2004 | debit | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD... | 83.00 |
| Check | 1/12/2004 | 1458 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 1/20/2004 | 1460 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 1/22/2004 | debit | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD... | 25.00 |
| Check | 1/27/2004 | 1461 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 75.00 |
| Check | 2/2/2004 | 1498 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 2/4/2004 | 1472 | Tom Rider | For Tom Rider usage | Elephants | CASH - WILD... | 500.00 |
| Check | 2/11/2004 | 1497 | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD... | 50.00 |
| Check | 2/13/2004 | DEBIT | Virgin Mobile | Media expenses in GA | Elephants | CASH - WILD... | 500.00 |
| Check | 2/18/2004 | 1468 | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD... | 50.00 |
| Check | 2/23/2004 | DEBIT | Virgin Mobile | Media expenses in Cincinnati | Elephants | CASH - WILD... | 500.00 |
| Check | 3/1/2004 | 1470 | Tom Rider | For Tom Rider usage | Elephants | CASH - WILD... | 50.00 |
| Check | 3/5/2004 | debit | Virgin Mobile | Media expenses in Charlotte, NC | Elephants | CASH - WILD... | 50.00 |
| Check | 3/9/2004 | 1471 | Tom Rider | For Tom Rider usage | Elephants | CASH - WILD... | 500.00 |
| Check | 3/17/2004 | 1472 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |

Page 1

2:11 PM
09/17/07
Cash Basis

The Wildlife Advocacy Project
Transaction Detail By Account
All Transactions

| Type | Date | Num | Name | Memo | Class | Split | Paid Amount |
|---|---|---|---|---|---|---|---|
| Check | 3/17/2004 | DEBIT | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD. | 50.00 |
| Check | 3/26/2004 | 1475 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 3/28/2004 | debit | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD. | 50.00 |
| Check | 4/5/2004 | 1477 | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD. | 50.00 |
| Check | 4/9/2004 | DEBIT | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD. | 500.00 |
| Check | 4/12/2004 | 1479 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 75.00 |
| Check | 4/20/2004 | 1481 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 4/27/2004 | 1482 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 5/3/2004 | debit | Virgin Mobile | For Tom Rider usage | Elephants | CASH - WILD. | 500.00 |
| Check | 5/8/2004 | 1483 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 75.00 |
| Check | 5/22/2004 | 1485 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 5/22/2004 | 1486 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 6/2/2004 | 1486 | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 800.00 |
| Check | 6/9/2004 | 1488 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 6/10/2004 | DEBIT | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 6/14/2004 | 1489 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 6/14/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 6/22/2004 | 1490 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 75.00 |
| Check | 6/29/2004 | 1493 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 6/30/2004 | 1495 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 7/6/2004 | 1494 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 7/6/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 7/15/2004 | 1502 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 50.00 |
| Check | 7/19/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 50.00 |
| Check | 7/20/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 30.00 |
| Check | 7/20/2004 | 1498 | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 30.00 |
| Check | 7/22/2004 | 1499 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 7/26/2004 | 1500 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 7/30/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 300.00 |
| Check | 8/2/2004 | 1502 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 100.00 |
| Check | 8/22/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 20.00 |
| Check | 8/8/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 800.00 |
| Check | 8/10/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 80.00 |
| Check | 8/18/2004 | 1503 | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 8/18/2004 | 1504 | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 50.00 |
| Check | 8/18/2004 | DEBIT | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 5000.00 |
| Check | 8/23/2004 | 1506 | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 8/24/2004 | DEBIT | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 8/30/2004 | 1507 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 9/3/2004 | 1508 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 9/7/2004 | 1508 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 600.00 |
| Check | 9/9/2004 | Debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 300.00 |
| Check | 9/14/2004 | 1509 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 50.00 |
| Check | 9/15/2004 | 1510 | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 9/17/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 9/21/2004 | 1511 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 50.00 |
| Check | 9/23/2004 | DEBIT | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 50.00 |
| Check | 9/28/2004 | 1512 | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 10/5/2004 | 1513 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 10/5/2004 | DEBIT | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 300.00 |
| Check | 10/5/2004 | 1514 | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 20.00 |
| Check | 10/8/2004 | Debit | Tom Rider | Media expenses | Elephants | CASH - WILD. | 90.00 |
| Check | 10/8/2004 | 1515 | Virgin Mobile | Media expenses | Elephants | CASH - WILD. | 500.00 |
| Check | 10/12/2004 | Debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 20.00 |
| Check | 10/13/2004 | 1514 | Tom Rider | Media expenses | Elephants | CASH - WILD. | 30.00 |
| Check | 10/13/2004 | Debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 500.00 |
| Check | 10/18/2004 | 1516 | Tom Rider | cell phone minutes | Elephants | CASH - WILD. | 350.00 |
| Check | 10/18/2004 | Debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD. | 30.00 |

The Wildlife Advocacy Project
Transaction Detail By Account
All Transactions

2:11 PM
09/17/07
Cash Basis

| Type | Date | Num | Name | Memo | Class | Split | Paid Amount |
|------|------|-----|------|------|-------|-------|-------------|
| Check | 10/25/2004 | Debit | Virgin Mobile | VOID: cell phone minutes | Elephants | CASH - WILD... | 0.00 |
| Check | 11/1/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 50.00 |
| Check | 11/8/2004 | 1518 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 700.00 |
| Check | 11/8/2004 | 1519 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 400.00 |
| Check | 11/11/2004 | 1520 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 400.00 |
| Check | 11/12/2004 | DEBIT | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 20.00 |
| Check | 11/15/2004 | 1521 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 20.00 |
| Check | 11/18/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 200.00 |
| Check | 11/19/2004 | 1523 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 20.00 |
| Check | 11/19/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 200.00 |
| Check | 11/24/2004 | 1524 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 20.00 |
| Check | 11/24/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 560.00 |
| Check | 11/30/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 20.00 |
| Check | 12/1/2004 | 1525 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 20.00 |
| Check | 12/2/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 500.00 |
| Check | 12/7/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 20.00 |
| Check | 12/7/2004 | 091 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 20.00 |
| Check | 12/8/2004 | 091 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 300.00 |
| Check | 12/10/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 20.00 |
| Check | 12/13/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 100.00 |
| Check | 12/13/2004 | debit | Cingular Wireless | Dec & Jan cell phone service | Elephants | CASH - WILD... | 52.88 |
| Check | 12/13/2004 | debit | Cingular Wireless | Media expenses | Elephants | CASH - WILD... | 52.88 |
| Check | 12/14/2004 | 1601 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 12/19/2004 | 1600 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 12/20/2004 | 1602 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 12/23/2004 | debit | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | 500.00 |
| Check | 12/27/2004 | 1604 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 12/28/2004 | debit | Cingular Wireless | Dec & Jan cell phone service | Elephants | CASH - WILD... | 500.00 |
| Check | 1/3/2005 | 1606 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 205.72 |
| Check | 1/11/2005 | 1607 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 103.25 |
| Check | 1/19/2005 | 1608 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Deposit | 1/21/2005 | | Cingular Wireless | refund from overcharging us | Elephants | CASH - WILD... | 700.00 |
| Check | 1/24/2005 | 1610 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 2/1/2005 | 1611 | Virgin Mobile | cell phone minutes | Elephants | CASH - WILD... | -52.88 |
| Check | 2/7/2005 | 1613 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 3/8/2005 | 1617 | Cingular Wireless | 12/21/04-1/2005 | Elephants | CASH - WILD... | 400.00 |
| Check | 3/11/2005 | DEBIT | Virgin Mobile | Media expenses | Elephants | CASH - WILD... | 205.72 |
| Check | 3/11/2005 | 1620 | Cingular Wireless | VOID: cell phone minutes - $20.00 never cleared voided 1/20/06 | Elephants | CASH - WILD... | 500.00 |
| Check | 3/14/2005 | 1621 | Virgin Mobile | 1/21/05-2/2005 | Elephants | CASH - WILD... | 0.00 |
| Check | 3/14/2005 | debit | Virgin Mobile | Media expenses | Elephants | CASH - WILD... | 342.33 |
| Check | 3/21/2005 | 1622 | Lincoln Inn | cell phone minutes | Elephants | CASH - WILD... | 22.00 |
| Check | 3/22/2005 | 1623 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 421.60 |
| Check | 3/29/2005 | 1623 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 400.00 |
| Check | 4/4/2005 | 1624 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 200.00 |
| Check | 4/4/2005 | 1625 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 0.00 |
| Check | 4/11/2005 | 1626 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 500.00 |
| Check | 4/11/2005 | debit | Western Union | wire transfer to Atlanta, GA for hotel | Elephants | CASH - WILD... | 500.00 |
| Check | 4/12/2005 | 1627 | Tom Rider | Media expenses | Elephants | CASH - WILD... | 0.00 |
| Check | 4/14/2005 | | | Service Charge | Elephants | CASH - WILD... | 5,500.00 |
| Check | 4/19/2005 | 1628 | Tom Rider | Media | Elephants | CASH - WILD... | 73.00 |
| Check | 4/19/2005 | 1629 | Cingular Wireless | 2/21-3/20/05 | Elephants | CASH - WILD... | 500.00 |
| Check | 4/25/2005 | 1631 | Tom Rider | Media | Elephants | CASH - WILD... | 148.17 |
| Check | 5/2/2005 | 1632 | Cingular Wireless | 3/21-4/2005 | Elephants | CASH - WILD... | 500.00 |
| Check | 5/4/2005 | 1633 | Tom Rider | Media | Elephants | CASH - WILD... | 160.75 |
| Check | 5/9/2005 | 1634 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 5/13/2005 | 1635 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |

2:11 PM
08/17/07
Cash Basis

The Wildlife Advocacy Project
Transaction Detail By Account
All Transactions

| Type | Date | Num | Name | Memo | Class | Split | Paid Amount |
|---|---|---|---|---|---|---|---|
| Check | 5/19/2005 | 1637 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 5/31/2005 | 1638 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 6/6/2005 | 1639 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 6/7/2005 | 1640 | Cingular Wireless | 4/21/05-5/20/2005 | Elephants | CASH - WILD... | 108.20 |
| Check | 6/13/2005 | 1641 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 6/20/2005 | 1643 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 6/23/2005 | 1644 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 6/23/2005 | 1645 | Cingular Wireless | 5/21/05-6/2/2005 | Elephants | CASH - WILD... | 199.24 |
| Check | 6/26/2005 | 1646 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 7/5/2005 | 1647 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 7/11/2005 | 1648 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 7/14/2005 | 1649 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 7/18/2005 | 1650 | Tom Rider | Media | Elephants | CASH - WILD... | 300.00 |
| Check | 7/25/2005 | 1651 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 7/29/2005 | 1652 | Tom Rider | Media | Elephants | CASH - WILD... | 300.00 |
| Check | 8/2/2005 | 1660 | Tom Rider | Media | Elephants | CASH - WILD... | 700.00 |
| Check | 8/4/2005 | 1655 | Tom Rider | Media | Elephants | CASH - WILD... | 300.00 |
| Check | 8/8/2005 | 1661 | Tom Rider | VOID: Media | Elephants | CASH - WILD... | 500.00 |
| Check | 8/10/2005 | 1662 | Cingular Wireless | 6/21/05-7/2005 | Elephants | CASH - WILD... | 0.00 |
| Check | 8/15/2005 | 1663 | Tom Rider | Media | Elephants | CASH - WILD... | 500.00 |
| Check | 8/22/2005 | 1664 | Tom Rider | Media | Elephants | CASH - WILD... | 144.02 |
| Check | 8/29/2005 | 1666 | Tom Rider | Media in San Francisco | Elephants | CASH - WILD... | 500.00 |
| Check | 9/6/2005 | 1667 | Tom Rider | Media in Everett, Washington | Elephants | CASH - WILD... | 500.00 |
| Check | 9/12/2005 | 1668 | Tom Rider | Media in Sacramento, CA | Elephants | CASH - WILD... | 500.00 |
| Check | 9/13/2005 | 1669 | Cingular Wireless | 7/21/05-8/2005 | Elephants | CASH - WILD... | 175.21 |
| Check | 8/19/2005 | 1671 | Tom Rider | Media in Sacramento, CA | Elephants | CASH - WILD... | 500.00 |
| Check | 9/28/2005 | 1673 | Tom Rider | Media in Salt Lake City, UT | Elephants | CASH - WILD... | 500.00 |
| Check | 9/30/2005 | 1674 | Tom Rider | 8/21/05-9/20/05 | Elephants | CASH - WILD... | 169.66 |
| Check | 10/3/2005 | 1675 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 500.00 |
| Check | 10/5/2005 | 1676 | Tom Rider | Media in Boston, MA | Elephants | CASH - WILD... | 500.00 |
| Check | 10/11/2005 | 1677 | Tom Rider | Media in Boston, MA | Elephants | CASH - WILD... | 500.00 |
| Check | 10/17/2005 | 1678 | Tom Rider | Media in Manchester, NH | Elephants | CASH - WILD... | 500.00 |
| Check | 10/27/2005 | 1680 | Tom Rider | Media in Pittsburg & Chicago | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/2/2005 | 1681 | Tom Rider | Media in Tampa, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/12/2005 | 1682 | Tom Rider | Media in Tampa, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/14/2005 | 1683 | Cingular Wireless | 9/21/05-10/20/05 | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/14/2005 | 1686 | Tom Rider | 11/12/05-12/2005 | Elephants | CASH - WILD... | 241.84 |
| Check | 11/28/2005 | 1687 | Cingular Wireless | Media in Huntsville, AL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 12/5/2005 | 1688 | Cingular Wireless | 10/21/05-11/20/05 | Elephants | CASH - WILD... | 184.82 |
| Check | 12/12/2005 | 1691 | Tom Rider | Media in Miami, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 12/20/2005 | 1692 | Tom Rider | Media in Miami, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 12/30/2005 | 1693 | Tom Rider | Media in Tampa, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/12/2006 | 1695 | Tom Rider | Media in Jacksonville, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/17/2006 | 1696 | Cingular Wireless | 11/12/05-12/2005 | Elephants | CASH - WILD... | 106.33 |
| Check | 1/24/2006 | 1697 | Tom Rider | Media in Omaha, NE | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/31/2006 | 1700 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 2/9/2006 | 1701 | Cingular Wireless | 12/21/05-1/2006 | Elephants | CASH - WILD... | 137.21 |
| Check | 2/13/2006 | 1702 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 400.00 |
| Check | 2/21/2006 | 1703 | Tom Rider | Media in Chicago, IL | Elephants | CASH - WILD... | 500.00 |
| Check | 3/1/2006 | 1704 | Cingular Wireless | 1/21/06-2/2006 | Elephants | CASH - WILD... | 1,000.00 |
| Check | 3/2/2006 | 1705 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 142.53 |
| Check | 3/6/2006 | 1706 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 400.00 |
| Check | 3/15/2006 | 1707 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 3/27/2006 | 1708 | Cingular Wireless | 2/21/06-3/2006 | Elephants | CASH - WILD... | 137.21 |
| Check | 4/3/2006 | 1709 | Cingular Wireless | | Elephants | CASH - WILD... | 114.08 |
| Check | 4/3/2006 | 1710 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 4/10/2006 | 1711 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |

2:11 PM
09/17/07
Cash Basis

The Wildlife Advocacy Project
Transaction Detail By Account
All Transactions

| Type | Date | Num | Name | Memo | Class | Split | Paid Amount |
|---|---|---|---|---|---|---|---|
| Check | 4/21/2006 | 1712 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 4/26/2006 | 1714 | Tom Rider | Media in Florida | Elephants | CASH - WILD... | 1,000.00 |
| Check | 5/1/2006 | 1716 | Tom Rider | Media in Hartford, CT | Elephants | CASH - WILD... | 600.00 |
| Check | 5/11/2006 | 1718 | Cingular Wireless | | Elephants | CASH - WILD... | 159.33 |
| Check | 5/12/2006 | 1717 | Tom Rider | 3/21/06-4/20/06 | Elephants | CASH - WILD... | 159.33 |
| Check | 5/24/2006 | 1720 | Tom Rider | Media in Harrisburg, PA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 6/5/2006 | 1721 | Tom Rider | Media in Omaha, NE | Elephants | CASH - WILD... | 1,000.00 |
| Check | 6/16/2006 | 1721 | Tom Rider | Media in Las Vegas, NV | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/19/2006 | 1723 | Tom Rider | Media in Las Vegas, NV | Elephants | CASH - WILD... | 300.00 |
| Check | 6/21/2006 | 1724 | Cingular Wireless | 4/21/06-5/20/06 | Elephants | CASH - WILD... | 700.00 |
| Check | 6/27/2006 | 1726 | Tom Rider | Media in Phoenix, AZ | Elephants | CASH - WILD... | 317.49 |
| Check | 7/6/2006 | 1727 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 7/18/2006 | 1728 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 7/20/2006 | 1730 | Sabina Venskus | Van repair for T.Rider to continue media | Elephants | CASH - WILD... | 262.87 |
| Check | 7/20/2006 | 1732 | Cingular Wireless | 5/21/06-8/20/06 | Elephants | CASH - WILD... | 3,805.15 |
| Check | 7/28/2006 | 1733 | Tom Rider | Media in Anaheim, CA | Elephants | CASH - WILD... | 206.71 |
| Check | 8/8/2006 | 1734 | Tom Rider | Media in San Diego, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/14/2006 | 1735 | Cingular Wireless | 6/21/06-7/20/06 | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/17/2006 | 1737 | Tom Rider | Media in San Francisco, CA | Elephants | CASH - WILD... | 189.28 |
| Check | 8/29/2006 | 1738 | Tom Rider | Media in Seattle, WA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/31/2006 | 1739 | Cingular Wireless | 7/21/06-8/20/06 | Elephants | CASH - WILD... | 1,000.00 |
| Check | 9/11/2006 | 1740 | Tom Rider | | Elephants | CASH - WILD... | 164.85 |
| Check | 9/18/2006 | 1742 | Tom Rider | Media in Sacramento, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 10/2/2006 | 1743 | Tom Rider | Media in Canton & Toledo, OH | Elephants | CASH - WILD... | 1,000.00 |
| Check | 10/4/2006 | 1745 | Cingular Wireless | Media in Toledo, OH | Elephants | CASH - WILD... | 198.14 |
| Check | 10/10/2006 | 1748 | Tom Rider | 8/21/06-9/20/06 | Elephants | CASH - WILD... | 262.87 |
| Check | 10/17/2006 | 1747 | Tom Rider | Media in Washington, DC | Elephants | CASH - WILD... | 1,000.00 |
| Check | 10/17/2006 | 1748 | Tom Rider | Media in Omaha, NE | Elephants | CASH - WILD... | 0.00 |
| Check | 10/23/2006 | 1749 | Tom Rider | Media in Omaha, NE including van repairs | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/2/2006 | 1751 | Tom Rider | 10/21/06-11/20/06 | Elephants | CASH - WILD... | 200.54 |
| Check | 11/14/2006 | 1753 | Tom Rider | Media in Chicago, IL | Elephants | CASH - WILD... | 500.00 |
| Check | 11/14/2006 | 1754 | Cingular Wireless | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/14/2006 | 1755 | Tom Rider | 9/21/06-10/20/06 | Elephants | CASH - WILD... | 1,000.00 |
| Check | 11/22/2006 | 1757 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 198.14 |
| Check | 12/5/2006 | 1758 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 500.00 |
| Check | 12/8/2006 | 1759 | Cingular Wireless | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 12/18/2006 | 1761 | Tom Rider | | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/2/2007 | 1763 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/5/2007 | 1764 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/12/2007 | 1765 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 100.00 |
| Check | 1/22/2007 | 1767 | Tom Rider | Media in Jacksonville, FL | Elephants | CASH - WILD... | 900.00 |
| Check | 1/22/2007 | debit | Cingular Wireless | Media in Birmingham, AL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 1/29/2007 | 1768 | Tom Rider | cell phone service 11/21/06-12/20/06 | Elephants | CASH - WILD... | 500.00 |
| Check | 2/8/2007 | 1772 | Tom Rider | Media in Charleston, SC & Raleigh, NC | Elephants | CASH - WILD... | 178.64 |
| Check | 2/21/2007 | 1776 | Tom Rider | Media in Richmond, Norfolk & Hampton, VA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 2/22/2007 | 1778 | Cingular Wireless | Media in Petersburg, VA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 3/12/2007 | 1777 | Tom Rider | cell phone service 12/21/06-1/20/07 | Elephants | CASH - WILD... | 167.63 |
| Check | 3/15/2007 | 1779 | Cingular Wireless | Media in Petersburg, VA | Elephants | CASH - WILD... | 152.69 |
| Check | 3/27/2007 | 1781 | Tom Rider | cell phone service 1/21/07-2/22/007 | Elephants | CASH - WILD... | 237.96 |
| Check | 4/3/2007 | 1783 | Tom Rider | Media in D/C/New York City | Elephants | CASH - WILD... | 1,000.00 |
| Check | 4/12/2007 | 1785 | Tom Rider | Media in Charleston, WV | Elephants | CASH - WILD... | 700.00 |
| Check | 4/20/2007 | 1786 | Tom Rider | Media in Charleston, WV | Elephants | CASH - WILD... | 500.00 |
| Check | 4/20/2007 | 1787 | Sprint | | Elephants | CASH - WILD... | 500.00 |
| Check | 5/3/2007 | 1789 | Tom Rider | 3/12/07-4/11/07 | Elephants | CASH - WILD... | 152.69 |
| Check | 5/18/2007 | 1791 | Tom Rider | Media in Texas | Elephants | CASH - WILD... | 1,000.00 |
| Check | 5/25/2007 | 1792 | Sprint | Media in Pensacola, FL | Elephants | CASH - WILD... | 1,000.00 |
| Check | 5/31/2007 | 1793 | Tom Rider | 4/12-5/11/07 | Elephants | CASH - WILD... | 28.45 |
| | | | | Media in Mobile, AL; New Orleans, LA | Elephants | CASH - WILD... | 1,000.00 |

Page 5

2:11 PM
09/17/07
Cash Basis

The Wildlife Advocacy Project
Transaction Detail By Account
All Transactions

| Type | Date | Num | Name | Memo | Class | Split | Paid Amount |
|------|------|-----|------|------|-------|-------|-------------|
| Check | 6/7/2007 | 1794 | Tom Rider | Media in Las Vegas, NV | Elephants | CASH - WILD... | 500.00 |
| Check | 6/14/2007 | 1795 | Tom Rider | Media in Las Vegas, NV & Bakersfield, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 6/26/2007 | 1798 | Sprint | 5/11/07-6/11/07 | Elephants | CASH - WILD... | 134.51 |
| Check | 6/26/2007 | 1799 | Tom Rider | Media in Bakersfield and Fresno, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 7/12/2007 | 1801 | Tom Rider | Media in Los Angeles, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 7/20/2007 | 1803 | Sprint | 6/12/2007-7/11/07 | Elephants | CASH - WILD... | 129.94 |
| Check | 7/25/2007 | 1807 | Tom Rider | Media in Los Angeles & San Diego, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/7/2007 | 1809 | Tom Rider | Media in San Diego & San Francisco, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/20/2007 | 1811 | Tom Rider | Media in San Jose, CA | Elephants | CASH - WILD... | 1,000.00 |
| Check | 8/27/2007 | 1812 | Sprint | 7/12/07-8/11/07 | Elephants | CASH - WILD... | 137.77 |
| Check | 9/12/2007 | 1814 | Tom Rider | Media in Indianpolis, IN | Elephants | CASH - WILD... | 1,000.00 |
| Total | | | | | | | 137,912.08 |

Page 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.          :
                                  :
            Plaintiff,            :
                                  :
      v.                          :        Case No. 07- 1532 (EGS)
                                  :
AMERICAN SOCIETY FOR THE          :
PREVENTION OF CRUELTY             :
ANIMALS, et al.                   :
                                  :
            Defendants.           :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, <u>et al.</u>,<br><br>Plaintiffs,<br><br>v.<br><br>RINGLING BROS. AND BARNUM & BAILEY CIRCUS, <u>et al.</u>,<br><br>Defendants. | Civ. No. 03-2006 (EGS) |

## PLAINTIFF TOM RIDER'S SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

### DEFINITIONS AND OBJECTIONS

1.    Mr. Rider hereby incorporates by reference the definitions and general and specific objections that he made in his Objections and Responses to Defendants' First Set of Interrogatories to Plaintiff Tom Rider.

### SUPPLEMENTAL RESPONSES

**Interrogatory No. 1:**

Describe each and every job or volunteer position you have held with defendants.

**Supplemental Response to Interrogatory No. 1:**

Mr. Rider has nothing to add to his original response to this Interrogatory.

**Interrogatory No. 2:**

Describe each and every job or volunteer position you have held since you completed high school (or, if you never completed high school, since your last year of schooling) that you did not describe in response to the previous interrogatory.

experience, including the employer that required you to take such training, if any.

**Supplemental Response to Interrogatory No. 3:**

Mr. Rider has nothing to add to his original response to this Interrogatory.

**Interrogatory No. 4:**

Describe every communication you have had regarding defendants with any and all animal advocates or animal advocacy groups prior to working for defendants, while working for defendants, or since leaving defendants' employment.

**Supplemental Response to Interrogatory No. 4:**

Mr. Rider objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, seeks irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence, and is being asked for the purpose of harassing him. Subject to and without waiving the foregoing or previous objections to these Interrogatories, Mr. Rider supplements his answer to this Interrogatory as follows:

During 2002-2003, I had regular conversations with Lisa Weisberg of the American Society for the Prevention of Cruelty to Animals (ASPCA) concerning my media and public education advocacy on behalf of captive elephants. Those conversations included which reporters I was meeting with in which city, the substance of my media interviews, discussions about which city I would go to next and which reporters to talk to, and any subsequent news coverage that was generated. I may also have had conversations with her concerning other advocacy work I was doing on behalf of elephants, such as testifying at hearings on various legislative proposals or speaking to grassroots groups. I also had conversations with other individuals in the ASPCA's media office, including Brigid Fitzgerald, Patricia Jones, and Robin Walker about these same matters during the same time period.

I also had conversations with D'Arcy Kemnitz of the Wildlife Advocacy Project between March 2001 and February 2002, and with Katherine Meyer of the Wildlife Advocacy Project between March 2001 and June 2004 about these same matters and other public education outreach I was doing on the issue of elephants in circuses with grassroots groups around the country.

In January 2006 I spoke to an animal rights group in Florida called "ARF" about the abuse and mistreatment of animals I witnessed when I worked at Ringling Bros., and I also attended a press conference with that group in Florida. In February 2005, I also talked to a group of people in Atlanta, Georgia about these same matters. During Memorial Day weekend in 2005 and 2006 I spoke with Virginia Wolfe and others of the Lehigh Valley Animal Rights group in Harrisburg, Pennsylvania. In October 2005 I spoke to a woman in Westminster, New York who asked me to speak to the City Council there about the abuse I saw when I worked at Ringling.

I also spoke to Karen Laski with a Hartford Connecticut group in May and October of 2005 and 2006, and some individuals at a rally that took place there, whose first names I know (Rob, Nancy, Sue), but I do not know their last names. I spoke to Senator Robert Hedlund in Boston, Massachusetts in October 2005, and did a radio talk show with him, and also attended a press conference with him during that time in Boston. In Manchester, New Hampshire, in October 2004, 2005, and 2006, I spoke to Linda Dionne of the New Hampshire Animal Rights group, and in October 2004 I was on a local television show with her concerning the mistreatment of animals in circuses. In October 2004 and 2005 I also attended demonstrations with animal advocates in Manchester New Hampshire. During October 4-6, 2006, I attended a conference held by a group called "EARS" in Hollenwald, Tennessee, and I spoke about this

lawsuit and the abuse of the elephants I saw when I worked at Ringling. At that same conference I saw Carol Buckley of The Elephant Sanctuary and I introduced myself and said hello to her.

In February 2005, I spoke to Senators Marion Price and Ernie Chambers in Omaha Nebraska and some local people when I testified in support of a bill that was pending there. In February 2005, I also spoke to RaeLeann Smith of PETA in Omaha Nebraska about legislation that was pending there, and she asked me if I would go to Chicago in March to speak to the City Council about another bill that was pending there. In March 2006 I went to Chicago and spoke to the City Council and I believe I spoke to Ms. Smith there as well. I also talked to Debbie Leahy of PETA by phone during the summer of 2006 to ask her if I could use some video footage that PETA had taken in Greenville, South Carolina, and she said no. I believe I also had a short conversation with Ms. Leahy in Chicago when I was there in March 2006, just to say hello.

In the summer of 2005, I spoke to Mike Markarian of the Fund for Animals in Denver Colorado in connection with a press conference that was held on the steps of City Hall about a bill that was pending there, and I had at least one conversation with him or someone on his staff about the logistics of getting to that press conference. In Denver I also spoke to the 15-year old girl who wrote the Denver Initiative, who also attended the press conference.

In the spring of 2006, I did a radio talk show in Las Vegas Nevada with a local animal advocate named Linda Faso. In December 2004, I spoke to Chris DeRose of The Last Chance for Animals in Los Angeles California and spoke at a press conference with him there about Ringling Bros.' mistreatment of the elephants. In August 2004, 2005, and 2006, I spoke to people who were demonstrating against the circus in San Diego, California, including Pat Cuviello and Deniz Bolbo, and in August 2006 I also went with them to see the Ringling train

arrive in San Diego, and we talked about the fact that the elephants were on chains without any

firehose around the chains and that the elephants were completely unsupervised by anyone.

I attended a press conference with the Animal Protection Institute on September 22, 2005

on the steps of the Capitol in Sacramento, California concerning a bill that was pending there,

and I had a conversation with Nicole Paquette, Emily Claremont, Michelle Thew, and a woman

named Zibby, all of whom worked for API, about the logistics of the press conference. I also

spoke to Tracy Silverman of AWI who also attended the press conference and we talked about

the press conference and what I witnessed when I worked at Ringling Bros.

On July 21, 2005, I spoke to Wayne Pacelle of the Humane Society of the United States

(HSUS) at a benefit that was held near Los Angeles California to help rescue the Ringling Bros.

elephants; I said hello to him and thanked him for coming to the benefit, and he thanked me for

speaking out against the abuse and mistreatment of elephants. At the same event, I also talked to

Gretchen Wyler and a woman named Sue who worked for HSUS, and told them of some of the

things I witnessed when I worked at Ringling. At the same event I also said hello to Pat Cuviello

and Deniz Bolbo. I also talked to Tracy Silverman of the Animal Welfare Institute at that event

about my experiences at Ringling and about my travels around the country.

Sometime in September or October 2004 I spoke to a woman with the Rocky Mountain

Animal Defense group in Boulder Colorado and I attended a demonstration against the circus

there and was interviewed by a reporter for Fox Channel 4.

Since June, 2004, I have also had conversations with the various plaintiff organizations

and our lawyers about legal strategies in this case, the evidence that plaintiffs may rely on, and

the status of the litigation, all of which are protected by the attorney-client and attorney work

-6-

product privileges. I have also had conversations with some of the other plaintiffs about their legislative and media strategies for halting the abuse and mistreatment of circus elephants and educating the public about this issue. Additional details of such conversations are irrelevant and their disclosure would impose an undue burden on me and the other plaintiffs and infringe upon my and the other plaintiffs' First Amendment rights of association and expression. I have also had conversations with Katherine Meyer in her capacity as an official of the Wildlife Advocacy Project concerning my media and public education work for the Wildlife Advocacy Project, including which journalists, grass roots groups, or legislative bodies I am talking to or plan to talk to about these matters.

I have spoken to other groups and individuals around the country whose names I do not know about the mistreatment of the elephants that I saw at Ringling Bros. and sometimes about this lawsuit. More information about which groups I have spoken to can be found by going to the Yahoo search engine on the internet and typing in "tom rider elephants."

**Interrogatory No. 5:**

Describe every communication you have had regarding defendants with
any members of the press or at any lectures, conferences, or seminars.

**Supplemental Response to Interrogatory No. 5:**

Mr. Rider objects to this Interrogatory on the ground that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and being asked for the purpose of harassing and intimidating him. Mr. Rider further objects to this Interrogatory on the ground that it invades his right to privacy, and freedom of association. Subject to and without waiving the foregoing or general objections to these Interrogatories, Mr.

Rider supplements his answer to this Interrogatory as follows:

In 2004 I talked to reporters for NBC in Tampa Florida, and the Telemundo station in Miami, Florida. In 2005 I talked to reporters for Channel 2 in Orlando, Florida; CNN in Atlanta, Georgia and Channel 5 NBC in Atlanta; in Norfolk, Virginia I spoke to reporters for NBC and Fox news; in Washington, D.C. I spoke to a reporter for National Geographic Online; in Hartford, Connecticut, I spoke to reporters for Fox and NBC news; in Boston Massachusetts I spoke to a reporter for the Boston Herald and also did a radio talk show with Senator Robert Hedlund; in Los Angeles, California I spoke to reporters with NBC, Fox, CBS, Telemundo, KCAL 9, LA Times, and two radio programs (I don't know their names); in San Diego, California I talked to reporters for Fox TV; in Oakland, California I talked to Leslie Griffith of Channel 2; in Hartford, Connecticut I spoke to a reporter at the Boston Herald, and also spoke to a state senator about the abuse I witnessed at Ringling; in Manchester, New Hampshire I was on a public TV show for PBS; in Hartford, Connecticut I spoke to reporters for NBC and Fox; in Bridgeport Connecticut I was interviewed by a local college paper and also spoke on a radio show.

In November 2006, I spoke to Jennifer Santiago at CBS in Miami Florida, and during that same time I also spoke to Sally Shulze at Channel 2 in Orlando, Florida; I spoke to a reporter at CNN in Atlanta, Georgia; In Norfolk, Va. I spoke to reporters for ABC and NBC; in Omaha, Nebraska, I spoke to a state senator and reporters for Omaha Fox TV; in Chicago, Illinois I spoke to the City Council and to a reporter for ABC Channel 7; in Boston, Massachusetts I spoke at a press conference with Senator Hedlund; in Hartford, Connecticut I spoke to a reporter for Fox TV; in Harrisburg, Pennsylvania I spoke to a reporter for a local paper called The Patriot and a

reporter for NBC; in Lincoln, Nebraska I spoke to a reporter for Fox TV; in Las Vegas, Nevada I

spoke to a journalist with National Public Radio; in San Diego, California I spoke to a reporter

for Fox TV; in Oakland, California I spoke to Leslie Griffith with Channel 2; in Omaha,

Nebraska I spoke to a reporter for Fox TV; in Bridgeport, Connecticut I spoke to a reporter for

Fox TV; in Chicago, Illinois, I spoke to a reporter for Channel 7; in Pittsburgh, Pennsylvania I

spoke to a reporter for ABC channel 4; in Miami, Florida I spoke to Jennifer Santiago with CBS;

in Orlando, Florida I spoke to a reporter for Channel 2.

     With respect to all of these conversations, I discussed the treatment of the elephants that I

witnessed when I worked at Ringling Bros., as I have previously described in great detail in

response to these Interrogatories. I also hereby incorporate my supplemental answer to

Interrogatory No. 4. Additional information concerning communications I have had with the

press and others can be found by going to the Yahoo search engine on the internet and typing in

"tom rider elephants."

**Interrogatory No. 6:**

State whether you have ever been arrested for, charged with, or convicted of a crime. If you have
been arrested for, charged with, or convicted of a crime, for each arrest, charge, or conviction,
describe the incident for which you were arrested, charged, or convicted and provide the
jurisdiction of the arrest, charge, or conviction, and/or plea; the offense(s) for which you were
arrested and/or charged; the offense(s) to which you pled guilty or of which you were convicted;
the disposition of any other charges against you; the sentence, incarceration, or other form of
punishment imposed on you; and the date of each arrest, conviction, plea, punishment,
incarceration, or other disposition.

**Supplemental Response to Interrogatory No. 6:**

     Mr. Rider has nothing to add to his original response to this Interrogatory.

each person identified in the initial disclosures.

**Supplemental Response to Interrogatory No. 25:**

This information was provided by plaintiffs with their initial disclosures. The subject and

substance of the testimony that I will be giving is provided in the answers to the above

Interrogatories.

Objections and responses on behalf of Plaintiff by:

Katherine A. Meyer
(D.C. Bar No. 244301)
Tanya M. Sanerib
(D.C. Bar No. 473506)
Howard M. Crystal
(D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

Dated: January 31, 2007

-20-

## VERIFICATION

CITY OF N) CHARLESTON )

STATE OF South Carolina )

TOM RIDER, being duly sworn, says:

I am a plaintiff in this case. I have read the foregoing supplemental responses to Defendants' First Set of Interrogatories to Plaintiff Tom Rider and know the contents thereof, and, upon information and belief, said supplemental responses are true and correct.

_____
TOM RIDER

Sworn to before me this

30ᵈ Day of Janry, 2007

_____
DEBRA L CARMICHAEL            Notary Public

for State of South Carolina

My Commission Expires    February 9, 2016
_____

-21-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.  :
           :
    Plaintiff,   :
           :
  v.        :  Case No. 07- 1532 (EGS)
           :
AMERICAN SOCIETY FOR THE :
PREVENTION OF CRUELTY  :
ANIMALS, et al.     :
           :
    Defendants.  :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY ALL PROCEEDINGS**

# EXHIBIT 13

Last Modified: Tue 7/24/07

# RD-135  Red - 135th Edition  2005

| # | City | Dates | Arena |
|---|------|-------|-------|
| | Rehearsal Tampa, FL | Mon, 11/1/04-Sun, 1/2/05 | Florida State Fairgrounds-Expo Hall |
| 1 | Tampa, FL | Wed, 1/5/05-Sun, 1/9/05 | St. Pete Times Forum |
| 2 | Orlando, FL | Thu, 1/13/05-Sun, 1/16/05 | Amway Arena |
| 3 | Birmingham, AL | Wed, 1/19/05-Sun, 1/23/05 | BJCC Arena |
| 4 | Jacksonville, FL | Wed, 1/26/05-Sat, 1/29/05 | Jacksonville Veterans Memorial Arena |
| 5 | Greenville, SC | Wed, 2/2/05-Sun, 2/6/05 | BI-LO Center |
| 6 | Greensboro, NC | Wed, 2/9/05-Sun, 2/13/05 | Greensboro Coliseum |
| 7 | Richmond, VA | Wed, 2/16/05-Mon, 2/21/05 | Richmond Coliseum |
| 8 | Norfolk, VA | Wed, 2/23/05-Sun, 2/27/05 | Norfolk Scope |
| 9 | Hampton, VA | Wed, 3/2/05-Sun, 3/6/05 | Hampton Coliseum |
| 10 | East Rutherford, NJ | Wed, 3/9/05-Mon, 3/14/05 | Continental Airlines Arena |
| 11 | Uniondale, NY | Wed, 3/16/05-Mon, 3/21/05 | Nassau Veterans Memorial Coliseum |
| 12 | New York City, NY | Thu, 3/24/05-Sun, 4/10/05 | Madison Square Garden |
| 13 | State College, PA | Thu, 4/14/05-Sun, 4/17/05 | Bryce Jordan Center |
| 14 | Philadelphia, PA | Wed, 4/20/05-Sun, 5/1/05 | Wachovia Spectrum |
| 15 | Providence, RI | Wed, 5/4/05-Sun, 5/8/05 | Dunkin Donuts Center Providence |
| 16 | Hartford, CT | Wed, 5/11/05-Sun, 5/15/05 | Hartford Civic Center |
| 17 | Trenton, NJ | Wed, 5/18/05-Sun, 5/22/05 | Sovereign Bank Arena |
| 18 | Hershey, PA | Wed, 5/25/05-Mon, 5/30/05 | Giant Center |
| 19 | Wilkes Barre, PA | Wed, 6/1/05-Sun, 6/5/05 | Wachovia Arena |
| 20 | Omaha, NE | Fri, 6/10/05-Sun, 6/12/05 | Qwest Center Omaha |
| 21 | Colorado Springs, CO | Wed, 6/15/05-Sun, 6/19/05 | World Arena |
| 22 | Las Vegas, NV | Thu, 6/23/05-Sun, 6/26/05 | Orleans Arena |
| 23 | Phoenix, AZ | Wed, 6/29/05-Mon, 7/4/05 | US Airways Center |
| 24 | Bakersfield, CA | Thu, 7/7/05-Sun, 7/10/05 | Rabobank Arena |
| 25 | Fresno, CA | Wed, 7/13/05-Sun, 7/17/05 | Selland Arena at Fresno Convention and Ente |
| 26 | Los Angeles, CA | Wed, 7/20/05-Sun, 7/24/05 | STAPLES Center |
| 27 | Anaheim, CA | Wed, 7/27/05-Sun, 8/7/05 | Honda Center |
| 28 | San Diego, CA | Wed, 8/10/05-Sun, 8/14/05 | San Diego Sports Arena |
| 29 | Oakland, CA | Wed, 8/17/05-Sun, 8/21/05 | ORACLE Arena |
| 30 | San Jose, CA | Wed, 8/24/05-Sun, 8/28/05 | HP Pavilion at San Jose |
| 31 | San Francisco, CA | Wed, 8/31/05-Mon, 9/5/05 | Cow Palace |
| 32 | Portland, OR | Thu, 9/8/05-Sun, 9/11/05 | The Rose Garden |
| 33 | Everett, WA | Wed, 9/14/05-Sun, 9/18/05 | Comcast Arena at Everett Events Center |
| 34 | Sacramento, CA | Thu, 9/22/05-Sun, 9/25/05 | ARCO Arena |
| 35 | Salt Lake City, UT | Wed, 9/28/05-Sun, 10/2/05 | EnergySolutions Arena |
| 36 | Denver, CO | Wed, 10/5/05-Sun, 10/16/05 | Denver Coliseum |
| 37 | Cleveland, OH | Fri, 10/21/05-Sun, 10/30/05 | Quicken Loans Arena |
| 38 | Rosemont, IL | Wed, 11/2/05-Sun, 11/13/05 | Allstate Arena |
| 39 | Chicago, IL | Tue, 11/15/05-Sun, 11/27/05 | United Center |
| 40 | Columbus, OH | Wed, 11/30/05-Sun, 12/4/05 | Nationwide Arena |
| 41 | Huntsville, AL | Wed, 12/7/05-Sun, 12/11/05 | Von Braun Center |

ALL INFORMATION IS SUBJECT TO CHANGE

| Key Definition | Status |
|----------------|--------|
| G = Ground Support | CD = Confirmed Date |
| ? = Ground Support Unknown | DF = Deal Firm |
| B = Box Office Required | EC = Executed Contract |
| | O = Option to renew |
| | POSS = Possibility |

## BL-134  Blue - 134th Edition  2005

| # | City | Dates | Arena |
|---|------|-------|-------|
| | Winter Quarters Orlando, FL | Mon, 12/6/04-Sun, 1/2/05 | Central Florida Fair, Inc. |
| | Rehearsal Miami, FL | Sun, 1/2/05-Tue, 1/4/05 | Miami Arena |
| 1 | Miami, FL | Thu, 1/8/05-Mon, 1/17/05 | AmericanAirlines Arena |
| 2 | Columbia, SC | Thu, 1/20/05-Sun, 1/23/05 | Colonial Center |
| 3 | Nashville, TN | Wed, 1/26/05-Sun, 1/30/05 | Sommet Center |
| 4 | Charlotte, NC | Wed, 2/2/05-Sun, 2/6/05 | Charlotte Coliseum |
| 5 | Raleigh, NC | Fri, 2/11/05-Mon, 2/14/05 | RBC Center |
| 6 | Atlanta, GA | Thu, 2/17/05-Sun, 2/27/05 | Philips Arena |
| 7 | Cincinnati, OH | Wed, 3/2/05-Sun, 3/6/05 | U.S. Bank Arena |
| 8 | Baltimore, MD | Wed, 3/9/05-Sun, 3/20/05 | 1st Mariner Arena |
| 9 | Washington, DC | Wed, 3/23/05-Mon, 3/28/05 | Verizon Center |
| 10 | Fairfax, VA | Wed, 3/30/05-Sun, 4/3/05 | Patriot Center |
| 11 | Washington, DC | Wed, 4/6/05-Sun, 4/17/05 | DC Armory |
| 12 | Worcester, MA | Wed, 4/20/05-Sun, 4/24/06 | DCU Center |
| 13 | Albany, NY | Wed, 4/27/05-Sun, 5/1/05 | Times Union Center |
| 14 | Charleston, WV | Thu, 5/5/05-Sun, 5/8/05 | Charleston Civic Center |
| 15 | Knoxville, TN | Wed, 5/11/05-Sun, 5/15/05 | Knoxville Civic Coliseum |
| 16 | Lexington, KY | Wed, 5/18/05-Sun, 5/22/05 | Rupp Arena |
| 17 | Chattanooga, TN | Wed, 5/25/05-Sun, 5/29/05 | UTC McKenzie Arena |
| 18 | Memphis, TN | Wed, 6/1/05-Sun, 6/5/05 | FedExForum |
| 19 | Lafayette, LA | Wed, 6/8/05-Sat, 6/11/05 | The Cajundome |
| 20 | Mobile, AL | Tue, 6/14/05-Wed, 6/15/05 | Mobile Civic Center |
| 21 | Pensacola, FL | Fri, 6/17/05-Sun, 6/19/05 | Pensacola Civic Center |
| 22 | New Orleans, LA | Wed, 6/22/05-Sun, 6/26/05 | New Orleans Arena |
| 23 | San Antonio, TX | Wed, 6/29/05-Mon, 7/4/05 | Alamodome |
| 24 | Dallas, TX | Thu, 7/7/05-Sun, 7/17/05 | American Airlines Center |
| 25 | Fort Worth, TX | Wed, 7/20/05-Sun, 7/24/05 | Ft. Worth Convention Center |
| 26 | Houston, TX | Wed, 7/27/05-Sun, 8/7/05 | Reliant Stadium |
| 27 | Corpus Christi, TX | Wed, 8/10/05-Sun, 8/14/05 | AmericanBank Center |
| 28 | Austin, TX | Wed, 8/17/05-Sun, 8/21/05 | Frank Erwin Center |
| 29 | Kansas City, MO | Wed, 8/24/05-Sun, 8/28/05 | Kemper Arena |
| 30 | Moline, IL | Thu, 9/1/05-Mon, 9/5/05 | I wireless Center |
| 31 | Des Moines, IA | Wed, 9/7/05-Sun, 9/11/05 | Wells Fargo Arena |
| 32 | Grand Rapids, MI | Wed, 9/14/05-Sun, 9/18/05 | Van Andel Arena |
| 33 | Buffalo, NY | Thu, 9/22/05-Sun, 9/25/05 | HSBC Arena |
| 34 | Indianapolis, IN | Wed, 9/28/05-Sun, 10/2/05 | Conseco Fieldhouse |
| 35 | Boston, MA | Fri, 10/7/05-Sun, 10/16/05 | TD Banknorth Garden |
| 36 | Manchester, NH | Wed, 10/19/05-Sun, 10/23/05 | Verizon Wireless Arena |
| 37 | Bridgeport, CT | Wed, 10/26/05-Sun, 10/30/05 | Arena at Harbor Yard |
| 38 | Pittsburgh, PA | Wed, 11/2/05-Sun, 11/8/05 | Mellon Arena |
| 39 | Auburn Hills, MI | Wed, 11/9/05-Sun, 11/13/05 | Palace of Auburn Hills |
| 40 | St. Louis, MO | Wed, 11/16/05-Sun, 11/20/05 | Scottrade Center |

ALL INFORMATION IS SUBJECT TO CHANGE

**Key Definition**

G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**

CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Thu 4/27/06

## GL-01  Gold Unit  2005

| # | City | Dates | Arena |
|---|------|-------|-------|
| 1 | Salisbury, MD | Thu, 1/13/05 -Sun, 1/16/05 | Wicomico Youth and Civic Center |
|  | Break TBA-Domestic, TBA-Do | Wed, 1/19/05 -Sun, 1/23/05 | TBA-Domestic |
| 2 | Tallahassee, FL | Wed, 1/26/05 -Sun, 1/30/05 | Leon County Civic Center |
| 3 | Dothan, AL | Wed, 2/2/05 -Sun, 2/6/05 | Dothan Civic Center |
|  | Break TBA-Domestic, TBA-Do | Wed, 2/9/05 -Sun, 2/13/05 | TBA-Domestic |
| 4 | Baton Rouge, LA | Thu, 2/17/05 -Sun, 2/20/05 | Baton Rouge River Center |
|  | Break TBA-Domestic, TBA-Do | Tue, 2/22/05 -Sun, 2/27/05 | TBA-Domestic |
| 5 | Wichita, KS | Tue, 3/1/05 -Thu, 3/3/05 | Kansas Coliseum |
| 6 | Salina, KS | Sat, 3/5/05 -Sun, 3/6/05 | Bicentennial Center |
| 7 | Kearney, NE | Thu, 3/10/05 -Sat, 3/12/05 | FirsTier Event Center |
|  | Transit TBA-Domestic, TBA-D | Tue, 3/15/05 -Sun, 3/20/05 | TBA-Domestic |
| 8 | Mexico City, MX | Wed, 3/23/05 -Sun, 4/3/05 | Auditorio Nacional |
| 9 | Guadalajara, MX | Wed, 4/6/05 -Sun, 4/10/05 | Benito Juarez Arena |
| 10 | Monterrey, MX | Wed, 4/13/05 -Sun, 4/17/05 | Fundidora Coca-Cola |
| 11 | Laredo, TX | Thu, 4/21/05 -Sun, 4/24/05 | Laredo Entertainment Center |
| 12 | Hidalgo, TX | Wed, 4/27/05 -Sun, 5/1/05 | Dodge Arena |
| 13 | Las Cruces, NM | Thu, 5/5/05 -Fri, 5/6/05 | Pan American Center |
| 14 | El Paso, TX | Wed, 5/11/05 -Sun, 5/15/05 | El Paso County Coliseum |
| 15 | Abilene, TX | Thu, 5/19/05 -Sun, 5/22/05 | Taylor County Coliseum |
| 16 | Loveland, CO | Wed, 5/25/05 -Sun, 5/29/05 | Budweiser Events Center |
| 17 | Albuquerque, NM | Wed, 6/1/05 -Sun, 6/5/05 | Tingley Coliseum |
| 18 | Odessa, TX | Thu, 6/9/05 -Sun, 6/12/05 | Ector County Coliseum |
| 19 | Amarillo, TX | Tue, 6/14/05 -Wed, 6/15/05 | Amarillo Civic Center |
| 20 | Belton, TX | Fri, 6/17/05 -Sun, 6/19/05 | Bell County Expo Center |
| 21 | San Angelo, TX | Thu, 6/23/05 -Sun, 6/26/05 | San Angelo Coliseum |
| 22 | Biloxi, MS | Thu, 6/30/05 -Sun, 7/3/05 | Mississippi Coast Coliseum |
| 23 | Jackson, MS | Thu, 7/7/05 -Sun, 7/10/05 | Mississippi Coliseum |
| 24 | Tupelo, MS | Thu, 7/14/05 -Sun, 7/17/05 | BancorpSouth Arena |
| 25 | Pine Bluff, AR | Tue, 7/19/05 -Wed, 7/20/05 | Pine Bluff Convention Center |
| 26 | Fort Smith, AR | Fri, 7/22/05 -Sun, 7/24/05 | Fort Smith Convention Center |
| 27 | Lincoln, NE | Thu, 7/28/05 -Sun, 7/31/05 | Pershing Center |
| 28 | Sioux Falls, SD | Tue, 8/2/05 -Wed, 8/3/05 | Sioux Falls Arena |
| 29 | Bismarck, ND | Sat, 8/6/05 -Sun, 8/7/06 | Bismarck Civic Center |
| 30 | Grand Forks, ND | Thu, 8/11/05 -Sat, 8/13/05 | Alerus Center |
| 31 | Fargo, ND | Thu, 8/18/05 -Sun, 8/21/05 | FARGODOME |
| 32 | Casper, WY | Thu, 8/25/05 -Sun, 8/28/05 | Casper Events Center |
| 33 | Great Falls, MT | Fri, 9/2/05 -Sun, 9/4/05 | Four Seasons Arena |
| 34 | Edmonton, AB | Wed, 9/7/05 -Sun, 9/11/05 | Rexall Place |
| 35 | Calgary, AB | Wed, 9/14/05 -Sun, 9/18/05 | Stampede Corral |
| 36 | Prince George, BC | Tue, 9/20/05 -Wed, 9/21/05 | CN Centre |
| 37 | Grande Prairie, AB | Fri, 9/23/05 -Sun, 9/25/05 | Crystal Centre |
| 38 | Billings, MT | Thu, 9/29/05 -Sun, 10/2/05 | MetraPark |
| 39 | Bozeman, MT | Thu, 10/6/05 -Sun, 10/9/05 | Brick Breeden Fieldhouse |
| 40 | Spokane, WA | Thu, 10/13/05 -Sun, 10/16/05 | Spokane Arena |
| 41 | Kennewick, WA | Fri, 10/21/05 -Sun, 10/23/05 | Toyota Center |
| 42 | Nampa, ID | Fri, 10/28/05 -Sun, 10/30/05 | Idaho Center |
| 43 | Rapid City, SD | Fri, 11/4/05 -Sun, 11/6/05 | Rushmore Plaza Civic Center |
| 44 | Spencer, IA | Wed, 11/9/05 -Thu, 11/10/05 | Clay County Regional Events Center |
| 45 | Topeka, KS | Sat, 11/12/05 -Sun, 11/13/05 | Kansas Expocentre |
| 46 | Pikeville, KY | Fri, 11/18/05 -Sun, 11/20/05 | Eastern Kentucky Exposition Center |

CP = CP=CO-PROMOTE

**Key Definition**
G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**
CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Thu 4/27/06

## GL-01  Gold Unit  2005

| # | City | Dates | Arena |
|---|------|-------|-------|
| | Transit TBA-Domestic, TBA-D | Fri, 11/25/05-Sun, 12/4/05 | TBA-Domestic |
| 47 | San Juan, Puerto Rico | Wed, 12/7/05-Sun, 12/18/05 | Coliseo de Puerto Rico |
| | Transit TBA-Domestic, TBA-D | Tue, 12/20/05-Thu, 12/22/05 | TBA-Domestic |
| 48 | West Palm Beach, FL | Tue, 12/27/05-Sun, 1/1/06 | South Florida Expo Center |
| 49 | Lakeland, FL | Fri, 1/6/06-Sun, 1/8/06 | The Lakeland Center |
| 50 | Anderson, SC | Wed, 1/11/06-Sun, 1/15/06 | Civic Center of Anderson |
| 51 | Daytona Beach, FL | Tue, 1/17/06-Sat, 1/21/06 | Ocean Center |

ALL INFORMATION IS SUBJECT TO CHANGE

CP = CP=CO-PROMOTE

**Key Definition**
G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**
CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

## RD-135  Red - 135th Edition  2006

| # | City | Dates | Arena |
|---|------|-------|-------|
|  | Winter Quarters Orlando, FL | Mon, 12/12/05-Wed, 1/4/06 | Central Florida Fair, Inc. |
| 1 | Miami, FL | Thu, 1/5/06-Mon, 1/16/06 | AmericanAirlines Arena |
| 2 | Columbia, SC | Thu, 1/19/06-Sun, 1/22/06 | Colonial Center |
| 3 | Nashville, TN | Thu, 1/26/06-Sun, 1/29/06 | Sommet Center |
| 4 | Raleigh, NC | Thu, 2/2/06-Tue, 2/7/06 | RBC Center |
| 5 | Atlanta, GA | Fri, 2/10/06-Mon, 2/20/06 | Philips Arena |
| 6 | Charlotte, NC | Wed, 2/22/06-Sun, 2/26/06 | Charlotte Bobcats Arena |
| 7 | Cincinnati, OH | Wed, 3/1/06-Sun, 3/5/06 | U.S. Bank Arena |
| 8 | Baltimore, MD | Wed, 3/8/06-Sun, 3/19/06 | 1st Mariner Arena |
| 9 | Washington, DC | Tue, 3/21/06-Sun, 3/26/06 | DC Armory |
| 10 | Washington, DC | Tue, 3/28/06-Sun, 4/2/06 | Verizon Center |
| 11 | Fairfax, VA | Wed, 4/5/06-Sun, 4/16/06 | Patriot Center |
| 12 | Charleston, WV | Wed, 4/19/06-Sun, 4/23/06 | Charleston Civic Center |
| 13 | Dayton, OH | Wed, 4/26/06-Sun, 4/30/06 | Nutter Center |
| 14 | Albany, NY | Thu, 5/4/06-Sun, 5/7/06 | Times Union Center |
| 15 | Rochester, NY | Wed, 5/10/06-Sun, 5/14/06 | Blue Cross Arena |
| 16 | Worcester, MA | Wed, 5/17/06-Sun, 5/21/06 | DCU Center |
|  | Break TBA-Domestic, TBA-Do | Wed, 5/24/06-Sun, 6/4/06 | TBA-Domestic |
| 17 | Tulsa, OK | Tue, 6/6/06-Wed, 6/7/06 | Tulsa Convention Center |
| 18 | Oklahoma City, OK | Fri, 6/9/06-Sun, 6/11/06 | Ford Center |
| 19 | San Antonio, TX | Wed, 6/14/06-Sun, 6/18/06 | Alamodome |
| 20 | Memphis, TN | Wed, 6/21/06-Sun, 6/25/06 | FedExForum |
| 21 | Austin, TX | Wed, 6/28/06-Sun, 7/2/06 | Frank Erwin Center |
| 22 | Corpus Christi, TX | Wed, 7/5/06-Sun, 7/9/06 | AmericanBank Center |
| 23 | College Station, TX | Tue, 7/11/06-Wed, 7/12/06 | Reed Arena |
| 24 | Houston, TX | Fri, 7/14/06-Sun, 7/23/06 | Reliant Stadium |
| 25 | Dallas, TX | Wed, 7/26/06-Sun, 8/6/06 | American Airlines Center |
| 26 | Fort Worth, TX | Wed, 8/9/06-Sun, 8/13/06 | Ft. Worth Convention Center |
| 27 | Lexington, KY | Thu, 8/17/06-Sun, 8/20/06 | Rupp Arena |
| 28 | Little Rock, AR | Thu, 8/24/06-Sun, 8/27/06 | ALLTEL Arena |
| 29 | Moline, IL | Thu, 8/31/06-Mon, 9/4/06 | i wireless Center |
| 30 | Kansas City, MO | Wed, 9/6/06-Sun, 9/10/06 | Kemper Arena |
| 31 | Youngstown, OH | Thu, 9/14/06-Sun, 9/17/06 | Chevrolet Centre |
| 32 | Indianapolis, IN | Wed, 9/20/06-Sun, 9/24/06 | Conseco Fieldhouse |
| 33 | Grand Rapids, MI | Wed, 9/27/06-Sun, 10/1/06 | Van Andel Arena |
| 34 | Boston, MA | Fri, 10/6/06-Sun, 10/15/06 | TD Banknorth Garden |
| 35 | Manchester, NH | Wed, 10/18/06-Sun, 10/22/06 | Verizon Wireless Arena |
| 36 | Bridgeport, CT | Wed, 10/25/06-Sun, 10/29/06 | Arena at Harbor Yard |
| 37 | Pittsburgh, PA | Wed, 11/1/06-Sun, 11/5/06 | Mellon Arena |
| 38 | Auburn Hills, MI | Wed, 11/8/06-Sun, 11/12/06 | Palace of Auburn Hills |
| 39 | St. Louis, MO | Wed, 11/15/06-Sun, 11/19/06 | Scottrade Center |

ALL INFORMATION IS SUBJECT TO CHANGE

| Key Definition | Status |
|----------------|--------|
| G = Ground Support | CD = Confirmed Date |
| ? = Ground Support Unknown | DF = Deal Firm |
| B = Box Office Required | EC = Executed Contract |
|  | O = Option to renew |
|  | POSS = Possibility |

Last Modified: Tue 7/24/07

# BL-136  Blue - 136th Edition  2006

| # | City | Dates | Arena |
|---|------|-------|-------|
| | Winter Quarters Tampa, FL | Mon, 11/14/05-Sat, 12/31/05 | Florida State Fairgrounds-Expo Hall |
| 1 | Tampa, FL | Wed, 1/4/06-Sun, 1/8/06 | St. Pete Times Forum |
| 2 | Orlando, FL | Thu, 1/12/06-Sun, 1/15/06 | Amway Arena |
| 3 | Jacksonville, FL | Wed, 1/18/06-Sun, 1/22/06 | Jacksonville Veterans Memorial Arena |
| 4 | Birmingham, AL | Wed, 1/25/06-Sun, 1/29/06 | BJCC Arena |
| 5 | Greenville, SC | Wed, 2/1/06-Sun, 2/5/06 | BI-LO Center |
| 6 | Greensboro, NC | Wed, 2/8/06-Sun, 2/12/06 | Greensboro Coliseum |
| 7 | Richmond, VA | Wed, 2/15/06-Mon, 2/20/06 | Richmond Coliseum |
| 8 | Norfolk, VA | Wed, 2/22/06-Sun, 2/26/06 | Norfolk Scope |
| 9 | Hampton, VA | Wed, 3/1/06-Sun, 3/5/06 | Hampton Coliseum |
| 10 | East Rutherford, NJ | Wed, 3/8/06-Sun, 3/12/06 | Continental Airlines Arena |
| 11 | Uniondale, NY | Tue, 3/14/06-Sun, 3/19/06 | Nassau Veterans Memorial Coliseum |
| 12 | New York City, NY | Thu, 3/23/06-Mon, 4/17/06 | Madison Square Garden |
| 13 | Philadelphia, PA | Thu, 4/20/06-Sun, 4/30/06 | Wachovia Spectrum |
| 14 | Providence, RI | Wed, 5/3/06-Sun, 5/7/06 | Dunkin Donuts Center Providence |
| 15 | Hartford, CT | Wed, 5/10/06-Sun, 5/14/06 | Hartford Civic Center |
| 16 | Trenton, NJ | Wed, 5/17/06-Sun, 5/21/06 | Sovereign Bank Arena |
| 17 | Hershey, PA | Wed, 5/24/06-Mon, 5/29/06 | Giant Center |
| 18 | Wilkes Barre, PA | Wed, 5/31/06-Sun, 6/4/06 | Wachovia Arena |
| 19 | Omaha, NE | Fri, 6/9/06-Sun, 6/11/06 | Qwest Center Omaha |
| 20 | Colorado Springs, CO | Wed, 6/14/06-Sun, 6/18/06 | World Arena |
| 21 | Las Vegas, NV | Thu, 6/22/06-Mon, 6/26/06 | Orleans Arena |
| 22 | Tucson, AZ | Fri, 6/30/06-Sun, 7/2/06 | Tucson Convention Center |
| 23 | Phoenix, AZ | Wed, 7/5/06-Sun, 7/9/06 | US Airways Center |
| 24 | Fresno, CA | Wed, 7/12/06-Sun, 7/16/06 | Selland Arena at Fresno Convention and Ente |
| 25 | Los Angeles, CA | Wed, 7/19/06-Sun, 7/23/06 | STAPLES Center |
| 26 | Anaheim, CA | Wed, 7/26/06-Sun, 8/8/06 | Honda Center |
| 27 | San Diego, CA | Wed, 8/9/06-Sun, 8/13/06 | San Diego Sports Arena |
| 28 | Oakland, CA | Thu, 8/17/06-Sat, 8/19/06 | ORACLE Arena |
| 29 | San Jose, CA | Wed, 8/23/06-Sun, 8/27/06 | HP Pavilion at San Jose |
| 30 | Stockton, CA | Thu, 8/31/06-Sun, 9/3/06 | Stockton Arena |
| 31 | Everett, WA | Thu, 9/7/06-Sun, 9/10/06 | Comcast Arena at Everett Events Center |
| 32 | Portland, OR | Wed, 9/13/06-Sun, 9/17/06 | The Rose Garden |
| 33 | Sacramento, CA | Thu, 9/21/06-Sun, 9/24/06 | ARCO Arena |
| 34 | Salt Lake City, UT | Wed, 9/27/06-Sun, 10/1/06 | EnergySolutions Arena |
| 35 | Denver, CO | Wed, 10/4/06-Sun, 10/15/06 | Denver Coliseum |
| 36 | Cleveland, OH | Fri, 10/20/06-Sun, 10/29/06 | Quicken Loans Arena |
| 37 | Rosemont, IL | Wed, 11/1/06-Sun, 11/12/06 | Allstate Arena |
| 38 | Chicago, IL | Tue, 11/14/06-Sun, 11/26/06 | United Center |
| 39 | Columbus, OH | Thu, 11/30/06-Sun, 12/3/06 | Nationwide Arena |

ALL INFORMATION IS SUBJECT TO CHANGE

**Key Definition**

G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**

CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Sat 12/30/06

## GL-02  Gold Unit  2006

| # | City | Dates | Arena |
|---|------|-------|-------|
|  | Rehearsal Florence, SC | Mon, 1/23/06 -Fri, 2/3/06 | Florence Civic Center |
| 1 | Florence, SC | Sat, 2/4/06 -Sun, 2/5/06 | Florence Civic Center |
| 2 | Salisbury, MD | Thu, 2/9/06 -Sun, 2/12/06 | Wicomico Youth and Civic Center |
| 3 | North Charleston, SC | Thu, 2/16/06 -Sun, 2/19/06 | North Charleston Coliseum |
| 4 | Fayetteville, NC | Wed, 2/22/06 -Sun, 2/26/06 | Cumberland County Crown Coliseum |
| 5 | Tallahassee, FL | Thu, 3/2/06 -Sun, 3/5/06 | Leon County Civic Center |
| 6 | Mobile, AL | Thu, 3/9/06 -Sun, 3/12/06 | Mobile Civic Center |
| 7 | Macon, GA | Tue, 3/14/06 -Wed, 3/15/06 | Macon Coliseum |
| 8 | Albany, GA | Fri, 3/17/06 -Sun, 3/19/06 | Albany Civic Center |
| 9 | Knoxville, TN | Wed, 3/22/06 -Sun, 3/26/06 | Knoxville Civic Coliseum |
| 10 | Murray, KY | Tue, 3/28/06 -Wed, 3/29/06 | Regional Special Events Center |
| 11 | Bowling Green, KY | Fri, 3/31/06 -Sun, 4/2/06 | Diddle Arena |
| 12 | Montgomery, AL | Thu, 4/6/06 -Sun, 4/9/06 | Garrett Coliseum |
| 13 | Carbondale, IL | Thu, 4/13/06 -Sat, 4/15/06 | SIU Arena |
| 14 | Cape Girardeau, MO | Mon, 4/17/06 -Wed, 4/19/06 | Show Me Center |
| 15 | Champaign, IL | Fri, 4/21/06 -Sun, 4/23/06 | University of Illinois Assembly Hall |
| 16 | Bloomington, IL | Wed, 4/26/06 -Sun, 4/30/06 | U.S. Cellular Coliseum |
| 17 | State College, PA | Thu, 5/4/06 -Sun, 5/7/06 | Bryce Jordan Center |
| 18 | Springfield, MA | Wed, 5/10/06 -Sun, 5/14/06 | MassMutual Center |
| 19 | Newark, DE | Thu, 5/18/06 -Sun, 5/21/06 | Bob Carpenter Center |
| 20 | Chattanooga, TN | Wed, 5/24/06 -Sun, 5/28/06 | UTC McKenzie Arena |
| 21 | Asheville, NC | Wed, 5/31/06 -Sun, 6/4/06 | Asheville Civic Center |
| 22 | Johnson City, TN | Thu, 6/8/06 -Sun, 6/11/06 | Freedom Hall |
| 23 | Rome, GA | Wed, 6/14/06 -Sun, 6/18/06 | The Forum |
| 24 | Lafayette, LA | Wed, 6/21/06 -Sun, 6/25/06 | The Cajundome |
|  | Break TBA-Domestic, TBA-Do | Wed, 6/28/06 -Wed, 7/5/06 | TBA-Domestic |
| 25 | Dothan, AL | Sun, 7/9/06 -Tue, 7/11/06 | Dothan Civic Center |
| 26 | Augusta, GA | Thu, 7/13/06 -Sun, 7/16/06 | James Brown Arena |
| 27 | Columbus, GA | Tue, 7/18/06 -Wed, 7/19/06 | Columbus Civic Center |
| 28 | Starkville, MS | Fri, 7/21/06 -Sun, 7/23/06 | Humphrey Coliseum |
| 29 | Houma, LA | Thu, 7/27/06 -Sun, 7/30/06 | Houma-Terrebonne Civic Center |
| 30 | Baton Rouge, LA | Wed, 8/2/06 -Sun, 8/6/06 | Baton Rouge River Center |
| 31 | Bossier City, LA | Thu, 8/10/06 -Sun, 8/13/06 | CenturyTel Center |
| 32 | Monroe, LA | Wed, 8/15/06 -Wed, 8/16/06 | Monroe Civic Center |
| 33 | Jonesboro, AR | Fri, 8/18/06 -Sun, 8/20/06 | Convocation Center |
| 34 | Savannah, GA | Wed, 8/23/06 -Sun, 8/27/06 | Savannah Civic Center |
|  | Break TBA-Domestic, TBA-Do | Thu, 8/31/06 -Sun, 9/3/06 | TBA-Domestic |
| 35 | Cedar Rapids, IA | Thu, 9/7/06 -Sun, 9/10/06 | U.S. Cellular Center |
| 36 | Des Moines, IA | Thu, 9/14/06 -Sun, 9/17/06 | Wells Fargo Arena |
| 37 | Louisville, KY | Wed, 9/20/06 -Sun, 9/24/06 | Louisville Gardens |
| 38 | Canton, OH | Tue, 9/26/06 -Wed, 9/27/06 | Canton Memorial Civic Center |
| 39 | Toledo, OH | Fri, 9/29/06 -Mon, 10/2/06 | Toledo Sports Arena |
| 40 | Lake Placid, NY | Fri, 10/6/06 -Mon, 10/9/06 | Olympic Center |
| 41 | Portland, ME | Thu, 10/12/06 -Sun, 10/15/06 | Cumberland County Civic Center |
| 42 | Syracuse, NY | Wed, 10/18/06 -Sun, 10/22/06 | War Memorial at OnCenter |
| 43 | Reading, PA | Wed, 10/25/06 -Sun, 10/29/06 | Sovereign Center |
| 44 | Erie, PA | Wed, 11/1/06 -Sun, 11/5/06 | Erie Civic Center |
| 45 | Wheeling, WV | Wed, 11/8/06 -Sun, 11/12/06 | WesBanco Arena |
| 46 | Elmira, NY | Tue, 11/14/06 -Thu, 11/16/06 | First Arena |
| 47 | Binghamton, NY | Sat, 11/18/06 -Sun, 11/19/06 | Broome County Veterans Memorial Arena |

**Key Definition**

G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**

CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Sat 12/30/06

## GL-02  Gold Unit  2006

| # | City | Dates | Arena |
|---|------|-------|-------|
|  | Break TBA-Domestic, TBA-Do | Wed, 11/22/06-Sun, 11/26/06 | TBA-Domestic |
| 48 | Roanoke, VA | Fri, 12/1/06-Sun, 12/3/06 | Roanoke Civic Center |
| 49 | Charlottesville, VA | Wed, 12/6/06-Sun, 12/10/06 | John Paul Jones Arena |

ALL INFORMATION IS SUBJECT TO CHANGE

**Key Definition**

G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**

CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Mon 9/24/07

## RD-137  Red - 137th Edition  2007

| # | City | Dates | Arena |
|---|------|-------|-------|
| | Rehearsal Tampa, FL | Tue, 11/14/06 -Sun, 12/31/06 | Florida State Fairgrounds-Expo Hall |
| 1 | Tampa, FL | Wed, 1/3/07 -Sun, 1/7/07 | St. Pete Times Forum |
| 2 | Orlando, FL | Thu, 1/11/07 -Sun, 1/14/07 | Amway Arena |
| 3 | Jacksonville, FL | Wed, 1/17/07 -Sun, 1/21/07 | Jacksonville Veterans Memorial Arena |
| 4 | Birmingham, AL | Wed, 1/24/07 -Sun, 1/28/07 | BJCC Arena |
| 5 | Greenville, SC | Wed, 1/31/07 -Sun, 2/4/07 | BI-LO Center |
| 6 | Greensboro, NC | Wed, 2/7/07 -Sun, 2/11/07 | Greensboro Coliseum |
| 7 | Richmond, VA | Wed, 2/14/07 -Mon, 2/19/07 | Richmond Coliseum |
| 8 | Norfolk, VA | Wed, 2/21/07 -Sun, 2/25/07 | Norfolk Scope |
| 9 | Hampton, VA | Wed, 2/28/07 -Sun, 3/4/07 | Hampton Coliseum |
| 10 | East Rutherford, NJ | Wed, 3/7/07 -Mon, 3/12/07 | Continental Airlines Arena |
| 11 | Uniondale, NY | Wed, 3/14/07 -Mon, 3/19/07 | Nassau Veterans Memorial Coliseum |
| 12 | Atlantic City, NJ | Thu, 3/22/07 -Sun, 3/25/07 | Atlantic City Boardwalk Hall |
| 13 | New York City, NY | Fri, 3/30/07 -Sun, 4/15/07 | Madison Square Garden |
| 14 | Philadelphia, PA | Wed, 4/18/07 -Sun, 4/29/07 | Wachovia Spectrum |
| 15 | Providence, RI | Wed, 5/2/07 -Sun, 5/6/07 | Dunkin Donuts Center Providence |
| 16 | Hartford, CT | Wed, 5/9/07 -Sun, 5/13/07 | Hartford Civic Center |
| 17 | Trenton, NJ | Wed, 5/16/07 -Sun, 5/20/07 | Sovereign Bank Arena |
| 18 | Hershey, PA | Wed, 5/23/07 -Mon, 5/28/07 | Giant Center |
| 19 | Wilkes Barre, PA | Wed, 5/30/07 -Sun, 6/3/07 | Wachovia Arena |
| 20 | Omaha, NE | Fri, 6/8/07 -Sun, 6/10/07 | Qwest Center Omaha |
| 21 | Colorado Springs, CO | Wed, 6/13/07 -Sun, 6/17/07 | World Arena |
| 22 | Las Vegas, NV | Thu, 6/21/07 -Sun, 6/24/07 | Orleans Arena |
| 23 | Phoenix, AZ | Wed, 6/27/07 -Sun, 7/1/07 | US Airways Center |
| 24 | Bakersfield, CA | Thu, 7/5/07 -Sun, 7/8/07 | Rabobank Arena |
| 25 | Fresno, CA | Wed, 7/11/07 -Sun, 7/15/07 | Selland Arena at Fresno Convention and Ente |
| 26 | Los Angeles, CA | Wed, 7/18/07 -Sun, 7/22/07 | STAPLES Center |
| 27 | Anaheim, CA | Wed, 7/25/07 -Sun, 8/5/07 | Honda Center |
| 28 | San Diego, CA | Wed, 8/8/07 -Sun, 8/12/07 | San Diego Sports Arena |
| 29 | Oakland, CA | Thu, 8/16/07 -Sun, 8/19/07 | ORACLE Arena |
| 30 | San Jose, CA | Wed, 8/22/07 -Sun, 8/26/07 | HP Pavilion at San Jose |
| 31 | Portland, OR | Thu, 8/30/07 -Sun, 9/2/07 | The Rose Garden |
| 32 | Everett, WA | Thu, 9/6/07 -Sun, 9/9/07 | Comcast Arena at Everett Events Center |
| 33 | Stockton, CA | Thu, 9/13/07 -Sun, 9/16/07 | Stockton Arena |
| 34 | Sacramento, CA | Thu, 9/20/07 -Sun, 9/23/07 | ARCO Arena |
| 35 | Salt Lake City, UT | Wed, 9/26/07 -Sun, 9/30/07 | EnergySolutions Arena |
| 36 | Denver, CO | Thu, 10/4/07 -Sun, 10/14/07 | Denver Coliseum |
| 37 | Cleveland, OH | Fri, 10/19/07 -Sun, 10/28/07 | Quicken Loans Arena |
| 38 | Rosemont, IL | Thu, 11/1/07 -Sun, 11/11/07 | Allstate Arena |
| 39 | Chicago, IL | Tue, 11/13/07 -Sun, 11/25/07 | United Center |
| 40 | Huntsville, AL | Thu, 11/29/07 -Sun, 12/2/07 | Von Braun Center |

ALL INFORMATION IS SUBJECT TO CHANGE

**Key Definition**
G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**
CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Wed 9/26/07

## BL-136  Blue - 136th Edition  2007

| # | City | Dates | Arena |
|---|------|-------|-------|
| | Winter Quarters Orlando, FL | Tue, 12/5/06 -Thu, 1/4/07 | Central Florida Fair, Inc. |
| 1 | Miami, FL | Fri, 1/5/07 -Mon, 1/15/07 | AmericanAirlines Arena |
| 2 | Columbia, SC | Thu, 1/18/07 -Sun, 1/21/07 | Colonial Center |
| 3 | Nashville, TN | Thu, 1/25/07 -Sun, 1/28/07 | Sommet Center |
| 4 | North Charleston, SC | Wed, 1/31/07 -Sun, 2/4/07 | North Charleston Coliseum |
| 5 | Raleigh, NC | Wed, 2/7/07 -Sun, 2/11/07 | RBC Center |
| 6 | Atlanta, GA | Wed, 2/14/07 -Mon, 2/19/07 | Philips Arena |
| 7 | Knoxville, TN | Thu, 2/22/07 -Sun, 2/25/07 | Knoxville Civic Coliseum |
| 8 | Cincinnati, OH | Wed, 2/28/07 -Sun, 3/4/07 | U.S. Bank Arena |
| 9 | Baltimore, MD | Wed, 3/7/07 -Sun, 3/18/07 | 1st Mariner Arena |
| 10 | Washington, DC | Wed, 3/21/07 -Sun, 3/25/07 | Verizon Center |
| 11 | Fairfax, VA | Thu, 3/29/07 -Sun, 4/8/07 | Patriot Center |
| 12 | Washington, DC | Wed, 4/11/07 -Sun, 4/15/07 | DC Armory |
| 13 | Charleston, WV | Wed, 4/18/07 -Sun, 4/22/07 | Charleston Civic Center |
| 14 | Albany, NY | Thu, 4/26/07 -Sun, 4/29/07 | Times Union Center |
| 15 | Worcester, MA | Thu, 5/3/07 -Sun, 5/6/07 | DCU Center |
| 16 | Rochester, NY | Wed, 5/9/07 -Sun, 5/13/07 | Blue Cross Arena |
| | Break TBA-Domestic, TBA-Do | Wed, 5/16/07 -Sun, 6/3/07 | TBA-Domestic |
| 17 | Lafayette, LA | Thu, 6/7/07 -Sun, 6/10/07 | The Cajundome |
| 18 | Pensacola, FL | Wed, 6/13/07 -Sun, 6/17/07 | Pensacola Civic Center |
| 19 | New Orleans, LA | Thu, 6/21/07 -Sun, 6/24/07 | New Orleans Arena |
| 20 | Austin, TX | Wed, 6/27/07 -Sun, 7/1/07 | Frank Erwin Center |
| 21 | San Antonio, TX | Wed, 7/4/07 -Sun, 7/8/07 | Alamodome |
| 22 | Houston, TX | Wed, 7/11/07 -Sun, 7/22/07 | Reliant Stadium |
| 23 | Corpus Christi, TX | Wed, 7/25/07 -Sun, 7/29/07 | AmericanBank Center |
| 24 | Dallas, TX | Wed, 8/1/07 -Sun, 8/12/07 | American Airlines Center |
| 25 | Fort Worth, TX | Wed, 8/15/07 -Sun, 8/19/07 | Ft. Worth Convention Center |
| 26 | Lexington, KY | Thu, 8/23/07 -Sun, 8/26/07 | Rupp Arena |
| 27 | Moline, IL | Thu, 8/30/07 -Mon, 9/3/07 | i wireless Center |
| 28 | Kansas City, MO | Wed, 9/5/07 -Sun, 9/9/07 | Kemper Arena |
| 29 | Grand Rapids, MI | Thu, 9/13/07 -Sun, 9/16/07 | Van Andel Arena |
| 30 | Indianapolis, IN | Thu, 9/20/07 -Sun, 9/23/07 | Conseco Fieldhouse |
| 31 | Des Moines, IA | Fri, 9/28/07 -Sun, 9/30/07 | Wells Fargo Arena |
| 32 | Boston, MA | Fri, 10/5/07 -Sun, 10/14/07 | TD Banknorth Garden |
| 33 | Manchester, NH | Wed, 10/17/07 -Sun, 10/21/07 | Verizon Wireless Arena |
| 34 | Bridgeport, CT | Wed, 10/24/07 -Sun, 10/28/07 | Arena at Harbor Yard |
| 35 | Pittsburgh, PA | Thu, 11/1/07 -Sun, 11/4/07 | Mellon Arena |
| 36 | St. Louis, MO | Thu, 11/8/07 -Sun, 11/11/07 | Scottrade Center |
| 37 | Auburn Hills, MI | Wed, 11/14/07 -Sun, 11/18/07 | Palace of Auburn Hills |

ALL INFORMATION IS SUBJECT TO CHANGE

**Key Definition**
G = Ground Support
? = Ground Support Unknown
B = Box Office Required

**Status**
CD = Confirmed Date
DF = Deal Firm
EC = Executed Contract
O = Option to renew
POSS = Possibility

Last Modified: Mon 9/24/07

## GL-02  Gold Unit  2007

| # | City | Dates | Arena |
|---|------|-------|-------|
| 1 | West Palm Beach, FL | Tue, 12/26/06-Sun, 12/31/06 | South Florida Expo Center |
| 2 | Fort Myers, FL | Tue, 1/2/07-Thu, 1/4/07 | Germain Arena |
| 3 | Lakeland, FL | Thu, 1/11/07-Sun, 1/14/07 | The Lakeland Center |
| 4 | Sarasota, FL | Tue, 1/16/07-Mon, 1/22/07 | Robarts Arena |
| 5 | Daytona Beach, FL | Fri, 1/26/07-Sun, 1/28/07 | Ocean Center |
| 6 | Charlotte, NC | Wed, 1/31/07-Sun, 2/11/07 | Cricket Arena |
| 7 | Pikeville, KY | Thu, 2/15/07-Sun, 2/18/07 | Eastern Kentucky Exposition Center |
| 8 | Evansville, IN | Tue, 2/20/07-Wed, 2/21/07 | Roberts Stadium |
| 9 | Shelbyville, TN | Fri, 2/23/07-Sun, 2/25/07 | Calsonic Arena |
| 10 | Ottumwa, IA | Wed, 2/28/07-Sun, 3/4/07 | Bridge View Center |
| 11 | Waco, TX | Thu, 3/8/07-Sun, 3/11/07 | Heart O' Texas Coliseum |
| 12 | San Angelo, TX | Tue, 3/13/07-Wed, 3/14/07 | San Angelo Coliseum |
| 13 | Wichita Falls, TX | Fri, 3/16/07-Sun, 3/18/07 | Kay Yeager Coliseum |
| 14 | Laredo, TX | Wed, 3/21/07-Sun, 3/25/07 | Laredo Entertainment Center |
| 15 | Hidalgo, TX | Wed, 3/28/07-Sun, 4/1/07 | Dodge Arena |
| 16 | Fort Smith, AR | Thu, 4/5/07-Sat, 4/7/07 | Fort Smith Convention Center |
| 17 | Kearney, NE | Wed, 4/11/07-Sun, 4/15/07 | FirstTier Event Center |
| 18 | Durant, OK | Fri, 4/20/07-Sun, 4/22/07 | Choctaw Coliseum |
| 19 | Rio Rancho, NM | Thu, 4/26/07-Sun, 4/29/07 | Santa Ana Star Center |
| 20 | El Paso, TX | Thu, 5/3/07-Sun, 5/6/07 | El Paso County Coliseum |
| 21 | Amarillo, TX | Tue, 5/8/07-Wed, 5/9/07 | Amarillo Civic Center |
| 22 | Lubbock, TX | Fri, 5/11/07-Sun, 5/13/07 | City Bank Coliseum |
| | Break TBA-Domestic, TBA-Do | Mon, 5/14/07-Fri, 6/1/07 | TBA-Domestic |
| 23 | Beaumont, TX | Tue, 6/5/07-Wed, 6/6/07 | Ford Arena |
| 24 | Lake Charles, LA | Fri, 6/8/07-Sun, 6/10/07 | Lake Charles Civic Center |
| 25 | Tupelo, MS | Wed, 6/13/07-Sun, 6/17/07 | BancorpSouth Arena |
| 26 | Memphis, TN | Thu, 6/21/07-Sun, 6/24/07 | FedExForum |
| 27 | Biloxi, MS | Thu, 6/28/07-Sun, 7/1/07 | Mississippi Coast Coliseum |
| | Break TBA-Domestic, TBA-Do | Mon, 7/2/07-Sun, 7/8/07 | TBA-Domestic |
| 28 | Jackson, MS | Thu, 7/12/07-Sun, 7/15/07 | Mississippi Coliseum |
| 29 | Aiken, SC | Thu, 7/19/07-Sun, 7/22/07 | University of South Carolina Aiken Convocatic |
| | Break TBA-Domestic, TBA-Do | Tue, 7/24/07-Sun, 8/5/07 | TBA-Domestic |
| 30 | Little Rock, AR | Thu, 8/9/07-Sun, 8/12/07 | Barton Coliseum |
| 31 | Duluth, GA | Thu, 8/16/07-Sun, 8/19/07 | The Arena at Gwinnett Center |
| | Break TBA-Domestic, TBA-Do | Tue, 8/21/07-Sun, 8/26/07 | TBA-Domestic |
| | Transit TBA-Domestic, TBA-D | Wed, 8/29/07-Sun, 9/2/07 | TBA-Domestic |
| 32 | Prescott Valley, AZ | Thu, 9/6/07-Sun, 9/9/07 | Tim's Toyota Center |
| 33 | Loveland, CO | Thu, 9/13/07-Sun, 9/16/07 | Budweiser Events Center |
| 34 | Spokane, WA | Thu, 9/20/07-Sun, 9/23/07 | Spokane Arena |
| 35 | Kennewick, WA | Thu, 9/27/07-Sun, 9/30/07 | Toyota Center |
| 36 | Nampa, ID | Thu, 10/4/07-Sun, 10/7/07 | Idaho Center |
| 37 | Sioux City, IA | Fri, 10/12/07-Sun, 10/14/07 | Tyson Events Center |
| 38 | Topeka, KS | Thu, 10/18/07-Sun, 10/21/07 | Kansas Expocentre |
| 39 | Wichita, KS | Thu, 10/25/07-Sun, 10/28/07 | Kansas Coliseum |
| 40 | Lincoln, NE | Thu, 11/1/07-Sun, 11/4/07 | Pershing Center |
| 41 | Rockford, IL | Tue, 11/6/07-Wed, 11/7/07 | MetroCentre |
| 42 | Fort Wayne, IN | Fri, 11/9/07-Sun, 11/11/07 | Allen County War Memorial Coliseum |
| | TBA TBA-Domestic, TBA-Dom | Thu, 11/15/07-Sun, 11/18/07 | TBA-Domestic |
| 43 | Dayton, OH | Wed, 11/21/07-Sun, 11/25/07 | Hara Arena |

ALL INFORMATION IS SUBJECT TO CHANGE

**Key Definition**

G = Ground Support

? = Ground Support Unknown

B = Box Office Required

**Status**

CD = Confirmed Date

DF = Deal Firm

EC = Executed Contract

O = Option to renew

POSS = Possibility

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.   :
             :
     Plaintiff,   :
             :
   v.        :   Case No. 07- 1532 (EGS)
             :
AMERICAN SOCIETY FOR THE  :
PREVENTION OF CRUELTY   :
ANIMALS, et al.       :
             :
     Defendants.  :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 14

Page 1

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - - - - - X

4   AMERICAN SOCIETY FOR THE PREVENTION    :

    OF CRUELTY TO ANIMALS, et al.,         :

5                    Plaintiffs,           : Civ. No.

         v.                                : 03-02006

6   RINGLING BROTHERS AND BARNUM & BAILEY  : (EGS)

    CIRCUS, et al.,                        :

7                    Defendants.           :

8    - - - - - - - - - - - - - - - - - - - X

9                    Washington, D.C.

10                   Thursday, October 12, 2006

11            Videotaped deposition of TOM E. RIDER, called

12   for examination by counsel for the Plaintiffs in the

13   above-entitled matter, pursuant to notice, the witness

14   being duly sworn by CARLA L. ANDREWS, a Notary Public

15   in and for the District of Columbia, taken at the

16   offices of Meyer, Glitzenstein & Crystal at 1601

17   Connecticut Avenue, Northwest, Suite 700, Washington,

18   D.C. 20009-1056, at 9:27 a.m., Thursday, October 12,

19   2006, and the proceedings being taken down by Stenotype

20   by CARLA L. ANDREWS and transcribed under her

21   direction.

22

Page 2

```
 1    APPEARANCES:

 2    On behalf of the Plaintiffs:

 3         KATHERINE A. MEYER, ESQ.

 4         KIMBERLY D. OCKENE, ESQ.

 5         TANYA M. SANERIB, ESQ.

 6         Meyer, Glitzenstein & Crystal

 7         1601 Connecticut Avenue, Northwest

 8         Suite 700

 9         Washington, D.C. 20009-1056

10         (202) 588-5206

11

12    On behalf of the Defendants:

13         JOHN M. SIMPSON, ESQ.

14         MICHELLE C. PARDO, ESQ.

15         Fulbright & Jaworski, L.L.P.

16         801 Pennsylvania Avenue, N.W.

17         Washington, D.C. 20004-2623

18         (202) 662-0200

19

20    ALSO PRESENT:

21         ALICIA CLARK

22         ELLEN HEBERT, Videographer
```

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FELD ENTERTAINMENT, INC.   :
             :
     **Plaintiff,**   :
             :
   **v.**         :  **Case No. 07- 1532 (EGS)**
             :
AMERICAN SOCIETY FOR THE  :
PREVENTION OF CRUELTY   :
ANIMALS, <u>et</u> al.       :
             :
     **Defendants.**  :
_____:

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY**</u>
<u>**ALL PROCEEDINGS**</u>

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 03-2006 (EGS/JMF) |
| RINGLING BROTHERS AND BARNUM & BAILEY CIRCUS, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## <u>DECLARATION OF TOM RIDER</u>

1.     I am one of the plaintiffs in this case.  I am submitting this declaration, based on my personal knowledge, pursuant to this Court's August 23, 2007 Discovery Order, Docket No. 178, at p. 3.

2.     I have now produced all documents that I have in my possession, custody, or control that are responsive to the defendant's Interrogatories and Document Production Requests and required by this Court's August 23, 2007 Discovery Order.  I have done a thorough search of all places where such documents might be located and have produced all such documents.

3.     I may have had some additional records in my possession prior to March 30, 2004, which was the date I was served with defendant's discovery responses, that would have been responsive to those later discovery requests.   In particular, I may have had some additional records that would have reflected my receipt of grant money via Western Union to pursue my media and public education work, because I remember that when I went to the Western Union

office to receive those transfers, I was sometimes asked to sign some kind of receipt. I did not keep such receipts prior to March 30, 2004 because I have been living on the road for the last six and a half years and have a very limited ability to keep track of papers, and because I did not know that such records had anything to do with the plaintiffs' claims in this case or defendant's defenses.

4.     Although with few exceptions I do not regard any such information to be responsive to either Document Request No. 20 or Document Request No. 21, I have produced as many receipts as I could find that show how I spend the grant money I receive.

5.     I believe that I have produced all responsive records that came into my possession since March 30, 2004, and I am absolutely confident that I did not intentionally destroy, discard, or otherwise dispose of any such documents. If I failed to produce every such document, this would only be because of the way I live – out of a used van; I do not have a home or office. I have tried my best to keep track of all documents I have received that in any way relate to this case, and to produce all responsive documents to defendant.

-2-

Pursuant to 26 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Tom E. Rider

9/24/2007

Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELD ENTERTAINMENT, INC.  :
          :
    **Plaintiff,**    :
          :
  **v.**         :  **Case No. 07- 1532 (EGS)**
          :
AMERICAN SOCIETY FOR THE  :
PREVENTION OF CRUELTY  :
ANIMALS, <u>et</u> al.     :
          :
    **Defendants.**  :
_____:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO TEMPORARILY STAY
ALL PROCEEDINGS**

# EXHIBIT 16

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, et al.,** ) ) ) ) | |
| ) | **Civ. No. 03-2006 (EGS/JMF)** |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | |
| **RINGLING BROS. AND BARNUM & BAILEY CIRCUS, et al.,** ) ) ) | |
| **Defendants.** ) ) | |

## DECLARATION OF LISA WEISBERG

I, Lisa Weisberg, hereby declare as follows.

1.     I am Senior Vice President for Government Affairs and Public Policy for the American Society for the Prevention of Cruelty to Animals (the "ASPCA"), and am submitting this declaration on behalf of the ASPCA, based on my personal knowledge and pursuant to this Court's August 23, 2007 Discovery Order, Docket No. 178.  To the best of my knowledge, the ASPCA has produced all records in its possession, custody, or control that are responsive to defendant's Document Production Requests and that are required by the Court's Order.

2.     However, there are records that the ASPCA believes likely existed at one time, that the ASPCA has been unable to locate despite a thorough search of records.  Those records are the following:

    a.   The ASPCA no longer has any records from inspections conducted by its Humane Law Enforcement ("HLE") department that would have taken place during the years 1996 or 1997.  Although HLE cannot be certain that such

inspections in fact took place, any such records would have been destroyed pursuant to HLE's normal six-year document retention policy prior to the receipt of defendant's March 2004 discovery requests to the ASPCA. Since the receipt of the discovery requests HLE has preserved all records pertaining to inspections of the Ringling Bros. circus.

b.  The ASPCA has not located the 2003 American Express credit card statements that would document any of Mr. Rider's lodging expenses – as well as possibly other travel expenses from time to time – that the ASPCA paid for directly during 2003. However, weeks ago, after the ASPCA received the Court's discovery Order, Docket No. 178, I requested these credit card statements directly from American Express for the years 2001, 2002, and 2003. American Express sent me the statements for 2001 and 2002, but omitted the statements from 2003. Because this was American Express's error, they have agreed to expedite sending me the 2003 statements, and when I receive those records I will supplement the ASPCA's response to Interrogatory No. 21 as expeditiously as possible.

c.  The ASPCA also has been unable to locate any documentation or receipt concerning the laptop computer that it gave to Mr. Rider for use in connection with his media and public education advocacy on behalf of the elephants. I do not know whether any such receipt was discarded or has simply been misplaced. The computer was not new, and the ASPCA estimates that it was worth no more than $500.00 when it was provided to Mr. Rider.

2

    d.  The ASPCA also has been unable to locate any documentation or receipt concerning the value of the cell phone that the ASPCA gave to Mr. Rider for use in connection with his media and public education efforts. I have not been able to determine whether any such documentation was discarded or simply misplaced. The ASPCA estimates that the phone was worth approximately $200.00.

3.    Although there may have been additional records responsive to defendant's discovery requests and the Court's Order that existed at some point over the last seven years since this lawsuit began that we have not located, the ASPCA does do not know of any such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/26/07

_Lisa Weisberg_
Lisa Weisberg

MARCY ALTMAN
NOTARY PUBLIC, STATE OF NEW YORK
No. 01AL6132373
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES AUG. 22, 2009

3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FELD ENTERTAINMENT, INC.** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 07- 1532 (EGS)** |
| | : | |
| **AMERICAN SOCIETY FOR THE** | : | |
| **PREVENTION OF CRUELTY** | : | |
| **ANIMALS, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

## [PROPOSED] ORDER

This matter came before the Court on Defendants' Motion to Temporarily Stay All Proceedings and Supporting Memorandum (Docket No. 5) ("Motion").  Upon consideration of the Motion, the submissions of the parties and the entire record herein it is, by the Court, this _____ day of _____, 2007, hereby

**ORDERED** that the Motion be, and hereby is, **DENIED.**

Defendants' answer or other response to Plaintiff's complaint is due by no later than October 25, 2007.  See Minute Order (9/12/07).

**SO ORDERED.**



_____
EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE