**EXHIBIT A**



## ASSET ACQUISITION AGREEMENT

Agreement executed on the *22nd* day of *November*_____, 2004 by and between The Humane Society of the United States ("HSUS") a nonstock corporation organized and existing pursuant to the laws of Delaware, with principal offices at 2100 L Street, N.W., Washington, D.C. 20037, and The Fund for Animals, Inc. a New York Not-for-Profit Corporation with principal offices at 200 West 57th Street, New York, NY 10019 (the "Fund").

### Background

The parties are charitable corporations dedicated to the protection of animals, who have a common mission and whose operations complement each other.

The parties believe that by combining their resources, their common charitable mission will be enhanced.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties agree as follows:

### ARTICLE 1

### ACQUISITION AND SALE OF ASSETS

1.1     Acquisition of Assets.  In consideration of the assumption of Fund's liabilities as provided in Section 1.3 hereof, the undertakings set forth in Section 1.5 hereof, and on the terms and subject to the conditions of this Agreement, on the Closing Date (as defined herein), HSUS shall purchase, acquire directly or indirectly, and accept from Fund, and Fund shall sell, convey, assign, transfer, and deliver to HSUS, or its designees, which are charitable organizations exempt from taxation pursuant to the Internal Revenue Code, all of its assets, including but not limited to all of its real and personal property, tangible and intangible, of any type or kind and wheresoever situated (the "Assets") but excluding all Excluded Assets as defined in Section 1.2 below:

Except for Excluded Assets, the Assets include but are not limited to:

(a)      all land, buildings, and other improvements thereon; all other interest in real property; all interests in equipment, fixtures, fittings, furniture, and other tangible personal property, whether owned, leased, or otherwise (including, without limitation, items which have been fully depreciated or expensed):

1

(b)      all intangible assets and intellectual property (including, without limitation, unregistered trademarks, service marks and trade names, logos, trade dress and other names, marks and slogans, and all variations and permutations thereof), all publishing and distribution rights, and all associated goodwill; all statutory, common law and registered copyrights; together with all rights to use all of the foregoing forever and all other rights in, to, and under the foregoing in all jurisdictions;

(c)      all cash and cash equivalent items, bank and securities accounts, deposits, prepaid items, stocks, bonds and securities of other kinds, if any.

(d)      all rights, to income or otherwise, existing under licenses, permits, or agreements, contracts and orders, warranties, consents, orders, registrations, privileges, franchises, memberships, certificates, approvals, or other similar rights, and all other agreements, arrangements and understandings, including agreements or arrangements for grants or other income from foundations, trusts, or other third-party granting entities; provided, however, that if the grant or remainder interest is not assignable, it will not be transferred, assigned or conveyed to HSUS;

(e)      the right to receive mail and other communications addressed to Fund (including, without limitation, mail and communications from donors, members, contributors, suppliers, consultants, agents, and other);

(f)      all lists and records, no matter how maintained, pertaining to donors, contributors, members, suppliers, consultants, and agents, and all other books, ledgers, files, documents, correspondence, computer programs, and business records of every kind and nature;

(g)      all creative materials (including, without limitation, photographs, films, art work, color separations and the like), advertising and promotional materials, and all other printed, written, or electronically stored or formatted materials;

(h)      all claims, refunds, causes of action, choses in action, insurable interests, rights of coverage, defense, and recovery under insurance policies or otherwise, and rights of set-off of every kind and nature related to the Assets;

(i)      all rights to receive legacies, bequests, income from trusts of any kind, remainder interests from estates and trusts, or otherwise, and all other future interests; unless a particular legacy, bequest, amount of trust income, or remainder is not legally transferable;

(j)      all goodwill as a going concern and all other intangible property; and

(k)      all interest in and to telephone numbers, e-mail addresses, web sites, web site links, and all listings pertaining to Fund in all telephone books and other directories.

(l)   all rights to use, control, exploit, and alienate the Assets described in ¶¶ (a) through (k), above.

1.2   Excluded Assets. Notwithstanding the foregoing, the following Fund assets (the "Excluded Assets") are expressly excluded from the acquisition and sale contemplated hereby and, as such, are not included in the Assets:

(a)   cash in the amount of $250,000.;

(b)   books and records relating to its incorporation and qualification to do business as a foreign corporation in those jurisdictions where it is qualified, and minutes of proceedings of its members and directors, provided that copies of such books and records are provided to HSUS by Closing;

(c)   records, whether in its possession or in the possession of its auditors, relating to preparation and certification of financial statements;

(d)   all rights of the Fund under this Agreement and agreements related hereto;

(e)   the personal property of officers, directors, and employees of Fund, whether in their individual or a fiduciary capacity, which may on the Closing Date be stored or located at an office or other facility of Fund;

(f)   the right to receive mail and other communications addressed to Fund relating to any of the Excluded Assets; and

(g)   title to and other real property interests in the Fund's unimproved property in Colebrook, Connecticut and in the Fund's facilities at Murchison, Texas (the Black Beauty Ranch), and at Ramona, California (the Wildlife Rehabilitation Center).

1.3   Assumption of Liabilities. Subject to the conditions specified in this Agreement, HSUS shall assume, defend, discharge, and perform as and when due, all lawful liabilities and obligations of Fund (the "Assumed Liabilities") of whatever type or kind, including without limitation contingent liabilities whether known or unknown and whether asserted or unasserted, including, but not limited to all:

(a)   trade payables incurred in the ordinary course of business;

(b)   liabilities and obligations under agreements, contracts, orders, leases, and commitments and further including, but not limited to:

(c)   liabilities under promissory notes and security agreements;

3

(d)   liabilities under leases;

(e)   liabilities under Annuity contracts; and

(f)   after giving effect to the releases and waivers referenced in Section 1.5(b)(1)(iii), below, liabilities to employees, past and present, whether arising under any employee benefit program or practice, or under any state, municipal or federal law or regulation affording or requiring employee rights or benefits or otherwise, and whether or not contested by Fund or any one or more of its present or past employees.

1.4   Excluded Liabilities. Notwithstanding the foregoing, the following liabilities are expressly excluded from the effect of Section 1.3 and shall not be assumed by HSUS; all liabilities and obligations of whatever type or kind — including without limitation contingent liabilities whether known or unknown, whether asserted or unasserted, and whenever arose or accrued — arising from or related to the ownership, operation, and use of Fund's real property and real property interests at,

1.   Murchison, Texas, known as Black Beauty Ranch (sometimes referred to as the "Ranch");

2.   Ramona, California, known as the Wildlife Rehabilitation Center; and

3.   Colebrook, Connecticut.

1.5   Undertakings of HSUS.

(a)   For a period of not less than five (5) years after Closing, HSUS shall continue to operate Fund's property in Murchison, Texas, known as Black Beauty Ranch, primarily as a home for rescued hooved animals. As the material measure of HSUS's compliance with this undertaking, HSUS agrees to provide funding for its operation of the Black Beauty Ranch at a minimum annual level of $900,000. per year during the five-year period referenced above, which amount shall not include that portion of HSUS's general or administrative overhead chargeable to Ranch operations. This minimum annual funding level may be drawn, in HSUS's discretion, from any one or more of the following sources: HSUS's unrestricted principal or current income, restricted income or principal for which such use is appropriate, current income raised expressly for the benefit of the Ranch, or from the income and principal of the Black Beauty Ranch Board-Designated and Board-Restricted Account in accordance with ¶1.5(d) below. This operating and funding commitment by The HSUS is subject to the following conditions: (1) the HSUS shall have complete discretion to manage the Ranch, within the charitable mission and purpose of the Ranch as a sanctuary primarily for hooved animals, for the benefit and welfare of present and future resident animals, which discretionary management may include, but not be limited to, reordering funding priorities among the Ranch-budget's line items and augmenting capital

4

improvements, relocating or rehousing non-hooved exotic animals, and controlling reproduction among resident animals; (2) HSUS's aggregate funding commitment under this ¶1.5(a) for and during the five-year period shall not exceed $5.0 million; (3) the holders of the various real property interests within the Black Beauty Ranch, must continue to provide reasonable and appropriate cooperation, throughout the five (5) year period; and (4) the Board of Directors of The HSUS may, by formal finding and written resolution — after taking into account all relevant information reasonably available and after undertaking reasonable deliberation — determine that major changes in circumstances call for commensurate changes in the way the Ranch is funded or operated, including without limitation discontinuance in whole or in part of such funding and operation. Such "major changes in circumstances" shall be limited to,

- Changes in climate, weather, water supply, ecology, general environment, or in carrying capacity or other land conditions that would affect the feasibility of operating the sanctuary or the health or welfare of the resident animals;

- Changes in the insurability of the Ranch operations to the extent that liability insurance cannot be obtained or that the HSUS is forced to effectively self-insure the Ranch operations; and

- Changes in zoning law or other land use regulation that would render the operation of the Ranch as an animal sanctuary unfeasible.

(b)     (1) The HSUS agrees to offer employment to all persons who are Fund employees as of the effective date of this Agreement and who wish to be employed by the HSUS. Each such offer of employment shall be conditioned upon, as conditions precedent, (i) each Fund employee submitting a completed HSUS-standard pre-employment application for employment and executing HSUS-standard authorizations to enable HSUS to perform its usual and permissible background and reference checks, (ii) such background and reference checks disclosing nothing about the Fund employee which would disqualify an applicant for employment under current HSUS guidelines, including, but not limited to:

- Any material omission, misrepresentation, or falsification on the candidate's application, resume, or any other materials submitted for consideration.

- Any felony conviction relevant to the prospective employment.

- A history of one or more,

  •• incidents of workplace violence

  •• complaints that the candidate engaged in discriminatory or harassing behavior unless such allegations were thoroughly investigated and found to be

5

without merit

•• citations and/or convictions for moving violations and/or reckless driving, when driving is a job requirement of the prospective employment

•• incidents of disclosure or unauthorized use of confidential information, including but not limited to constituent/membership lists

•• incidents of damage or destruction of employer's property due to careless or willful acts

•• incidents of insubordination or refusal to comply with instructions or failure to perform reasonable duties assigned

• A history of,

•• inability or unwillingness to work in harmony with other employees

•• excessive or unexcused absenteeism or tardiness,

and (iii) (as a third condition precedent) each such Fund employee executing a full release and waiver of any and all claims, demands, liabilities, actions, causes of action, and suits at law or in equity of whatever kind or nature — including attorneys fees and costs — fixed or contingent, whether known or unknown, suspected or unsuspected, and whether or not concealed or hidden, which such employee had, now has, or may have against The Fund, or against the HSUS derivatively, relating to or arising out of the employee's employment with (including termination by) The Fund up to and including the date the employee signs the Release or through the final day of the employee's employment with the Fund, whichever is later.

(2) HSUS shall endeavor to complete its pre-employment evaluation and clerical processes so that employment with the HSUS may commence on the day after the Closing Date, or as soon thereafter as is feasible.

(3) Each Fund employee hired by the HSUS shall be paid a base salary that is at least equal to the base salary provided by the Fund. Each Fund employee hired by the HSUS shall be included, at the employee's request, in all HSUS benefit plans to the extent, and as soon as, he or she is eligible, as a new HSUS hire, for inclusion under the terms of each plan, with only the following variations: (i) with respect to the HSUS's plan for paid annual leave (vacation), each Fund employee hired by the HSUS shall be given credit for continuous fulltime employment with the Fund immediately prior to, and including, the day of Closing for purposes of determining each employee's starting rate for earning annual leave per pay period; and (ii) with respect to The HSUS's group health plan, each Fund employee hired by The HSUS shall be given time-credit for the employee's continuous participation in the Fund's group health plan immediately prior to, and including, the day of Closing for purposes of determining the five-year period upon the completion of which The HSUS

6

will waive all employee costs and pay the entire costs of health insurance premiums for employees. otherwise eligible to participate in the group health plan.

(4) Notwithstanding any other provision of this ¶1.5(b) or of this Agreement, each Fund employee hired by the HSUS shall be hired and employed by the HSUS on an "at-will" basis, which means that the employment shall be for no definite period of time, that the employee is free to resign at any time, and that the HSUS can terminate the employment at any time, with or without cause, with or without a stated reason, and with or without advance notice.

(5) Except as qualified by the terms of this ¶1.5(b), all HSUS-standard employment practices and policies, as expressed in The HSUS Employee Handbook (as may be amended from time to time) will be applicable to Fund employees hired by the HSUS.

(6) Nothing in this Agreement is intended to create or confer an enforceable benefit on anyone not a party to this Agreement.

(c) HSUS will continue to lease and operate, directly or indirectly, the Fund's office at 200 West 57th Street, New York, NY until the expiration of the term of the present lease therefore on December 31, 2007, provided, if necessary, that the lease can be made assignable.

(d) For a period of not less than five (5) years after Closing, the Fund's Black Beauty Ranch Board-Designated and Board-Restricted Account (currently in the custody of or managed by Smith Affiliated Capital as Account No. 137-003697) will continue to be held by The HSUS as a Board-Designated account for the exclusive benefit of Black Beauty Ranch. After Closing, The HSUS may, in its discretion, invest and reinvest the assets in the Account; commingle the Account's assets with other HSUS assets for purposes of investment; discharge and hire investment managers or advisors; alter the mix of securities or other assets in the Account; and apply and expend the income and principal in any form and by any distribution formula, which may take into account unrealized capital gain, for the exclusive benefit of the Black Beauty Ranch.

(e) Any one who has contributed $10 or more to the Fund at any time within twelve months of Closing (and who is not already an HSUS member) will be a member of HSUS through the twelve-month anniversary date of the contribution.

(f) By its ratification or approval of this Agreement, the HSUS's Board of Directors shall be simultaneously appointing, effective on the day after Closing, the following persons as members of the HSUS's Board of Directors, with each person's term to be determined by the HSUS's Board: Marian Probst, Judith Ney, Adele Donati, Edgar Smith, and Neil Fang. Also by its ratification or approval of this Agreement, The HSUS's Board of Directors shall be agreeing, also effective on the day after Closing, to place before The HSUS's voting membership the name of Mary Max, in a special election by referendum to be held in 2005, to fill the currently vacant directorship in the class of directors whose term expires in 2007.

7

ARTICLE 2

REPRESENTATIONS AND WARRANTIES OF FUND

As an inducement to HSUS to enter into this Agreement, Fund hereby represents and warrants to HSUS as of the date hereof and as of the Closing Date that:

2.1     Organization and Power. Fund is a corporation duly organized, validly existing and in good standing under the laws of New York, and Fund is qualified to do business as a foreign corporation and is in good standing in the jurisdictions in which the ownership of properties or the conduct of its operations requires it to be so qualified. Fund has all requisite power and authority and all material licenses, permits, and other authorizations necessary to own and operate its properties and to carry on its operations as now conducted (including, to the best of its knowledge, valid registrations under the charitable solicitation laws of any states in which Fund solicits contributions by mail or otherwise). The copies of the certificate of incorporation and by-laws of Fund which have not been previously furnished to HSUS reflect all amendments made thereto at any time prior to the date of this Agreement and are correct and complete in all material respects.

2.2     Affiliates. Fund does not control any other corporation, organization, or entity.

2.3     Authorization; No Breach. Except as set forth on the Schedule hereto, the execution, delivery, and performance of this Agreement and the other agreements contemplated hereby and the transactions contemplated hereby and thereby have been duly and validly authorized by Fund. No other corporate act or proceeding on the part of Fund, or its Board of Directors, or members, other than as contemplated by Section 7.3(a)(iv) is necessary to authorize the execution, delivery, or performance of this Agreement, any other agreement contemplated hereby or the consummation of the transactions contemplated hereby or thereby. This Agreement has been duly executed and delivered by Fund, and this Agreement constitutes, and the other agreements contemplated hereby upon execution and delivery by Fund shall each constitute, a valid and binding obligation of Fund, enforceable in accordance with its and their terms. Except as set forth on the "Schedule" hereto, the execution, delivery and performance of this Agreement shall not (a) conflict with or result in any breach of any of the provisions of, (b) constitute a default under, result in a violation of, or cause the acceleration of any obligation under, (c) result in the creation of any lien, security interest, charge or encumbrance upon any of the Assets, or (d) require any authorization, consent, approval, exemption or other action by or notice to any court or other governmental body under the provisions of Fund's certificate of incorporation or by-laws or any indenture, mortgage, lease, loan agreement, or other agreement or instrument to which Fund is bound or affected, or any law, statute, rule, regulation, judgment, order or decree to which Fund is subject or by which any of the Assets is bound.

2.4     Financial Statements. Fund has furnished HSUS with copies of its "Statement of Financial Position at December 31, 2003" (its "Latest Balance Sheet") and "Statement of Activities and Changes in Net Assets," "Statement of Functional Expenses" and "Statement of Cash Flows" all for the year ended December 31, 2003 (the "Financial Statements"). Each of the foregoing financial statements has been based upon the information contained in Fund's books and records (which are

accurate and complete in all material respects) and fairly presents the financial condition and result of operations of Fund as of the times and for the periods referred to therein, and such financial statements contain proper accruals and adequate reserves and have been prepared in accordance with generally accepted accounting principles, consistently applied throughout the periods indicated, except as otherwise noted therein.

2.5   Absence of Undisclosed Liabilities. As of the Closing, Fund shall have no material liabilities or obligations arising out of transactions entered into at, or prior to, the Closing, except (a) liabilities and obligations under agreements, contracts, leases, or commitments described on the Schedule or under agreements, leases, contracts, and commitments which are not required pursuant to this Agreement to be disclosed thereon (but not liabilities for breaches thereof), (b) liabilities and obligations reflected on Fund's Financial Statements, (c) liabilities and obligations which have arisen after the date of Fund's Financial Statements in the ordinary course of Fund's operations, and (d) liabilities and obligations otherwise expressly disclosed in the Agreement or the Schedule heretofore delivered to HSUS.

2.6   No Material Adverse Changes. Since the date of the Latest Balance Sheet, there has been no material adverse change in the financial condition, operations, or employee relations of Fund. A change or changes shall be deemed to be materially adverse to the Fund's financial condition if alone or in the aggregate it or they reduce or may reduce the Fund's total net assets, as stated in the Latest Balance Sheet, by more than $1.0 million.

(The anticipated costs of capital improvements to the Fund's Wildlife Rehabilitation Center at Ramona, California (c. $600,000.) and the anticipated costs of the Fund's media advertising related to its anti-fur campaign in late 2004 (c. $600,000.) shall not be charged against the aforementioned $1.0 million threshold.)

2.7   Absence of Certain Developments. Except as set forth in the Schedule heretofore delivered to HSUS, since the date of the Financial Statements, Fund has not, without the written consent of HSUS:

(a)   borrowed any amount or incurred or become subject to any material liabilities, except current liabilities incurred in the ordinary course of operations and liabilities under contracts entered into in the ordinary course of operations;

(b)   discharged or satisfied any material lien or encumbrance or paid any material liability, other than current liabilities paid in the ordinary course of operations;

(c)   mortgaged, pledged, or subjected to any lien, charge, or any other encumbrance, any portion of the Assets, except liens, if any, for current property taxes not yet due and payable;

(d)   sold, assigned, or transferred any of the Assets, except in the ordinary course of operations, or cancelled without fair consideration any material debts or claims owing to

9

or held by it;

     (e)   sold, assigned, or transferred, any trademarks, trade names, copyrights;

     (f)   suffered any extraordinary losses or waived any rights of material value, whether or not in the ordinary course of business or consistent with past practice;

     (g)   entered into any other material transaction other than in the ordinary course of operations; or

     (h)   suffered any material damage, destruction, or casualty loss to the Assets, whether or not covered by insurance.

A liability, loss, lien, mortgage, encumbrance on an asset or group of like assets will be deemed material if alone or in the aggregate they are more than $500,000.

2.8   <u>Tax Matters</u>.

     (a)   Fund has duly filed all federal, state and local tax information and tax returns (the "Returns") required to be filed by it (all such returns being accurate and complete in all material respects) and has duly paid or made provision for the payment of all taxes and other governmental charges which have been incurred or are shown to be due on said Returns.

     (b)   All monies required to be withheld from employees of Fund for income taxes, social security and unemployment insurance taxes have been withheld or collected and paid, when due, to the appropriate governmental authority, or if such payment is not yet due, an adequate reserve has been established.

2.9   <u>Contracts and Commitments</u>.

     (a)   Except as set forth on the Schedule or reflected in the Financial Statements heretofore delivered to HSUS, Fund is not a party to any;

     (i)   agreement or indenture relating to the borrowing of money or to mortgaging, pledging or otherwise placing a lien on any of the Assets;

     (ii)   guarantee of any obligation for borrowed money or otherwise, other than endorsements made for collection in the ordinary course of business;

     (iii)   agreement or commitment with respect to the lending or investing of funds to or in other persons or entities;

     (iv)   lease or agreement under which it is lessee of or holds or operates any personal property owned by any other party for which the aggregate annual rental payments

to any one person and its affiliates exceeds $50,000;

      (v)    lease or agreement under which it is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by it;

      (vi)   contract or group of related contracts with the same party for the purchase or sale of products or services under which the undelivered balance of such products and services has a selling price in excess of $50,000;

      (vii)  other contract or group or related contracts with the same party continuing over a period of more than six months from the date or dates thereof, not terminable by it on 30 days' notice or less;

      (viii) contract which prohibits it from freely operating anywhere in the world; or

      (ix)   other agreement material to it whether or not entered into in the ordinary course of business.

      (b)    Except as specifically disclosed in the Schedule, (i) to the best of Fund's knowledge, no contract or commitment material to Fund has been breached in any material respect or cancelled by the other party, (ii) Fund has in all material respects performed all the obligations required to be performed by it to the date of this Agreement and is not in receipt of any claim of default under any material lease, contract, commitment or other agreement to which it is a party; (iii) no event has occurred which with the passage of time or the giving of notice or both would result in a breach or default under any material lease, contract, instrument, or other agreement to which Fund is a party; and (iv) Fund is a party to no contract which is materially adverse to its operations or financial condition.

      (c)    HSUS has been supplied with a true and correct copy of all written contracts which are referred to on the Schedule, together with all amendments or other changes thereto.

      2.10   Litigation; Proceedings. Except as set forth in the Schedule heretofore delivered to HSUS, there are no actions, suits, counterclaims, cross-claims, proceedings, orders, or investigations ("Actions") pending or, to the best of Fund's knowledge, threatened against or naming Fund (or any of its present and former officers, directors, employees, and agents in their capacities as such) as a defendant or respondent, or otherwise affecting Fund, at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign. Except as set forth in the Schedule, so far as is known to the Fund, no state of facts exists or has existed that would constitute grounds for the institution of any Action against the Fund, or against its present and former officers, directors, employees, or agents. No officer, director, employee, or agent of Fund has been or is authorized to make or receive, and Fund knows of no such person making or receiving, any bribe, kickback, or other illegal payment at any time. Within the three years preceding the date hereof, Fund has received no opinion or legal advice in writing to the effect that Fund is materially exposed from a legal standpoint to any liability

11

or disadvantage which may be material to the operation as previously or presently conducted using the standard of materiality set forth in Section 2.6.

    2.11   <u>Governmental Consent, etc.</u>  Except as set forth on the Schedule no permit, consent, approval, or authorization of, or declaration to or filing with, any governmental or regulatory authority is required in connection with the execution, delivery, or performance of this Agreement by Fund, or the consummation by Fund of any of the transactions contemplated hereby and thereby.

    2.12   <u>Employees.</u>  To the best of Fund's knowledge, no key employee nor group of Fund's employees has any plans to terminate employment with Fund.  Except as set forth on the Schedule, Fund has complied in all material respects with all applicable laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, and the payment of social security and other taxes.  Fund has no material labor relations problems, and there has been no union organization efforts by the employees of Fund.  Except as set forth on a schedule hereto, the Fund does not have any employment contracts.  All its employees serve at the will of Employer.  There are no known pending or threatened complaints, formal or informal, filed or presented to Fund management at any level by any present or former Fund employee citing or founded upon (a) alleged or possible violations by the Fund of any federal, state, or local law or policy against discrimination (including sexual or other kinds of harassment); (b) alleged violations by the Fund of any federal, state, or local laws governing employment wages and hours; (c) alleged violations or noncompliance by the Fund with any other federal, state, or local law or policy; (d) alleged violations by Fund management of any internal Fund policy or procedure; or (e) an allegation of retaliation against any employee by the Fund for the employee's making complaints described in (a) through (d).  Fund has no deferred compensation plan or arrangement, formal or informal, with any present or former Fund employee or Fund board member.

    2.13   <u>Employee Benefit Plans.</u>

        (a)    The Employee Benefits information heretofore delivered to HSUS contains a list and a true and correct copy, including all amendments thereto, of any employee benefit plan, within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which Fund maintains, to which Fund contributes, or under which any employee or former employee, officer or former officer, director or former director of Fund is covered or has benefit rights and pursuant to which any liability of Fund exists or is reasonably likely to occur, and each other arrangement, program, or plan pursuant to which any benefit is or shall be provided to an employee, former employee, or retired employee whether formal or informal, including, without limitation, those providing any form of medical, health, and dental insurance, severance pay and benefits continuation, relocation assistance, vacation pay, tuition aid, and matching gifts for charitable contributions to educational or cultural institutions (collectively, the "Benefit Plans").  Except as set forth on the "Employee Benefits Schedules," Fund neither maintains nor has entered into any Benefit Plan or other document, plan, or agreement which contains any change in control provisions which would cause an increase or acceleration of benefits or benefit entitlements to employees or former employees of Fund or their respective beneficiaries, or other provisions, which would cause an increase in liability of Fund or to HSUS as a result of the

transactions contemplated by this Agreement or any related action thereafter. To the extent such laws or regulations are applicable thereto, of such plan that is an employee pension benefit plan within the meaning of Section 3(2) of ERISA that is intended to be a qualified plan under Section 401(a) of the Code has been amended to comply in all material respects with current law as required and each such plan either has obtained a favorable determination letter with respect to such amendment or the remedial amendment period for such amendment under Section 401(b) of the Code has not expired.

      (b)    Except as set forth in the Fund's Schedule, all accrued contributions and other payments to be made by Fund or any ERISA Affiliate (as defined in Section 2.18(e)) to any Benefit Plan through the date of the Financial Statements have been set aside therefore and reflected on the Financial Statements . Fund is not in material default in performing any of its contractual obligations under any of the Benefit Plans of any related trust agreement or insurance contract, and there are no material outstanding liabilities of any Benefit Plan other than liabilities for benefits to be paid to participants in such Benefit Plan.

      (c)    There is no pending litigation or, to the best knowledge of Fund, overtly threatened litigation or pending claim (other than benefit claims made in the ordinary course) by or on behalf of or against any of the Benefit Plans (or with respect to the administration of any of the Benefit Plans) now or heretofore maintained by Fund which allege violations of applicable state or federal law.

      (d)    To the best of Fund's knowledge, each Benefit is and has been in compliance in all material respects with, and each such Plan is and has been operated in accordance with the applicable laws, rules, and regulations governing such Plan, including, without limitation, the rules and regulations promulgated by the Department of Labor, the Pension Benefit Guaranty Corporation ("PBGC") and the IRS under ERISA, the Code or any other applicable law. Fund is current in transferring to the appropriate custodian(s) of §403(b) plans any amounts withheld from employees' pay or amounts contributed by the Fund itself.

      (e)    Neither Fund nor any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Fund would be deemed a "single employer" with the meaning of Section 4001 of ERISA, has incurred, nor to the best knowledge of Fund is reasonably likely to incur, any liability under Title IV of ERISA in connection with any plan subject to the provisions of Title IV of ERISA now or heretofore maintained or contributed to by Fund or any ERISA Affiliate. No condition exists that presents a material risk to Fund or any ERISA Affiliate of incurring a liability for premiums due to the PBGC. The PBGC has not instituted proceedings to terminate any of the ERISA Plans and no condition known to Fund exists that presents a material risk that such proceedings shall be instituted. All reporting and disclosure requirements of ERISA and the Code have been satisfied in all material respects with respect to each of the Benefit Plans. Neither Fund nor any ERISA Affiliate is required to contribute to an employee benefit plan that is a "multiemployer plan" within the meaning of Section 3(37) of ERISA nor has been so required during the five-year period ending on the Closing Date.

(f)     Neither Fund nor any member of a "controlled group," as defined in Section 4971(c)(2)(B) of the Code, of which Fund is a member has any liability on account of any accumulated funding deficiency (as defined in Section 412 of the Code) or on account of any failure to make contributions to or pay benefits under any such plan, nor is Fund aware of any claim pending or threatened to be brought by any party regarding such matters.  No prohibited transaction has occurred with respect to any Benefit Plan that would result, directly or indirectly, in the imposition of any excise tax under Section 4975 of the Code; nor has any reportable event under Section 4043 of ERISA occurred with respect to any Benefit Plan.

2.14    Insurance. The insurance information heretofore delivered to HSUS lists and briefly describes each material insurance policy maintained by Fund with respect to the Assets or Fund's operations. All of such insurance policies are in full force and effect, and Fund is not in material default with respect to its obligations under any of such insurance policies. Such insurance coverage is customary for entities engaged in similar operations. Without limiting the effect of the previous sentences, Fund has not defaulted on the payment of premiums or the fulfillment of any other obligation under any insurance policy, nor has Fund been notified in writing by any insurance carrier that any policy has expired, will expire before and including the Closing Date, or that carrier does not intend to renew the applicable insurance for the succeeding twelve-month term, except with respect to coverage that has since been extended or renewed.

2.15    Compliance with Laws; Permits; Certain Operations.  Fund and its officers and directors have complied in all material respects with all applicable laws and regulations of foreign, federal, state, and local governments and all agencies thereof which affect their operations or the Assets or to which Fund may otherwise be subject, and no claims have been filed against Fund alleging a violation of any such law or regulation, except as set forth on the Schedule. So far as it knows, Fund holds all of the permits, licenses, certificates, and other authorizations of federal, state, and local governmental agencies required for the conduct of its operations. Fund is current in its payment of premiums or contributions under state workers' compensation laws, subject, however, to retrospective adjustments in accord with the auditing practices of the insurer.

2.16    Environmental Matters.

(a)     Except as set forth on the Schedule, Fund has not received any written notice alleging in any manner that Fund is, or might be potentially, responsible for any release of hazardous materials, or any costs arising under or in violation of environmental laws with respect to the Assets or its operations.

(b)     None of the real estate owned, leased, or operated by Fund is or has been listed on the United States Environmental Protection Agency National Priorities List of Hazardous Waste Sites, or any other list, schedule, law, inventory, or record of hazardous or solid waste sites maintained by any federal, state or local agency.

(c)     Except with respect to the real property at 519 C Street, N.E., Washington, D.C., Fund has no environmental reports with respect to the Assets or its operations. With respect to

14

519 C Street, N.E., the Fund has provided HSUS with a report entitled, Phase I Environmental Site Assessment Update (the "Environmental Site Assessment") prepared by Bregman & Company, Inc. under date of September 8, 2003. Fund is not aware of the existence of any fact or circumstance that has or would change any material finding or conclusion in the Environmental Site Assessment.

(d)     No lien has been attached or filed against Fund with respect to the Assets in favor of any governmental or private entity for (i) any liability or imposition of costs under or in violation of any applicable environmental law; or (ii) any release of hazardous materials.

2.17     Disclosure. Neither this Agreement nor any of the schedules, attachments, or exhibits hereto contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading. There is no material fact which has not been disclosed in writing to HSUS of which any officer, director, or key employee of Fund is aware and which materially adversely affects or could reasonably be anticipated to materially and adversely affect the Assets.

2.18     Closing Date. All of the representations and warranties of Fund in this Article 2 and elsewhere in this Agreement and all information delivered in any schedule, attachment, or exhibit hereto or in any certificate delivered to HSUS are true and correct in all respects on the effective date of this Agreement and shall be true and correct in all respects on the Closing Date.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF HSUS

As an inducement to Fund to enter into this Agreement, HSUS hereby represents and warrants to Fund as of the date hereof and as of the Closing Date that:

3.1     Organization and Power. HSUS is a corporation duly organized, validly existing, and in good standing under the laws of Delaware, and is qualified to do business as a foreign corporation and is in good standing in the jurisdictions listed on the Schedule hereto. So far as it knows, HSUS has all requisite power and authority and all material licenses, permits, and other authorizations necessary to own and operate its properties and to carry on its operations as now conducted, or, not being so licensed or qualified would not materially adversely affect its operations or assets. The copies of the certificate of incorporation and by-laws of HSUS which have been previously furnished to Fund reflect all currently effective amendments made thereto and are correct and complete in all material respects.

3.2     Affiliates. Except for those identified on the HSUS's Schedule hereto HSUS does not control or have any partnership or joint venture interest in any other corporation, organization or entity.

3.3     Authorization; No Breach. Except as set forth on HSUS's Schedule hereto the

15

execution, delivery, and performance of this Agreement and the other agreements contemplated hereby and the transactions contemplated hereby and thereby have been duly and validly authorized by HSUS. No other corporate act or proceeding on the part of HSUS, or its Board of Directors or members, other than as contemplated by Section 7.3(b)(ii) is necessary to authorize the execution, delivery, or performance of this Agreement, any other agreement contemplated hereby, or the consummation of the transactions contemplated hereby or thereby. This Agreement has been duly executed and delivered by HSUS, and, provided that this Agreement, as executed, has been approved by the HSUS's Board of Directors, this Agreement constitutes and the other agreements contemplated hereby upon execution and delivery by HSUS shall each constitute, a valid and binding obligation of HSUS, enforceable in accordance with its and their terms. Except as set forth on the HSUS's Schedule hereto, the execution, delivery, and performance of this Agreement by HSUS and the consummation of the transactions contemplated hereby and thereby do not and shall not (a) conflict with or result in any breach of any of the provisions of, (b) constitute a default under, result in a violation of, or cause the acceleration of any obligation under, (c) result in the creation of any lien, security interest, charge, or encumbrance upon any of the Assets, or (d) require any authorization, consent, approval, exemption, or other action by or notice to any court or other governmental body under the provisions of HSUS's certificate of incorporation or by-laws or any indenture, mortgage, lease, loan agreement, or other agreement or instrument to which HSUS is bound or affected, or any law, stature, rule, regulation, judgment, order, or decree to which HSUS is subject or by which any of the Assets is bound.

   3.4   Financial Statements. HSUS has furnished Fund with copies of its Consolidated Statements of Financial Position at December 31, 2003, and Consolidated Statements of Activities and Changes in Net Assets, Consolidated Statement of Functional Expenses and Consolidated Statement of Cash Flows, each for the year ended December 31, 2003 (the "Financial Statements"). Each of the foregoing Financial Statements has been based upon the information contained in HSUS's books and records (which are accurate and complete in all material respects) and fairly presents the financial condition and results of operations of HSUS as of the times and for the periods referred to therein, and such financial statements contain proper accruals and adequate reserves and have been prepared in accordance with generally accepted accounting principles, consistently applied throughout the periods indicated, except as otherwise noted therein.

   3.5   Absence of Undisclosed Liabilities. As of the Closing, HSUS shall have no material liabilities or obligations arising out of transactions entered into at or prior to the Closing, except (a) liabilities and obligations under agreements, contracts, leases, or commitments described on the HSUS's Schedule or under agreements, leases, contracts, and commitments which are not required pursuant to this Agreement to be disclosed thereon (but not liabilities for breaches thereof), (b) liabilities and obligations reflected on HSUS's Financial Statements, (c) liabilities and obligations which have arisen after the date of HSUS's Financial Statements in the ordinary course of HSUS's operations, and (d) liabilities and obligations otherwise expressly disclosed in this Agreement or the HSUS's Schedule.

   3.6   No Material Adverse Changes. Since the date of the Financial Statements, there has been no material adverse change in the financial condition, operations, or employee relations of

16

HSUS.

3.7   <u>Absence of Certain Developments</u>. Except as set forth in the Schedule heretofore delivered to Fund, since the date of the Financial Statements, HSUS has not:

(a)   borrowed any amount or incurred or become subject to any material liabilities, except current liabilities incurred in the ordinary course of operations and liabilities under contracts entered into in the ordinary course of operations;

(b)   discharged or satisfied any material lien or encumbrance or paid any material liability, other than current liabilities paid in the ordinary course of operations;

(c)   mortgaged, pledged, or subjected to any lien, charge, or any other encumbrance, any of its Assets, except liens, if any, for current property taxes not yet due and payable;

(d)   suffered any extraordinary losses or waived any rights of material value, whether or not in the ordinary course of business or consistent with past practice;

(e)   entered into any other material transaction other than in the ordinary course of operations; or

(f)   suffered any material damage, destruction, or casualty loss to its Assets, whether or not covered by insurance.

3.8   <u>Tax Matters</u>.

(a)   HSUS has duly filed all federal, state, and local tax information and tax returns (the "Returns") required to be filed by it (all such returns being accurate and complete in all material respects) and has duly paid or made provision for the payment of all taxes and other governmental charges which have been incurred or are shown to be due on said Returns.

(b)   All monies required to be withheld from employees of HSUS for income taxes, social security, and unemployment insurance taxes have been withheld or collected and paid, when due, to the appropriate governmental authority, or if such payment is not yet due, an adequate reserve has been established.

3.9   <u>Contracts and Commitments</u>.

(a)   Except as set forth on HSUS's Schedule or reflected in the financial statements, HSUS is not a party to any:

(i)   agreement or indenture relating to the borrowing of money or to mortgaging, pledging, or otherwise placing a lien on any of its assets;

17

(ii)     guarantee of any obligation for borrowed money or otherwise, other than endorsements made for collection in the ordinary course of business;

(iii)     agreement or commitment with respect to the lending or investing of funds to or in other persons or entities;

(iv)     lease or agreement under which it is lessee of or holds or operates any personal property owned by any other party for which the aggregate annual rental payments to any one person and its affiliates exceeds $500,000;

(v)     lease or agreement under which it is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by it;

(vi)     contract or group of related contracts with the same party for the purchase or sale of products or services under which the undelivered balance of such products and services has a selling price in excess of $500,000;

(vii)     contract which prohibits it from freely operating anywhere in the world;

(ix)     other agreement material to it whether or not entered into in the ordinary course of business.

(b)     Except as specifically disclosed in HSUS's Schedule, (i) to the best of HSUS's knowledge, no contract or commitment material to HSUS has been breached in any material respect or cancelled by the other party, (ii) HSUS has in all material respects performed all the obligations required to be performed by it to the date of this Agreement and is not in receipt of any claim of default under any material lease, contract, commitment, or other agreement to which it is a party; (iii) no event has occurred which with the passage of time or the giving of notice or both would result in a breach or default under any material lease, contract, instrument, or other agreement to which HSUS is a party; and (iv) HSUS is a party to no contract which materially adverse to its operations or financial condition.

(c)     Fund has been supplied with a true and correct copy of all written contracts which are referred to on the HSUS's Schedule, together with all amendments, or other changes thereto.

3.10     Litigation; Proceedings. Except as set forth in HSUS's Schedule there are no actions, suits, proceedings, orders, or investigations pending or, to the best of HSUS's knowledge, threatened against HSUS at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign. No officer, director, employee, or agent of HSUS has been or is authorized to make or receive, and HSUS knows of no such person making or receiving, any bribe, kickback, or other illegal payment at any time.

18

Within the three years preceding the date hereof, HSUS has received on opinion or legal advice in writing to the effect that HSUS is materially exposed from a legal standpoint to any liability or disadvantage which may be material to its operations as previously or presently conducted.

3.11   Governmental Consent, etc.   Except as set forth on HSUS's Schedule no permit, consent, approval or authorization of, or declaration to or filing with, any governmental or regulatory authority is required in connection with the execution delivery or performance of this Agreement by HSUS, or the consummation by HSUS of any of the transactions contemplated hereby and thereby.

3.12   Employees.   Except as set forth in HSUS's Schedule, to the best of HSUS's knowledge, no key employee nor group of HSUS's employees has any plans to terminate employment with HSUS.   Except as set forth in its Schedule, HSUS has complied in all material respects with all applicable laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, and the payment of social security and other taxes.   HSUS has no material labor relations problems, and there have been no union organization efforts by employees of HSUS.

3.13   Employee Benefit Plans.

(a)   The Employee Benefits information heretofore delivered to Fund, contains a list and a true and correct copy, including all amendments thereto, of any employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which HSUS maintains, to which HSUS contributes, or under which any employee or former employee, officer or former officer, director or former director of HSUS is covered or has benefit rights and pursuant to which any liability of HSUS exists or is reasonably likely to occur, and each other arrangement, program, or plan pursuant to which any benefit is or shall be provided to an employee, former employee, or retired employee, whether formal or informal, including, without limitation, those providing any form of medical, health, and dental insurance, severance pay and benefits continuation, relocation assistance, vacation pay, tuition aid, and matching gifts for charitable contributions to educational or cultural institutions (collectively, the "Benefit Plans").   Except as set forth on the "Employee Benefits Schedules," HSUS neither maintains nor has entered into any Benefit Plan or other document, plan, or agreement which contains any change in control provisions which would cause an increase or acceleration of benefits or benefit entitlements to employees or former employees of HSUS or their respective beneficiaries, or other provisions, which would cause an increase in liability of HSUS or to Fund as a result of the transactions contemplated by this Agreement or an related action thereafter.   To the extent such laws or regulations are applicable thereto, of such plan that is an employee pension benefit plan within the meaning of Section 3(2) of ERISA that is intended to be a qualified plan under Section 401(a) of the Code has been amended to comply in all material respects with current law as required and each such plan either has obtained a favorable determination letter with respect to such amendment or the remedial amendment period for such amendment under Section 401(b) of the Code has not expired.

(b)   Except as set forth on HSUS's Schedule, all accrued contributions and other payments to be made by HSUS or any ERISA Affiliate (as defined in Section 3.18(e)) to any Benefit

19

Plan through the date of the Financial Statements have been made or reserves adequate for such purposes as of the date of the Financial Statements have been set aside therefore and reflected on the Financial Statements. HSUS is not in material default in performing any of its contractual obligations under any of the Benefit Plans of any related trust agreement or insurance contract, and there are not material outstanding liabilities of any Benefit Plan other than liabilities for benefits to be paid to participants in such Benefit Plan.

(c) There is no pending litigation or, to the best knowledge of HSUS, overtly threatened litigation or pending claim (other than benefit claims made in the ordinary course) by or on behalf of or against any of the Benefit Plans (or with respect to the administration of any of the Benefit Plans) now or heretofore maintained by HSUS which allege violations of applicable state or federal law.

(d) To the best of HSUS's knowledge, each Benefit Plan is and has been in compliance in all material respects with, and each such Plan is and has been operated in accordance with the applicable laws, rules and regulations governing such Plan, including, without limitation, the rules and regulations promulgated by the Department of Labor, the Pension Benefit Guaranty Corporation ("PBGC") and the IRS under ERISA, the Code or any other applicable law.

(e) Neither HSUS nor any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with HSUS would be deemed a "single employer" within the meaning of Section 4001 of ERISA, has incurred, nor to the best knowledge of HSUS is reasonably likely to incur, any liability under Title IV of ERISA in connection with any plan subject to the provisions of Title IV of ERISA now or heretofore maintained or contributed to by HSUS or any ERISA Affiliate. No condition exists that presents a material risk to HSUS or any ERISA Affiliate of incurring a liability under Title IV of ERISA with respect to Benefit Plans, other than liability for premiums due to the PBGC. The PBGC has not instituted proceedings to terminate any of the ERISA Plans and no condition known to HSUS exists that presents a material risk that such proceedings shall be instituted. All reporting and disclosure requirements of ERISA and the Code have been satisfied in all material respects with respect to each of the Benefit Plans. Neither HSUS nor any ERISA Affiliate is required to contribute to an employee benefit plan that is a "multiemployer plan" within the meaning of Section 3(37) of ERISA nor has been so required during the five-year period ending on the Closing Date.

(f) Neither HSUS nor any member of a "controlled group," as defined in Section 4971(e)(2)(B) of the Code, of which HSUS is a member has any liability on account of any accumulated funding deficiency (as defined in Section 412 of the Code) or on account of any failure to make contributions to or pay benefits under any such plan, nor is HSUS aware of any claim pending or threatened to be brought by any party regarding such matters. No prohibited transaction has occurred with respect to any Benefit Plan that would result, directly or indirectly, in the imposition of any excise tax under Section 4975 of the Code; nor has any reportable event under Section 4043 of ERISA occurred with respect to any Benefit Plan.

3.14   Insurance. The insurance information heretofore delivered to Fund lists and briefly

20

describes each material insurance policy maintained by HSUS with respect to its assets or operations. All of such insurance policies are in full force and effect, and HSUS is not and has never been in material default with respect to its obligations under any of such insurance policies. Such insurance coverage is customary for well insured entities engaged in similar operations.

3.15   <u>Compliance with Laws; Permits; Certain Operations</u>.   HSUS and its officers, directors, agents, and employees have complied in all material respects with all applicable laws and regulations of foreign, federal, state, and local governments and all agencies thereof which affect their operations or to which HSUS may otherwise be subject, and no claims have been filed against HSUS alleging a violation of any such law or regulation, except as set forth on the HSUS's Schedule. HSUS holds all of the permits, licenses, certificates, and other authorizations of federal, state, and local governmental agencies required for the conduct of its operations.

3.16   <u>Environmental Matters</u>.

(a).   Except as set forth on the HSUS's Schedule, HSUS has not received notice alleging in any manner that HSUS is, or might be potentially, responsible for any release of hazardous materials, or any costs arising under or in violation of environmental laws with respect to the Purchased Assets or its operations.

(b)   None of the real estate owned, leased, or operated by HSUS is or has been listed on the United States environmental Protection Agency National Priorities List of Hazardous Waste Sites, or any other list, schedule, law, inventory, or record of hazardous or solid waste sites maintained by any federal, state, or local agency.

(c)   No lien has been attached or filed against HSUS with respect to the Assets in favor of any governmental or private entity for (i) any liability or imposition of costs under or in violation of any applicable environmental law; or (ii) any release of hazardous materials.

3.17   <u>Disclosure</u>. Neither this Agreement nor any of the schedules, attachments, or exhibits hereto contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading. There is no material fact which has not been disclosed in writing to Fund of which any officer, director, or key employee of HSUS is aware and which materially adversely affects or could reasonably be anticipated to materially and adversely affect the Business or the Purchased Assets.

3.18   <u>Closing Date</u>. All of the representations and warranties of HSUS in this Article 3 and elsewhere in this Agreement and all information delivered in any schedule, attachment, or exhibit hereto or in any certificate delivered to Fund are true and correct in all respects on the date of this Agreement and shall be true and correct in all respects on the Closing Date.

ARTICLE 4

COVENANTS AT OR PRIOR TO CLOSING

4.1    Affirmative Covenants.   At or prior to the Closing, as the paragraphs below may call for, Fund shall:

(a)    conduct its operations only in the usual and ordinary course of business in accordance with past custom and practice

(b)    keep in full force and effect its corporate existence and all material rights, franchises, and intellectual property relating to or pertaining to its operations;

(c)    use best efforts to retain its employees and preserve its present relationships, and continue to compensate its employees in accordance with past custom and practice;

(d)    maintain Assets in customary repair, order and condition and in the event of any casualty, loss or damage to any of the Assets prior to Closing, transfer or assign HSUS at Closing the proceeds of any insurance recovery with respect thereto;

(e)    maintain its books, accounts and records in accordance with past custom and practice as used in the preparation of the financial statements described in Section 2.4;

(f)    use best efforts to obtain all consents and approvals necessary or desirable to consummate the transactions contemplated hereby and to cause the other conditions to HSUS's obligation to close to be satisfied;

(g)    promptly inform HSUS in writing of any variances from the representations and warranties contained in Article 2 hereof;

(h)    not terminate or otherwise interfere with Fund insurance policies and coverages whose expiration dates occur after Closing, and take such steps as are possible to obtain the longest extended reporting period, discovery period, or similar benefit available under that policy.

(i)    take all appropriate corporate action to: (A) elect, effective as of 12:01 A.M. Eastern Standard Time on the day after Closing, as voting members of the Fund, HSUS designees – who shall be identified, by their official positions within the HSUS, in writing to the Fund at least twenty (20) days prior to Closing; (B) elect, effective as of 12:01 A.M. Eastern Standard Time on the day after Closing, as members of the Fund's board of directors, HSUS designees whose names shall be delivered in writing to the Fund at least twenty (20) days prior to Closing; and (C) if not prohibited by New York State law, amend §2.01 of the Fund's By-Laws to provide, effective as of the 2005 annual meeting of the Fund, that the

22

voting members of the Fund shall consist of the persons designated by a vote of the HSUS's board of directors;

      (j)    prepare and have executed letters of resignation for all current voting members of the Fund and all current members of the Fund's board of directors, which resignations shall take effect at midnight of the day of Closing;

      (k)    have delivered to HSUS via facsimile (to the attention of the Chief Financial Officer, G. Thomas Waite, III at fax number 301-548-7726) not less than fifteen (15) days prior to Closing, the following documents:

      (A)    Smith Affiliated Capital Corporation's month-end (i.e., November 30, 2004) "Portfolio Valuations" for Account Nos. 137-003697 (Black Beauty), 153-003788 (General Endowment), and 158 (Gift Annuity Fund) with a copy faxed to "Chuck" Violand of Grant Thornton at (703) 848-9583;

      (B)    Interim financial statements for 2004 current to October 31, 2004, or later, consisting of a balance sheet, an income and expense statement, and a budget-to-expense statement; and

      (C)    A list current to fifteen (15) days prior to Closing, itemizing any debt, bill accrued, or account payable in excess of $10,000. that is not reflected in the interim financial statements referenced in subparagraph (k)(B) above;

      (l)    repay any indebtedness for borrowed money to Deutsche Bank or others, and have released any pledge or other security interest that Deutsche Bank may have with respect to any Fund assets.

      (m)    upon the HSUS's request, file notice(s) of claim(s) with the appropriate insurance carrier(s) of the Fund in the matter of Weinhart v. Traisi, Case No. RIC410746 (Cal. Super. Ct., Riverside County) and with respect to any other possible liability or claim that may arise prior to Closing with respect to which the Fund or the HSUS determines that notice(s) of claim(s) should be filed.

    4.2    <u>Negative Covenants.</u>  Prior to Closing, without the prior written consent of HSUS, Fund shall not:

      (a)    take any written action that would require disclosure under Section 4.1 of this Agreement; and

      (b)    take or omit to take any action which would reasonably be anticipated to have a material and adverse effect upon the Assets.

ARTICLE 5

CONDITIONS TO HSUS'S OBLIGATION TO CLOSE

5.1    Conditions to HSUS's Obligation.   The obligation of HSUS to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions on or before the Closing Date:

(a)    the representations and warranties set forth in Article 2 hereof shall be true and correct at and as of the Closing as though then made and as though the Closing Date was substituted for the date of the Agreement, without taking into account any disclosures made by Fund to HSUS pursuant to Section 2.17 hereof;

(b)    Fund shall have performed all of the covenants and agreements required to be performed by it under this Agreement prior to the Closing;

(c)    There shall have been no material adverse change in the operations, financial condition, or assets of Fund taken as a whole, and there shall have been no material casualty loss or damage to the Assets, whether or not covered by insurance (for purposes of this Section 5.1(c): "material adverse change" to financial condition shall mean a diminution of $1.0 million or more relative to the Fund's total net assets stated in its Latest Balance Sheet, without charging against the $1.0 million the anticipated costs of capital improvements to the Fund's Wildlife Rehabilitation Center at Ramona, California (c. $600,000.) and the anticipated costs of the Fund's media advertising related to its anti-fur campaign in late 2004 (c. $600,000.); and "material casualty loss or damage" shall mean loss or damage of $500,000. or more);

(d)    All governmental filings, authorizations, and approvals that are required for the consummation of the transactions contemplated hereby shall have been duly made and obtained on terms and conditions satisfactory to HSUS;

(e)    All consents by third parties that are required for the transfer of the Assets to HSUS as contemplated herby, that are required for the consummation of the transactions completed hereby, that are required to prevent a breach of, or a default under or a termination or modification, of any instrument, contract license, lease or other agreement to which Fund is a party or to which any of the Assets is subject, and releases of all liens, security interests, and claims of others on the Assets shall have been obtained on terms and conditions satisfactory to HSUS;

(f)    No action or proceeding before any court or governmental body shall be pending or threatened which, in the judgment of HSUS, made in good faith and upon the advice of counsel, makes it inadvisable or undesirable to consummate the transactions

24

contemplated hereby, declare unlawful the transactions contemplated by this Agreement, or cause such transactions to be rescinded;

(g)     All proceedings to be taken by Fund in connection with the consummation of the Closing and the other transactions contemplated hereby and all certificates , opinions, instruments, and other documents required to effect the transactions contemplated hereby reasonably requested by HSUS shall be satisfactory in form and substance to HSUS and its counsel.

## ARTICLE 6

### CONDITIONS TO FUND'S OBLIGATION TO CLOSE

6.1     The obligation of Fund to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions on or before the Closing Date:

(a)     the representatives and warranties set forth in Article 3 hereof shall be true and correct in all material respects at and as of the Closing as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties;

(b)     HSUS shall have performed in all material respects all the covenants and agreements required to be performed by it under this Agreement prior to the Closing;

(c)     all proceedings to be taken by HSUS in connection with the consummation of the Closing and the other transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby reasonably requested by Fund shall be reasonably satisfactory in form and substance to Fund and its counsel;

(d)     HSUS shall have offered employment to qualified employees of Fund subject to the terms and conditions and in accordance with the processes and procedures described in Section 1.5 (b), above;

(e)     Fund shall have obtained the approval of the Supreme Court of the State of New York under New York's Not-for-Profit Corporation Law §§ 510-511.

Any condition specified in this Section 6.1 may be waived by Fund; provided that no such waiver shall be effective against Fund unless it is set forth in a writing executed by Fund that otherwise conforms to Section 11.1.

25

ARTICLE 7

CLOSING TRANSACTIONS

7.1    The Closing. Subject to the conditions contained in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Vedder Price, Edward J. Walsh, Jr., Esq. at 805 Third Avenue in New York, New York at noon local time on December 31, 2004, or at such other place or on such other date as may be mutually agreeable to the parties, — and confirmed in writing — but in no event later than December 31, 2004. The date and time of the Closing are referred to herein as the "Closing Date."

7.2    Action to Be Taken at the Closing. The sale, conveyance, assignment, and delivery of the Assets pursuant to the terms of this Agreement shall take place at the Closing along with the transfer of control and governance of the Fund to the HSUS, and the delivery of all documents in accordance with Section 7.3, below.

7.3    Closing Documents.

(a)    Fund shall deliver to HSUS prior to or at the Closing, as may be appropriate, the following documents and items, duly executed by Fund where necessary to made them effective:

(i)    copies of all necessary third party and governmental consents, approvals, releases, and filings required in order to effect the transactions contemplated by this Agreement, including court approval under New York's Not-for-Profit Corporation Law, §§510-511;

(ii)    such recordable deeds, bills of sale, and instruments of transfer, assignment, conveyance and delivery, as are required in order to transfer to HSUS title to and control of the Assets;

(iii)    Any and all signature cards, assignments, board resolutions, and other instruments effective to transfer ownership and control, as of the Closing Date, to The HSUS of the Fund's liquid assets, including but not limited to those assets described in,

1.    Smith Affiliated Capital Account No. 153-003788 (the Fund's "General Endowment" account);

2.    Smith Affiliated Capital Account No. 137-003697 (the Board-Designated and–Restricted Account for the benefit of the Black Beauty Ranch); and

3.    Smith Affiliated Capital Account No. 158 (the Fund's Gift

26

Annuity Fund).

(iv)    certified copy of the resolution(s) of the Fund's Board of Directors and of the voting members of Fund (as may be necessary) approving or ratifying this Agreement; and certified copies of the minutes recording the actions described in Section 4.1(i), above;

(v)    the lists referenced in Section 1.1(f), which the Fund shall deliver in the electronic and paper formats whose technical specifications HSUS shall provide to the Fund at least twenty (20) days prior to Closing;

(vi)    the letters of resignation called for in Section 4.1(j), above;

(vii)    one or more check(s) or wire transfers payable to "The Humane Society of the United States" effective to transfer to the HSUS all cash except for the $250,000. to be retained by the Fund under Section 1.2(a), above; and

(viii)    such other documents or instruments as HSUS may reasonably request to effect the transactions contemplated hereby.

All of the foregoing documents in this Section 7.3(a) shall be satisfactory in form and substance to HSUS and shall be dated or made effective as of the Closing Date.

(b)    HSUS shall deliver to Fund at the Closing the following items, duly executed by HSUS where necessary to make them effective:

(i)    an assumption agreement, and such other instruments of assumption as are necessary, providing for the assumption by HSUS of Fund's liabilities, which agreements and instruments of assumption shall be consistent with this Agreement;

(ii)    certified copies of the resolutions duly adopted by HSUS's board of directors authorizing the execution, delivery and performance of this Agreement and each of the other agreements contemplated hereby, and the consummation of all other transactions contemplated by this Agreement;

(iii)    copies of all necessary third party and governmental consents, approvals, releases and filings required in order for HSUS to effect the transactions contemplated by this Agreement; and

(iv)    such instruments of assumption and other documents or instruments as Fund reasonably may request to effect the transactions contemplated hereby.

All of the foregoing documents in this Section 7.3(b) shall be reasonably satisfactory in form and substance to Fund and shall be dated or made effective as of the Closing Date.

27

7.4    Nonassignable Contracts.  To the extent that the assignment hereunder by Fund to HSUS of any contract, commitment, license, lease or other agreement of Fund (the "Contracts") is not permitted or is not permitted without the consent of any other party to the Contract, this Agreement shall not be deemed to constitute an assignment of any such Contract if such consent is not given or if such assignment otherwise would constitute a breach of, or cause a loss of contractual benefits under, any such Contract, and HSUS shall assume no obligations or liabilities thereunder. Fund shall use its best efforts to advise HSUS promptly in writing with respect to any Contract which it knows or has reason to believe shall not receive any required consent. If any such consent is not obtained or if such assignment is not permitted irrespective of consent and the Closing hereunder is consummated, Fund shall cooperate with HSUS in any reasonable arrangement designed to provide HSUS with the rights and benefits, subject to the obligations, under the Contract, including enforcement for the benefit of HSUS of any and all rights of Fund against any other person arising out breach or cancellation by such other person and if requested by HSUS, acting as an agent on behalf of HSUS or as HSUS shall otherwise reasonably require, in each case at HSUS's cost.

## ARTICLE 8

## INDEMNIFICATION

8.1    Indemnification by HSUS.  HSUS agrees to indemnify to the fullest extent possible all present and former officers, directors, employees, and agents of Fund (individually an "Indemnified Party", collectively, "Indemnified Parties") and hold them harmless against any loss, liability, damage, expense or cost, including reasonable attorneys fees ("Losses") which any Indemnified Party may suffer, sustain or become subject to as a result of (i) any misrepresentation in any of the representations or breaches of any of the warranties of HSUS contained in this Agreement or (ii) any breach of, or failure to perform any agreement of the HSUS contained in this Agreement, and (iii) any claim or liability of any kind whatsoever against the Fund or any Indemnified Party to which the Indemnified Party would not have been subject, but for the fact that the Indemnified Party was employed by or was an officer, agent, or director of Fund, provided that the claim or liability does not arise from, or is not a result of, fraud, dishonesty, or knowingly wrongful acts by the Indemnified Party and, provided further that, the claim or liability does not arise from, or is not a result of, any fraudulent, dishonest, or knowingly wrongful misrepresentation or breaches of any of the Fund's representations and warranties in this Agreement by the Indemnified Party.

## ARTICLE 9

## TERMINATION

9.1    Termination.  This Agreement may be terminated at any time prior to the Closing,

(a)     by mutual consent of HSUS and Fund;

(b)     by either HSUS or Fund if there has been a material misrepresentation or breach of warranty or breach of covenant on the part of the other party in the representations and warranties or covenants set forth in this Agreement and any such misrepresentation or breach, if capable of cure, is not cured within 15 days after written notice thereof to such other party, or if events have occurred which have made it impossible to satisfy a condition precedent to the terminating party's obligations to consummate the transactions contemplated hereby (other than as a result of any willful act or omission by the terminating party); or

(c)     by either HSUS or Fund if the transactions contemplated hereby have not been consummated by December 31, 2004, or by such later date as the parties may agree; provided that neither HSUS nor Fund shall be entitled to terminate this Agreement pursuant to this subsection (c) if HSUS's or Fund's willful breach of this Agreement, respectively, has prevented the consummation of the transactions contemplated hereby.

(d)     by either HSUS or Fund if, at any time prior to Closing, Wayne Pacelle is for any reason, not ready, willing, and able, to continue as President & CEO of The HSUS.

(e)     by The HSUS if, for any reason, prior to Closing, the Fund's total net assets as stated in its Latest Balance Sheet are diminished by $1.0 million or more, without charging against the $1.0 million the anticipated costs of capital improvements to the Fund's Wildlife Rehabilitation Center at Ramona, California (c. $600,000.) and the anticipated costs of the Fund's media advertising related to its anti-fur campaign in late 2004 (c. $600,000).

9.2     <u>Effect of Termination</u>. In the event of termination of this Agreement as provided above, this Agreement shall forthwith become void, and there shall be no liability on the part of Fund or HSUS, except for willful breaches of this Agreement prior to the time of such termination.

9.3     <u>Effect of Closing</u>. Fund and HSUS shall be deemed to have waived their respective rights to terminate this Agreement upon the completion of the Closing. No such waiver shall constitute a waiver of any other rights arising from the non-fulfillment of any of condition precedent set forth in Article 5 or 6 unless such waiver is made in writing.

ARTICLE 10

ADDITIONAL AGREEMENTS

10.1     <u>Survival</u>. Unless otherwise expressly specified, all provisions of this Agreement will survive Closing and consummation of the transactions contemplated herein. In particular the representations, warranties, covenants and agreements of each party set forth in this Agreement or in any writing delivered to each party to the other in connection with this Agreement shall survive until

29

the third anniversary of the Closing — or until the expiration of the applicable statute of limitations for any underlying cause of action, whichever is later — and the consummation of the transactions contemplated hereby and shall not be affected by any examination made for or on behalf of either party, or the knowledge of any of each party's officers, directors, employees or agents. HSUS agrees not to assert any right or claim based on this Agreement against any present or former officer, director or employee of Fund, unless the right or claim arises from, or is the result of, fraud, dishonesty, or knowingly wrongful acts, or from any fraudulent, dishonest, or knowingly wrongful misrepresentation or breach of any of the Fund's representations and warranties in this Agreement by the officer, director, or employee against whom the claim is asserted.

   10.2   _Mutual Assistance._ Subsequent to the Closing, Fund on the one hand and HSUS on the other, at HSUS's cost, shall assist each other (including making records available) in the preparation of their respective tax or information returns or in connection with any audits or litigation that may ensue as a result of the filing thereof, to the extent that such assistance is reasonably requested.

   10.3   _Press Release and Announcements._ No press release related to this Agreement or the transactions contemplated hereby, or other announcements to the employees, customers or suppliers of Fund shall be issued on or after the date of execution of this Agreement without the joint approval of HSUS and Fund, given through their respective presidents.

   10.4   _Expenses._ Each party shall pay all of its expenses, including legal fees and related expenses, in connection with the negotiation and preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated by this Agreement. HSUS shall pay the cost of recording all documents necessary to place record title in the HSUS. HSUS shall pay any transfer fees, taxes, or impositions on the transfer of the Assets to it.

   10.5   _Further Transfers._ At and after Closing, Fund shall execute and deliver such further instruments of conveyance and transfer and take such additional action as HSUS may reasonably request to effect, consummate, confirm, or evidence the transfer to HSUS of the Assets, and to otherwise execute the terms of this Agreement. Fund shall execute such documents as may be necessary to assist HSUS in preserving or perfecting its rights in the Assets. The preparation, filing, or delivery of any such documents will be at HSUS's sole cost and expense. With respect to Fund's real property interests that are to be transferred to HSUS under Section 1.1, above, and which have or may have encumbrances or defects on the title, the Fund agrees, upon the HSUS's written request, to delay — until after Closing if need be — transferring title and ownership so as to maintain Fund's standing as an insured under Fund's title insurance policies; file appropriate notices of claim under applicable title insurance policies; and otherwise cooperate with HSUS, before and after Closing, at no cost or expense to Fund, in clearing encumbrances and defects from real property titles.

   10.6   _Remittances._ All donations, bequests, distributions from trusts, refunds and the like, received by Fund at any time after the Closing Date shall be immediately turned over to HSUS by Fund. Fund shall cooperate with HSUS, and take such actions as HSUS reasonably requests, to cause remittance to be made directly sent to HSUS.

10.7   Best Efforts to Consummate Closing Transactions.  On the terms and subject to the conditions contained in this Agreement, Fund and HSUS each agrees to use its best efforts to take, or to cause to be taken, all reasonable actions, and to do, or to cause to be done, all reasonable things, necessary, proper, or advisable under applicable laws and regulations to consummate the Closing, including the satisfaction of all conditions thereto set forth herein, and to cooperate with each other in doing so.

## ARTICLE 11

## MISCELLANEOUS

11.1   Amendment and Waiver.  This Agreement may be amended, and any provision of this Agreement may be waived; provided that any such amendment or waiver shall be binding on Fund only if such amendment or waiver is set forth in a writing executed by Fund and that any such amendment or waiver shall be binding upon HSUS only if such amendment or waiver is set forth in a writing executed by HSUS.  Moreover, any such amendment or waiver must also be expressly identified on the writing(s) as an amendment or waiver pertaining to this Agreement.  No course of dealing between or among any persons having any interest in this Agreement shall be deemed effective to modify, amend, or discharge any part of this Agreement or any rights or obligations of any person under or by reason of this Agreement.

11.2   Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when personally delivered or mailed by first class mail, return receipt requested, or when delivered by regulated commercial courier such as Federal Express, having provision for proof of receipt. Notices, demands and communications to Fund or HSUS shall, unless another address is specified in writing in accordance herewith, be sent to the address indicated below:

Notices to Fund

Marian Probst, Board Chair
The Fund for Animals
200 West 57th Street
New York, NY 10019

With a copy to:

Edward J. Walsh, Jr., Esq.
Vedder, Price, Kaufman & Kammholz, P.C.
805 Third Avenue
New York, NY 10022

31

Notices to HSUS

Wayne Pacelle, President & CEO
The HSUS
2100 L Street, N.W.
Washington, D.C. 20037

With copy to:

Roger A. Kindler, General Counsel
The HSUS
Suite 400
2100 L Street, N.W.
Washington, D.C. 20037

11.3   Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but neither this Agreement nor any of the rights, interests, or obligations hereunder of either party shall be assignable without the prior written consent of the other party.

11.4   Severability. If any provisions of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

11.5   No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any person.

11.6   Captions. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption had been used in this Agreement.

11.7   Complete Agreement. This document and the Schedules referred to herein contain the complete agreement between the parties and supersede any prior understandings, negotiations, agreements, or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

11.8   Counterparts. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

11.9   Governing Law. The internal law, not the law of conflicts, of the State of New York

32

shall govern all questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement.

11.10   Effective Date. The effective date of this Agreement shall be the date when the last of the following acts of consent and authorization is completed: each party's representative signs the Agreement, and each party's board of directors (or in the case of the Fund, the voting members and the board) approves the Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

The Fund for Animals, Inc. (Fund)

By:   _Michael Markarian_

        Michael Markarian

Its:   President

Date:   November 22, 2004

The Humane Society of the United States (HSUS)

By:   _Wayne Pacelle_

        Wayne Pacelle

Its:   President & Chief Executive Officer

Date:   11/22/04

33

Schedules to Agreement between the Fund and HSUS

Fund's Schedules

**Schedule § 2.3 (Authorizations)**

The Fund's Lease for office space at 200 West 57th Street, New York, NY would be breached by an assignment unless Landlord's consent is obtained.

**Schedule § 2.5 (Undisclosed Liabilities)**

There are incorporated herein by reference liabilities which might arise from litigation and claims described in sections 2.10; and 2.12 of this Schedule.

**Schedule § 2.7 (Certain Developments)**

There are incorporated herein by reference liabilities which might arise from litigation and claims described in section 2.10 of this Schedule.

Consistent with § 4.1(l) of this Agreement prior to Closing The Fund expects to repay $2,000,000 to Deutsche Bank which will satisfy the security interest in the bank's favor in the Fund's portfolio of securities in the custody account maintained by the Fund with Deutsche Bank.

The Fund has and may from time to time provide non-exclusive royalty free licenses to use its name, logo and other intellectual property to web site operators like Charities USA, Greater Good.com and I Give.com, which solicit charitable contributions on line and to BB&T Bank and MessageIProducts in connection with "affinity credit/charge card programs and sale of printed material (e.g. checks, return address stickers, etc.)

**Schedule §2.9 (Contracts and Commitments)**

. The Fund has issued a promissory note to Deutsche Bank Trust Company Americas ("Deutsche Bank") dated October 16, 2003 and borrowed pursuant thereto two million dollars. The borrowing is secured by a Security Agreement and pledge of securities in the Fund's securities under custody of the Bank.

Fund leases property at 200 West 57th Street, New York, NY for which annual rental exceeds $50,000.

The Fund has a contract dated January 2, 2004 with LW Robbins Associates Inc. for its services in connection with direct mail solicitation of contributions and memberships.

The Fund has agreements with Smith Affiliated Capital Corp. a registered investment advisor pursuant to which Smith Affiliated Capital Corp. manages the Fund's general endowment, Black Beauty Ranch and Planned Giving (annuities) accounts.

The Fund has an agreement with PG CALC, an affiliate of State Street Bank pursuant to which it provides administrative services for the Fund's annuity contracts.

The Fund has a custody agreement with Deutsche Bank pursuant to which it holds securities owned by the Fund in custody.

The Fund writes and there are in effect annuity contracts under its Planned Giving Program.

The Fund leases office space at Woodbridge Ct. and at Fort Mason Center, San Francisco, CA under leases of more than thirty days.

A memorandum of Understanding between National Park Service, BLM and the Fund expiring September 30, 2005, pursuant to which the Fund agrees to accept 100 rescued burros a year.

Agreement with Carol/Trevelynn Strategy Group for web site design and hosting dated 3/27/00.

Agreement with Charities USA dated July 2002 for on line solicitation.

Agreement with BB&T Bank relating to affinity charge/credit cards.

Agreement with Payment Solutions Inc. dated 10/01/00 for electronic transfer of monthly donations.


## Schedule §2.10 (Litigation)

There are two actions pending against the Fund (or its employee Charles Traci) both in the Superior Court for the State of California captioned:

Tiger Rescue v. The State of California, et al.

Weinhardt v. Traci, et al.

The Fund has intervened as defendant in a number of lawsuits contesting the validity or enforcement of animal welfare related laws, rules or regulations. These suits do not present exposure for damages, but rather involve declaratory or equitable relief.

35

**Schedule §2.11 (Governmental Consent)**

Approval of the Supreme Court of the State of New York with notice to the Attorney General.

**Schedule §2.12 (Employees)**

In the past the Fund engaged the services of two "contractors" at its Black Beauty Ranch who might by virtue of their work assignments and hours be considered to be employees. The Fund understands that some time ago one of the contractors suggested that he should have received premium pay for overtime. That person, for reasons unrelated to his wage and hour claim no longer does work for the Fund. In any event, the Fund believes that the Agricultural Exemption to FLSA would exempt it from any liability for premium pay to this person even if he were determined to be an employee.

The Fund has engaged the services of "undocumented aliens" from time to time.

HSUS - FfA Acquisition Agreement

## HSUS Schedules

**Schedule 3.1 (Jurisdictions in which The HSUS is currently registered and authorized to do business as a foreign corporation.)**

| Jurisdiction | Qualif. Date | ID No. |
|---|---|---|
| Arkansas | 06/18/99 | 100172311 |
| California | 03/01/02 | 2379506 |
| Delaware | 11/22/54 | 4481810 |
| District of Columbia | 08/12/63 | 630754-fnp |
| Florida | 11/01/04 | F04000006290 |
| Maryland | 06/10/92 | f03456332 |
| Massachusetts | 03/30/92 | 630225390 |
| Michigan | 09/09/82 | 902238 |
| Montana | 08/16/93 | f024344 |
| New York | 06/22/65 | |
| North Carolina | 04/07/98 | 455641 |
| North Dakota | 03/29/96 | 10851500 |
| Ohio | 09/20/79 | 542106 |
| Oklahoma | 07/25/95 | 4300593498 |
| Pennsylvania | 06/27/57 | 167467 |
| Texas | 06/16/97 | 11575807 |
| Vermont | 08/04/93 | n-08149-0 |

37

Schedule 3.2 (Affiliates).

The Humane Society of the United States - Virginia Branch

The Humane Society of the United States - California Branch

The Humane Society of the United States - Connecticut Branch

The Humane Society of the United States - New Jersey Branch

National Association for Humane and Environmental Education

Center for the Respect of Life and Environment

EarthVoice

Humane Society International

Humane Society International Australian Office, Inc.

The Humane Society of the United States Wildlife Land Trust

Humane Society International for the Protection and Conservation of Animals

HSUS Fund for Animals

Meadowcreek, Inc.

Associacion Humanataria de Costa Rica

The Humane Society Hong Kong Limited

Humane Society International - United Kingdom

Humane Society International - France

Humane Society International - Germany

The National Humane Education Center

EarthKind USA

Animal Kind

The Ark Trust, Inc

Schedule 3.3 (Authorization).

As noted below, the text of the Agreement as executed, (or in executable form) must be approved by The HSUS Board of Directors for the Agreement to be a binding corporate obligation. The HSUS officers' authority is expressly so limited with respect to this transaction.

38

Schedule 3.9(a)(iii) (Loans to Entities).

The HSUS routinely advances funds or otherwise financially supports its controlled affiliated corporations, which is reflected as program or other categories of expenses in The HSUS's Financial Statements. In addition, The HSUS may loan its affiliated § 501(c)(4) organization up to $250,000. in 2004.

Schedule 3.9(a)(vii) (Long-term Contracts, etc.).

As of late September, 2004, The HSUS was a party to the following such contracts.

First, a personal services contract at $200,000. per year that has about 2½ years remaining to its term; second, a publications production contract (services and material) the direct costs of which are about $2.0 million per year and which has about 4 ¾ years before expiration; third, there is a "tech contract" for website management that has twenty-one months left to run. The monthly cost of this third contract to The HSUS ranges from c.$8,500. to c.$13,500. depending upon the "service modules" or website features The HSUS chooses to employ.

As a fourth category, the premises of six of The HSUS's Regional Offices are leased for $2-3,000. per month in rent, each, on a year-to-year or longer basis.

Schedule 3.9(b).  [N/A]

Schedule 3.10 (Litigation).

In June 2004, The HSUS received a one-sentence "Writ of Summons - Civil Action" originating in the Court of Common Pleas, Lancaster County, Pennsylvania, notifying the Society that it had been named as co-defendant in *Stoltzfus d/b/a Puppy Love Kennels vs. Humane League of Lancaster Cy. et al.* (CI-04-05875).

Plaintiffs have not filed any further pleadings or otherwise pursued the litigation. The HSUS has hired local counsel in Philadelphia and has notified its liability insurance carrier.

(In addition, HSUS is routinely involved in litigation involving estates and testamentary proceedings, in its capacity as a named legatee in a will that is being contested, or as some other kind of interested party. HSUS is usually involved as plaintiff, co-plaintiff, or intervenor in animal protection litigation, which hitherto has not resulted in counterclaims or other exposure for damages. The defendant is typically a government agency.)

Schedules 3.11, 3.12, 3.13, and 3.14. [N/A]

Schedule 3.15 Compliance with Laws; Permits, etc.

    (See Schedule 3.1.)

Schedule 3.16 Environmental Matters. [N/A]

               [end of HSUS's Schedules]