# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT

                        DISTRICT OF COLUMBIA

AMERICAN SOCIETY FOR THE                  CIVIL ACTION NO. 03-2006
PREVENTION OF CRUELTY TO
ANIMALS, ET AL

                                          WASHINGTON, D.C.

VERSUS                                    TUESDAY, MARCH 10, 2009

                                          2:40 P.M.

FELD ENTERTAINMENT, INC.                  DAY (18)
```

**TRANSCRIPT OF BENCH TRIAL - AFTERNOON SESSION**

**BEFORE THE HONORABLE EMMET SULLIVAN**

UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF,
    KATHERINE A. MEYER, ESQ.
    TANYA SANERIB, ESQ.
    HOWARD CRYSTAL, ESQ.
    DELCIANNA WINDERS, ESQ.
    Meyer, Glitzenstein & Crystal
    1601 Connecticut Avenue, N.W.
    Suite 700
    Washington, DC  20009
    202-364-4092

FOR THE DEFENDANT,
    LISA JOINER, ESQ.
    KARA PETTEWAY, ESQ.
    JOHN SIMPSON, ESQ.
    MICHELLE PARDO, ESQ.
    LANCE SHEA, ESQ.
    Fulbright & Jaworski, LLP
    801 Pennsylvania Avenue
    Washington, DC  20004
    202-662-4504

WENDY C. RICARD, RPR, CCR
OFFICIAL COURT REPORTER

1   A.   That's correct.

2   Q.   Could we look at Defendant's Exhibit 68, which has
3   already been admitted into evidence. Do you recognize this
4   document, Mr. Markarian?

5   A.   Yes, I do.

6   Q.   And this is the acquisition agreement that was entered
7   into by FFA and HSUS; is it not?

8   A.   Yes.

9   Q.   As part of this asset acquisition agreement, HSUS
10  acquired assets from the Fund for Animals; did it not?

11  A.   That's correct.

12  Q.   And if we look at Section 1.1, which is titled
13  "Acquisition of assets" and I'm paraphrasing, but this
14  paragraph indicates that the Humane Society of the United
15  States purchased, acquired, and accepted from the Fund all
16  assets with the exclusion of assets that were identified in a
17  different section, Section 1.2, correct?

18  A.   That's right.

19  Q.   And if we could go to Section 1.2. And this section
20  identifies the excluded assets, right?

21  A.   Yes. That appears to be right.

22  Q.   And the excluded assets are in letters "A" through "G";
23  cash in the amount of $250,000, correct?

24  A.   Yes.

25  Q.   Books and records relating to the incorporation, correct?

1   A.   Yes.

2   Q.   And, then, letter "C", records relating to certification
3   of financial statements, correct?

4   A.   Yes.

5   Q.   Letter "E" is personal property of officers of the Fund,
6   correct?

7   A.   That's right.

8   Q.   "F" is the right to receive mail and other
9   communications, correct?

10  A.   That's true.

11  Q.   And letter "G" is certain real property, including the
12  Black Beauty Ranch?

13  A.   That's correct.

14  Q.   And pursuant to this agreement, the Humane Society also
15  assumed most of FFA's liabilities; did it not?

16  A.   I believe that's true.

17  Q.   Let's look at Section 1.3 on Page 3 of this document.
18  It's at the bottom of the page, and this is language regarding
19  the assumption of liabilities; is it not?

20  A.   That's correct.

21  Q.   Mr. Markarian, who pays your salary?

22  A.   The Humane Society of the United States.

23  Q.   And on average, how many hours do you spend working on
24  Fund for Animals matters?

25  A.   It varies; maybe an hour a week, more this week.

```
 1   Q.   And you submit that number would be accurate, correct?
 2   A.   Yes, I do.
 3   Q.   Meyer, Glitzenstein & Crystal would actually provide the
 4   money to Mr. Rider; isn't that right?
 5   A.   I believe they reimbursed Mr. Rider for his travel and
 6   other expenses related to the media and educational campaign.
 7   Q.   But the money flowed from Meyer, Glitzenstein & Crystal
 8   on Mr. Rider?
 9   A.   That's right.
10   Q.   And then after MGC -- that's an abbreviation for Meyer,
11   Glitzenstein & Crystal -- after MGC provided the money to Mr.
12   Rider, the funds would then be invoiced on legal bills to the
13   Fund For Animals, correct?
14   A.   That's correct, yes.
15   Q.   And FFA paid those amounts, did it not?
16   A.   Yes, it did.
17   Q.   And the invoices that the Fund For Animals received were
18   dated between June of 2001 and April of 2003, correct?
19   A.   The time frame sounds about right. I'm not sure about
20   the exact months.
21   Q.   FFA was aware that ASPCA, American Society for the
22   Prevention of Cruelty to Animals and AWI, the Animal Welfare
23   Institute, were also receiving invoices for MGC for amounts
24   provided to Mr. Rider, correct?
25   A.   Yes, that's right.
```

```
 1   our objection is that discussing whether and when there was
 2   communications between the plaintiffs goes to media and
 3   legislative --
 4            THE COURT:  Yeah.  I've already ruled on that.  Let's
 5   move on.  I've already ruled on that.
 6            MS. PETTEWAY:  Could we look at Defendant's Exhibit 64,
 7   which is already in evidence.  Mr. Markarian, do you
 8   recognize this document?
 9   A.   Yes, I do.
10   Q.   And this document memorializes the payments that were
11   provided to Mr. Rider in July of 2004; does it not?
12   A.   Yes.
13   Q.   And if I read from this document the second check for
14   $500 to Tom Rider is because we were supposed to send $500 to
15   ASPCA -- excuse me -- and the ASPCA was supposed to send $500
16   and turns out the "A" cannot send $500 until next week, which
17   is too late.  Did I read that correctly?
18   A.   Yes, you did.
19   Q.   And the "A" refers to the ASPCA; does it not?
20   A.   That's right.
21   Q.   Since 2005, FFA has made payments to the Wildlife
22   Advocacy Project; has it not?
23   A.   That's correct.
24   Q.   And, in fact, it's made six payments totaling $11,500.
25   A.   I don't remember the exact amounts, but that sounds
```

1    approximately right to me.

2    Q.  And you moved FFA's payments to Wildlife Advocacy
3    Project, correct?

4    A.  That's right.

5    Q.  And FFA's payments to -- I'll refer to the Wildlife
6    Advocacy Project as "WAP" -- FFA's payments to WAP were drawn
7    on HSUS bank accounts; were they not?

8    A.  Those donations were processed by the HSUS accounting
9    department but they were Fund For Animals expenditures.

10   Q.  And they were drawn on HSUS bank accounts because the
11   Fund For Animals now relies on the administrative function of
12   HSUS, correct?

13   A.  The Fund For Animals as an affiliate of HSUS does rely on
14   the administrative functions of HSUS so that was the mechanism
15   for processing the Fund For Animals' checks.

16   Q.  Now, FFA stated under oath in its answer to interrogatory
17   Number 21 -- excuse me -- that its understanding was that WAP
18   could use FFA's grant money, however it chose, in conjunction
19   with its advocacy and public education work concerning
20   elephants in captivity, did it not?

21   A.  Yes.

22   Q.  And, Mr. Markarian, you testified under oath at an
23   evidentiary hearing in this case that FFA's grants to WAP were
24   not to be used exclusively for Mr. Rider, correct?

25   A.  I don't remember my testimony exactly.

```
 1   about the funding that was provided to or for Mr. Tom Rider?
 2   A.   No, there wasn't.
 3   Q.   You were asked a few questions about the Black Beauty
 4   Ranch.  What is the Black Beauty Ranch?
 5   A.   The Black Beauty Ranch is an animal Sanctuary in east
 6   Texas.  It's about 1,300 acres in size and is home to many
 7   animals who have been rescued from abusive situations or have
 8   been abandoned.
 9   Q.   And why is Babe at -- we talked about Babe earlier today;
10   why is Babe at the Black Beauty Ranch?
11   A.   Babe came to Black Beauty Ranch in 1996, I believe, and
12   she had been in a circus for 10 years; two of her legs were
13   badly injured, and the circus apparently did not want her any
14   longer.  She was not a very good performer with injured legs,
15   so they were willing to bring her to Black Beauty Ranch and
16   she has been there since that time.
17   Q.   Does she have a better life at Black Beauty Ranch than
18   she had in the circus?
19   A.   She has a much better life in our view; she has
20   veterinary care.  She has exercise.  She has a good diet.  She
21   has enrichment.  She is not forced to perform any tricks or do
22   anything that she doesn't want to do.
23   Q.   Does Babe ever spend her days on chains?
24   A.   No.
25   Q.   And is a bull hook ever used on Babe?
```