## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FELD ENTERTAINMENT, INC.** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :     **Case No. 07- 1532 (EGS)** |
| | : |
| **AMERICAN SOCIETY FOR THE** | : |
| **PREVENTION OF CRUELTY** | : |
| **ANIMALS, <u>et al.</u>** | : |
| | : |
| **Defendants.** | : |
| _____ | : |

## PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY OF TERMS ................................................................................ xviii

INTRODUCTION ................................................................................................ 1

    1. Manufacturing Article III jurisdiction ......................................... 2

    2. Defendants' conduct clearly violates RICO ............................... 10

        a. Enterprise ...................................................................... 10

        b. Conducting the enterprise's affairs.............................. 11

        c. Through a pattern of racketeering activity ................... 12

        d. Business injury by reason of the racketeering activity.................. 13

    3. Actions very similar to the conduct alleged here have been
        criminally prosecuted ................................................................ 16

    4. Defendants are not above the law............................................... 18

    5. Defendants cannot transport themselves "back to the future" ............. 20

    6. Defendants cannot hide behind Fed. R. Civ. P. 8........................ 24

ARGUMENT ..................................................................................................... 28

    I.     FEI'S CLAIMS ARE NOT BARRED BY FED. R. CIV. P. 13(A) ............... 28

        A.    Judicial Estoppel Bars Defendants' Argument................................... 28

        B.    The RICO Counterclaim Was Not Subject To Rule 13(a), And
            That Rule Does Not Bar The Instant Case ......................................... 32

            1. Same transaction or occurrence ......................................... 32

            2. Maturity of the counterclaim............................................. 33

    II.    THIS LAWSUIT IS NOT BARRED BY LIMITATIONS............................. 42

    III.   DEFENDANTS HAVE NO NOERR-PENNINGTON IMMUNITY ............ 54

        A.    The First Amendment Does Not Protect Fraud ................................... 54

        B.    The ESA Case Was "Sham" Litigation............................................. 58

    IV.   THE FAC STATES A CAUSE OF ACTION UNDER 18 U.S.C. §
        1962(C) ........................................................................................ 61

        A.    The FAC Alleges A Pattern of Racketeering Activity ....................... 62

        B.    The FAC Adequately Alleges Standing Under Section 1964(c)......... 67

        C.    The FAC Pleads A RICO "Enterprise" Distinct From The
            Perpetrators................................................................................. 70

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| | D. | The FAC Does Not Engage In "Group Pleading" ............................... 72 |
| | E. | The FAC Sufficiently Pleads The Predicate Offenses ......................... 78 |
| V. | | **THE FAC STATES A CLAM FOR MALICIOUS PROSECUTION** .......... 82 |
| VI. | | **THE FAC STATES A CLAIM FOR ABUSE OF PROCESS** ....................... 84 |
| VII. | | **THE FAC STATES A CLAIM FOR CHAMPERTY** .................................... 85 |
| VIII. | | **THE FAC STATES A CLAIM FOR MAINTENANCE** ............................... 87 |
| **CONCLUSION** | | ............................................................................................................. 89 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*131 Main St. Assocs. v. Manko,*
  897 F. Supp. 1507 (S.D.N.Y. 1995)..................................................................76

*Abraham v. Singh,*
  480 F.3d 351 (5th Cir. 2007) .......................................................................63

*Accrued Fin. Serv. v. Prime Retail, Inc.,*
  298 F.3d 291 (4th Cir. 2002) ......................................................................88

*Aktieselskabet Af 21. November 2001 v. Fame Jeans,*
  525 F.3d 8 (D.C. Cir. 2008)........................................................................26

*Allan Block Corp. v. County Materials Corp.,*
  512 F.3d 912 (7th Cir. 2008)......................................................................33

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
  486 U.S. 492 (1988)....................................................................................57

*Allstate Ins. Co. v. Linea Latina De. Acc., Inc.,*
  2011 U.S. Dist. Lexis 16221 (D. Minn. 2011)............................................70

*Am. Fed. of Teachers v. Bullock,*
  539 F. Supp. 2d 161 (D.D.C. 2008), *vacated on other grounds,* 605 F. Supp. 2d
  251 (D.D.C. 2009) ......................................................................................53

*Am. Special Risk Ins. v. Greyhound,*
  1996 U.S. Dist. Lexis 14231 (S.D.N.Y. 1996) ...........................................63

*Ammerman v. Newman,*
  384 A.2d 637 (D.C. 1978) ..........................................................................84

*In re Amtrak,*
  136 F. Supp. 2d 1251 (S.D. Ala. 2001)................................................40, 81

*Ashcroft v. Iqbal,*
  129 S.Ct. 1937 (2009)............................................................................24, 26

*\*ASPCA, et al. v. Feld Entm't, Inc.,*
  244 F.R.D. 49 (D.D.C. 2007)...............................................8, 15, 29, 30, 31,32, 33

*ASPCA, et al. v. Feld Entm't, Inc.,*
  523 F. Supp. 2d 1 (D.D.C. 2007) ...............................................................47

*ASPCA v. Feld Entm't, Inc.,
    677 F. Supp. 2d 55 (D.D.C. 2009), *appeal pending* Nos. 10-7007 & 10-7021
    (D.C. Cir.) ..................3, 4, 5, 8, 9, 10, 13, 21, 22, 24, 35, 38, 57, 58, 60, 61, 68, 72, 82, 83

Bankers Tr. Co. v. Rhoades,
    859 F.2d 1096 (2d Cir. 1988) ......................................................................48, 68

Bates v. Northwestern Human Servs., Inc.,
    466 F. Supp. 2d 69 (D.D.C. 2006) ....................................................................78

Baker v. Gold Seal Liquors, Inc.,
    417 U.S. 467 (1974) ..........................................................................................41

BCCI Holdings (Lux.), S.A. v. Clifford,
    964 F. Supp. 468 (D.D.C. 1997) ..................................................................75, 79

Beard v. Edmondson & Gallagher,
    790 A.2d 541 (D.C. 2002) ....................................................................48, 66, 67

*Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ..........................................................................24, 25, 26, 78

Bill Johnson's Restaurant, Inc. v. NLRB,
    461 U.S. 731 (1983) ..........................................................................................58

Bingham v. Zolt,
    66 F.3d 553 (2d Cir. 1995) ..........................................................................48, 49

Bixby's Food Sys. v. McKay,
    2001 U.S. Dist. Lexis 3355 (N.D. Ill. 2001) ....................................................45

Born Free USA v. Norton,
    278 F. Supp. 2d 5 (D.D.C. 2003), *order vacated as moot*, 2004 WL 180263 (D.C.
    Cir. 2004) ..........................................................................................................27

Boyle v. United States,
    129 S.Ct. 2237 (2009) ................................................................................11, 70

Bridge v. Phoenix Bond & Indem. Co.,
    553 U.S. 639 (2008) ....................................................................................15, 80

Bridgewater v. Double Diamond-Delaware, Inc.,
    2010 U.S. Dist. Lexis 45790 (N.D. Tex. 2010) ....................................72, 78, 79

In re Brown,
    354 B.R. 100 (N.D.W.Va. 2006) ......................................................................87

70938499.1                 

*Brown v. Carr,*
    503 A.2d 1241 (D.C. 1986) ....................................................................82

*Browning v. Clinton,*
    2001 U.S. Dist. Lexis 24537 (D.D.C. 2001) ..........................................43

*Bryant v. Mattel, Inc.,*
    2010 U.S. Dist. Lexis 103851 (C.D. Cal. 2010) .........................16, 65, 66, 78

*Burger v. Kuimelis,*
    325 F. Supp. 2d 1026 (N.D. Cal. 2004) ..................................................68

*Burlington No. R. Co. v. Strong,*
    907 F.2d 707 (7th Cir. 1990) ...........................................................33, 39

*Bussineau v. President & Dir. of Georgetown College,*
    518 A.2d 423 (D.C. 1986) ...............................................................46, 47

*California Motor Transp. Co. v. Trucking Unltd.,*
    404 U.S. 508 (1972)........................................................................55, 57

*Chalabi v. Hashemite Kingdom of Jordan,*
    503 F. Supp. 2d 267 (D.D.C. 2007), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008)......43

*Chevron Corp. v. Bonifaz,*
    2010 U.S. Dist. Lexis 55459 (N.D. Cal. 2010) ......................................61, 83

*Christian v. Lapidus,*
    833 S.W.2d 71 (Tenn. 1992)..............................................................83

*City of New York v. Venkataram,*
    2010 U.S. App. Lexis 21115 (2d Cir. 2010) ............................................80

*Columbia Plaza Corp. v. Sec. Nat'l Bank,*
    525 F.2d 620 (D.C. Cir. 1975)..........................................................33, 41

*Comcast Corp. v. FCC,*
    600 F.3d 642 (D.C. Cir. 2010) ..............................................................22

*\*Connors v. Hallmark & Son Coal Co.,*
    935 F.2d 336 (D.C. Cir. 1991) ..................................................42, 43, 46, 47

*Cox v. Administrator, U.S. Steel,*
    17 F.3d 1386 (11th Cir. 1994) ...............................................................24

*Crown Life Ins. Co. v. American Nat'l Bank & Tr. Co.,*
    35 F.3d 296 (7th Cir. 1994) ..................................................................41

*CSX Transp. v. Gilkison,*
    2010 U.S. App. Lexis 26566 (4th Cir. 2010).........................................................46, 59, 60

*Data Mountain Solutions, Inc. v. Giordano,*
    680 F. Supp. 2d 110 (D.D.C. 2010) ................................................................................32

*Del Webb Comm. Inc. v. Partington,*
    2009 U.S. Dist. Lexis 85616 (D. Nev. 2009).........................................................86, 87, 89

*Design for Bus. Interiors, Inc. v. Hersons, Inc.,*
    659 F. Supp. 1103 (D.D.C. 1986) ...................................................................................87

*Dillard v. Sec. Pac. Brokers, Inc.,*
    835 F.2d 607 (5th Cir. 1988) .........................................................................................39

*Dotson v. Bravo,*
    202 F.R.D. 559 (N.D. Ill. 2001).....................................................................................81

*Eastern R. Presidents Conf. v. Noerr,*
    365 U.S. 127 (1961)..................................................................................................54, 58

*Edmondson & Gallagher v. Alban Towers Ten. Ass'n,*
    48 F.3d 1260 (D.C. Cir. 1995) ...........................................................................65, 66, 67

*Edwards v. Prime Inc.,*
    602 F.3d 1276 (11th Cir. 2010) ......................................................................................64

*Elemary v. Philipp Holzmann A.G.,*
    533 F. Supp. 2d 116 (D.D.C. 2008) ..........................................................................65, 78

*Ellipso, Inc. v. Mann,*
    541 F. Supp. 2d 365 (D.D.C. 2008) ...............................................................................67

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,*
    663 F.2d 253 (D.C. Cir. 1981) .......................................................................................55

*Firestone v. Firestone,*
    76 F.3d 1205 (D.C. Cir. 1996)...............................................................25, 29, 50, 51

*First Am. Corp. v. Al-Nahyan,*
    17 F. Supp. 2d 10 (D.D.C. 1998) .......................................................................20, 21, 72

*First Capital Asset Mgmt. Inc. v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004).............................................................................................72

*Freeman v. Lasky, Haas & Choler,*
    410 F.3d 1180 (9th Cir. 2005) ........................................................................................60

*Friends of the Earth v. Laidlaw Env. Serv., Inc.,*
 528 U.S. 167 (2000)..........................................................................3

*Garrett v. Cassity,*
 2010 U.S. Dist. Lexis 134776 (E.D. Mo. 2010) .............................73, 76, 78, 79

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.,*
 337 F.3d 297 (3d Cir. 2003)..............................................................43, 85

*Golden Commissary Corp. v. Shipley,*
 157 A.2d 810 (D.C. 1960) ...............................................................86, 87, 88

*Goldman v. Bequai,*
 19 F.3d 666 (D.C. Cir. 1994) ...........................................................43, 53

*Gordon v. Nat'l Youth Work Alliance,*
 675 F.2d 356 (D.C. Cir. 1982) ..........................................................42

*Green Ventures LLC v. Guttridge,*
 2010 U.S. Dist. Lexis 127488 (D.S.C. 2010) ...................................79

*Grimmett v. Brown,*
 75 F.3d 506 (9th Cir. 1996) ..............................................................49

*\*H. J. Inc. v. Northwestern Bell Tel. Co.,*
 492 U.S. 229 (1989)..........................................................12, 18, 19, 62, 63, 64

*Hampton Rds. Sanitation Dist. v. McDonnell,*
 360 S.E.2d 841 (Va. 1987)...............................................................53

*\*Handeen v. Lemaire,*
 112 F.3d 1339 (8th Cir. 1997) .........................................................20, 65, 68, 76

*Harbor Ins. Co. v. Cont'l Bank Co.,*
 922 F.2d 357 (7th Cir. 1990) ...........................................................28, 31

*Hartley v. Dombrowski,*
 2010 U.S. Dist. Lexis 110472 (D.D.C. 2010)...................................44

*Hemi Group, LLC v. City of New York,*
 130 S.Ct. 983 (2010).......................................................................13, 14, 68

*Hensley v. Eckerhart,*
 461 U.S. 424 (1983).........................................................................15

*High Voltage Beverages, L.L.C. v. Coca-Cola Co.,*
 2010 U.S. Dist. Lexis 63308 .............................................................87, 89

*Hobson v. Wilson,*
    737 F.2d 1 (D.C. Cir. 1984) ....................................................................50, 51, 64, 67

*Holmberg v. Armbrecht,*
    327 U.S. 392 (1946) ....................................................................................................50

*Hough v. Stockbridge,*
    216 P.3d 1077 (Wash. App. 2009) .............................................................................85

*HSUS v. Babbitt,*
    46 F.3d 93 (D.C. Cir. 1995) ..........................................................................................3

*Huntair, Inc. v. Gladstone,*
    2011 U.S. Dist. Lexis 15817 (N.D. Cal. 2011) ...........................................................65

*Huntingdon Life Sciences, Inc. v. Rokke,*
    986 F. Supp. 982 (E.D. Va. 1997) ..............................................................................19

*Inforizons, Inc. v. VED Software Serv., Inc.,*
    204 F.R.D. 116 (N.D. Ill. 2001) ..................................................................................41

*In re Ins. Brokerage Antitrust Lit.,*
    618 F.3d 300 (3d Cir. 2010) ........................................................................................71

*Jankovic v. Int'l Crisis Group,*
    494 F.3d 1080 (D.C. Cir. 2007) ..................................................................................50

*Javier v. Garcia-Botello,*
    239 F.R.D. 342 (W.D.N.Y. 2006) ........................................................................45, 53

*Jay E. Hayden Found. v. First Neighbor Bank,*
    610 F.3d 382 (7th Cir. 2010) ..........................................................................42, 43, 44

*Joeckel v. Disabled Am. Veterans,*
    793 A.2d 1279 (D.C. 2002) .........................................................................................84

*Johnson v. Computer Tech. Servs.,*
    670 F. Supp. 1036 (D.D.C. 1987) ...............................................................................79

*Jones v. Meridian Towers Apts.,*
    816 F. Supp. 762 (D.D.C. 1993) .................................................................................52

*Jovanovic v. US-Algeria Bus. Council,*
    561 F. Supp. 2d 103 (D.D.C. 2007) ............................................................................50

*JPMorgan Chase Bank, N.A. v. KB Home,*
    2010 U.S. Dist. Lexis 108306 (D. Nev. 2010) ...........................................................88

*Jung v. Mundy, Holt & Mance,*
    P.C., 372 F.3d 429 (D.C. Cir. 2004) ...................................................49

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004) ..........................................................50

*Kerner v. Cult Awareness Network,*
    843 F. Supp. 748 (D.D.C. 1994) ..................................................85, 86

*Kim v. United States,*
    2011 U.S. App. Lexis 2397 (D.C. Cir. 2011) ....................................42

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997) ...................................................................47, 48

*Koro Co., Inc. v. Bristol-Myers Co.,*
    568 F. Supp. 280 (D.D.C. 1983) ..................................................85, 87

*Kuschner v. Nationwide Credit, Inc.,*
    256 F.R.D. 684 (E.D. Cal. 2009) ......................................................40

*Labadie Coal Co. v. Brock,*
    672 F.2d 92 (D.C. Cir. 1982) ............................................................76

*Leatherman v. Tarrant Cty.,*
    507 U.S. 163 (1993) ........................................................................78

*Levy v. Ohl,*
    477 F.3d 988 (8th Cir. 2006) (Missouri law) ...............................82, 83

*Lewis v. Lhu,*
    696 F. Supp. 723 (D.D.C. 1988) ............................................55, 65, 79

*Living Designs, Inc. v. E.I. du Pont de Nemours & Co.,*
    431 F.3d 353 (9th Cir. 2005), *cert. denied,* 547 U.S. 1192 (2006) ......................15, 65, 70

*Local No. 11 v. G. P. Thompson Elec., Inc.,*
    363 F.2d 181 (9th Cir. 1966) ............................................................41

*Lopez v. CAIRAN,*
    657 F. Supp. 2d 104 (D.D.C. 2009) ...................................................67

*Lucas v. D.C.,*
    505 F. Supp. 2d 122 (D.D.C. 2007) .............................................82, 83

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................3, 60, 83

*Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co.,*
 792 F.2d 341 (3d Cir. 1986), *aff'd on other grounds*, 483 U.S. 143 (1987)................14, 68

*Marshall v. Bickel,*
 445 A.2d 606 (D.C. 1982) .................................................................................85

*Mauldin v. WalMart Stores, Inc.,*
 2006 U.S. Dist. Lexis 85189 (N.D. Ga. 2006)................................................18

*McDonald v. Smith,*
 472 U.S. 479 (1985)...........................................................................................54

*In re Medtronic, Inc.,*
 434 F. Supp. 2d 729 (D. Minn. 2006) ..............................................................17

*In re Merrill Lynch Ltd. P'ship Lit.,*
 154 F.3d 56 (2d Cir. 1998).........................................................................47, 49

*Morowitz v. Marvel,*
 423 A.2d 196 (D.C. 1980) .................................................................................84

*Morton v. D.C. Housing Auth.,*
 720 F. Supp. 2d 1 (D.D.C. 2010) ......................................................................48

*Moses v. Howard Univ. Hosp.,*
 606 F.3d 789 (D.C. Cir. 2010) ..............................................................22, 31, 64

*Nader v. DNC,*
 555 F. Supp. 2d 137 (D.D.C. 2008) .............................................................59, 84

*\*Nader v. DNC,*
 567 F.3d 692 (D.C. Cir. 2009) .............................................43, 51, 58, 82, 84

*Napoli v. United States,*
 32 F.3d 31 (2d Cir. 1994).............................................................................76, 77

*National Org. for Women v. Scheidler,*
 510 U.S. 249 (1994).............................................................................................19

*In re New Motor Vehicles Canadian Export Antitrust Lit.,*
 466 F. Supp. 2d 364 (D. Me. 2006) ...................................................................17

*United States ex rel. New v. Rumsfeld,*
 350 F. Supp. 2d 80 (D.D.C. 2004) .....................................................................50

*New York Life Ins. Co. v. Deshotel,*
 142 F.3d 873 (5th Cir. 1998) .............................................................................41

*Newman v. Walker*,
618 S.E.2d 336 (Va. 2005)..................................................................53

*Oceanic Expl. Co. v. ConocoPhillips, Inc.*,
2006 U.S. Dist. Lexis 72231 (D.D.C. 2006).......................................64

*Oregon Natural Res. Council v. Mohla*,
944 F.2d 531 (9th Cir. 1991) ..............................................................58

*In re Organogenesis Sec. Lit.*,
241 F.R.D. 397 (D. Mass. 2007)..........................................................17

*Osprey, Inc. v. Cabana Ltd. P'ship*,
532 S.E.2d (S.C. 2000) .......................................................................88

*Parcoil Corp. v. NOWSCO Well Serv., Ltd.*,
887 F.2d 502 (4th Cir. 1989) ..............................................................65

*Pasquantino v. United States*,
544 U.S. 349 (2005).............................................................................80

*Perkumpulan Inv. Crisis Ctr. v. Regal Fin. Bancorp, Inc.*,
2011 U.S. Dist. Lexis 16132 (W.D. Wash. 2011) ...............................79

*Pilkington v. United Airlines*,
112 F.3d 1532 (11th Cir. 1997) ..........................................................49

*Plunkett v. Poyner*,
2010 U.S. Dist. Lexis 79885 (S.D. Fla. 2010) ....................................25

*Polymer Ind. Prod. Co. v. Bridgestone/Firestone, Inc.*,
347 F.3d 935 (Fed. Cir. 2003)............................................................41

*Prof'l Real Estate Inv., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993).........................................................................59, 61

*Reisner v. Stoller*,
51 F. Supp. 2d 430 (S.D.N.Y. 1999)....................................................48

*Republic Telcom Corp. v. Telemetrics Commc'ns, Inc.*,
634 F. Supp. 767 (D. Minn. 1986) ......................................................41

*\*Reves v. Ernst & Young*,
507 U.S. 170 (1993)...............................................11, 12, 71, 72, 76, 78

*Richards v. Mileski*,
662 F.2d (D.C. Cir. 1981) .............................................50, 51, 52, 54

*Riddell v. Riddell Washington Corp.,
    866 F.2d 1480 (D.C. Cir. 1989) ................................................................43, 51, 52, 53

Rotella v. Wood,
    528 U.S. 549 (2000) ........................................................................................42, 43, 47

RTC v. Stone,
    998 F.2d 1534 (10th Cir. 1993) .................................................................................63

Salinas v. United States,
    522 U.S. 52 (1997) ....................................................................................................82

Santana v. Cook County Bd. of Review,
    270 F.R.D. 388 (N.D. Ill. 2010) ..........................................................................25, 78

Schmuck v. United States,
    489 U.S. 705 (1989) ........................................................................................78, 80, 81

Schoenbaum v. E.I. du Pont de Nemours & Co.,
    2008 U.S. Dist. Lexis 24630 (E.D. Mo. 2008) ........................................................17

Scott v. D.C.,
    101 F.3d 748 (D.C. Cir. 1996) ..................................................................................85

Seattle Times Co. v. Rhinehart,
    467 U.S. 20 (1984) ....................................................................................................85

Sedima, S.P.R.L. v. Imrex Co., Inc.,
    473 U.S. 479 (1985) ..................................................................................................19

Selph v. Nelson,
    966 F.2d 411 (8th Cir. 1992) ....................................................................................45

Shulman v. Miskell,
    626 F.2d 173 (D.C. Cir. 1980) ..................................................................................43

Smith v. Haden,
    872 F. Supp. 1040 (D.D.C. 1994) .............................................................................60

Smith-Haynie v. D.C.,
    155 F.3d 575 (D.C. Cir. 1998) ..................................................................................42

Sosa v. DirecTV, Inc.,
    437 F.3d 923 (9th Cir. 2006) ....................................................................................58

Southern Constr. Co. v. Pickard,
    371 U.S. 57 (1962) ....................................................................................................41

*Steinberg v. St. Paul Mercury Ins.*,
    108 F.R.D. 355 (S.D. Ga. 1985) ...................................................................40

*Stochastic Decisions, Inc. v. DiDomenico*,
    995 F.2d 1158 (2d Cir. 1993)......................................................................68

*Stone v. Dep't of Aviation*,
    453 F.3d 1271 (10th Cir. 2006) ..................................................................31

*Swierkiewcz v. Sorema, N.A.*,
    534 U.S. 506 (2002).....................................................................................78

*In re Text Messaging Antitrust Lit.*,
    2010 U.S. App. Lexis 26299 (7th Cir. 2010)..............................................27

*Truesdale v. DOJ*,
    657 F. Supp. 2d 219 (D.D.C. 2009).............................................................50

*United States v. Adefehinti*,
    510 F.3d 319 (D.C. Cir. 2007) ....................................................................80

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990).........................................................................23

*United States v. Brewster*,
    506 F.2d 62 (D.C. Cir. 1974) ...............................................................23, 56

*United States v. Burden*,
    600 F.3d 204 (2d Cir. 2010).................................................................62, 72

*United States v. Campbell*,
    684 F.2d 141 (D.C. Cir. 1982) ....................................................................22

*United States v. Dean*,
    2011 U.S. App. Lexis 328 (D.C. Cir. 2011) ...............................................21

*United States v. Duke Energy Corp.*,
    232 F.R.D. 1 (D.D.C. 2005)...........................................................................7

*United States v. Gatling*,
    96 F.3d 1511 (D.C. Cir. 1996) ....................................................................22

*\*United States v. Milberg Weiss LLP, et al.*,
    No. 05-cr-0587(D)-JFW (C.D. Cal.)...............................................16, 17, 18

*United States v. Palfrey*,
    499 F. Supp. 2d 34 (D.D.C. 2007) ..............................................................64

*United States v. Philip Morris,*
    327 F. Supp. 2d 13 (D.D.C. 2004) ................................................................70, 82

*United States v. Philip Morris USA,*
    449 F. Supp. 2d 1 (D.D.C. 2006). ........................................................................56

*\*United States v. Philip Morris USA Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) .................................54, 56, 63, 64, 67, 70, 72, 79, 80

*United States v. Project on Gov't Oversight,*
    616 F.3d 544 (D.C. Cir. 2010) .............................................................................23

*United States v. Richardson,*
    167 F.3d 621 (D.C. Cir. 1999) .............................................................................64

*United States v. Russo,*
    104 F.3d 431 (D.C. Cir. 1997) .............................................................................81

*United States v. Schaffer,*
    183 F.3d 833 (D.C. Cir. 1999), *vacated as moot,* 240 F.3d 35 (D.C. Cir. 2001) ..............23

*United States v. Secord,*
    726 F. Supp. 845 (D.D.C. 1989) ..........................................................................23

*United States v. Shamah,*
    624 F.3d 449 (7th Cir. 2010) ...............................................................................72

*United States v. Skilling,*
    130 S.Ct. 2896 (2010) ...................................................................................67, 80

*United States v. Stevens,*
    130 S. Ct. 1577 (2010) ......................................................................................54

*United States v. Sun Diamond Growers of Cal.,*
    526 U.S. 398 (1998) .....................................................................................21, 23

*United States v. Williams,*
    216 F.3d 1099 (D.C. Cir. 2000) .......................................................................23, 42

*\*United States v. Wilson,*
    605 F.3d 985 (D.C. Cir. 2010) ...........................................................63, 64, 67, 70

*Universal Underwriters Ins. Co. v. Sec. Ind., Inc.,*
    391 F. Supp. 326 (W.D. Wash. 1974) ..................................................................40

*Veg-Mix Inc. v. USDA,*
    832 F.2d 601 (D.C. Cir. 1987) .............................................................................50

*Venetian Casino Resort v. NLRB,*
    484 F.3d 601 (D.C. Cir. 2007) .................................................................58

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.,*
    858 F.2d 1075 (5th Cir. 1988) ...............................................................60

*Waddell & Reed Fin., Inc. v. Torchmark Corp.,*
    292 F. Supp. 2d 1270 (D. Kan. 2003) ......................................................40

*WAKA LLC v. DC Kickball,*
    517 F. Supp. 2d 245 (D.D.C. 2007) .........................................................61

*\*Western Assocs. v. Market Square Assocs.,*
    235 F.3d 629 (D.C. Cir. 2001) ...............................................64, 65, 66, 67

*\*Whelan v. Abell,*
    48 F.3d 1247 (D.C. Cir. 1995) ...............................................54, 55, 56, 57

*Whelan v. Abell,*
    953 F.2d 663 (D.C. Cir. 1992) ...........................................................49, 55

*Williams v. Conner,*
    522 F. Supp. 2d 92 (D.D.C. 2007) .....................................................34, 42, 49

*Woolner v. Flair Commc'ns Agency, Inc.,*
    2004 U.S. Dist. Lexis 746 (E.D. Ill. 2004) ...............................................40

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local # 639,*
    883 F.2d 132 (D.C. Cir. 1989), *modified on other grounds,* 913 F.2d 948 (1990),
    *cert. denied,* 501 U.S. 1222 (1991) .......................................................25

*Zernick v. DOJ,*
    630 F. Supp. 2d 24 (D.D.C. 2009) .........................................................67

*State of Indiana ex rel. Zoeller v. Pastrick,*
    696 F. Supp. 2d 970 (N.D. Ind. 2010) ......................................................15

**STATUTES**

16 U.S.C. § 1531 (2006) *et seq* ...........................................................2, 84, 85

16 U.S.C. § 1538 (2006) ....................................................................32

18 U.S.C. § 201 (2006) .........................................................12, 17, 21, 22, 35

18 U.S.C. § 1341 (2006) .................................................................13, 17

18 U.S.C. § 1343 (2006) .................................................................13, 17

18 U.S.C. § 1503 (2006) ...................................................................................12, 17

18 U.S.C. § 1956 (2006) ...................................................................................13, 17

18 U.S.C. § 1961(2006) ...............................................................1, 11, 12, 16, 65

18 U.S.C. § 1962 (2006) ...........................................10, 17, 19, 20, 32, 61, 81, 82

18 U.S.C. § 1964(2006) ....................................................................... 62, 65, 67

18 U.S.C. § 2326 (2006) ....................................................................................79

28 U.S.C. § 1367 (2006) ....................................................................................53

D.C. CODE § 12-301 (2010) ..............................................................................42

D.C. CODE § 12-304 (2010) ..............................................................................45

D.C. CODE § 29-301 (2010) ..............................................................................77

D.C. CODE § 33-103 (2010) ..............................................................................75

N.Y. JUD. CT. ACTS. LAW § 488.2 (Consol. 2010) ..........................................86

N.Y. NOT-FOR-PROFIT CORP. LAW § 905(b)(3) (Consol. 2010) ....................77

VA. CODE ANN. § 8.01-229(D) (2010).............................................................53

VA. CODE ANN. § 8.01-230 (2010) ...................................................................42

VA. CODE ANN. §§ 18.2-499(a), 18.2-500 ....................................................1, 42

**RULES**

Fed. R. Civ. P. 8 ......................................................................24, 25, 34, 42

Fed. R. Civ. P. 9 ................................................................................78, 79

Fed. R. Civ. P. 12 .....................................................................8, 26, 34, 50

Fed. R. Civ. P. 13(a) .....................................24, 28, 29, 30, 31, 32, 34, 40, 41

Fed. R. Civ. P. 13(e) ....................................................................................28

Fed. R. Civ. P. 15 ........................................................................................44

Fed. R. Civ. P. 56 ........................................................................................42

## OTHER AUTHORITIES

6 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1418....................41

6 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1417....................34

W. Page Keeton *et al.*, PROSSER AND KEETON ON THE LAW OF TORTS § 119 ...............................82

D.C. RULES OF PROFESSIONAL CONDUCT, Rule 1.8(d) ..................................................................86

## GLOSSARY OF TERMS

| Term | Explanation |
| --- | --- |
| API | Animal Protection Institute, defendant herein. |
| ASPCA | American Society for the Prevention of Cruelty to Animals, defendant herein. |
| AWI | Animal Welfare Institute, defendant herein. |
| COL | Conclusion of law. |
| Crystal | Howard M. Crystal, defendant herein. |
| DE | A docket entry in the instant case, Civil Action No. 07-1532-EGS (D.D.C.). |
| Def. Mem. | Memorandum and Points of Authorities in Support of Motion of Defendants to Dismiss Plaintiff's Amended Complaint (12-3-10) (DE 54-1). |
| DX | A trial exhibit of the defendant in the ESA Case. |
| ESA | Endangered Species Act, 16 U.S.C. § 1531 *et seq.* |
| ESA Case | The litigation styled, *American Society for the Prevention of Cruelty to Animals, et al. v. Feld Entertainment, Inc.*, Civil Action Nos. 00-1641-EGS & 3-2006-EGS (D.D.C.). |
| [ESA]DE | A docket entry in the ESA Case. |
| FAC | First Amended Complaint of Feld Entertainment, Inc. (2-16-10) (DE 25). |
| FEI | Feld Entertainment, Inc., plaintiff herein. |
| FFA | The Fund for Animals, Inc., defendant herein. |
| FOF | Finding of Fact. |
| Glitzenstein | Eric R. Glitzenstein, defendant herein. |
| HSUS | Humane Society of the United States, defendant herein. |
| HSUS Mot. | Defendant The Humane Society of the United States's Supplemental Motion to Dismiss Plaintiff's Amended Complaint and Memorandum of Points and Authorities in Support (12-3-10) (DE 55). |
| Liss | Cathy Liss, President of AWI, during some or all of time period alleged in FAC. |
| Lovvorn | Jonathan R. Lovvorn, defendant herein. |

| **Term** | **Explanation** |
|----------|-----------------|
| Markarian | Michael Markarian, President of FFA and Executive Vice President of HSUS, during some or all of time period alleged in FAC. |
| Meyer | Katherine A. Meyer, defendant herein. |
| MGC | Meyer, Glitzenstein & Crystal, defendant herein. |
| Ockene | Kimberly D. Ockene, defendant herein. |
| Paquette | Nicole Paquette, General Counsel of API, during some or all of time period alleged in FAC. |
| PAWS | Performing Animal Welfare Society. |
| PETA | People for the Ethical Treatment of Animals. |
| RICO | Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* |
| Rider | Thomas Eugene Rider, defendant herein. |
| Supp. Mot. | Supplemental Motion to Dismiss the Claims Against Attorneys Lovvorn and Ockene, and Memorandum of Law in Support Thereof (12-3-10) (DE 53). |
| USDA | United States Department of Agriculture. |
| WAP | Wildlife Advocacy Project, defendant herein. |
| Weisberg | Lisa Weisberg, Senior Vice President of Government Affairs and Public Policy of ASPCA, during some or all of time period alleged in FAC. |

Plaintiff Feld Entertainment, Inc. ("FEI")[1] hereby opposes the Motion of Defendants to Dismiss Plaintiff's Amended Complaint (12-03-10) (Docket Entry ("DE") 54).[2]

## **INTRODUCTION**

This case involves criminal conduct. The plaintiff is a private corporation, and the remedies sought are civil. But the conduct at issue violates multiple provisions of Title 18, United States Code. Defendants hired a plaintiff for a case that had no real one and paid him to say he had injuries that never existed. The serious threat posed by that conduct to the integrity of the judicial system cannot be overemphasized. That the perpetrators were non-profit groups and their lawyers is no absolution. If anything, counsel's involvement is even more troubling and heightens the scrutiny required. As set out in the First Amended Complaint of Feld Entertainment, Inc. ("FAC") (2-16-10) (DE 25), defendants perpetrated a fraud on the courts in the course of *ASPCA, et al. v. Feld Entertainment, Inc.*, Nos. 00-1641 & 03-2006 (D.D.C.) ("ESA Case"). Defendants did so by violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* They likewise violated the Virginia Conspiracy Act, VA. CODE ANN. §§ 18.2-499(a), 18.2-500, and committed four separate state law intentional torts.

Defendants' brief ("Def. Mem.") (DE 54-1) fails to show otherwise. Instead, defendants attempt to divert attention away from their misconduct by invoking the First Amendment and weak procedural arguments. As shown below, there is no First Amendment (or any other constitutional) right to bribe a witness, to launder the bribes or to obstruct justice when questions about the bribes are asked, and defendants cite no authority in support of such novel

---

[1] An explanatory table of acronyms and abbreviations used herein is located after the Table of Authorities.

[2] Leave to file this brief in excess of the page limit was granted by the Court on March 4, 2011. Minute Order (3-4-11).

propositions.[3]  Defendants' procedural arguments lack merit and several are barred by estoppel in any event.  Defendants also darkly suggest that the instant case will become a platform for re-litigating their claims about alleged elephant "mistreatment" and that they will continue to use the litigation process to harass FEI with discovery on such issues and more.[4]  However, that chapter of the book is closed.  Tom Rider and the other ESA Case plaintiffs have had their day in court while FEI's RICO case was stayed for 3 years at defendants' urging.  Rider's testimony – the linchpin upon which the Court's jurisdiction was invoked – was rejected in its entirety for lack of credibility, *i.e.*, Rider lied.  The present case concerns the consequences of defendants having procured that false testimony and the fraudulent use to which it was put.  Defendants based the ESA Case on a fraudulent jurisdictional predicate, and they cite nothing, nor could they, that excuses their fraud on the ground that the underlying claims were supposedly "meritorious."

**1. Manufacturing Article III jurisdiction.**  Because neither ASPCA, AWI, FFA, API nor any of the lawyer defendants believes that Asian elephants should be exhibited in a circus, because they knew that the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., does not, and never did, ban circus elephants, and because they had been totally unsuccessful in getting elephants out of the circus through complaints to the federal government and other measures, these defendants decided to achieve that result through a "citizen suit" claiming that FEI was "taking" its Asian elephants in violation of section 9 of the ESA.  FAC ¶¶ 2, 9-10, 16.  They targeted FEI because FEI's circus is the most visible in the world, is the one most closely identified with Asian elephants, having exhibited them for more than 140 years, and because FEI

---

[3] There is no way to sugar-coat the reality that this case involves bribes and lies.  Such terms are used herein, not as hyperbole, but as factually accurate descriptors.

[4] Indeed, several of the defendants' initial disclosures and recently served discovery requests make it clear that they seek to re-litigate all elephant "mistreatment" issues in the instant case.

owns the largest, most successful captive breeding population of such animals in North America. *Id.* ¶ 11. However, any holder of elephants in the United States using the same free contact methods of elephant handling used by FEI (the guide and tethers) – and there are many such circuses, zoos and other holders – would ultimately be affected by such a case. *Id.* ¶ 3. The ESA Case was the point of a sword wielded to end exotic animals in entertainment and, ultimately, in captivity, not only through litigation, but through legislative and other fora as well. *Id.* ¶¶ 236-45.

The objectives of the ESA Case were to defraud FEI of its money and property by (i) destroying FEI's circus with a court order confiscating the hallmarks of the show, FEI's Asian elephants; (ii) enjoining use of the guide and tethers, which (as the Court later found after trial[5]) would likewise force FEI's elephants out of traveling performances; (iii) bleeding FEI through the expenditure of legal fees defending a case with no real plaintiff and responding to harassing discovery irrelevant to any "taking" claim but instead freely distributed by defendants to the media, legislative and other arenas, in order either to drain FEI's resources or to extort FEI into removing elephants from the circus to avoid ruinous legal costs (or both); and (iv) regardless of outcome, keeping the litigation going as long as possible to maximize its utility for recovery of legal fees, for publicity and as a fund-raising vehicle for the organizations. FAC ¶¶ 9-11, 57. All of this, however, depended on defendants invoking the federal judicial power by establishing the jurisdiction of a district court under Article III of the Constitution.

Under clear precedent,[6] neither the organizational nor the lawyer defendants had any Article III standing to bring such a "taking" case. However, a person with a direct connection to

---

[5] *ASPCA v. Feld Entm't, Inc.*, 677 F. Supp. 2d 55, 87 (D.D.C. 2009) (Finding of Fact ("FOF") 75), *appeal pending* Nos. 10-7007 &10-7021 (D.C. Cir.).

[6] *E.g., Friends of the Earth v. Laidlaw Env. Serv., Inc.*, 528 U.S. 167 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *HSUS v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995).

the elephants who suffers "aesthetic injury" as a result of the alleged "take" might have standing: enter Tom Rider, a former FEI elephant barn man.  FAC ¶ 4.  The problem with Rider (which became manifest at trial, as found by the Court, 677 F. Supp. 2d at 83-87 (FOF 60-73)) is that Rider really had no "aesthetic injury."  FAC ¶ 4.  He had no bond or attachment with any of FEI's elephants and was not affected by how FEI treated them.  *Id.*  This truth was fatally inconvenient for the claims of the organizations and their lawyers.  Undeterred, these defendants paid Rider to be a plaintiff and to testify falsely that he suffered "aesthetic injury" as a result of FEI's elephant handling practices so that they could bring their case, which commenced on July 11, 2000.  FAC ¶¶ 2-4, 7, 50, 53.

Throughout the pendency of the ESA Case, from July 2000 through at least the trial in 2009, the organizations and the lawyers paid Rider more than $190,000 for his services as a plaintiff and witness.  FAC ¶¶ 5, 19.  Rider had no job.  *Id.*  His co-parties and his lawyers were his sole source of support.  *Id.*  ASPCA, AWI, FFA, API and HSUS all each paid Rider tens of thousands of dollars at various times and in various ways.  FAC ¶¶ 60-178.  Some of these parties paid the money directly to Rider.  *Id.*  Other payments went through MGC, the law firm representing the plaintiffs in the ESA Case, and through WAP, an organization that is controlled by MGC partners Meyer and Glitzenstein and that is the alter ego of MGC.  *Id.* & ¶ 43.  To mask the true purpose of the money, it was falsely characterized as "grants" or "expense reimbursement" for "media work," *id.* ¶¶ 24, 72-178, euphemistic labels that the Court in the ESA Case ultimately rejected.  677 F. Supp. 2d at 78-81, 89 (FOF 48-53; Conclusion of Law ("COL") 5).  For nearly 7 years, Rider used these same false labels to evade federal income tax on the monies he received.  FAC ¶¶ 28-29.  Passing the funds through the law firm and WAP put buffers between the benefactors and Rider and made the money hard to trace.  *Id.* ¶ 62.  It also

created potential roadblocks to inquiry into the money through claims of attorney-client privilege and "associational freedom." *Id.*

When FEI asked questions about the money in discovery in the ESA Case, defendants stone-walled. FAC ¶¶ 30-32, 192-235. As the Court later found after trial, in their answers to interrogatories, responses to document requests and in depositions, defendants resisted FEI's discovery tooth and nail and concealed the payment scheme by omission or affirmatively false statements. *Id.*; 677 F. Supp. 2d at 83 (FOF 59). In June 2004, Rider actually submitted a perjured answer to an interrogatory, flatly denying that he had been paid when, at the time he made this false, sworn statement, he had already been paid more than $50,000 by ASPCA, AWI, FFA, MGC and WAP. FAC ¶¶ 223-30. AWI and FFA similarly offered false Rule 30(b)(6) deposition testimony in July 2005 and concealed their payments to Rider. *Id.* ¶¶ 206-22.[7]

When FEI subpoenaed non-party WAP in July 2005, WAP avoided making any meaningful document production for nearly a year. *See* [ESA]DE 85 at 13-17. In the interim, it produced highly redacted materials that affirmatively misled FEI and the Court. *Id.* at 13.[8]

---

[7] Defendants try to downplay these obstructions by asserting that Rider "agreed to provide FEI with a list of all the funding he had received subject to a confidentiality agreement." Def. Mem. at 9 n.4. This is false. Rider made no such representation about a "list of all the funding." *See* [ESA]DE 476, Att. 14 (DX 16 at 12 (No. 24)). Instead, he lied and said he had "not received any such compensation." *Id.* The Court expressly found *"no excuse* for this false response." 677 F. Supp. 2d at 82 (FOF 55) (emphasis added). Moreover, Rider's confidentiality objection to the rest of the interrogatory was frivolous and was overruled when the Court granted FEI's motion to compel in 2007 and denied Rider a protective order for the information related to the payments. [ESA]DE 178 at 5. Furthermore, Rider himself produced such information in March 2007 without a confidentiality agreement, as did his lawyers when they produced such information without confidentiality through WAP on June 30, 2006. [ESA]DE 126 at 12, 22-23. FEI was not required to accede to these bad faith obstructive tactics in order to get information Rider was required to produce, and should have produced, in June 2004. Rider's disingenuous request for confidentiality for his payments stood in marked contrast to the ESA Case plaintiffs' repeated opposition to any confidentiality order for FEI's documents. *See, e.g.,* [ESA]DE 34.

[8] For example, on April 12, 2005, defendant Meyer paid Rider $5,500 through WAP to buy a van. FAC ¶ 106. When produced originally by WAP on September 29, 2005, the document transmitting this payment redacted both the amount and the purpose of the payment; the unredacted version was produced on June 30, 2006. [ESA]DE 166-21. Similarly, in its September 29, 2005 production, WAP withheld the fact that, after the merger with FFA in January 2005, FAC ¶ 36, HSUS had made at least three payments to WAP to "support" the ESA Case (*i.e.,* to pay Rider). The redacted correspondence deleted the facts that the "donor" was HSUS and that the person sending the money from HSUS to WAP was defendant Lovvorn — an MGC law partner who had since become employed by

Shortly after service of FEI's subpoena, WAP also started generating phony letters signed by Glitzenstein and bogus ledger entries to further the fiction that Rider was receiving "grants" for media work in certain cities, when, in reality, his "media work" was episodic at best, his actual travels had no relation to the cities listed, and he spent much of his time in one place in Florida. FAC ¶¶ 112-23. The cover-up started to fail on June 30, 2006, when WAP produced its IRS Form 1099's and other documents showing thousands of dollars of payments to Rider. *See* [ESA]DE 165 at 46. WAP's ledger, which had redacted all payments to Rider when produced on September 29, 2005, [ESA]DE 87-13, now showed hundreds of systematic payments to Rider, weekly and bi-weekly, for more than 4 years, [ESA]DE 85-5. All of this graphically demonstrated that Rider, ASPCA, AWI and FFA had deliberately concealed the payments in their earlier discovery responses and deposition testimony. On October 12, 2006, in a deposition of Rider noticed by Meyer, further critical facts emerged. Among other things, Rider revealed that he had evaded taxes and that he had no source of money other than WAP and the other ESA Case plaintiffs. FAC ¶ 193. Thereafter, even though the parties engaged in mutual discovery supplementation in January 2007, the organizational plaintiffs continued to conceal their involvement in the Rider payments. *See* [ESA]DE 165-6.

The true scope of the corrupt payment scheme did not finally emerge until late September, 2007, ***after*** the Court ordered the organizations and Rider on August 23, 2007 ([ESA]DE 178) to provide complete and truthful answers to the same interrogatories and production requests that, in 2004, had yielded FEI essentially nothing on Rider's payments. FAC ¶ 32. The result was stunning. Despite false claims of having been "forthright" about the money paid to Rider, defendants produced more than 1,000 pages of documents, 44 revised

---

HSUS and who was counsel of record for plaintiffs in the ESA Case in both his MGC and HSUS capacities. [ESA]DE 166-14, 166-19 & 166-22, 166-24; FAC ¶ 44.

interrogatory answers and 6 declarations. [ESA]DE 198 at 1. Among the materials that had been wrongfully denied and withheld for more than 3 years were at least 8 MGC invoices (that Meyer previously had denied existed, FAC ¶ 81) showing that multiple payments to Rider had passed through MGC from ASPCA, AWI and FFA, as well as an IRS Form 1099 showing that MGC itself had paid Rider nearly $9,000 in 2001 in "non-employee compensation." [ESA]DE 198 at 2-3. Every single plaintiff, including Rider, also supplied elaborate interrogatory answers detailing multiple direct and indirect payments to Rider from 2001 through 2007, when heretofore they had stood mute on the subject or, in Rider's case, had affirmatively lied. FAC ¶¶ 31-31, 196-98; [ESA]DE 476, Att. 14 (DX 16), Att. 15 (DX 21); [ESA]DE 477, Att. 1 (DX 18R), Att. 2 (DX 20R), Att. 3 (DX 19). Clearly, this material should have been disclosed earlier.[9]

On August 29, 2007, six days after the Court ordered the payment information disclosed (and evidently worried about what was going to come out about the Rider payments), the ESA Case plaintiffs tried to add three more "aesthetic injury" plaintiffs with a supplemental complaint: Archelle Hundley and Robert and Margaret Tom. FAC ¶ 266. Unlike Rider, none of these people had even worked with elephants. *Id.* ¶¶ 262, 264. However, they all shared the

---

[9] Defendants overstate the reference to the First Amendment in the August 23, 2007 order. Def. Mem. at 9. The Court raised such issues only with respect to then-non-party WAP's donors; the ruling on media strategy was purely on relevance grounds. [ESA]DE 178 at 9. In the RICO case, however, where WAP is now a party and is alleged to have been used to make and conceal the illegal payments, the First Amendment will not block discovery. *E.g.*, *United States v. Duke Energy Corp.*, 232 F.R.D. 1, 2-3 (D.D.C. 2005).

Defendants also misrepresent the 2008 rulings of Magistrate Judge Facciola ([ESA]DE 326 & 374) as somehow preclusive of the document production and spoliation issues asserted in the FAC. Def. Mem. at 10-11. The contempt proceeding that the Magistrate Judge held concerned the limited issue of whether the ESA Case plaintiffs had complied with the specific terms of the Court's August 23, 2007 order compelling discovery. The Magistrate Judge ruled that the ESA Case plaintiffs had complied with that order and had done a satisfactory search of whatever documents they still had. However, he never addressed the point whether the documents and information that had been produced had been wrongfully withheld for 3 years, nor did he address any of the incidents of spoliation set forth in FAC ¶ 235. Furthermore, when these same issues – delayed production and spoliation – came up at trial in the examination of Weisberg, plaintiffs objected that these matters had already been addressed by the Magistrate Judge, and the objections were overruled. No. 03-2006, 3-10-09 a.m. at 76:18-78:17, 79:8-81:12 (Weisberg).

advantage of ostensibly not having been paid "grants" by the other ESA plaintiffs and the lawyers. *Id.* ¶ 266. The Court denied this amendment on October 25, 2007. [ESA]DE 213 at 9-12. Although these people testified at trial (where it was shown that they were coached and sponsored financially by PETA (an MGC client) and where they demonstrated no more credibility than Rider, FAC ¶¶ 267-72), they all ultimately disappeared. They never filed a "taking" case, despite their own purported 60-day notice letter (drafted by MGC, [ESA]DE 181-3) and their professed "aesthetic injury" over FEI's elephant treatment. FAC ¶ 266.

The Court-ordered payment revelations and the maneuver with Hundley, *et al.*, confirmed that FEI was trapped in a fraudulent case. However, other than going to trial in the ESA Case and exposing the fraud, there was little else that FEI could do about it. FEI tried to add a RICO counterclaim to the ESA Case, but that was denied on August 23, 2007. 244 F.R.D. 49 (D.D.C. 2007). The instant action was filed on August 28, 2007, DE 1, but shortly thereafter stayed – at defendants' behest – pending the outcome of the ESA Case. DE 22 & 23.

The ESA Case had been originally dismissed in 2001 on the ground that neither the organizations nor Rider had any standing. FAC ¶ 50. That determination was reversed on appeal in 2003 as to Rider, due to the deliberately false statements of fact that were made to this Court and the D.C. Circuit by Rider, his counsel and his co-plaintiffs about Rider's purported "aesthetic injury." *Id.* ¶¶ 51-54. These statements were proven untrue at trial in 2009. 677 F. Supp. 2d at 71-72, 83-84, 89-90 (FOF 20, 61-62, COL 6). But Fed. R. Civ. P. 12(b)(6) required the courts to assume they were true in 2001 and 2003 when addressing the standing issue. FAC ¶¶ 53-54. Rider was therefore allowed to proceed on this (then unknown) false predicate. *Id.* Notably, the determination that ASPCA, AWI and FFA, had no standing independent of Rider was not disturbed on appeal, remained in effect for the rest of the ESA Case, was never

reconsidered and was in effect reaffirmed by this Court on October 25, 2007, with respect to all of the organizations, including the recently arrived plaintiff, API. *Id.* ¶ 50; [ESA]DE 213 at 6.

So, as the ESA Case headed to trial in late 2008, the issue whether the Court even had Article III jurisdiction depended entirely on Rider. And that issue turned solely on whether Rider's claim of "aesthetic injury" – a subjective matter as to which only Rider himself could testify – was believable. This was not an issue capable of resolution by dispositive motion; it was quintessentially a fact issue for the finder of fact at trial. Defendants engineered the ESA Case to this point with their corrupt payments, their dogged attempts to hide the money and their false representations to the courts about Rider's standing.

After another year's worth of pre-trial proceedings and trial preparation, the ESA Case went to trial from February 4 through March 18, 2009. FAC ¶ 58. Thirty fact and expert witnesses testified, and hundreds of exhibits were admitted into evidence. *Id.* Rider's "aesthetic injury" story did not survive at trial: Rider was "pulverized" on cross-examination. *Id.* ¶ 59; 677 F. Supp. 2d at 67 & n.12 (FOF 1). Rider's testimony about his "aesthetic injury," for which he had been paid more than $190,000, was found to have no credibility whatsoever. *Id.* This was based, not only on the money, but on his demeanor on the stand in the courtroom during 2 days of testimony and on his own undisputed prior inconsistent statements and actions, which were all well known to the other defendants, some before the ESA Case even began. FAC ¶ 7; 677 F. Supp. 2d at 93-94 (COL 18.1-18.5 & 19). Given Rider's performance at trial, defendants now try to pretend that Rider was not an important witness after all. Def. Mem. at 15 n.11. However, at trial, Rider was the only witness plaintiffs called live who ever worked with FEI's elephants, and the only one who testified about Rider's "aesthetic injury" – the key to Article III jurisdiction. Because Rider failed to prove any "aesthetic injury," he had no Article III standing,

and his claims were dismissed with prejudice. FAC ¶ 59; 677 F. Supp. 2d at 94 (COL 20).

Although they had "piggy-backed" on Rider's standing, ASPCA, AWI and FFA abandoned the case. FAC ¶ 12; 677 F. Supp. 2d at 66 n.10. They filed a motion (which the Court denied) to prevent themselves from being called as witnesses at trial; defaulted on any attempt to prove the facts related to their own standing; and, during the final argument, expressly abjured any claim for relief whatsoever. *Id.*; FAC ¶ 6; [ESA]DE 349 & 387. The only remaining plaintiff, API, was found to have no standing independent of Rider's, resulting in the entry of final judgment in FEI's favor on December 30, 2009, and thus terminating a case that had been predicated on a fraud from the outset. FAC ¶ 59. The entry of that judgment lifted the stay in the instant case that had been in effect since November 7, 2007. DE 22 & 23.

**2. Defendants' conduct clearly violates RICO.** The foregoing facts – all of which are alleged in depth in the FAC, all of which must be assumed as true for purposes of defendants' motion, and all of which are in fact true – establish serious RICO violations. Despite their effort to obfuscate, whether defendants violated RICO is a straightforward analysis.

It is a crime for any person associated with an "enterprise" to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (2006). A person "injured in his business or property by reason of a violation of section 1962 ... may sue therefor in any appropriate United States district court, and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ..." *Id.* § 1964(c) (2006). The FAC clearly and sufficiently pleads all of these elements in full compliance with Fed. R. Civ. P. 8, 9 and 12.

**a. Enterprise.** An "enterprise" can be a corrupt organization or, as here, a "group of individuals associated in fact although not a legal entity" who come together for a corrupt reason.

18 U.S.C. § 1961(4) (2006). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 129 S.Ct. 2237, 2244 (2009). The enterprise here plainly has the structural features required by *Boyle*. With the possible exceptions of WAP, which is the alter ego of MGC, and FFA and HSUS, which have merged, the defendants are all persons or entities legally distinct from each other, and they all do things in life other than sue FEI. FAC ¶¶ 34-46. But these otherwise independent actors associated to bring a lawsuit against FEI based upon a fraudulent jurisdictional predicate propped up by a plaintiff who was hired to claim an injury he did not have. *Id.* ¶¶ 13-32. The enterprise's purposes were to force elephants out of FEI's circus, to drain FEI's resources and to use the ESA Case as a fund-raiser, publicity stunt and source of attorneys fees. *Id.* ¶¶ 2, 9-12. The relationships among these associates are obvious: they were plaintiffs in the fraudulent case, counsel of record for those plaintiffs, and other organizations that lent financial support to the fraudulent case. *Id.* ¶¶ 18-21, 39-46, 82-130, 156-62. Sufficient longevity to pursue the enterprise's purposes is equally obvious: the ESA Case went on for more than 9 years. *Id.* ¶¶ 50, 59.

   **b. Conducting the enterprise's affairs.** Conducting the affairs of the enterprise means that "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Every defendant meets this test. In varying degrees, they all had a direct hand in devising, making, receiving or funding the corrupt payments that fueled the ESA Case; in covering up those payments through obstructive and false discovery responses, false testimony or document spoliation in the ESA Case; in generating documentation and records falsely characterizing the nature of the payments; or in making false statements

about Rider's standing to the courts. FAC ¶¶ 60-235. Defendants include those who were "upper management" in the enterprise, as well as "lower rung participants in the enterprise who [were] under the direction of upper management." *Reves*, 507 U.S. at 184; FAC ¶¶ 60-235.

   c.  **Through a pattern of racketeering activity.** "Racketeering activity" means committing any of the "predicate acts," *i.e.*, the federal or state crimes that are listed in 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires "at least two acts of racketeering activity," not more than 10 years apart, one of which must be after 1970. *Id.* § 1961(5). "[T]o prove a pattern of racketeering activity, a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (original emphasis). The FAC describes, in specific detail (*i.e.*, when and where it happened, who did it and what they did), ***more than 1300 predicate acts*** from May 2001 through the trial of the ESA Case in 2009:

> • On ***at least 672 specifically identified occasions***, Rider was paid and received money by one or more of the defendants, either with a corrupt intent to influence his testimony or, in any event, for or because of such testimony. Each payment and each receipt is a separate violation of the federal bribery or illegal gratuity statute, 18 U.S.C. § 201(b)(3)-(4) & (c)(2)-(3), as well as at least 3 state bribery statutes. FAC ¶¶ 19-22, 27, 64-65, 72-80, 85-86, 90-97, 106, 125-26, 132-34, 137, 146-48, 158-61, 170, 172, 283.

> • On ***at least 18 specifically identified occasions***, one or more of the defendants obstructed justice by providing false discovery responses, false deposition testimony or other false testimony or by spoliating evidence. 18 U.S.C. § 1503(a). FAC ¶¶ 27, 30-32, 184-235, 283.

> • On ***at least 339 specifically identified occasions***, one or more of the defendants used the U.S. mail, a private interstate carrier or an interstate wire to transmit documents in support of the scheme to defraud FEI of its elephants and its money; namely, the payments themselves (none of which was made in person), MGC invoices that falsely labeled the Rider payments as expenses, the phony WAP "grant" letters to Rider, the WAP fundraising materials sent in 2003 and 2005 and all of the other correspondence between and

among the parties falsely describing the Rider payments as "grants" or "reimbursement" for "media expenses." Each such instance violated the mail or wire fraud statute. 18 U.S.C. §§ 1341, 1343. FAC ¶¶ 25-26, 76-77, 98-129, 138-42, 150-54, 163-67, 174-77, 179-83, 283.

● On *at least 339 specifically identified occasions*, one or more of the defendants engaged in transactions to conceal or disguise the fact that the Rider payments were bribes or illegal gratuities or with an intent to evade federal income tax, which Rider successfully accomplished for nearly 7 years. Each such instance is a violation of the money laundering statute. 18 U.S.C. § 1956(a)(1)(A)(ii) & (B)(i). FAC ¶¶ 24, 28-29, 24, 28-29, 76, 80, 130, 143, 155, 168, 178, 283.

Every defendant was involved in this pattern of racketeering activity. Some committed more predicate acts than the others, but they all committed more than two. FAC ¶¶ 60-235. All of these predicate acts were related because they all occurred in support of the fraudulent ESA Case. *Id.* And because the known part of this activity occurred over a period of more than 9 years, it constitutes, or clearly threatens, continued criminal activity. *Id.* ¶¶ 50, 59. Indeed, since Rider testified at trial that he expects payment as long as the ESA Case lasts (and has been on the take since 2000), it is very likely that discovery will show that the racketeering activity continues to this day. *Id.* ¶¶ 124, 280; 677 F. Supp. 2d at 80 (FOF 51).

**d. Business injury by reason of the racketeering activity.** "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of New York*, 130 S.Ct. 983, 989 (2010) (citation omitted). For RICO, "proximate cause … requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* The injury to FEI's business here is the money spent defending the fraudulent ESA case. FAC ¶ 101. The predicate acts directly caused this injury. Had Rider not been paid to claim falsely that he had an "aesthetic injury," there never would have been an ESA Case, and FEI would not have

spent the money it spent defending that case. *Id.* ¶ 7. None of the organizations or lawyer defendants had standing to sue FEI by claiming an "aesthetic injury" over how it handles its elephants. *Id.*[10] Defendants used the mails, wires and private interstate carriers to effectuate the corrupt payment scheme which propelled the case. *Id.* ¶¶ 60-235. And their money laundering and obstructions of justice were not only integral to the payment scheme, but also constituted a separate scheme to cover the payments up. All of these predicate acts directly injured FEI because they all directly caused FEI's expenditure of legal fees on the ESA Case. *Id.*

By the end of 2009, FEI had been forced to spend more than $20 million to defend itself from a case with no real plaintiff. *See* [ESA]DE 575 at 1. As the evidence at trial showed, that amount is equivalent to the cost of caring for FEI's entire 54-elephant herd for approximately 6 years.[11] There is nothing "'too remote,' 'purely contingent,' or 'indirect'" about the injury that defendants willfully inflicted on FEI. *Hemi*, 130 S.Ct. at 989. Indeed, the expenditure of legal fees by FEI was not only foreseeable, it was an intended consequence of defendants' conduct.

Defendants argue that, since FEI's RICO damages are its ESA Case attorneys fees, the RICO claims "circumvent[]" the ESA by "transform[ing] an attorneys' fee claim into a massive RICO lawsuit." Def. Mem. at 1. That alternate routes to recovery of the same sum exist in addition to RICO is beside the point. While FEI cannot obtain double recovery, it is entitled to pursue all avenues of relief. *Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 354-55 (3d Cir. 1986) (attorneys fees incurred in defending a case affected by obstruction of justice were recoverable as damages in later RICO suit even though plaintiff could have sought

---

[10] Although original plaintiff Glenn Ewell had alleged an "aesthetic injury" as well, he disappeared from the case on August 11, 2000, thirty days after the ESA Case began. FAC ¶ 258. Based on what is currently known, it appears that Ewell was in the case for money as well. *Id.* ¶ 259.

[11] $20 million ÷ $62,000 per elephant per year ÷ 54 elephants = 5.97 years. *See* No. 30-2006, 3-3-09 p.m. at 10:3-6 (Feld).

sanctions in the earlier case; "[w]e must assume that by including obstruction of justice among the RICO predicate acts, Congress envisioned the statute being used, where all other requirements are met, to supplement remedies already available for such conduct"), *aff'd on other grounds*, 483 U.S. 143 (1987); *State of Indiana ex rel. Zoeller v. Pastrick*, 696 F. Supp. 2d 970, 982 (N.D. Ind. 2010) (for claims brought under RICO and state law, court will award "greatest of the amounts of damages recoverable under any one of the three statutes"). The Supreme Court has consistently rebuffed arguments like defendants' that attempt "to rewrite RICO ... in order make it conform to a preconceived notion of what Congress intended to proscribe." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 660 (2008) (rejecting argument that "reliance" element needed for mail fraud to prevent RICO from federalizing common law fraud).[12]

Nor are FEI's RICO claims a "rehash [of] the discovery disputes it lost in the ESA litigation." Def. Mem. at 39. As the Court has recognized, the scope of discovery here will be far different than in the ESA Case. 244 F.R.D. at 51. Moreover, FEI prevailed in the ESA Case on the discovery disputes that matter here, namely, its motions to compel production of the payment information from Rider, ASPCA, AWI, FFA and WAP. [ESA]DE 178. And the fact that FEI's obstruction claims rest on defendants' false or misleading discovery responses, spoliation or other false statements in the ESA Case, FAC ¶¶ 192-235, is no defense. *See Living Designs, Inc. v. E.I. du Pont de Nemours & Co.*, 431 F.3d 353, 364 (9th Cir. 2005) (reversing dismissal of RICO claim "predicated on [defendant's] falsification, destruction and

---

[12] Thus, defendants' repeated citation to *Hensley v. Eckerhart*, 461 U.S. 424 (1983), Def. Mem. at 2, 5, 56, 70, is irrelevant. FEI agrees that the attorneys fee phase of a fee-shifting case should not devolve into re-litigating the merits (which should be kept in mind when the ESA Case moves to the fee petition stage). However, this has nothing to do with whether a party can recover, as damages under RICO, attorneys fees incurred in defending a prior case predicated on racketeering activity. Nothing in *Hensley* addresses that point. Defendants' position also rings hollow in light of their position in the ESA Case that FEI is not entitled to recover any attorneys fees. *See* Nos. 03-2006 & 07-1532, Tr. of Hearing at 19 (3-23-10) (counsel for ESA Case plaintiffs).

misrepresentation of evidence;" defendant "has not cited any federal case which holds that a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim"), *cert. denied*, 547 U.S. 1192 (2006); *Bryant v. Mattel, Inc.*, 2010 U.S. Dist. Lexis 103851 at *25 (C.D. Cal. 2010) ("fraudulent statements … made to the Court in order to prevail in the litigation" cognizable under RICO).

**3. Actions very similar to the conduct alleged here have been criminally prosecuted.**

RICO proscribes, *inter alia*, "any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 … 1341 … 1343 … 1503 … 1956." 18 U.S.C. § 1961(1)(B) (definition of "racketeering activity"). Not only is the conduct alleged in the FAC "indictable," very similar conduct has been the subject of a federal criminal prosecution.

In *United States v. Milberg Weiss LLP, et al.*, No. 05-cr-0587(D)-JFW (C.D. Cal.), a federal grand jury indicted a law firm, two of its former named partners and others for a scheme in which the lawyers hired plaintiffs to bring shareholder and other class actions that, without "injured" named plaintiffs, the lawyers could not bring themselves. *See id.*, 2d Superseding Indictment (9-27-07) (DE 353) (Ex. 1 hereto). As summarized by the indictment, *id.* ¶¶ 39-47, the paid plaintiffs bought stock in the targeted corporations, not for investment purposes, but anticipating losses so that they could become securities fraud plaintiffs. Thus, the injuries suffered technically were real, but entirely litigation-motivated. The lawyers paid these plaintiffs additional monies (kickbacks) from the settlement or judgment proceeds. The corrupt payments were made hard to trace by passing them through intermediary lawyers and by camouflaging them as "referral fees," "professional fees" or "fees to others." The defendant law firm itself was at times used as a payment vehicle. Defendants concealed the payments from the courts and from the other members of the class by false statements in certifications, declarations, in

depositions and discovery aimed at the paid plaintiffs, and in court filings.  Based on these facts,

defendants were indicted, *inter alia*, under RICO for a section 1962(d) conspiracy to violate

section 1962(c).  *Id.* ¶¶ 48-54.  The predicate acts underlying the section 1962(c) violation

included obstruction of justice (18 U.S.C. § 1503); mail and wire fraud (*id.* §§ 1341, 1343);

illegal witness payments (*id.* § 201(c)(2)); and money laundering (*id.* § 1956).  *Id.* ¶ 52.

The various indictments in *Milberg Weiss* survived multiple motions to dismiss.  *See* No.

05-cr-0587(D)-JFW (C.D. Cal), DE 332, 335, 474.  The case never went to trial and was

resolved by plea agreements and other dispositions as to the lawyers, the paid plaintiff and the

payment intermediary.  *Id.*, Docket Sheet at pp. 1-13.  Two of the lawyers who had been

involved in engineering and carrying out the payment scheme (Weiss and Schulman) pleaded

guilty to violating section 1962(d).[13]  Weiss was sentenced to 30 months in prison, 3 years

supervised release, a $250,000 fine and forfeiture of $9.75 million.  *Id.*, Docket Sheet at pp. 10-

12 & DE 510-512.  Schulman was sentenced to 6 months in prison, 3 years supervised release, a

$250,000 fine and forfeiture of $1.85 million.  *Id.*, Docket Sheet at pp. 9-10 & DE 541, 571.

Because "a Grand Jury's indictment means that it found probable cause to believe a

criminal act has taken place," *In re Medtronic, Inc.*, 434 F. Supp. 2d 729, 732 (D. Minn. 2006),

the *Milberg Weiss* indictments reverberated in the civil context as well.  The indictments resulted

in removal of the firm as class counsel in some cases, *Schoenbaum v. E.I. du Pont de Nemours &*

*Co.*, 2008 U.S. Dist. Lexis 24630 at *9 (E.D. Mo. 2008); *In re New Motor Vehicles Canadian*

*Export Antitrust Lit.*, 466 F. Supp. 2d 364, 369 (D. Me. 2006); *In re Medtronic*, 434 F. Supp. 2d

at 732; in denial of class certification due to inadequacy of class counsel, *In re Organogenesis*

*Sec. Lit.*, 241 F.R.D. 397, 411 (D. Mass. 2007); and in one court reopening discovery into

---

[13] No. 05-cr-0587(D)-JFW (C.D. Cal.), Plea Agreement for Defendant Melvyn I. Weiss ¶ 4 (3-20-08) (DE 478); Plea
Agreement for Defendant Steven G. Schulman ¶ 4 (9-20-07) (DE 343).

"highly irregular" payments to a class representative, *Mauldin v. WalMart Stores, Inc.*, 2006 U.S. Dist. Lexis 85189 at *10-12 (N.D. Ga. 2006).

As the outcome of *Milberg Weiss* illustrates, the smokescreen that defendants' motion to dismiss attempts to create does not obscure the gravity of the perversion of justice alleged in the FAC. Defendants apparently believe that the purported merits of their "taking" claim in the ESA Case somehow justifies the jurisdictional fraud on the courts that they perpetrated through Rider and his paid-for testimony. Def. Mem. at 40. Defendants cite no authority for this proposition, and there is none. Indeed, in *Milberg Weiss* it was argued that, despite the illegal payment scheme, the defendants there had achieved positive results for the class members in the cases that the firm had handled.[14] However, that did not prevent severe criminal sanctions from being imposed for the admitted RICO violation. The ends did not justify the means in *Milberg Weiss*, and do not do so here.

    **4. Defendants are not above the law.** As they have from the outset of this matter, defendants continue to insinuate that, because they are allegedly "several of the nation's leading animal protection organizations and their counsel, who are devoted to advancing the interests of animals," or are self-proclaimed "private attorneys general" under the ESA, Def. Mem. at 19, 38, they are untouchable by RICO. The Supreme Court has foreclosed such arguments. In *H. J.*, the Court rejected the notion that, because RICO targeted organized crime, civil RICO could not apply to "legitimate businesses":

> "Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises." … ***Legitimate businesses "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences"*** … [Using civil RICO] "against respected businesses allegedly engaged in a pattern of specifically identified

---

[14] *E.g.*, No. 05-cr-0587(D)-JFW (C.D. Cal.), Defendant Melvyn I. Weiss's Sentencing Memorandum at 14 (5-23-08) (DE 497) ("Melvyn Weiss and the firm he built played central roles in obtaining <u>billions</u> of dollars in compensation for millions of aggrieved investors, consumers, and other victims of corporate wrongdoing") (original emphasis).

> criminal conduct is hardly sufficient reason for assuming that the
> provision is being misconstrued."

492 U.S. at 249 (citation omitted; emphasis added).   Likewise, "animal protection organizations

and their counsel" are not inherently incapable of violating RICO and enjoy no immunity for

such violations.   *See also Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495, 499 (1985)

(rejecting argument that a civil RICO action could only lie against a defendant with prior

criminal conviction or only for "racketeering injury"; "[s]ection 1962 ... makes it unlawful for

'any person' – *not just mobsters* – to ... conduct an enterprise through a pattern of racketeering

activity."; "'[The] fact that RICO has been applied in situations not expressly anticipated by

Congress does not demonstrate ambiguity.   It demonstrates *breadth.*'") (citation omitted;

emphasis added); *Huntingdon Life Sciences, Inc. v. Rokke*, 986 F. Supp. 982, 985-89 (E.D. Va.

1997) (§ 1962(c) RICO claim stated against PETA and its employees).

It also does not matter that the object of a RICO enterprise is an ideological, rather than a

purely economic, goal or that the predicate acts were committed to advance a social cause.   In

*National Org. for Women v. Scheidler*, 510 U.S. 249 (1994), the Court held that a RICO

"enterprise" for purposes of section 1962(c) can include a group of anti-abortion protestors, and

squarely rejected the argument that "RICO requires proof that either the racketeering enterprise

or the predicate acts of racketeering were motivated by an economic purpose." *Id*. at 252.   As

the Court observed, "[a]n enterprise surely can have a detrimental influence on interstate or

foreign commerce without having its own profit-seeking motives." *Id*. at 258.   Moreover,

"predicate acts, such as the alleged extortion, may not benefit the protesters financially but still

may drain money from the economy by harming businesses *such as the clinics which are

petitioners in this case.*" *Id*. at 260 (emphasis added).

Nor, given their heavy involvement in the affairs of the enterprise, can the lawyer

defendants in this case hide behind the fiction that they were simply providing "routine" legal services to the other defendants.  As one court observed in reversing a summary judgment against a RICO plaintiff who claimed that the defendant and his lawyers had perpetrated a fraud on a bankruptcy court:

> An attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is bound by generally applicable legislative enactments. ... Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise. The polestar is the activity in question, not the defendant's status.

*Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997).  *See also First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 24-25 (D.D.C. 1998) (in RICO case arising from BCCI scandal, it was jury issue whether "Clifford's and Altman's respective roles as outside counsel so surpassed provision of 'routine legal services' that they can be said to have participated in the operation or management of BCCI [one of the claimed enterprises]").

**5.  Defendants cannot transport themselves "back to the future."**  Defendants try to focus the Court's attention on statements made in interlocutory rulings in 2007 or on statements made during the course of the ESA Case trial before all of the evidence in that case had been presented on defendants' payments to Rider. *E.g.*, Def. Mem. at 11-12.  As explained in depth below, this gets defendants nowhere.  The 2007 statements came during defendants' on-going cover-up of major aspects of the corrupt Rider payment scheme and before the true nature of that enterprise was exposed in the Court-ordered discovery.  Furthermore, *after* presentation of the evidence and cross-examination of the witnesses, the Court's December 30, 2009 decision validated essentially everything that FEI had said in 2007 about the Rider payments and the roadblocks FEI had encountered in obtaining discovery on that issue.  More importantly, the

final decision in the ESA Case, which defendants barely acknowledge in their motion and mostly ignore, undermines their position in this case in several crucial respects.

*First*, the Court found that Rider's trial testimony about his "aesthetic injury" had no credibility at all, *i.e.*, it was untruthful. 677 F. Supp. 2d at 67 (FOF 1). This is largely conclusive on the predicate act of bribery. Since the facts are undisputed that Rider was paid more than $190,000 by his lawyers and the other ESA Case plaintiffs, since the truth (*i.e.*, that Rider had no "aesthetic injury") would have completely defeated any claim of standing that Rider could make, and since the whole case turned on Rider's standing, a reasonable jury could easily find that the money was paid and received with a "corrupt intent" to influence the testimony that Rider gave. *See United States v. Sun Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1998) (bribery requires a "quid pro quo"); *United States v. Dean*, 2011 U.S. App. Lexis 328 at *5 (D.C. Cir. 2011) (same); 18 U.S.C. § 201(b)(3)-(4). In other words, a jury could find that Rider's lies at trial were in exchange for the money he was paid because the ESA Case could only proceed by his lying about an injury that he did not have.

Defendants have already admitted this problem. In 2007, when they eagerly sought and obtained a stay of this case pending the outcome of the ESA Case, defendants argued that the RICO case "centrally concerns Mr. Rider's credibility (i.e., is he participating because he cares about the way the elephants are mistreated and seeks to alleviate their suffering, or because he is a 'bribed' witness?)" DE 5 at 16. Thus, asserted defendants, "a stay would plainly serve the interests of judicial economy and efficiency, since the disposition of the ESA Case ***will have a significant – and likely dispositive – impact*** on the Second RICO Suit ... ." *Id.* at 13 (emphasis added). Indeed such impact will follow – now that it has been proven that Rider was a paid

plaintiff and a paid fact witness with no credibility.  677 F. Supp. 2d at 67 (FOF 1).[15]

**Second**, the Court found that the "primary purpose of the funds paid to Mr. Rider was to secure and maintain his participation in this lawsuit and were not legitimate reimbursements for bona fide media expenses." 677 F. Supp. 2d at 89 (COL 5); *see also id.* at 80-81 (FOF 51-53). In addition to Rider's testimony, this result followed from, *inter alia*, evaluating the live testimony of ASPCA (Weisberg), AWI (Liss), FFA (Markarian) and API (Paquette) as well as the video deposition of Glitzenstein, the 30(b)(6) witness for WAP, who all claimed that "the money is to reimburse Mr. Rider for the expenses he has incurred in conducting a media and educational outreach program." *Id.* at 79 (FOF 48).  As the Court observed, "[t]he Court does not find this testimony to be persuasive." *Id.*  In addition to bribery, the finding on the purpose of the money will be controlling here as to whether defendants paid and received illegal gratuities.  It was not possible for Rider to be an "aesthetic injury" plaintiff without, at a minimum, testifying about that claimed injury.  Thus, the finding as to the money's primary purpose (participation in the case) is a determination that Rider was paid and received the money "for or because of" his testimony. 18 U.S.C. § 201(c)(2)-(3) (2006).

Unlike bribery, which requires a "corrupt intent," accepting or paying an illegal gratuity only requires that the defendant acted "knowingly and willingly." *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996); *see also United States v. Campbell*, 684 F.2d 141, 150 (D.C. Cir. 1982).  While it has to be proven that a bribed act was done in return for the bribe, the act

---

[15] Another "significant impact" of the ESA Case described by defendants in their stay motion was that if the Court found that any of the other plaintiffs had standing, then FEI would have suffered no RICO injury due to the Rider bribes because FEI would have had to defend the case anyway. DE 5 at 19-20.  This did not work out for defendants either because none of the other ESA Case plaintiffs had standing. 677 Supp. 2d at 66 n.10 & 101 (COL 32). Thus, by defendants' own reasoning, FEI suffered a RICO injury by reason of the racketeering alleged in the FAC.  Since they obtained a stay of the instant case by making these representations, defendants are judicially estopped from disavowing them now. *E.g.*, *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010); *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010).  The stay motion was submitted on behalf of Rider, ASPCA, AWI, FFA (which had since merged with HSUS), API, and WAP (defendant MGC's alter ego) and was signed by defendant Crystal (a partner in MGC) and by current counsel for all defendants. DE 5 at 23.  Thus, it binds all defendants.

"for which the gratuity is given might have been done without the gratuity, although the gratuity was produced because of the … act." *United States v. Brewster*, 506 F.2d 62, 72 (D.C. Cir. 1974). *See also United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 966 (D.C. Cir. 1998) ("in contrast to bribery, the gratuity and the official act need not each motivate each other. But the gratuity statute by its terms does still require at least a unidirectional relationship – the gift must be 'for or because of' the act"), *aff'd*, 526 U.S. 398 (1998); *United States v. Secord*, 726 F. Supp. 845, 847 (D.D.C. 1989) ("there need be no 'quid pro quo'" for an illegal gratuity). The defendant's "good faith" is not a defense to an illegal gratuity charge. *United States v. Project on Gov't Oversight*, 616 F.3d 544, 553 (D.C. Cir. 2010) (it is enough that "the perpetrator '[k]now that [his act] ha[s] the characteristics bringing it within the scope of the statute,' not that those characteristics make the acts unlawful") (citation omitted).

Even if the payments had a partially legitimate purpose, the fact that the ***primary purpose*** of the money was to pay Rider for his testimony is all that is required to establish a violation. *See United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) (a payment can be a bribe "where it is sought and paid for both lawful and unlawful purposes"); *see also United States v. Schaffer*, 183 F.3d 833, 843 (D.C. Cir. 1999) ("human beings rarely act for a single purpose alone. …[The question is] whether the acts in question were substantially, or in large part, motivated by the requisite intent to influence"), *vacated as moot*, 240 F.3d 35 (D.C. Cir. 2001). Thus, defendants' mantra-like repetition of the terms "grants" or "reimbursement" for "media" work to describe the Rider payments is unavailing and inconclusive. It is the rare bribery case that has money in envelopes marked "bribes;" there is usually a euphemistic label. *E.g.*, *Brewster*, 506 F.2d at 66 (bribes to a U.S. Senator labeled "campaign contributions"). Even in a criminal case, circumstantial evidence is sufficient to prove a bribe or illegal gratuity. *United States v.*

*Williams*, 216 F.3d 1099, 1103 (D.C. Cir. 2000).   It is notable that, of all the predicate acts

alleged in the FAC, defendants' motion nowhere attacks FEI's claim that defendants violated the

illegal gratuity statute.

*Third*, the Court found that defendants had not been forthright about the Rider payments

during the ESA Case by failing to disclose them "initially in discovery, both by omissions and

affirmatively false statements." 677 F. Supp. 2d at 83 (FOF 59).   The Court specifically found

that there was "no excuse" for Rider's false answer to Interrogatory No. 24, in which Meyer had

participated. *Id*. at 82 (FOF 56).   These findings bear directly on the predicate act of obstruction

of justice.   Indeed, the Court ruled that defendants had successfully obstructed FEI's inquiry into

the payments for more than 3 years, finding that "[t]he true nature and extent of the payments the

organizational plaintiffs had made to Mr. Rider directly or through MGC or WAP was not fully

disclosed until after the Court's order of August 23, 2007, granting FEI's motion to compel the

disclosure of such information." 677 F. Supp. 2d at 82 (FOF 57). *Cf. Cox v. Administrator, U.S.

Steel*, 17 F.3d 1386, 1402 (11th Cir. 1994) ("[a] jury could find it strange that those who insist

that their conduct was proper and pure went to such great lengths to hide it all from the light of

day").   As discussed further below, these findings likewise undermine defendants' arguments

that FEI's claims are somehow barred by Fed. R. Civ. P. 13(a) or by limitations.

**6. Defendants cannot hide behind Fed. R. Civ. P. 8.** Despite the FAC's 129 pages of

detailed pleading, defendants claim that FEI has not given them "notice" of what they have been

accused of doing under the pleading standards of *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).   Defendants know what they are alleged to

have done, as shown by their lengthy brief, which improperly goes outside the four corners of the

FAC and largely argues defendants' side of the facts, underscoring the point that defendants have

"notice" and that the issues involved are factual and not susceptible to resolution on 12(b)(6). *Compare* Def. Mem. at 19 (the FAC rests on "a fictitious premise") *with Plunkett v. Poyner*, 2010 U.S. Dist. Lexis 79885 at *5-6 (S.D. Fla. 2010) (denying RICO dismissal; defendants' claim that complaint was "demonstrably false" was beside the point; "arguments regarding the relative merits of Plaintiff's version of the facts compared with Defendants' version are not germane to a consideration of a motion to dismiss"). Given that they have submitted what amounts to a trial brief, defendants cannot credibly contend that the FAC does not give them notice of the claims against them. *Cf. Twombly*, 550 U.S. at 565 n.10 (lack of notice under Rule 8 arises where defendant "would have *little idea where to begin*" to answer) (emphasis added).

Defendants' demand for further detail reflects an approach that one federal court recently rejected in denying a similarly prolix motion to dismiss a civil RICO claim based upon a "pay to play" bribery scheme: "revisionist transmutation by attempting to turn the *Twombly-Iqbal* pairing into a judicial command to plead evidence. … [T]he *Twombly-Iqbal* duo have *not* inaugurated an era of evidentiary pleading." *Santana v. Cook County Bd. of Review*, 270 F.R.D. 388, 389-90 (N.D. Ill. 2010) (original emphasis). Indeed, in that case, the court held that plaintiff's complaint adequately stated a civil RICO claim, based on the summary of those allegations in the plaintiff's brief opposing the motion to dismiss. *Id.* at 389, 390-92. The instant case is no different. If the Court disagrees as to the requisite factual specificity of the FAC, then FEI should be allowed to provide it with another amended complaint; there is no "defect" identified by defendants that cannot be remedied. *E.g., Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("leave to amend 'almost always' allowed to cure deficiencies in pleading fraud"); *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local # 639*, 883 F.2d 132, 145 (D.C. Cir. 1989) (granting leave to amend to remedy deficiencies in RICO allegations),

*modified on other grounds*, 913 F.2d 948 (1990), *cert. denied*, 501 U.S. 1222 (1991).

It is still the law that the facts alleged in a plaintiff's complaint must be taken as true on a motion under Fed. R. Civ. P. 12(b)(6). *Ashcroft*, 129 S.Ct. at 1949-50; *Twombly*, 550 U.S. at 555. As defendants admit, all that *Twombly/Iqbal* did was move the bar from "conceivable" to "plausible" as to whether a claim for relief has been stated. Def. Mem. at 18. *Twombly* did not adopt a heightened pleading standard, did not change the requirement that a complaint need only include a short and plain statement of the claim, did not alter the point that "*detailed factual allegations are not required*," and did not change the rule that a complaint may proceed if it presents "enough facts to raise a reasonable expectation that discovery will reveal evidence" in support of the claim, even if the court believes that "actual proof of those facts is improbable, and that recovery is very remote and unlikely." 550 U.S. at 555-56 (internal quotes omitted; emphasis added).

The Circuit has concluded that "*Twombly* leaves the longstanding fundamentals of notice pleading intact." *Aktieselskabet Af 21. November 2001 v. Fame Jeans*, 525 F.3d 8, 15 (D.C. Cir. 2008). Thus, when deciding a motion to dismiss, the court "must not make any judgment about the probability of the plaintiff's success, for a complaint may proceed even if it appears that a recovery is very remote and unlikely"; "may not [] dismiss[] based on [its] assessment that the plaintiff will fail to find evidentiary support for his allegations"; and "must assume all the allegations in the complaint are true" and "give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Id*. at 17 (citing, *inter alia*, *Twombly*, 127 S. Ct. at 1965, 1969).

Defendants claim that the FAC "cannot survive 'plausibility' review." Def. Mem. at 20. However, at this stage, before any discovery, the FAC need only "establish a *nonnegligible*

*probability* that the claim is valid." *In re Text Messaging Antitrust Lit.*, 2010 U.S. App. Lexis 26299 at *17 (7th Cir. 2010) (emphasis added). The FAC easily clears this hurdle:

- Given the organizational and lawyer defendants' extreme views against animals in entertainment and in captivity – which were well evidenced in the ESA Case trial[16] and which are well known publicly[17] – as well as their intimate familiarity with Article III standing requirements, a reasonable jury could find it more than plausible that these defendants hired Rider to testify falsely about his "aesthetic injury" in their zeal to pursue their ideological agenda in court. It is entirely plausible that a litigant could pursue a case with an "ends justifies the means" mentality, and assume arrogantly that he/she was above the law because the cause was "in the public interest." It is entirely plausible that such litigant also would spoliate evidence and obstruct inquiry into the payments once its adversary was on the trail.

- Given Rider's own undisputed prior acts and statements and his lack of any source of money other than his lawyers and fellow plaintiffs, a reasonable jury also could find it more than plausible that the unbelievable testimony Rider gave about his "aesthetic injury" was influenced by the money he was paid.

- Given the defendants' abandonment of injunctive relief and forfeiture (to avoid a jury trial) in the ESA Case, after years of arguing that FEI's elephants were being continuously harmed, their admitted use of the litigation to raise donations, and their ultimate request that the Court order a permit proceeding that could take years to complete and that would do

---

[16] No. 03-2006, 3-10-09 a.m. at 11:8-13:8 (Weisberg); 3-10-09 p.m. at 59:1-60:10, 60:21-23 (Markarian); 3-11-09 a.m. at 6:6-14, 6:22-7:1 (Liss); 2-19-09 p.m. at 48:12-49:3 (Paquette).

[17] *See Born Free USA v. Norton*, 278 F. Supp. 2d 5, 25 n.4 (D.D.C. 2003) (noting the statement of Meyer, counsel for plaintiffs in that case (which included AWI and API), that "given the choice plaintiffs *would rather see the elephants dead than in a zoo*") (emphasis added), *order vacated as moot*, 2004 WL 180263 (D.C. Cir. 2004).

nothing to redress Rider's claimed "aesthetic injury," a reasonable jury could find it more than plausible that defendants were motivated by a desire to keep the ESA Case alive as long as possible (at FEI's expense) either to collect legal fees or to maximize the case's potential for publicity and fund-raising. Throwing overboard the only remedies that could have affected how the elephants were treated makes it entirely plausible that the ESA Case was never really about the welfare of the elephants in the first place.

None of this is "fictitious." All of it is more than "plausible."

## ARGUMENT

### I.   FEI'S CLAIMS ARE NOT BARRED BY FED. R. CIV. P. 13(A)

Defendants assert that this case should be dismissed because FEI's claims were compulsory counterclaims in the ESA Case and are barred by Fed. R. Civ. P. 13(a). Def. Mem. at 20-25. This argument is groundless.

#### A.   Judicial Estoppel Bars Defendants' Argument

Defendants' current arguments are totally incompatible with what they said and did when FEI sought leave to assert its counterclaim in the ESA Case in 2007. FEI expressly premised its motion for leave on Rule 15(a), regarding amended pleadings, and Rule 13(e), which governs supplemental counterclaims acquired after a party has already filed a responsive pleading. [ESA]DE 121-1 at 4-5; see Fed. R. Civ. P. 13(e) ("[t]he court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading"). Rule 13(e) requires court permission because "the course of the litigation may be unduly disrupted if the new claims are belatedly injected." *Harbor Ins. Co. v. Cont'l Bank Co.*, 922 F.2d 357, 360-61 (7th Cir. 1990). However, if permission is denied, the Rule 13(e) counterclaim may be filed as a separate lawsuit. *Id.* Thus, FEI argued that "[e]ven though, pursuant to Rule 13(e), FEI's counterclaim is a ***permissive counterclaim that could be***

***brought in an independent action***," it should nonetheless be allowed in the ESA Case. [ESA]DE 121-1 at 9 (emphasis added).

Defendants never contested the point that Rules 15 and 13(e) governed FEI's motion. [ESA]DE 132. Defendants never contested the point that the counterclaim was permissive and could be asserted in a separate action. *Id*. Defendants never even mentioned Rule 13(a), much less argue that FEI's counterclaim was already "barred" as a compulsory counterclaim. *Id*. They never argued that FEI's claim arose out of the same transaction or occurrence as the claims in the ESA Case or that it had "matured" at the time that FEI's responsive pleadings were due. *Id*. If any of these points had merit (and they do not), they were all available to defendants in 2007. Instead, defendants simply argued that the Court should exercise its discretion to disallow the counterclaim – an approach that would have been totally unnecessary if defendants' current compulsory counterclaim arguments were credible. *Id*.

The Court denied FEI's motion based upon the standards governing the exercise of the Court's discretion under Rule 15(a). 244 F.R.D. at 50-51 (citing *Firestone v. Firestone,* 76 F.3d 1205 (D.C. Cir. 1996)). There was no reference whatsoever to Rule 13(a). Defendants' broad assertion (Def. Mem. 20) that denial of the counterclaim meant that FEI's counterclaim was "too late" for all time misstates the Court's ruling. The counterclaim was, in the Court's opinion, "too late" for the ESA Case, given the posture of the case at that time: "a case that is winding down … where discovery can soon be closed and the case can be set for trial on the 'taking' claim." 244 F.R.D. at 51. This was consistent with the Court's ruling two months later when it denied the ESA Case plaintiffs' Rule 15(d) motion to file a supplemental complaint adding Hundley and the Toms. [ESA]DE 213 at 12 ("[t]he Court rejected defendant's proposed counterclaim because plaintiffs would be prejudiced by the late expansion of the lawsuit and defendant's delay in filing

its claim. The Court finds the same potential for prejudice here, and declines plaintiffs' invitation to expand this litigation now with the late addition of parties after so recently narrowing the scope of this case").

Moreover, the Court's decision disallowing FEI's counterclaim undermines the Rule 13(a) argument that defendants now advance. The Court observed that

> [a]ny limited information about payments to or the behavior of Tom Rider that defendant is entitled to in order to challenge the credibility of one plaintiff in this case is *far different* from the *vast amount of information* they would be seeking under the guise of attempting to prove an alleged RICO scheme. ... *The far-reaching nature of defendant's RICO claim* would likely require *substantial additional evidence* ... beyond the evidence already produced on payments to Tom Rider ... [T]here is no reason for the Court to find that discovery on the RICO claim would be anything but *burdensome and lengthy*. Moreover, such discovery would *sidetrack this litigation away from the remaining narrowed "taking" claim that is the central focus of this litigation.* Plaintiffs would be required to devote substantial resources to defending against a RICO claim rather than bringing their "taking" claim to trial.

244 F.R.D. at 51 (emphasis added). These findings are completely inconsistent with defendants' newly minted theory that the RICO claims arose out of the same transaction or occurrence alleged in the ESA Case complaint. The Court also found that FEI had no excuse, from and after *June 30, 2006*, for not seeking to add the counterclaim. *Id.* at 52. This statement was made before the full extent of defendants' corrupt payment scheme and obstruction had been unearthed and the evidence presented at trial. Yet this finding nonetheless refutes defendants' current argument that FEI had "acquired" a "mature" RICO counterclaim at the time it answered the original complaint in 2003 or API's supplemental complaint in March 2006.

Defendants are judicially estopped by their prior statements from now asserting that FEI's counterclaim was compulsory. While they now insist that the RICO claims arose out of the same transaction and occurrence, defendants characterized them as follows in 2007:

"additional, complex issues;" "not peculiarly relevant to the basic action;" "[a]n amendment without a substantive relationship with the case;" "not related to the issues raised in the case," and "remote from other issues in the case." [ESA]DE 132 at 42-43 (citations & internal quote marks omitted).

In addition, defendants' first argument opposing the motion for leave to amend was that it should be held in abeyance because, defendants argued, even if FEI's motion were denied FEI "would almost certainly *refile it [the counterclaim] in another jurisdiction*." *Id.* at 31 (emphasis added). Defendants said this with no reservation that Rule 13(a) would supposedly bar such a lawsuit. That, as defendants recognized, the counterclaim could have been filed as an independent suit, is an admission that the counterclaim was an after-acquired claim governed by Rule 13(e), which is what FEI argued. A Rule 13(e) counterclaim, even one that arises out of the same transaction or occurrence, is permissive and, if not allowed in the original action by permission of the court, can be brought as a separate action. *E.g., Stone v. Dep't of Aviation*, 453 F.3d 1271, 1280-81 (10th Cir. 2006); *Harbor Ins.*, 922 F.2d at 360.

Judicial estoppel arises where (i) a party's later position is clearly inconsistent with its earlier position, (ii) the party succeeded in persuading a court to accept that earlier position, so that judicial acceptance of the inconsistent position would create the appearance that the earlier court was misled; and (iii) the party would derive an unfair advantage if not estopped. *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010). With their arguments in 2007 about remoteness of the issues and that the RICO counterclaim would "unleash a hydra," [ESA]DE 132 at 40, and their frank admission that the counterclaim could be the subject of a separate action, defendants convinced the Court to exercise its discretion under Rules 15(a) and 13(e) and deny FEI's motion for leave to amend. *See* 244 F.R.D. at 52 (proposed counterclaim would

"unleash a Hydra ...'") (citation omitted). Because their 2007 assertions totally contradict their current positions, defendants are estopped from disavowing those assertions now to avoid their day of reckoning on FEI's RICO claims. (Indeed, the only consistency in their arguments in the two matters is defendants' desire to avoid the RICO claims.) To accept defendants' current argument that the RICO claim really did arise out of the same transaction, given all of their statements to the contrary in 2007, would create the clear impression that the Court was misled in 2007. And the unfair advantage – barring the counterclaim – is obvious. "Such crass manipulation of the legal process constitutes an insult to the integrity of the judicial system and fully warrants invocation of the doctrine of judicial estoppel." *Data Mountain Solutions, Inc. v. Giordano*, 680 F. Supp. 2d 110, 128 (D.D.C. 2010).

**B.**     **The RICO Counterclaim Was Not Subject To Rule 13(a), And That Rule Does Not Bar The Instant Case**

Even if defendants were not estopped, their Rule 13(a) argument should be rejected. Defendants cannot establish two critical elements required by Rule 13(a):  (1) that FEI's counterclaim arose "out of the transaction or occurrence that is the subject matter of the [ESA plaintiffs'] claim;" and (2) that FEI "had" the counterclaim, *i.e.*, that it was mature, at the time FEI served responsive pleadings in the ESA Case. Fed. R. Civ. P. 13(a)(1)(A).

**1. Same transaction or occurrence.** The transactions or occurrences sued upon in the ESA Case involved the "very narrow issue," 244 F.R.D. at 52, of how FEI handles its Asian elephants and whether such actions were a "take" in violation of section 9 the ESA, 16 U.S.C. § 1538 (2006). Although there is a connection to the ESA Case, the transactions or occurrences at issue in the RICO case are totally different, namely, "[t]he far-reaching ... claim," 244 F.R.D. at 51, whether defendants violated 18 U.S.C. § 1962(c) and state statutory and common law when they hired Rider to testify falsely in the ESA Case about his purported "aesthetic injury" and

committed other criminal and tortious acts in furtherance of their scheme to destroy FEI's circus. In the ESA Case, the remedies were forfeiture and injunctive and declaratory relief; here, they are actual, treble and punitive damages. The two cases thus clearly raise "'different legal and factual issues governed by different bodies of law'" and therefore the claims in the RICO case do not arise out of the same transaction or occurrence at issue in the ESA Case. *See Burlington No. R. Co. v. Strong*, 907 F.2d 707, 712 (7th Cir. 1990) (citation omitted). And, as this Court has already recognized, "the vast amount of information" needed in discovery in the RICO case is very different from the discovery that was necessary in the ESA Case. 244 F.R.D. at 51. *Cf. Columbia Plaza Corp. v. Sec. Nat'l Bank*, 525 F.2d 620, 626 (D.C. Cir. 1975) ("same transaction" standard satisfied when "the same evidence[] will be considered in both actions, and [the] two proceedings could duplicate discovery").[18]

    **2. "Maturity" of the counterclaim.** Whether or not the RICO counterclaim arose from the same transaction or occurrence at issue in the ESA Case, it is clear that no such counterclaim was "mature" or available to FEI at the time it served an answer to any pleading in the ESA Case. "Even when a counterclaim meets the 'same transaction' test, a party need not assert it as a compulsory counterclaim if it has not matured when the party serves his answer." *Burlington*, 907 F.2d at 712; *see also Allan Block Corp. v. County Materials Corp.*, 512 F.3d 912, 920 (7th Cir. 2008). Defendants claim that FEI had the "essential facts" to sue them under RICO and the other causes of action alleged here at two points in time: on October 8, 2003, when FEI served its answer to the original complaint in No. 03-2006, and on March 15, 2006, when FEI served its

---

[18] Defendants' claim (Def. Mem. at 2, 21-23) that FEI "expressly conceded" that the RICO claim arises out of the same transaction or occurrence in the ESA Case is incorrect. FEI's reference to "part and parcel" was in the context of Rule 13(e) because, even a permissive, after-acquired counterclaim must have a connection to the main action to be properly asserted therein. [ESA]DE 121-1 at 9. This gets defendants nowhere in any event because the Court rejected FEI's characterization. 244 F.R.D. at 51 (proposed RICO counterclaim would "***dramatically change*** the nature of the litigation") (emphasis added).

answer to API's supplemental complaint. Def. Mem. at 22. As with their limitations argument (*see* pp. 42-54, *infra*), this point is entirely factual and not properly subject to 12(b)(6). Defendants' citation to Fed. R. Civ. P. 12(b)(1) is inapposite. Def. Mem. at 5 n.1. The effect of Rule 13(a) is not "jurisdictional" or one of standing. It rests on *res judicata*, waiver or estoppel. 6 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1417 at pp. 149-53 (2010). These are all affirmative defenses, Fed. R. Civ. P. 8(c)(1), and not cognizable under Rule 12(b)(1). *Williams v. Conner*, 522 F. Supp. 2d 92, 102 n.6 (D.D.C. 2007) (*res judicata*). In any event, defendants' maturity argument is flawed and precluded by their own obstructively false statements.

**October 8, 2003.** Defendants claim, falsely, that "FEI knew in 2000 that Mr. Rider was employed by [PAWS]." Def. Mem. at 8, 22. The only thing cited for this assertion is paragraph 61 of the FAC which pleads that Rider had a "security job" with PAWS in 2000, but says nothing at all about **when FEI knew** this. An allegation in an amended complaint – filed on February 16, 2010 – that Rider worked for PAWS in 2000 is obviously not an "admission" that FEI knew about that **in 2000**. Even if FEI had somehow "known" this fact in 2000, it proves nothing. A job with PAWS as a security guard, for which Rider was paid bona fide wages to perform, would not lead to the conclusion that he was being bribed to anchor a lawsuit and be a witness any more than would the salary FEI paid Gary Jacobson (an FEI trial witness) to do his very real job of caring for FEI's elephants. If Rider really had such a job, it would have born on his credibility as a witness, as the bona fide employment of any witness gainfully employed by a party does, but a bona fide salary, standing alone, is not evidence of criminal conduct.[19]

---

[19] The irony of defendants' argument is that Rider admitted at trial in the ESA Case that his "security job" at PAWS was not a real job, No. 03-2006, 2-12-09 p.m. at 67:15-19 (Rider), and, thus, may well have been cover for the money he received to be a plaintiff and witness. The words "security job" and "payroll" came from a May 2001 letter that Rider claims he wrote. [ESA]DE 457, Att. 7 (DX 39). However, each time he was asked about it in

Defendants also point to a May 29, 2002 email string relaying a third-hand account of what Rider apparently told a Rhode Island legislator, [ESA]DE 475 Att. 16 (PWCX 197), but this simply underscores the actions that defendants took to conceal the payment scheme. In the first place, the statement by Rider that "ASPCA pays his expenses for traveling," *id.* at 4, was not true. As was proven at trial in the ESA Case, regardless of the label used, the money ASPCA paid to Rider was to secure his participation in the ESA Case. 677 F. Supp. 2d at 83 (FOF 59). It likewise was false that "ASPCA ... pay[s] for everything." [ESA]DE 475 Att. 16 (PWCX 197) at 4. As of May 2002, Rider had also received thousands of dollars from AWI, FFA, MGC and WAP in cash and other benefits. FAC ¶¶ 72-75, 85-88, 125, 132-33, 136-37, 144, 146-47, 156, 158. Had Rider told the truth to this legislator – *i.e.*, "ASPCA, these other groups and my own lawyers are paying me to be a plaintiff and witness in the case against FEI" – such a statement might have put FEI on notice of something. But, without knowledge of the rest of the payment scheme (which FEI did not have), the Rider statements in this email string indicate nothing nefarious on their face. Even if it were inferred that Rider's "traveling expenses" were for the ESA Case, the bribery statute expressly excludes from its prohibitions paying a witness "the reasonable cost of travel and subsistence incurred." 18 U.S.C. § 201(d).

Other than the foregoing, defendants do not assert that FEI was aware of anything else about Rider payments when FEI answered the complaint in No. 03-2006 on October 8, 2003. [ESA]DE 4. The assertion that the foregoing facts gave FEI the "essential facts" of a "mature" compulsory RICO and tort counterclaim against the ESA Case plaintiffs on October 8, 2003 is

---

depositions in the ESA Case, Rider denied under oath ever working for, or having a job with, PAWS. Rider Dep. at 203:20-204:1, 210:12-20 (10-12-06); Rider Dep. at 175:16-176:17 (12-18-07). In the same 2004 answers to interrogatories in which Rider falsely denied receiving any compensation from animal advocates, he also omitted PAWS in his response to the question about all jobs he had held. [ESA]DE 476, Att. 14 (DX 16 at 4-6). Moreover, Rider did not produce the IRS forms 1099 and W-2 showing that PAWS had paid him compensation and wages until after the Court's order of August 23, 2007 compelling him to respond to FEI's discovery requests. *Id.* (DX 16 at 26).

frivolous.

**March 15, 2006.**  On this date, FEI answered API's supplemental complaint.  [ESA]DE 63 & 180.  API was the only party who had sought to amend the pleadings and the only plaintiff who filed a supplemental complaint.  [ESA]DE 180.  Defendants cite no authority for their apparent assumption that the filing of API's supplemental complaint somehow triggered a duty by FEI to file a counterclaim against those plaintiffs who had not amended the pleadings, *i.e.*, ASPCA, AWI, FFA and Rider.  Indeed, under Rule 15(d), FEI was not even required to respond to the supplemental complaint, and was not ordered to do so by the Court.  [ESA]DE 60.  The only point at which FEI was ever obligated to file a pleading responsive to any pleading of any party was October 8, 2003, when FEI answered the original complaint.  [ESA]DE 4.

FEI had no counterclaim of any kind against API on March 15, 2006.  FEI had had no discovery against API at all.  Later, WAP's June 30, 2006 document production revealed that API, like the others, had been giving "grants" to WAP earmarked for Rider, but those payments had apparently begun in April 2006.  FAC ¶ 170.  API revealed nothing about its Rider payments until after it was ordered by the Court to do so on August 23, 2007.  [ESA]DE 178.  And it was not until API's Rule 30(b)(6) deposition in January 2008 – after the original complaint in the instant case had been filed and stayed – that FEI learned that API had actually known about the ESA Case from its inception, had a working relationship with PAWS, but only decided to get involved in the case in 2005 to use it as a fund-raiser.  FAC ¶ 169; No. 03-2006, Paquette Dep. at 58-61, 74-75, 229 (1-29-08).

Even if March 15, 2006 were relevant for measuring the maturity of a potential counterclaim against the other ESA Case plaintiffs, defendants' argument fails.  Defendants point to a May 7, 2001 email (produced to FEI in June 2004) in which ASPCA's Weisberg

discusses paying and sharing Rider's "travel expenses" with AWI and FFA.  Def. Mem. at 23; [ESA]DE 457, Att. 8 (DX 46).  However, this email, like the one discussed above simply repeated the fiction of paying for travel expenses – as opposed to the truth, namely, paying Rider to be a plaintiff – so it was no basis on its own for concluding that ASPCA, AWI and FFA were bribing Rider.  ***What defendants ignore is, at the same time this document was produced in June 2004, the contemporaneously served interrogatory answers of ASPCA, AWI and FFA said nothing about any payments to Rider, even though the Court ruled on August 23, 2007 that such information was responsive to these questions and even though, by June 2004, these parties had already paid Rider more than $50,000.***  FAC ¶ 196.  Moreover, Rider's June 2004 interrogatory answer on the same subject flatly denied under oath receiving any compensation from animal advocates.  *Id.* ¶¶ 223-30.  These responses were all coordinated by MGC; Meyer and Ockene were both on them.  [ESA]DE 476, Att. 14 (DX 16 at 13); [ESA]DE 477, Att. 1 (DX 18R at 12), Att. 2 (DX 20R at 20), Att. 3 (DX 19 at 8).  Furthermore, when the subject was probed in 30(b)(6) depositions a year later defended by Meyer and Ockene, AWI and FFA continued to conceal their payments.  FAC ¶¶ 206-22; No. 03-2006, Liss Dep. at 2 (5-18-05); Markarian Dep. at 2 (6-22-05).

These obstructions totally eclipsed any significance the lone 2001 Weisberg email may have had.  All that the totality of this information reasonably showed was that the three organizational plaintiffs may have shared defraying some "traveling expenses" for Rider in 2001.  There was no indication that they had paid him anything since then or that their counsel were involved.  And Rider flatly denied under oath receiving any compensation from them or any other animal advocate.  The truth was that all of these plaintiffs since 2001 had paid (and two of them were still paying) Rider fixed, regularly recurring amounts of money, specifically

denominated for tax purposes as "compensation" through MGC and then through WAP. They were not "reimbursing" him for "expenses." They were paying him a salary, as was ultimately proven, to be a plaintiff in the ESA Case. But all of those facts remained hidden by defendants when the Weisberg email was produced in 2004.

Equally unavailing is defendants' reference (Def. Mem. at 24) to Meyer's September 16, 2005 statement to the Court that "what we have on the other side, Your Honor, we have Tom Rider, a plaintiff in this case, he's going around the country *in his own van*, he gets *grant money* from *some of the clients* and *some other organizations* to speak out and say what really happened when he worked there." [ESA]DE 169-13 at 29-30 (emphasis added). This statement is notorious, not for what it says, but for its omissions, and is further proof of the obstructions. Meyer said nothing about the true purpose of the payments, which was to secure Rider's participation in the ESA Case. 677 F. Supp. 2d at 83 (FOF 59). Her statement also was disingenuous because (1) "his own van" was actually bought by a $5,500 WAP payment that Meyer herself had sent to Rider; (2) "grant money" actually meant Rider's sole livelihood since he had no job, and his only source of income was the money he was receiving from his lawyers and co-plaintiffs and maximizing through tax evasion; (3) payments had come not from "some of the clients" but from *all* organizational plaintiffs in the ESA Case, going back to 2000; and (4) "other organizations" included (i) WAP, an organization controlled by Meyer; (ii) MGC, Meyer's own law firm, both of which had served as payment conduits; and (iii) HSUS, which had made payments to WAP for Rider at the direction of one of Meyer's former partners, now HSUS employee, Lovvorn. [ESA]DE 142 at 4-5; [ESA]DE 165 at 45; *see also* note 8, *supra*. None of these important details emerged until much later.

On September 29, 2005, 13 days after Meyer made these statements, WAP produced the

only Rider payment documents that FEI received before the purported March 16, 2006 "maturity" date of a counterclaim.   However, WAP's production simply continued the obfuscation. The WAP payment ledger deleted the hundreds of payments to Rider that WAP had systematically made since 2002.   *Compare* [ESA]DE 87-13 *with* [ESA]DE 85-5.   So even though the ledger did indicate that AWI and FFA had given money to WAP, it could not be determined if any of it went to Rider (and neither of those parties to this point had disclosed it in any event).   In addition, while WAP produced some of the letters that Glitzenstein had begun sending to Rider in August after WAP was subpoenaed, those documents were also heavily redacted as to amount and purpose. [ESA]DE 166-26. WAP produced the April 2005 letter that Meyer had sent to Rider to pay for the van, but the amount paid and the purpose were redacted so it was impossible to tell what this was for.   [ESA]DE 166-21.   And WAP totally redacted from the documents the fact that HSUS had made Rider payments to WAP through Lovvorn. [ESA]DE 166-14, 166-19, 166-22, 166-24.   None of these redactions was lifted until WAP's second document production on June 30, 2006, after FEI warned it would file a motion to compel (and after FEI had already answered API's supplemental complaint). *Id.*; [ESA]DE 85 at 13-15.

Based on what had been produced to FEI as of March 16, 2006, and the false and misleading statements that had been made by the ESA Case plaintiffs and their counsel, the picture on the Rider payments at that point was completely obscure.  Although FEI had enough information to keep asking for more, FEI did not have the "essential facts" on March 16, 2006 to actually sue any of these parties under RICO or any other theory.   Therefore, no such counterclaim was "mature" on that date against any party. *Burlington*, 907 F.2d at 712; *Dillard v. Sec. Pac. Brokers, Inc.*, 835 F.2d 607, 609 (5th Cir. 1988) (RICO counterclaim not mature);

*Kuschner v. Nationwide Credit, Inc.*, 256 F.R.D. 684, 689-90 (E.D. Cal. 2009); *Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 292 F. Supp. 2d 1270, 1281-82 (D. Kan. 2003) (RICO counterclaim not required to be asserted in earlier case because, regardless of relation to first case, it alleged "a continuing course of wrongful conduct"); *Steinberg v. St. Paul Mercury Ins.*, 108 F.R.D. 355, 358-59 (S.D. Ga. 1985) (counterclaim not mature because operative facts occurred after original answer filed); *Universal Underwriters Ins. Co. v. Sec. Ind., Inc.*, 391 F. Supp. 326, 329 (W.D. Wash. 1974) (counterclaim that rests on the bringing of the first suit not a compulsory counterclaim in that case).

Furthermore, because defendants either affirmatively concealed the necessary information or actually falsified it in their discovery responses and depositions throughout the period from June 2004 – when the initial discovery responses came in – through March 16, 2006 – when FEI was supposed to know it had a RICO claim – defendants are in no position now to invoke whatever "bar" Rule 13(a) might otherwise pose. *See Woolner v. Flair Commc'ns Agency, Inc.*, 2004 U.S. Dist. Lexis 746 at *10 (E.D. Ill. 2004) (compulsory counterclaim not precluded because essential facts had been withheld by plaintiffs in discovery); *In re Amtrak*, 136 F. Supp. 2d 1251, 1260 (S.D. Ala. 2001) (party is entitled to rely on an adversary's interrogatory responses, and false responses deceive party into believing that there is no reason to ask questions about the responses).

Finally, even if FEI's claims here were compulsory counterclaims in the ESA Case that were "mature" enough to be asserted when FEI served responsive pleadings (none of which was possible), defendants fail to show that Rule 13(a) actually requires dismissal of the FAC. To the extent that the authorities cited by defendants even address the issue, the bar stated in Rule 13(a) only applies when the party with the counterclaim waits until the original action has been finally

decided and **then** asserts the counterclaim either in the original or in a separate suit.[20]   However, where, as here, the purportedly compulsory counterclaim is asserted as a complaint in a separate lawsuit, **while the original lawsuit is still pending**, then Rule 13(a) does not bar it. "Rule 13(a) does not expressly bar a party from asserting an independent action that could have been brought as a compulsory counterclaim **in a pending action**." *Inforizons, Inc. v. VED Software Serv., Inc.*, 204 F.R.D. 116, 118 (N.D. Ill. 2001).   When that happens, the court in the second action will either stay the case, or dismiss it without prejudice to be asserted in the first action. *Id.* at 120. Rule 13(a) does not "bar" it when the original action is still pending. *See also Columbia Plaza*, 525 F.2d at 629 (second action based on claim that was compulsory counterclaim in first action properly enjoined pending outcome of first action); *Republic Telcom Corp. v. Telemetrics Commc'ns, Inc.*, 634 F. Supp. 767, 769 (D. Minn. 1986) (second action based on counterclaim compulsory in first cased stayed pending outcome of first case); 6 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1418 at pp. 165-71 (2010).   That is exactly what occurred here.   The Court determined that FEI's counterclaim was not properly part of the ESA Case and then stayed those claims when they were brought separately in the present case pending outcome of the ESA Case.   DE 22 & 23.   The purpose of Rule 13(a) is to "avoid unnecessary multiplication of litigation." *Columbia Plaza*, 525 F.2d at 629.   That purpose is served either by deciding the counterclaim in the original action if appropriate or, if already asserted in a second

---

[20] *See Polymer Ind. Prod. Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935, 936-39 (Fed. Cir. 2003) (second action containing what was compulsory counterclaim in first action barred after filed after judgment in first action affirmed on appeal); *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873 (5th Cir. 1998) (party barred from pursuing claim in second action that was compulsory counterclaim in first case after first case decided against her); *Crown Life Ins. Co. v. American Nat'l Bank & Tr. Co.*, 35 F.3d 296, 300 (7th Cir. 1994) (movant attempted to assert compulsory counterclaim after summary judgment entered against him).   The dictum in the footnote defendants cite from *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467 (1974) states the general rule but did not apply in that case, offering it merely to describe the difference from bankruptcy procedure. *Id.* at 468 n.1.   The part of *Local No. 11 v. G. P. Thompson Elec., Inc.*, 363 F.2d 181 (9th Cir. 1966), cited by defendants also is dictum.   Rule 13(a) was not a bar there because the claims were arbitrable. *Id.* at 184. *Southern Constr. Co. v. Pickard*, 371 U.S. 57, 60-61 (1962), states the general policy of Rule 13(a) but does not apply it in any way helpful to defendants here.

action, staying the second action pending the outcome of the first.

## II.   **THIS LAWSUIT IS NOT BARRED BY LIMITATIONS**

Limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). A plaintiff is "not obliged to anticipate this defense in [its] complaint." *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 344 n.12 (D.C. Cir. 1991). Instead, limitations must be "pleaded and proved by the defendant." *Jay E. Hayden Found. v. First Neighbor Bank*, 610 F.3d 382, 383 (7th Cir. 2010). Limitations may be raised in a pre-answer 12(b)(6) motion, *only* "when the facts that give rise to the defense *are clear from the face of the complaint*." *Smith-Haynie v. D.C.*, 155 F.3d 575, 578 (D.C. Cir. 1998) (emphasis added). In considering such motion, a court must assume the facts alleged by plaintiff as true, construe the complaint liberally in the plaintiff's favor and give plaintiff the benefit of all inferences that can be derived from the facts alleged. *Williams*, 522 F. Supp. 2d at 97. Matters outside the four corners of plaintiff's complaint can only be considered if the court treats the motion as one for summary judgment and provides the parties notice thereof and access to the procedures prescribed by Fed. R. Civ. P. 56. *Kim v. United States*, 2011 U.S. App. Lexis 2397 at *16-17 (D.C. Cir. 2011); *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982). Defendants' limitations argument should be rejected.

FEI's RICO claims are subject to a 4-year statute of limitations. *Rotella v. Wood*, 528 U.S. 549, 552 (2000). While malicious prosecution is subject to the one-year statute of limitations in D.C. CODE § 12-301(4) (2010), the claims for abuse of process, champerty and maintenance are subject to the 3-year period in D.C.'s residual provision for which a limitation is not "otherwise specified." D.C. CODE § 12-301(8) (2010). The claim under the Virginia Conspiracy Act, VA. CODE ANN. §§ 18.2-499(a), 18.2-500 (2010), is subject to the 5-year period in VA. CODE ANN. § 8.01-230 (2010).

The cause of action under RICO and the D.C. tort claims (champerty and maintenance)

accrues for limitations purposes upon discovery of the injury.   Under the discovery rule, as applied to both types of claims in this Circuit, "'a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) *some* evidence of wrongdoing.'" *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 274 (D.D.C. 2007) (original emphasis; quoting *Goldman v. Bequai*, 19 F.3d 666, 671-72 (D.C. Cir. 1994)), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008).   *See also Hayden*, 610 F.3d at 386 (RICO statute of limitations begins to run "when the prospective plaintiff discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer or (in this case) injurers"); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1489-90 (D.C. Cir. 1989); *Connors*, 935 F.2d at 342-43. [21]   Applying this discovery rule standard of inquiry notice to the facts alleged in the FAC, the RICO and D.C. tort claims are timely against all defendants. [22]

---

[21] Contrary to defendants' implication, Def. Mem. at 26, *Rotella* did not hold that RICO claims are subject to a strict "discovery of the injury" rule.   *See* 528 U.S. at 554 n.2 ("[w]e do not … settle upon a final rule").   *Rotella* merely rejected the proposition that a RICO cause of action accrues only upon discovery of the injury plus a pattern of racketeering activity. *Id.* at 551.   *Rotella* is inapposite here because the plaintiff there admitted that he knew of his injury in 1986 and that his RICO claim was "complete and subject to suit at that time," but he did not sue until 1997. *Id.* at 559.   In *Riddell*, the D.C. Circuit deferred deciding the exact nature of the discovery rule applicable to RICO claims, 866 F.2d at 1491, but later affirmed application of the 3-part version of that rule described in the text by the district court in *Chalabi*, 543 F.3d at 730.   The discovery rule has been applied by other courts in this Circuit in RICO cases.   *Browning v. Clinton*, 2001 U.S. Dist. Lexis 24537 at *35 (D.D.C. 2001).

[22] There is no dispute that FEI's malicious prosecution claim was filed within the one-year statute of limitations. Limitations on malicious prosecution runs from the date that the maliciously prosecuted action was terminated in favor of the malicious prosecution plaintiff. *Nader v. DNC*, 567 F.3d 692, 699 (D.C. Cir. 2009); *Shulman v. Miskell*, 626 F.2d 173, 176 (D.C. Cir. 1980).   Here, that date was December 30, 2009, when the Court entered judgment in FEI's favor in the ESA Case. FAC ¶ 324.   Since the FAC was filed on February 26, 2010, DE 25, the malicious prosecution claim is timely against all original and new defendants regardless whether it relates back to the filing of the original complaint.

The 3-year statute for abuse of process begins to run "from the date on which abusive process *last issued*." *Nader*, 567 F.3d at 699 (emphasis added).   For this tort, "process" "has been interpreted broadly, and encompasses the entire range of procedures incident to the litigation process … including discovery proceedings, the noticing of depositions and the issuing of subpoenas." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 310 (3d Cir. 2003) (citations, quote marks omitted; applying Pennsylvania law).   The FAC documents numerous abusive uses by defendants of the litigation processes in the ESA Case in the 3-year period prior to the filing of the FAC on February 16, 2010. FAC ¶¶ 11-12, 169, 307, 314-15.   Therefore, FEI's abuse of process claim is timely as to all original and new defendants, regardless of whether it relates back to the filing of the original complaint.

FEI's RICO, champerty and maintenance claims hinge upon the stream of corrupt Rider payments. Accordingly, the FAC alleges that "FEI did not begin to uncover the payment scheme described herein until the Rule 30(b)(6) deposition of ASPCA, taken in the ESA Action on July 19, 2005." FAC ¶ 32. While this allegation is not synonymous with knowledge of the injury, its cause, and some evidence of wrongdoing, it is the *earliest* point alleged in the FAC that even addresses FEI's knowledge of any of the three requirements of the discovery rule. *Cf. Hayden*, 610 F.3d 384-86 (while "[t]he fraud began to unravel in 2002 ... plaintiffs had discovered or should have discovered these things by the summer of 2003"). Assuming FEI's allegation to be true, as the Court must, FEI, at a minimum, had until, respectively, July 19, 2008 and July 19, 2009 to file any claim covered by a 3- or 4-year statute of limitations. Since the original complaint was filed on August 28, 2007, DE 1, FEI's RICO claims in the original complaint against the original defendants are timely.

The new claims added on February 16, 2010 (malicious prosecution and abuse of process, *see* note 22, *supra*, and maintenance and champerty) also are timely. All such claims "arose out of the conduct, transaction, or occurrence set out ... in the original pleading," and therefore, for limitations purposes, they all "relate[] back to the date of the original pleading." Fed. R. Civ. P. 15(c)(B). *See Hartley v. Dombrowski*, 2010 U.S. Dist. Lexis 110472 (D.D.C. 2010). Thus, they are all timely as to the original defendants. As to the new defendants (MGC, the individual lawyer defendants and HSUS), even if they are not considered original parties,[23] the claims against them likewise are timely. This case was stayed from November 7, 2007 through December 30, 2009. DE 22 & 23. Under both the RICO statute of limitations and D.C.

---

[23] WAP was a party to the original complaint. WAP is the alter ego of MGC, a general partnership in which Meyer, Glitzenstein, Crystal, Lovvorn and Ockene were all general partners during some or all of the period alleged in the FAC. FAC ¶¶ 39-45. HSUS merged with FFA effective January 1, 2005. *Id.* ¶ 36. Therefore, all of these parties could be considered parties to the original complaint.

law, the time in which a case is stayed by court order is excluded from the limitations period. *Selph v. Nelson*, 966 F.2d 411, 413 (8th Cir. 1992) (*per curiam*); *Javier v. Garcia-Botello*, 239 F.R.D. 342, 347-48 (W.D.N.Y. 2006); *Bixby's Food Sys. v. McKay*, 2001 U.S. Dist. Lexis 3355 at *6-7 (N.D. Ill. 2001); D.C. CODE § 12-304 (2010).  This is particularly the case where, as here, defendants obtained the stay over FEI's objection with repeated representations to the Court that FEI would not be prejudiced if the stay were granted.  DE 5 at 4, 13, 22-23.  At the time that this case was stayed on November 7, 2007, FEI had 1 year and 7 months left in the 4-year statute of limitations and 7 months left in the 3 year period in which to assert any claims against other defendants arising from the earliest discovery-of-injury date alleged in the FAC – July 19, 2005.  FAC ¶ 32.  Therefore the assertion of claims against the new defendants in the FAC on February 16, 2010 was well within the time remaining.

Defendants claim that FEI is out of time because the FAC supposedly admits that "FEI knew as early as 2000 that Mr. Rider was employed by the original lead plaintiff in the ESA case.  *See* Am. Compl. at ¶ 61."  Def. Mem. at 26.  As shown above (p. 34, *supra*), this statement – which defendants repeat multiple times, *id.*, at 2, 8, 22, 23 – is simply false.  Nothing in that paragraph of the FAC says anything of the kind.[24]

Defendants also argue that, since FEI's injury is the attorneys fees it paid defending the ESA Case, and since FEI hired compensated attorneys in 2000, then FEI "knew" of its injury in 2000, and the statutes of limitation began running then.  Def. Mem. at 26.  Unless defendants suggest that, no matter what the nature of the claim, any litigation instituted by these them was criminal or tortious on its face, then this point goes nowhere.  While FEI may have been fully aware that it was paying legal fees in 2000, it had no evidence that this was the result of

---

[24] Defendants' reference to a brief that FEI filed in the ESA Case in *2006*, Def. Mem. at 27, likewise is irrelevant and neither states nor indicates that FEI knew anything *in 2000* about Rider's relationship with PAWS *in 2000*.

wrongdoing by defendants, and nothing in the FAC is to the contrary. The discovery rule exists to cover situations exactly like this one: "where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs." *Bussineau v. President & Dir. of Georgetown College*, 518 A.2d 423, 425 (D.C. 1986). *See also Connors*, 935 F.2d at 343. Until FEI had some reason to believe that its fee hemorrhage was caused by a fraudulent lawsuit, as opposed to (unfortunately) the normal cost of doing business in this country, FEI could not have discovered its injury for either its RICO or tort claims. As the FAC states, that did not even begin to happen any earlier than July 19, 2005. FAC ¶ 32.

The Fourth Circuit recently rejected the same argument in *CSX Transp. v. Gilkison*, 2010 U.S. App. Lexis 26566 (4th Cir. 2010) *(per curiam)*. The RICO claim there arose from suits against CSX in which clients of the defendant lawyers had made false claims of asbestosis. Since the plaintiff's RICO injury stemmed from the fabricated litigation, the district court granted the defendant lawyers' 12(b)(6) motion, ruling that the statute of limitations began running when the suits were filed or settled, not when CSX claimed it discovered that the claims were fabricated. The Fourth Circuit reversed:

> [T]he case at bar necessitates a fact-intensive inquiry as to when CSX knew or should have known of the existence of the claimed RICO violations. ***The fact that an underlying asbestos suit was filed or settled, without more, does not establish as a matter of law that the separate gravamen of RICO fraud should have been known by that event alone.*** The district court thus erred in making the unilateral finding that either the date of the filing or of the settlement of the underlying lawsuits was dispositive on this question. It does not follow from the facts pled on the face of the complaint that CSX knew or should have known that the underlying asbestos lawsuits were fraudulently filed when they were filed.

*Id.* at *14-15 (emphasis added). The same analysis applies here. Defendants are essentially arguing an occurrence-of-injury versus a discovery-of-injury theory, which has not been adopted

for RICO claims and which is not the law for torts in D.C. *Rotella*, 528 U.S. at 554 & n.2; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997); *Connors*, 935 F.2d at 342-43; *Bussineau*, 518 A.2d at 425.

Defendants' argument also flies in the face of what they told the Court when they obtained a stay of this case in 2007. Then, defendants argued that, since FEI's claimed damages "are the attorneys' fees FEI is incurring <u>in the ESA Action</u>," "it is evident that it is premature to even <u>consider</u> whether FEI's alleged RICO violations are the 'but for' cause of its alleged damages." DE 5 at 19 (original emphasis). Thus, argued defendants, "it will not become clear whether Mr. Rider's testimony is the 'but for' cause of the ESA Action ***until the case is concluded***" *Id.* at 20 (emphasis added). The Court accepted defendants' representations, noting that since "FEI has no choice but to continue to defend the ESA suit regardless of the outcome of its RICO claim, FEI's damages ***are unascertainable at this point***." 523 F. Supp. 2d 1, 4 (D.D.C. 2007) (emphasis added). Thus, by defendants' own reasoning (which they should be judicially estopped from disavowing now, *see* pp. 28-32, *supra*), the RICO injury to FEI was not "clear" or "ascertainable" until the ESA Case concluded on December 30, 2009, and, under any formulation of the discovery rule, the statute of limitations on the RICO claims did not start running until then.[25]

Putting defendants' duplicity to one side, even if the statute of limitations began to run with the first dollar of attorneys fees incurred by FEI in the ESA Case, FEI's claims are not barred. "Even after injury has occurred ... and a civil RICO claim has accrued, there will

---

[25] Defendants also contradict themselves in the current motion with their assertion that FEI's RICO claims are a "circumvention" of the ESA attorneys fee provision. Def. Mem. at 1. If defendants were correct that an ESA attorneys fee claim must be exhausted before pursuing any RICO claims, then no statute of limitations could have yet begun to run on any RICO claim that FEI has. As noted by one of defendants' own cases (Def. Mem. at 29) "when contractual or other legal remedies remain which hold out a real possibility that the injury[] may be eliminated or significantly reduced," then "[t]he RICO claim is not ripe until those remedies are exhausted and the damages are clear." *In re Merrill Lynch Ltd. P'ship Lit.*, 154 F.3d 56, 59 (2d Cir. 1998) (*per curiam*).

frequently be additional independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to plaintiff's business or property. ... Multiple injuries, spread over time, frequently result from the very nature of a RICO violation." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (citation omitted). Attorneys fees incurred in defending a case fueled by a pattern of racketeering activity are recoverable damages under RICO. *Id.* at 1105. A RICO cause of action accrues, and the 4-year statute of limitations begins to run separately, each time such attorneys fees are incurred. *Id.* at 1105. Under this separate accrual rule, a plaintiff may recover "for all injuries ... discovered or [it] should have discovered within the four years prior to filing complaint, regardless of [the] dates of [the] RICO violations causing the injuries." *Reisner v. Stoller*, 51 F. Supp. 2d 430, 451 (S.D.N.Y. 1999). *See also Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir. 1995) ("with each diversion [of royalties from the estate] a new civil RICO cause of action accrued, with a corresponding four-year limitations period, and plaintiffs' action is timely with respect to all diversions occurring within four years of suit"). Thus, at a minimum, FEI has timely claims for any RICO damages incurred during the four years prior to August 28, 2007.[26]

The same result follows for the D.C. tort claims under D.C.'s continuing tort doctrine which requires "'(1) continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period.'" *Morton v. D.C. Housing Auth.*, 720 F. Supp. 2d 1, 7 (D.D.C. 2010). *See also Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547-48 (D.C. 2002). A tortiously

---

[26] This parallels the rule under the Clayton Act, from which the 4-year RICO statute of limitations was borrowed. *See, e.g., Klehr*, 521 U.S. at 189 ("'each overt act that is part of the violation and that injures the plaintiff' ... 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.' ... But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period") (citations omitted).

prosecuted lawsuit is a continuing tort under D.C. law. *Jung v. Mundy, Holt & Mance,* P.C., 372

F.3d 429, 433 (D.C. Cir. 2004) ("a lawsuit is a continuous, not an isolated event, because its

effects persist from the initial filing to the final disposition;" injury flows from "cumulative costs

of defense"); *Whelan v. Abell,* 953 F.2d 663, 673 (D.C. Cir. 1992). The ESA Case, as alleged in

the FAC, is a continuing tort. With defendants' "death by a thousand cuts" approach to draining

FEI's resources, no single instance of legal fees incurred by FEI was decisive; it was the

cumulative effect of the entire course of conduct, and the FAC documents numerous wrongful

acts within the 3 years prior to suit. FAC ¶¶ 2-12, 303-18. Thus, FEI is entitled to recover

damages "attributable to the part of the continuing tort that was committed within the limitations

period immediately preceding the date on which suit is brought.'" *Jung,* 372 F.3d at 433

(citation omitted). For champerty and maintenance it is the three years prior to August 28,

2007.[27]

Defendants invite the Court to look outside the FAC, Def. Mem. at 27-28, but this is

improper on a 12(b)(6) motion. Limitations is not a matter of "jurisdiction" or "standing"

addressed under 12(b)(1) as defendants suggest. Def. Mem. at 5 n.1. *See Williams,* 522 F. Supp.

2d at 99 (motion to dismiss on limitations grounds improperly brought under 12(b)(1)).

Moreover, none of defendants' authorities (Def. Mem. 5-6) supports their bootstrapping

approach, *i.e.,* using "judicial notice" to refer to an evidentiary exhibit that *they* introduced

---

[27] Defendants' authorities (Def. Mem. at 29-30) are not to the contrary. Plaintiffs were out of time in *In re Merrill Lynch* (not properly recognized as *per curiam* by defendants) because the fraud occurred at the outset of the venture; the prospectuses disseminated thereafter were only efforts at concealment, not new, independent wrongs. 154 F.3d at 59-60. While continuous harassment occurred in *Pilkington v. United Airlines,* 112 F.3d 1532 (11th Cir. 1997), the result was influenced by the fact that plaintiffs had actually filed a RICO case within the limitations period but inexplicably dismissed it voluntarily, so were hard pressed to claim they were the victims of separate, independent injuries. *Id.* at 1536 n.3. Similarly, in *Grimmett v. Brown,* 75 F.3d 506 (9th Cir. 1996), no independent injuries occurred after the injury complained of – loss of a medical practice – and plaintiff had all information essential to value her injury well before the statute of limitations expired, as shown by a pleading she filed in a bankruptcy case. *Id.* at 513-14. As indicated above, *Bingham* actually supports FEI and is an ironic citation by defendants given its affirmance of a civil RICO jury verdict of $800,000 (trebled to $2.4 million). 66 F.3d at 558, 566.

against FEI in the ESA Case.[28]   In any event, the May 2002 email string defendants cite does not assist them.   As discussed above (p. 35, *supra*), the false statements in this email that ASPCA was paying certain of Rider's traveling expenses (when in fact ASPCA was paying him to be a plaintiff in the ESA Case) was not evidence of "wrongdoing."   Taken at face value, this email refers to nothing that is illegal or tortious.   Unless it is defendants' position that ***any payment*** to Rider was illegal per se, then this document put FEI on notice of nothing sinister.   As the D.C. Circuit has observed, a party in FEI's position is not required to "'have proceeded from the outset as if he were dealing with thieves.'"   *Richards v. Mileski*, 662 F.2d, 65, 71 (D.C. Cir. 1981) (citation omitted).   Furthermore, the email makes no reference to any of the other ESA Case plaintiffs, to WAP, to MGC or to the lawyer defendants, so it could not have put FEI on notice of any claim as to those parties in any event.   *Firestone*, 76 F.2d at 1210; *Hobson v. Wilson*, 737 F.2d 1, 36 (D.C. Cir. 1984) ("simply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant").

Even if this email gave FEI inquiry notice of its RICO and tort claims against all defendants, defendants' fraudulent concealment of the cause of action would toll the statute in any event.   Fraudulent concealment is an equitable tolling principle "read into every federal statute of limitations."   *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).   It arises either when the wrongs upon which a defendant has been sued are self-concealing by nature or when

---

[28] In *Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103 (D.D.C. 2007), and *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007), the courts referred to a pleading that the plaintiff himself had filed in another case, not to an exhibit offered by his adversary. *Veg-Mix Inc. v. USDA*, 832 F.2d 601, 607 (D.C. Cir. 1987), has nothing to do with Rule 12(b)(6), and simply holds that an ALJ may take official notice of bankruptcy court records. In *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004), the court took judicial notice of another court's findings of fact. *Truesdale v. DOJ*, 657 F. Supp. 2d 219, 224 n.2 (D.D.C. 2009), took judicial notice of orders in another case.   None of these cases blesses what defendants attempt here – to make reference to an evidentiary document that is not referred to in the FAC and that clearly raises an issue of fact – under the guise that it happened to be an exhibit in another case.   On the other hand, the materials cited herein by FEI, *see* pp. 5-7, 34-39, are properly considered because they are referred to in the FAC. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

defendant has engaged in "some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action.  The deception may be as simple as *a single lie* ... ." *Hobson*, 737 F.2d at 34-35 (emphasis added). *See also Riddell*, 866 F.2d at 1491.  The elements of fraudulent concealment under D.C. law are the same. *Id.*; *Richards*, 662 F.2d at 68.  Under federal law, fraudulent concealment tolls the statute of limitations until plaintiff has gained actual notice of "*the particular cause of action at issue*, not just of any cause of action." *Hobson*, 737 F.2d at 35 (emphasis added).  Under D.C. law, fraudulent concealment tolls the statute of limitations until plaintiff gains inquiry notice. *Nader*, 567 F.3d at 700.  Under either standard, the statutes of limitation were tolled in this case by defendants' fraud.

A plaintiff need not plead fraudulent concealment, *Firestone*, 76 F.3d at 1210, but the FAC states facts that fully support application of that doctrine.  Defendants' conduct throughout the period beginning July 2000 was self-concealing.  They characterized the payments to Rider as "grants" or "reimbursement" for "media" work when, in fact the money was for Rider to participate in the ESA Case as a plaintiff.  FAC ¶¶ 24, 72-178.  The money was paid through MGC and WAP to make it hard to trace and to provide ways of deflecting inquiry. *Id.* ¶¶ 28-29, 62.  Plaintiffs also affirmatively misrepresented the facts about Rider's standing to this Court and to the D.C. Circuit. *Id.* ¶¶ 51-54.  Indeed, at the time that the 2002 email cited by plaintiffs was generated, the ESA Case had already been dismissed and was on appeal.  The only reason the case came back to the district court was the misrepresentations defendants made about Rider's standing. *Id.*  Furthermore, on remand, once FEI began to inquire about the money, defendants engaged in affirmative misrepresentations.  None of the organizations disclosed such payments in their original, June 2004 interrogatory answers, and Rider denied, falsely under oath, that he

had been paid. *Id.* ¶¶ 30-32, 192-235. The payments were concealed in certain of the 30(b)(6) depositions, and defendants failed to preserve or destroyed underlying payment documentation. *Id.* ¶¶ 206-222, 235. FEI did not begin to uncover the payment scheme until July 19, 2005. *Id.* ¶ 32. Indeed, the full story did not emerge until *after* the Court ordered complete discovery on August 23, 2007, when, among other things, MGC was forced to reveal for the first time its own heavy involvement in the Rider payments. *Id.* ¶¶ 81, 198. These acts of concealment by parties to a conspiracy, *id.* ¶¶ 289-310, bind all the co-conspirators. *Riddell*, 866 F.2d at 1493; *Jones v. Meridian Towers Apts.*, 816 F. Supp. 762, 771 (D.D.C. 1993). Based on these facts, which the Court must assume as true, the statutes of limitation on FEI's claims were tolled during the entire time period from July 11, 2000 through at least July 19, 2005. *See, e.g.*, *Riddell*, 866 F.2d at 1495, 1499 (summary judgment against plaintiff reversed; fraudulent concealment tolled RICO statute of limitations; while plaintiff knew in 1981 that his stock price was low, he did not discover that the valuation report the price was based upon was fraudulent until 1983); *Richards*, 662 F.2d at 70-72 (order granting motion to dismiss reversed; fraudulent concealment tolled the 3-year D.C. statute of limitation for 23 years; while plaintiff knew he had been fired in 1955 on a false accusation, he did not know until 1978, after a response to his FOIA request, that his superiors had knowingly participated in the false report). Since the fraudulent concealment continued through July 19, 2005, FAC ¶ 32, all of FEI's claims were timely asserted on August 28, 2007 within the 3- or 4-year statutes of limitations.

The same result follows for the Virginia conspiracy claim. Although Virginia follows the occurrence of injury rule, rather than the discovery rule, for claims under the Conspiracy Act, Virginia also follows a rule analogous to the continuous tort theory, recognizing that wrongs occurring at intervals generate separate causes of action and that a plaintiff aggrieved by such

wrongs may recover damages during the 5 years preceding suit. *Hampton Rds. Sanitation Dist. v. McDonnell*, 360 S.E.2d 841, 843 (Va. 1987). Therefore, FEI's Virginia conspiracy claim is timely as to the injuries sustained during the 5 years prior to February 28, 2007.[29] Virginia also recognizes, by statute, the doctrine of fraudulent concealment and excludes from the limitations period the time during which a defendant obstructed the filing of an action using "any ... direct or indirect means." VA. CODE ANN. § 8.01-229(D) (2010). *See also Newman v. Walker*, 618 S.E.2d 336, 338 (Va. 2005). Since defendants fraudulently concealed FEI's cause of action during the period from July 11, 2000 through at least July 19, 2005, FEI had until July 19, 2010 in which to file its Virginia conspiracy claim, and it is timely as to all original and new defendants.

At most, the reference to the 2002 email creates an issue of fact – which cannot be the basis for a 12(b)(6) dismissal. As the Circuit has stated, "what a plaintiff knew and when he knew it, in the context of a statute of limitations defense, are questions of fact for the jury." *Riddell*, 866 F.2d at 1484. *See also Goldman*, 19 F.3d at 672; *Am. Fed. of Teachers v. Bullock*, 539 F. Supp. 2d 161, 167 (D.D.C. 2008) (application of fraudulent concealment and discovery rule is "a highly fact-intensive inquiry that must be made by the fact finder"), *vacated on other grounds*, 605 F. Supp. 2d 251 (D.D.C. 2009). As the Circuit also has said, in terms equally applicable to defendants here, "a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss

---

[29] The filing date for purposes of the Virginia conspiracy claim is February 28, 2007, the date on which FEI filed its motion for leave to assert a counterclaim in the ESA Case which, at the time, contained the RICO and Virginia conspiracy claims. [ESA]DE 121. The statute of limitations on the claims in a counterclaim is tolled by the filing of a motion for leave to file the counterclaim. *Javier*, 239 F.R.D. at 348. While federal claims in a lawsuit that is dismissed without prejudice do not receive any tolling credit for the period in which they are pending in federal court, the rule for state claims asserted under supplemental jurisdiction is different. Pursuant to 28 U.S.C. § 1367(d) (2006), the period of limitations for any such claim "is tolled while the claim is pending and for a period of 30 days after it is dismissed ...." FEI's original complaint in this action was filed on August 28, 2007, 5 days after the disallowance of the counterclaim. DE 1. Therefore, the statute of limitations on the Virginia conspiracy claim was tolled throughout the period from February 28 through August 28, 2007.

to raise such an affirmative defense." *Richards*, 662 F.2d at 73.   Defendants' limitations argument should be rejected.

## III.   DEFENDANTS HAVE NO *NOERR-PENNINGTON* IMMUNITY

### A.   The First Amendment Does Not Protect Fraud

Defendants seek dismissal of the entire action on grounds of *Noerr-Pennington* immunity.   Def. Mem. at 30-42.   To succeed, however, defendants must show that – even if it is determined that (1) Rider was bribed to testify falsely about his "aesthetic injury" to fabricate Article III jurisdiction in the ESA Case and to testify falsely before legislative and administrative bodies; (2) the scheme to pay Rider was executed with hundreds of acts of mail and wire fraud; (3) the funds paid to Rider were laundered to conceal their nature and so that he could evade federal income tax; and (4) when FEI started asking questions about the money, defendants obstructed the inquiry with false or misleading answers or spoliation – defendants nonetheless have a right under the petitioning clause of the First Amendment to do these things.   Defendants cannot make such a showing.

The First Amendment right to petition is not absolute. *McDonald v. Smith*, 472 U.S. 479, 484 (1985).   Defendants' exposition, *see* Def. Mem. at 30-35, conspicuously omits a dispositive principle:  the First Amendment does not protect fraud. *See United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (citations omitted); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) ("'[N]either the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation.") (citations omitted).   Thus, "[a]ttempts to influence governmental action through overtly corrupt conduct, such as ***bribes (in any context) and misrepresentation (in the adjudicatory process)*** are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*." *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995)

(emphasis added; discussing *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981)); *see also California Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 512-13 (1972) (perjury and bribery are among "illegal and reprehensible practice[s] which may corrupt the administrative or judicial processes" and which would not be immune under *Noerr-Pennington*). Defendants cannot claim petitioning immunity for the bribery and obstruction alleged in the FAC.

Nor can defendants carve out their "legislative and executive branch advocacy efforts." Def. Mem. at 36-37. These actions were all tainted by bribes, and therefore are not immune from RICO liability. *See Whelan*, 48 F.3d at 1255. Rider's varying, conflicting and ultimately false testimony in sworn written statements and/or live testimony before Congress, the Connecticut Legislature, the Nebraska Legislature, and the Chicago City Council occurred while he was being paid by the ESA Case plaintiffs and their (and his) counsel. FAC ¶¶ 17-32, 241-43. These allegations are more than sufficient to take defendants' petitioning conduct outside the protection of *Noerr-Pennington*.

The same follows for defendants' "executive branch advocacy efforts." The FAC alleges that Rider submitted a false affidavit to USDA and that defendants procured other false statements by former FEI employees before the USDA. FAC ¶¶ 184, 248-72. These actions are analogous to the *Whelan* defendants' false letter of complaint filed with the Maryland Division of Securities, a state administrative agency, which the D.C. Circuit held had no *Noerr-Pennington* or other First Amendment immunity. *See* 48 F.3d at 1254 ("We see no reason to believe that the right to petition includes a right to file deliberately false complaints"). *See also Lewis v. Lhu*, 696 F. Supp. 723, 729 (D.D.C. 1988) (RICO claims based on false statements to FCC; "'[t]here is no first amendment protection for furnishing with predatory intent false

information to an administrative or adjudicative body'") (citation omitted).

Defendants contend that their actions are no different than the testimony provided to members of Congress by tobacco companies that was held protected under the *Noerr-Pennington* doctrine by the district court in *United States v. Philip Morris USA*, 449 F. Supp. 2d 1, 886-87 (D.D.C. 2006). *See* Def. Mem. at 36. But there was no allegation in *Philip Morris* that the false testimony before Congress was procured through bribes, *see id.* at 374-80, which takes the petitioning activity outside of First Amendment protection. *See Whelan*, 48 F.3d at 1255. Moreover, on appeal, the D.C. Circuit never decided whether these acts had been correctly excluded from RICO liability based on *Noerr-Pennington*. *Philip Morris*, 566 F.3d at 1124.

Defendants proclaim their "rights to associate for the purpose of petitioning policymakers to adopt their agenda without suffering a retaliatory RICO lawsuit[.]" Def. Mem. at 36-37.[30] Defendants are liable under RICO, not because they purportedly asserted First Amendment rights, but because they colluded to champion their cause before legislative and executive bodies on the basis of bribe-induced falsehoods, all for the purpose of expanding their own coffers and putting FEI's circus out of business. The purported "genuineness" of defendants' activities directed at legislators, executive branch officials, or other policy makers, *see* Def. Mem. at 37, is immaterial when the acts are tainted by fraud and corruption. There is no need for First Amendment "breathing space," *id.*, to commit bribery, obstruction or the other predicate crimes alleged in the FAC. *See, e.g., Brewster*, 506 F.2d at 77 (preserving the integrity of government operations by outlawing the payment and receipt of illegal gratuities "supersedes any conceivable First Amendment value related to such conduct").

Defendants also have no *Noerr-Pennington* immunity for their actions in court. *See* Def.

---

[30] *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Assoc.* and *Citizens United v. FEC*, cited by defendants, Def. Mem. at 36-37, have no direct factual relevance to this case.

Mem. at 38. The Court need not even reach the issue of whether the ESA Case was a "sham," as defendants argue, *see id.*, because *Noerr-Pennington* does not apply to deliberate misrepresentations to the court. "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor*, 404 U.S. at 513; *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) ("[I]n less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations") (citation omitted); *Whelan*, 48 F.3d at 1255 ("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods."); *Nader*, 567 F.3d at 698 (same). The FAC identifies numerous false statements by defendants in the ESA Case, FAC ¶¶ 185-90, including the false representations made to the district court and the court of appeals about Rider's "aesthetic injury," *id.* ¶¶ 51-54 – statements that were proven at trial to be untrue. 677 F. Supp. 2d at 71-72, 83-84, 89-90 (FOF 20, 61-62, COL 6). As the Circuit has observed, the sham exception does not even arise where, as here, a party's "'knowing fraud upon, or its intentional misrepresentations to, the court deprive the [prior] litigation of its legitimacy.'" *Whelan*, 48 F.3d at 1255 (citation omitted).

FEI's abuse of process and malicious prosecution claims also rest on the allegation that Rider was paid to be a plaintiff and key fact witness with a fabricated injury who made knowingly false statements in the ESA Case. FAC ¶¶ 302-334. Neither of these claims runs afoul of *Noerr-Pennington* or other First Amendment principles. *See Whelan*, 48 F.3d at 1257 ("To the extent that the torts [of malicious prosecution and abuse of process] require plaintiffs to establish to a jury's satisfaction that defendants' assertions in the MDS proceeding and the Putty Hill lawsuit were knowingly false ... they would certainly not conflict with the First Amendment

or *Noerr-Pennington*."); *Nader*, 567 F.3d at 699 ("If Nader in fact concedes that his theory [of abuse of process] requires him to prove a pattern of deliberately false filings, no *Noerr-Pennington* problem could arise ... .").

Defendants suggest that FEI has a "particularly high hurdle ... to overcome to avoid the presumption of *Noerr-Pennington* immunity[,]" because they are "non-profit organizations" pursuing "political" goals under the citizen suit provision of the ESA. Def. Mem. at 38 (relying on *Oregon Natural Res. Council v. Mohla*, 944 F.2d 531, 535 n.3 (9th Cir. 1991)).[31]  Nothing in the ESA permits bribery, obstruction, mail and wire fraud or money laundering by citizen suit plaintiffs and their counsel.   And defendants' pursuit of the ESA Case as fund-raiser, FAC ¶¶ 9, 11, belies their effort to wrap themselves in the "public interest."[32]

## B.     The ESA Case Was "Sham" Litigation

*Noerr-Pennington* immunity does not protect sham litigation:   actions "ostensibly directed toward influencing governmental action, [but that are] a mere sham to cover what is nothing more than an attempt to interfere directly with the business relationships of a competitor ...." *Eastern R. Presidents Conf. v. Noerr*, 365 U.S. 127, 144 (1961); *see also, e.g., Bill Johnson's Restaurant, Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("Just as false statements are not immunized by the First Amendment right to freedom of speech ... baseless litigation is not

---

[31] While the Ninth Circuit apparently applies a heightened pleading standard for claims implicating *Noerr-Pennington*, *see Oregon Natural Res. Council*, 944 F.2d at 533, this Circuit has no such standard, nor apparently do any other circuits. The *Oregon Natural Resources Council* court refused to credit as true the plaintiff's allegations of misrepresentations in the underlying litigation that would have foreclosed the defendants' reliance on *Noerr-Pennington* immunity. *See id.* at 536. Here, however, the misrepresentations of defendants pleaded by the FAC have already been found by the Court to be false. 677 F. Supp. 2d at 71-72, 83-84, 89-90 (FOF 20, 61-62, COL 6). Unlike the plaintiffs in *Oregon Natural Resources Council*, FEI's allegations go far beyond simply "recast[ing] disputed issues from the underlying litigation as 'misrepresentations.'" 944 F.2d at 536.

[32] This is unlike *Sosa v. DirecTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), which held that pre-suit demand letters could be sufficiently related to petitioning activity so as to be entitled to immunity. Here, defendants' fundraising efforts cannot be characterized as incidental to any petition to the government. They are a separate and distinct activity. *Cf. Venetian Casino Resort v. NLRB*, 484 F.3d 601, 614 (D.C. Cir. 2007) (defendants' acts in broadcasting a trespass message and attempting a "citizen's arrest" were not acts prerequisite to lawsuit and were not protected by *Noerr-Pennington* doctrine).

immunized by the First Amendment right to petition.") (internal citations omitted).

Sham litigation has two elements. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. ... [Second], the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor' ... through the 'use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon ... ." *Prof'l Real Estate Inv., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (citations omitted).[33]

The fabricated standing renders the ESA Case objectively baseless. No reasonable attorney would hire a plaintiff to testify falsely about an injury that he did not have so that the lawyer could bring a case to recover legal fees or for any other purpose. FAC ¶¶ 3-5. Nor would a reasonable attorney represent to the courts that, in order to avoid "aesthetic injury," the plaintiff was avoiding visiting the elephants when, at the time those representations were made, the plaintiff not only *was* visiting the elephants, he was being paid to do so by those same lawyers and the co-plaintiffs in order to collect evidence in the case. *Id.* ¶¶ 7, 51-52. *See, e.g., CSX*, 2010 U.S. App. Lexis 26566 at *28 n.7 (given the evidence in the record that the lawyers induced plaintiffs to bring fabricated asbestosis claims, they had no *Noerr-Pennington* defense and case easily fit within the "sham" exception).

Defendants argue that it "is of no moment" that they lost on standing grounds, Def. Mem. at 39, but that is not true. Their standing to sue in the ESA Case was "*an indispensable part* of the plaintiff[s'] case," to be "'supported adequately by the evidence adduced at trial,'" and not a

---

[33] Defendants suggest that FEI carries a heightened burden in showing that the ESA Case was a sham, *see* Def. Mem. at 38 ("FEI cannot satisfy its *stringent burden*") (emphasis added), but there is no such heightened standard in the D.C. Circuit. *See Nader v. DNC*, 555 F. Supp. 2d 137, 157 (D.D.C. 2008) ("plaintiff bears the burden to demonstrate that the sham exception applies") (citation omitted).

*"mere pleading requirement."*   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added; citation omitted).   Defendants thus lost on an "indispensable part" of their case." *Id.*[34]

Nor does it matter that defendants claim they believed Rider's story or that the Court in the ESA Case did not find that no reasonable person could have believed it.  Def. Mem. at 4, 41. Whether there was an objective basis for such "beliefs" is an issue of fact for the finder of fact. *See CSX*, 2010 U.S. App. Lexis 26566 at *27 (reversing summary judgment on fraud claim as to whether lawyers knew their clients were not injured; "a reasonable jury could find that the lawyer defendants at worst fraudulently manufactured the claimed exposures, or at least lacked a good faith basis to file an asbestos injury claim").  The evaluation will be based, not solely on what Rider said and did after he became a paid plaintiff and witness, but also on what he did and said before he was retained.  A major portion of Rider's impeachment rested on facts occurring well before he became a paid plaintiff, 677 F. Supp. 2d at 67-72 (FOF 2-20) – information that was known to or easily ascertainable by the other defendants before they embarked on the ESA Case with Rider as their anchor point for standing to sue.[35]

Finally, FEI's malicious prosecution claim asserts that defendants lacked probable cause

---

[34] This not like *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082-83 (5th Cir. 1988), or *Freeman v. Lasky, Haas & Choler*, 410 F.3d 1180, 1185 (9th Cir. 2005), cases cited by defendants, where the defendants succeeded in their underlying petitions, which the courts pointed to as further proof that their petitions were not shams.  Indeed, the defendants in *Freeman* won their case despite their earlier misconduct in discovery.  410 F.3d at 1185.  The present case is much different.

[35] Defendants' long list of things that they believe went well for them in the ESA Case is irrelevant. Def. Mem. at 40.  Even if all of this were true, and it is not, none of it addresses the "sham" nature of the case, *i.e.*, the fact that Rider was paid to claim an injury he did not have.  Thus, for example, that purported "leading elephant experts" testified in a trial that only took place because of the fraudulent creation of Article III jurisdiction does not negate the "sham."  Nor did the Court "reject FEI's motion for a directed verdict." *Id.*  There is no such motion in a bench trial.  FEI made a Rule 52(c) motion for judgment on partial findings, and the Court announced before it was made that it would not decide any such motion until all of the evidence was in (including what FEI put on its own case about the payments).  No. 03-2006, 2-26-09 a.m. 68:11-13.  Unlike Rule 50, applicable in jury trials, it was within the Court's discretion to decide a Rule 52(c) motion at either the close of plaintiffs' case or at the close of *all* the evidence. *Smith v. Haden*, 872 F. Supp. 1040, 1043-44 (D.D.C. 1994).  The Court's deferral of the motion until the end of the case was not some kind of determination that plaintiffs had made a "prima facie" case.

for the ESA Case, *see* FAC ¶¶ 323-333, and those allegations are sufficient to defeat this motion to dismiss. *Cf. Prof'l Real Estate Inv.*, 508 U.S. at 62-63 (noting connection between probable cause in tort of wrongful civil proceedings/malicious prosecution and the sham litigation test). In this regard, that the organizational plaintiffs contended throughout the ESA Case that they had standing independent of Rider (Def. Mem. at 41) does not help them on the "objectively baseless" point. It shows the opposite. The law of the case from June 29, 2001 through the end was that the organizations had no standing. FAC ¶¶ 53-54; [ESA]DE 213 at 6. Furthermore, ASPCA, API and FFA all abandoned any claim for relief during the trial, FAC ¶¶ 12; 677 F. Supp. 2d at 66 n.10, which demonstrates the objective baselessness of their claims. *See Chevron Corp. v. Bonifaz*, 2010 U.S. Dist. Lexis 55459 at *14 (N.D. Cal. 2010) ("'one does not simply abandon a meritorious claim once instituted'") (citation omitted).

Defendants mount no argument on the second part of the sham litigation test. *See* Def. Mem. at 42. Nor could they. The FAC contains detailed allegations that the design of the ESA Case was either to destroy FEI's circus by taking its elephants away or forcing them out of the show and by draining FEI's resources with litigation costs. FAC ¶¶ 9-11, 57. The FAC satisfies both prongs of the sham litigation exception, and the complaint should not be dismissed on *Noerr-Pennington* grounds. *See WAKA LLC v. DC Kickball*, 517 F. Supp. 2d 245, 251 (D.D.C. 2007) (monopolization counterclaim sufficiently apprised plaintiff of that claim and both prongs of the sham litigation exception "in that they allege that plaintiff filed a baseless copyright infringement suit with the intent of inhibiting competition") (citation omitted).

## IV.    THE FAC STATES A CAUSE OF ACTION UNDER 18 U.S.C. § 1962(C)

FEI's RICO claim arises under 18 U.S.C. § 1962(c), which prohibits any person associated with an enterprise from conducting, or participating directly or indirectly in the conduct of, the affairs of that enterprise through a pattern of racketeering activity. *Id.* FEI's

claim for damages arises under 18 U.S.C. § 1964(c) which provides for recovery of damages to business or property "by reason of a violation of section 1962." *Id*. Defendants claim that the FAC does not adequately plead the elements of "pattern," proximate cause and "enterprise," Def. Mem. at 44-57, but these arguments have no merit.

## A.   The FAC Alleges A Pattern of Racketeering Activity

"[T]o prove a pattern of racketeering activity a plaintiff … must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J.*, 492 U.S. at 239. The FAC pleads both elements.

Relatedness for purposes of RICO turns on the "relationship that [the predicate acts] bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged.'" *Id*. at 238. As indicated above, the FAC sets forth more than 1300 separately identified instances of bribery/illegal gratuities, mail and wire fraud, money laundering and obstruction of justice, occurring between May 2001 through March 2009. *See* pp. 12-13, *supra*. All of these acts were related; the external organizing principle was pursuit of a fraudulent case against FEI to defraud it of its money and elephants. The money paid to Rider was for his participation in the ESA Case as a plaintiff and a witness (bribes/illegal gratuities); the payments were sent through the mails or by private carrier (mail fraud); the monies were falsely characterized in the WAP letters, MGC invoices and other communications as "grants" or "reimbursements" for "media work" to disguise the illegal proceeds and to assist Rider in evading income taxes, thereby stretching the value of the payments (mail and wire fraud and money laundering); and the defendants concealed the payments in discovery by omission and affirmative false statements (obstruction of justice). Thus, there is no risk here that defendants face "charges based on isolated or sporadic criminal acts." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period

of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J.*, 492 U.S. at 241.  The FAC pleads open- as well as closed-ended continuity. Continuity is measured "as of the time suit is filed." *RTC v. Stone*, 998 F.2d 1534, 1545 (10th Cir. 1993), *superseded on other grounds*.  At that time – August 2007 – defendants' pattern of racketeering activity was in high gear. *See* FAC ¶¶ 13-32. The FAC also specifically pleads open-ended continuity by alleging that the racketeering "extends over a substantial period of time, up to and beyond the date of this Amended Complaint." *Id.* ¶ 283.  The conduct complained of in the FAC continued beyond the trial in the ESA Case in actions that were coordinated by one or more of the defendants. *Id.* ¶ 245.  Furthermore, Rider was not the only paid witness or plaintiff.  The FAC documents other examples in which defendants, working with others, procured individuals who were witnesses or potential plaintiffs in the ESA Case and other fora for money or other inducements. *Id.* ¶¶ 246-72.  Thus, what occurred in the ESA Case with Rider was the enterprise's "regular way of doing business," which establishes the "threat of continuity." *H.J.*, 492 U.S. at 242.  Finally, given the radical agenda that defendants pursued, the gravity of the wrongs committed to pursue it, and the fact that the agenda was not achieved through the ESA Case, there is a distinct threat of long-term racketeering activity. *Compare* "Born Free USA Will Not Give Up!" (1-20-11)[36] *with United States v. Wilson*, 605 F.3d 985, 1021 (D.C. Cir. 2010) (*per curiam*) (open-ended continuity shown, by, *inter alia*, statement of defendant that "'Nothing will stop this money train'"). *See also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (open-ended continuity shown, *inter alia* because acts "would … have continued indefinitely" had plaintiffs not sued); *Am. Special Risk Ins. v. Greyhound*, 1996 U.S. Dist. Lexis 14231 at *238, 240-41 (S.D.N.Y. 1996) (witness bribes paid annually over several

---

[36] *Born Free USA Will Not Give Up!*, BORN FREE USA, Jan. 20, 2011, available (control + click) at http://bfusa.convio.net/site/MessageViewer?em_id=5761.0&dlv_id=8941.

years for testimony that became more favorable over time was open-ended pattern).

Closed-end continuity may be shown by "a series of related predicates extending over a substantial period of time." *H.J.*, 492 U.S. at 242. The FAC's allegation of more than 1300 related predicate acts over a 9-year period readily establishes closed-end continuity. *Compare id.* at 250 (unspecified number of bribe payments over period of 6 years showed closed-end continuity); *Wilson*, 605 F.3d at 1021 (drug activity over period of 16 months showed open-and closed-end continuity); *Edwards v. Prime Inc.*, 602 F.3d 1276, 1297 (11th Cir. 2010) (that defendants committed predicate acts "far more times than two" adequately alleged pattern); *Philip Morris*, 566 F.3d at 1117-18 (108 predicate acts of mail and wire fraud over several decades was a sufficient pattern); *United States v. Richardson*, 167 F.3d 621, 623, 625-26 (D.C. Cir. 1999) (pattern shown by 15 separate violent criminal incidents over 2.5 months); *United States v. Palfrey*, 499 F. Supp. 2d 34, 46 (D.D.C. 2007) (indictment sufficiently showed continuity with 14 prostitution–related predicate acts between 1998 and 2006); *Oceanic Expl. Co. v. ConocoPhillips, Inc.*, 2006 U.S. Dist. Lexis 72231 at *58-59 (D.D.C. 2006) (continuous bribes of government officials over a decade was a pattern).

Defendants contend that FEI has alleged a single scheme, directed against a single victim in connection with a single lawsuit which, according to defendants, is not a pattern as a matter of law under D.C. Circuit precedent. Def. Mem. at 44-49. This is a misstatement of the law. As the very authority cited by defendants recognizes, the Supreme Court has rejected the point that "predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes. ...[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes." *H.J.*, 492 U.S. at 234, 236 240 (original emphasis; pattern shown by single scheme to bribe utility commissioners). *See Western Assocs. v. Market Square Assocs.*,

235 F.3d 629, 634 (D.C. Cir. 2001) ("[i]t is true that ... *a single scheme may suffice* for purposes of RICO") (emphasis added); *Parcoil Corp. v. NOWSCO Well Serv., Ltd.*, 887 F.2d 502, 503 (4th Cir. 1989) (same); *Huntair, Inc. v. Gladstone*, 2011 U.S. Dist. Lexis 15817 at *24 (N.D. Cal. 2011) (evidence of multiple schemes not required to show continuity); *Bryant*, 2010 U.S. Dist. Lexis 103851 at *35 ("[n]either form of continuity ... requires ... more than one 'scheme' or 'criminal episode'") (citation & quote marks omitted).

Nor is it the case that a pattern of racketeering activity cannot arise with respect to a single victim or a single lawsuit. *Handeen*, 112 F.3d at 1343-44 (a single "intricate scheme through which defendant sought to fraudulently obtain a discharge ... by manipulating the bankruptcy system" which victimized one person in one case was a pattern of racketeering activity). *See also Living Designs*, 431 F.3d at 357, 364-65 (reversing summary judgment for defendants; fraudulent discovery conduct by defendant in consolidated products liability litigation was pattern of racketeering activity); *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 142-43 (D.D.C. 2008) (single victim, single scheme pattern of racketeering activity over 3 years stated RICO cause of action); *Lewis*, 696 F. Supp. at 727-28 (single victim of fraud on FCC through pattern of racketeering activity). Nothing in the statute requires that a pattern of racketeering activity victimize more than one person to be actionable. 18 U.S.C. § 1961(5) (definition of "pattern"); § 1964(c) ("[a]ny person injured" may sue).

The cases on which plaintiffs rely, *Edmondson & Gallagher v. Alban Towers Ten. Ass'n*, 48 F.3d 1260 (D.C. Cir. 1995), and *Western*, are inapposite. They both address closed-end continuity, and, as shown above, the FAC alleges both closed- and open-ended continuity. Moreover, neither case establishes the per se rule on closed-end continuity that defendants describe. *Edmondson* involved a single scheme to defeat a single sale of a single building, the

wrongs occurred over the course of a month, and the only persons affected were the buyer, seller and real estate broker and only with respect to that one transaction. The conduct had "'no potential to extend to other persons or entities.'" 48 F.3d at 1265 (citation omitted). This is why it was "virtually impossible for plaintiffs" – *in that case* – "to state a RICO claim." *Id*. The instant case is quite different. Defendants' racketeering activity was not directed at a single transaction but at destroying a 140-year old business by confiscating the elephants or by banning the tools necessary to exhibit elephants in FEI's traveling shows, thereby preventing thousands of performances in hundreds of localities each year. In addition, while *Edmondson* did involve abusive litigation conduct, the tenants in that case really lived in the building. They did not do what defendants did here with Rider: pay someone to falsely claim to be a tenant. Furthermore, the racketeering in the instant case potentially victimized more than one person or entity. While FEI was the primary target, any institution that uses the guide or tethers was going to be affected by the ESA Case, which the defendants brought for the very reason of creating precedent. Nor does this case involve one scheme. As the FAC alleges, defendants used the ESA Case as a fund-raising mechanism, a scheme wholly separate from the attack on FEI and its elephants and that did not clearly emerge until API admitted to it in its January 2008 deposition. And the efforts that defendants went to conceal their activities itself is a separate scheme and one that executed the scheme to defraud. *Bryant*, 2010 U.S. Dist. Lexis 103851 at *28 ("'cover up' of a scheme to defraud executes the scheme").

*Western* was a dispute between parties to a business transaction gone sour that was predicated solely on claims of mail and wire fraud. While the dispute lasted 8 years, it was still in essence a case of commercial fraud impacting a single partnership. As the court noted, such cases should be scrutinized "to prevent ordinary business disputes from becoming viable RICO

claims … simply because the parties used the United States mails or a fax machine to transmit financial documents." 235 F.3d at 637.  The instant case does not involve a business dispute or "ordinary commercial fraud" in which some correspondence was mailed.  It involves conduct that perverted the judicial process.  *Cf. United States v. Skilling*, 130 S.Ct. 2896, 2933 (2010) ("it has always been 'plain as a pikestaff that' bribes" are "seriously culpable" "hard core fraud").  Furthermore, the six factors that these two cases suggested be considered in determining whether a pattern has been alleged do not "establish a per se rule for pattern analysis." 235 F.3d at 637.  Instead they "present[] a flexible guide" that is "case-by-case" and "fact-specific." *Id.* at 634, 637.  These factors[37] all point to finding a pattern of racketeering activity here:  thirteen defendants committed more than thirteen hundred related predicate acts over a 9-year period of time that struck at the core of the judicial system and that injured FEI and potentially a class of victims:  all other users of the guide and tethers in the U.S.  The FAC therefore clearly complies with precedent in this Circuit on the RICO "pattern" requirement.[38]

## B.   The FAC Adequately Alleges Standing Under Section 1964(c)

To have standing to recover damages under RICO, a private party must have been "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).  The injury to FEI's business here is the money spent defending the ESA case.  FAC ¶ 101.  The predicate acts alleged in the FAC that executed and concealed the Rider payment

---

[37] *Western*, 235 F.3d at 633 ("[t]hese factors are:  'the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity'") (quoting *Edmondson*, 48 F.3d at 1265).

[38] Neither of these cases has had wide application in this Circuit beyond the business dispute/mail or wire fraud predicate context.  Neither case was even cited in *Philip Morris* when the Circuit affirmed the finding of a pattern of racketeering activity, 566 F.3d at 1117, and while citing *Western* in *Wilson*, the Circuit found open- and closed-end continuity in a drug case with racketeering activity over a period of less than two years, 605 F.3d at 1020-21. *See also Lopez v. CAIRAN*, 657 F. Supp. 2d 104, 114 (D.D.C. 2009) (15 acts of mail fraud over 2 years not a pattern; "[t]he Circuit has noted that 'RICO claims premised on mail or wire fraud must particularly scrutinized'") (citing *Western & Edmondson*); *Zernick v. DOJ*, 630 F. Supp. 2d 24, 27 (D.D.C. 2009) (per *Western*, no pattern regarding forced sale of single residential property); *Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 376-77 (D.D.C. 2008) (per *Western*, no pattern in case based on phone calls, faxes and emails (mail and wire fraud) as to single financing).

scheme, therefore were the "but for" as well as the proximate cause of FEI's injuries. *Hemi*, 130 S.Ct. at 989. Had Rider not been paid to claim falsely that he had an "aesthetic injury," there never would have been an ESA Case, and FEI would not have spent the money it spent defending that case. FAC ¶ 7. Monies expended in defending litigation that is the product of racketeering activity are an injury to business or property and are recoverable damages under RICO. *Handeen*, 112 F.3d at 1354; *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993); *Bankers Tr.*, 859 F.2d at 1105; *Malley-Duff*, 792 F.2d at 354-55; *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035 (N.D. Cal. 2004). Therefore, the FAC alleges sufficient RICO standing for FEI.

Defendants admit that FEI's ESA Case attorneys fees are a "concrete injury," Def. Mem. at 55, but argue that FEI cannot establish that Rider's fraud was the "but for" cause of this concrete injury "because of the ***independent*** assertion of organizational standing arguments that were vigorously advanced throughout the entire ESA litigation," *id.* at 56 (original emphasis). This ignores the Court's determination that the ESA Case "***could not have been maintained without Mr. Rider's participation as a plaintiff***, and the payments to him are linked directly to the litigation itself." 677 F. Supp. 2d at 89 (COL 5) (emphasis added). It also ignores the fact that the three original organizational plaintiffs were dismissed for lack of standing in June 2001, in a ruling that remained undisturbed up to and through the point at which they totally abandoned the case at trial. FAC ¶¶ 12, 50. So, at a minimum, the Rider payments were the sole cause of FEI's RICO injury from and after June 2001. And the entry of API into the case in 2006, does not change the analysis. The Court found that API had no standing either. FAC ¶ 59.[39]

---

[39] Even if the determination as to API were overturned on appeal (which defendants seem to assume prematurely), and even if it were determined that API's participation in the Rider bribes and cover-up and API's 6-year delayed entry into the ESA Case to use it as a fund-raising vehicle do not constitute unclean hands or laches, that would still

Defendants' further speculation that there allegedly is "no discernible way for the Court (or a jury) to assess how much of FEI's fees and costs would have been expended if only organizational standing had been advanced from the outset" is hypothetical and pointless. Def. Mem. at 56.  Organizational standing was never the sole standing theory.  Rider was in the case from the outset, and FEI spent legal fees dealing with his claims regardless of the fact that the other plaintiffs continued to assert organizational standing after the Court had rejected their arguments.

Defendants' other arguments – that FEI has allegedly suffered no injury because no elephant bans have been enacted as a result of Rider's legislative efforts or that it would allegedly be impossible to determine whether anyone donating money to defendants to support the ESA Case would have acted differently with knowledge that the money was to fund Rider's bribes – completely miss the point.  Def. Mem. 52-54.  The ESA Case with its fraudulent jurisdictional predicate was the means by which defendants carried or attempted to carry out these other initiatives:  defendants sought discovery in the ESA Case for use in the legislative arena and in the media; Rider's stature as a legislative witness was enhanced by being a plaintiff in a "ground-breaking" case against his former employer, FEI; and defendants used the ESA Case to raise money.  Whether or not any of these initiatives succeeded, FEI was held hostage in the ESA Case and drained of legal fees while defendants used that litigation to try to accomplish these things.[40]

---

not change the fact that Rider was the sole cause of FEI's injuries between June 2001 and March 2006, when API entered the case.

[40] Defendants mischaracterize the FAC when they assert that FEI seeks disgorgement of "one billion dollars."  Def. Mem. at 55 n.29.  The FAC notes that defendants raised that amount in donations during the relevant time period and that a "material part" of it was due to defendants' wrongdoing.  FAC ¶ 11.  How much that was is a matter for discovery, but defendants overstate the complexity.  For example, WAP produced the "thank you" notes (in redacted form) it sent to donors for the Rider project, [ESA]DE 166-24, and the other defendants presumably still have similar documents, so these donors could be queried as to whether they would have paid had they known the truth about where the money was going.

### C.  The FAC Pleads A RICO "Enterprise" Distinct From The Perpetrators

Defendants do not contend that the FAC fails to plead facts necessary for an enterprise under RICO: "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 129 S.Ct. at 2244. Indeed, the pattern of racketeering activity pleaded in the FAC itself shows the enterprise. *Id.* at 2247 ("'the existence of an association in fact is often-times more readily proven by what it does, rather than by abstract analysis of its structure'"); *Wilson*, 605 F.3d at 1020 (same); *Allstate Ins. Co. v. Linea Latina De. Acc., Inc.*, 2011 U.S. Dist. Lexis 16221 at *13 (D. Minn. 2011) (pleading a pattern showed the enterprise). Instead, defendants claim that the FAC "fails to allege any distinction between the RICO persons themselves ... and the so-called 'enterprise.'" Def. Mem. at 58. This argument is misconceived. The FAC alleges a clear distinction between the enterprise and the perpetrators who conducted the affairs of that enterprise through a pattern of racketeering activity. Here, the enterprise is the plaintiffs' side of the ESA Case. Defendants associated in fact to bring the ESA Case as plaintiffs, plaintiffs' counsel and two other benefactors, WAP and HSUS, supplying money to Rider. FAC ¶¶ 2-12, 275-81. None of these persons or entities is named in the FAC as the enterprise, and all of them are legally distinct from each other. *Id.* ¶¶ 34-46. Since at least two of these legally distinct entities is part of an enterprise – the existence of which defendants do not deny – the FAC pleads sufficient "distinctness" between the enterprise and defendants (the RICO "persons"). *United States v. Philip Morris*, 327 F. Supp. 2d 13, 18 (D.D.C. 2004). *See also Philip Morris*, 566 F.3d at 1111 ("[w]hen the enterprise is an association-in-fact, ***members*** of the association may be both part of the 'enterprise' and liable as 'persons' under RICO if they conduct the enterprise's affairs through racketeering activity") (original emphasis); *Living Designs*, 431 F.3d at 362 (RICO case based on fraudulent conduct in lawsuit; where enterprise was defendant, its lawyers and expert

witnesses, the lawyers were sufficiently distinct from their client, the RICO "person:" [t]hese

law firms are required to conform to ethical rules and thus are not merely at the beck and call of

their clients").

Defendants' assertion that the FAC does "not distinguish the purported enterprise from

defendants' conduct of their '*own* affairs,' as longstanding animal advocates, *Reves*, 507 U.S. at

185," is equally flawed. Def. Mem. at 59 (original emphasis; citation omitted). In *Reves*, the

Court found that an accounting firm hired to audit an enterprise's books did not participate in the

enterprise simply by doing its job. 507 U.S. at 185-86. Here, the FAC clearly distinguishes the

parties and their missions and activities from their involvement in the ESA Case. FAC ¶¶ 34-46.

Moreover, where, as here, the enterprise was formed to conduct the racketeering activity, there

will be an overlap between the affairs of the enterprise and the perpetrators' own affairs, but this

does not mean that the enterprise is not sufficiently distinct. Indeed, the Third Circuit recently

rejected this very argument:

> Here ... defendants are alleged to be members of the enterprise. It
> will often be the case that the interests of the enterprise are
> congruent with those of its members; such congruence presumably
> provides the incentive for members to participate in the enterprise.
> We think, therefore, that *"if defendants band together to commit
> [violations] they cannot accomplish alone ... then they
> cumulatively are conducting the association-in-fact enterprise's
> affairs, and not [simply] their own affairs."* ... Here, defendants'
> alleged collaboration in the Marsh-centered enterprise, most
> notably the bid rigging, allowed them to deceive insurance
> purchasers in a way not likely without such collusion.

*In re Ins. Brokerage Antitrust Lit.*, 618 F.3d 300, 378 (3d Cir. 2010) (emphasis added; citation

omitted). The same analysis applies here. Defendants banded together in the ESA Case in an

effort to accomplish ends that they could not achieve on their own: ending elephants in FEI's

circus with a lawsuit based on a fabricated claim of "aesthetic injury" standing. None of the

lawyers or the organizations could have sued FEI on their own, and as was proven at trial, Rider

never would have been a plaintiff without being paid to be one.  677 F. Supp. 2d at 80-81 (FOF

53).  Therefore, by bringing the ESA Case, defendants were not simply conducting their own

affairs.  *See Philip Morris*, 566 F.3d at 1116 ("[d]efendants jointly committed fraud and so

participated in the conduct of not just their own affairs but the enterprise's as well").

### D.    The FAC Does Not Engage In "Group Pleading"

According to defendants, the FAC has no "specific allegations as to the manner in which

Mr. Rider, any of the organizations or their lawyers 'direct[ed] the enterprise's affairs,'" and the

FAC engages in impermissible "group pleading."  Def. Mem. at 61, 63.  This argument is

frivolous.

*First*, it rests on the wrong legal standard.  To be liable under RICO, a person must

participate in the "operation *or* management of the enterprise."  *Reves*, 507 U.S. 183 (emphasis

added).  RICO liability is not limited to upper management but also extends to "lower rung

participants in the enterprise who are under the direction of upper management."  *Id.* at 184.  *See*

*United States v. Shamah*, 624 F.3d 449 (7th Cir. 2010) (where enterprise was Chicago Police

Department, "lowly" police officers were "operators" per *Reves*, despite having no authority to

make command decisions, no supervisory powers over other officers and no control over

department-wide policies); *Burden*, 600 F.3d at 219 (since defendant had discretion in

performing his tasks, he participated in operation of enterprise, despite claim that "he was doing

nothing more than taking orders").  Whether a defendant participated in operating or managing

the enterprise ultimately is a question of fact.  *First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*,

385 F.3d 159, 176 (2d Cir. 2004); *Bridgewater v. Double Diamond-Delaware, Inc.*, 2010 U.S.

Dist. Lexis 45790 at *33 (N.D. Tex. 2010).

*Second*, a RICO complaint need not have to read like WAR AND PEACE.  Allegations that

"defendants did this, and defendants did that" suffice as long as each defendant's involvement is

highlighted. *See Garrett v. Cassity*, 2010 U.S. Dist. Lexis 134776 at *57-58 (E.D. Mo. 2010) ("[a]lthough Plaintiffs' Amended Complaint does contain a substantial number of allegations directed at defined groups such as the RICO defendants, the Fraudulent Transfer Defendants, and so on, it also contains numerous allegations specifically highlighting Brent Cassity's involvement in the scheme to defraud"). As the table below illustrates, the FAC clearly sets out each defendant's involvement in the management or operation of the enterprise at issue here, namely, the prosecution of the fraudulent ESA Case:

| Defendant | Participation in Management or Operation of the Enterprise [FAC ¶] |
|---|---|
| Rider | Involvement in the scheme to defraud FEI, through his own actions and actions of WAP, MGC, Meyer and Glitzenstein on his behalf. [98-129]. Plaintiff in ESA Case. [50, 55]. Accepted more than $190,000 in cash as well as property and other benefits over more than 9 years from ASPCA, AWI, FFA, HSUS, API, WAP and MGC. [5, 19-27]. Provided false testimony in an ever-evolving story in exchange for the money he was paid. [184-91]. Evaded federal income taxes for 7 years on the payments he received. [28-29]. Through counsel, made false statements to the courts about his "aesthetic injury." [50-56]. Obstructed FEI's inquiry into the payments he received by submitting false interrogatory answers, spoliating evidence, and absenting himself from contempt hearing. [192-93, 223-35]. |
| ASPCA | Involvement in the scheme to defraud FEI, through its own actions and actions of WAP, MGC, Meyer and Glitzenstein on its behalf. [98-129]. Plaintiff in ESA Case. [50, 55]. Agreed in 2001 with MGC, AWI and FFA to fund Rider through MGC. [144, 156]. Made payments to Rider through MGC. [132]. Made direct payments to Rider. [133]. Paid Rider's "expenses." [136]. Provided Rider with property and other items. [137]. Provided $6000 "grant" to WAP for payment to Rider. [86, 136]. Agreed in 2003 with MGC, AWI and FFA on manner of further Rider funding through WAP. [145, 157]. Paid Rider at least $14,000. [69, 135]. Participated in July 2005 fund-raiser. [179-83]. Through counsel, made false statements to the courts about Rider's "aesthetic injury." [50-56]. Obstructed FEI's inquiry into the Rider payments by omitting material facts from interrogatory answers, spoliating evidence, and procuring Rider's absence from contempt hearing. [196, 231-35]. |
| AWI | Involvement in the scheme to defraud FEI, through its own actions and actions of WAP, MGC, Meyer and Glitzenstein on its behalf. [98-129]. Plaintiff in ESA Case. [50, 55]. Agreed in 2001 with MGC, ASPCA and FFA to fund Rider through MGC. [146, 156]. Made direct payments to Rider. [147]. Agreed in 2003 with MGC, ASPCA and FFA to fund Rider through WAP. [145, 157]. Made "grants" to WAP for payment to Rider. [148]. Paid Rider at least $66,532. [149]. Participated in July 2005 fund-raiser. [179-83]. Through |

| Defendant | Participation in Management or Operation of the Enterprise [FAC ¶] |
|---|---|
| | counsel, made false statements to the courts about Rider's "aesthetic injury." [50-56]. Obstructed FEI's inquiry into the Rider payments by omitting material facts from interrogatory answers, providing false interrogatory answers, providing false deposition testimony, spoliating evidence, and procuring Rider's absence from contempt hearing. [196-216, 231-35]. |
| FFA | Involvement in the scheme to defraud FEI, through its own actions and actions of WAP, MGC, Meyer and Glitzenstein on its behalf. [98-129]. Plaintiff in ESA Case. [50, 55]. Agreed in 2001 with MGC, ASPCA and AWI to fund Rider through MGC. [156]. Made direct payments to Rider. [159, 161]. Agreed in 2003 with MGC, ASPCA and AWI to fund Rider through WAP. [145, 157]. With HSUS, made "contributions" or "donations" to WAP for payment to Rider. [160]. With HSUS, paid Rider at least $11,933. [162]. Participated in July 2005 fund-raiser. [179-83]. Through counsel, made false statements to the courts about Rider's "aesthetic injury." [50-56]. Obstructed FEI's inquiry into the Rider payments by omitting material facts from interrogatory answers, providing false interrogatory answers, providing false deposition testimony, spoliating evidence, and procuring Rider's absence from contempt hearing. [196-98, 217-22, 231-35]. |
| API | Involvement in the scheme to defraud FEI, through its own actions and actions of WAP, MGC, Meyer and Glitzenstein on its behalf. [98-129]. Joined the enterprise in 2006 as plaintiff in ESA Case to provide further funding for Rider and to use ESA Case as a fund-raiser. [169]. Made "grants" to WAP for payment to Rider. [170]. Made direct payments to Rider. [172]. Paid Rider at least $13,619.63. [173]. Procured Rider's absence from contempt hearing. [231-34]. |
| MGC | Involvement in the scheme to defraud FEI. [98-129]. Counsel of record for plaintiffs in ESA Case throughout litigation. [39]. Paid Rider directly and charged amounts on legal bills back to ASPCA, AWI and FFA. [67-68, 72-75]. To obstruct FEI's inquiry into Rider payments, withheld MGC Form 1099 showing payments directly to Rider and withheld, and misrepresented existence of, MGC invoices showing same. [80-81]. Participated in Rider's false interrogatory answer regarding compensation received from animal advocates, false or misleading interrogatory answers of ASPCA, AWI and FFA and false deposition testimony of AWI and FFA. [192-93, 196-230]. Made false statements to the courts about Rider's "aesthetic injury." [50-56]. Procured Rider's absence from contempt hearing. [231-34]. Made alterations in website to conceal fact that WAP is its alter ego. [194-95]. |
| WAP | Involvement in the scheme to defraud FEI. [98-129]. Alter ego of MGC. [43]. Established, dominated and managed by Meyer and Glitzenstein. [43]. Made payments to Rider on behalf of ASPCA, AWI, FFA, API and HSUS of more than $155,000. [82-97, 125-26]. Paid Rider's "expenses." [94-96]. Issued falsely worded correspondence to Rider and made false ledger entries to conceal the true nature of the payments. [113-124]. Through Meyer, disseminated false fundraising materials on behalf of WAP. [127-29]. Participated in July 2005 fund-raiser. [179-83]. Made alterations in website to conceal fact that it is |

| Defendant | Participation in Management or Operation of the Enterprise [FAC ¶] |
|---|---|
|  | MGC's alter ego. [194-95]. |
| Meyer | Involvement in the scheme to defraud FEI. [98-129]. Counsel of record for plaintiffs in ESA Case throughout litigation. [40]. Conceived of the plan to pay Rider. [61]. Solicited "donations" from other ESA Case plaintiffs to fund Rider. [76]. To obstruct FEI's inquiry into Rider payments, withheld MGC Form 1099 showing payments directly to Rider and withheld, and misrepresented existence of, MGC invoices showing same. [80-81]. Participated in Rider's false June 2004 interrogatory answer regarding compensation received from animal advocates. [223-30]. Coordinated other plaintiffs' June 2004 interrogatory answers that omitted disclosure of the payments or that provided false information about same. [196-97, 199-205]. Made false statements to the courts about Rider's "aesthetic injury." [50-56]. Established, dominates and manages WAP. [43]. Disseminated false fundraising materials on behalf of WAP. [127-29]. Personally made at least one payment to Rider. [106]. Procured Rider's absence from contempt hearing. [231-34]. |
| Glitzenstein | Involvement in the scheme to defraud FEI. [98-129]. Counsel of record for plaintiffs in ESA Case throughout litigation. [41]. Established, dominates and manages WAP. [43]. Made false statements to the courts about Rider's "aesthetic injury." [50-56]. Paid Rider under cover of false correspondence to conceal the true nature of the payments. [113-124]. Paid Rider's "expenses." [97]. Procured Rider's absence from contempt hearing. [231-34]. |

Defendants give Crystal, Ockene and Lovvorn special mention, Def. Mem. at 61-62, but they participated in the operation or management of the enterprise as well. During various periods (yet to be determined in discovery), these individuals were all partners in MGC, a general partnership under D.C. law. FAC ¶¶ 39, 41, 44-45. As such, they are all jointly and severally liable for the racketeering activity of their fellow partners, Meyer and Glitzenstein, as well as the racketeering activity of the firm, MGC, as detailed above and in the FAC, all of which was done in the ordinary course of the partnership's business. FAC ¶ 46; D.C. CODE § 33-103.01(1) (2010) (each partner is an agent of the other partners, whose acts in the ordinary course of business bind the others); § 33-103.05(a) (2010) (partnership liable for third party loss due to partner's wrongful acts); § 33-103.06(a) (2010) (all partners jointly and severally liable for all partnership obligations). *See also BCCI Holdings (Lux.), S.A. v. Clifford*, 964 F. Supp. 468, 486 (D.D.C. 1997) (in RICO case, law firm partners jointly and severally liable for wrongs

of other partner while they were partners and cannot escape liability by leaving the firm); *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1534 (S.D.N.Y. 1995) ("[i]t is not unreasonable to think that if partners are held civilly liable for the RICO violations of their partnership and co-partners, they will have added incentive to take steps to reign in misconduct by their colleagues").   Furthermore, since WAP was the alter ego of MGC, FAC ¶ 43, its racketeering activity is attributable to MGC and, thus, under the foregoing authorities, to the individual partners as well. *See, e.g., Labadie Coal Co. v. Brock*, 672 F.2d 92, 97 (D.C. Cir. 1982).

Crystal, Ockene and Lovvorn all had actual knowledge of the Rider payments, and with that knowledge, acted as counsel of record in the ESA Case. FAC ¶¶ 42, 44-45. Where, as here, the RICO enterprise is fraudulent litigation, the lawyers handling that case operate the enterprise, and their actions exceed the provision of ordinary legal services. *Handeen*, 112 F.3d at 1350 (attorney participated in operation of enterprise by helping client perpetrate fraud on bankruptcy court); *Napoli v. United States*, 32 F.3d 31, 36 (2d Cir. 1994) (where enterprise was pursuit of false personal injury claims with bribes and false testimony, "of counsel" lawyers involved in the "core activities" of the enterprise, *i.e.*, handling the cases, participated in the management or operation of the enterprise per *Reves*); *Garrett*, 2010 U.S. Dist. Lexis 134776 at *87 (outside counsel involved in executing and concealing some of the illegal acts participated in operation of enterprise).

Furthermore, Crystal, Ockene and Lovvorn all participated in procuring Rider's absence from the 2008 contempt hearings, one of the episodes of bribery/illegal gratuities alleged in the FAC. FAC ¶¶ 231-34. Ockene and Lovvorn both made false statements to the courts about Rider's "aesthetic injury." *Id.* ¶¶ 44-45, 51-56. Ockene participated in obstructing FEI's inquiry into the payments:   the organizational plaintiffs' misleading or false, and Rider's false,

interrogatory answers in June 2004, and AWI's 30(b)(6) deposition in which Liss testified falsely about AWI's payments to Rider. *Id.* ¶¶ 192-216, 223-30; [ESA]DE 476, Att. 14 (DX 16 at 13); [ESA]DE 477, Att. 1 (DX 18R at 12), Att. 2 (DX 20R at 20), Att. 3, (DX 19 at 8); Liss Dep. at 2 (5-18-05).  Lovvorn participated in the planning and execution of the payments to Rider.  FAC ¶ 44.  After he became employed by HSUS, Lovvorn participated personally in the payments made to Rider by HSUS through WAP.  *Id.* ¶¶ 44, 160; [ESA]DE 166-14, 166-19, 166-22, 166-24.

According to defendants, the FAC does "nothing more than allege incorrectly that [HSUS] 'merged' with [FFA] in 2005 ...." Def. Mem. at 62.  This is incorrect.  In the first place, the allegation that HSUS and FFA merged, FAC ¶ 36, is an assertion of fact that must be accepted as true for purposes of defendants' motion.  And while HSUS suggests that it did not merge with FFA, that is exactly how HSUS described the transaction in its own press release. [ESA]DE 167-27 ("[t]he *merger* will formally occur on January 1, 2005") (emphasis added).  By merging with FFA, HSUS inherited liability for FFA's racketeering activity.  N.Y. NOT-FOR-PROFIT CORP. LAW § 905(b)(3) (Consol. 2010); D.C. CODE § 29-301.44 (5) (2010).

After the merger, HSUS itself participated in the operation of the enterprise and committed its own predicate acts.  HSUS made at least 6 payments to WAP that were intended for Rider.  FAC ¶ 160.  HSUS participated in the July 2005 fund-raiser that garnered money to continue to the payments to Rider and which constitutes one of the episodes of mail fraud.  *Id.* ¶¶ 179-83.  When FFA obstructed FEI's discovery by providing false 30(b)(6) deposition testimony about the Rider payments, the witness, Markarian, was the Executive Vice President of HSUS. *Id.* ¶¶ 36, 217-22.  HSUS also had a hand in controlling the fraudulent ESA Case, as two of its employees, Ockene and Lovvorn, remained counsel of record in the ESA Case after they left MGC and joined HSUS.  *Id.* ¶¶ 44-45.  All of this sufficiently establishes HSUS's participation

in the management or operation of the enterprise. *Compare Elemary*, 533 F. Supp. 2d at 142

(having organized single transaction for enterprise, defendant "played '*some* part in directing the

enterprise's affairs.' *Reves*, 507 U.S. at 179") (original emphasis).

### E.   The FAC Sufficiently Pleads The Predicate Offenses

Defendants imply, incorrectly, that FEI's RICO claims are subject to the heightened

pleading requirements of Fed. R. Civ. P. 9(b).  Def. Mem. at 19, 20.  Because RICO claims are

not listed in Rule 9(b), they are not subject to that rule. *Swierkiewcz v. Sorema, N.A.*, 534 U.S.

506, 512-13 (2002); *Leatherman v. Tarrant Cty.*, 507 U.S. 163, 168-69 (1993); *Santana*, 270

F.R.D. at 389 (to "universalize RICO pleading as though it were fully governed by the standard

of 9(b)" is "flat-out wrong"). *See also Twombly*, 550 U.S. at 569 n.14 ("we do not … broaden

the scope of … Rule …9"). The only thing subject to Rule 9(b) here are the predicate acts of

mail and wire fraud. *Bates v. Northwestern Human Servs., Inc.*, 466 F. Supp. 2d 69, 88 (D.D.C.

2006).  A plaintiff "alleging mail and wire fraud, must satisfy two essential elements:  (1) a

scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme."

*Id.* at 89 (citation omitted).  "'[I]nnocent' mailings – ones that contain no false information –

may supply the mailing element." *Schmuck v. United States*, 489 U.S. 705, 715 (1989); *see also*

*Bryant*, 2010 U.S. Dist. Lexis 103851 at *29030.  A plaintiff alleging mail or wire fraud is not

required to "state all facts pertinent to the case." *Bridgewater*, 2010 U.S. Dist. Lexis 45790 at

*24.  Nor does Rule 9(b) require pleading fraud "'with complete insight before discovery is

complete,'" or "set[ting] out specific facts concerning matters that are likely solely known by

defendant." *Garrett*, 2010 U.S. Dist. Lexis 134776 at *55-56.  Defendants' claim of

"impermissible vagueness," Def. Mem. at 64, has no basis.

The FAC sets out, in specific detail, the scheme to defraud FEI, devoting an entire,

separately titled section of the pleading to that subject.  FAC ¶¶ 98-111.  The FAC contains

another separately entitled section showing how defendants used the mails and wires to execute the scheme to defraud. *Id.* ¶¶ 112-56.[41]   And the FAC specifically sets out how those of the defendants who are alleged to have committed mail or wire fraud did so. *Id.* ¶¶ 72-77 (MGC); *id.* 98-156 (WAP); *id.* ¶¶ 138-42 (ASPCA); *id.* ¶¶ 150-54, 179-83 (AWI); *id.* ¶¶ 163-67 (FFA & HSUS); *id.* ¶¶ 174-77 (API); *id.* ¶¶ 106, 127-29 (Meyer); *id.* ¶¶ 112-23 (Glitzenstein).   The FAC likewise pleads, in detail, "the who, what, where, when, and how of the alleged fraud," *Garrett*, 2010 U.S. Dist. Lexis 134776 at *55, with reference to specific communications, dates, senders and recipients and, where applicable, with reference to specific falsehoods.  FAC ¶¶ 85, 95-97, 106, 113-20, 125-26 (WAP payments and accompanying cover letters); *id.* ¶¶ 127-29 (Meyer funds solicitation); *id.* ¶¶ 132, 146, 158 (MGC invoices); *id.* ¶ 136 (ASPCA payments); *id.* ¶ 148 (AWI payments); *id.* ¶¶ 159-60 (FFA & HSUS payments); *id.* ¶¶ 170, 172 (API payments); *id.* ¶¶ 179-83 (July 2005 fundraising materials).   The FAC therefore readily satisfies the specificity requirements of Rule 9(b). *Perkumpulan Inv. Crisis Ctr. v. Regal Fin. Bancorp, Inc.*, 2011 U.S. Dist. Lexis 16132 at *33-34 (W.D. Wash. 2011); *Garrett*, 2010 U.S. Dist. Lexis 134776 at *57-60, 65-67, 77-79; *Green Ventures LLC v. Guttridge*, 2010 U.S. Dist. Lexis 127488 at *15-17 (D.S.C. 2010); *Bridgewater*, 2010 U.S. Dist. Lexis 45790 at *25-27; *Lewis*, 696 F. Supp. at 727.

Defendants' claim that the FAC fails to allege facts showing specific intent to defraud is wrong. Def. Mem. at 64. "Specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence." *Philip Morris*, 566 F.3d at 1118. Given the specificity of the FAC, "[t]he scienter requirements for wire and mail fraud can be inferred from the detailed pattern of conduct alleged in the Complaint." *BCCI*, 964 F. Supp. at 483. *See also Johnson v. Computer Tech. Servs.*, 670 F. Supp. 1036, 1040 n.8

---

[41] Contrary to defendants' assertion, Def. Mem. at 67 n.35, mail fraud includes use of Federal Express or other private carrier. 18 U.S.C. § 2326 (2006).

(D.D.C. 1987) (under Rule 9(b), "[f]raudulent intent need only be pleaded generally").

Nor are defendants correct that FEI's mail fraud and wire fraud claims fail because defendants did not "obtain" for themselves the fees that FEI paid to its attorneys to defend the ESA Case. Def. Mem. at 65. The only case cited, *Skilling*, an "honest services fraud" case, says nothing about this. Indeed, the ***headnote*** in *Skilling* from which defendants deceptively quote, contrasts "traditional fraud," not mail fraud, with the honest services doctrine. 130 S.Ct. at 2904. Defendants cite nothing to support their view that a scheme using the mails and wires that forces someone to spend money defending a fraudulent case is not mail or wire fraud. Mail fraud lies whether or not the perpetrator ends up with the victim's property or money. *Schmuck*, 489 U.S. at 707 (defendant used car salesman guilty of mail fraud even though he had no contact with, and received nothing from, ultimate car purchasers he victimized). Furthermore, "the mail and wire fraud statutes ***punish 'the scheme, not its success.'***" *Philip Morris*, 566 F.3d at 1130 (quoting *Pasquantino v. United States*, 544 U.S. 349, 371 (2005)) (emphasis added). *See also Bridge*, 533 U.S. at 647 ("[t]he gravamen of the offense is the scheme to defraud").

Defendants identify no flaws in how FEI has pleaded the predicate acts of money laundering and obstruction of justice. The FAC alleges that the bribes/illegal gratuities paid to Rider were falsely characterized as "grants" or "reimbursement" of expenses for "media work" to disguise their origin, their true nature and to assist Rider in evading taxes (a point that defendants skip over), all of which states the elements of the two money laundering offenses. FAC ¶¶ 24, 28-29, 72-178. *See, e.g., City of New York v. Venkataram*, 2010 U.S. App. Lexis 21115 at *5-6 (2d Cir. 2010) (phony subcontractor invoices were essential to the scheme to launder the embezzled funds); *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) (laundering transactions must be designed to hide provenance of funds involved). The FAC also

documents several instances in which defendants obstructed justice by either providing false interrogatory answers or false deposition testimony about the payments. FAC ¶¶ 192-230. These false statements were obstructions because they were made with an intent to impede the due administration of justice. *United States v. Russo*, 104 F.3d 431, 435 (D.C. Cir. 1997); *see also Dotson v. Bravo*, 202 F.R.D. 559, 567 (N.D. Ill. 2001) ("[k]nowingly incomplete and misleading answers to written interrogatories constitutes perjury, as well as, fraud"); *In Re Amtrak*, 136 F. Supp. 2d at 1258 (plaintiff's interrogatory answer "so knowingly incomplete and misleading that it constituted perjury as well as fraud on defendants and the court").

Defendants go outside the FAC and argue their side of the facts on these issues, claiming that, due to Rider's and Meyer's public statements about the payments, FEI somehow knew that they really were bribes and thus, there can be no money laundering or obstruction. Def. Mem. at 66. As shown above, this is untrue. *See* pp. 38-39, *supra*. These false characterizations of the funds simply illustrate the concealment: calling the money something other than what it really was, *i.e.*, a bribe. This is all irrelevant on this motion to dismiss, because none of these assertions of fact is in the FAC. Moreover, defendants cannot bootstrap their way out of the offenses by relying on statements that effectuated the scheme and that ultimately contributed to discovery of the scheme. *Cf. Schmuck*, 489 U.S. at 715 ("[w]e also reject Schmuck's contention that mailings that someday may contribute to the uncovering of a fraudulent scheme cannot supply the mailing element of the mail fraud offense. The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, *regardless of whether the mailing later, through hindsight, may ... return to haunt the perpetrator of the fraud*.") (emphasis added). [42]

---

[42] The discussion above at pp. 78-81 also covers the predicate act of bribery. Defendants make no argument on the predicate act of paying and receiving illegal gratuities, and therefore should be deemed to have conceded the

## V.    THE FAC STATES A CLAM FOR MALICIOUS PROSECUTION

"[T]he victor may sue the vanquished for a baseless suit if it was brought with malicious disregard for its validity and caused injury over and above the ordinary costs of litigation." *Nader*, 567 F.3d at 697.  In D.C., an action for malicious prosecution has four elements: (1) the underlying suit terminated in plaintiff's favor; (2) malice on the part of the defendant; (3) lack of probable cause of the underlying suit; and (4) special injury occasioned by plaintiff as the result of the original action.  *Lucas v. D.C.*, 505 F. Supp. 2d 122, 127 (D.D.C. 2007).  Defendants' argument that the ESA Case did not terminate in FEI's favor is baseless.  Def. Mem. 70-73.

Defendants' claim that the underlying case must be terminated on the merits, Def. Mem. at 70, is incorrect.  Instead, the termination must "***reflect on the merits*** of the underlying action." *Brown v. Carr*, 503 A.2d 1241, 1245 (D.C. 1986) (emphasis added).  *See also* W. Page Keeton *et al.*, PROSSER AND KEETON ON THE LAW OF TORTS, § 119 (5th ed. 1984).  The judgment against Rider clearly reflected on the merits.  His claims were "dismissed with prejudice."  677 F. Supp. 2d at 94 (COL 20).  This was because Rider's claim of "aesthetic injury" and his claim that a "taking" had occurred were one in the same:  both rested on what he claimed he witnessed regarding FEI's elephant handling.  As the Court found, however, after considering the entirety of his testimony, "Mr. Rider either (1) did not witness elephant mistreatment when he was employed by FEI or (2) any mistreatment he did witness did not affect him to the extent that he suffered an aesthetic or emotional injury."  *Id*. at 69 (FOF 8).  A "dismissal by the court with prejudice" is termination in the malicious prosecution plaintiff's favor.  *Levy v. Ohl*, 477 F.3d

---

sufficiency of those allegations and not be heard on this point in their reply briefs.  Defendants say nothing about FEI's § 1962(d) RICO conspiracy claim other than the conclusory assertion that it fails because the § 1962(c) claim allegedly fails.  Def. Mem. at 44 n.23.  This is incorrect.  Liability under § 1962(c) is not a prerequisite to finding liability under § 1962(d).  *Salinas v. United States*, 522 U.S. 52, 65, 66 (1997).  *See also Philip Morris*, 327 F. Supp. 2d at 20 ("liability for RICO conspiracy under Section 1962(d) does not require ... proof of commission of all the other elements of the Section 1962(c) substantive offense").

988, 992 (8th Cir. 2006) (Missouri law).

The same result follows for API.  While the Court in the ESA Case did not reach the merits of the underlying "taking" claim, the result as to API nonetheless reflected on the merits. In federal court, Article III standing is "an *indispensable part of the plaintiff[s'] case*, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. ... [A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'"  *Lujan*, 504 U.S. at 561 (emphasis added; citation omitted). Because API lost on an "indispensable part" of its case, not a "mere pleading requirement," *id.*, its claims in the ESA Case were also terminated in a manner reflecting upon their merits and, thus, in FEI's favor.  *Compare Lucas*, 505 F. Supp. 2d at 127 (denying motion to dismiss malicious prosecution claim; underlying case had been dismissed for want of prosecution and, thus, in plaintiff's favor).[43]

Because ASPCA, AWI and FFA totally abandoned the case at trial and expressly disavowed seeking any relief in the case, FAC ¶ 12; 677 F. Supp. 2d at 55, 66 n.10, their claims likewise terminated in favor of FEI.  Voluntary dismissal or abandonment of the underlying action constitutes termination in the malicious prosecution plaintiff's favor.  *Levy*, 477 F.3d at 992; *Chevron*, 2010 U.S. Dist. Lexis 55459 at *14 (California law); *Christian v. Lapidus*, 833 S.W.2d 71, 74 (Tenn. 1992).[44]

---

[43] Defendants cite no D.C. authority to the contrary.  None of the authorities cited by defendants involved dismissal of a federal case on Article III standing grounds.  Def. Mem. at 72.

[44] Defendants' footnote attack on FEI's allegation of special injury, Def. Mem. at 73 n.38, is meritless.  The FAC alleges the following special injury: "FEI was forced to defend a lawsuit in which the plaintiff had no injury but was hired and paid by his co-plaintiffs and his (and their) attorneys to make a false claim of injury so that the other defendants could pursue a case in federal district court for which there otherwise would have been no Article III jurisdiction, in order to further the other plaintiffs' ulterior purposes of banning elephants in circuses, entertainment and, ultimately captivity, and of raising money.  These effects – flowing from having to defend a lawsuit brought by a paid plaintiff – who has no injury but who was paid to testify falsely that he was injured – are special injuries

## VI.   THE FAC STATES A CLAIM FOR ABUSE OF PROCESS

To state a claim for abuse of process in D.C., "a plaintiff must allege that a defendant perverted the judicial process to achieve a purpose not contemplated in the regular prosecution of the charge and that the defendant had an ulterior motive." *Nader*, 555 F. Supp. 2d at 152.  The "critical concern in abuse of process cases is whether process was used to accomplish some end unintended by law. . . ." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).  Defendants' assertion (Def. Mem. at 75) that FEI has not alleged a perversion of the judicial process is inaccurate.  Litigants and their lawyers who pay a fellow plaintiff and client to testify falsely about an injury he does not have so that the lawsuit can be brought and who make affirmatively false statements to the trial court and court of appeals about that purported injury – knowing full well that the Federal Rules require the courts to accept those statements as true – engage in the worst form of perversion of the court system.  FAC ¶¶ 1-12.  Defendants cite nothing to suggest that these activities are a "regular and legitimate use of process consistent with the regular prosecution" of ESA citizen suits, or any other form of litigation.  Def. Mem. at 75 n.39.

The FAC also specifies how defendants used the ESA Case to accomplish purposes not contemplated in the regular prosecution of such a case.  Defendants used the ESA Case to raise money for their organizations, holding FEI hostage in the process.  FAC ¶¶ 11, 305-10.  Nothing in the ESA authorizes a "citizen suit" to be filed for fund-raising.  *See* 16 U.S.C. § 1531 *et seq* (2006).  Defendants used discovery in the ESA Case to publicize their cause and to pursue their legislative agendas.  FAC ¶¶ 305-18.  Nothing in the ESA or the Federal Rules authorizes the

---

because they are over and above the normal inconvenience, expense and business disruption that results from being a defendant in litigation in federal district court." FAC ¶ 331. Defendants cite nothing to indicate that this is not a special injury. *See Nader*, 567 F.3d at 697 (special injury is "injury over and above the ordinary costs of litigation"); *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1284 (D.C. 2002) (special injury is one so "blatant and beyond that which would normally be incurred in such litigations such that the court fe[els] sound policy require[s] relief"); *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978) (*per curiam*) (a special injury is one "which would not necessarily result in suits to recover for like causes of action").

pursuit of discovery in a "citizen suit" for such purposes. *See* 16 U.S.C. § 1531 *et seq*. Indeed, parties have no right to disseminate pre-trial discovery material produced in a private lawsuit. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32-33 (1984). Defendants used and prolonged the ESA Case to drain FEI's resources, as was clearly shown by their frivolous demand for a "preliminary injunction" in May 2008 (8 years after suit was brought) only to abandon injunctive relief at trial in 2009 in favor of a permit proceeding that would drag on for years. FAC ¶¶ 12, 314. *Gen. Refractories*, 337 F.3d at 308 (abuse of process lies where case pursued to drain resources of opponent); *Hough v. Stockbridge*, 216 P.3d 1077, 1087 (Wash. App. 2009) (same). Finally, defendants used the ESA Case to attempt to extort FEI into taking elephants out of its circus, FAC ¶ 318 – a result that is not, and never has been, required by the ESA. *See* 16 U.S.C. § 1531 *et seq*. *See Scott v. D.C.*, 101 F.3d 748, 756 (D.C. Cir. 1996) (extortionate collateral purpose of stifling competition sufficient for abuse of process). Although the tort of abuse of process should not be used to "chill" bringing legitimate cases, Def. Mem. at 74, the activities that these defendants engaged in through the ESA Case should be chilled and frozen forever.

## VII.   THE FAC STATES A CLAIM FOR CHAMPERTY

Champerty is "a bargain to divide the proceeds of a litigation between the owner of the litigated claim and the party supporting or enforcing the litigation." *Kerner v. Cult Awareness Network,* 843 F. Supp. 748, 751 (D.D.C. 1994). Champerty seeks to prevent "trafficking and speculation in lawsuits." *Koro Co., Inc. v. Bristol-Myers Co.*, 568 F. Supp. 280, 288 (D.D.C. 1983). In D.C., the elements of a common law claim for champerty are: (1) the attorney's fees must come from the recovery in a successful lawsuit; (2) the lawyer must have no independent claim to the recovery fund; and (3) the costs and expenses must be borne by the attorney with no expectation of reimbursement from the client. *Marshall v. Bickel*, 445 A.2d 606, 609 (D.C. 1982). The FAC pleads all three elements. FAC ¶¶ 345-354.

The common law action for champerty still exists in D.C. *Golden Commissary Corp. v. Shipley*, 157 A.2d 810, 814 (D.C. 1960). Although not common, champerty has been recognized as a tort giving rise to a claim for relief. *Del Webb Comm. Inc. v. Partington*, 2009 U.S. Dist. Lexis 85616 at *14-16 (D. Nev. 2009). That champerty is not commonly invoked is not surprising since the tort generally requires attorney participation, and paying a client to bring a case violates the rules of professional responsibility in most jurisdictions. *See* D.C. RULES OF PROFESSIONAL CONDUCT, Rule 1.8(d) (absent certain narrow exceptions, "[w]hile representing a client in ... pending litigation ... a lawyer shall not advance or guarantee financial assistance to the client"). In New York where ASPCA is headquartered and Weisberg is licensed, it is a misdemeanor for a lawyer to pay a plaintiff to bring a case. N.Y. JUD. CT. ACTS. LAW § 488.2 (Consol. 2010) (an attorney "shall not ... either before or after an action brought ... give ... a valuable consideration to any person ... for the purpose of bringing an action thereon").

Defendants argue that FEI's champerty claim fails because no monetary proceeds were at stake in the ESA Case. Def. Mem. at 77. This is incorrect. Rider explicitly sought recovery of a statutory reward. FAC ¶ 348. *See also* [ESA]DE 1 ¶ 24. Indeed, the other plaintiffs made the same claim. *Id.* ¶¶ 7, 12, 17. Therefore, unless these claims were filed willfully in bad faith, then Rider and the other plaintiffs expected to get money out of the ESA Case. Moreover, the attorneys expected to recover attorneys fees under the ESA attorneys fee provision, FAC ¶ 348, so they had a monetary stake as well. Defendants claim that *Kerner* holds that an attorneys fee provision does not provide the requisite financial stake, Def. Mem. at 77 n.40, but the case says nothing of the kind. 843 F. Supp. at 751. MGC had a further monetary incentive as to the original forfeiture claim, given the significant fund-raising potential that confiscated FEI elephants would have if they were transferred to The Elephant Sanctuary, a client of MGC. FAC

¶ 349.  The ESA Case therefore had potential proceeds.

Defendants' further argument that FEI has no standing because champerty allegedly has been limited in D.C. to parties to, or third party beneficiaries of, a champertous contract also is wrong.  Def. Mem. at 77.  In *Design for Bus. Interiors, Inc. v. Hersons, Inc.*, 659 F. Supp. 1103 (D.D.C. 1986), while the defendant was a party to the contract sued upon, the defendant was ***not*** a party to the assignment of that contract and was permitted to challenge the assignment agreement on grounds of champerty.  *Id.* at 1108-09.  Furthermore, in *Koro*, while the court applied New York law, it noted that D.C. also prohibits champerty and held that defendants could challenge as champertous an agreement assigning an antitrust claim against it to a third party.  568 F. Supp. at 288-89.  In neither case was the party claiming champerty a party to, or third-party beneficiary of, the champertous agreement.  *See also High Voltage Beverages, L.L.C. v. Coca-Cola Co.*, 2010 U.S. Dist. Lexis 63308 at*8-9 n.3 (W.D.N.C. 2010) (under North Carolina law, "[t]o have standing, Defendant need only suffer injury from Plaintiff's champerty – nothing more"); *Del Webb*, 2009 U.S. Dist. Lexis 85616 at *14-16 (target of champertous arrangement had claim). [45]

## VIII.  <u>THE FAC STATES A CLAIM FOR MAINTENANCE</u>

As described by the D.C. Court of Appeals:

> "maintenance means the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring actions or to make defense which they have no right to make, and the term seems to be confined to the ***intermeddling in a suit of a stranger*** or of one not having any ***privity or concern*** in the subject matter, or standing ***in no relation of duty*** to the suitor."

*Golden Commissary*, 157 A.2d at 814 (emphasis added; citation omitted)  As alleged in the FAC, ASPCA, AWI, FFA, HSUS, API and WAP (for this section "ASPCA, *et al.*") were all strangers

---

[45] *In re Brown,* 354 B.R. 100, 105 (N.D.W.Va. 2006), cited by defendants, Def. Mem. at 78, is limited to West Virginia law.

to any dispute that Rider had with FEI.  None of these parties had any connection to Rider; he

was not an employee or member of any of the groups.  None of the groups owed Rider any duties

or stood in any relation of privity to him.  Therefore, when ASPCA, *et al.* agreed to fund Rider's

litigation against FEI, they were guilty of maintenance.  FAC ¶¶ 334-44.  This is a classic case of

maintenance.  *See Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d, 269, 273 (S.C. 2000) ("[s]ince

ancient times, political allies have joined together ***to harass their enemies with vexatious***

***litigation***.  Those who did so were known as 'sycophants' in ancient Greece, 'calumniators' in

ancient Rome, and ***'maintainers' in medieval England"***) (emphasis added).  That defendants

find themselves defending this relatively rare cause of action merely underscores the egregious

and unusual nature of their misconduct:  paying someone to bring a lawsuit against an

ideological foe upon a false claim of "aesthetic injury."[46]

ASPCA, *et al.* claim that they were not strangers to Rider's purported dispute with FEI

because they are "interested" in humane animal treatment.  Def. Mem. at 79.  Yet they cite no

case holding such an "interest" – sympathizing with the maintained plaintiff – immunizes the

maintainer from liability.  Defendants' reliance upon *JPMorgan Chase Bank, N.A. v. KB Home*,

2010 U.S. Dist. Lexis 108306 (D. Nev. 2010), is misplaced.  JPMorgan was not a stranger to the

arbitration there because it was a lender to one of the parties and "it would be a beneficiary of

any result which compelled specific performance" of the contract at issue.  *Id.* at *28.  ASPCA,

*et al.* identify no similar relationship with Rider.  Instead, ASPCA, *et al.* are like the defendants

found liable in *Del Webb*:  the home inspectors who stirred up litigation between the home

---

[46] Defendants claim that maintenance is "all but a dead letter" in D.C.  Def. Mem. at 79.  Yet they admit that *Golden Commissary* is still good law.  *Id.*  Although not frequently, maintenance is still discussed and applied by the courts, including in Maryland, which D.C. courts often follow.  *E.g., Accrued Fin. Serv. v. Prime Retail, Inc.*, 298 F.3d 291, 299 (4th Cir. 2002) (noting that Maryland continues to prohibit maintenance, "now prohibited under the label of barratry" and defined as "improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring actions, or to make defenses which they have no right to make").

owners and the builders. 2009 U.S. Dist. Lexis 85616 at *14-16. Whether ASPCA, *et al.* have an "interest" in the dispute that immunizes them from maintenance liability is a fact question not properly resolved on a motion to dismiss. *Cf. High Voltage*, 2010 U.S. Dist. Lexis 63308 at *11 (with proposed champerty/maintenance counterclaim in trademark case, it was ultimately a fact issue whether "'plaintiff invested not in a valuable mark, but in valuable litigation'") (citation omitted).

## CONCLUSION

Defendants' motion should be denied.

Dated: March 4, 2011                    Respectfully submitted,

_____/s/_____
John M. Simpson (D.C. Bar #256412)
jsimpson@fulbright.com
Stephen M. McNabb (D.C. Bar #367102)
smcnabb@fulbright.com
Michelle C. Pardo (D.C. Bar #456004)
mpardo@fulbright.com
FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
Counsel for Plaintiff Feld Entertainment, Inc.

70938499.1                    -89-