**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                              )
FELD ENTERTAINMENT, INC.      )
                              )
          Plaintiff,          )
                              )
      v.                      )    Civ. Action No. 07-1532 (EGS)
                              )
AMERICAN SOCIETY FOR THE      )
PREVENTION OF CRUELTY         )
TO ANIMALS, et al.,           )
                              )
          Defendants.         )
_____)
```

<u>**MEMORANDUM OPINION**</u>

This case arises out of a prior, long running litigation in this Court over whether Feld Entertainment Inc. ("FEI") violated the Endangered Species Act by its use of Asian elephants in FEI's Ringling Brothers and Barnum & Bailey Circus ("Circus"). That litigation (hereinafter the "ESA Action") was brought by several non-profit organizations and one individual plaintiff, Thomas Rider ("Rider"), who had worked with several of FEI's elephants in the Circus. After nine years of litigation and a six week non-jury trial, the Court concluded that Rider failed to prove that he had Article III standing. *ASPCA v. Feld Entm't, Inc.*, 677 F. Supp. 2d 55 (D.D.C. 2009). The Court found that Rider was "not credible" with respect to his asserted emotional and aesthetic injuries that formed the basis for his claim to standing. *Id.* at 83. The Court further found that Rider was "essentially a paid plaintiff and fact witness" whose sole source

of income throughout the litigation was provided by the animal advocacy organizations which had been his co-plaintiffs in the ESA Action.  *Id.* at 67, 72.[1]

FEI has now sued the plaintiffs in the ESA Action as well as their counsel of record, arguing that the ESA plaintiffs' payments to Rider during that litigation violated the Racketeer Influence and Corrupt Organizations Act ("RICO") and the Virginia Conspiracy Act.  FEI has also asserted claims of common law abuse of process, malicious prosecution, maintenance, and champerty. Defendants move to dismiss FEI's Amended Complaint in its entirety.  Upon consideration of the motions to dismiss, the oppositions and replies thereto, the arguments of counsel during the hearing held on June 23, 2011, the supplemental submissions of the parties, the applicable law and the record as a whole, the motions to dismiss are hereby **GRANTED IN PART AND DENIED IN PART**.

---

[1] The Court found that the one remaining organizational plaintiff asserting claims in the ESA Action, the Animal Protection Institute ("API") also lacked standing to proceed. *Id.* at 95-101.  The other organizational plaintiffs abandoned all of their claims for relief during the trial.  *Id.* at 66 n.10.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

   A.    **The ESA Case and the Alleged Racketeering Activity[2]**

   The original complaint in the ESA Action was filed in July,
2000 on behalf of, among others, the American Society for the
Prevention of Cruelty to Animals ("ASPCA"), Animal Welfare
Institute ("AWI"), Fund For Animals ("FFA"), and Rider.  *ASPCA et
al. v. Ringling Bros., et al.*, Case No. 00-1641.  That complaint,
and the others that were filed in the original case as well as
its successor case, *ASPCA et al. v. Feld Entertainment Inc.*, Case
No. 03-2006, alleged that Asian elephants are an endangered
species and that the circus mistreats its elephants in violation
of the ESA, 16 U.S.C. § 1531, *et. seq.*  The cases were filed
under the citizen-suit provision of the ESA, which permits
private individuals or organizations to sue to enjoin violations
of the statute.

_____

   [2]   Inexplicably, during briefing on the Motions to Dismiss,
all of the parties constantly cited to the record in the ESA
Action, while at the same time insisting adverse parties should
not be able to rely on the same record.  The Court therefore
addresses at the outset how it will make use of the record in the
ESA Action.  Given the centrality of the ESA Action to the
Amended Complaint, the Court takes judicial notice of the record
in the ESA Action in considering the motion to dismiss.  The
Court may do so without converting the motion to dismiss into one
for summary judgment.  *Covad Commc'ns Co. v. Bell Atlantic Corp.*,
407 F.3d 1220, 1222 (D.C. Cir. 2005); *Dupree v. Jefferson*, 666
F.2d 606, 608 n.1 (D.C. Cir. 1981); *United States ex rel. New v.
Rumsfeld*, 350 F. Supp. 2d 80, 88-89 (D.D.C. 2004) (citations
omitted).  However, the Court emphasizes that it did not pore
over the entire record in that action, which contains nearly 600
docket entries and is extremely voluminous.  The Court considers
such an exercise outside the purview of a motion to dismiss.

Tom Rider was a former elephant "barn helper" and "barn man" for FEI from June 1997 until November 1999.  First Amended Complaint ("FAC") ¶¶ 4, 37.  He alleged that he had suffered aesthetic and emotional injury based on his exposure to mistreated elephants while working for FEI.  Specifically, Rider alleged that he "has a personal and emotional attachment to these elephants," Complaint, *ASPCA v. Feld Entm't*, Case 03-2006, ECF No. 1 at ¶ 20, that he "stopped working in the circus community because he could no longer tolerate the way the elephants were treated by defendants," *id.* ¶ 21, and that he "continues to visit" the elephants he knows, even though "each time he does so, he suffers more aesthetic injury," *id.* ¶ 23.

This Court dismissed the original case on the ground that Rider as well as the organizational plaintiffs lacked standing to sue.  *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, No. 00-1641, 2001 U.S. Dist. Lexis 12203 (D.D.C. June 29, 2001).  In February 2003, the D.C. Circuit reversed, ruling that, assuming the truth of the allegations in the complaint, Rider had standing.  *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003).[3]  The ESA Action continued for another six years, culminating in a six week bench trial in

---

[3]  The Circuit did not reach the organizational plaintiffs' standing, asserted on separate grounds, "because each of them is seeking relief identical to what Rider seeks."  334 F.3d at 338 (citations omitted).

4

February and March 2009.  Following the trial, on December 30, 2009, this Court dismissed the case on the grounds that neither Rider nor the other then-remaining plaintiff in the case, the non-profit organization Animal Protection Institute ("API"), satisfied the constitutional standing requirements.

The bulk of the Court's December 2009 decision is devoted to Rider.  The Court found that Rider "failed to prove either a strong and personal attachment to the seven elephants at issue or that FEI's treatment of those elephants caused and continues to cause [him] to suffer aesthetic or emotional injury." *ASPCA v. Feld Entm't*, 677 F. Supp. 2d at 67.  The Court further found Rider was "essentially a paid plaintiff and fact witness who is not credible, and therefore affords no weight to his testimony regarding the matters discussed herein, *i.e.*, the allegations related to his standing to sue." *Id*.

The Court found serious problems with the substance of Rider's allegations.  It noted that Rider had never complained to management, veterinarian, or government officials about the treatment of the elephants during the two and a half years he worked at Ringling Brothers  *Id.* at 68.  The Court also found incredible Rider's claim that he left Ringling Brothers because he could not bear to witness further mistreatment of the elephants, noting that after he left FEI's employment he went to work for another circus which allegedly mistreated its elephants

in the same way. *Id.* 70.  The Court also found that since his employment with FEI ceased, Rider continued to see the elephants who were allegedly still suffering mistreatment, thus undermining his claim that "he would like to again visit or observe" these elephants but "was refraining from doing so in order to avoid subjecting himself to further aesthetic injury." *Id.* at 83.  At the same time, Rider made little to no effort to see the elephants who were no longer performing in the circus and therefore no longer allegedly mistreated, thus undermining his claim that he "had formed a personal attachment" to the elephants and, if "they were no longer allegedly mistreated, he would visit these animals as often as possible and would seek a position to work with them again." *Id.*  Indeed, the Court found that when presented with videotapes of the elephants practicing for the circus, Rider could not identify the elephants to whom he was allegedly personally and emotionally attached. *Id.* at 84.

As to the payments themselves, the Court found that Rider had received at least $190,000 from the ESA plaintiffs since the lawsuit began. *Id.* at 78.  The Court further found that the ESA plaintiffs had been "less than forthcoming about the extent of the payments to Mr. Rider." *Id.* at 82.  Finally, the Court found that the primary purpose of the payments to Rider was to keep him involved in the litigation, and not, as the ESA plaintiffs asserted, to support his "media and educational outreach program

about the treatment of FEI's elephants." *Id.* at 79.  The Court

found that Rider did engage in such activity, and the plaintiff

organizations "willingly supported those efforts." *Id.*  The

Court concluded, however, that "while the organizational

plaintiffs may see Mr. Rider's media and outreach activities as a

benefit, this is not the primary purpose for the payments to Mr.

Rider." *Id.*   Rather, the Court found that:

> [T]he primary purpose of the funding provided by the
> organizational plaintiffs . . . was to secure Mr. Rider's
> initial and continuing participation as a plaintiff in this
> litigation. This is not a case in which the financial
> support began years--or even months--after Mr. Rider's
> advocacy efforts, which might suggest that the organizations
> were simply providing financial support so that Mr. Rider
> could continue advocating for an issue or cause to which he
> had long since demonstrated a commitment. To the contrary,
> the financial support in this case began before the advocacy
> efforts and suggests that absent the financial incentive,
> Mr. Rider may not have begun or continued his advocacy
> efforts or his participation as a plaintiff in this case. In
> May 2001, at the time that the organizational plaintiffs
> commenced providing financial support to Mr. Rider . . . Mr.
> Rider was the only plaintiff in the case alleging that he
> had a personal and emotional attachment to FEI's elephants
> and the only plaintiff alleging that FEI's treatment of its
> elephants caused him aesthetic and emotional injury. . . .
> [I]t was . . . crucial to the organizational plaintiffs that
> Mr. Rider remain a plaintiff.  The Court finds that ensuring
> Mr. Rider's continued participation as a plaintiff was a
> motivating factor behind the payments to him, and that these
> payments were a motivating factor for his continued
> involvement in the case.

*Id.* at 81.

### B.   This Action.

FEI's Amended Complaint here is based on the initiation and

prosecution of the ESA Action.  FEI alleges that through that

litigation, the ESA plaintiffs and their attorneys perpetrated "multiple schemes to permanently ban Asian elephants in circuses, to defraud FEI of money and property, and/or to unjustly enrich themselves."  FAC ¶ 16.

First, FEI alleges that the ESA plaintiffs and their counsel of record knew that the factual assertions underlying Rider's claims of emotional and aesthetic standing were false.  *Id.* ¶ 51-53.  FEI claims that they paid Rider for this false testimony in order to prosecute the ESA lawsuit, which amounts to bribery and illegal witness payments.  *Id.* ¶¶ 2-3, 60-65, 78-79.

Second, FEI alleges that the payments to Rider were deliberately concealed.  All of the organizational plaintiffs in the ESA Action paid Rider during the course of the litigation, beginning as early as May 2001.  *Id.* ¶ 60.  These payments were, for the most part, coordinated through counsel of record in the ESA case, Meyer, Glitzenstein & Crystal ("MGC").  *Id.* ¶ 61.  In some cases, "the funds that MGC paid to Rider were charged back to the existing organizational plaintiffs . . . on MGC's legal bills for the ESA Action."  *Id.* ¶ 62.  At other times, the organizational plaintiffs gave money to the Wildlife Advocacy Project ("WAP"), a non-profit advocacy group founded by attorneys at MGC.  *Id.* ¶ 43.  WAP, in turn, made "regular and systematic payments of . . . $1000.00 every two weeks" to Rider.  *Id.* ¶ 112. FEI alleges that defendants tried "deliberately [to] conceal,"

*id.* ¶ 62, and "cover-up the improper payment scheme," *id.* ¶ 104, by routing payments through MGC and/or WAP and by characterizing them as legal expenses, "grants" for "media and public education efforts" or "PR efforts." *Id.* ¶¶ 62, 104. FEI alleges that each payment to Rider, and each invoice from MGC to the organizational ESA plaintiffs constitutes wire fraud as well as money laundering. *Id.* ¶¶ 77, 80.

FEI alleges the ESA plaintiffs further sought to conceal the payments to Rider through "responses to discovery in the ESA Action." *Id.* ¶ 196. FEI alleges that Rider and some of the organizational plaintiffs failed to disclose that they had paid money to Rider by providing false or incomplete answers in interrogatories and depositions in 2004 and 2005. *Id.* ¶¶ 199-230. FEI alleges that this conduct amounts to obstruction of justice. *Id.* ¶¶ 205, 216, 222, 230.

Third, FEI alleges that the ESA plaintiffs violated mail and wire fraud statutes when, in July 2005, they jointly hosted a fundraiser to raise money from donors to fund the ESA litigation. *Id.* ¶ 179. FEI alleges the invitation to the fundraiser is "false and or misleading" because, *inter alia*, it portrays Rider as someone genuinely injured by FEI, and it claims to raise money for a legitimate litigation rather than one characterized by fraud. *Id.* ¶ 180. FEI claims the mailings defrauded the non-profit organizations' donors, who gave money on the basis of

false information, and defrauded FEI, because money from the
fundraiser was used to pay Rider to participate in the ESA
Action.  *Id.* ¶¶ 180-82.

Fourth, FEI alleges that Rider testified falsely in
proceedings other than the ESA Action.  Specifically, FEI alleges
that Rider gave false information about FEI and about his own
attachment to the elephants he worked with on five occasions: a
sworn statement to Congress in 2000, an affidavit to the U.S.
Department of Agriculture also in 2000, testimony to a committee
of the Connecticut legislature in 2005, testimony to a committee
of the Nebraska legislature in 2006, and a statement to the
Chicago City Council in 2006.  *Id.* ¶¶ 236-243.  Plaintiff alleges
this false testimony to the state legislatures, procured through
payments to Rider since the inception of the ESA litigation,
violates the bribery laws of Connecticut, Nebraska and Illinois.
*Id.*[4]

---

[4]  FEI claims that other individuals, in addition to Rider,
were paid to participate in the ESA Action and other forums.
Specifically, FEI alleges that non-party People for the Ethical
Treatment of Animals ("PETA") paid a former FEI employee named
Frank Hagan for a period of time in 2004, during which he
participated in news conferences and other public events on
behalf of PETA, swore a false affidavit to the USDA regarding FEI
and was deposed for the ESA Action.  *Id.* ¶¶ 248-257.  FEI alleges
PETA also paid former FEI employees Archele Hundley and Robert
Tom, who attempted to join the ESA Action as plaintiffs in 2007,
to testify falsely in the ESA Action and to speak against FEI in
"participating in PETA's legislative and public relations
efforts."  *Id.* ¶ 270; *see generally* ¶¶ 262-272.  The FAC does
not, however, name PETA as a defendant.

FEI alleges that it suffered financially from the defendants' fraud "resulting from the substantial costs incurred by FEI to defend the ESA Action." *Id.* ¶ 273. FEI alleges that the ESA Action continued, after May 2001, "only due to the racketeering and tortious activity" of the ESA plaintiffs, WAP and MGC. *Id.*

FEI initially sought to bring its claims underlying this lawsuit as permissive counterclaims in the ESA Action. *See* ESA Action, Case No. 03-2006, Docket No. 121. The Court denied the motion in August 2007, finding, *inter alia*, that the claims were made with a dilatory motive--namely, to indefinitely delay and dramatically change the nature of the ESA Action. *See ASPCA v. Feld*, 244 F.R.D. 49, 51 (D.D.C. 2007) ("[T]he only claim in this case is whether or not defendant's treatment of its elephants constitutes a taking within the meaning of Section 9 of the ESA. Any limited information about payments to or the behavior of Tom Rider that defendant is entitled to in order to challenge [the] credibility of *one* plaintiff in this case is far different from the vast amount of information they would be seeking under the guise of attempting to prove an alleged RICO scheme.").

FEI filed this action (hereinafter the "RICO Action") four days after the Court's ruling. *See* RICO Action, Doc. No. 1, Aug. 28, 2007. The original complaint named ASPCA, FFA, AWI, WAP, and Rider, and alleged violations under RICO and the Virginia

11

Conspiracy Act.  The defendants in the RICO Action immediately
moved to stay the proceedings pending a final judgment in the ESA
Action, and the Court granted the motion.  Specifically, the
Court found that pursuit of the RICO Action while the ESA Action
was pending would delay resolution of the ESA Action, thereby
prejudicing the ESA plaintiffs, and would not serve judicial
economy and efficiency.  *Feld Entm't, Inc. v. ASPCA*, 523 F. Supp.
2d 1 (D.D.C. 2007).  On December 30, 2009, the Court issued its
opinion and judgment in the ESA Action.[5]  On January 15, 2010,
the Court lifted the stay in this action, and on February 16,
2010, FEI filed its First Amended Complaint (hereinafter "FAC").
In addition to the original defendants, the FAC adds attorney
defendants MGC, Katherine Meyer, Eric Glitzenstein, Howard
Crystal, Jonathan Lovvorn and Kimberly Ockene, as well as
organizational defendant Humane Society of the United States
("HSUS").  It alleges violations of RICO (Counts I and II) and
the Virginia Conspiracy Act (Count III), as well as common law
claims of Abuse of Process (Count IV), Malicious Prosecution
(Count V), Champerty (Count VI) and Maintenance (Count VII).
After the parties' unsuccessful attempt at settlement, the

---

[5]  The decision was affirmed on appeal.  *ASPCA v. Feld
Entm't, Inc.*, 659 F.3d 13 (D.C. Cir. 2011).

defendants filed three motions to dismiss the FAC.[6]  The motions to dismiss are now ripe for resolution by the Court.

## II.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).  "'[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint[,]'" *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  A court need not, however, "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.*

---

[6]  The defendants filed one omnibus motion to dismiss.  RICO Action, Doc. No. 54. In addition, defendant HSUS and defendants Jonathan Lovvorn and Kimberly Ockene filed separate motions. *Id.*, Doc. Nos. 53, 55.

In addition, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 1950.

## III. ANALYSIS

Defendants raise two arguments that the case must be dismissed before reaching the RICO allegations: compulsory counterclaim and *Noerr-Pennington* immunity.  The Court finds that the counterclaim defense must be rejected, and further concludes that although *Noerr-Pennington* narrows FEI's claims slightly, it does not dispose of most of the case.

### A.   Compulsory Counterclaim

The defendants argue that FEI's RICO claims must be dismissed pursuant to Rule 13(a) of the Federal Rules of Civil Procedure because they should have been raised as compulsory counterclaims in the ESA Action.  Federal Rule of Civil Procedure 13(a)(1) provides:

> A pleading must state as a counterclaim any claim that--at the time of its service--the pleader has against the opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claims; and (B) does not require adding another party over whom the court cannot acquire jurisdiction.

The parties agree that the RICO action does not require adding another party over whom the Court cannot acquire

jurisdiction.  FEI maintains, however, that the other requirements for a compulsory counterclaim are not met: the RICO action does not arise out of the same subject matter as the claims in the ESA Action, and FEI did not know enough to trigger the filing of a compulsory counterclaim when it answered the Complaints in the ESA Action.  The Court concludes that the ESA claims and the RICO claims do not arise out of the same transaction or occurrence, and for that reason finds FEI's RICO claims were not compulsory counterclaims in the ESA Action. Accordingly, the Court need not determine whether FEI knew enough to file its RICO claims when it filed its Answers in the ESA Action.

The Supreme Court has stated that "'[t]ransaction' is a word of flexible meaning.  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926).  "This inquiry is flexible and attempts to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Computer Assocs. Int'l v. Altai, Inc.*, 893 F.2d 26, 29 (2d Cir. 1990) (internal citations omitted). Courts routinely examine four factors to determine whether a counterclaim is compulsory:

15

> (1) Are the issues of fact and law raised by the claim or counterclaim largely the same?
> (2) Would res judicata . . . bar a subsequent suit on defendant's claim absent the compulsory counterclaim?
> (3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
> (4) Is there any logical relationship between the claim and the counterclaim?

6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1410 (3d ed. 2011) (collecting cases).  Applying these factors to FEI's RICO claims, the Court finds that they were not compulsory counterclaims.

The Court begins with the first and third factors.  The issues of fact and law raised in the ESA claim, and the evidence required to sustain it, concerned whether FEI's treatment of elephants constituted a taking under the Endangered Species Act.  These are entirely distinct from the issues of fact and law raised in the RICO case, which has nothing to do with the law of endangered species or FEI's treatment of elephants; rather, it concerns whether the prosecution of the ESA Action was a racketeering scheme.  In order to prove its RICO claim, FEI must prove that the ESA plaintiffs and their attorneys bribed Rider to testify falsely about his aesthetic and emotional injury.  Although the Court's decision in the ESA case that Rider lacked standing may be helpful to FEI, it is hardly conclusive of a RICO scheme.[7]  *See, e.g.*, *Majik Mkt. v. Best*, 684 F. Supp. 1089, 1091

---

[7]  The fact that the Court ultimately resolved the ESA matter on standing grounds in 2009 does not render the RICO

(N.D. Ga. 1987) (where defendant in RICO action filed a separate suit for abusive litigation stemming from the RICO action, the abusive claim was not a compulsory counterclaim because of the difference in the substantive law and evidence required to prove a RICO claim compared to an abusive litigation claim).  The second factor also weighs against finding a counterclaim; defendants do not even suggest FEI's claims are *res judicata*.

Turning to the fourth factor, the Court does not find there is a "logical relationship" between the ESA claim and RICO claim of the type contemplated by Rule 13(a).  "The general purpose of . . . Rule 13(a) is to have all related actions heard at one time." *Chelsea House N. Apts. v. Blonder*, 223 F.R.D. 388, 391 (D. Md. 2004) (quoting *Painter v. Harvey*, 863 F.2d 329, 334 (4th Cir. 1988)).  In this instance, the Court already determined that it would have served neither efficiency nor convenience to adjudicate the ESA and RICO claims in one action.  *See generally ASPCA v. Ringling Bros.*, 244 F.R.D. 49.  Moreover, as already explained, the claim and would-be counterclaim do not share substantially the same issues of fact, law, and evidence.  The Court therefore concludes that the claims in this case should not

---

claim, filed in 2007, a compulsory counterclaim.  Neither the parties nor the Court could have known, in 2007, that the Court would not reach the merits of the ESA claim.

be dismissed because FEI failed to plead them as compulsory counterclaims in the ESA Action.[8]

### B.  Noerr-Pennington

The *Noerr-Pennington*[9] doctrine is rooted in the Petition Clause of the First Amendment, which provides that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  The "doctrine holds that defendants who petition the government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking redress in court, are immune from liability for such activity under the First Amendment." *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008), *aff'd on other grounds*, 567 F.3d 692 (D.C. Cir. 2009) (internal citations omitted).  Although the doctrine is broad, it does have limits. "Neither the *Noerr-*

---

[8]   Defendants also argue that this Court's refusal to allow FEI to add its RICO claims to the ESA litigation in 2007 because those claims were untimely supports their compulsory counterclaim argument.  This is inaccurate.  FEI's attempt to add RICO claims to the ESA Action was based on Rule 15(a), regarding amended pleadings, and Rule 13(e), which provides that the Court may permit supplemental counterclaims acquired after a party has already filed a responsive pleading.  Fed. R. Civ. P. 13(e). This Court's concerns in 2007 regarding the lateness of *permissive* counterclaims are irrelevant to any analysis regarding the timeliness of *compulsory* counterclaims.

[9]   *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

*Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) (internal citations omitted). As a threshold matter, therefore, "[a]ttempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process) are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*." *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) (quoting *Federal Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981)), *see also Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 512-13 (1974).

In this case, defendants have been involved in both legislative/executive advocacy as well as litigation.  The parties spend significant time in their briefs arguing whether the alleged legislative and executive advocacy is immunized pursuant to *Noerr-Pennington*.  However, as explained below, the Court finds that FEI does not have standing to assert claims based on the legislative and executive advocacy; accordingly, the

Court need not determine whether such conduct is protected under *Noerr-Pennington*.   See *infra* Section III.C.5.[10]

Turning to the ESA lawsuit, FEI argues that *Noerr-Pennington* does not apply to bribery or to deliberate misrepresentations to the Court.  Opp'n at 57.  The Court agrees.  As set forth above, *Noerr-Pennington* does not apply, first and foremost, to bribes, "in any context." *Whelan,* 48 F.3d at 1255  (citations omitted). Moreover, "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *Cal. Motor*, 404 U.S. at 513.   As discussed throughout, the FAC is premised on allegations of bribery and deliberate misrepresentations by defendants throughout the ESA Action. Accordingly, defendants are not entitled to *Noerr-Pennington* immunity at the motion to dismiss stage as to their litigation efforts.

However, the FAC alleges defendants engaged in other activities to garner publicity and urge legislative action, which

---

[10]  Were the Court to consider defendants' legislative and administrative activity, it would likely find it unprotected under *Noerr-Pennington*, at least at the motion to dismiss stage. In this case, plaintiff has alleged that Rider's legislative branch advocacy efforts were "all tainted by bribes." Opp'n at 55.  Specifically, the FAC alleges that ASPCA, AWI, FFA/HSUS, and/or API paid Rider to testify falsely under oath before Congress, three state legislatures, and the USDA, that these payments violated state bribery laws in Connecticut, Nebraska and Illinois as well the federal bribery statutes.  FAC ¶¶ 239-243. Under the law of this Circuit, such allegedly corrupt conduct is not protected under *Noerr-Pennington*. *See, e.g.*, *Whelan*, 48 F.3d at 1255.

involved neither bribery to petition a legislature nor bribery or
deliberately false statements in adjudicative proceedings.
Specifically, it is alleged that Rider and others made false or
misleading statements, and in some cases were compensated to do
so, when they participated in press conferences, made other
statements to news outlets, and posted letters on organizational
websites. *See, e.g.*, FAC ¶¶ 159, 161, 245, 252, 269-71. These
statements were not made during any governmental proceeding.
Rather, the statements were part of "publicity campaign[s] to
influence governmental action," and therefore are entitled to
*Noerr-Pennington* immunity. *Noerr*, 365 U.S. at 140. *See also
Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492,
499-500 (1988) ("a publicity campaign directed at the general
public, seeking legislative or executive action, enjoys . . .
immunity even when the campaign employs unethical or deceptive
methods.") Accordingly, FEI cannot rely on these statements to
support its claims.

### C. RICO

FEI alleges violations under RICO sections 1962(c) and (d).
"A violation of § 1962(c) . . . consists of four elements: (1)
conduct (2) of an enterprise (3) through a pattern (4) of
racketeering." *Western Assocs. Ltd. P'ship v. Market Square
Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (citations omitted).
Section 1962(d) provides in part: "It shall be unlawful for any

21

person to conspire to violate any of the provisions of Subsection [] (c) of this section." 18 U.S.C. § 1962(d).  The defendants argue that the RICO claims are barred by the statute of limitations, that FEI has failed to allege adequately the existence of a pattern, an enterprise, that defendants conducted the enterprise, the existence of predicate acts, and that FEI has standing.  In addition to the arguments made by all defendants, three defendants:  HSUS, Jonathan Lovvorn and Kimberly Ockene have filed supplemental motions to dismiss.  The Court will first address defendants' global arguments, then will address arguments advanced with respect to individual defendants.

### 1.  Statute of Limitations

Statute of limitations is an affirmative defense which need not be asserted in a pre-answer motion.  Fed. R. Civ. P. 8(c)(1).  "A defendant may raise the affirmative defense of statute of limitations via a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint." *DePippo v. Chertoff*, 453 F. Supp. 2d 30, 33 (D.D.C. 2006) (citing *Smith-Haynie v. Dist. of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)).  "Because statute of limitations issues often depend on contested questions of fact, however, the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint."  *Id.* (citing *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)).  Accordingly,

22

"a court should grant a pre-discovery motion to dismiss on limitations grounds 'only if the complaint on its face is conclusively time-barred,' and the parties do not dispute when the limitations period began." *Turner v. Afro-American Newspaper Co.,* 572 F. Supp. 2d 71, 72 (D.D.C. 2008) (quoting *DePippo*, 453 F. Supp. 2d at 33).  Upon careful consideration, the Court finds that the defendants have not met their heavy burden here.

Civil RICO actions face a four year statute of limitations, which begins to run from the date of discovery of the injury. Under the discovery rule, "a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) *some* evidence of wrongdoing." *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 274 (D.D.C. 2007) (citations omitted)(internal quotation marks omitted), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008).

FEI filed its original Complaint on September 26, 2007. Defendants base their argument that the four year statute of limitations had expired before then on two facts they allege FEI knew before September 2003: first, Rider had been employed by PAWS as a security guard in 2000 (PAWS is another not-for-profit organization dedicated to animal welfare, which was then the lead plaintiff in the ESA case), and second, ASPCA paid Rider's traveling expenses to testify before various state legislatures.

23

Defs.' Mem at 22-23.   The Court agrees with FEI that these two
pieces of evidence, without more, are insufficient to trigger the
statute of limitations.   *See* FEI Opp'n at 33-34, 35 ("[A] job
with PAWS as a security guard, for which Rider was paid bona fide
wages to perform, would not lead to the conclusion that he was
being bribed to anchor a lawsuit," nor does payment of traveling
expenses to testify before state legislatures.   "The bribery
statute expressly excludes from its prohibitions paying a witness
the reasonable cost of traveling and subsistence incurred."
(citing 18 U.S.C. § 201(d))).   Accordingly, defendants have not
conclusively shown that the statute of limitations began to
accrue before September 26, 2003, four years before FEI filed its
RICO claim.

Defendants argue that even if FEI's original complaint was
timely, the FAC, which added new defendants MGC, Katherine Meyer,
Eric Glitzenstein, Howard Crystal, HSUS, Jonathan Lovvorn, and
Kimberley Ockene when it was filed in February 2010, is not
timely as to the new defendants.   Defendants argue that the
statute of limitations for the RICO claims against these
defendants began running prior to February 2006; accordingly, the
new defendants must be dismissed.   Defs.' Mem. at 30 n.20.

In support of their argument, defendants rely on several
pieces of information FEI knew in 2005.   Specifically, defendants
reference (1) a 2001 email (provided to FEI in 2004), stating

that three ESA plaintiffs were contributing to Rider's living and
traveling expenses; (ESA Action, Doc. No. 457, Att. 8); (2) a
statement by ESA plaintiffs' counsel in open court in 2005 that
plaintiff organizations provided grants to Rider to "speak out
about what really happened when he worked" at the circus. (Defs.'
Mem at 9, 23-24; *see also* September 16, 2005 hearing transcript,
ESA Action, Doc. No. 169-13 at 29-30); and (3) FEI's own
statement, in the FAC, that it "did not begin to uncover the
payment scheme [to Rider] until the Rule 30(b)(6) deposition of
ASPCA, taken in the ESA Action on July 19, 2005." (Defs.' Mem at
9, n.5, citing FAC ¶ 32.)[11]  Defendants also maintain that in
June 2004, Rider responded to an interrogatory from FEI asking
him to, *inter alia*, "[i]dentify all income, funds, compensation,

---

[11]    In the Reply in support of their Motion to Dismiss,
defendants attach excerpts of the deposition transcript; however,
neither plaintiff nor defendants have identified it as part of
the record in the ESA Action.  Plaintiffs claim that "because FEI
specifically relies in its Amended Complaint on the deposition
testimony, the Court may consider other portions of those same
documents on a ruling in its motion to dismiss."  Reply at 38,
n.34.  The Court declines to consider these excerpts here.
First, defendants improperly submitted this evidence for the
first time in their reply brief.  *See, e.g., Holiday CVS Pharmacy
v. Holder*, -- F. Supp. 2d --, 2012 WL 883123, at *20 n.16 (D.D.C.
March 16, 2012) (issues and factual evidence may not be raised
for the first time in a reply brief) (collecting cases).  Second,
even if the Court did consider arguments and evidence raised for
the first time in a reply brief, the Court is not persuaded that
it should consider non-contiguous excerpts of a deposition which,
so far as the Court is aware, does not appear in the record of
the ESA Action.  *See DePippo*, 453 F. Supp. 2d at 33 (facts for
statute of limitations defense in motion to dismiss must be clear
on face of complaint).

other money or items, including, without limitation, food, clothing, shelter, or transportation, you have ever received from any animal advocate or animal advocacy organization." ESA Action, Doc. No. 476, Att. 14 at 39. Rider offered to provide FEI with the information requested, subject to a confidentiality agreement; FEI rejected this offer. *Id.; see also* Defs.' Mem. at 9 n.4; Defs.' Reply at 48 n.43.

FEI responds that again, these statements did not place it on notice that Rider was being paid to be a plaintiff and to testify falsely about his standing. It argues that the 2001 email showed no more than that "organizational plaintiffs may have shared defraying some traveling expenses for Rider in 2001." Opp'n at 37. And it points out that defendants' account of the September 16, 2005 hearing is incomplete: counsel's full statement at the hearing was that Rider is "going around the country in his own van, he gets grant money from some of the clients and some other organizations to speak out and say what really happened when he worked there." *Id*. at 38, citing ESA Action, Doc. No. 169-13 at 29-30. FEI argues that this statement is in fact misleading: "it says nothing about the true purpose of the payments, which was to secure Rider's participation in the ESA case . . . his 'own van' was actually bought by [ESA organizational plaintiffs] . . . 'grant money' actually meant Rider's sole livelihood . . . [and] payments had come not from

'some of the clients' but from all organizational plaintiffs in the ESA case." *Id.* (internal citations omitted).

With respect to the June 2004 interrogatory, FEI points out that in June 2004, FFA, ASPCA and AWI also responded to interrogatories and each of them failed to disclose any payment to Rider, or to WAP or MGC for remittance to Rider; moreover, in his June 2004 interrogatory Rider denied receiving any "compensation" from animal advocates.  Opp'n at 37 (citing to ESA Docs. 476, 477, FAC ¶¶ 196, 223-30).  With respect to its allegation that "FEI did not begin to uncover the payment scheme described herein until the Rule 30(b)(6) deposition of ASPCA, taken in the ESA Action on July 19, 2005," FAC ¶ 32, FEI argues that this is "not synonymous with knowledge of the injury, its cause, and some evidence of wrongdoing." Opp'n at 44.  Rather, FEI claims, it is merely "the **earliest** point alleged in the FAC that even addresses FEI's knowledge of any of the three requirements of the discovery rule." *Id.; see also* FAC ¶¶ 81, 219 (FEI was not fully aware of MGC's involvement in the payments to Rider until August 2007; FEI was not aware of FFA/HSUS payments to Rider until August 2007).  Finally, FEI responds that "the time in which a case is stayed by court order is excluded from the limitations period" as to all defendants, including those who have not been named when the case is stayed.   Opp'n at 45.

The Court is troubled by the statute of limitations argument with respect to the new defendants.  As an initial matter, FEI's argument is not persuasive that the statute of limitations is tolled as to new defendants when a case is stayed.  *See Anbinder v. Kelleher*, No. 92 Civ 7315, 1997 U.S. Dist. LEXIS 10832, *9,*18 n.4 (S.D.N.Y. July 25, 1997) (Sotomayor, J.) (stay does not toll statute of limitations as to new defendant unless defendant's actions prevented plaintiff from discovering he has a cause of action), *aff'd* 152 F.3d 917 (2d Cir. 1998).  In most of the cases FEI cites, the court tolled the statute of limitations against *existing* defendants during the period of time where the case was stayed.  *Selph v. Nelson*, 966 F.2d 411 (8th Cir. 1992); *Bixby Food Sys. v. McKay*, No. 96 c 3915, 2001 U.S. Dist. Lexis 3355 (N.D. Ill. Mar. 19, 2001).  In *Javier v. Garcia Botella*, the sole case cited by FEI in which the statute of limitations was tolled against new defendants while the case was stayed, the Court permitted tolling because "plaintiff's counsel lacked knowledge of [the new defendants'] existence until counsel was able to review . . . evidence" which did not become available until the stay was lifted.  239 F.R.D. 342, 348 (W.D.N.Y. 2006).  FEI makes no argument, nor could it, that it did not know the new defendants' identities as a result of the stay.

Moreover, as discussed above, defendants point to not-insignificant information at FEI's disposal before February 16,

2006 that, defendants may be able to show, may well have triggered the statute of limitations for RICO against the new defendants. However, FEI asserts it did not discover the alleged RICO violation as to the new defendants until later in 2006, or even until 2007. Opp'n at 30, 32, 33-39, see also FAC ¶¶ 81, 219. The face of the FAC does not clearly provide otherwise. Accordingly, and given the stringent standard defendants must meet to warrant dismissal on statute of limitations grounds on a 12(b)(6) motion, FEI's RICO claim will not be dismissed as time barred at this stage of the litigation.

### 2.   Pattern

A "pattern of racketeering activity" requires commission of at least two predicate offenses on a specified list. 18 U.S.C. § 1961(1), (5). In this case, FEI has alleged the defendants committed the predicate acts of bribery, illegal witness payments, money laundering, mail and wire fraud, and obstruction of justice. FAC at pps. 103-112. "The Supreme Court, however, has made it clear that in addition to the requisite number of predicate acts, the plaintiff must show 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (quoting *H.J. Inc. v. Nw. Bell Telephone Co.*, 492 U.S. 229, 239 (1989)). In their motions to dismiss, defendants do not

challenge the relatedness of the predicate acts; they challenge their continuity.  "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241 (internal quotation marks omitted).  For the following reasons, the Court finds the FAC adequately pleads closed-ended continuity; therefore, the Court need not determine whether it also sufficiently alleges open-ended continuity.

The D.C. Circuit has identified six factors the Court should consider in deciding whether closed-ended continuity has been established.  *Western Assocs.*, 235 F.3d at 633 (citing *Edmondson*, 48 F.3d at 1265).  Those factors are "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Id.* (quoting *Edmondson*, 48 F.3d at 1265).  The factors "d[o] not establish a rigid test," and should be used as a "flexible guide for analyzing RICO allegations on a case by case basis." *Id.* at 634.  The D.C. Circuit has also found that if a plaintiff alleges only "a single scheme, a single injury and few victims it is 'virtually impossible for plaintiffs to state a RICO [pattern] claim.'" *Id.* (quoting *Edmondson*, 48 F.3d at 1265).

FEI claims defendants engaged in "multiple schemes to permanently ban Asian elephants in circuses, to defraud FEI of money and property and to unjustly enrich themselves." FAC ¶ 16. FEI claims it was the primary victim of these schemes, but alleges that third party donors to the organizational defendants were also victimized.[12] Specifically, FEI alleges that the defendants held a fundraiser in 2005 and committed mail and wire fraud by soliciting funds based on "materially false and/or misleading statements about Rider, the ESA Action, and FEI." *Id.* ¶ 179. FEI claims that the defendants "unjustly enrich[ed]" themselves "through donations obtained from third parties on the basis of false or otherwise misleading information." *Id.* ¶¶ 181-82. Defendants, by contrast, argue that the FAC must be read to boil down to a single scheme: the lawsuit, a single victim: FEI, and a single injury to FEI: the costs of defending the lawsuit. Defs.' Mem. 47. Defendants claim that the remaining activity is either immunized by *Noerr-Pennington* (in the case of the legislative and administrative activity) or did not generate

---

[12] FEI also claims that defendants "potentially victimized . . . any institution that uses the guide or tethers" on elephants because "the ESA case . . . was brought for the very reason of creating precedent." Opp'n at 66. FEI fails to explain, however, how RICO is cognizable to protect "potential" victims, at whom the alleged racketeering was not directed and who never suffered any injury. Accordingly, this claim is rejected.

additional victims or result in any injury besides the cost of defending against the lawsuit.  *Id.* at 48-49.

The Court agrees with defendants that the ESA Action is, overwhelmingly, the basis for this lawsuit. However, at this stage of the proceedings, the Court accepts all facts alleged in the FAC as true and thus cannot ignore the other allegations in the Amended Complaint: specifically, the allegedly unlawful fundraising activity.[13]  The FAC alleges victims and injuries in

---

[13]  As discussed in section III.C.5 *infra*, FEI lacks standing to pursue the claims related to the alleged legislative and administrative advocacy.  Following oral argument, the parties submitted supplemental briefs addressing, *inter alia*, whether FEI could rely on these acts to show a pattern of racketeering activity even if it has no standing to sue for them. Upon careful consideration, the Court concludes that FEI cannot, because FEI has not adequately alleged *any other victims* of the alleged legislative and administrative activity.  See n.12, *supra* (no other institution using elephants injured); see also *Giuliano v. Fulton*, 399 F.3d 381, 390 n.8 (1st Cir. 2005) (declining to find governmental bodies victims of racketeering schemes).  The lack of any cognizable victim of defendants' alleged legislative and administrative activity distinguishes this case from those cited by FEI, in which courts allowed RICO plaintiffs to plead allegations of essentially the same injuries to other, non-party victims to support a pattern of racketeering activity.  *See, e.g.*, *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 810 (7th Cir. 1987) ("[E]ach victim can sue the RICO violator, adducing evidence of the offense against the other victims to meet the proof requirement of the statute as to a pattern."); *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) ("[W]hile plaintiff may not be able to collect damages with respect to the injuries of other, unnamed parties, it does not necessarily follow that Plaintiff may not allege injury to others in support of . . . [a] pattern of racketeering activity."); *Pruitt v. County of Sacramento*, Case No. 10-416, 2010 U.S. Dist. LEXIS 102125 (E.D. Cal. Sept. 15, 2010) (permitting plaintiffs, victims of baseless drug prosecutions, to allege other baseless drug prosecutions by same defendants in order to meet RICO's pattern requirement).  Therefore, the Court does not consider the

addition to FEI and its lawsuit related costs: the donors who
were allegedly defrauded and lost money as a result.  FEI may
ultimately be unable to demonstrate that the fundraising
materials were unlawful or that anyone other than FEI was injured
by them.  However, reading the FAC in the light most favorable to
FEI, the Court finds it has alleged more than one victim, and
more than one injury, associated with defendants' alleged RICO
activity.  Accordingly, because FEI has alleged more than a
single victim and a single injury, this case is distinguishable
from *Edmondson* and *Western Associates*.  *See Edmondson*, 48 F.3d at
1266 (finding no pattern where there was a single scheme to
prevent or delay the sale of a building, single injury of loss of
the sale, and three victims); *Western Assocs.*, 235 F.3d at 634-35
(finding no pattern where single scheme to diminish the value of
a partnership interest in a single property, single injury of
lost value in the property, and single victim).

The remaining factors in the pattern analysis--which,
notably, the defendants do not acknowledge or address--also
support a finding that FEI has adequately pled closed-ended
continuity.  The FAC pleads over 1000 predicate acts which varied
in nature:  bribery, illegal gratuity, mail fraud, wire fraud,

---

claims related to the alleged legislative and administrative
advocacy as support for demonstrating a pattern of racketeering
activity.

money laundering, and obstruction of justice.  It alleges these

acts occurred for eight years: from 2001 through the ESA trial in

2009.  And it alleges the acts were committed by thirteen

perpetrators.  These factors further distinguish this case from

*Edmondson* and *Western Associates*.  *See Edmondson*, 48 F.3d at 1265

(fifteen predicate acts over three years, most of which were

committed over a span of about six months); *Western Assocs.*, 235

F.3d at 635-36 (although predicate acts took place over eight

years, the total number of acts was in the "dozens," and the

predicate acts were all of the same type--mail and wire fraud--

which "can basically be characterized as beginning with

fraudulent budget underestimates, with the subsequent predicate

acts serving as attempts to cover up . . . cost overruns.").[14]

### 3.  Enterprise

The defendants make two arguments related to the

"enterprise" element of RICO.  First, they claim FEI has failed

to allege an enterprise that is separate from the person[s] who

participate in it.  *See* 18 U.S.C. § 1962(c) ("It shall be

---

[14]  These factors likewise distinguish this case from others
cited by defendants, where courts have dismissed RICO cases
focused on a single legal dispute or litigation.  In *Jackson v.
Bellsouth Telecomm.*, 372 F.3d 1250 (11th Cir. 2004), the Eleventh
Circuit found no RICO pattern where the alleged predicate
activity took place solely during the settlement phase of a
single lawsuit, and lasted nine months.  In *In re Burzynski*, 989
F.2d 733 (5th Cir. 1993), the Fifth Circuit dismissed the RICO
claims where the alleged racketeering consisted of five predicate
acts during litigation, all of which were mail fraud.

unlawful for any person employed by or associated with any
enterprise . . . to conduct or participate, directly or
indirectly, in the conduct of such enterprise's affairs through a
pattern of racketeering activity."). Second, defendants claim
that even if FEI has sufficiently pled the existence of a
distinct enterprise, it failed to plead that each and every
defendant "participate[d] . . . in the conduct of such
enterprise's affairs." *Id.* FEI responds that it has adequately
pled both.

    *i. Distinct Enterprise*

    "[T]o establish liability under § 1962(c), one must allege
and prove the existence of two distinct entities: (1) a 'person';
and (2) an 'enterprise' that is not simply the same 'person'
referred to by a different name." *Cedric Kushner Promotions,
Ltd. v. King*, 533 U.S. 158, 161 (2001). The term "enterprise" is
defined in the statute to "include[] any individual, partnership,
corporation, association or other legal entity, and any union or
group of individuals associated in fact although not a legal
entity." 18 U.S.C. § 1961(4). An associated-in-fact enterprise,
which is the type FEI asserts here, reaches a group of people
and/or organizations "associated together for a common purpose of
engaging in a course of conduct" and "is proved by evidence of an
ongoing organization, formal or informal, and by evidence that
the various associates function as a continuing unit." *United*

*States v. Turkette*, 452 U.S. 576, 583 (1981).  It is undisputed

that a collection of RICO "persons" may, together, make up a RICO

"enterprise."  *See, e.g.*, *Boyle v. United States*, 129 S. Ct.

2239, 2241-42 (2009); *Philip Morris*, 566 F.3d at 1116; *Yellow Bus*

*Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883

F.2d 132, 141 (D.C. Cir. 1989).  To establish liability, however,

plaintiff must "show[] that the defendants conducted or

participated in the *enterprise's* affairs, not just

their *own* affairs."  *Cedric Kushner*, 533 U.S. at 163 (quoting

*Reves v. Ernst & Young*, 507 U.S. 170, 185 (2001)).

 Defendants allege that FEI has not shown a distinct

enterprise because FEI has not alleged how the defendants

conducted or participated in the enterprise's affairs as opposed

to their own.[15]  Defendants argue that "all that FEI has alleged

---

[15]  As a threshold matter, they claim FEI has not pled "any
distinction between the RICO persons themselves (namely, the
animal protection organizations, their lawyers and Mr. Rider) and
the so called 'enterprise'."  Defs.' Mem. at 58.   This claim is
unavailing.  There are three structural features required to
plead an associated-in-fact enterprise: "a purpose, relationships
among those associated with the enterprise, and longevity
sufficient to permit these associates to pursue the enterprise's
purpose."  *Boyle*, 129 S.Ct at 2244.  FEI has pled all three.  The
FAC states that the individual defendants came together for the
purpose of, *inter alia*, filing and prosecuting the ESA Action,
became plaintiffs, attorneys and/or benefactors of that
litigation, and engaged in a pattern of allegedly unlawful
conduct for several years while pursuing that litigation.  FAC ¶¶
2-12, 282.  Moreover, this Circuit has expressly found that in a
RICO case, a litigation "enterprise" may be distinct from the
"persons" who are parties and counsel in that litigation.  *See*
*Philip Morris*, 566 F.3d at 1114 ("[T]here is no question that
[the clients] and the law firms together can constitute an

is that the various animal advocates simply engaged in conduct to further their own interests--the protection of elephants--which cannot constitute a RICO enterprise." Defs.' Mem. at 59.  FEI responds that "the enterprise is plaintiffs' side of the ESA case.  Defendants associated in fact to bring the ESA case as plaintiffs, plaintiffs' counsel and two other benefactors, WAP and HSUS, supplying money to Rider."  Opp'n at 70.  FEI further argues that the FAC "clearly distinguishes the defendants and their missions and activities from their involvement in the ESA case."  *Id.*  FEI admits there is "an overlap between the affairs of the enterprise" and the individual defendants, but argues "this does not mean that the enterprise is not sufficiently distinct."  *Id.* at 71 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010)).

The Court agrees with FEI.  The FAC adequately pleads that the individual defendants conducted the affairs of the enterprise as opposed to their own individual affairs, and distinguishes the parties and their missions and activities from their involvement in the ESA case.  FEI identifies the organizational defendants as having longstanding missions dedicated to protecting a wide variety of animals, not merely elephants or circus animals, and makes clear that their identities are in no way limited to that

---

'associated in fact' RICO enterprise." (quoting *Living Designs, Inc. v. E.I. DuPont De Nemours & Co.*, 431 F.3d 353, 362 (9th Cir. 2005))).

as plaintiffs in, or beneficiaries of, the ESA litigation.  FAC
¶¶ 34-36, 38.  It identifies lawyers, law firms, and
plaintiff/witnesses, which are distinct entities from the
litigation in which they participate or the clients they serve.

The cases defendants rely on do not prove otherwise.  In
*Yellow Bus*, this Circuit held that a union and its business agent
cannot, without more, form an enterprise -- "an organization
cannot join with its own members to do that which it normally
does and thereby form an enterprise separate and apart from
itself.  Where . . . the organization is named as defendant, and
the organization associates with its member to form the
enterprise, the requisite distinctness does not obtain . . .
There is no difference between the union as an entity including
[the officer], and the union plus [the officer], since the whole
is no different than the sum of its parts."  883 F.2d at 141.
The facts here are easily distinguishable; the enterprise is the
plaintiffs' side of the ESA litigation, which is not named as an
individual defendant, and moreover is a separate entity than any
individual defendant.

*Reves* and *Cedric Kushner* likewise do not help defendants.
In *Reves*, the Supreme Court focused not on whether the enterprise
was distinct from individual defendants, but whether those
defendants participated in or conducted the affairs of the
enterprise.  Finally, in *Cedric Kushner*, the Supreme Court held

that plaintiff could name an employee (Don King) as a RICO person
and his employer (Don King Productions, a closely held
corporation) as an enterprise, because they were two distinct
entities.  533 U.S. at 163.  If *Cedric Kushner* helps any party
here, it is FEI.

> ii.  *Conducted or Participated in the Enterprise's
>      Affairs*

To be liable under RICO, a person must "participate,
directly or indirectly, in the conduct of such enterprise's
affairs."  18 U.S.C. § 1962(c).  The Supreme Court has held that
in order to meet this requirement, "one must participate in the
operation or management of the enterprise itself."  *Reves*, 507
U.S. at 185.  "Of course, the word 'participate' makes clear that
RICO liability is not limited to those with primary
responsibility for the enterprise's affairs, just as the phrase
'directly or indirectly' makes clear that RICO liability is not
limited to those with a formal position in the enterprise, but
*some* part in directing the enterprise's affairs is required."
*Id.* at 179.  This does not mean, however, that "participants"
must serve in leadership roles.  "An enterprise is 'operated' not
just by upper management but also by lower rung participants in
the enterprise who are under the direction of upper management."
*Id.* at 184.

Defendants claim that FEI failed to specifically allege "how
the animal protection organizations, their lawyers, or Mr. Rider

39

participated in the operation or management" of the enterprise.
Defs.' Mem. at 61.  FEI responds with a three page chart
detailing the specific paragraphs in the FAC which allege direct,
hands-on, continuing involvement in the enterprise, namely the
prosecution of the ESA case, by most of the defendants.  Opp'n at
73-75.

Specifically, FEI alleges Rider (1) accepted more than
$190,000 in cash, property and other benefits, FAC ¶¶ 5, 19-27,
(2) provided false testimony in exchange for the money he was
paid, FAC ¶¶ 184-91, (3) evaded paying federal income tax on the
money, FAC ¶¶ 28-29, and (4) obstructed FEI's inquiry into the
alleged bribery by submitting false affidavits, spoliating
evidence and absenting himself from the contempt hearing.  FAC ¶¶
192-93, 223-25.

FEI alleges organizational defendants ASPCA, AWI and FFA (1)
were plaintiffs in the ESA lawsuit, and agreed with each other
and other defendants in this case to fund Rider's participation
in the lawsuit with knowledge that he would testify falsely
regarding his standing,  FAC ¶¶ 50-51, 55, 98-129, 144-46, 157,
(2) paid Rider for his participation in the fraudulent lawsuit,
FAC ¶¶ 69, 132-33, 135-37, 147-49, 159, 161, (3) participated in
the July 2005 fundraiser, FAC ¶¶ 179-83, and (4) obstructed FEI's
inquiry into the alleged bribery by submitting false
interrogatories, providing false deposition testimony, spoliating

40

evidence and procuring Rider's absence from contempt hearings. FAC ¶¶ 196-222, 231-35. FEI alleges organizational defendant API became a plaintiff in the ESA Action in 2006 and participated in the alleged bribery of Rider. *Id.* ¶¶ 169-70, 172-73.

FEI alleges MGC, Meyer and Glitzenstein (1) were counsel of record for the ESA plaintiffs throughout the litigation, FAC ¶¶ 98-129, (2) paid Rider directly and charged amounts on legal bills back to ASPCA, AWI and FAA, FAC ¶¶ 67-68, 72-75, and (3) concealed the payments to Rider, and obstructed FEI's inquiry into the payments by participating in submission of knowingly false interrogatories and false deposition testimony, and by procuring Rider's absence from contempt hearings. FAC ¶¶ 50-56, 196-234.

FEI alleges WAP was the alter ego of MGC, was controlled by Meyer and Glitzenstein, and collected over $155,000 from ASPCA, AWI, API, and FFA/HSUS to pay to Rider for his participation in the lawsuit. FAC ¶¶ 43, 82-97, 125-26. FEI further alleges that WAP concealed the nature of the payments to Rider by issuing falsely worded correspondence and making false ledger entries. FAC ¶¶ 113-124.

Based on the foregoing, the Court is persuaded that the FAC adequately pleads participation in the enterprise as to these

defendants.[16]   Three of the four remaining defendants, Jonathan

Lovvorn, Kimberly Ockene and HSUS, have filed separate motions to

dismiss, which are considered in separate sections below.   The

Court therefore turns to the last remaining defendant, attorney

Howard Crystal.

Crystal argues that he committed no acts of racketeering,

that even if he did commit such acts, the acts do not comprise a

pattern of racketeering, and he did not participate in the

operation or management of the enterprise.   Defs.' Mem. at 61-62.

FEI offers two arguments in response.   First, it claims that as a

partner or former partner in MGC, Crystal may be held jointly and

severally liable for the acts of the partnership during the time

he was a partner.   Opp'n at 75-76.   Second, FEI argues that the

FAC properly pleads direct liability as to Crystal, namely that

---

[16] In a footnote to their Motion to Dismiss, defendants cite
a number of cases where lawyers or other professionals providing
traditional legal services have not been accorded "participant"
status in a RICO enterprise.   Defs.' Mem. 62 n.33.   These cases
are inapplicable here because MGC, Meyer and Glitzenstein are
alleged to have gone far beyond providing traditional legal
services.   See FAC ¶¶ 98-129 (alleging lawyers paid Rider to
fabricate his standing as a plaintiff and concealed nature of
payments).   In circumstances more like the facts alleged here,
courts have found attorneys conducted or participated in the RICO
enterprise.   *Handeen v. Lemaire*, 112 F.3d 1339, 1348-50 (8th Cir.
1997); *Napoli v. United States*, 32 F.3d 31, 36 (2d Cir. 1994);
*see also JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, Case
No. 06-6095, 2007 U.S. Dist. LEXIS 28954, *27-29 (S.D.N.Y Apr.
18, 2007) (applying the same principles to accountants; *compare
RSM Prod. Co. V. Freshfields Bruckhaus Derenger*, Case 11-7101,
2012 U.S. App. LEXIS 12784 (June 22, 2012) (law firm and
attorneys not liable under RICO where complaint did not allege
that lawyer or law firm committed any predicate act).

he individually engaged in sufficient racketeering acts to
constitute a pattern under RICO, and he participated in the
operation or management of the enterprise. *Id.* at 76-77.  The
Court finds that FEI has pled only indirect liability as to
Crystal.

A partnership, and its partners, may be held jointly and
severally liable for wrongful acts committed by other partners
acting in the ordinary course of business of the partnership.
*See, e.g.*, D.C. Code § 29-603.01(1) (each partner is an agent of
other partners, whose acts in the ordinary course of business
bind the others); § 29-603.05(a) (partnership liable for third-
party loss due to partner's wrongful acts); § 29-603.06(a) (all
partners jointly and severally liable for all partnership
obligations).  The Court agrees with several others that have
found vicarious liability based on the racketeering acts of co-
partners is appropriate in RICO claims.  *See, e.g.*, *Avianca, Inc.
v. Corriea*, No. 89-3277, 1992 WL 93128, *13-14 (D.D.C. Apr. 13,
1992), *amended on reconsideration on other grounds*, 1993 WL
797453 (D.D.C. Mar. 16, 1993) (Lamberth, J.) (co-partners may be
held indirectly liable under RICO for acts of co-partners);
*Burns v. MPK Partnership*, No. 03-3021, 2003 WL 23979014, *13 (D.
Or. Nov. 5, 2003); *Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547,
555-59 (D. Md. 1998); *131 Main St. Assocs. v. Manko*, 897 F. Supp.

43

1507, 1533-35 (S.D.N.Y. 1995); *Crowe v. Smith*, 848 F. Supp. 1258, 1261-63 (W.D. La. 1994).

Here, FEI alleges that MGC is a law firm organized as a general partnership, and alleges that Crystal was a partner in MGC during at least a portion of the period during which MGC, Meyer, and Glitzenstein allegedly committed hundreds of racketeering acts.  FAC ¶¶ 39, 40-42, 44-46.  At the motion to dismiss stage, the Court finds that plaintiff has sufficiently pled joint and several liability.  *BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468, 485-86 (D.D.C. 1997).

By contrast, plaintiff does not plead direct liability as to Crystal.  The FAC alleges only one act of racketeering specifically involving Crystal: the alleged refusal of "MCG and the lawyer defendants," to accept a subpoena for Rider, and "on information and belief, one of more of [the ESA plaintiffs and/or the lawyers] procured Rider's absence from the hearing [to which the subpoena pertained] and told him not to attend."  FAC ¶ 231. Even assuming that this states a predicate act of racketeering against Crystal, as opposed to group pleading, it is only a single act, which is insufficient to meet RICO's pattern element. *See H.J. Inc.*, 492 U.S. at 237.

4.   **Pleading Predicate Offenses**

   i.   *Mail and Wire Fraud*

A plaintiff "alleging mail and wire fraud must establish two essential elements: (1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 89 (D.D.C. 2006) (citations omitted).  Mail and wire fraud claims are subject to Rule 9(b) heightened pleading requirements; furthermore, these claims require specific intent to defraud.  *Id.*  Defendants assert three arguments in support of their claim that FEI failed to meet the pleading requirements; none has merit.

First, defendants claim FEI did not meet the particularity requirement of Rule 9(b) because it failed to specify "what . . . statements were made and in which context, when they were made, who made them, and the manner in which these statements were misleading." *Bates*, 466 F. Supp. 2d at 89 (citations omitted).  This is inaccurate.  The FAC explains the alleged scheme to defraud generally, setting forth how some of the defendants allegedly provided Rider with "grants" and "donations" through the mail, and arranged a cover for their payments to induce him to fraudulently participate in the ESA lawsuit.  *See* FAC ¶¶ 98-112.  The FAC further sets out how those of the defendants who are alleged to have committed wire fraud did so, with references to specific communications, dates, senders and recipients.  *Id.*

45

at ¶¶ 85, 95-97, 106, 113-20, 125-26 (WAP payments and accompanying cover letters); *id.* ¶ 127-29 (Meyer sends fraudulent solicitation); *id.* ¶¶ 132, 146, 158 (MGC invoices); *id.* ¶¶ 136 (ASPCA payments); *id.* ¶ 148 (AWI payments); *id.* ¶¶ 159-60 (FFA/HSUS payments); *id.* ¶¶ 170, 172 (API payments); *id.* ¶¶ 179-83 (July 2005 fundraising materials).

Second, defendants argue that a finding of "specific intent" to defraud requires the court to determine the state of mind of the individual corporate officers or employees who made or approved the fraud. Defs.' Mem. at 64. Defendants, who cite *Philip Morris* for the state of mind requirement, omit the very next sentence of the Circuit's analysis: "[a] person's state of mind is rarely susceptible of proof by direct evidence, so specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence." *Philip Morris*, 566 F.3d at 1118. The FAC alleges the defendants knew Rider was being paid to anchor the lawsuit and to fabricate his injury, and they attempted to cover up the payments by, variously, denying the payments existed, attempting to hide the source of the money, and mis-characterizing the payments. At the pleading stage, FEI has met its burden to plead specific intent.

Finally, defendants claim the mail and wire fraud claims fail because defendants did not "obtain" for themselves the fees

that FEI paid to its attorneys to defend the ESA case.  This is incorrect as a matter of law.  Mail fraud lies whether or not the perpetrator ends up with the victim's property or money.  *Schmuck v. United States*, 489 U.S. 705, 707, 711 (1989) (defendant used car salesman guilty of mail fraud even though he had no contact with, and received nothing from, ultimate car purchasers he victimized).

> ii.   *Obstruction of Justice, Money Laundering and Bribery*

Defendants claim there are two deficiencies in how FEI has pled obstruction of justice, money laundering and bribery.  First, defendants argue that plaintiff is attempting to "bootstrap" into a RICO case a series of discovery disputes or litigation activity that cannot form the basis for RICO predicate acts.  Defs.' Mem. at 66; Defs.' Reply at 29-32.  Defendants are correct that courts have refused to allow "litigation activities" such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for RICO, but only in circumstances where such acts constitute "the only allegedly fraudulent conduct."  *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 162 (D. Conn. 2000).  In such circumstances, courts have found that these allegations of litigation misconduct may be grounds for malicious prosecution or abuse of process claims, but not for a RICO case.  *See, e.g.*, *Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 171-72 (E.D.N.Y.

2010).  On the other hand, where "additional allegations of extortion or some other pattern of racketeering activity" are involved, courts "have found that alleged mail and wire fraud violations arising out of malicious prosecution or abuse of process could be RICO predicate acts." *Daddona*, 156 F. Supp. 2d at 163 (collecting cases).  This case, at least at the pleading stage, falls into the latter category.  Plaintiff's allegations in the FAC are not limited to claims that defendants filed false documents with the Court or otherwise engaged in frivolous and harassing litigation; they claim the entire lawsuit was based on bribery of the lead plaintiff and witness.

Second, defendants allege that plaintiff's allegations of money laundering, bribery and obstruction of justice should be dismissed because violations of these statutes depend on secrecy or concealment from public view.  Defs.' Mem. at 66-68. Reprising the factual arguments asserted in support of their compulsory counterclaim and statute of limitations defenses, defendants argue that FEI knew the defendants were supporting Rider because Rider and the other defendants told FEI.  *Id.* Therefore, according to defendants, FEI can satisfy neither the 'secrecy' nor the 'specific intent' elements of these predicate acts.

The Court finds FEI has adequately pled the elements of money laundering, bribery and obstruction.  "The money laundering

statute criminalizes behavior that masks the relationship between the individual and his illegally obtained proceeds." *U.S. v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007); 18 U.S.C. § 1956. The FAC alleges that the defendants bribed Rider, and that the bribes were falsely characterized as grants or reimbursement of expenses for media work to disguise their origins, their true nature and purpose, and to assist Rider in evading taxes.  FAC ¶¶ 24, 28-29, 72-178.

The bribery statute requires that payments be given or accepted "corruptly" to influence testimony under oath or affirmation.  18 U.S.C. § 201(b)(3), (4).  FEI alleges that the defendants paid Rider approximately $200,000 in order to influence Rider to participate in the lawsuit and to fabricate his claim of standing, upon which the lawsuit was ultimately based.  FEI further alleges that the defendants tried to hide the payments themselves, as well as their nature and purpose.  FAC ¶¶ 20-32.

Finally, the obstruction of justice statute prohibits, in relevant part, "corruptly . . . influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice."  18 U.S.C. § 1503.  "There must be a nexus in time, causation or logic between the conduct and its effect on the proceeding:  A defendant must know that his corrupt actions 'are likely to affect the . . . proceeding.'"

49

*United States v. Jahedi*, 681 F. Supp. 2d 430, 434 (S.D.N.Y. 2009)

(quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).

Although obstruction of justice charges are not often applied to

lies or misrepresentations in the course of civil discovery,

courts have permitted parties to pursue it under certain

circumstances.  *See, e.g.*, *In re Sealed Case*, 162 F.3d 670, 674

(D.C. Cir. 1998) (non-party's submission of false affidavit in a

motion to quash a subpoena in civil litigation); *United States v.

Abbell*, 271 F.3d 1286, 1300-01 (11th Cir. 2001) (obtaining false

affidavits and deposition testimony for use in possible

extradition proceedings in Colombia); *United States v. Lundwall*,

1 F. Supp. 2d 249 (S.D.N.Y. 1998) (withholding and destroying

documents in employment discrimination case).  Moreover, bribery

of a witness can itself constitute obstruction of justice.  *See,

e.g.*, *United States v. LeMoure*, 474 F.3d 37, 41 (1st Cir. 2007)

(citations omitted).  In this case, FEI has alleged that

defendants provided knowingly false responses to interrogatories

and knowingly false deposition testimony which were designed to

conceal the alleged bribery of Rider.  FAC ¶¶ 184-230.  In light

of the subject matter of the allegedly false information provided

in discovery-- information regarding bribery of a plaintiff and a

witness so that he would, in turn,  provide false testimony to

the Court regarding the merits of the underlying case--the Court

finds that FEI has sufficiently pled the elements of obstruction

of justice, as well as money laundering and bribery, to survive a motion to dismiss.

### 5.   Standing

Defendants argue that FEI cannot establish proximate cause between the predicate acts alleged and its alleged RICO injury. First, they claim FEI cannot show a legally sufficient connection between its injuries and the predicate acts not directly related to the ESA Action, specifically, bribery, illegal gratuity payments, obstruction of justice, money laundering, mail fraud, and wire fraud in connection with defendants' legislative and executive branch advocacy and fundraising efforts. Second, they argue that FEI cannot show that the lawsuit-related predicate acts proximately caused its injuries. The Court considers each in turn.

> i.   *Causation for Predicate Acts Not Directly Related to Prosecution of the ESA Action.*

In order to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. SEC Investor Protection Corp.*, 503 U.S. 258, 268 (1992). "Proximate cause . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged. A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Group, LLC v. City of New*

51

*York*, 130 S. Ct. 983, 989 (2008) (quoting *Holmes*, 503 U.S. at 268, 271, 274).

Defendants note that the only injury FEI alleges is "the substantial costs incurred by FEI to defend the ESA Action."  FAC ¶ 273.  Accordingly, they argue that FEI cannot claim injury related to defendants' legislative and executive advocacy efforts or to their fundraising efforts because any connection between this conduct and FEI's injury is far too remote to satisfy proximate cause.  Turning first to their legislative and administrative advocacy efforts to ban elephants in circuses, defendants note that FEI has alleged no injury from these actions.  Defs.' Mem. at 52; *see also Sedima v. Imrex*, 473 U.S. 479, 496 (1985) ("[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation. . . . [A] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured.").  Even if FEI claimed that there is somehow a connection between defendants allegedly defrauding legislative or administrative bodies and FEI losing money by defending the ESA lawsuit, defendants argue that it is far too attenuated to satisfy RICO's causation requirement.  *Id.* at 53.

52

The Court agrees with defendants.  Even assuming FEI was a
direct target of defendants' administrative and legislative
efforts, it has not alleged that it suffered any injury from
these efforts.  FEI makes a cursory attempt to tie the ESA
litigation to defendants' legislative efforts, stating,
"defendants sought discovery in the ESA case for use in the
legislative arena; Rider's stature as a legislative witness was
enhanced by being a plaintiff in" the ESA Action.  Opp'n at 69.
Even assuming the truth of this assertion, the Court finds it
insufficient for the purpose of satisfying RICO's standing
requirements.  The FAC contains no allegations that would create
the plausible inference that the defendants' legislative and
administrative activity "led directly to [FEI's] injur[y]" of
spending money to defend the litigation.  *See Anza v. Ideal Steel
Group*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO
claim for proximate causation, the central question it must ask
is whether the alleged violation led directly to the plaintiff's
injuries.").  Accordingly, FEI does not have standing to maintain
a RICO claim with respect to this activity.

Turning to the fundraising activity, FEI alleges that, in
July 2005, some of the organizational defendants violated mail
and wire fraud statutes by using false and misleading statements
in an invitation to a fundraiser to raise money to support the
ESA litigation. FEI alleges that the false information enticed

53

defendants' donors into giving money to support the ESA litigation.  FAC ¶¶ 179-183.  FEI further alleges that at least one of the defendants, API, "made two payments to WAP for Rider using proceeds from the fundraiser."  *Id.* ¶ 180.  Finally, FEI alleges that it was the direct victim of the scheme because the sole purpose of the fundraiser was to raise money for the ESA Action.  *Id.* ¶ 183.

Defendants argue that FEI has not established direct causation between their fundraising activities and plaintiff's expenses litigating the ESA Action.  *Id.* at 54-55.  The Court does not agree.  The Supreme Court has held that "[a] scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO, if the injury is not derivative of someone else's."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 645 (2008); see also *Sandwich Chef v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 223 (5th Cir. 2003) (plaintiff need not prove direct reliance on defendant's fraudulent predicate act "when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party"); *Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994) (RICO does not require that "only injuries suffered by the immediate victim of a predicate act" may satisfy proximate cause, particularly when the injuries suffered by others are not

54

"derivative of any losses suffered by" the immediate victims).
Here, FEI claims that it was directly and contemporaneously
injured as a result of the alleged fraud committed against the
donors: the money defendants obtained via the alleged mail fraud
was directly used to pay Tom Rider for his participation in the
ESA Action.  Moreover, FEI's injury is not derivative of the
alleged losses suffered by the donors.  Instead, it claims an
independent injury: lost revenue due to the necessity of
defending the ESA Action.

Defendants argue that FEI cannot show that the donors "would
have withheld their contributions had they received different
information regarding the ESA case[.]" Defs.' Mem. at 54.  The
Court agrees that "it may well be that a RICO plaintiff alleging
injury by reason of a pattern of mail fraud must establish at
least third-party reliance in order to prove causation." *Bridge*,
553 U.S. at 659.  At this point, these claims are not
established, but they are alleged in the complaint, see FAC ¶¶
181-82, which is all that is required at the motion to dismiss
stage.  Accordingly, FEI has sufficiently alleged standing with
respect to the fundraising activity.

> ii.  *Causation for Predicate Acts Directly Related to*
> *Prosecution of ESA Action.*

Defendants also argue that "FEI cannot establish that it
would not have had to expend resources defending the ESA Action
but for Mr. Rider's assertion of legal standing . . . [b]ecause

of the *independent* assertion of organizational standing arguments
that were vigorously advanced throughout the entire ESA
litigation." Defs.' Mem. at 56.  Because none of the alleged
predicate acts relate to the claims of organizational standing,
defendants assert FEI cannot show a direct connection between its
expenses in the lawsuit and the alleged predicate acts: it might
have had to defend a long and costly lawsuit anyway.  Plaintiff
responds that this Court found, in its 2009 Opinion deciding the
ESA case, that "the lawsuit could not have been maintained
without Mr. Rider's participation as a plaintiff." Opp'n at 68
(quoting *ASPCA v. Feld Entm't*, 677 F. Supp. 2d at 89).  FEI
argues that "organizational standing was never the sole standing
theory.  Rider was in this case from the outset, and FEI spent
legal fees dealing with his claims regardless of the fact that
the other plaintiffs continued to assert organizational standing
after the Court had rejected their arguments." *Id.* at 69.

This Court has already decided that Rider's standing was
essential to the prosecution of the ESA lawsuit, from which FEI's
injuries directly flow.  In its 2009 Opinion, this Court made a
factual finding that:

> On June 29, 2001, the Court dismissed this case on the basis
> that neither Mr. Rider nor the organizational plaintiffs had
> standing to sue.  The [ESA Action] was reinstated by the
> Court of Appeals in 2003, but solely on the basis of what
> had been alleged by Mr. Rider with respect to his personal
> and emotional attachment to the elephants with whom he had
> worked and the aesthetic injury he claims that he suffered
> as a result of FEI's treatment of those elephants.  Indeed,

> the Court of Appeals recognized that Mr. Rider presented the plaintiffs' "strongest case for standing." In order for this case to continue it was therefore crucial to the organizational plaintiffs that Mr. Rider remain a plaintiff.

*ASPCA v. Feld*, 677 F. Supp. 2d at 81. Accordingly, FEI has sufficiently alleged that the predicate acts related to the ESA Action caused its injury and thus has standing to pursue its RICO claims based on the litigation-related conduct.[17]

### 6. Humane Society of the United States ("HSUS") Motion to Dismiss

Having addressed the RICO claims raised in the omnibus motion to dismiss, the Court turns to HSUS's separate motion to dismiss. The FAC contains the following allegations with respect to HSUS. First, FEI claims that HSUS merged with FFA, a plaintiff in the ESA case, on January 1, 2005.[18] FAC ¶ 36. The

---

[17] Defendants argue that standing should not lie because it would be hard for a court "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors" such as organizational standing or, indeed, FEI's own role in contributing to the delay and expense of the litigation. Defs.' Mem. At 56 (quoting *Anza*, 547 U.S. at 458). The Court does not agree. *Anza* does not stand for the proposition that no RICO injury could ever be asserted unless it was solely attributable to the alleged unlawful activity. Rather, it simply notes that "[t]he less direct an injury is, the more difficult it becomes" to ascertain the source of the injury. *Anza*, 547 U.S. at 458. In this case, the asserted injury--FEI's attorneys' fees in the ESA litigation--is the direct result of the alleged RICO offenses involving Rider's involvement in the litigation. The fact that the Court may at some point need to determine which portion of the fees were spent defending against Rider's claims as opposed to the claims of the organizations does not mean that FEI lacks standing to assert any RICO injury.

[18] HSUS was never a plaintiff in the ESA Action.

FAC further alleges that FFA made money available to Rider on several occasions before January 1, 2005, FAC ¶¶ 158-59, and that FFA/HSUS made money available to Rider on several occasions after January 1, 2005, as well. *Id.* ¶ 160.  Second, FEI alleges that Michael Markarian, an officer of FFA/HSUS, gave false deposition testimony to conceal FFA/HSUS's payments to Rider.  FAC ¶¶ 36, 217-22.  Finally, FEI claims that FFA/HSUS, operating under the name HSUS, participated in the July 2005 fundraiser which allegedly defrauded donors and FEI.  *Id.* ¶ 179.

In its motion to dismiss, HSUS asserts that, although it "join[ed] forces in a corporate combination" with FFA via an asset purchase agreement, the two organizations did not merge; therefore, FFA's RICO liabilities cannot be imputed to HSUS. HSUS Mot. To Dismiss ("HSUS Mem.") at 2.  In support of its motion to dismiss, HSUS filed the Asset Acquisition Agreement ("Agreement") between HSUS and FFA.  *See* HSUS Mem. Ex. A.  It also filed excerpts of FFA's tax returns from 2005, 2006 and 2007, as well as several excerpts of Markarian's deposition testimony in which he asserts that HSUS never made any money available to Rider.  *Id.*, Exs. B-E.  In its opposition, FEI attached additional tax returns filed by FFA.  Opp'n to HSUS Mot. to Dismiss, Exs. 1-4.

As a threshold matter, the Court must determine whether it may consider the attachments to the motion to dismiss without

converting it into a summary judgment motion.  The Court
concludes it may consider the Agreement but not the remainder of
the exhibits.  Where an attachment to a motion to dismiss is a
document "upon which the complaint necessarily relies, and
because plaintiff does not dispute its authenticity, the Court
may consider [it] without converting [the] motion to dismiss into
a motion for summary judgment." *Navab-Safavi v. Broad. Bd. of
Governors*, 650 F. Supp. 2d 40, 56 n.5 (D.D.C. 2009); *see also
Hinton v. Corrections Corp. Of Am.*, 624 F. Supp. 2d 45, 47 (2009)
(considering contract attached to motion to dismiss, noting that
"[b]y pleading that the defendant had the duty to provide him
with eye treatment and care, the plaintiff's complaint
necessarily rests on the contract, although it did not
incorporate the contract.").  In this case, by pleading that FFA
and HSUS merged, the FAC necessarily rests on the Agreement--the
contract memorializing the alleged merger--and it is integral to
FEI's claims.  However, the FAC does not necessarily rely on the
incomplete portions of certain of FFA's tax filings, or the other
documents attached to the motion to dismiss or the opposition.
The Court will therefore exercise its discretion not to consider
the remaining attachments, and accordingly need not convert the
motion to dismiss into a motion for summary judgment.  *See
Robinson v. Dist. of Columbia*, 736 F. Supp. 2d 254, 263 (D.D.C.
2010).

FEI asserts two theories under which HSUS may be liable: merger and successor liability.  "A corporate merger consists of a combination whereby one of the constituent corporations remains in being, absorbing in itself all the other constituent corporations, which cease to exist."  *See, e.g.*, 20 Am. Jur. Proof of Facts 2d 609; *see also* N.Y. Not-for-Profit Corp. Law § 905.[19]  In its opposition, FEI does not seriously contest that FFA continues to exist following the asset purchase.  Indeed, it has sued FFA separately as a co-defendant in these actions. Accordingly, no statutory merger occurred.

Under the doctrine of successor liability, a corporation acquiring assets of another corporation takes on its liabilities if, *inter alia*, there was a de facto merger of the companies, or if there is an expressed or implied agreement.  *R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 635-36 (S.D.N.Y. 1995).  FEI claims that HSUS may be held liable under either of these theories of successor liability.  Opp'n to HSUS Mot. at 4.  The Court finds that the FAC, in conjunction with the Agreement, adequately alleges a de facto merger; accordingly, it need not reach the question of whether HSUS agreed to take FFA's liabilities in this lawsuit.

---

[19]  The parties agree that New York law governs the Agreement.  *See* Agreement, HSUS Mot. Ex. A., § 11.9.

"A de facto merger occurs when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003) (citations omitted).  The hallmarks of a de facto merger are "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption of the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (Sotomayor, J.) (citations omitted).  "[T]he de facto merger exception derives from the concept that a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities in order to ensure that a source remains to pay for the victim's injuries."  *Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001) (overruled on other grounds by *Slayten v. Am. Ex.*, 460 F.3d 215 (2d Cir. 2008)) (internal citations omitted); *see also Matter of N.Y. City Asbestos Litig.*, 15 A.D.3d 254, 258-59 (N.Y. App. Div. 2005).  Accordingly, a de facto merger does not necessarily require the presence of all four factors.  *See AT&S Transp. LLC v. Odyssey Logistics & Tech. Corp.*, 22 A.D.3d 750, 753 (N.Y. App. Div. 2005); *Fitzgerald v. Fahnestock & Co.*, 286 A.D.2d 573, 574

61

(N.Y. App. Div. 2001); *Sweatland v. Park Corp.*, 181 A.D.2d 243, 246 (N.Y. App. Div. 1992).

HSUS does not dispute, at least for the purposes of its motion to dismiss, that the transaction between it and FFA satisfies the last two elements of the de facto merger test. The first element, continuity of ownership, is not applicable to non-profit corporations. HSUS's argument therefore hinges on the second factor: it argues that there can be no de facto merger as a matter of law because FFA has not dissolved. However, New York courts have not necessarily found this factor sufficient, without more, to overcome a finding of de facto merger. "So long as the acquired corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made." *AT&S Transp.*, 22 A.D.3d at 753; *see also Cargo Partner AG v. Albatrans, Inc.*, 207 F. Supp. 2d 86, 98 (S.D.N.Y. 2002); *Fitzgerald*, 286 A.D. 2d at 575 (collecting cases). "Courts will look to whether the acquiring corporation was seeking to obtain for itself intangible assets such as good will, trademarks, patents, customer lists and the right to use the acquired corporation's name. The concept upon which this doctrine is based is that a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it

derives from the good will purchased." *Fitzgerald*, 286 A.D.2d at 575 (citations omitted).

In this case, although the Asset Purchase Agreement provides for FFA to retain ownership of three real properties, HSUS acquired substantially everything else.  Among other things, HSUS acquired the good will, trademarks, logos, donor lists, creative materials and name of FFA.  Asset Purchase Agreement § 1.1.  It assumed the trade payables in the ordinary course of business, as well as the liabilities and obligations under FFA's agreements, contracts, orders, leases, and other commitments.  *Id.* § 1.1. HSUS offered employment to all of FFA's employees, *id.* § 1.5(b), and automatically extended membership in HSUS to anyone donating $10 or more to FFA, *id.* § 1.5(e).  Taken together, particularly given that the other factors in the de facto merger test weigh in favor of finding a merger, these facts raise a plausible inference that the corporate combination between FFA and HSUS satisfies the requirements of a de facto merger.  It may be that FEI will not be able to show that the corporate combination of HSUS and FFA amounts to a de facto merger under New York law; however, for the reasons stated above, the allegation is sufficient to survive a motion to dismiss.[20]

--------

[20]   In its Opposition to HSUS's motion to dismiss, FEI for the first time implies that even if HSUS and FFA did not merge, HSUS is still separately liable under RICO.  If indeed FEI is making such an argument, the Court rejects it.  While the Federal Rules permit parties to plead more than one claim in support of

Having found that FEI adequately alleges a de facto merger of HSUS and FFA, the Court concludes that FEI also alleges the merged entity conducted or participated in the affairs of the enterprise.  According to the FAC, FFA/HSUS employed attorneys of record in the litigation, knowingly paid Rider, on multiple occasions, for his participation in the lawsuit, attempted to obstruct FEI's inquiry into the payments to Rider, and co-hosted the July 2005 fundraiser.  FAC ¶¶ 44-45, 60-70, 156-60, 179-83, 217-22.  Based on the foregoing, the Court likewise concludes that the FAC has adequately alleged the merged entity knowingly agreed to the commission of a violation of § 1962(c), and accordingly has pled the elements of a RICO conspiracy charge. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 61-66 (1997). Accordingly, the Court will deny HSUS's motion to dismiss.

### 7.    Lovvorn & Ockene Motion to Dismiss

Jonathan Lovvorn and Kimberely Ockene, two attorneys of record in the ESA Action, move separately to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[21]  Lovvorn and Ockene argue that they were merely members of a litigation team:  they

---

alternative theories of recovery, *see* Fed. R. Civ. P. 8(d)(3), FEI has pled no claims against HSUS as an entity independent of its merger with FFA.

[21]    Lovvorn and Ockene also move to strike FEI's notice of supplemental authority as to them.  The Court finds FEI's notice of supplemental authority complies with the Court's June 24, 2011 minute order permitting such filings; accordingly, the Motion to Strike is **DENIED**.

committed no acts of racketeering; even if they did commit such acts, the acts do not comprise a pattern of racketeering; and they did not participate in the operation or management of the enterprise.  FEI offers two arguments in response.  First, it claims that as former partners in Meyer, Glitzenstein and Crystal, Lovvorn and Ockene may be held jointly and severally liable for the acts of the partnership during the time they were partners.  Second, FEI argues that the complaint properly pleads direct liability as to Lovvorn and Ockene, alleging that each individually engaged in sufficient racketeering acts to constitute a pattern under RICO, and each participated in the operation or management of the enterprise.

With respect to joint and several liability, the Court reaches the same conclusion as to Lovvorn and Ockene as it did as to Crystal (see *supra* section III.C.3); namely, as alleged partners in MGC, they may be held jointly and severally liable for the wrongful acts of the partnership or other partners taken in the course of ordinary partnership business during the time they were partners.  Lovvorn and Ockene respond that they were "non-equity employees, not general partners," and therefore cannot be vicariously liable.  Lovvorn & Ockene Reply at 4.  FEI will have the burden to show that these individuals were partners to establish liability; however, at the motion to dismiss stage,

the Court finds that plaintiff has sufficiently pled joint and several liability.  *BCCI Holdings*, 964 F. Supp. at 485-86.

In addition to joint and several liability for his partners' and law firm's actions, the Court finds FEI has plead direct liability as to Lovvorn.  The FAC alleges that Lovvorn had actual knowledge of the payments to Rider, that he participated in discussions with other defendants to plan and execute the payments to Rider, and he "directly participated in some or all of the payments that FFA/HSUS made to or on behalf of Rider." FAC ¶ 44, *see also id.* ¶ 160 (detailing payments from FFA/HSUS to Rider); FEI Opp'n to Lovvorn & Okene Mot. to Dismiss at 5 (citing ESA Action, DE 166 Exs. 14, 19, 22, & 24; DE 459-12 (correspondence from Lovvorn, as representative of HSUS, to Glitzenstein, enclosing payments to Rider on four separate occasions).  For the reasons explained in section III.C.4.ii *supra*, the Court finds that FEI has sufficiently pled the elements of bribery, and, for the reasons explained in section III.C.2 *supra*, finds that FEI has sufficiently alleged a closed-ended pattern of racketeering activity sufficient to survive a motion to dismiss.

The FAC also adequately pleads Lovvorn "participated in the operation or management of the enterprise itself" and therefore may be liable under § 1962(c).  *Reves*, 507 U.S. at 179, 183-84 ("[T]he word 'participate' makes clear that RICO liability is not

limited to those with primary responsibility for the enterprise's affairs . . . but *some* part of directing that enterprise's affairs is required."). Lovvorn echos the argument, raised in the defendants' omnibus motion to dismiss, that attorneys providing traditional legal services are not accorded 'participant' status in a RICO enterprise. Lovvorn & Ockene Mot. at 5-6. "However, *Reves* provides no blanket immunity for professionals regardless of their involvement in a criminal enterprise . . . where professionals are alleged to have exceeded the mere rendering of legitimate professional service, the 'operation or management' requirement will be pleaded adequately." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 U.S. Dist. LEXIS 28954, at *28 (collecting cases). In *JSC*, the defendant accounting firm was found to participate in the operation and management of the enterprise when it was the alleged architect of some of the money laundering activities and devised and managed a scheme to carry out some of the fraudulent transactions. Other courts have likewise found that lawyers may be liable for operating or managing the enterprise when they participate in the central activities of the enterprise. *See, e.g.*, *Napoli v. United States*, 32 F.3d at 36 (enterprise was fraudulent litigation, attorneys who conducted the litigation, bribed witnesses and suborned perjury operated the enterprise); *Handeen*, 112 F.3d at 1349-50 (when purpose of the enterprise was

67

to manipulate bankruptcy process, attorneys who created and
executed plan to fraudulently hide assets and inflate debt and
made representations to bankruptcy court based on that plan are
liable; court found "an underlying distinction between acting in
an advisory professional capacity . . . and acting as a direct
participant in [an enterprise's] affairs").

Here, FEI has alleged that the enterprise was the
plaintiffs' side of the ESA litigation, which was managed and
controlled by the lawyers in the case.  FEI has alleged that
Lovvorn, among other attorneys, participated in the core
activities that constituted the affairs of the enterprise,
namely, litigating the ESA case and planning and executing the
payments to Rider.  Moreover, FEI has alleged that he did so
through a pattern of illegal acts, including knowingly procuring
false testimony through bribery.  Even if he did so at the
direction of others, Lovvorn may still be liable for
participation in the conduct of an enterprise as a lower-rung
participant "by knowingly implementing decisions, as well as by
making them."  *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir.
1994), *cert. denied*, 513 U.S. 1177 (1995); *see also MCM Partners
v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 978-79 (7th Cir.
1995) (collecting cases).

By contrast, the FAC does not plead direct liability under §
1962(c) as to Ockene.  The FAC pleads only one alleged act of

68

racketeering specifically involving Ockene: the alleged refusal

of "MCG and the lawyer defendants," to accept a subpoena for

Rider, and "on information and belief, one or more of [the ESA

plaintiffs and/or the lawyers] procured Rider's absence from the

hearing [to which the subpoena pertained] and told him not to

attend." FAC ¶ 231. Even assuming that this states a predicate

act of racketeering against Ockene, as opposed to group pleading,

it is only a single act, which is insufficient to meet RICO's

pattern element. *See H.J. Inc.*, 492 U.S. at 237. In its

opposition to her motion to dismiss, FEI claims that it alleged

additional acts of racketeering by Ockene: specifically that she

provided misleading and/or false interrogatory answers in order

to cover up the payments to Rider, and defended a deposition in

which the deponent gave false testimony about the Rider payments.

Opp'n to Lovvorn & Ockene Mot. To Dismiss at 4-5. This is

inaccurate; the FAC contains no such allegations as to Ockene.[22]

---

[22]   In its Opposition to her Motion to Dismiss, FEI cites to
documents in the record of the ESA case which purport to show
Ockene's involvement in these events. In the absence of any
allegations in the FAC naming her on these issues, this is simply
insufficient to meet the requirements of notice pleading pursuant
to Federal Rule of Civil Procedure 8(a). Even assuming FEI did
plead Ockene's involvement in these acts, the Court is skeptical
that her involvement would comprise operation or management of
the enterprise, either as an upper-rung manager or a lower-rung
participant, as a matter of law. Unlike Lovvorn, Ockene is not
alleged to have participated in bribery of a witness. Even if
her name appeared on interrogatories which contained false
information, or if she defended a deposition in which a witness
testified falsely, this does not establish that Ockene knew the
submissions or testimony were false, much less that she falsified

The Court does, however, find that FEI has adequately pled RICO conspiracy as to Ockene.  Section 1962(d) of RICO states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).  A RICO conspirator need not commit an overt act.  "[A] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 64; *see also United States v. Zichetello*, 208 F.3d 72, 99 (2d Cir. 2000) ("We need inquire only whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise.") Moreover, "a conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting

---

answers or coached a witness to do the same.  The cases FEI relies on in support of a finding of attorney liability under RICO involved attorney actions on a different scale than those alleged against Ockene in the FAC or argued by FEI in its opposition to her motion to dismiss.  *See, e.g.*, *Napoli*, 32 F.3d at 36; *Handeen*, 112 F.3d at 1350; *Garrett v. Cassity*, Case No.09-1252, 2010 U.S. Dist. LEXIS 134776 (E.D. Mo. Dec. 21, 2010) (outside counsel, an individual, was sole trustee of the trust that owned and controlled all the entities which committed the alleged fraud, was also general counsel to many of those entities, helped devise scheme regarding fraudulent promissory notes, and signed at least one fraudulent note worth $ 6.3 million).

circumstantial evidence." *U.S. v. Mellon*, 393 F.3d 175, 191 (D.C. Cir. 2004).

Here, the FAC alleges that Ockene (1) was counsel of record in the ESA Action both as an attorney at MGC and at FFA/HSUS, FAC ¶ 45, (2) "deliberately misrepresented Rider's purported standing in pleadings and other filings before this Court and the D.C. Circuit in the ESA Action," *id.* ¶ 329, and, (3) "during some or all of the time period material to this lawsuit . . . had actual knowledge of the payments to Rider," *id.* ¶ 45. Taking all of these allegations together and construing them in the light most favorable to FEI, the Court finds that plaintiff has alleged Ockene "knew about and agreed to facilitate the scheme" of her co-defendants, and therefore has alleged RICO conspiracy. *Salinas*, 522 U.S. at 66.

### 8.   Conclusion as to RICO Claims (Counts I and II)

For the reasons set forth above, FEI lacks standing to bring RICO claims regarding the defendants' alleged legislative and administrative advocacy efforts, as set forth in the FAC, Factual Background, Sections VI and VII. In addition, the allegations that Rider and others made false or misleading statements, and were compensated to do so, when they participated in press conferences, made other statements to news outlets, and posted letters on organizational web-sites, are entitled to *Noerr-Pennington* immunity. *See, e.g.*, FAC ¶¶ 159, 161, 245, 252, 269-

71

71.  Finally, the FAC fails to allege direct liability under
section 1962(c) as to Howard Crystal or Kimberly Ockene.
Accordingly, the defendants' motions to dismiss the RICO claims
are **GRANTED IN PART** as to these allegations.  In all other
respects, defendants' motions to dismiss the RICO claims are
**DENIED.**

### E.    State Law Claims (Counts III-VII)

In addition to their RICO claims, FEI has alleged violations
of the Virginia Conspiracy Act, and the torts of abuse of
process, malicious prosecution, champerty and maintenance.
Defendants have moved to dismiss all of these claims.  The Court
will address each in turn.

### 1.    Count III: Virginia Conspiracy Act

The Virginia Conspiracy Act prohibits actors from conspiring
to willfully and maliciously injure another in his reputation,
trade, business or profession by any means whatsoever, and, like
RICO, provides treble damages for violations.  Va. Code. Ann. §§
18.2-499; 18.2-500(A) (2010).  The statute of limitations under
the Virginia Conspiracy Act is five years.  *Id.* § 8.01-243(B).

Defendants argue that this claim is barred by the statute of
limitations because Virginia follows the occurrence of injury
rule, rather than the discovery rule, for claims under the
Virginia Conspiracy Act.  *See id.* § 8.01.230 ("[T]he prescribed
limitations period shall begin to run from the date the injury is

sustained . . . and not when the resulting damage is discovered.") Defendants argue the sole injury claimed by FEI is the attorneys' fees it expended in defending the ESA Action, and it began paying those fees on July 11, 2000, when the ESA Case was originally filed. Defs.' Mot. To Dismiss at 81-82. FEI responds that under Virginia law, regardless of when the injury began, it may recover for the portion of injuries it sustained within the five years preceding the filing of its complaint. Opp'n at 52-53. FEI also argues that the defendants fraudulently concealed their payment scheme, thus tolling the statute of limitations "through at least July 19, 2005." *Id.* 50-52. For the reasons explained below, the Court agrees with FEI that under Virginia law it may recover damages for the five years preceding suit, and accordingly the Virginia Conspiracy claim is timely as to at least that portion of FEI's injury. Accordingly, the Court declines to reach the issue of fraudulent concealment at this stage of the litigation.

Under the Virginia Conspiracy Act, "every action for injury to property . . . shall be brought within five years after the cause of action accrues." Va. Code. Ann. § 8.01-243(B). The question before the Court is when the cause of action accrues. "If the wrongful act is of a permanent nature and one that produces all the damages that can ever result from it, [then] the entire damages must be recovered in one action and the statute of

limitations begins to run from the date of the wrongful act.
Conversely, when wrongful acts are not continuous but occur only
at intervals, each occurrence inflicts a new injury and gives
rise to a new and separate cause of action." *Hampton Rds.
Sanitation Dist. v. McDonnell*, 360 S.E.2d 841, 843 (Va. 1987)
(citations omitted).  In the latter situation, the plaintiff may
recover for "the damages sustained during the five years
immediately preceding the institution of the suit." *Id.* at 843-
44 (citation omitted); *see also Union Labor Life Ins. Co. v.
Sheet Metal Workers Nat'l Health Plan*, No. 90-2728, 1991 U.S.
Dist. Lexis 13613, at *15 (D.D.C. Sept. 30, 1991)(Virginia
statute of limitations accrued anew each time defendant was
unjustly enriched by underpaying its periodic insurance:
"wrongful acts or breaches of duty which occur in distinct
intervals or installments, as opposed to being continuous, cause
distinct and severable injuries.  Consequently, each breach gives
rise to new and separate causes of action and the statutes of
limitations . . . run separately for each.")

In this case, FEI claims each time the defendants paid Rider
constituted a new wrongful act which gave rise to a new injury to
FEI's business, namely, a separate payment of fees to defend the
ESA Action.  The Court agrees.  According to the FAC, there was
no one permanent wrongful act, or one that produced all the
damages resulting to FEI.  Rather, FEI has alleged that over the

74

course of several years, the defendants committed numerous wrongful acts--mainly paying Rider every two weeks or every month to continue to anchor the lawsuit and to testify falsely. Defendants allege each wrongful act resulted in a separate injury to FEI, namely, new legal bills.  Accordingly, the statute of limitations does not bar FEI's Virginia Conspiracy Act claim, at least for the wrongful acts and injuries occurring within five years before the filing of the Complaint, as to the original defendants, or the FAC, as to the newly added defendants.[23]

### 2.   Count IV:  Abuse of Process

Abuse of process "lies where the legal system has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used

---

[23] The cases defendants cite are not to the contrary.  In the three principal cases cited by defendants, the damages all arose from *one unlawful act*.  The courts held that the statute of limitations began to run from the time any injury was sustained as a result of the unlawful act, even if the damages reverberated from that one act for more than five years.  *See, e.g.*, *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan Inc.*, 838 F.2d 124 (4th Cir. 1988) (plaintiff alleged defendant withheld information material to its decision on the amount of insurance to purchase; statute of limitations began to run when another entity first made demand under that insurance policy), *Eshbaugh v. Amoco Oil Co.*, 360 S.E.2d 350 (Va. 1987) (conspiracy to injure plaintiff in his business by removing him from the premises; statute of limitations accrued when defendants fraudulently induced plaintiff to cancel his lease, not the day plaintiff actually vacated the premises); *Stone v. Ethan Allen, Inc.*, 350 S.E.2d 629 (Va. 1986) (plaintiff alleged refrigerator was defective when delivered, several years later, it caught fire, damaging their home, court found statute of limitations for negligence accrued the date of the fire, not the date it was delivered).

to do some collateral thing which he could not legally and regularly be paid to do." *Bown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992) (quoting *Morowitz v. Marvel*, 426 A.2d 196, 198 (D.C. 1980)). "There are two essential elements to an abuse of process claim: '(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *Houlahan v. World Wide Ass'n of Specialty Programs & Schs.*, 677 F. Supp. 2d 195, 199 (quoting *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959)). "Thus, in addition to ulterior motive, one must also allege and prove that there has been a perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge." *Hickey v. Scott*, 738 F. Supp. 2d 55, 71 (D.D.C. 2010)(quotation omitted).

FEI alleges that the defendants had several ulterior motives in prosecuting the ESA Action, including "to raise money for their organizations . . . to publicize their cause and pursue their legislative agendas . . . to drain FEI's resources . . . [and] to attempt to extort FEI into taking elephants out of its circus." Opp'n at 84-85. FEI also alleges a multitude of acts in the litigation process which were improper and wholly outside the "regular" prosecution of a civil action: namely, defendants filed a lawsuit based on a knowingly fraudulent claim of standing, and bribed their primary plaintiff to participate in

76

the lawsuit and to testify falsely about his standing in order to maintain the lawsuit.  *Id.*  And FEI has alleged that the defendants used discovery in the ESA Case to achieve an end not contemplated in the regular prosecution of the charge, namely, to pursue their legislative attempts to ban the use of elephants in circuses.  *Id.*  Taken together, these allegations are sufficient to survive a motion to dismiss.  Accordingly, defendants' motion to dismiss the abuse of process claim is **DENIED**.

### 3.   Count V:  Malicious Prosecution

To succeed on a malicious prosecution claim under District of Columbia law, a plaintiff "must plead and prove four things: (1) the underlying suit terminated in plaintiff's favor; (2) malice on the part of defendant; (3) lack of probable cause for the underlying suit; and (4) special injury occasioned by plaintiff as the result of the original action." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980) (citations omitted).  In the District of Columbia, "a termination is favorable only where 'it tends to indicate the innocence of the accused.'" *Lucas v. Dist. of Columbia*, 505 F. Supp. 2d 122, 127 (D.D.C. 2007) (citing *Brown v. Carr*, 503 A.2d 1241, 1245 (D.C. 1986)).

> It is apparent "favorable" termination does not occur merely
> because a party . . . has prevailed in an underlying action.
> While the fact he has prevailed is an ingredient of a
> favorable termination, such termination must further reflect
> on his innocence of the alleged wrongful conduct.  If the
> termination does not relate to the merits--reflecting on
> neither innocence of nor responsibility for the alleged

77

misconduct--the termination is not favorable in the sense it would support a subsequent action for malicious prosecution.

*Brown*, 503 A.2d at 1245 n.2 (quoting *Lackner v. LaCroix*, 602 P.2d 393, 395 (Cal. 1979), and adopting the standard under California law).  Courts have consistently dismissed malicious prosecution claims when the prior suit was dismissed for lack of jurisdiction or standing, as opposed to on the merits of the plaintiff's claims.  *See Fish v. Watkins*, 298 Fed. App'x 594, 597 (9th Cir. 2008); *Hudis v. Crawford*, 125 Cal. App. 4th 1586 (Cal. App. 4th 1586 (Cal. Dist. Ct. App. 2005); *Parrish v. Marquis*, 172 S.W.3d 526 (Tenn. 2005); *Bearden v. Bellsouth Telecomm.*, Inc., 29 So. 3d 761 (Miss. 2010); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[Article III] standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.").[24]

By contrast, District of Columbia courts have found that abandonment of an action, or voluntary dismissal for lack of prosecution, can constitute a termination in plaintiff's favor for the purposes of malicious prosecution.  *Lucas*, 505 F. Supp. 2d at 127 (when underlying case was dismissed for lack of

---

[24]  The case cited by FEI is inapplicable in this jurisdiction.  In *Levy v. Ohl*, the court applied Missouri law, which states that for the purposes of malicious prosecution, "[t]ermination is effected by . . . a dismissal by the court with prejudice[.]" 477 F.3d 988, 992 (8th Cir. 2006).  As explained above, this is not the standard for favorable termination in the District of Columbia.

prosecution, it may reflect on innocence of defendant); *Brown*, 503 A.2d at 1245 ("dismissal for failure to prosecute has ben held to be a favorable termination where the facts of the case indicate that such a disposition reflects on the innocence of the defendant in the underlying suit.") (citations omitted).

The ESA Action implicates both standing and abandonment of claims/lack of prosecution.  With respect to Tom Rider and API, the Court dismissed the ESA case based on lack of standing and did not reach the merits, namely, whether FEI's treatment of elephants violated the "take" provision of the ESA.  The Court explicitly acknowledged that it was not reaching the merits of the case:

> Based on the [Court's] findings of fact and conclusions of law, the Court concludes that plaintiffs have failed to prove the standing required by Article III . . . .  This Court therefore lacks jurisdiction over plaintiffs' claims. Because the Court concludes that plaintiffs lack standing, the Court does not--and indeed cannot--reach the merits of plaintiffs' allegations that FEI "takes" its elephants in violation of Section 9 of the ESA.

*ASPCA v. Feld Entm't*, 677 F. Supp. 2d at 66.  Because the termination of the ESA Action as to Rider and API did not reflect on the merits of the underlying litigation, it was not favorable in the legal sense required to support an allegation for malicious prosecution.  *Brown*, 503 A.2d 1246.  Accordingly, the Court will **GRANT** the motion to dismiss Count V with respect to Rider and API.

However, the other ESA plaintiffs, namely ASPCA, AWI and FFA, abandoned their claims for relief before the Court took the case under advisement. *ASPCA v. Feld Entm't*, 677 F. Supp. 2d at 66, n.10 ("While the ASPCA, AWI, and FFA apparently wish to remain named plaintiffs in the caption of this case, plaintiffs' counsel confirmed during closing arguments that those organizations are no longer advancing a standing argument or seeking relief in this case"). Accordingly, the Court treated these former plaintiffs as non-parties in its findings of fact and conclusions of law.

At this stage of the litigation, these defendants have provided no "facts of the case" arising from their decision to abandon their claims "from which the Court could find that the disposition did not reflect on the innocence" of FEI. *Lucas*, 505 F. Supp. 2d at 127. Accordingly, the Court will **DENY** the motion to dismiss the malicious prosecution claims with respect to the remaining defendants.[25]

---

[25] Defendants also argue, in a footnote, that FEI cannot plead the fourth element of malicious prosecution, namely, that it suffered "special injury . . . as the result of the original action." Defs.' Mem. 73, n.38. The Court rejects this argument at this stage of the proceedings. While it is true that "loss of income and substantial expense in defending have [] been held outside the scope of the definition of special injury," *Joekel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002), District of Columbia courts have also found that, in exceptional cases, "some sort of balance had to be struck between the social interest in preventing unconscionable suits and in permitting honest assertion of supposed rights." *Id.* (quoting *Soffos v. Eaton*, 152 F.2d 682, 683 (D.C. Cir. 1945)). In such cases, where

4.    **Count VI: Maintenance**

Maintenance means "the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring actions or to make defense which they have no right to make, and the term seems to be confined to the intermeddling in a suit of a stranger or of one not having any privity or concern in the subject matter, or standing in no relation of duty to the suitor." *Golden Commissary Corp. v. Shipley*, 157 A.2d 810, 814 (D.C. 1960).  In other words, "[m]aintenance is helping another prosecute a suit" in which the helping party has no bona fide interest.  14 C.J.S. Champerty & Maintenance § 2 (2012).  The laws against [] maintenance . . . are aimed at the prevention of multitudinous and useless lawsuits. . . . [I]n some jurisdictions, actions for maintenance [] have been supplanted by actions for malicious prosecution and abuse of process . . . ." *Id.* § 4, *see also JPMorgan Chase Bank, N.A. v. KB Home*, 740 F. Supp. 2d 1192, 1204 (D. Nev. 2010)(maintenance is "the prosecution of doubtful claims by strangers.") (citation omitted).

---

multiple unconscionable suits were filed or where the unconscionability of the lawsuit was particularly egregious, the courts have found that the costs of defending the suit may satisfy the special injury requirement.  *Id.* at 1282-83.  In this action, FEI has alleged that it was forced to defend a litigation which spanned nine years, was not only baseless, but fraudulent from its outset, and was premised on bribery and other alleged criminal activity.  Accordingly, the Court cannot find that FEI suffered no special injury at this point in the litigation.

FEI claims that the organizational plaintiffs in the ESA
Action, as well as WAP, engaged in maintenance by financing
Rider's participation in the ESA Action.  The FAC claims that
"WAP was never a party to the ESA Action.  WAP was a stranger to
any dispute between Rider and FEI concerning any aesthetic injury
suffered by Rider as a result of how Rider handles its Asian
elephants.  Although ASPCA, AWI, FFA/HSUS and API were parties to
the ESA Action, they also were in fact strangers to any dispute
between Rider and FEI."  FAC ¶¶ 335-36.  Defendants respond that
maintenance is no longer a viable cause of action in the District
of Columbia, and also that WAP and the animal rights
organizations had a bona fide interest in the litigation because
their mission is to protect animals.  Defs.' Mem. 79.[26]

---

[26] Defendants also argue that the claim is barred by the
District of Columbia's three year statute of limitations.  FEI
responds that the statute of limitations has not run because (1)
the tort of maintenance is a continuing tort, and therefore FEI
can recover for at least three years' worth of damages before it
filed the original RICO complaint or FAC; and (2) the defendants
fraudulently concealed their conduct, thus tolling the statute of
limitations.  The Court agrees that the maintenance claim is not
barred under the continuing tort doctrine, accordingly, the Court
need not reach FEI's fraudulent concealment argument.  Under
D.C.'s continuing tort doctrine, FEI is entitled to recover
damages "attributable to the part of the continuing tort that was
committed within the limitations period immediately preceding the
date on which suit was brought."  *Jung v. Mundy, Holt & Mance,
P.C.*, 372 F.3d 429, 433 (D.C. Cir. 2004).   A tortiously
prosecuted lawsuit is a continuing tort under D.C. law.  *Id.*
("[A] lawsuit is a continuous, not an isolated event, because its
effects persist from the initial filing to the final
disposition;" injury flows from "cumulative costs of defense").
Accordingly, the statute of limitations is not a bar to FEI
seeking damages on its maintenance claim for, at a minimum, three

It is unclear to the Court whether the District of Columbia still recognizes the tort of maintenance. *Golden Commissary*, 157 A.2d at 814 n.2. However, the defendants have not shown that the cause of action has been abandoned here. Moreover, at this stage of the proceedings, the Court cannot accept defendants' representation that the organizations' sincere passion for the subject matter of a lawsuit, without more, constitutes the type of "interest" in Rider's particular claims sufficient to overcome an allegation of maintenance. Accordingly, defendants' motion to dismiss Count VI is **DENIED**.

   5.   **Count VII: Champerty**

Champerty lies where there is "a bargain to divide the proceeds of litigation between the owner of the litigated claim and the party supporting or enforcing the litigation." *Design for Bus. Interiors, Inc. v. Hersons's, Inc.*, 659 F. Supp. 1103, 1107 (D.D.C. 1986) (quoting 14 W. Jaeger, *Willison on Contracts* § 1711 at 857 (3d ed. 1972)). "[T]here are three essential elements of common law champerty: (1) the attorney's fee must come from the recovery in a successful lawsuit; (2) the lawyer must have no independent claim to the recovery fund; and (3) the costs and expenses must be borne by the attorney with no expectation of reimbursement from the client." *Marshall v.*

_____

years preceding the filing of the FAC.

*Bickel*, 445 A.2d 606, 609 (D.C. 1982) (citing *Merlaud v. Nat'l Metrop. Bank of Washington, D.C.*, 84 F.2d 238, 240 (D.C. 1936)).

FEI claims that the arrangement between the attorneys of record in the ESA case and Rider was champertous; the attorneys allegedly "pursued his claim in the ESA case at their own expense and at no expense to Rider.  Rider has never paid any attorneys fees or costs to [the attorneys] with respect to their representation of him in the ESA Action.  Upon information and belief . . . Rider is not obligated to pay them back[.]" FAC ¶ 347.

The defendants raise three arguments in support of their motion to dismiss the champerty claim.  First, they argue the case was brought for injunctive, not monetary, relief; therefore, there are no proceeds at stake in the litigation.  Defs.' Mem. 77.  Second, they argue that champerty is solely a contract claim in the District of Columbia; therefore, only parties to the contract and third party beneficiaries have standing to sue to challenge the terms of the retention agreement.  *Id.*  Finally, they argue the champerty claim is barred by the statute of limitations.  *Id.* 78.

The Court agrees with defendants that the champerty claim must be dismissed.  First, as defendants point out, this was a claim for injunctive, not monetary relief, therefore there are no "proceeds" at stake to share and champerty does not lie.  FEI

84

responds that Rider sought recovery of a statutory reward under Section 11 of the ESA, therefore, he "expected to get money out of the case." Opp'n at 86. This fact is unavailing in the context of the champerty claim; the FAC explicitly states that the parties agreed among themselves that "if the ESA Action were successful for the plaintiffs in that case, Rider would claim a statutory reward under the ESA, and the attorneys would claim [statutory] attorneys' fees under the . . . ESA." FAC ¶ 348. Therefore, the FAC does not allege that the parties agreed to divide the proceeds of the claim between Rider and the attorneys. And, contrary to FEI's claim, the mere fact that the statute under which the claim was brought allows for an award of attorneys' fees to the prevailing party does not convert the claim into one for monetary relief. *See Kerner v. Cult Awareness Network*, 843 F. Supp. 748, 749, 751 (D.D.C. 1994) (finding no champerty because the underlying action was for injunctive relief, even though it was brought under a provision of the Civil Rights Act of 1964 which allows for recovery of attorneys' fees).[27]

---

[27] FEI claims that the attorneys also stood to gain financially because "any FEI elephant that plaintiffs could have succeeded in having the Court in the ESA Action order forfeited and transferred to [The Elephant Sanctuary, a client of MGC], would have been beneficial to MGC and/or Meyer in their ongoing attorney-client or other relationship with" The Elephant Sanctuary. FAC ¶ 349. This claim in no way meets the elements of champerty: The Elephant Sanctuary was not a plaintiff in the litigation, and transfer of any elephants there would constitute,

Even if FEI could show that the lawyers planned to take their fees from the "proceeds" of the ESA Action, which it has not, it has not shown that it may bring a cause of action for the tort of champerty in the District of Columbia. FEI has identified no authority indicating that the District recognizes champerty as a cause of action in tort, and the Court is aware of none. To the contrary, courts applying District of Columbia law in champerty claims have identified it solely as a defense to a contract claim.[28] FEI does not acknowledge any of this authority, citing instead two decisions from other jurisdictions applying North Carolina and

---

again, solely injunctive relief.

[28] *See Marshall*, 445 A.2d at 609 (denying attorney's claim to enforce agreement between him and his client; where agreement is "unlawful and void for champerty . . . District of Columbia courts will not enforce it, and the attorney will be denied even quantum meruit recovery.")(citing *Merlaud,* 84 F.2d at 240; Willison on Contracts §§ 1711-12 (3d ed. 1972)); *Design for Bus. Interiors*, 659 F.2d at 1107-08 (denying plaintiff's claim for breach of contract, finding champerty in the District comes from the common law of contracts and champertous contracts will not be enforced); *Columbia Hosp. for Women Med. Ctr. v. NCRIC, Inc.*, 481 B.R. 648, 677-78 n.22 (Bankr. D.C. 2011) (explaining champerty doctrine, and its history in the District of Columbia as a "valid defense" to a contract claim under D.C. law); *Johnson v. Van Wyck*, at 4 App. DC. 294, 316-20 (D.C. 1894) (affirming trial court's judgment against plaintiff trustee in action to eject landowner from property, also affirming court's exclusion from evidence as champertous a contract under which trustee claimed title to property; the champerty doctrine is one of contract, and when a contract is champertous it will not be enforced); *cf. Golden Commissary Corp. v. Shipley*, 157 A.2d 810, 814 (D.C. 1960) (stating that "the common law action for [] champerty, in some modified form, probably exists in this jurisdiction," but citing only to cases in which champerty was asserted as a defense, and not discussing champerty in remainder of opinion).

Nevada law, both of which explicitly recognize the tort of champerty. *High Voltage Beverages LLC v. Coca-Cola Co.*, No. 08-367, 2010 U.S. Dist. Lexis 63308, *8-*9 n.3 (W.D.N.C. June 8, 2010), *Del Webb Communities, Inc. v. Partington*, No. 08-571, 2009 U.S. Dist. Lexis 85616, *14-*16 (D. Nev. Sept. 18, 2009). FEI offers no reason why this court should ignore District of Columbia law, which it concedes controls its common law claims, and apply Nevada or North Carolina law in this action.

For the foregoing reasons, the Court finds that FEI has not met its burden to plead a plausible claim for relief in its champerty claim, and therefore will **GRANT** defendants' motion to dismiss the champerty claim.

## IV.   CONCLUSION

For the foregoing reasons, defendants' motions to dismiss Counts I and II and V are **GRANTED IN PART** and **DENIED IN PART**; defendants' motion to dismiss Counts III, IV, and VI is **DENIED**, defendants' motion to dismiss Count VII is **GRANTED**. Defendants Lovvorn & Ockene's Motion to Strike Plaintiff's Notice of Supplemental Filing is **DENIED**. Defendants shall respond to the First Amended Complaint by no later than August 9, 2012. A separate Order accompanies this Memorandum Opinion.

**Signed:**      **Emmet G. Sullivan**
             **United States District Judge**
             **July 9, 2012**