Filed Under Seal

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **FELD ENTERTAINMENT, INC.** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 07-1532 (EGS/JMF)** |
| | : | |
| **ANIMAL WELFARE INSTITUTE, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANTS KATHERINE MEYER, ERIC GLITZENSTEIN AND MEYER GLITZENSTEIN & CRYSTAL**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

GLOSSARY OF TERMS ..... vii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

I. 2000-2004: FEI IS AWARE THAT RIDER IS "WORKING" WITH ANIMAL ACTIVIST GROUPS ..... 3

II. JUNE 9, 2004: IN DISCOVERY RESPONSES SIGNED BY MEYER, RIDER "LIES" ABOUT THE PAYMENTS AND THE ORGANIZATIONAL PLAINTIFFS CONCEAL THEM ..... 5

A. Rider's "Affirmatively False" Interrogatory Response ..... 6

B. The Organizational Plaintiffs' Interrogatory Responses Also "Concealed" the Rider Payments ..... 7

C. The ESA Action Plaintiffs Produced Nine (9) Pages of Documents Reflecting Intermittent Reimbursement of Rider's Expenses ..... 8

III. SPRING AND SUMMER 2005: THE ESA ACTION ORGANIZATIONAL PLAINTIFFS CONTINUE TO CONCEAL THE PAYMENTS AT THEIR RULE 30(B)(6) DEPOSITIONS, WHICH WERE DEFENDED BY MGC ..... 12

IV. SEPTEMBER 2005: MEYER MISLEADS THE COURT AND FEI ..... 15

V. 2005-2008: WAP'S INITIAL PRODUCTION, OVERSEEN BY GLITZENSTEIN, CONTINUES THE CONCEALMENT AND WAP BLOCKS DISCOVERY ON THE BASIS THAT IT IS SEPARATE FROM MGC ..... 16

A. WAP's September 2005 Partial Production Was Deliberately Edited by Glitzenstein to Conceal the Nature, Extent and Amount of the Payments, and MGC's Involvement in the Payments in their "Counsel" Capacities ..... 16

B. WAP's Website Did Not Indicate That It Was a Sham ..... 21

C. WAP Blocked the Production of Documents and Testimony on the Basis that the Organizations were Separate Corporate Entities ..... 22

VI. 2006-2007: RIDER REVEALS THE PAYMENTS ARE HIS SOLE SOURCE OF INCOME, AND MEYER MISLEADS FEI AND THE COURT CONCERNING THE PAYMENTS THROUGH MGC ..... 23

VII. THE TRUE NATURE AND EXTENT OF THE PAYMENTS, AND MGC'S INVOLVEMENT IN THEM, BECOMES KNOWN AFTER THE COURT'S AUGUST 23, 2007 ORDER ..... 25

ARGUMENT ........................................................................................................ 26

I. FEI'S RICO CLAIM AGAINST MGC IS NOT BARRED BY THE STATUTE OF LIMITATIONS ........................................................................................ 27

A. The Payment Evidence Cited in the Motion is Duplicative of the Evidence Already Rejected by the Court's Motion to Dismiss Opinion ............................ 28

B. Evidence Concerning Rider's Credibility is Irrelevant to Whether FEI Had Inquiry Notice of an Injury Caused by MGC's Racketeering Conduct ................ 31

II. MGC FRAUDULENTLY CONCEALED ITS INVOLVEMENT IN THE RACKETEERING CONDUCT ........................................................................ 32

A. For Federal Claims, Fraudulent Concealment Requires Actual Notice of the Particular Cause of Action and the Persons Responsible for the Injury ......... 32

B. At a Minimum, There Are Questions of Material Fact as to Whether the Statute of Limitations was Tolled by Defendants' Fraudulent Concealment ....... 35

III. THE MOTION TREATS WAP AND MGC AS ONE AND THE SAME, BUT FEI SHOULD BE AFFORDED DISCOVERY REGARDING THEIR RELATIONSHIP ........................................................................................ 38

IV. MGC IS PRECLUDED FROM RE-LITIGATING THE ESA ACTION ........................ 39

A. 12-30-09 Opinion ........................................................................................ 41

1. MGC was in Privity with the ESA Action Plaintiffs ................................ 42

2. MGC "Controlled" Litigation of the ESA Action .................................... 44

B. 3-29-13 Opinion .......................................................................................... 44

CONCLUSION ................................................................................................... 45

Filed Under Seal

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Fed. of Teachers v. Bullock*,
539 F. Supp. 2d 161 (D.D.C. 2008) (Sullivan, J.), *vacated on other grounds*, 605 F. Supp. 2d 251 (D.D.C. 2009) ....................35

*In re Amtrak "Sunset Limited" Train Crash*,
136 F. Supp. 2d 1251 (S.D. Ala. 2001), *aff'd*, 29 Fed. Appx. 575 (11th Cir. 2001) ..............37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................26

*ASPCA v. Ringling Bros.*,
502 F. Supp. 2d 103 (D.D.C. 2007)....................26

*Byers v. Burleson*,
713 F.2d 856 (D.C. Cir. 1983)....................28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................26

*Chalabi v. Hashemite Kingdom of Jordan*,
503 F. Supp. 2d 267 (D.D.C. 2007), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008)....................27

*Consol. Edison v. Bodman*,
449 F.3d 1254 (D.C. Cir. 2006)....................40

*Crooked Creek Properties, Inc. v. Ensley*,
2009 U.S. Dist. LEXIS 100907 (M.D. Ala. Oct. 28, 2009)....................42

*Diamond v. Davis*,
680 A.2d 464 (D.C. 1996) ....................34

*Dickens v. Whole Foods Mkt. Group, Inc.*,
2003 U.S. Dist. LEXIS 11791 ....................27

*Dotson v. Bravo*,
202 F.R.D. 559 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003)....................37

*Ferris v. Cuevas*,
118 F.3d 122 (2d Cir. 1997)....................44

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996)....................33, 34, 36

*First Chicago Int'l v. United Exch. Co.*,
836 F.2d 1375 (D.C. Cir. 1988) ........ 26

*Gill & Duffus Svs., Inc. v. A.M. Nural Islam*,
675 F.2d 404 (D.C. Cir. 1982) ........ 42

*Gonzalez v. Banco Central Corp.*,
27 F.3d 751 (1st Cir. 1994) ........ 44

*Henry v. Farmer City Bank*,
80 F.2d 1228 (7th Cir. 1986) ........ 43

*Hobson v. Wilson*,
737 F.2d 1 (D.C. Cir. 1984) ........ 30, 33, 34, 35, 36, 37

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) ........ 33

*Khan v. Parsons Global Servs., Ltd.*,
428 F.3d 1079 (D.C. Cir. 2005) ........ 26

*Krupski v. Costa Crociere*,
560 U.S. 538, 130 S. Ct. 2485 (2010) ........ 39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ........ 26

*McGrath v. Everest Nat'l Ins. Co.*,
668 F. Supp. 2d 1085 (N.D. Ind. 2010) ........ 42

*McLaughlin v. Bradlee*,
803 F.2d 1197 (D.C. Cir. 1986) ........ 40

*Molecular Diagnostics Labs v. Hoffman-La Roche, Inc.*,
402 F. Supp. 2d 276 (D.D.C. 2005) (Kennedy, J.) ........ 34

*Montana v. United States*,
440 U.S. 147, 154 (1979) ........ 44

*Nader v. Democratic Nat'l Comm.*,
567 F.3d 692 (D.C. Cir. 2009) ........ 34, 35

*Nixon v. Freeman*,
670 F.2d 346 (D.C. Cir. 1982) ........ 26

*Otherson v. Dep't of Justice*,
711 F.2d 267, 277 (D.C. Cir. 1983) ........ 45

*Pelt v. Utah*,
539 F.3d 1271 (10th Cir. 2008) ....................42

*Pena v. A. Anderson Scott Mortg. Group., Inc.*,
692 F. Supp. 2d 102 (D.D.C. 2010) (Huvelle, J.) ....................34

*Phelps v. Hamilton*,
122 F.3d 1309 (10th Cir. 1997) ....................44

*Plotner v. AT&T Corp.*,
224 F.3d 1161 (10th Cir. 2000) ....................43

*Render v. Hall*,
2012 U.S. Dist. LEXIS 13358 (S.D. Ohio Feb. 3, 2012)....................43

*Richards v. Milewski*,
662 F.2d 65 (D.C. Cir. 1981)....................34, 37

*Riddell v. Riddell Washington Corp.*,
866 F.2d 1480 (D.C. Cir. 1989)....................28, 31, 33, 34, 35

*Riley v. Giguiere*,
631 F. Supp. 2d 1295 (E.D. Cal. 2009)....................43

*Rotella v. Wood*,
528 U.S. 549 (2000)....................27

*Southern Pacific R. Co. v. United States*,
168 U.S. 1 (1897)....................40

*Steele v. Schafer*,
535 F.3d 689 (D.C. Cir. 2008)....................26

*Taylor v. Sturgell*,
553 U.S. 880 (2008)....................40, 41, 42, 44

*United States v. Blaszak*,
349 F.3d 881 (6th Cir. 2003)....................32

*United States v. Valdes*,
475 F.3d 1319 (D.C. Cir. 2007)....................32

*Vacanti v. Apothaker & Assocs., P.C.*,
2010 U.S. Dist. LEXIS 120109 (E.D. Pa. Nov. 12, 2010)....................43

*Verhagen v. Arroyo*,
552 So. 2d 1162 (Fla. Ct. App. 1989)....................43

*Weinberger v. Tucker*,
510 F.3d 486 (4th Cir. 2007) ....................43

*Yamaha Corp. v. United States*,
961 F.2d 245 (D.C. Cir. 1992) ....................41, 42

*Zahran v. Frankenmuth Mut. Ins. Co.*,
1997 U.S. App. LEXIS 8879 (7th Cir. 1997) ....................43

**RULES AND STATUTES**

18 U.S.C. § 201(d) ....................30

18 U.S.C. § 1962(c) ....................1

28 U.S.C. § 1927 ....................6, 44

D.C. RULE OF PROF'L CONDUCT 1.8(d) .................... 31

**OTHER AUTHORITIES**

47 AM. JUR. 2D JUDGMENTS § 617 ....................42

Filed Under Seal

## GLOSSARY OF TERMS

| **Term** | **Explanation** |
|---|---|
| API | Born Free USA United with Animal Protection Institute, defendant herein. |
| ASPCA | American Society for the Prevention of Cruelty to Animals, former defendant herein. |
| AWI | Animal Welfare Institute, defendant herein. |
| **COL** | A Conclusion of Law set forth in the Court's December 30, 2009 Memorandum Opinion in the ESA Action (ECF 559), reported at *ASPCA v. Feld Ent. Inc.*, 677 F. Supp. 2d 55 (D.D.C. 2009), *aff'd,* 659 F.3d 12 (D.C. Cir. 2011). |
| Crystal | Howard M. Crystal, defendant herein. |
| DX | A trial exhibit of the defendant, admitted into evidence, in the ESA Action. "DX 1 at 5" means defendant's trial exhibit 1 at .pdf page 5. |
| ECF | A docket entry in the instant case. "ECF 1 at 5" means docket entry number one (1) in Civ. No. 07-1532, at .pdf page 5. |
| No. 03-2006 ECF | A docket entry in the ESA Action, *Animal Welfare Institute et al. v. Feld Entertainment, Inc.*, Civil Action No. 03-2006-EGS/JMF (D.D.C.). "No. 03-2006, ECF 1 at 5" means docket entry number one (1) in Civ. No. 03-2006, at .pdf page 5. |
| ESA | Endangered Species Act, 16 U.S.C. § 1531 *et seq*. |
| ESA Action | The litigation styled, *Animal Welfare Institute et al. v. Feld Entertainment, Inc.*, Civil Action Nos. 00-1641-EGS & 03-2006-EGS/JMF (D.D.C.). |
| FEI | Feld Entertainment, Inc., plaintiff herein. |
| **FEI OBJECTION** | A citation to FEI's Responses and Objections to MGC's Statement of Material Facts, submitted herewith. "**FEI OBJECTION** to ¶ 1" means the objection of FEI to paragraph 1 of MGC's Statement of Material Facts. |
| FFA | The Fund for Animals, Inc., defendant herein. |
| **FOF** | A Finding of Fact set forth in the Court's December 30, 2009 Memorandum Opinion in the ESA Action (ECF 559), reported at *ASPCA v. Feld Ent. Inc.*, 677 F. Supp. 2d 55 (D.D.C. 2009), *aff'd,* 659 F.3d 12 (D.C. Cir. 2011). |
| Glitzenstein | Eric R. Glitzenstein, defendant herein. |

| **Term** | **Explanation** |
|---|---|
| HSUS | The Humane Society of the United States. |
| Meyer | Katherine A. Meyer, defendant herein. |
| MGC | Collective reference to Meyer, Glitzenstein and the law firm, Meyer, Glitzenstein & Crystal. |
| PAWS | Performing Animal Welfare Society, an original plaintiff in the ESA Action under Civil Action No. 00-1641-EGS (D.D.C.). |
| ESA Action Plaintiffs | Collective reference to all plaintiffs in the ESA Action. |
| PWC | A will call trial exhibit of the ESA Action plaintiffs, admitted into evidence, in the ESA Action. "PWC 1 at 5" means ESA Action plaintiffs' trial exhibit 1 at .pdf page 5. |
| Rider | Tom Rider, defendant herein. |
| WAP | Wildlife Advocacy Project, defendant herein. A purported 501(c)(3) organization controlled by defendants Meyer and Glitzenstein. *See* No. 03-2006, ECF 620 at 10. |

## INTRODUCTION

The motion for partial summary judgment filed by defendants Katherine Meyer, Eric Glitzenstein and Meyer, Glitzenstein & Crystal (collectively "MGC")[1] (ECF 177) ("Motion") rehashes the arguments raised by defendants' motions to dismiss, selectively cites the record and pretends that the Court's 12-30-09 (ECF 559) and 3-29-13 (ECF 620) opinions in the related ESA Action, No. 03-2006 (D.D.C.) (EGS/JMF) never issued. If anything, the Motion demonstrates that there are genuine issues of material fact as to whether FEI's RICO claims against MGC are time-barred, which are inappropriate for resolution on summary judgment and must be determined by a jury. Moreover, the Motion is premature and FEI should be afforded the opportunity to take discovery concerning the relationship between WAP and MGC. Ex. 1, Rule 56(d) Decl. Accordingly, the Motion should be denied.

Even though discovery has just started, defendants' motions to dismiss on this same issue were denied (ECF 90), and MGC itself seeks discovery on the limitations issue, MGC seeks a partial summary judgment that FEI's RICO claim is barred by limitations as a matter of law. In effect, MGC claims that FEI's First Amended Complaint (ECF 25 ("FAC")), which added them as defendants, was out of time because FEI (1) should have known that the ESA Action plaintiffs and MGC were all lying about the payments to Rider; (2) should have assumed that litigation of an Endangered Species Act case necessarily entails illegal racketeering conduct by animal protection charities and their "public interest" counsel; and (3) therefore should have sued well before any corrupt conduct and lies came out in judicially compelled discovery. MGC's

---

[1] MGC incorrectly contends that Howard Crystal ("Crystal") already was dismissed by the Court in his individual capacity. Mot. at 1, n.1. However, the Court's dismissal opinion (ECF 90) makes clear that Crystal remains a defendant to Counts II, III, IV and V of FEI's First Amended Complaint. *See* ECF 90 at 44, 72, & 87 (dismissing Crystal only under 18 U.S.C. § 1962(c) (Count I) and champerty (Count VII)). Further, FEI maintains that Crystal remains a defendant in the case because he is a general partner of MGC. Crystal answered the First Amended Complaint, and he has submitted motions and other filings in this case as a party notwithstanding his purported "dismissal." *See, e.g.*, ECF 97, 105, 118.

argument is illogical, duplicitous and involves inherently factual matters that cannot be resolved as a matter of law.

MGC cannot benefit from its fraud. MGC alone, or on behalf of its ESA Action plaintiff clients, made or fostered at least ***twenty (20)*** false or misleading statements about the payments over the course of the ESA Action. Indeed, the Court has held that "the funds paid to Rider appeared to be paid in such a way as to avoid ready detection," No. 03-2006, ECF 620 at 10, and that "Rider, the organizational plaintiffs, and ***plaintiffs' counsel*** sought to ***conceal*** the nature, extent and purpose of the payments from FEI … ." *Id.* at 8 (emphasis added). It was not until the Court entered its discovery order (No. 03-2006, ECF 178) that the true nature and extent of the payments were revealed. **FOF 57**. *See also* No. 03-2006, ECF 620 at 8-9 & 11. As MGC's own lawyer has observed, "[i]t is always difficult to discover and prove fraud,… [and] [i]t is also always difficult to discover and to prove a conspiracy, which by its very nature is secretive." No. 03-2006, ECF 637-7 at 8. FEI cannot be said to have sat on its claims where defendants deliberately (and successfully) hid their fraudulent conduct for years.

There was no evidence whatsoever of any payment prior to February 16, 2006 – the operative date for the statute of limitations – that was, on its face, unlawful. Mere knowledge of lawful payments (*i.e.*, reimbursement of travel expenses) does not trigger a duty to investigate bribes (*i.e.*, payments to influence testimony). Here, the critical elements of the bribes – there were regular and systematic payments of the same, fixed amount of money (**FOF 41**), filtered through intermediaries (**FOF 35 & 37**), without any correlation to the proffered reason for the payments (expenses, actual travel or actual media work) (**FOF 49-50**); the payors tried to hide the payments through omissions and affirmatively false statements (**FOF 55-57**); the recipient had no other source of income (**FOF 21**); and the recipient failed to file any income tax returns

(**FOF 58**) – emerged well after February 16, 2006. *See also* **FOF 59**.

FEI is aware of no case where summary judgment was entered on the basis of limitations, where virtually all of the "material" facts proffered by the movant, including facts concerning inquiry notice and fraudulent concealment, are disputed, *see* FEI Responses and Objections to MGC's Statement of Material Facts (submitted herewith), and where discovery is in its infancy. Here, none of the parties has made any substantial production of documents, nor have any of them served (let alone answered) any interrogatories. Indeed, the curious timing of the Motion is underscored by the fact that only two months ago, MGC served requests specifically seeking the production of documents ***concerning the statute of limitations***. Ex. 29, MGC Document Requests (8-28-13). The Motion should be denied.

## FACTUAL BACKGROUND

Over the course of the ESA Action, defendants herein made a number of false, misleading and conflicting statements about the Rider payments, and withheld the production of relevant documents and testimony on the basis of frivolous objections. A brief history of the production of the Rider payment information – much of which was omitted from the Motion – follows. *See also* Ex. 2, Timeline of Key Rider Payment Facts.

### I. 2000-2004: FEI IS AWARE THAT RIDER IS "WORKING" WITH ANIMAL ACTIVIST GROUPS

From March 2000 to June 9, 2004 (the date of the ESA Action plaintiffs' initial discovery responses), Rider received a continuous stream of more than $50,000.00 in payments and benefits directly from PAWS, AWI, MGC, ASPCA and WAP. **FOF 21, 58 & 55**; DX 48A. *See also* No. 03-2006, ECF 620 at 10 ("Rider was paid continuously and without interruption throughout the litigation."). Further, by the date of the initial discovery responses, ASPCA, AWI and FFA collectively had received twenty-two (22) invoices from MGC for payments to Rider,

DX 61, and the payments had been characterized variously as "wages" (DX 57); "nonemployee compensation" (DX 54-56); "grants" (Ex. 12, Payment Documents Produced on 6-9-04 (F 01945-46)); "special expenses" and "shared expenses" (DX 61); and "donations" (DX 50). *See also* No. 03-2006, ECF 620 at 10. The money was Rider's sole source of income, **FOF 21**, and he was not paying taxes on any of it. **FOF 58**.

Despite the fact that the illegal witness payment scheme was well under way, and all of the above facts were known to MGC, the evidence available to FEI from 2000 to June 9, 2004 indicated only that Rider was "working" with animal activist groups[2] and receiving episodic reimbursement of travel expenses in connection with bona fide media work that involved travel.[3] If anything, this information indicated that Rider may have been a biased witness, who was sympathetic to and affiliated with the animal rights "cause." None of it indicated that he was a witness for hire, let alone that he had been hired by MGC. MGC points to ***no*** evidence available to FEI before June 9, 2004 indicating that Rider's sole source of income was the systematic payments from each and every one of his co-plaintiffs ***and counsel*** for his participation and testimony in the ESA Action, and that his "media" campaign was a charade. **FOF 1, 21, 48-50, 53, 59**. Indeed, in 2003, ***Rider falsely stated that he was "not employed by any animal welfare***

2 MGC Ex. E (2000) ("The employee, who quit in November, is now working with an animal-rights group that has filed complaints against Ringling – a fact the company has cited in discounting his story."); MGC Ex. N (5-7-2000) (same text as MGC Ex. E); MGC Ex. C (5-22-2000) ("Catherine Ort-Mabry, director of corporate communications for Feld Entertainment, the producer of Ringling Bros., said Rider is being used by the activist group and isn't telling the truth."); MGC Ex. H (6-13-2000) ("Rider is clearly working in collaboration with animal activist groups, the stated purpose of which is to eliminate animals in circuses."); MGC Ex. L (11-22-2002) ("Today he works for an extremist hate organization and he gets paid to do it. He shoveled manure for us then and he shovels manure today … .").

3 MGC Ex. I (PWC 197) (5-28-2002) ("Tom said he follows Ringling around to protect 'my girls', and ASPCA pays his expenses for traveling. … Tom said ASPCA pays for hotels, bus fare, meals, and a new set of luggage, and other business expenses."); MGC Ex. R (11-4-03) ("Hosted by ASPCA lawyer Jill Buckley, and sponsored by the ASPCA (and probably other AR organizations … ), Tom Rider has been touring the country … .); MGC Ex. M (11-20-2003) ("This case is very old, made by a former employee who is being paid by animal rights organizations … ."). MGC also cites a document indicating that a ***non-party*** to the ESA Action was paying for Rider's expenses, which is entirely irrelevant. MGC Ex. S (7-17-02) ("IDA is covering all of Rider's expenses as he follows Ringling Bros. … .").

***agency and he d[id] not received a paycheck,"*** and that ***"no big group" was funding him***. MGC Ex. M (11-20-2003) (emphasis added). *See also* MGC Ex. U (1-11-04) ("Rider said he doesn't belong to any group … . ***He said he doesn't receive money at this time from animal groups***, but does receive money from a private individual in California.") (emphasis added).

## II. JUNE 9, 2004: IN DISCOVERY RESPONSES SIGNED BY MEYER, RIDER "LIES" ABOUT THE PAYMENTS AND THE ORGANIZATIONAL PLAINTIFFS CONCEAL THEM

The ESA Action plaintiffs' June 9, 2004 discovery responses, ***which were all overseen and signed by Meyer***, were "affirmatively false" and "concealed" the nature, extent, purpose and amount of the payments to or for Rider. No. 03-2006, ECF 620 at 8 (Rider's June 9, 2005 interrogatory response, "prepared by Ms. Meyer," was "affirmatively false") & 11 ("[t]he organizational plaintiffs also concealed the payments from FEI, in whole or in part, by providing misleading or incomplete information to FEI"); No. 03-2006, ECF 599-2 (Meyer Decl.) ("As the lead attorney for the litigation, I was ultimately responsible for supervising the plaintiffs' discovery responses … ."); DX 16 at 13 (Meyer signature); DX 18R at 12 (same); DX 19 at 8 (same); DX 20R at 20 (same). *See also* **FOF 55-57 & FOF 59**; **FEI OBJECTION** to ¶ 34. MGC not only participated directly in the illegal witness payment scheme; as the counsel who prepared and signed the initial discovery responses, it sat at the center of the effort to conceal. The across-the-board obfuscation of the payments in the June 2004 discovery responses was not inadvertent, nor was it rooted in a legitimate discovery dispute. It was a "deliberate" and coordinated effort to hide the illegal Rider payments and delay the litigation of a vexatious and frivolous case that never should have been filed. No. 03-2006, ECF 620 at 27 ("Plaintiffs prolonged the litigation … by attempting to conceal the nature and extent of Rider's funding[.]") & 33 ("They deliberately delayed the proceedings by (1) providing false or incomplete

information about the financial arrangements between Rider and the other plaintiffs for years … .”). The ESA Action plaintiffs’ June 9, 2004 responses amounted to obstructions of justice.

### *A. Rider’s “Affirmatively False” Interrogatory Response*

“Rider lied about the payments.” No. 03-2006, ECF 620 at 10. *See also id.* at 42. In response to Interrogatory No. 24, which requested information concerning compensation received from any animal advocate or animal advocacy organization, Rider stated – under oath – “I have not received any such compensation.” DX 16 at 12. This response was “false.” **FOF 55**. *See also* No. 03-2006, ECF 620 at 8 (Rider’s response was “affirmatively false”). Further, the Court found that there was “no excuse for this false response” based on ***Meyer’s*** own knowledge of and involvement in the payments to Rider. **FOF 56** (“The lawyer who signed the objections to this answer, Katherine Meyer, DX 16 at 13, was a principal in two of the entities – WAP and MGC – that had paid Mr. Rider and had sent him 1099’s reporting such payments. … [I]t was apparently Ms. Meyer’s suggestion that the other organizational plaintiffs pay Mr. Rider, initially through MGC and later through WAP.”). ***Meyer and MGC were subsequently sanctioned pursuant to 28 U.S.C. § 1927 for assisting Rider with preparing this “affirmatively false” interrogatory response***. No. 03-2006, ECF 620 at 8 & 41-42.

MGC is bound by the Court’s unequivocal and repeated findings that Rider’s response was “false,” **FOF 55-56** & No. 03-2006, ECF 620 at 8 & 41-42, and their attempt to re-litigate this issue, Mot. at 34-36, is unpersuasive, if not frivolous. The offer of a confidentiality agreement was made only as to Rider’s response to the first sentence of Interrogatory No. 24. DX 16 at 12. Rider provided a response to the second sentence of that interrogatory (“If the money or other items were given to you as compensation for services rendered, describe the service rendered and the amount of compensation,” *id.*), without any such qualification and lied: “Subject to and without waiving the foregoing or general objections to these Interrogatories, Mr.

Rider provides the following answer to the second sentence of this interrogatory: I have received no such compensation." *Id.* This response was "affirmatively false" and Rider's offer of a confidentiality agreement as to the first sentence does nothing to change Rider's answer to the second sentence. Moreover, the record of the ESA Action makes clear that the offer of a confidentiality agreement was hollow given that (1) plaintiffs did not move for one until almost three (3) years after Rider's June 9, 2004 response—and only after FEI moved to compel (No. 03-2006, ECF 141)—and (2) the Court denied this request completely. No. 03-2006, ECF 178 at 5 ("As Rider is a plaintiff in this case and the financing of his public campaign regarding the treatment of elephants is relevant to his credibility in this case, Rider's relevant information shall be produced without a protective order … ."). The Court's discovery order (No. 03-2006, ECF 178) found that the payment information was requested and it was relevant; the Court's 12-30-09 Memorandum Opinion (No. 03-2006, ECF 559) found that the response was "false" and that there was "no excuse for this false response;" and, the Court's attorneys' fees entitlement decision (No. 03-2006, ECF 620) found that Meyer and MGC's involvement in that "false" response was sanctionable. The attempt to re-litigate this issue should be rejected.[4]

### *B. The Organizational Plaintiffs' Interrogatory Responses Also "Concealed" the Rider Payments*

The organizational plaintiffs, through Meyer, "concealed" the Rider payments. No. 03-2006, ECF 620 at 11. *See also* **FOF 57** ("The organizational plaintiffs have also been less than forthcoming about the extent of the payments to Mr. Rider."). All of the organizational plaintiffs had made payments to or for Rider by June 9, 2004 (*see* DX 48A), but ***none*** of them disclosed those payments in their interrogatory responses. **FOF 57**. The only plaintiff that made any

[4] Moreover, Rider's June 9, 2004 response to Interrogatory No. 2, which requested a list of all of Rider's jobs or volunteer positions, failed to list Rider's "job" with PAWS. DX 16 at 4-6 (Resp. to Interrogatory No. 2). Rider's response to Interrogatory No. 2 was with at odds with the single payment document he produced, which indicated that he "quit" a "security job" at PAWS. Ex. 12, Payment Documents Produced on 6-9-04 (TR 00001).

disclosure of the payments was ASPCA, which "made reference to the fact that payments had been made to MGC and WAP." *Id.* However, "ASPCA did not disclose that such payments were ultimately remitted to Mr. Rider." *Id.* *See also* **FEI OBJECTION** to ¶ 34. MGC's argument that the information was not disclosed because FEI did not request it, Mot. at 34, is yet another attempt to re-litigate issues already decided. The Court's discovery order (No. 03-2006, ECF 178) granted in significant part FEI's motion to compel the disclosure of the payment information and ordered the ESA Action organizational plaintiffs to provide "[a]ll ***responsive*** documents and information concerning payments to Tom Rider, regardless of whether such payments were made directly to him or indirectly through other means such as WAP." *Id.* at 6 (emphasis added). The information was requested, and the ESA Action plaintiffs, through Meyer, deliberately concealed their Rider payments. Nothing in the organizations' June 9, 2004 interrogatory responses indicated the organizations were involved in an ongoing illegal witness payment scheme – let alone that the scheme involved ***counsel of record***.

### *C. The ESA Action Plaintiffs Produced Nine (9) Pages of Documents Reflecting Intermittent Reimbursement of Rider's Expenses*

The concealment extended to the ESA Action plaintiffs' document productions. The ESA Action plaintiffs, through Meyer, produced a total of only ***nine (9) pages*** of payment documents, which reflected intermittent reimbursements of Rider's travel expenses. Ex. 12, Payment Documents Produced on 6-9-04. "The funds paid to Rider appeared to be paid in such a way as to avoid ready detection," No. 03-2006, ECF 620 at 10, and none of the documents produced on June 9, 2004 put FEI on notice of any illegal conduct. ***None*** of the documents produced on June 9, 2004 indicated that Rider was receiving payments for his participation and testimony in the ESA Action. *See* **FEI OBJECTION** to ¶ 34. The scant documents that were produced indicated that:

- Rider actually was traveling. Ex. 12, Payment Documents Produced on 6-9-04 (A 00046) (MGC Ex. W) ("In order to follow the circus [Mr. Rider] cannot be employed.") & *id.* (F 01945-947) ("Mr. Rider has been touring the country for the past two years, staying just ahead of Ringling … .").

- Rider actually was doing specific media work and/or engagements. Ex. 12, Payment Documents Produced on 6-9-04 (A 00073) (MGC Ex. X) ("Tom [sic] has been doing some impressive p.r. work for us … ."), *id.* (F 01945-947) ("Mr. Rider has been … doing media interviews and television spots on the subject, and assisting grass-roots groups in educating the public."), *id.* (TR 00001) ("as long as I was on PAWS's payroll I could not do any media against Ringling Bros. any more"); and,

- The payments were reimbursements for specific "media" work, and not payments for all of Rider's day-to-day living expenses. Ex. 12, Payment Documents Produced on 6-9-04 (A 00886) (MGC Ex. Z) (expenses for trip to Massachusetts where Rider was to provide testimony), *id.* (F 01945-947) ("Funds would be spent principally on transportation, lodging, meals, phone expenses, and other administrative and out-of-pocket costs for Mr. Rider to continue these efforts.") & *id.* (TR 00001) ("When you found out that I was planning to go to Washington to help the ASPCA at a press conference … .") .

***None*** of the documents produced on June 9, 2004 indicated that ***MGC*** sat at the center of an illegal witness payment scheme. ASPCA produced two (2) check requests for payments to MGC reflecting that approximately ***$600.00*** and a ***zoom camera valued at $400.00*** had been provided to Rider. *See* Ex. 12, 6-9-04 Payment Documents (A 00884) (MGC Ex. Y) (ASPCA check request to MGC for "reimbursement for money given to Tom Rider exceeding the $6,000 grant to the Wildlife Advocacy Project for 1st quarter 2002. $400 of this covers zoom camera –

charge to capital budget?") ***($526.16)***; *id.* (A 00886) (MGC Ex. Z) (ASPCA check request to MGC for "Tom Rider testimony at MA legislative hrg on anti-circus bill") ***($445.00)***.[5] MGC cites no case holding that the payment of a witness's expenses in connection with travel to a legislative hearing or the provision of a zoom camera to a witness is a notice of a crime or a tort. ***None*** of the documents indicated that ***MGC*** had made payments to Rider, fraudulently labeled as "grants," for his participation and testimony in the ESA Action. *Cf.* Ex. 12, Payment Documents Produced on 6-9-04 (F 10845-947) (WAP proposal representing that the "grants" to Rider were tax deductible and for Rider's travel expenses). Indeed, the affirmative effort to conceal MGC's involvement in the payments is demonstrated by the fact that, by time of the ESA Action plaintiffs' initial discovery responses, the following MGC payment documents had been generated but ***none*** of them was produced, even though they were all requested. The Motion makes no mention of these documents:

- Nearly sixty (60) pages of invoices from MGC to ASPCA, AWI and FFA for payments to Rider (DX 61) ***(first produced by ASPCA, AWI and FFA on September 24 & 26, 2007)***. The ESA Action organizational plaintiffs, through Meyer, objected to FEI's document requests on the grounds that they, *inter alia*, "would require the disclosure of invoices received by Meyer & Glitzenstein, which describe work performed in connection with ASPCA v. Ringling Bros., Civ. No. 00-161 [sic], 03-2006 … and hence are protected by attorney-work product privilege." Ex. 10, Org. Pls. Resp. to Document Requests at 20. Meyer's meritless privilege objection (and subsequent false and misleading representations on this issue, *see infra*)

5 The Motion also cites an ASPCA check request for a payment to MGC for "Ringling Bros. Media Support," produced by ASPCA in June 2004. MGC Ex. AA (included in Ex. 13 hereto). That document did not reference Rider or payments to him, and thus did not put FEI on notice of any illegal conduct. *See* **<u>FEI OBJECTION</u>** to ¶ 34.

blocked the production of the invoices for payments to Rider – which were not privileged – for more than three years.

- An MGC invoice to ASPCA reflecting that ASPCA had a made "grant" (purportedly to WAP) that was deposited into an "account towards Tom Rider expenses" that was maintained by MGC (DX 209 at 44-45) (I 196 / A 01254) ***(first produced by ASPCA on 8-11-08)***.

- A November 5, 2003 email ***sent by Meyer, using her MGC email account*** to ASPCA, AWI and FFA soliciting funds to be provided to Rider through WAP (DX 65) ***(first produced by WAP on 6-30-06)***.

- An IRS Form 1099 for calendar year 2001, sent to Rider by MGC (DX 55) ***(first produced by Rider on 9-24-07)***, reporting nearly $9,000.00 in "non-employee compensation" directly from MGC. *Cf.* DX 16 at 12 ("I have not received any such compensation.").

- Federal Express Airbills from MGC to Rider, dated 2003-2004, that were used to send payments to Rider (DX 58A at 84-97) ***(first produced by MGC on 2-8-08).*** **Several** of those Federal Express Airbills were sent by ***Meyer herself***. *See* DX 58A at 84, 86-88 & 90.

In sum, on June 9, 2004, the only evidence available to FEI was that Rider had, at some point in time, received episodic reimbursements from animal advocacy groups, including ASPCA and AWI, for "traveling expenses" associated with media work and/or engagements. But there was no evidence of any current funding by MGC or the ESA Action organizational plaintiffs, legitimate or otherwise. Indeed, Rider had publicly stated – two times – that he was only receiving funding from a private individual in California, and he was not receiving money or a "paycheck" from any animal groups. MGC Ex. M & MGC Ex. U. Further, Rider's employment relationship with former plaintiff PAWS was completely muddled. *Compare* Ex.

12, Payment Documents Produced on 6-9-04 (TR 00001) *with* DX 16 at 5-6 (work at PAWS not listed as one of Rider's jobs or volunteer positions). All of these facts contradicted Rider's sworn denial under oath of any compensation from animal advocates or any animal advocacy organization for services rendered (DX 16 at 12), and the complete absence in the ESA Action organizational plaintiffs' interrogatory responses of any reference to payments to or for Rider (**FOF 57**). There was no evidence available to FEI by June 9, 2004 that would have put it on notice of any illegal conduct by any of the ESA Action plaintiffs, ***let alone MGC***. To the contrary, the ESA Action plaintiffs' initial discovery responses, which were all overseen and signed by Meyer, were affirmative acts of concealment.

## III. SPRING AND SUMMER 2005: THE ESA ACTION ORGANIZATIONAL PLAINTIFFS CONTINUE TO CONCEAL THE PAYMENTS AT THEIR RULE 30(B)(6) DEPOSITIONS, WHICH WERE DEFENDED BY MGC

The deception and lies continued at all three of the Rule 30(b)(6) depositions of the ESA Action organizational plaintiffs, which took place between May – July 2005. The Motion tries to brush aside the false statements made by FFA and AWI at deposition, *see* Mot. at 21 n.11, but those lies, under oath, amounted to further obstructions of justice. "FFA and AWI did not disclose their payments to Mr. Rider through MGC and WAP even when specifically asked about Mr. Rider's funding at their depositions taken pursuant to Federal Rule of Civil Procedure 30(b)(6)." **FOF 57**. Both depositions were defended by MGC attorneys (Ex. 23, AWI Dep. Excerpts (Ockene) & Ex. 24, FFA Dep. Excerpts (Meyer)), both of whom, ***by the time of the deposition testimony***, had themselves sent WAP payments to Rider using MGC's resources. DX 58A at 89 (Ockene) & *id.* at 78-79, 81, 84, 86-88 & 90 (Meyer). *See also* **FOF 42**.

Specifically, AWI testified that it was "not aware" whether it was "sharing" Rider's "expenses" with "other organizations," Ex. 23, AWI Dep. Excerpts at 138-46, even though, by that point in time, AWI had (1) received seventeen (17) pages of MGC invoices for payments to

Rider, some of which were designated as "shared expenses" to be split by ASPCA, AWI, and FFA (DX 61 at 16-33) and (2) made five (5) "donations" to WAP for Rider totaling $10,500.00 (DX 49). FFA testified that it paid Rider on only one occasion in connection with a press conference in Denver, Ex. 24, FFA Dep. Excerpts at 157-59, even though, by that point in time (1) FFA had received twenty-three (23) pages of MGC invoices for payments to Rider (DX 61 at 34-57) and (2) HSUS had made two (2) "donations" to WAP for Rider, that were internally marked as being for "Fund," *i.e.*, FFA, litigation. DX 49; Ex. 22, HSUS Disbursement Request Forms. The egregiousness of FFA's testimony is underscored by the fact that Meyer defended the deposition, and certainly was aware that FFA had made numerous payments to Rider through her own law firm and to an organization which she "controlled," No. 03-2006, ECF 620 at 10.[6] *See also* **<u>FEI OBJECTION</u>** to ¶ 8.

Nor was ASPCA's Rule 30(b)(6) deposition the model of candor that MGC claims. ASPCA testified that it made payments to or for Rider directly, through MGC and WAP, but it falsely testified about the nature, purpose and extent of the payments it made to Rider – and specifically the payments it made to Rider through MGC. ASPCA repeatedly testified that the money was to "reimburse" Rider for "expenses" incurred with a traveling media campaign, Ex. 25, ASPCA Dep. Excerpts at 34-36, 45-47 & 228-29, which was not true. **<u>FOF 1, 44, 49-50, 53, 59</u>**. *See also* **<u>FEI OBJECTION</u>** to ¶ 46. Further, ASPCA falsely testified that a payment it made to MGC was for "copies and dissemination" of a report concerning FEI and ***further testified that the money was not "compensation" provided to Rider***. Ex. 25, ASPCA Dep. Excerpts at 41-42 (testimony regarding MGC Ex. AA (A 00894)). But, the money was classified as "compensation" on tax forms, DX 54-56, and in its Court ordered interrogatory responses,

[6] AWI and FFA underscored the falsity of their 2005 deposition testimony when they attempted qualifying explanations of their testimony in their Court ordered (No. 03-2006, ECF 178) interrogatory responses in 2007. DX 19 at 13 n.1 & DX 20R at 13 n.1.

ASPCA admitted that ***all*** of the money it provided to Rider through MGC, including the funds associated with this specific check request, were for Rider's living expenses. None of it was for "copies" of a report as ASPCA testified. DX 18R at 21-24. *See also* **FEI OBJECTION** to ¶ 39. Further, ASPCA falsely testified that it had made only one payment to MGC that included funds that were intended to go to Rider. Ex. 25, ASPCA Dep. Excerpts at 48-49. But, by the time of ASPCA's testimony, it had received fifteen (15) pages of MGC invoices for payments to Rider. DX 61 at 1-15. *See also* **FEI OBJECTION** to ¶ 51. And, while ASPCA testified that it made a "grant" to WAP that was intended for Rider (a fact not disclosed in its initial interrogatory responses, **FOF 57**), its testimony did not disclose that this payment did not go to WAP but actually was deposited into an "account towards Tom Rider expenses" maintained by MGC and reflected on an MGC invoice. DX 209 at 44 (I 196 / A 01254). *See also* **FEI OBJECTION** to ¶ 46. The Motion does not cite to ***any*** of this testimony.

ASPCA testified that it "believed" that AWI and FFA had provided funding to Rider, but that it did not know whether Rider was currently receiving money from any of the other plaintiffs or whether any of the funding had been provided through WAP. Ex. 25, ASPCA Dep. Excerpts at 80-81 & 210. Further, the lawyer representing ASPCA, defendant herein, Kimberly Ockene, specifically blocked any questioning as to discussions among the plaintiffs about funding to Rider on the basis of ***attorney-client privilege***. *Id.* at 80. This effectively concealed MGC's involvement in those discussions. *Id.* at 80. *See also* **FEI OBJECTION** to ¶ 53.

Moreover, the July 2005 fundraiser invitation, and ASPCA's testimony about it, did not provide FEI with any evidence that ***MGC*** was engaged in illegal conduct. If anything, the fundraiser invitation and ASPCA's testimony about it were additional acts of concealment. The invitation (DX 62) states the event was being held to "raise money so we can successfully wage

this battle on behalf of the elephants," but ASPCA testified that the money was being raised to "support Tom Rider in his outreach to the public and the media." Ex. 25, ASPCA Dep. Excerpts at 205. Neither the invitation nor ASPCA's testimony indicated that the funds actually were being used to pay for Rider's participation and testimony in the lawsuit. *Cf.* **FOF 1, 39, 53, 59**. Further, neither the invitation, nor ASPCA's testimony, made reference to the fact that the monies raised were funneled ***by AWI to WAP to Rider, and subsequently labeled as "grants."*** **FOF 39**. WAP's role in distributing the fundraising proceeds to Rider did not become known to FEI until well after February 16, 2006. Ex. 4, Production Dates of Rider Payment Trial Exhibits (WAP deposit ledger (DX 50) for funds received from 10-3-05 to 3-26-07 ***produced by WAP on 3-30-07***). And, as is further discussed *infra*, knowledge of WAP's role in the fraud is not synonymous with knowledge of MGC's role in the fraud. Indeed, the invitation stated that a "question and answer session" would be led by counsel (DX 62); but, that is not any indication that MGC sat at the center of an extensive, ongoing illegal witness payment, donor fraud and cover-up schemes directly through their law firm and indirectly through a sham 501(c)(3) organization that they "controlled." **FEI OBJECTION** to ¶ 58; No. 03-2006, ECF 620 at 10.

## IV. SEPTEMBER 2005: MEYER MISLEADS THE COURT AND FEI

The lies continued. On September 16, 2005, ***Meyer*** misled the Court and FEI about the Rider payments when making the following statement:

> And what we have on the other side, Your Honor, we have Tom Rider, a plaintiff in this case, ***he's going around the country*** in ***his own van***, he gets ***grant money*** from s***ome of the clients*** and ***some other organizations*** to ***speak out*** and say what really happened when he worked there.

MGC Ex. II at 29-30 (emphases added).

Meyer's statement omitted critical facts which subsequently were found by the Court in its 12-30-09 Opinion, ***including that her law firm had made payments to Rider***: (1) Rider was

not "going around the country." **FOF 49**. *See also* No. 03-2006, ECF 620 at 10. (2) It was Rider's "own van" in name only. WAP, through Meyer, provided Rider the money to purchase the van. **FOF 43**. (3) The "money" received by Rider," which by then was more than $70,000.00, was his sole source of income. **FOF 21**. (4) The "money" was actually systematic and regular payments of the same dollar amount. **FOF 41**. (5) Rider was not paying taxes on the "money." **FOF 58**. (6) The "money" was not provided by only "some of the clients"; it was provided by each and every one of the past and present ESA Action organizational plaintiffs. **FOF 48**. (7) The "other organizations" paying Rider included counsel's law firm, MGC, and WAP, an organization "controlled" by them. **FOF 35** & **FOF 37**. *See also* No. 03-2006, ECF 620 at 9-10. Meyer herself sent some of the payments to Rider using MGC's resources. DX58A at 78-79, 81, 84, 86-88 & 90. (8) Rider's "media work", *i.e.*, "speak[ing] out" about the treatment of FEI's elephants, was "episodic and non-continuous" and was not related to the amount of "money" he received. **FOF 44** & **FOF 50**. *See also* No. 03-2006, ECF 620 at 10. (9) The payments were "directly linked to the litigation." **FOF 51.** As set forth in detail in FEI's Responses and Objections, the documents and testimony relied upon by the Court when making the findings of fact referenced *supra* were first produced to FEI after February 16, 2006. The information relied upon by the Court was not available to FEI at the time of Ms. Meyer's statement. Meyer, however, was privy to all of it. *See* **FEI OBJECTION** to ¶ 8.

## V. 2005-2008: WAP'S INITIAL PRODUCTION, OVERSEEN BY GLITZENSTEIN, CONTINUES THE CONCEALMENT AND WAP BLOCKS DISCOVERY ON THE BASIS THAT IT IS SEPARATE FROM MGC

### *A. WAP's September 2005 Partial Production Was Deliberately Edited by Glitzenstein to Conceal the Nature, Extent and Amount of the Payments, and MGC's Involvement in the Payments in their "Counsel" Capacities*

On September 29, 2005, WAP, through ***Glitzenstein***, made a partial production of documents in response to a third-party subpoena issued by FEI. *See* Ex. 14, WAP 9-29-05

Production; Ex. 6, WAP Production Letters (9-29-05). WAP produced heavily redacted versions of certain documents and other documents ***(more than 270 pages)*** were withheld in their entirety, purportedly on "First Amendment" grounds, due to the "need" for an "appropriate protective order," and because they were "duplicative" of other documents. *See* Ex. 6, WAP Production Letters (9-29-05); Ex. 15, WAP 9-29-05 Privilege Log. The objections were entirely without merit. The end result of the redaction and withholding of documents ***(done at the direction of Glitzenstein)***, was that the nature, extent and amount of the payments to Rider were concealed from FEI. Indeed, WAP's partial production was not designated by WAP as exclusively consisting of Rider payment information. Instead, Glitzenstein described the production as a "comprehensive compilation of receipts and disbursements relating in any fashion to elephants, Tom Rider, Ringling Brothers or the lawsuit." Ex. 6, WAP Production Letters (9-29-05). That nebulous language deliberately hid the fact that virtually all of WAP's money was going to one person: Rider.

After FEI warned that it would file a motion to compel, WAP made a subsequent production on June 30, 2006, and completely abandoned its "First Amendment," "protective order" and "duplicative" document objections. WAP's complete abandonment of its prior objections demonstrates that WAP (Glitzenstein) knew that the objections were patently frivolous to begin with, and would not withstand the motion to compel that FEI indicated it would file. Indeed, a comparison of WAP's productions shows that the initial September 2005 production was deliberately edited by Glitzenstein – the objections were not made by Glitzenstein to protect any real First Amendment or privacy interests.

For example, on September 29, 2005, WAP produced a ledger of "disbursements" that redacted the following fields: name, memo, account, class and amount. *See* Ex. 17, Comparison

of WAP to Rider Ledgers (DX 49). The redacted version of the WAP to Rider ledger produced on September 29, 2005 did not indicate to whom WAP was making payments, nor did it indicate the amount of those payments or what they were for. S*ee id.* WAP dropped its "First Amendment" claim and produced an unredacted version of the WAP to Rider ledger on June 30, 2006. *Id.* The unredacted ledger for the first time showed that nearly all of WAP's disbursements were for Rider[7]; Rider received systematic, regular payments of the same amount; ***and WAP had paid Rider more than $70,000.00***. *Id.* WAP's September 29, 2005 production also hid the amount and characterization of the payments to Rider by entirely withholding the IRS tax forms that WAP, by that point in time, had issued to him. But, on June 30, 2006, WAP produced (without a protective order) the IRS Form 1099's it issued to Rider for calendar years 2002-2004, which reported the amounts of the money paid to him (previously also hidden by the redactions to DX 49), ***and classified the money as "compensation."*** DX 54. *Cf.* DX 16 at 12 (6-9-04) ("I have not received any such compensation.") & 13 (response signed by Meyer; Glitzenstein included on signature block)[8].

WAP's September 29, 2005 production also included redacted copies of cover letters from Glitzenstein (in his capacity as WAP's "President") to Rider, enclosing WAP's grant

---

[7] MGC's argument that the version of the WAP deposit ledger (DX 50) (Ex. 18 hereto) produced on September 29, 2005 showed that the "grants" and "donations" made by the ESA Action organizational plaintiffs to WAP were "specifically for Mr. Rider's efforts," Mot. at 27, is contrary to the record. As discussed *supra,* WAP's production letter stated that the deposit ledger was not limited to only Rider. Ex. 6, WAP Production Letters (09-29-05) (producing a "comprehensive compilation of receipts and disbursements relating in any fashion to elephants, Tom Rider, Ringling Brothers or the lawsuit"). Further, at deposition, ASPCA testified that the money it provided to WAP may have been used for purposes other than funding Rider. Ex. 25, ASPCA Dep. Excerpts at 228-29 ("It may have gone towards whatever salary she got working on behalf of the project."). *See also* **FEI OBJECTION** to ¶ 46. And, at trial, both FFA/HSUS and AWI testified that they were not certain whether their donations to WAP were used for purposes other than paying Rider. 3-10-09 p.m. at 49-52 (Markarian); 3-11-09 a.m. at 17 (Liss). *See also* **FOF 38.** Moreover, at the time WAP made its September 29, 2005 production, all of the ESA Action organizational plaintiffs had failed to disclose any payments ***to Rider*** in their June 2004 interrogatory responses, and Rider had stated that he had received no such compensation. *See* **FEI OBJECTION** to ¶ 34.

Further, the Motion entirely ignores that the version of the WAP deposit ledger produced on September 29, 2005 redacted the identity of HSUS, which, by that point in time, had merged with ESA Action plaintiff FFA, made several payments to WAP. Ex. 18, Comparison of WAP Deposit Ledgers (DX 50).

[8] At the same time, Rider, through MGC, was withholding the exact same tax information for "privacy" reasons, all of which the Court later overruled.

checks to Rider (MGC Ex. XX). *See* Ex. 19, Comparison of WAP Grant Letters (DX 53); Ex. 15, WAP 9-29-05 Privilege Log at 31-32. The cover letters produced on September 29, 2005 redacted the purpose of the "grants," *i.e.*, that the "grants" were for "media" work in particular cities, on "First Amendment" grounds. Ex. 19, Comparison of WAP Grant Letters (DX 53). The unredacted cover letters were produced by WAP on June 30, 2006. WAP's September 29, 2005 production likewise included a redacted copy of a grant letter from Meyer (again in her "WAP" capacity, *see infra*) to Rider (DX 37) (MGC Ex. XX), which did not disclose the amount ($5500.00) and purpose of the grant (to purchase a van to purportedly follow FEI's circus), again due to the alleged need for an "appropriate protective order." Ex. 15, WAP 9-29-05 Privilege Log at 32. WAP produced an unredacted copy of the van grant letter on June 30, 2006, with no protective order. Ex. 20, Comparison of WAP Van Grant Letter (DX 37).

Further, WAP's September 29, 2005 production withheld Rider's receipts in their entirety, based on the purported "protective order" objection. Ex. 15, WAP Privilege Log at 33. *See also* MGC Ex. LL at 1 ("WAP has withheld (subject to an appropriate protective order) receipts received by WAP for Tom Rider's expenses regarding his public education and media work."). But WAP abandoned that objection and produced Rider's receipts on June 30, 2006, without any protective order. DX 52. Rider's receipts were critical because they showed that there was no correlation between the amount of "grant" money Rider received and his expenses, and that the "grant" money actually funded Rider's lifestyle, including entertainment expenses such as DVDs. *See* **FOF 43-44**.

Most importantly, by withholding the production of documents on September 29, 2005, WAP (through Glitzenstein) specifically concealed MGCs' involvement in the payments to Rider, ***in its role as counsel of record***. For example, WAP's September 29, 2005 production

withheld in its entirety a November 5, 2003 email ***from Meyer, using her MGC email account (katherinemeyer@meyerglitz.com),*** to ASPCA, AWI and FFA soliciting funds to be donated to WAP and then provided to Rider (DX 65). Ex. 15, WAP 9-29-05 Privilege Log at 33. This email was first produced – by WAP – on June 30, 2006, even though all three organizational plaintiffs had received it. Ex. 4, Production Dates of Rider Payment Trial Exhibits. WAP's September 2005 privilege log's description of this document was misleading. It was described only as a ***one page*** email from Meyer to ***Weisberg***, that was withheld because it included a "[d]escription of WAP strategy for funding media and public education efforts." Ex. 15, WAP 9-29-05 Privilege Log at 33. In reality, it was ***page two of out a three page email string (pages one and three still, to this day, have not been produced)***, that included an email from Meyer to ***all of the ESA Action organizational plaintiffs,*** not just Weisberg as the privilege log indicated. DX 65. There is no apparent reason why this email (which notes that Meyer is impressed with Rider's "total commitment to the lawsuit" and asks the organizations to make donations to WAP for Rider) could arguably have given rise to a First Amendment claim, or divulged any type of confidential media "strategy." WAP's attempt to hide MGC's role in the payments was not limited to the November 2003 email. The redacted version of the WAP to Rider ledger (DX 49), produced on September 29, 2005, did not disclose that ***MGC*** made a payment to Rider that was reimbursed by WAP. Ex. 17, Comparison of WAP to Rider Ledger (DX 49) (2-14-02 entry: "Reimburse money paid to Tom Rider"). The check evidencing this payment was first produced on July 20, 2006. Ex. 6, WAP Production Letters (7-20-06); Ex. 21, WAP Check to MGC. *See also* **FEI OBJECTION** to ¶¶ 8 & 62. The Motion completely ignores the existence (and production dates) of these documents.

To the extent that the documents produced on September 29, 2005 indicated the MGC

defendants' involvement in the Rider payments, it was ***on the basis of their roles at WAP***. For example, WAP produced a "grant" letter from AWI to Meyer, but it was addressed to Meyer at ***WAP***, not at MGC. MGC Ex. NN. Likewise, WAP produced a letter from Meyer to AWI soliciting funds to be donated ***to WAP***, that was printed on ***WAP letterhead.*** MGC Ex. TT. *See also* MGC Ex. UU (solicitation from Glitzenstein, ***on WAP letterhead***, to non-party donor). Further, WAP produced "thank you" letters, ***on WAP letterhead***, signed by Glitzenstein, as ***President of WAP***. MGC Ex. PP. Similarly, all of the correspondence between Meyer, Glitzenstein and Rider produced in September 2005 referenced Meyer and Glitzenstein in their WAP, and not counsel, capacities. *See* MGC Ex. WW (Rider letter to Glitzenstein, ***President of WAP***); MGC Ex. XX (Meyer letter to Rider, ***on WAP letterhead***; Glitzenstein letters to Rider, as ***President of WAP*** and on ***WAP letterhead***).

### *B. WAP's Website Did Not Indicate That It Was a Sham*

WAP's website, relied upon heavily in the Motion as purported notice of "WAP's relationship to Ms. Meyer and Mr. Glitzenstein," Mot. at 27-31, did not indicate that the MGC defendants, ***in their role as counsel***, were engaged in illegal conduct. It furthered the façade that WAP and MGC were entirely separate, and that WAP was a legitimate 501(c)(3) organization. WAP's website advertised the organization as an IRS 501(c)(3) non-profit organization, capable of accepting tax-deductible contributions, that was engaged in a number of "current activities," including protection of manatees, Florida panthers, Delmarva fox squirrels, ocelots and wild horses, as well as endangered Asian elephants. No. 03-2006, ECF 167-18. Nothing on WAP's website indicated that MGC and WAP had commingled funds and failed to observe corporate formalities. *Cf.* DX 65 (email from Meyer's MGC account soliciting funds to be donated to WAP); Ex. 21, WAP Check to MGC (WAP check reimbursing MGC for funds provided to Rider); DX 209 at 44 (I 196 / A 01254) (MGC invoice to ASPCA

for funds purportedly provided to Rider by WAP). Nor did anything on WAP's website indicate that it existed primarily as a filter for illegal witness payments to Rider. *Compare* DX 54 at 4 (2005 IRS Form 1099 issued to Rider by WAP, reporting ***$33,600.00*** in "nonemployee compensation") ***(produced by WAP on 6-30-06)*** *with* Ex. 30, WAP 2005 IRS Form 990 (reporting ***$31,893.00*** in revenue, expenses and changes in net assets or fund balances).[9]

### *C. WAP Blocked the Production of Documents and Testimony on the Basis that the Organizations were Separate Corporate Entities*

Moreover, later in the litigation of the ESA Action, WAP expressly denied that it and MGC were one and the same. *See, e.g.*, No. 03-2006, ECF 130 at 3 n.2 ("Although WAP was founded by Mr. Glitzenstein and Ms. Meyer to expand their efforts (beyond litigation) to conserve wildlife and alleviate the suffering of animals, the fact is that the organization is not, and never has been, the 'alter ego' of the public-interest law firm Meyer, Glitzenstein & Crystal."). WAP protested that ***"[t]he organizations are separate corporate entities"*** and that "the vast majority of cases on which [MGC] works have nothing to do with WAP, and there are WAP projects that have nothing to do with the firm's docket." *Id* (emphasis added). *See also* No. 03-2006, ECF 234 at 4-5 ("While some of the organization's public education campaigns have been conducted in coordination with the public-interest litigation pursued by plaintiffs' law firm, other projects have no relationship to the firm's pending cases.").

WAP refused to make discovery on the basis that it was completely separate from MGC.

9 It is ironic that MGC now attempts to rely on WAP's website as "notice" of "WAP's relationship to Ms. Meyer and Mr. Glitzenstein." Mot. 27. After FEI cited WAP's website in its motion to compel WAP's compliance with its document subpoena, filed in September 2006 (No. 03-2006, ECF 85), WAP inexplicably took the website down and altered it. *See* No. 03-2006, ECF 167-19 at 1 (WAP's website less than one month after FEI's Motion to Compel) & *id.* at 9-76 (WAP's revised website). The altered website indicated that WAP's board of directors had expanded to include two individuals who were not affiliated with MGC (Patti Thompson and D.J. Schubert). *Compare* No. 03-2006, ECF 167-18 at 7 *with* No. 03-2006, ECF 167-19 at 17. Later, WAP conveniently claimed that its revised website demonstrated that MGC and WAP were separate organizations, stating that the "organization's Board includes additional individuals who have no involvement in the firm." No. 03-2006, ECF 234 at 4 (citing website).

*See, e.g.*, No. 03-2006, ECF 169-19 at 14-15 (noting that a request for production "appear[s] to be asking for documents of Meyer Glitzenstein & Crystal, rather than WAP"). As WAP's Rule 30(b)(6) witness, Filed Under Seal

**VI. 2006-2007: RIDER REVEALS THE PAYMENTS ARE HIS SOLE SOURCE OF INCOME, AND MEYER MISLEADS FEI AND THE COURT CONCERNING THE PAYMENTS THROUGH MGC**

Meanwhile, approximately six (6) months after WAP's June 30, 2006 production, the ESA Action plaintiffs noticed the deposition of their own co-plaintiff, Rider, on October 12, 2006, and more details concerning the illegal witness payments emerged. Rider testified that the "grant" money was his only source of income, and that he was not paying taxes on any of it. Ex. 26, Rider Dep. Excerpts (10-06) at 125-27, 135-36 & 209-10. *See also* **FOF 21 & 58**.

Further, following WAP's June 30, 2006 production, which demonstrated that all of the June 2004 discovery responses were false, FEI began a meet and confer process with the ESA Action plaintiffs. During the course of the meet and confer, and in the subsequent filings with

the Court, ***Meyer*** repeatedly made false and misleading statements about the payments to Rider ***through her own law firm***. The Motion entirely omits reference to these statements, and pretends as though they never happened. Specifically, in correspondence, Meyer falsely stated that: ***"plaintiffs have no 'non-privileged portions of the invoices from [our] law firm that reflect monies filtered through it for payments to Mr. Rider."*** No. 03-2006, ECF 127-7 at 6 & 10 (signed by Meyer). This statement was affirmatively false. By this point in time, ASPCA, AWI and FFA collectively had received twenty-two (22) MGC invoices for payments to Rider. DX 61. Moreover, ASPCA had received an invoice from MGC reflecting payments to Rider through WAP. *Compare* DX 209 at 44 (I 196 / A 01254) *with* DX 49. MGC's deception continued in correspondence and Court filings falsely stating that the ESA Action plaintiffs had been "extremely forthcoming" and had disclosed all of the funding they provided ***"directly to Mr. Rider and to the Wildlife Advocacy Project."***[10] MGC's artfully worded advocacy knowingly, and purposefully, omitted the numerous payments that had been made to Rider

---

[10] *See, e.g.*, No. 03-2006, ECF 127-11 at 3 ("[P]laintiffs have always been ***extremely forthcoming*** about the fact that they were providing funding for this purpose, and the amount of funding they have provided ***directly to Mr. Rider and to the Wildlife Advocacy Project*** for this purpose – i.e., they have answered all of the discovery requests and provided deposition testimony on this matter, and have provided defendants with all documents that reflect this information.") (emphases added) & 4 (signed by Meyer); No. 03-2006, ECF 127-5 at 8-9 ("[A]ll of the plaintiff organizations have been ***extremely forthcoming*** about funds that they have contributed ***to either Tom Rider or the Wildlife Advocacy Project*** for media … . Accordingly, to the extent that defendants are complaining they have been denied such information, this is simply not true.") (emphases added) & 11 ("[A]ll of the plaintiff organizations have been ***extremely forthcoming*** about the funds that they have contributed ***to either Tom Rider or the Wildlife Advocacy Project***[.]") (emphases added) & 12 (signed by Meyer); No. 03-2006, ECF 132 at 15 ("[P]laintiffs have been ***extremely forthcoming*** with this Court about the fact that they are providing grants ***either to the Wildlife Advocacy Project ("WAP") or to Mr. Rider directly*** to allow him to travel around the country to educate the public about the elephants' condition … . [T]he plaintiff organizations have answered every question posed to them about how they have contributed to ***WAP and/or Mr. Rider's media and public education efforts***, … .") (emphases added); No. 03-2006, ECF 138 at 15 ("[P]laintiffs have freely admitted that Mr. Rider is funded by the organizational plaintiffs and other animal advocates, and indeed have provided many pages of documents reflecting this fact. That should be enough for defendants' asserted purposes … ."); No. 03-2006, ECF 141-1 at 3 n.1 ("The other plaintiffs have also already identified all of the funding ***that they have provided to Mr. Rider***.") & 4 ("[T]he only financial information that has ever been outstanding with respect to defendants' discovery is any information concerning funding or other 'items' Mr. Rider may have received from any additional groups or individuals[.]") (emphasis added) & 14 (signed by Meyer); No. 03-2006, ECF 156 at 4-5 ("[D]efendants already have the only information to which they are arguably entitled concerning the funding issue – i.e., the actual amounts of funding that the groups have donated for Mr. Rider's media and educational campaign … ***[T]here is no information remaining to compel on this matter that would not simply duplicate information already provided*** … .") (emphasis added). These statements were all false. *See* Part VII, *infra*.

through the law firm. In 2006 and 2007, when sending correspondence and making Court filings on the payments, MGC was not just trying to hide the illegal witness payments that had been made by the organizations – ***it also was engaged in an affirmative attempt to hide that its own fingerprints were all over the payments*** – a fact that was not yet known to FEI or the Court.

## VII. THE TRUE NATURE AND EXTENT OF THE PAYMENTS, AND MGC'S INVOLVEMENT IN THEM, BECOMES KNOWN AFTER THE COURT'S AUGUST 23, 2007 ORDER

After the Court entered its August 23, 2007 discovery order (No. 03-2006, ECF 178), the "true nature and extent of the payments the organizational plaintiffs had made to Mr. Rider directly ***or through MGC*** or WAP was [] fully disclosed … ." **FOF 57** (emphasis added). *See also* No. 03-2006, ECF 620 at 11 ("The organizational plaintiffs also concealed the payments from FEI, in whole or in part, by providing misleading or incomplete information to FEI until after the Court granted FEI's motion to compel complete information about payments to Rider in the summer of 2007."). The Court ordered productions were stunning. Rider disclosed that the payments to him totaled more than ***$165,000.00***. DX 16 at 25-29 (9-24-07); DX 48A. The organizations and Rider also first disclosed that extensive payments had been made to him through MGC, during ***2001-2003*** (DX 61), even though counsel previously had stated that such documents did not exist and/or were privileged. Further, Rider produced IRS documents issued by PAWS and MGC, for calendar years ***2000-2001***, that classified the "grant" money as "compensation" or wages," even though these documents also were requested (but not produced) in ***2004***. DX 55-57. In total, despite the untrue claims of being "extremely forthcoming," the ESA Action plaintiffs and WAP produced 44 revised interrogatory answers; 6 declarations; and nearly 1,000 pages of additional documents. *See* **FEI OBJECTION** to ¶ 34.

## ARGUMENT

Summary judgment is inappropriate because there are genuine issues of material fact as to whether FEI's RICO claims against the MGC are barred by limitations. Summary judgment may be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether a genuine issue of fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692, (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). "[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

Alternatively, summary judgment is inappropriate at this stage of the litigation because FEI should be entitled to take discovery concerning the relationship between MGC and WAP. *See* Ex. 1. "Ordinarily, summary judgment is 'proper only after the plaintiff has been given adequate time for discovery.'" *ASPCA v. Ringling Bros.*, 502 F. Supp. 2d 103, 106 (D.D.C. 2007) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)). "[D]ecision by summary judgment is disfavored when additional development of facts might illuminate the issues of law requiring decisions." *Nixon v. Freeman*, 670 F.2d 346, 362 (D.C. Cir. 1982). "Insufficient time or opportunity to engage in discovery is sufficient cause to defer decision on a summary judgment motion." *ASPCA*, 502 F. Supp. 2d at 106 (*citing Khan v.*

*Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005)). Accordingly, pursuant to Fed. R. Civ. P. 56(d), the nonmoving party may indicate that it has not had adequate discovery to be able to respond to the motion. *See Dickens v. Whole Foods Mkt. Group, Inc.*, 2003 U.S. Dist. LEXIS 11791, at *7 n.5 ("The purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery.").

## I. FEI'S RICO CLAIM AGAINST MGC IS NOT BARRED BY THE STATUTE OF LIMITATIONS

A four (4) year statute of limitations applies to civil RICO claims. *Rotella v. Wood*, 528 U.S. 549, 552 (2000); *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 273 (D.D.C. 2007), *aff'd*, 543 F.3d 725 (D.C. Cir. 2008). This Court's July 9, 2012 Memorandum Opinion, which is the law of this case, held that the statute of limitations for a civil claim under the RICO statute "begins to run from the date of discovery of the injury." ECF 90 at 23. The Court further held that under the discovery rule, "'a cause of action accrues when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) ***some*** evidence of wrongdoing.'" *Id.* (citing *Chalabi*, 503 F. Supp. 2d at 274).

Here, the ***undisputed*** facts show that FEI filed its claim against MGC well within four (4) years after it learned that ***these defendants*** had caused FEI injury. FEI amended its complaint and added MGC on ***February 16, 2010***. ECF 25. FEI did not have any knowledge that it (1) had an injury (2) caused by MGC prior to ***February 16, 2006***. Here, knowledge of the injury is not simply knowledge of being sued or knowledge of being sued by an untruthful plaintiff. Instead it is knowledge that the existence of the case could be the product of racketeering. That is why mere knowledge of facially lawful payments and other facially lawful conduct is

insufficient. FEI could not have gained such knowledge through reasonable diligence. If anything, the facts show that FEI zealously pursued material about the payments but its attempts were thwarted by the RICO defendants at every turn, with MGC at the helm of every obstructionist maneuver protecting itself. Nothing cited in the Motion or in the Statement of Material Facts is to the contrary.

But, to the extent there are any questions as to whether the statute of limitations was triggered before February 16, 2006, they are questions of fact that must be resolved by the jury. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1484 (D.C. Cir. 1989) (emphasis added) ("[W]hat a plaintiff knew and when he knew it, in the context of a statute of limitations defense, are questions of fact for the jury."); *Byers v. Burleson*, 713 F.2d 856, 861-62 (D.C. Cir. 1983) ("Summary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury. … [A]pplication of the discovery rule invariably involves questions of knowledge and judgment, questions that should not generally be decided as a matter of law if there is any doubt as to the inferences to be drawn from the underlying facts."); ECF 90 at 22 ("statute of limitations issues often depend on contested questions of fact") (quotation omitted).

### ***A. The Payment Evidence Cited in the Motion is Duplicative of the Evidence Already Rejected by the Court's Motion to Dismiss Opinion***

The Motion should be denied for the same reasons that MGC's motion to dismiss was denied. The Court already has held that the following evidence was insufficient to trigger the statute of limitations: (1) Rider was employed by PAWS as a security guard in 2000; (2) ASPCA paid Rider's traveling expenses to testify before various state legislatures (MGC Ex. I / PWC 197); (3) ASPCA, AWI and FFA agreed to pay Rider's expenses for a two (2) month

period (MGC Ex. W); (4) Meyer made a statement in open court on September 16, 2005 which indicated that Rider was receiving "grants" from "some of the clients"; and (5) FEI stated in the FAC that it "did not begin to uncover the payment scheme [to Rider] until the Rule 30(b)(6) deposition of ASPCA." ECF 90 at 23-25 (rejecting defendants' statute of limitations argument). *See also* ECF 54-1 at 25-30 (motion to dismiss referencing this evidence) & ECF 73 at 42-50 (same).

The Motion cites to nothing new that would now entitle MGC to summary judgment. MGC argues that the motion to dismiss presented "only a fraction of the undisputed evidence on which they are relying" in the present summary judgment Motion, Mot. at 6; but, in reality, the present Motion heavily relies on the same evidence that was rejected in the Court's motion to dismiss opinion. *See, e.g.*, Mot. at 13 ("FEI indisputably knew in 2000 that Mr. Rider was working with the Performing Animal Welfare Society"); *id.* at 15-16 (citing MGC Ex. I / PWC 197); *id.* at 17 (citing MGC Ex. W); *id.* at 24-25 (citing FEI's allegation that it did not begin to uncover the payment scheme until ASPCA's Rule 30(b)(6) deposition); *id.* at 25-26 (citing Meyer's 9-16-05 statement in open Court).

Further, the purported "additional evidence" is no different than the insufficient motion to dismiss evidence. MGC cites additional documents which indicate that Rider was "working" with animal activist groups, including PAWS. *See* Mot. at 13. *Cf. supra* at 3. The Motion also cites additional evidence that Rider was receiving intermittent reimbursement of travel expenses by the ***ESA Action organizational plaintiffs***. *See* Mot. at 17-31. *Cf. supra* at 3-25. The Court already has found evidence indicating the very same thing was insufficient to trigger the statute of limitations. ECF 90 at 24. And, in any event, none of this evidence concerning the ***organizations*** put FEI on notice of ***MGC's*** involvement in the illegal conduct, which is

necessary to trigger the statute as to them. *See Hobson v. Wilson*, 737 F.2d 1, 36 (D.C. Cir. 1984).

The result is no different with regard to the minimal new evidence cited by the Motion none of which could have put a reasonable person on notice, as a matter of law, that MGC was a co-conspirator in the Rider payment scheme:

- Two (2) check requests for payments to MGC by ASPCA, for approximately $600.00 ($445.00 of which was in connection with Rider's testimony at a Massachusetts legislative hearing), and a zoom camera valued at $400.00 (MGC Exs. Y & Z).

- ASPCA's false testimony that (1) it made one payment to MGC that included funds that were intended to go to Rider (the same $445.00 check request for Rider's travel to a Massachusetts legislative hearing) (MGC Ex. Z); and (2) it made a payment to MGC for copies and dissemination of an enforcement reported related to FEI that did not include any "compensation" to be provided to Rider. (None of this testimony was cited in the Motion.)

- WAP's limited, and heavily redacted, September 29, 2005 production which concealed the nature, extent, purpose and amount of its payments to Rider, and MGC's involvement in those payments as counsel of record. (The Motion completely ignores that WAP's September 29, 2005 production was highly edited.)

The Court's motion to dismiss opinion dictates that ***none*** of the above information triggered the statute of limitations. Like the evidence rejected by the Court with respect to the organizational plaintiffs' payments to Rider (*see* ECF 90 at 24), the above evidence reflected only an intermittent reimbursement of expenses, which is in certain circumstances is permitted. 18 U.S.C. § 201(d); D.C. RULE OF PROF'L CONDUCT 1.8(d)(2). Indeed, the ESA Action plaintiffs and ***Glitzenstein*** have advanced this argument in other briefing. *See* No. 03-2006, ECF 599 at 33

(ESA Action plaintiffs arguing that Rule 1.8(d)(2) authorized them to pay Rider's living expenses) & ECF 599-30 (Glitzenstein Decl.) ¶ 28 ("[E]ven if plaintiffs' counsel had been providing Mr. Rider with funds for his basic living expenses so that he could maintain his participation in the lawsuit, that would have been consistent with the D.C. Rules of Professional Conduct[.]"). So, according to Glitzenstein, it was ethical for him to do it, but FEI was supposed to have concluded, at the same time, that it was illegal and the grist of a racketeering claim.

***None*** of the documents and testimony available to FEI prior to February 16, 2006 indicated that (1) Rider was receiving a regular, fixed amount of money (DX 49, produced by WAP on 6-30-06); (2) Rider's expenses had no correlation to the amounts received by him (DX 52, produced by WAP on 6-30-06); and (3) Rider was not actually traveling (DX 58A, produced by MGC on 2-8-08). Nor did any of the evidence available to FEI indicate that the ***law firm*** had made payments to Rider that were not reimbursements for specific travel expenses (DX 61, produced on 9-24-07 & 9-26-07; DX 209 at 44, ***produced on 8-11-08***), or that the lawyers, in their capacity as counsel, were involved in WAP's payments to Rider (DX 65, ***produced by WAP on 6-30-06***; Ex. 21, WAP Check to Rider, produced by WAP on ***7-20-06***). *See* Ex. 4, Production Dates of Rider Payment Trial Exhibits. Indeed, the critical MGC 1099 showing that the law firm directly paid Rider nearly $9,000.00 in "compensation" in 2001 (DX 55) did not surface until September 2007 after the order compelling production. To the extent that there are any questions as to whether the evidence produced before February 16, 2006 triggered the statute of limitations as to MGC, those questions are for a jury resolve at trial and cannot be decided as a matter of law. *See Riddell*, 866 F.2d at 1484.

### ***B. Evidence Concerning Rider's Credibility is Irrelevant to Whether FEI Had Inquiry Notice of an Injury Caused by MGC's Racketeering Conduct***

In addition to payment evidence, the Motion also cites evidence concerning the

credibility of Rider's allegations of aesthetic and emotional injury, ***but none of this evidence is relevant to whether FEI had inquiry notice of its injury or racketeering claims against MGC***. *See* **FEI OBJECTION** to ¶¶ 18-22. For example, whether FEI knew that Rider's "2000 account of his experiences when he worked at FEI were true," Mot. at 8; the fact that FEI "knew the circumstances under which Mr. Rider left FEI's employment and went to Europe with Daniel Raffo," *id*. at 10; and the fact that FEI knew that Rider never complained to management about elephant mistreatment, *id.,* all went to Rider's ***credibility*** – which was an issue for the finder of fact to determine at trial. No. 03-2006, ECF 620 at 35 ("Rider's standing hinged on his credibility, which only a trial could resolve."). None of the issues concerning Rider's credibility, in tandem with the fact that Rider was receiving intermittent reimbursement of expenses for a travelling media campaign, put FEI on inquiry notice of its injury or racketeering claims against MGC, as counsel of record, for bribery and illegal gratuity payments, obstruction of justice, money laundering and mail and wire fraud. Whether Rider was a biased witness due to his affiliation and/or sympathies with animal activists, and whether his allegations of aesthetic and emotional injury were credible, are not synonymous with whether he was a "hired" plaintiff with a "motive to falsify." No. 03-2006, ECF 620 at 3.[11]

## II. MGC FRAUDULENTLY CONCEALED ITS INVOLVEMENT IN THE RACKETEERING CONDUCT

### *A. For Federal Claims, Fraudulent Concealment Requires Actual Notice of the Particular Cause of Action and the Persons Responsible for the Injury*

Even if the statute of limitations barred FEI's RICO claims against MGC as a matter of law (*i.e.*, as a matter of law, FEI was on inquiry notice that MGC caused it injury before

[11] Moreover, whether Rider was paid to lie has no bearing on whether the RICO defendants violated the illegal gratuity statute. *United States v. Valdes*, 475 F.3d 1319, 1322 (D.C. Cir. 2007) ("Unlike most of § 201's anti-bribery provisions, the anti-gratuity provision has no requirement that the payment actually 'influence[] … the performance' of an official act."). The Sixth Circuit has held that even the sale of truthful testimony in a civil case can support an conviction under the illegal gratuity statute. *See United States v. Blaszak*, 349 F.3d 881 (6th Cir. 2003).

February 16, 2006), questions of material fact exist as to whether the statute was tolled by the doctrine of fraudulent concealment. Fraudulent concealment is an equitable tolling principle "read into every federal statute of limitations." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). Fraudulent concealment arises either when the wrongs upon which a defendant has been sued are (1) self-concealing by nature (*i.e.*, frauds) or (2) when the defendant has engaged in "some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action." *Hobson*, 737 F.2d at 34-35. *See also Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("Generally, fraudulent concealment requires that the defendant make an affirmative misrepresentation tending to prevent discovery of the wrongdoing."). With regard to the latter type of case, ***"the deception may be as simple as a single lie … ."*** *Hobson*, 737 F.2d at 34-35 (emphasis added). *See also Riddell*, 866 F.2d at 1491 (discussing *Hobson*).

Fraudulent concealment requires a two-part inquiry. The first question is whether the plaintiff had ***actual notice of "the particular cause of action at issue,*** not just any cause of action." *Hobson*, 737 F.2d at 35. More than inquiry notice, *i.e.*, "hints, suspicions, hunches or rumors," is required. *Id.* at 35. *See also Firestone*, 76 F.3d at 1209-10 ("Once a plaintiff shows fraudulent concealment, a defendant wishing to assert ***'a defense based on the plaintiff's lack of due diligence must show something closer to actual notice than the merest inquiry notice*** that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment.'") (quoting *Riddell*, 866 F.2d at 1491) (emphasis added). The second question is whether the plaintiff had awareness of the persons responsible for the injury: ***"[S]imply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant***." *Hobson*, 737 F.2d at 36. *See also id.* ("We therefore must

probe a plaintiff's knowledge to determine whether he was on notice of all possible defendants, and not just a subgroup, as well as the particular cause of action."). Then, "if the jury finds fraudulent concealment, defendants will have the burden, if the statute is not tolled, of proving that plaintiff 'could have discovered … the cause of action if he had exercised due diligence.'" *Hobson*, 737 F.3d at 35 (quoting *Richards*, 662 F. 2d at 71).[12]

The Motion repeatedly cites to *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692 (D.C. Cir. 2009), but *Nader* addressed the standard for fraudulent concealment under ***District of Columbia local law***, not federal law. *Id.* at 700. In *Nader*, the Circuit, looking to the holding of the D.C. Court of Appeals in *Diamond v. Davis*, 680 A.2d 364 (D.C. 1996), held that an inquiry notice standard, as opposed to actual notice standard, governed statute of limitations claims under District of Columbia law even where fraud was alleged. *See* 567 F.3d at 700 (discussing *Diamond*). *Diamond's* decision is, as the Circuit noted in *Nader*, at odds with *Riddell* and other authorities applying an actual notice federal standard in the context of fraudulent concealment. *See id*. In *Nader*, the Circuit did not, however, hold that *Hobson*, *Riddell* and *Firestone* are no longer good law. Indeed, courts in this district, in decisions issued post-*Diamond*, have continued to apply an actual notice standard to ***federal claims*** involving fraudulent concealment. *See, e.g., Pena v. A. Anderson Scott Mortg. Group., Inc.*, 692 F. Supp. 2d 102, 109 (D.D.C. 2010) (Huvelle, J.); *Molecular Diagnostics Labs v. Hoffman-La Roche, Inc.*, 402 F. Supp. 2d

---

[12] As stated in *Riddell*, 866 F.2d at 1490, the questions for the Court are:

> (1) whether a jury could reasonably find that plaintiff never had sufficient knowledge of the facts to set the statutes of limitations for his respective causes of action running the first instance; if it could not so find, (2) whether it could reasonably conclude that those statutes of limitations were tolled, either from the outset or at some subsequent point, by affirmative acts of fraudulent concealment by the defendants; and, if the jury could reasonably conclude that the statutes were so tolled, (3) whether the jury would nonetheless be compelled to conclude that defendants met their burden of showing that plaintiff was on notice of his claims under the standard for notice that is applicable once fraudulent concealment is shown.

276, 283-84 (D.D.C. 2005) (Kennedy, J.). *Nader* is not controlling with regarding to FEI's federal RICO claim. The Motion incorrectly assumes *Nader* should apply.

***B. At a Minimum, There Are Questions of Material Fact as to Whether the Statute of Limitations was Tolled by Defendants' Fraudulent Concealment***

At a minimum, there are questions of material fact as to (1) whether the doctrine of fraudulent concealment tolled the statute of limitations, and, if so (2) when FEI had actual notice of its racketeering injury and claims against MGC. *See Riddell*, 886 F.2d at 1484 ("[T]he determination of whether a defendant has committed an act of concealment, where it turns on questions of fact, is a matter for the jury."); *Am. Fed. of Teachers v. Bullock*, 539 F. Supp. 2d 161, 167 (D.D.C. 2008) (Sullivan, J.) (whether defendants "engaged in fraudulent concealment, and when the plaintiffs discovered or should have discovered the embezzlement scheme … is a highly fact-intensive inquiry that must be made by the fact-finder"), *vacated on other grounds*, 605 F. Supp. 2d 251 (D.D.C. 2009). Indeed, FEI pleaded fraudulent concealment with respect to MGC in the First Amendment Complaint (ECF 25, ¶ 81), but the Motion does not specifically address this allegation.

The illegal conduct (*i.e.*, a conspiracy to engage in illegal witness payments, mail and wire fraud, obstruction of justice and money laundering), was, by definition fraudulent and self-concealing, meaning that the statute should be tolled on this basis alone. *See Hobson*, 737 F.2d at 34-35. *Cf.* No. 03-2006, ECF 620 at 10 ("The funds paid to Rider appeared to be paid in such a way as to avoid ready detection.").

But, beyond the self-concealing nature of the conduct, there were an ***astounding*** number "affirmative misrepresentations" concerning the payments. The false and misleading statements about the payments to Rider, and MGC's involvement in them, number at least ***twenty (20):*** (1) Rider's "false" June 2004 interrogatory response. (2)-(4) The ESA Action organizational

plaintiffs' initial discovery responses, which "concealed" the payments in whole or in part three separate times. (5) AWI's false testimony that it was "not aware" whether it was "sharing" Rider's "expenses" with "other organizations." (6) FFA's false testimony that it paid Rider on only one occasion. (7) ASPCA's false testimony that the payments were to "reimburse" Rider for "expenses" incurred with a traveling media campaign. (8) ASPCA's false testimony that a payment to MGC was for "copies and dissemination" of a report concerning FEI, and the payment was not for "compensation" provided to Rider, when, in reality, the payment was for Rider's participation and testimony in the ESA Action. (9) ASPCA's false testimony that it made only one payment to MGC that included funds that were intended to go to Rider. (10) Meyer's false and misleading statement to the Court on September 16, 2005 that Rider was "going around the country in his own van" and received "grant money" from "some of the clients and some other organizations to speak out." (11) Meyer's false statement, in correspondence, that there were no non-privileged portions of invoices reflecting monies paid to Rider. (12)-(20) MGC's nine (9) separate false representations in correspondence and briefings that all of the funds provided directly to Rider and WAP were produced, which omitted any reference to payments to Rider through the law firm.

Even though the record contains at least twenty (20) false or misleading statements concerning the payments, only ***one*** is necessary to toll the statute until FEI was on "***actual notice***" of the ***racketeering conduct and injury*** caused by ***MGC***. *Firestone*, 76 F.3d at 1209; *Hobson*, 737 F.2d at 34-35. The instant Motion can be denied based on the ESA Action plaintiffs' June 2004 interrogatory responses alone. The Court already has found that Rider's response was "affirmatively false," and the organizations' responses "concealed" the payments. **FOF 55-57**; No. 03-2006, ECF 620 at 10-11. In particular, the Court found that ***"plaintiffs'***

***counsel"*** sought to ***"conceal the nature, extent and purpose of the payments from FEI during the litigation."*** No. 03-2006, ECF 620 at 8 (emphases added). Indeed, Rider was specifically asked to disclose any compensation he had received from any animal advocate or animal advocacy organization for services rendered, ***and that request encompassed payments from MGC***. *See* **FOF 55** (MGC is, and was at the time, an animal advocate or animal advocacy organization). But Rider, ***assisted by Meyer***, answered that he had not received any such compensation. *Id.* FEI was entitled to rely on Rider's false response (as well as the organizations' responses, which also were overseen by Meyer and failed to disclose the same payments). *See In re Amtrak "Sunset Limited" Train Crash*, 136 F. Supp. 2d 1251, 1260 (S.D. Ala. 2001), *aff'd*, 29 Fed. Appx. 575 (11th Cir. 2001) (A "party is entitled to rely on an opposing party's written responses to interrogatory questions. … defendants are not to be penalized for accepting as true [plaintiff's] answer to the interrogatories – answers which were made under oath and were plainly responsive."). *See also Dotson v. Bravo*, 202 F.R.D. 559, 567 (N.D. Ill. 2001) ("Knowingly incomplete and misleading answers to written interrogatories constitutes perjury, as well as, fraud."), *aff'd*, 321 F.3d 663 (7th Cir. 2003)). The June 2004 false and misleading responses tolled the statute of limitations. There is no evidence in the record that would have, ***as a matter of law***, put FEI on ***"actual notice"*** of its RICO injury and claims, ***with respect to MGC***, prior to February 16, 2006.

MGC's due diligence argument, Mot. at 34, gets them nowhere. This argument grossly distorts the record of the ESA Action, and, if anything, raises another issue of fact to be determined by a jury (*i.e.*, whether FEI "'could have discovered … the cause of action if [it] had exercised due diligence'"). *Hobson*, 737 F.3d at 35. FEI was not required to assumed that it was "dealing with thieves." *Richards v. Milewski*, 662 F.2d 65, 71 (D.C. Cir. 1981). As discussed

previously, the Court already has held that the payment information was requested by FEI, but it was inappropriately withheld by the ESA Action plaintiffs. *See* No. 03-2006, ECF 178. Moreover, Rider's request for a protective order, Mot. at 34-37, does not mitigate his "affirmatively false" interrogatory response. This issue has been considered and rejected ***three times*** already. Meyer and the law firm cannot escape that they were both ***sanctioned*** for assisting Rider in making his "affirmatively false" response, and that the Court considered and rejected this same protective order argument when doing so. *See* No. 03-2006, ECF 599-2 (Meyer Decl.), ¶¶ 77-76 ("[B]ecause at the same time we offered to provide FEI with all of the funding information under a confidentiality agreement … it was my professional judgment that we acted appropriately by responding to the Interrogatory this way.").

## III. THE MOTION TREATS WAP AND MGC AS ONE AND THE SAME, BUT FEI SHOULD BE AFFORDED DISCOVERY REGARDING THEIR RELATIONSHIP

The Motion repeatedly presumes that knowledge of WAP's involvement in the payments equals knowledge of MGC's involvement in the payments. *See, e.g.*, Mot. at 9, 19, 21-22, 26-31. However, this argument only works if, in fact, WAP is a sham with no existence separate from MGC, so that everything that WAP does is an act by MGC. MGC nowhere makes this assertion. To the contrary, as discussed previously, in the ESA Action, WAP thwarted FEI's discovery of material from MGC on the basis that the organizations were separate and that their "WAP" and "counsel" capacities were distinct. Indeed, WAP and MGC have asserted ***in this very case*** that the organizations are separate. In their Answers, both WAP and MGC denied FEI's allegations that WAP is the alter ego of MGC and that Meyer and Glitzenstein completely dominate WAP's operations. *Compare* FAC ¶ 43 *with* ECF 97 ¶ 43 *and* ECF 98 ¶ 43. The duplicity is transparent: MGC cannot be heard to contend that WAP is totally separate for purposes of avoiding discovery and RICO liability and then to contend that there is no

separation because it purportedly helps MGC's current limitations argument.

MGC cannot have it both ways. Either WAP is a sham or it isn't. If WAP is a sham, as the Motion apparently now contends, then there is no limitations issue. FEI sued MGC on time because: WAP (MGC simply by another name) was named as a defendant in the original complaint filed on August 28, 2007 (ECF 1), and MGC has been on notice since then that its conduct is at issue. *See Krupski v. Costa Crociere*, 560 U.S. 538, 130 S. Ct. 2485, 2490 (2010) ("relation back under ***Rule 15(1)(C) depends on what the party to be added knew or should have known***, not on the amending party's knowledge or timeliness in seeking to amend the pleading") (emphasis added). In *Krupski*, the Supreme Court expressly rejected the ***exact*** same argument that MGC is advancing now, reasoning that "repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity." *Compare id.* (***rejecting*** argument that the "key issue" was "whether the plaintiff made a deliberate choice to sue one party over another") *with* Mot. at 30 ("FEI obviously made a *strategic decision to exclude the MGC Defendants* when FEI first filed its RICO case … .").

If the organizations are not one and the same, then the actions by one do not necessarily put the injured party on notice that the other one is involved. FEI should be afforded the opportunity to take discovery into the relationship between MGC and WAP. *See* Ex. 1 Rule 56(d) Decl. It cannot be determined as a matter of law on the current record that, based on the evidence available prior to February 16, 2006, no reasonable juror could have concluded that WAP was separate from MGC. Absent the establishment of that critical fact, the current limitations argument totally fails.

## IV. MGC IS PRECLUDED FROM RE-LITIGATING THE ESA ACTION

The Motion makes clear that MGC apparently intends to re-litigate the ESA Action,

including the findings concerning the purpose of the Rider payments and his "false" interrogatory response. But the Court's 12-30-09 Opinion (No. 03-2006, ECF 559) and 3-29-13 Opinion (No. 03-2006, ECF 620) in the ESA Action are preclusive in this case, against ***all*** of the defendants. Those opinions conclusively decided that the payments were for Rider's participation and testimony in the ESA Action, that Rider's standing allegations were knowingly false when made, and that the ESA Action plaintiffs concealed the Rider payments from FEI, including through an "affirmatively false" statement under oath by Rider. While MGC may disagree with the Court's findings, that disagreement is irrelevant as to whether it is bound by them. *Consol. Edison v. Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006) ("[A] court conducting an issue preclusion analysis does not review the merits of the determinations in the earlier action."); *McLaughlin v. Bradlee*, 803 F.2d 1197, 1204 (D.C. Cir. 1986) ("The earlier decisions remain dispositive on this issue regardless of whether they were right."). As Exhibit _ hereto shows, when the prior findings of the 12-30-09 and 3-29-13 decisions are applied here, MGC's statute of limitations argument fails. At a minimum, the findings surrounding the sanctions imposed on Meyer and MGC in the ESA Action, to which they are indisputably bound, are sufficient, standing alone, to constitute the "single lie" sufficient to at least create a jury issue on fraudulent concealment which, in turn, defeats the entire Motion.

A "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction … cannot be disputed in a subsequent suit between the same parties or their privies … ." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48-49 (1897). "Issue preclusion … bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quotation omitted).

Issue preclusion can bind non-parties to the prior litigation. *See Taylor*, 553 U.S. at 892-95. The general rule is that "a litigant is not bound by a judgment to which she was not a party." *Id.* at 898. That is because nonparties generally will not have "had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Id.* at 892. But "the rule against nonparty preclusion is subject to exception." *Id.* at 893. ***"A nonparty who has in fact enjoyed a full and fair litigation has no more claim than a party to enjoy a second chance."*** WRIGHT, MILLER & COOPER § 4451 (emphasis added).

Collateral estoppel may be applied where the following three requirements are met: (1) "the same issue now being raised … [was] contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue … [was] actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case [does] not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). All three requirements are satisfied here.

***A. 12-30-09 Opinion***

The issues decided in the ESA Action directly bear on FEI's present RICO claims – a point which the RICO defendants themselves previously have conceded.[13] The issues were contested, submitted for judicial determination and decided. Thus, the first two elements of

---

13 Indeed, in a brief signed by Crystal and MGC's current counsel, the RICO defendants successfully argued that this case should be stayed, claiming that the disposition of the ESA Action would "have a significant – and ***likely dispositive*** – impact" on the claims to be litigated in the RICO Action. The original RICO defendants, through their counsel, Mr. Crystal (defendant herein), repeated this argument throughout their motion to stay the RICO case. *See* ECF 5 at 3 ("The testimony that the Court will hear in the ESA Action, particularly from Tom Rider, will shed significant light on whether FEI should be permitted to pursue its allegations that the ASPCA Plaintiff and WAP have 'bribed' Mr. Rider … ."); *id.* ("[A]llowing the ESA Action to go to trial before this action proceeds will greatly simplify and elucidate any claims that may remain in the Second RICO Suit."); *id.* at 16 ("Since Tom Rider will be a witness in the ESA Action, and the Second RICO Suit centrally concerns Mr. Rider's credibility (i.e., is he participating because he cares about the way the elephants are mistreated and seeks to alleviate their suffering, or because he is a 'bribed' witness?"), the Court will be in a far better position to assess the sufficiency of FEI's allegations in the Second RICO Suit once the ESA Action is completed."); *id.* at 17 ("[I]f the Court concludes that Mr. Rider's testimony is credible (and, indeed, is corroborated by the other testimony and evidence), that that will raise serious questions as to whether FEI has sufficiently pled a claim under RICO.").

*Yamaha* are satisfied. The only issue to be decided is whether MGC, who was not a party to the ESA Action, is bound by the Court's judgment. It is. MGC (1) was in privity with the ESA Action plaintiffs and (2) assumed control over the litigation insofar as it concerned the Rider payments. Both exceptions make the judgment preclusive against MGC. MGC sat at the center of the payment scheme, and controlled the litigation of it: Meyer suggested that the ESA Action plaintiffs pay Mr. Rider through MGC and WAP; MGC directly participated in, and facilitated, the cover-up of the payments; and, throughout all phases of the ESA Action litigation, MGC controlled the legal theories and proofs advanced. ***MGC had its day in court and should be barred from re-litigating issues already decided.***

1. MGC was in Privity with the ESA Action Plaintiffs

Substantive legal relationships justifying preclusion are collectively referred to as "privity." *Taylor*, 553 U.S. at 894 n.8. "The term 'privity' signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon the others, although those others were not party to the lawsuit." *Gill & Duffus Svs., Inc. v. A.M. Nural Islam*, 675 F.2d 404, 405 (D.C. Cir. 1982). To establish privity, "the parties to the first suit [must] somehow [be] accountable to nonparties" in the subsequent suit. *Pelt v. Utah*, 539 F.3d 1271, 1290 (10th Cir. 2008). Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor. *Taylor*, 533 U.S. at 894.

The attorney-client relationship may give rise to privity.[14] *See* 47 AM. JUR. 2D JUDGMENTS § 617. Some courts have held that the attorney-client relationship, in itself,

[14] Some courts mix the concepts of privity, control and agency. *See, e.g., McGrath v. Everest Nat'l Ins. Co.*, 668 F. Supp. 2d 1085, 1115 (N.D. Ind. 2010) (Indiana law); *Crooked Creek Properties, Inc. v. Ensley*, 2009 U.S. Dist. LEXIS 100907, at *61-64 (M.D. Ala. Oct. 28, 2009) (Alabama law).

establishes privity.[15] Other courts have adopted a more restrictive approach and hold that an attorney's interests must be closely identified with those of his client in the prior litigation in order for privity to be established. *Weinberger v. Tucker*, 510 F.3d 486, 492-93 (4th Cir. 2007) (federal law and Virginia law) (privity where the attorney's interests were "so identified" with client that client "effectively represented" attorney's legal rights in prior litigation); *Riley v. Giguiere*, 631 F. Supp. 2d 1295, 1306-08 (E.D. Cal. 2009) (California law) (privity where attorney and client shared an "inextricable unity of interests" in prior litigation).

Even if *Weinberger and Riley's* heightened standard applies here, that standard is undoubtedly met. MGC, like the attorney in *Weinberger*, had an "undeniable interest" in the litigation of the ESA Action. There, the Fourth Circuit held that the attorney and client were privies ***because the attorney had a personal interest in the outcome of a motion to disqualify, which implicated his own professional conduct.*** 510 F.3d at 493. Similarly, in *Riley*, at issue was whether the attorney filed a false proof of service in a prior unlawful detainer action. 631 F. Supp. 2d at 1304. The district court emphasized that, in litigating the service issue in the prior case, the attorney ***"was not a mere conduit for her client's arguments or otherwise disinterested in the outcome of the motion to set aside the default judgment,"*** because the "central issue … was the propriety of [the attorney's] ***own conduct*** in effecting service." *Id.* at 1308 (emphases added). Like *Weinberger* and *Riley*, MGC was litigating its own conduct (*i.e.*, its own payments to Rider, through the law firm) in the ESA Action. MGC was not merely a "conduit" for the ESA Action plaintiffs' arguments about the payments. Indeed, this is not a typical case where counsel of record is advocating for a legal or factual interpretation of her client's conduct: ***as a***

[15] *See Verhagen v. Arroyo*, 552 So. 2d 1162, 1164 (Fla. Ct. App. 1989) (Florida law); *cf. Plotner v. AT&T Corp.*, 224 F.3d 1161, 1169 (10th Cir. 2000); *Zahran v. Frankenmuth Mut. Ins. Co.*, 1997 U.S. App. LEXIS 8879, at *9 (7th Cir. 1997); *Henry v. Farmer City Bank*, 808 F.2d 1228, 1235 n.6 (7th Cir. 1986) (Illinois law); *Render v. Hall*, 2012 U.S. Dist. LEXIS 13358, at *19 (S.D. Ohio Feb. 3, 2012); *Vacanti v. Apothaker & Assocs., P.C.*, 2010 U.S. Dist. LEXIS 120109, at *11-14 (E.D. Pa. Nov. 12, 2010).

***payor of Rider, MGC made arguments concerning Rider's credibility and the legitimacy of the payments on its own behalf.*** MGC was in privity with the ESA Action plaintiffs and is bound by the 12-30-09 Opinion.

2. <u>MGC "Controlled" Litigation of the ESA Action</u>

MGCs "controlled" the proofs and arguments advanced. *See Taylor*, 553 U.S. at 895 ("Because such a person has had the opportunity to present proofs and argument, he already had his day in court even though he was not a formal party to the litigation."). "One who prosecutes or defends a suit in the name of another ***to establish or protect his own right***, or who assists in the prosecution or defense of an action ***in aid of some interest of his own*** is as much bound as he would be if he had been party to the record." *Montana v. United States*, 440 U.S. 147, 154 (1979) (emphasis added). Courts have applied the "control" exception to counsel of record in a prior case. *See, e.g., Phelps v. Hamilton*, 122 F.3d 1309 (10th Cir. 1997); *Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997). MGC had "the power … to call the shots." *Gonzalez v. Banco Central Corp.*, 27 F.3d 751, 758 (1st Cir. 1994). It used that "power" to "aid" an "interest" of its own – the arguments to be advanced concerning the legitimacy of the payments. The "control" exception also precludes MGC from re-litigating the 12-30-09 Opinion.

***B. 3-29-13 Opinion***

MGC is directly bound by the Court's 3-29-13 Opinion. Separate and apart from FEI's request for fees against the ESA Action plaintiffs, FEI sought sanctions against MGC pursuant to 28 U.S.C. § 1927. *See* No. 03-2006, ECF 593. MGC independently, under their own signature block and as counsel for the law firm and themselves individually, signed the Opposition to FEI's Motion. No. 03-2006, ECF 599 at 54. MGC lawyers submitted declarations attempting to justify their conduct as counsel of record. They were, in effect, if not in fact, parties to the ESA Action for purposes of the § 1927 sanctions claim. Thus, there is no

unfairness in precluding MGC from re-litigating the issues decided by the 3-29-13 Opinion. *See Otherson v. Dep't of Justice*, 711 F.2d 267, 277 (D.C. Cir. 1983). MGC cannot re-litigate that Rider's interrogatory response was "affirmatively false," and that their conduct associated with that response was sanctionable.

## CONCLUSION

For all of the reasons stated above, the Motion should be denied.

Dated: November 22, 2013

Respectfully submitted,

/s/ John M. Simpson

John M. Simpson (D.C. Bar #256412)
jsimpson@fulbright.com
Michelle C. Pardo (D.C. Bar #456004)
mpardo@fulbright.com
Kara L. Petteway (D.C. Bar #975541)
kpetteway@fulbright.com
Rebecca E. Bazan (D.C. Bar #994246)
rbazan@fulbright.com

FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2623
Telephone: (202) 662-0200

*Counsel for Plaintiff and Counterclaim Defendant Feld Entertainment, Inc.*